IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;                    )
TINA GROSSMAN as next friend of                )
BRITTANY BARKES; TINA                          )
GROSSMAN as next friend of                     )
ALEXANDRA BARKES; and                          )
KAREN BARKES as administratrix                 )
of the ESTATE OF CHRISTOPHER                   )
BARKES,                                        )          C. A. No. 06-104-JJF
                                               )
          Plaintiffs,                          )
                                               )
v.                                             )
                                               )
FIRST CORRECTIONAL MEDICAL                     )
INC.; STANLEY TAYLOR;                          )
RAPHAEL WILLIAMS;                              )
CERTAIN UNKNOWN INDIVIDUAL                     )
EMPLOYEES OF STATE OF                          )
DELAWARE DEPARTMENT OF                         )
CORRECTION; CERTAIN                            )
UNKNOWN INDIVIDUAL                             )
EMPLOYEES OF FIRST                             )
CORRECTIONAL MEDICAL, INC.,                    )
and STATE OF DELAWARE,                         )
DEPARTMENT OF CORRECTION,                      )
                                               )
          Defendants.                          )


## OPENING BRIEF IN SUPPORT OF
## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


DEPARTMENT OF JUSTICE
STATE OF DELAWARE

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED: October 15, 2007          Attorney for State Defendants

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS.................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ........................................1

SUMMARY OF ARGUMENT .........................................................................3

STATEMENT OF FACTS ................................................................................6

    1.  Christopher Barkes' background ..........................................................6

    2.  Barkes' VOP arrest and medical intake screening at HRYCI............................7

    3.  Barkes uneventful overnight incarceration at HRYCI and sudden suicide on November 14, 2004.................................................................9

ARGUMENT....................................................................................................12

I.    SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE DEFENDANTS AS TO COUNTS I, III, AND IV, AS PLAINTIFFS HAVE ADDUCED NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT THEIR ALLEGATIONS OF EIGHTH AMENDMENT OR STATE LAW VIOLATIONS IN CONNECTION WITH THE 2004 SUICIDE OF CHRISTOPHER BARKES ...........................................................................12

    A.  Standard of Review.........................................................................12

    B.  There is no evidence in the record to support Plaintiffs' allegations in Count I that State Defendants, Stanley Taylor and Raphael Williams, exhibited deliberate indifference to a serious medical need of Christopher Barkes during his brief incarceration at HRYCI. Barkes did not exhibit any behavior which should have put Defendants or any DOC employee on notice that he was a suicide risk at that time ...............................................................................13

        1.  The Legal Standard: "Deliberate Indifference"......................................13

        2.  Defendants, Commissioner Taylor and Warden Williams, had no personal involvement in the events alleged, and there can be no liability against Taylor and Williams on a theory of Respondeat Superior ...................17

        3.  The record is void of any evidence that any person was "deliberately indifferent" to Mr. Barkes' medical needs, nor any evidence that his suicide was foreseeable........................................................................19

C.  There is no legal basis or evidence of record to support Plaintiffs' allegations in Count III that State Defendants, Stanley Taylor and Raphael Williams are subject to any liability on a "failure to train" or "maintenance of wrongful practices and policies" theory in connection with the incarceration of Christopher Barkes at HRYCI ...................................................................................................21

    1.  Plaintiffs have produced no evidence whatsoever of any wrongful training, practice or policy pertinent to the claims at issue..................21

    2.  The "failure to train/wrongful practices and policies" theories of liability Plaintiffs assert in Count III are theories of municipal liability which cannot be maintained against State officials, as a matter of law, by virtue of the Eleventh Amendment ................................................24

D.  There is no legal basis or evidence of record to support Plaintiff's claim in Count IV, under Delaware state law, for "wrongful death" under 10 Del.C. §3724 ..26

II.  SUMMARY JUDGMENT MUST BE GRANTED AS TO THE STATE OF DELAWARE AND DEFENDANTS TAYLOR AND WILLIAMS IN THEIR OFFICIAL CAPACITIES, AS THEY ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT.............................................................27

A.  Standard of Review......................................................................28

B.  Eleventh Amendment Immunity..................................................28

CONCLUSION........................................................................................30

UNREPORTED OPINIONS

Brathwaite v. Carroll, 2006 WL 839385 (D.Del. 2006)

Littlejohn v. City of Philadelphia, 1993 WL 79600 (E.D.Pa. 1993)

Saunders v. Sullivan, 608 A.2d 730, 1992 WL 53423 (Del. 1992)

## TABLE OF CITATIONS

**Case Name**                                                                 **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ......................................12

Bequeath v. L.B. Foster Co., 367 F.Supp.2d 779 (W.D. Pa. 2005) ....................................13

Bonenberger v. Plymouth Township, 132 F.3d 20 (3d Cir. 1997)......................................26

Borough of West Mifflin v. Lancaster, 45 F.3d 780 (3d Cir. 1995) ..................................26

Brathwaite v. Carroll, 2006 WL 839385 (D.Del. 2006) ......................................17

Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004) ..........................25

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................12

City of Canton v. Harris, 489 U.S. 378 (1989) ......................................22, 25

Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991)......................................15

Duphily v. Del. Elec. Co-op, 662 A.2d 821 (Del. 1995) ......................................27

Edelman v. Jordan, 415 U.S. 651 (1974)......................................28

Estelle v. Gamble, 429 U.S. 97 (1976) ......................................14, 15, 20

Farmer v. Brennan, 511 U.S. 825 (1994)......................................15, 20

Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir. 1988)......................................20, 23

Littlejohn v. City of Philadelphia, 1993 WL 79600 (E.D.Pa. 1993)......................................21

Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990) ......................................13

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)24, 25

Neeley v. Samis, 183 F.Supp. 2d 672 (D.Del. 2002)......................................28

Polk County v. Dodson, 454 U.S. 312 (1981) ......................................18

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) ......................................17, 18

Saunders v. Sullivan, 608 A.2d 730, 1992 WL 53423 (Del. 1992)......................................27

Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996)..................................................28

United Mine Workers v. Gibbs, 383 U.S. 715 (1966) ......................................................26

Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) .......................................26, 29

Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005)............................... *passim*

**Statutes, Rules and Other Authorities**

United States Constitution, Eighth Amendment........................................................ *passim*

United States Constitution, Eleventh Amendment .................................................... *passim*

United States Constitution, Fourteenth Amendment ..................................................15, 29

28 U.S.C. §1367(c)(3)....................................................................................................26

42 U.S.C. §1983............................................................................................... *passim*

10 Del. C. §3722(a)....................................................................................................4, 27

10 Del. C. §3724 ...........................................................................................................26

10 Del.C. §4001 ...........................................................................................................27

10 Del.C. §4001(3) .......................................................................................................27

Federal Rule of Civil Procedure 12(b)(6) ......................................................................20

Federal Rule of Civil Procedure 56(c) ......................................................................12, 13

Federal Rule of Civil Procedure 56(e) ...........................................................................13

Federal Rule of Evidence 702 .......................................................................................23

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs, the widow and minor children of decedent, Christopher Barkes, filed the Complaint in this matter on February 16, 2006, against State of Delaware Defendants: (1) Stanley Taylor, Commissioner of Department of Correction (DOC) (now retired); (2) Raphael Williams, Warden of Howard R. Young Correctional Institution (HRYCI) and (3) State of Delaware Department of Correction. Plaintiffs also listed as defendants "Certain unknown individual employees of State of Delaware Department of Correction." Plaintiff never identified or served any of these "unknown employees." The last day to amend pleadings was January 31, 2007 (D.I. 17, A-59 - 62), and the statute of limitations on claims arising from Barkes' November 14, 2004 suicide expired almost one year ago.

Plaintiffs also sued First Correctional Medical, Inc. (FCM), the former contracted medical provider to DOC, and "certain unknown individual employees of First Correctional Medical, Inc." As with the "unknown" State Defendants, the "unknown" FCM medical defendants were never named. Finally, State Defendants filed a cross-claim against FCM based upon a contractual indemnification provision.

Decedent, Christopher Barkes, committed suicide in his cell at HRYCI on November 14, 2004, while being held for less than 24 hours on a violation of probation charge. Plaintiffs' claims against the named State Defendants are found in Counts I, III and IV of the Complaint. Plaintiff asserted an Eighth Amendment claim based on alleged deliberate indifference to serious medical needs [of Barkes]; an Eighth Amendment claim based on alleged failure to train/wrongful customs, practices and policies, and a State law wrongful death claim. (Complaint, D.I. 1) (A-32-41). Counts II and V are directed to FCM (medical) defendants only and, accordingly, are not addressed in this Motion. State Defendants

1

answered plaintiff's Complaint on April 7, 2006, denying all wrongdoing, and asserting numerous affirmative defenses. (D.I. 12) (A-42-53).

This Court's Scheduling Order, dated August 28, 2006 (A-000059-62), set August 31, 2007 as the date by which discovery must be completed. Plaintiffs and State Defendants each exchanged Initial Disclosures and written discovery. Plaintiffs failed to depose State Defendants, or any other person, during the discovery period of this case. State Defendants took the deposition of Plaintiff, Karen Barkes. Plaintiffs and State Defendants separately propounded written discovery to FCM[1], however FCM failed to respond to that discovery in any way, and has engaged in no discovery of its own since the inception of this case.

Defendants[2] have provided the parties with voluminous documentary evidence (Bates #D0001-D00525), including: Christopher Barkes entire institutional (including prior incarcerations) and medical file; all intake and medical documents from the 11/13/04-11/14/04 incarceration; incident reports, autopsy and morbidity and mortality reports pertaining to the suicide; HRYCI staffing reports from 11/13/04-11/14/04; DOC/HRYCI policies, including Suicide Prevention Policy (A-157-160) and training documents. Defendants have also provided the parties with approximately 300 pages of documents obtained by subpoena, primarily from Christopher and Karen Barkes' various medical providers.

This is State Defendants' Opening Brief in support of their Motion for Summary Judgment, pursuant to F.R.C.P. 56, which has been simultaneously filed with the Court. State Defendants are entitled to summary judgment for the reasons set forth herein.

---

1 See D.I. # 30,41-42.
2 Hereinafter, the term "Defendants" will refer to the moving State Defendants, unless otherwise specified.

## SUMMARY OF ARGUMENT

1.       Plaintiffs have produced no evidence in the record suggesting that State Defendants, Commissioner Stanley Taylor and Warden Raphael Williams, exhibited "deliberate indifference" to a serious medical need of decedent, Christopher Barkes, of which they were aware. In fact, neither defendant had any personal involvement whatsoever with Christopher Barkes' November 2004 incarceration and suicide. Supervisory defendants cannot be found liable on a respondeat superior theory. No correctional officers who actually dealt with Barkes have been named as defendants in this §1983 action. Moreover, the record in this case shows that no HRCYI employee could possibly have anticipated or prevented Christopher Barkes' sudden suicide on November 14, 2004, for which no warning signs were apparent. Certainly no evidence of deliberate indifference by any person exists on the record of this case. For the foregoing reasons there are no genuine issues of material fact and no basis upon which a reasonable fact-finder could find in Plaintiffs' favor on their Eighth Amendment claim for deliberate indifference to serious medical needs. State Defendants are entitled to judgment as a matter of law.

2.       Plaintiffs attempt to assert an Eighth Amendment claim against State Defendants, Commissioner Stanley Taylor and Warden Raphael Williams and the State of Delaware Department of Correction, based upon "failure to train" or the maintenance of wrongful practices and policies, resulting in Barkes' suicide. Plaintiffs have produced no evidence whatsoever in the record necessary to meet the elements of a "failure to train" claim. There is no evidence suggesting that the existing DOC training/policies were deficient in any way; Plaintiffs have not identified other specific training not provided that could reasonably have been expected to prevent the suicide that occurred; and there is no evidence that Defendants,

as policymakers (a fact also not established in the record) exhibited a "deliberate indifference" to whether detainees took their lives. Moreover, Plaintiffs' attempt to bring an Eighth Amendment claim, based upon failure to train, or policies/practices, against State Defendants is barred as a matter of law. The United States Supreme Court has held that these types of claims are asserted against the *governmental body itself.* Such claims against municipalities and other non-State governmental bodies may be brought in the federal courts. However, such claims may *not* be asserted against State governments or State policymakers in the District Court due to the State's immunity from suit under the Eleventh Amendment of the United States Constitution. For the foregoing reasons there are no genuine issues of material fact and no legal basis upon Plaintiffs' Eighth Amendment "failure to train" claim can be maintained against State Defendants. Accordingly, State Defendants are entitled to judgment as a matter of law.

        3.      Summary Judgment should be granted on Plaintiffs' state law "wrongful death" claim against State Defendants. The record contains no evidence upon which a reasonable fact finder could find liability for "wrongful death" under 10 <u>Del.C.</u> §3722(a), as State Defendants had no personal involvement with the events surrounding Christopher Barkes' suicide. Moreover, to circumvent Delaware's Tort Claim Immunity statute, Plaintiffs would have to prove that Defendants acted with "gross and wanton negligence." The Delaware Supreme Court has held that the "gross and wanton negligence" standard is equivalent to the "deliberate indifference" standard applied in a §1983 Eighth Amendment claim. On the record in this case, Plaintiffs cannot, as a matter of law, establish "deliberate indifference" on the part of the named Defendants. It follows, therefore, that they cannot meet the necessary burden of proof for their state law wrongful death claim. In any event, the

4

Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims to

the extent the Court grants summary judgment as to all original jurisdiction federal claims.

## STATEMENT OF FACTS

1.  **Christopher Barkes' background.**

Christopher Barkes, Plaintiffs' decedent, had a long history of problems with drug and alcohol abuse, dating back to his teenage years. (A-19). After a period of sobriety in his twenties, he began abusing prescription drugs again. (A-19). In 1997, while struggling with alcohol abuse, Mr. Barkes was the driver in an automobile accident which killed two people. (A-34; A-19-20). He pled guilty to two counts of vehicular homicide and was sentenced to two years in prison. (A-34; A-281-286).

After getting out of prison in 1999, Barkes, at some point, had a relapse into substance abuse. (A-20). He was sober from approximately two years before he got married to Plaintiff[3], Karen Barkes, in April 2003, and at various times during the marriage he had relapses into drug abuse and alcohol binges. (A-20). Barkes would get depressed when he would have relapses. (A-20). Karen Barkes testified that she had a sort of "sixth sense" about when Christopher Barkes had relapsed into drugs or alcohol. (A-20, A-30). On several occasions during their 19 month marriage, Karen Barkes kicked Christopher Barkes out of the house, or asked him to leave the house, due to his relapses into substance abuse. (A-21, A-28, A-30).

Christopher Barkes was hospitalized for depression and drug addiction in November 2003. According to Karen Barkes, this was not in connection with a suicide attempt. (A-21). At some point around Christmas 2003[4], Barkes overdosed on heroin and had to be

---

3 Barkes had been married previously, and had two children by that marriage: Plaintiffs Alexandra and Brittany Barkes. (A-13-14, A-20, A-26).

4 Karen Barkes testified she could not remember the date of this incident, but that it was "at Christmas time." (A-22). Given the duration of the marriage was from April 2003 to November 2004 (when Barkes died), this would suggest the heroin incident occurred in December 2003.

hospitalized.  (A-22).  Barkes had a suicide attempt in September 2004 when he was

hospitalized at Wilmington Hospital for excessive alcohol consumption.  (A-21).  At that

time, he allegedly tried to hang himself with some IV tubing in the emergency room, but the

attempt was thwarted.  (A-21-22).

At the time of his arrest on November 13, 2004, Christopher Barkes was not living at

home with Plaintiff Karen Barkes, but was living with an aunt.  (A-15-16).

**2.      Barkes' VOP arrest and medical intake screening at HRYCI.**

Christopher Barkes was arrested on a violation of probation by Wilmington Police

on Saturday afternoon November 13, 2004.  (A-14, A-287 - 288).  He was taken to HRYCI at

approximately 2:45 p.m.  (1445), where he was to be held over the weekend pending

transportation to the Sussex VOP Center on the following Monday morning.  (A-152-153;

A-113).  Thus, he was considered a detainee at HRYCI pending his transfer.  Id.  Barkes,

after being booked, received a medical evaluation at 3:00 p.m. (1500) by FCM medical staff,

who contracted with DOC to provide all medical services to inmates.  (A-145–146; 147-149;

289-96; Affidavits of CO Emig and CO Forte, A-1-4).

Part of the medical evaluation was the completion of a Mental Health/Suicide

Prevention Screening form, created by FCM and completed by an FCM nurse. (A-147).  The

form consists of 17 items (suicide risk factors) for which the inmate is screened.  If 8 or more

factors are checked "yes", the physician on call is to be notified and suicide precautions

initiated.  (A-147; A-154).  Also, if certain very serious risk factors are present (e.g. the

arresting officer believes the inmate is a suicide risk; the inmate expresses thoughts of killing

themselves) the physician on call is to be notified regardless of the total number of risk

factors. (A-147).  The form also records the presence or absence of hallucinations or violent

behavior or threats. Id.

When this form was completed for Christopher Barkes on November 13, 2004, he presented with only 2 "yes" answers to the screening questions, which pertained to his past history: (1) that he had a psychiatric history and (2) that he had previously attempted suicide by "overdose [in] 2003." Id. Barkes apparently did not disclose the more recent (September 2004) suicide attempt. In addition, FCM's standard medical intake form (a separate form completed during his screening) asked the provider to note if the inmate showed any obvious signs of "altered mental status . . . or abnormal conduct." (A-145). Barkes did not. Id. This form also listed all the psychiatric medications Barkes reported that he was taking, and correctly indicated that Barkes had previously attempted suicide. Id. Notably, the form contains a series of health history questions and Barkes answered "no" to the question of whether he had a "history of drug abuse." Id. Finally, the FCM medical screener completed a "Referral to Mental Health Services" form, on a "routine" urgency level, based upon Barkes' history of bipolar disorder and the reported 2003 suicide attempt. (A-148). After booking and the medical screening, Barkes was housed in Cell #122, in the booking and receiving area of the prison (immediately adjacent to the intake area). (A-152-153; Affidavit of CO Emig, A-1-2). The Correctional Officers working Booking and Receiving during Barkes' intake observed nothing unusual about this inmate. (Affidavits of CO Emig and CO Forte, A-1-4).

The medical file also contains a prescription chart, showing the prescriptions Barkes received while at HRYCI, and the dosages and frequency. (A-149). This record shows that Barkes was prescribed Effexor and Seroquel (as well as Synthroid, a non-psychiatric drug), and received dosages of each medication the evening of November 13, 2004. (A-149; A-

8

154). Barkes did not receive his medications on Sunday November 14, 2004, simply because the medical cart had not arrived in his area yet before he committed suicide. (A-154).

In addition to health care policies and mental health screening practices of medical provider FCM, DOC/HRYCI has, and had in place at the time, its own Suicide Prevention policy, SOP 190.04. (A-157-160). This policy states that training is provided to institutional personnel regarding identification of offenders at risk for suicide. (A-157). The Policy applies to all HRYCI personnel. Id. The policy and suicide prevention program is reviewed and approved by a qualified medical/mental health professional. Id. The policy notes that suicidal potential is assessed at intake, as occurred here, by "member[s] of the medical staff." Id. For incarcerated offenders, the policy outlines some indicators of suicide potential for staff to be aware of, and states that during a suicidal crisis most persons will display signs of depression or crisis, such as sadness, crying, withdrawal/silence, mood swings, sudden behavioral changes, etc. (A-157-158). Inmates deemed to be at risk for suicide are to be referred to medical personnel. (A-159-160). The policy notes that identification of offenders deemed suicidal for housing/supervision purposes is a determination to be made by the medical staff. (A-160).

### 3. Barkes uneventful overnight incarceration at HRYCI and sudden suicide on November 14, 2004.

Correctional officers at HRYCI work one of three shifts: 0000– 0800 (midnight to 8:00 a.m.); 0800 – 1600 (8:00 a.m. to 4:00 p.m.); and 1600 – 1200 (4:00 p.m. to midnight). Barkes' approximately 21 hour incarceration spanned each of these shifts. Barkes slept during the overnight shift and ate breakfast in the morning. (Affidavits of CO Daniels and Young, A-5 - 8). Not a single correctional officer who worked Booking and Receiving

9

during Barkes' incarceration recalls anything at all unusual about him, let alone anything that would have constituted an alert that he was having a suicidal crisis. (A-1-10).[5]

The documentary record and affidavits of COs on duty show that the events which took place on the morning of his suicide were as follows. At 0740, Correctional Officer (CO) Dorene Fields checked on Barkes and asked him if he was OK; he responded "yes." (A-150). Barkes ate breakfast (in his cell, as is typical in the booking and receiving area) before 8:00 a.m. (Affidavits of D. Young and K. Daniels, A-5 - 8). During the morning, CO Sandra Rayne was assigned to B&R and periodically checked on Barkes. (Aff. of S. Rayne, A-9-10). At approximately 1045, CO Fields was passing by Barkes' cell and saw him lying awake on the bed. (A-150). At approximately 1050, CO Sandra Rayne asked Barkes if he wanted to take a shower. Barkes said he was OK, and answered no. (A-152 - 153; Aff. of S. Rayne, A-9-10). Rayne asked him if he was sure, and he said no again. Id. At approximately 1100, CO Fields walked past Barkes' cell again and observed Barkes still lying awake on bed as he had been 15 minutes prior. (A-150).

At approximately 1135, CO Martelli arrived at Barkes' cell to deliver his lunch. (A-150-151). At that time he found Barkes hanging by a sheet from a steel partition in the room. (D0003, D005—006, Rayne Aff., A-151, 152 - 153, A-9 - 10). CO Fields immediately called a Code 7 (medical emergency) and, along with CO Rayne cut Barkes down from the sheet and lowered him to the floor. Id; (Affidavit of Rayne, A-9 -10). Medical staff from FCM (at least three nurses) responded at 1138 and began CPR. (A-150-153). An AED (defibrillator) was applied, but the device stated "no shock advised" four times. (A-155).

---

5 *See* Affidavits of COs: Brian Emig and Brian Forte (11/13/04, 0800-1600); Kimphus Daniels and Denisha Young (11/14/04, 0000-0800); and Sandra Rayne (11/14/04, 0800-1600).

CPR continued until Paramedics and EMT's arrived. The Paramedics and EMT's then transported Barkes (who never regained consciousness) to Christiana Hospital. (A-155). A post-mortem toxicology report showed no drugs or alcohol detected in Barkes' system. (A-156).

Defendant Raphael Williams does not normally work weekends and was not working at HRYCI at any time on November 13-14, 2004. (A-280). Warden Williams' time sheet shows that he was off work for vacation and training programs from November 11-17, 2004. Id. During this time, Deputy Warden, Perry Phelps, was Acting Warden of the facility. (A-154).

## ARGUMENT

I.    **SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE DEFENDANTS AS TO COUNTS I, III, AND IV, AS PLAINTIFFS HAVE ADDUCED NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT THEIR ALLEGATIONS OF EIGHTH AMENDMENT OR STATE LAW VIOLATIONS IN CONNECTION WITH THE 2004 SUICIDE OF CHRISTOPHER BARKES.**

A.    **Standard of Review.**

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment and judgment shall be entered forthwith, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

Summary judgment will not lie only if the dispute of material fact is "genuine", meaning "such that a reasonable jury could return a verdict for the nonmoving party" on the issue. Id. The moving party (Defendants, here) may satisfy the requirements of Rule 56(c) by showing the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). That showing is amply made herein. In addition, while Defendants have no obligation to come forward with their own evidence negating Plaintiffs' claims, the record is replete with such evidence, as discussed more fully herein.

12

In response, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, . . . [but] must set forth *specific facts* that indicate a genuine material issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). A non-moving party does not meet its responsive burden, and may not successfully oppose a summary judgment motion, by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. <u>Bequeath v. L.B. Foster Co.</u>, 367 F.Supp.2d 779, 784 (W.D. Pa. 2005), *citing* <u>Lujan v. National Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). To withstand summary judgment, the Plaintiffs' burden is to "introduce evidence from which a rational finder of fact could find in [their] favor." <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 319 (3d Cir. 2005). If the nonmoving party cannot make this showing, with reference to actual facts of record, the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c).

      **B.**      **There is no evidence in the record to support Plaintiffs' allegations in Count I that State Defendants, Stanley Taylor and Raphael Williams, exhibited deliberate indifference to a serious medical need of Christopher Barkes during his brief incarceration at HRYCI. Barkes did not exhibit any behavior which should have put Defendants or any DOC employee on notice that he was a suicide risk at that time.**

           **1. The Legal Standard: "Deliberate Indifference."**

In Count I of the Complaint, Plaintiffs have alleged that State Defendants violated Barkes' Eighth Amendment right to be free of cruel and unusual punishments, based upon Defendants' alleged "deliberate indifference" to serious medical needs of inmate Barkes. It is important to note that the only individual State Defendants in this case are former DOC Commissioner, Stanley Taylor, and HRYCI Warden, Raphael Williams. On the record in this case, Plaintiffs cannot establish the elements of an Eighth Amendment claim as to either

13

State Defendant as a matter of law.  It is axiomatic, of course, that the Plaintiffs bear the burden of proving each necessary element of their §1983 claim.

Plaintiffs' Eighth Amendment claim in Count I alleges that the named Defendants subjected Christopher Barkes to cruel and unusual punishment by denial of medical care—that is, the alleged failure to recognize that Barkes was suicidal and to take precautions to guard against his suicide.  There is no evidence whatsoever in the record to suggest that the named State Defendants (the DOC Commissioner and the prison Warden) had any interaction with Barkes, nor any knowledge of his condition which could meet the legal standard for §1983 liability on an Eighth Amendment claim.  Not only that, but the record made by Defendants in this case goes even further to show that the DOC personnel who dealt with Barkes (and, of course, none of these persons have been named as defendants) could not possibly have foreseen, anticipated or prevented this sudden and unfortunate incident, let alone exhibited a "deliberate indifference" towards the risk.

The United States Supreme Court has established a now well-settled test for Eighth Amendment liability based upon medical treatment (or lack thereof) for prisoners.  For liability to attach, the plaintiff must prove that the named defendants exhibited *"deliberate indifference* to serious medical needs of [the] prisoner[]." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (emphasis added).  Simple negligence will not suffice to maintain a constitutional claim.  An "inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary or wanton infliction of pain' . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." Id at 105-106.

The term "deliberate indifference" was further defined by the Supreme Court in

14

Farmer v. Brennan, 511 U.S. 825 (1994), which held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement *unless the official knows of and disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837 (emphasis added). The "official" in question is, of course, for §1983 purposes, the named State Defendant. The named defendant must actually, subjectively, know of the risk presented and affirmatively disregard it. Id at 838. Whether this test is met is a question of fact based upon the record presented. Id at 842. Further, the mere fact that harm may befall an inmate does not establish or presuppose liability. The Eighth Amendment requires prison officials to assure "reasonable safety" of inmates. Id at 844. If that is done, the officials will be free from liability even if the harm ultimately was not averted. Id.

The Third Circuit has also elaborated on the elements of proof necessary to maintain an Eighth Amendment claim based upon an inmate's suicide. The Plaintiff in a prison suicide case has the burden of establishing the following three elements:

(1) the detainee had a particular vulnerability to suicide;

(2) the custodial officer(s) knew or should have known of that vulnerability, and

(3) those officers acted with reckless indifference to the detainee's particular vulnerability.

Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (2005) (*citing* Estelle and Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991)).[6] In Woloszyn, the Third Circuit

---

[6] The claims in Woloszyn were grounded in the Due Process clause of the Fourteenth Amendment, but the Court noted the equivalency between the elements necessary to maintain a due process claim and the Eighth Amendment test in the case of inmate suicide. *See* 396 F.3d at 320-21.

affirmed the District Court's grant of summary judgment for the governmental defendants, finding that the plaintiff widow had failed to show any genuine issue of material fact as to the decedent's particular vulnerability to suicide.[7]

Woloszyn also recognized the important distinction between the criteria for establishing liability on medical vs. non-medical defendants in such cases:

> The detainee's condition must be such that failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death. Moreover, the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

396 F.3d at 320. In the case where the alleged condition is an inmate being suicidal, for liability to attach to a lay person, such as a correctional officer, the "strong likelihood of suicide must be *so obvious that a lay person would easily recognize the necessity for preventative action . . .* sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Id (emphasis added).

Within the parameters of the legal framework governing this Eighth Amendment claim, it is clear, for the reasons discussed below that, even viewing the record in the light most favorable to the non-moving party, Plaintiffs cannot, as a matter of law, meet their burden of proof that State Defendants Taylor and Williams exhibited "deliberate indifference" to a "serious medical need" of Christopher Barkes of which they were or should have been aware.

---

7 The Woloszyn record contained facts far more serious than any fact in evidence in the instant case, such as a fellow inmate's (unsworn) statement that decedent was kicking things, causing a commotion and "scream[ing] disjointedly about himself" in his cell, and evidence of one defendant's "callous" statement that he viewed decedent as "just another druggy." 396 F.3d at 318; 323. The defendant's statement was found to be inconsequential due to the fact that plaintiff had not established that the decedent exhibited a strong likelihood

**2.     Defendants, Commissioner Taylor and Warden Williams, had no personal involvement in the events alleged, and there can be no liability against Taylor and Williams on a theory of *Respondeat Superior*.**

As the sole State Defendants, it is the conduct of Stanley Taylor, the former Commissioner of Correction for the State of Delaware, and Raphael Williams, the Warden of Howard R. Young Correctional Institution, which must be examined under the "deliberate indifference" test set forth above. To the extent Plaintiffs allege, in Count I, that Defendants "denied medical care" to Christopher Barkes, the examination is short and clear, and requires a grant of summary judgment in Defendants' favor.

It is perhaps the most fundamental premise of § 1983 jurisprudence that the plaintiff must demonstrate—on the factual record—that a particular defendant has *personal involvement* in the alleged constitutional tort for the claim to even proceed. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). The plaintiff must "allege and prove a causal connection between the defendants and the alleged wrongdoing in order to recover." Brathwaite v. Carroll, 2006 WL 839385, *4, (D.Del. 2006)(*citing* Rode, *supra*). In the instant case, there is no evidence whatsoever that Defendants Taylor and Williams had any personal involvement in the events surrounding Barkes' brief incarceration at HRYCI on November 13-14, 2004, or his suicide on November 14, 2004.

Even on the face of the complaint, Plaintiffs fail to articulate exactly how they allege Commissioner Taylor or Warden Williams were personally involved in the alleged constitutional deprivations of medical care. (Complaint D.I. 1, A-32 - 41). Plaintiffs did not take the depositions of Defendants so, of course, no testimony was elicited which would support their burden of proof. Common sense, and the record that does exist, shows that

---

of suicide. Id at 323.

personal liability on these two defendants does not and could not exist. Stanley Taylor was the Commissioner of the DOC, and there is no evidence that he had any role in the intake or evaluation of Christopher Barkes (or of any inmates at HRYCI). Nor did Warden Williams have any involvement with the events surrounding Barkes' brief incarceration. In fact, Warden Williams' time record shows that he was not even working at the facility on the weekend in question. (A-280; A-19).

During her deposition, Plaintiff Karen Barkes testified that Taylor and Williams were sued because "[t]hose were the two in charge of the prison." (A-19). Thus, Plaintiff herself concedes that her claims against the named State officials are based solely on a vicarious liability/*respondeat superior* theory. *See also* Plts. Responses to State Defs. 1st Interrogatories, Q. 1, (A-75 - 76). It is well-settled that the theories of *respondeat superior* and vicarious liability are not acceptable bases for liability under § 1983. Rode, *supra*, 845 F.2d at 1207 ("a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.") ; *See also* Polk County v. Dodson, 454 U.S. 312, 325 (1981). The fact that a State official may have responsibility for supervising others "is irrelevant" to the constitutional claim. Rode, 845 F.2d at 1208. The allegations must show that the named State official *personally* violated the rights of the plaintiff. The Commissioner and the HRYCI Warden are at the top of the DOC chain of command, and any liability asserted against them for events which took place in this incident could only be premised on an impermissible vicarious liability theory. Plaintiffs do not and cannot identify a single act or omission against Christopher Barkes personally undertaken by Defendants Taylor and Williams.

   3. **The record is void of any evidence that any person was "deliberately indifferent" to Mr. Barkes' medical needs, nor any evidence that his suicide was foreseeable.**

While it is a moot point, in that Plaintiffs have not sued any correctional officers or other State defendants, it is notable that the record contains *no evidence* that *any* State employee at HRYCI exhibited any indifference to Mr. Barkes' medical needs. There is no evidence, on the documentary record of Barkes' November 13-14, 2004 incarceration, that there was any indication whatsoever, let alone a condition "so obvious that a lay person would easily recognize the necessity for preventative action," that any DOC correctional officer would have recognized Christopher Barkes was an imminent risk for suicide. Woloszyn, *supra*, 396 F.3d at 320. (See Affidavits of COs, A-1 - 10).

In the second set of Interrogatories posed by State Defendants to the Plaintiffs, Plaintiffs were asked to specify the factual bases for their prior denials (to Defendants Requests for Admissions) that Christopher Barkes had not expressed any suicidal thoughts or plans, nor exhibited any violent or erratic behavior either at intake or at any point during his incarceration. In response, Plaintiffs pointed only to the "Adult Mental Health Screening Form" (A-147), discussed above. (A-123 - 125). In addition, Plaintiffs stated "no current documents in our possession other than what is stated above [the intake form]. Plaintiff has an insufficient factual basis to admit or deny this statement." Id.

Thus, by Plaintiffs' own admissions, they are relying solely, on the content of the FCM mental health screening intake form. This form, as discussed in the statement of facts, is completed by FCM medical personnel, not by DOC personnel. Furthermore, there was nothing on the intake form that should have alerted anyone that Christopher Barkes was an imminent suicide risk. In answering the screening questions at his intake, Christopher

presented with only 2 out of 17 possible "yes" answers to the screening questions. Furthermore, the affirmative answers were probably the most innocuous risk factors, as they pertained to past history, rather than present condition. Id. Additionally, Barkes' rendition of his history was incomplete and inaccurate; he failed to tell the screener the potentially important information that he had attempted suicide two months prior to his incarceration. Notably, even though Barkes presented no imminent suicide risk to the examiner, FCM took the additional step of issuing a "Referral to Mental Health Services" form, on a "routine" urgency level, based upon Barkes' history of bipolar disorder and the reported 2003 suicide attempt. (A-148). Certainly no reasonable juror could find--in the face of this reasonable medical clearance and the lack of *any* evidence of suicidal, erratic, or unusual behavior during the incarceration—that any DOC personnel could have or should have subjectively appreciated that Barkes was at imminent risk for suicide, and exhibited a deliberate indifference to that (unknowable) risk. *See* Estelle, Farmer, Woloszyn, *supra*. The record actually shows that all parties involved responded entirely appropriately, given the apparent absence of any warning signs from Barkes.

On the record in this case, it could not be shown that any DOC employee acted even negligently with respect to Barkes. However, even assuming, *arguendo*, evidence of negligence did exist, this would not allow Plaintiffs to avoid summary judgment. *See* Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988)(affirming 12(b)(6) dismissal of complaint in prison suicide case where defendants' alleged conduct amounted, at most, to negligence). Nor does the tragic outcome of an accomplished suicide impose hindsight liability on prison officials. "We cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable

precautions to protect the safety of prisoners . . . ." <u>Id</u>. *See also* <u>Littlejohn v. City of Philadelphia</u>, 1993 WL 79600 (E.D. Pa. 1993) at p. 6 ("[d]eliberateness and indifference cannot be presumed simply because an event occurs. . . .").

In short, there is simply nothing within the record established in this case which would allow a reasonable fact finder to find that State Defendants exhibited "deliberate indifference" to a known serious medical need of Christopher Barkes. Rather, Barkes' suicide was sudden, unanticipated and, while unfortunate, was most definitely *not* the result of a constitutional deprivation nor in any way caused by the actions or inactions of State Defendants Taylor and Williams.

      **C. There is no legal basis or evidence of record to support Plaintiffs' allegations in Count III that State Defendants, Stanley Taylor and Raphael Williams are subject to any liability on a "failure to train" or "maintenance of wrongful practices and policies" theory in connection with the incarceration of Christopher Barkes at HRYCI.**

            **1. Plaintiffs have produced no evidence whatsoever of any wrongful training, practice or policy pertinent to the claims at issue.**

As with Plaintiffs' claims of deliberate indifference to medical needs, there is well-settled caselaw in the Third Circuit addressing the legal standard of proof on a claim of failure to train or inadequate policies and practices resulting in an inmate's suicide. As with the denial of medical care allegations, there is no evidence whatsoever in the record by which a reasonable fact finder could find that Defendants Taylor and Williams were liable under the Eighth Amendment for deliberate indifference in providing DOC training or policies/practices, resulting in Christopher Barkes suicide.

The plaintiff's burden in asserting this type of legal claim is set forth in <u>Woloszyn</u>, *supra* 396 F.3d at 324-26. In a §1983 prison suicide case, the plaintiff must:

(1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred and,

(2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide [the specific training established in (1)] can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

Id at 325 (*citing* City of Canton v. Harris, 489 U.S. 378 (1989)).

The record in this case as to the issue of DOC's training and policies/practices in suicide prevention consists solely of State Defendants' contributions to the record, which consist of: HRYCI's Suicide Prevention policy, SOP 190.04 (A-157-160); video training tape used for DOC suicide prevention training (*see* A-111); lesson plans and other written training materials provided to DOC correctional officers (A-161-193), and training records showing attendance at suicide prevention training for the various Correctional Officers who actually worked Booking and Receiving during Christopher Barkes' incarceration. (A-194-208).

Plaintiffs introduced no evidence addressing DOC's suicide prevention training and policies in any respect, and certainly no evidence suggesting the training/policies were deficient. Plaintiffs did not "identify [other] specific training not provided that could reasonably be expected to prevent the suicide that occurred." Woloszyn, *supra* at 325. When asked in interrogatories to specify with particularity the factual basis for each of their Constitutional claims (including failure to train), Plaintiffs responded with no evidence other than a statement that the named Defendants were "responsible" for the welfare of inmates at the institution. (A-75-76).

Moreover, the questions outlined in Woloszyn, upon which a plaintiff must meet his burden of proof involve technical, medical issues which would require expert opinion

22

testimony. *See* Federal Rule of Evidence 702. Plaintiffs themselves appear to concede that recognition of Barkes' suicidal tendencies involves medical assessments and determinations. In the same way, on the training question, lay jurors are certainly not equipped to determine what specific training (or policy) should be required for correctional officers to identify an inmate as a suicide risk, how the DOC training/policies were allegedly deficient, nor the risk reduction associated with one type of training versus another. Woloszyn, *supra*, 396 F.3d at 325. In this case, Plaintiffs have not identified any expert witnesses on their behalf.[8]

Notably, in Woloszyn, the plaintiff did produce an expert's report and affidavit in the record, but the Court upheld summary judgment, finding the expert's submission to be deficient, as his findings were broad, general and conclusory and did not identify the *specific type* of training which allegedly should have been provided. *See also* Freedman v. City of Allentown, 853 F.2d 1111, 1117 (3d Cir. 1988)(mere conclusory allegations of failure to train insufficient to maintain constitutional claim). Certainly, the Third Circuit would also find that where, as here, the Plaintiffs have proffered *no expert opinion* whatsoever as to deficiencies in training/policies *nor any evidence suggesting a specific type of training* which was allegedly absent, that the Plaintiffs could not meet their burden of proof under a "failure to train" theory of liability.

In addition to the failure of proof under the legal test, Plaintiffs' case also suffers the fatal deficiencies of producing no factual evidence suggesting that the named Defendants, Taylor and Williams, themselves created the DOC training/policies that did exist; that they were on notice of other training which would have avoided the suicide in question[9], nor any

---

8 Plaintiffs' deadline to provide expert discovery, according to the Court's scheduling order, was May 31, 2007. (D.I. 17) (A-59 - 62). Plaintiffs never named an expert nor provided expert discovery.
9 Given Barkes' lack of suicidal symptoms, or possibly intentional concealment of symptoms, it is difficult

evidence remotely suggesting that, in implementing policies or procedures, Defendants

exhibited a "deliberate indifference to whether [] detainees succeed[ed] in taking their lives."

Woloszyn, *supra*.

> ### 2. The "failure to train/wrongful practices and policies" theories of liability Plaintiffs assert in Count III are theories of municipal liability which cannot be maintained against State officials, as a matter of law, by virtue of the Eleventh Amendment.

In addition to the utter lack of factual evidence in the record upon which a "failure to

train" theory could be grounded, Plaintiffs' attempt to bring this claim against State

Defendants, Commissioner Taylor and Warden Williams, is legally barred in any event, by

virtue of the State Defendants' Eleventh Amendment immunity, which bars claims in this

court which are premised upon the actions of the State as a sovereign entity. *See also*,

Argument II, *infra*.

A "failure to train" or "policy/practice" claim is a claim brought against a

governmental body. It may be based upon the actions of an official who functions as the

incarnation of the governmental body in his or her role as policymaker, but it is nonetheless a

claim against the government itself. Such a claim can be asserted in federal court against a

municipal governmental entity, but *not* against a State agency or State actor. *See* Monell v.

Department of Social Services of City of New York, 436 U.S. 658 (1978). In Monell, the

Supreme Court held that "Congress did intend *municipalities and other local government*

*units* to be included among those persons to whom §1983 applies." 436 U.S. at 689

(emphasis added). The Court included a footnote to this holding that clearly set forth its

recognition of the distinction between municipal liability and state government liability (or

---

to imagine what possible kind of training or policy would have averted this suicide.

lack thereof) under §1983.  The Court stated:

> there [is no] basis for concluding that the Eleventh Amendment is a bar to
> municipal liability. . . .  Our holding today is, of course, limited to local
> government units which are not considered part of the State for Eleventh
> Amendment purposes.

Id at 691, *fn.* 54; *see also* Id at 694 (holding that the policy/practice claim seeks relief for an

injury for which "the *government as an entity* is responsible . . ." (emphasis added).

This limited holding in Monell makes sense, because matters of policy, custom and

training are functions or actions belonging to the governmental entity itself, and not to

individuals (at least not outside their official capacity as policy makers).[10]   A later U.S.

Supreme Court case, elaborating on Monell, City of Canton v. Harris, held unequivocally

that policy/custom claims are claims against the governmental *entity* only: "a municipality

can be found liable under §1983 only where the municipality itself causes the constitutional

violation at issue.  *Respondeat superior* or vicarious liability will not attach under §1983."

489 U.S. 378, 385.[11]  *See also* Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir.

2004) (failure to train is a violation of §1983 by the "municipality *itself*").

Thus, as this type of claim is one which sounds against the governmental entity itself,

it follows that the entity in question must be subject to suit in the federal courts.  Unlike

municipalities, *State* agencies are immune from suit under the Eleventh Amendment.  The

Delaware Department of Correction is therefore immune from suit under a "failure to

train/policy and practice" claim.  Nor can the actions of the named State Defendants subject

the State to vicarious liability.  While, as stated above, Plaintiffs have not linked the named

---

10  The Court in Monell took pains to note that the municipality could not be held liable on a *respondeat superior* theory for acts of an employee.  436 U.S. at 691.

11  *Accord* Canton at 389 (only where there is deliberate choice of failure to train "can *a city be liable*"); Id (city liable where "*municipal policy causes* a constitutional deprivation"); at fn. 7 ("*a city must exhibit*

Defendants to any particular training programs or policies, even if there was evidence that Taylor and Williams were policymakers (and evidence of deliberate indifference and the other legal requirements of the claim), these DOC officials would have been acting in their official capacity as the alter ego of the Delaware State agency. Just as no claim can be asserted against the agency (DOC) by virtue of the Eleventh Amendment, no "failure to train" claim could sound against the DOC Commissioner or HRYCI Warden in their official capacities, as they are not "persons" subject to suit under §1983. *See* Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989).

> **D.  There is no legal basis or evidence of record to support Plaintiff's claim in Count IV, under Delaware state law, for "wrongful death" under 10 Del.C. §3724.**

To the extent the Court finds that no federal constitutional claim is stated against the moving State Defendants, the Court should decline to exercise supplemental jurisdiction over purely state law claims against those defendants. 28 U.S.C. §1367(c)(3); Bonenberger v. Plymouth Township, 132 F.3d 20, 23 (3d Cir. 1997). However, the Court may also grant summary judgment in State Defendants' favor on the state law wrongful death claim as, if the Court were to conclude that the record as to the federal claims contained no evidence of deliberate indifference, it would necessarily follow that the state law claim is without merit. Rather than dismiss the state law claim without prejudice, the Court would promote judicial economy by entering summary judgment for Defendants on the state claim because Plaintiffs cannot as a matter of law, meet their burden of proof on this claim.[12]

---

deliberate indifference . . . ").
12  The district court may decide pendent state law claims where the original jurisdiction claims have been dismissed if "considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so." *See* Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995)(*citing* United Mine Workers v. Gibbs, 383 U.S. 715 (1966)).

The record contains no evidence upon which a reasonable fact finder could find liability for "wrongful death" under 10 Del.C. §3722(a), against the State Defendants. To prevail on a "wrongful death" claim, the Plaintiffs must allege (and subsequently prove) that the named defendant(s) caused the death of their decedent. 10 Del.C. §3722(a) ("an action may be maintained against a person whose wrongful act causes the death of another"). As discussed extensively above, there is no evidence whatsoever in the record that the named defendants, Commissioner Taylor and Warden Williams, had any personal involvement with Christopher Barkes, let alone "caused his death."[13]

In addition, Plaintiffs can not, as a matter of law, circumvent the State Defendants' tort claim immunity under Delaware State law. 10 Del.C. §4001. Under this statute, no cause of action shall arise against any public employee unless, *inter alia*, the alleged acts or omissions were "done with gross or wanton negligence." §4001(3). In Saunders v. Sullivan, 608 A.2d 730, 1992 WL 53423 (Del. 1992), the Delaware Supreme Court held that for *res judicata* and collateral estoppel purposes, the requirement of "gross and wanton negligence" is equivalent to the "deliberate indifference" standard applied in a §1983 Eighth Amendment claim. As discussed at length above, Plaintiffs cannot as a matter of law establish "deliberate indifference" on the part of the named Defendants, as needed to maintain their federal claims. It follows, therefore, that they also could not establish "gross and wanton negligence" which would be required to maintain their wrongful death (or any other) state law claim.

## II. SUMMARY JUDGMENT MUST BE GRANTED AS TO THE STATE OF DELAWARE AND DEFENDANTS TAYLOR AND WILLIAMS IN THEIR OFFICIAL CAPACITIES, AS THEY ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT.

---

13 Delaware recognizes the traditional "but for" test of proximate cause. Duphily v. Del. Elec. Co-op, 662 A.2d 821, 828-29 (Del. 1995)("proximate cause. . . is that direct cause without which [the outcome] would not have occurred.").

## A. Standard of Review.

*See* Standard of Review, §I(A), *supra*. Plaintiff does not, as a matter of law, state any justiciable claim against the "State of Delaware Department of Correction", as that defendant—a state agency--is immune from suit under 42 U.S.C. §1983. Defendant is therefore entitled to judgment as a matter of law on this claim.

## B. Eleventh Amendment Immunity.

The Plaintiffs in this case have named a State of Delaware agency, the Department of Correction, as a defendant in this matter. It is well settled that this defendant is Constitutionally immune from suit under §1983, as are State Defendants Taylor and Williams in their official capacities as Commissioner and Warden, respectively.

Claims against the state barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." While the Amendment does not facially bar suits against the State by its own citizens, the United States Supreme Court has long held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). "[I]n the absence of congressional abrogation or consent, a suit against a state agency is proscribed." Neeley v. Samis, 183 F. Supp. 2d 672,

28

678 (D. Del. 2002).  The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive state immunity will produce this result.  Id.

No such clear intent can be found in 42 U.S.C. §1983.  In fact, a review of the statute demonstrates that Congress did not intend to waive the states' immunity.  The statute facially allows suits only to be brought against "persons."  42 U.S.C. §1983.  Neither the State of Delaware, its agencies nor its officials acting in their official capacity are "persons" as contemplated by 42 U.S.C. § 1983.  Will, *supra*, 491 U.S. 58 (1989).  Accordingly, these Defendants are immune from suit and entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact and no basis upon which a reasonable fact-finder could find in Plaintiffs' favor on their Eighth Amendment claims for deliberate indifference to serious medical needs and "failure to train/wrongful policies and practices." The State and State Defendants in their official capacity are immune from suit under the Eleventh Amendment. Nor can Plaintiffs meet the necessary factual or legal elements of proof on their pendent state law wrongful death claim. State Defendants are therefore entitled to judgment as a matter of law as to all claims asserted against them in this action.

State Defendants respectfully request this Honorable Court grant Summary Judgment in its favor as to all Counts against them, pursuant to Rule 56(c).

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


By:___/s/ Stephani J. Ballard_____
STEPHANI J. BALLARD (I.D. No. 3481)
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
DATED: October 15, 2007          Attorney for State Defendants

# UNREPORTED OPINIONS

# Brathwaite v. Carroll

2006 WL 839385 (D.Del. 2006)

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Brathwaite v. Carroll
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Kevin BRATHWAITE, Plaintiff,
v.
Thomas CARROLL, Betty Burris, David Pierce,
David K. Holman, Anthony J. Rendina, Cathy
Malay, William Yoder, Larry Savage, Marcello
Rispoli, Robert Wallace, David Phillips, Matt
Stevenson, Stephanie Carpenter, Barbi Thomas,
Edwin Nkwopara, Lise Merson, First Correctional
Medical, Nurse Kera, Major Cunningham,
Lieutenant Godwin, Sergeant Lovett, V. Dunn, Don
Overmeyer, Bob Harris, Dr. Raman, and Amy
Whittle, Defendants.
No. Civ.A.04-1542(GMS).

March 29, 2006.

Kevin C. Brathwaite, Smyrna, DE, pro se.
Ophelia Michelle Waters, Department of Justice,
Wilmington, DE, for Defendants.

SLEET, J.

### I. INTRODUCTION

*1 The plaintiff, Kevin Brathwaite ("Brathwaite"),
is presently incarcerated at the Delaware
Correctional Center (the "DCC"), which is located
in Smyrna, Delaware. On December 22, 2004,
Brathwaite filed this *pro se* civil rights action
pursuant to 42 U.S.C. § 1983. The complaint
alleges that Warden Thomas Carroll ("Carroll"),
Deputy Warden Betty Burris ("Burris"), Deputy
Warden David Pierce ("Pierce"), Major David
Holman ("Holman"), Anthony Rendina ("Rendina"
), Cathy Malay ("Malay"), Lieutenant William
Yoder ("Yoder"), Lieutenant Larry Savage ("Savage
"), Lieutenant Marcello Rispoli ("Rispoli"),

Sergeant Robert Wallace ("Wallace"), Sergeant
David Phillips ("Phillips"), Sergeant Matt
Stevenson ("Stevenson"), Sergeant Stephanie
Carpenter ("Carpenter"), Sergeant Bambi Thomas ("
Thomas"), correctional officer Edwin Nkwopara ("
Nkwopara"), correctional officer Lise Merson ("
Merson"), First Correctional Medical ("FCM"), and
Nurse Kera ("Kera") (collectively, the "defendants"
) violated Brathwaite's Eighth and Fourteenth
Amendment rights. On March 21, 2005, prior to
serving any of the defendants, Brathwaite filed an
amended complaint naming additional defendants
and alleging further violations of his constitutional
rights pursuant to 42 U.S.C. § 1983. Brathwaite's
amended complaint alleges that Major Charles
Cunningham ("Cunningham"), Lieutenant Godwin ("
Godwin"), Sergeant Lovett ("Lovett"),
correctional officer V. Dunn ("Dunn"), correctional
officer Don Overmeyer ("Overmeyer"), Nurse Bob
Harris ("Harris"), and Dr. Raman ("Dr.Raman")
violated his constitutional rights. Presently before
the court is the defendants' motion to dismiss the
allegations of the complaint and amended complaint
against Carroll, Burris, Pierce, Cunningham,
Godwin, Lovett, Dunn, and Overmeyer
(collectively, the "moving defendants"), pursuant to
Federal Rule of Civil Procedure 12(b)(6).[FN1] For
the reasons that follow, the court will grant the
motion. The court will also permit Brathwaite to
amend his complaint consistent with its discussion
below.

> FN1. This opinion pertains only to those
> prison officials identified as the "moving
> defendants." The motion to dismiss, as
> well as some of the headings that are part
> of the memorandum filed in support of the
> motion mention Holman, Rendina, and
> Savage. Absent from the argument and
> analysis portions of the memorandum,
> however, is any discussion of the claims
> against them or why the claims against
> them must fail. Moreover, the prayer for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 2

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

relief asks the court to dismiss only the moving defendants from the case. As such, the court will address only the moving defendants in this opinion.

## II. BACKGROUND

The complaint alleges that, on October 9, 2004, several defendants, including Wallace, Phillips, Stevenson and Carpenter, physically assaulted Brathwaite with a dangerous weapon. (D.I. 2, at 1.) Brathwaite further alleges that nurse Kera denied him medical treatment for the injuries he received as a result of the assault. (Id.) Brathwaite next alleges that, on the same day, he informed Yoder, Kera, Thomas, and Phillips that he was feeling suicidal and that he "was going to kill himself if given the chance."(Id.) According to Brathwaite, his warning went unacknowledged, and Kera neglected her duties when she refused to contact the mental health department after his suicide threat.(Id.)

Additionally, Brathwaite alleges that Rispoli and several other officers assaulted him on October 22, 2004.(Id.) The complaint alleges that Brathwaite filed grievances regarding this assault, and the fact that he received no medical treatment after reporting it. Brathwaite also alleges that he notified Carroll, Burris, Pierce, and Internal Affairs. (Id.) The complaint further states that the defendants involved in the assaults violated Brathwaite's constitutional right to be free from cruel and unusual punishment, as well as his right to receive medical treatment and mental health treatment.(Id.)

*2 Brathwaite next alleges that Nkowpara, Kera, Wallace, Phillips, Stevenson, Thomas, and Yoder conspired to file false reports and obstruct justice by "conspiring to cover up a crime."(Id.) Brathwaite claims that he filed grievances regarding the aforementioned assaults and denial of medical treatment, but the grievance officer, Merson, " continuously gave fictitious reasons why [he] was not allowed to file grievances," thereby violating his constitutional rights. (Id. at 2.)

Brathwaite's complaint further alleges that he received a disciplinary report for "false charges" brought against him. (Id.) According to Brathwaite,

Savage, the hearing officer, denied him his right to due process when he refused to give him at least twenty-four hours notice of his disciplinary hearing on the matter. (Id.) He also claims that Savage refuse to investigate the charges brought against him and denied him his right to provide a full statement regarding the charges. (Id.)

Additionally, Brathwaite alleges that he appealed Savage's determination to Rendina, who denied the appeal without an investigation and without questioning witnesses to the incident. (Id.) He claims that Rendina failed to provide him with a written answer to his appeal, and when he requested a copy, he received a letter from Malay, with a " falsified appeal decision" attached, stating that his appeal was denied. (Id.) Brathwaite has attached an affidavit to his complaint, which further details his claims.

On March 21, 2005, Brathwaite filed an amended complaint (D.I.9), naming additional defendants, including Cunningham, Godwin, Lovett, Dunn, Overmeyer, Harris, and Dr. Raman. The amended complaint sets forth further allegations regarding constitutional violations that occurred from October 10, 2004 to February 24, 2005, when Brathwaite was housed in the infirmary. (Id.¶ 15.)Specifically, the amended complaint alleges that several officers assaulted Brathwaite and retaliated against him for having the assault investigated.(Id.¶ 17.)With respect to his claim of retaliation, Brathwaite alleges that officers would shakedown and search his cell three times a day, and that an officer would sit in front of his cell twenty four hours per day. (Id. ¶¶ 22-23.)Brathwaite further alleges that he was forced to sleep on the floor because officers confiscated his mattress. (Id.¶ 24-25.)

The amended complaint alleges that Brathwaite was denied access to the courts because his legal materials were confiscated, he was told he could not exercise his right to the courts, and the DCC paralegal was instructed not to assist him with any legal matters. (Id.¶¶ 18, 21.)Additionally, Brathwaite claims he was told that he could not receive mail from his family or friends. Nor was he allowed to receive newspaper and magazine subscriptions. (Id.¶ 19.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 3

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Brathwaite claims that he was subjected to cruel and unusual punishment, because he was only permitted to brush his teeth three times per week, resulting in " dental problems." (Id.¶ 20.)He also claims that the nurses at the infirmary were instructed not to give him "anything." (Id.¶ 26.)

*3 Lastly, the amended complaint alleges that Brathwaite "was denied his right to file any grievances or utilize the grievance system in any way," between January 6, 2005 and February 24, 2005. (Id.¶ 27.)

### III. STANDARD OF REVIEW

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, as in the case of a Rule 12(b)(1) motion, the court must accept the factual allegations of the complaint as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. "*Colburn v. Upper Darby Tp.,* 838 F.2d 663, 666 (3d Cir.1988). In performing this task, however, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."*Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). On the other hand, a court should dismiss a complaint " only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*See Graves,* 117 F.3d at 726;*Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Additionally, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Estelle*

*v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Conley,* 355 U.S. at 45-46).

Finally, the Third Circuit has held that a district court may not dismiss a complaint with prejudice, and must permit amendment, where a plaintiff can remedy the complaint by an amendment, unless the amendment would be inequitable, futile, or untimely. *See Alston v. Parker,* 363 F.3d 229, 235-36 (3d Cir.2004).

### IV. DISCUSSION

#### A. Sovereign Immunity

The moving defendants first contend that they are entitled to Eleventh Amendment immunity for claims brought against them in their official capacities. Brathwaite's complaint and amended complaint seek to hold the moving defendants liable in their official capacities. The moving defendants, as officials of the DCC, are state officials acting under color of state law. *See Cespedes v. Coughlin,* 956 F.Supp. 454, 465 (S.D.N.Y.1997). A suit against a state agency or state official in his or her official capacity is treated as a suit against the state. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). This is so because neither a state nor its officials acting in their official capacities are "persons" under § 1983.*Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). While a state is normally entitled to sovereign immunity, Congress may have abrogated the state's immunity through a valid exercise of its power, or the state itself may have waived its immunity. *See Lavia v. Commonwealth of Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000).

*4 Neither of the two above-mentioned sovereign immunity exceptions are relevant here. First, the state has not waived its Eleventh Amendment immunity. A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 4

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

construction."*Space Age Products, Inc. v. Gilliam,* 488 F.Supp. 775, 780 (D.Del.1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Such an express waiver may be made through clear constitutional or statutory language. *See Lavia,* 224 F.3d at 195. Neither the constitution nor any Delaware statute expressly waives Delaware's Eleventh Amendment sovereign immunity. *See Ospina v. Dept. of Corr.,* 749 F.Supp. 572, 579 (D.Del.1990). Therefore, Delaware has not clearly waived its immunity.

Finally, Congress has not abrogated the states' immunity for claims under Section 1983. *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Since Delaware's immunity has not been waived or abrogated, the court will dismiss Brathwaite's claims against the moving defendants in their official capacities.

### B. Individual Liability of the Moving Defendants under 42 U.S.C. § 1983

Through their motion, the moving defendants contend that Brathwaite's claims against them should be dismissed because they are predicated on the theory of respondeat superior. That is, the moving defendants contend that Brathwaite's complaint and amended complaint fail to allege personal involvement by any of them. In response, Brathwaite asserts that he has sufficiently pled his civil rights violations.

The Third Circuit has held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In other words, a plaintiff must allege and prove a causal connection between the defendants and the alleged wrongdoing in order to recover. *Rode,* 845 F.2d at 1207. A plaintiff establishes a causal connection by showing that the defendants were personally involved in the alleged wrongs through allegations of either personal direction or actual knowledge and acquiescence. *Id.* Finally, a plaintiff

must allege personal involvement with particularity, stating the time, place, and persons responsible for the violations. *Boykins v. Ambridge Area Sch. Dist.,* 621 F.2d 75, 80 (3d Cir.1980).

Viewing the allegations of Brathwaite's complaint in a light most favorable to him, and in the context of the applicable law, the court concludes that he has not shown any evidence that the moving defendants were involved in, had personal knowledge of, or in any way acquiesced to any deprivation of his constitutional rights. Here, Brathwaite has alleged only the supervisory functions of the moving defendants. For example, Brathwaite's complaint states that he filed a grievance and wrote letters to the wardens, Carroll, Burris, Pierce, as well as Internal Affairs. Additionally, the complaint does not allege any conduct on the part of Cunningham, Godwin, Dunn, and Overmeyer, and the amended complaint alleges only the following: Cunningham was the "security superintendent" at the DCC at the time the incidents occurred; Godwin is the "Area Supervisor" at the DCC, and was the "Area Lieutenant" at the time the incidents occurred; Dunn is a correctional officer at the DCC and was working at the time the incidents occurred; and Overmeyer is a correctional officer at the DCC and was working at the time the incidents occurred. As previously discussed, a Section 1983 defendant cannot be held liable under a respondeat superior theory. *See Fagan v. City of Vineland,* 22 F.3d 1283, 1291 (3d Cir.1994). Moreover, grievances are not enough to impute knowledge to the moving defendants. *Rode,* 845 F.2d at 1208 (noting that if the filing of a grievance was enough to impute liability to a government official, it would permit personal liability in most cases). Accordingly, the court will dismiss his claims against the moving defendants.[FN2]

---

FN2. The motion to dismiss also asks the court to dismiss Brathwaite's claims against Lovett because they are based on the theory of respondeat superior. The court cannot accede to this request, however, because Brathwaite has not yet effected service on Lovett. (See D.I. 45.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C. Brathwaite's Remaining Claims Alleged in His
Amended Complaint [FN3]

> FN3. The court will not address the merits of Brathwaite's allegations in the original complaint because he sets them forth clearly, linking specific defendants to the complained of conduct, and none of the defendants involved in the incidents have moved to dismiss the complaint. The court will address Brathwaite's amended complaint because it potentially sets forth certain constitutional violations, but does not do so with clarity and does not link specific defendants to the complained of conduct.

**\*5** Even though the court will dismiss Brathwaite's claims against the moving defendants under respondeat superior, it feels obligated to address his amended complaint in order to flesh out any potential claims for which Brathwaite may be able to recover. After having reviewed the amended complaint in a light most favorable to Brathwaite, the court construes it as setting forth potential claims regarding assault, retaliation, denial of access to the courts, interference with mail, cruel and unusual punishment, and lack of an adequate grievance system. The court will address each of these potential claims in turn.

### 1. Assault

Brathwaite alleges that, on December 15, 2004, he was sleeping on the floor of his infirmary cell when he was assaulted with a dangerous weapon by three correctional officers. Brathwaite does not provide any additional information regarding the alleged assault. Given the brevity of Brathwaite's claim, the court is not sure whether he is attempting to state a claim for cruel and unusual punishment based on the alleged assault, or a supplemental state claim for assault. Because Brathwaite potentially can state a claim for cruel and unusual punishment or assault, the court will permit him to amend this claim to allege with more particularity the incident that occurred on December 15, 2004, and the

correctional officers allegedly involved in the incident.

### 2. Retaliation

Brathwaite alleges that he experienced numerous retaliatory actions from the DCC staff as a result of requesting and receiving an internal affairs investigation into the December 15, 2004 assault. Brathwaite first alleges that from November 9, 2004 through February 24, 2005, officers retaliated against him by posting an officer outside his cell twenty four hours a day and searching his cell three times a day. Brathwaite next alleges that officers retaliated against him by forcing him to sleep on an ice cold floor, completely naked, and with no mattress.

In *Rauser v. Horn,* the Third Circuit defined the elements of a prisoner's cause of action for retaliation and the burden he must carry to succeed in that claim. *See Rauser v. Horn,* 241 F.3d 330 (3d Cir.2001). The court established a three prong test for determining whether retaliation has occurred. First, the prisoner must prove that the conduct which led to the alleged retaliation was constitutionally protected. *See id.* at 333 (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 389 (6th Cir.1999)); *see also Drexel v. Vaughn,* Civ.A.No. 96-3918, 1998 WL 15178, at \*7 (E.D.Pa. Apr. 2, 1998) (determining that prisoner had engaged in constitutionally protected conduct before proceeding with retaliation inquiry). Next, the prisoner-plaintiff must show that he has suffered some adverse action at the hands of prison officials. *See Rauser,* 241 F.3d at 333 (citing *Allah v. Sieverling,* 229 F.3d 220, 225 (3d Cir.2000)). A prisoner-plaintiff can satisfy this prong by demonstrating that the action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See id.* The last *Rauser* prong requires a prisoner-plaintiff to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him. The court employs a burden-shifting regime to determine whether a causal link exists. The prisoner-plaintiff bears the initial burden of proving that his constitutionally protected conduct was a substantial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 6

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

or motivating factor in the decision to discipline him or retaliate against him. *See id.*(citing *Mount Healthy Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *See id.*If the defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. *See id.* at 334.

*6 In the present case, even assuming that Brathwaite has met the first two prongs of the *Rauser* test, his claim must fail because the moving defendants would have taken the same steps regardless of whether Brathwaite reported the assault and requested an investigation. The moving defendants contend that they placed Brathwaite in the infirmary on suicide watch after he attempted to hang himself. As a result of being placed on suicide watch, Brathwaite was subject to observation twenty fours hour per day, and was prevented from possessing more than a suicide mattress, gown, and suicide blanket in his cell. The moving defendants also contend that correctional officers conducted routine cell shakedowns in order to uncover contraband items. Additionally, in conducting the shakedowns, the officers confiscated several contraband items from Brathwaite, including cell phones, a battery charger, and non-commissary food. Here, the moving defendants have a legitimate penological interest in guarding inmates against suicide. Furthermore, the court finds that keeping a close eye on an inmate who has already threatened and attempted to commit suicide by limiting his possessions and conducting cell shakedowns to confiscate contraband is reasonably related to that interest. As such, the court will dismiss Brathwaite's retaliation claim.

### 3. Access to Courts

Brathwaite alleges that he was told that he would not be permitted to exercise his right to the courts or an attorney. (D.I. 9 ¶ 18.) He also alleges that an officer told him she had been ordered to confiscate

all of his legal material and paperwork. (*Id.*) Lastly, Brathwaite alleges that the DCC paralegal was instructed not to assist him with any legal matters. ( *Id.* ¶ 21.)

Prisoners must be allowed "adequate, effective and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (holding that prisons must five inmates access to law libraries or direct legal assistance). In order to state a claim that he was denied his right of access to the courts, Brathwaite must show that he was actually injured by such interference. *Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir.1997).

Here, Brathwaite has not alleged that he was " actually injured" by any denial of his access to the courts. Moreover, Brathwaite has not alleged that any particular defendant has denied him access to the courts, as his amended complaint states only that "an officer" told him that he was no longer allowed to exercise his legal rights. The court, therefore, will dismiss this claim. However, the court recognizes that Brathwaite potentially has a cognizable claim for denial of his access to the courts. Thus, the court will permit Brathwaite to amend his complaint in order to include allegations regarding which officer allegedly denied him access to the courts, and how he was injured by the denial.

### 4. Interference with Mail

*7 Brathwaite alleges he was told that he was not allowed to receive mail from family and friends, or subscriptions to newspapers and magazines. Inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments. As such, prison officials may restrict an inmate's constitutional right to send and receive mail only for a legitimate penological interest. *See Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.*Morgan v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Montayne,* 516 F.2d 1367 (2d Cir.1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976).

In the present case, Brathwaite alleges that he was not allowed to receive mail from October 10, 2004 through February 24, 2005. This allegation, if proven, potentially could demonstrate a pattern of actual and deliberate interference with Brathwaite's mail. However, as with his access to the courts claim, Brathwaite fails to discuss who deprived him of his right to mail, alleging only that he "was told" he could not receive mail. Accordingly, the court will dismiss this claim, but grant Brathwaite leave to amend in order to state this claim with more particularity, and specify which prison official allegedly deprived him of his mail.

### 5. Cruel and Unusual Punishment

While not stated with clarity, Brathwaite appears to allege claims for cruel and unusual punishment. Specifically, Brathwaite alleges that, from October 10 2004 through February 24, 2005, he was permitted to brush his teeth only three times per week. According to Brathwaite, this caused him to develop dental problems. Brathwaite further alleges that, from January 6, 2005 through February 24, 2005, the nurses in the infirmary "were told" not to give him "anything." (D.I. 9 ¶ 26.)

The Eighth Amendment of the United States Constitution governs penal measures and prison conditions, and prohibits use of penal measures and existence of conditions which violate civilized standards and concepts of humanity and decency. *See Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In the prison context, however, "[n]ot every governmental action affecting the interest or well-being of a prisoner is subject to Eighth Amendment scrutiny."*Whitley v. Albers,* 475 U.S. 312, 319-20, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Only those actions that impose an unnecessary and wanton infliction of pain rise to the level of cruel and unusual punishment. *Id.*

To recover for the denial of medical care under the Eighth Amendment, Brathwaite must show that a prison official or employee was deliberately indifferent to his serious medical needs or acted with reckless disregard for his condition. *See Miller v. Correctional Medical Sys., Inc.,* 802 F.Supp. 1126, 1130 (D.Del.1992). The deliberate indifference prong is met only if the prison official " knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Rouse,* 182 F.3d at 197. The plaintiff must show a sufficiently culpable state of mind which demonstrates an unnecessary and wanton infliction of pain. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Rouse,* 182 F.3d at 197. Mere allegations of negligence do not meet the pleading standards for deliberate indifference. *See Estelle,* 429 U.S. at 105-106. Nor can the claim rest solely on the prisoner's dissatisfaction with the medical care he has received. *Id.* at 107.

**\*8** An inmate's condition is "serious" when it is so obvious that an ordinary person would easily recognize the need for a doctor's attention or when a physician has concluded that treatment is required. *See Monmouth County Correctional Inst. Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir.1987). The " seriousness" prong is met also if the effect of denying or delaying care results in wanton infliction of pain or a life-long handicap or permanent loss. *Id.* In addition, the "condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death."*See Colburn v. Upper Darby Township,* 946 F.2d 1017, 1023 (3d Cir.1991).

Here, Brathwaite's allegations are insufficient to meet the deliberate indifference standard. Brathwaite alleges that he was permitted to brush his teeth only three times per week, resulting in unspecified "dental problems." Given Brathwaite's scant allegations, the court cannot find that the prison officials acted with deliberate indifference to his health and safety. At most, Brathwaite has alleged that some unspecified prison officials were negligent in not allowing him to brush his teeth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 8

Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

more than three times per week. As previously discussed, however, mere allegations of negligence are not sufficient to meet the pleading standard for deliberate indifference.

The court also concludes that Brathwaite's allegations that the nurses were told not to give him anything do not rise to the level of deliberate indifference. First, Brathwaite does not specify who told the nurses not to administer him anything. Additionally, it is not clear from Brathwaite's amended complaint whether the nurses refused to give him anything. Moreover, even if the nurses did not administer any medication to Brathwaite, he has not alleged that their failure resulted in any harm or injury. Based on the foregoing discussion, the court will dismiss Brathwaite's cruel and unusual punishment claims alleged in the amended complaint.

### 6. Lack of an Adequate Grievance System

Brathwaite alleges that, from January 6, 2005 through February 24, 2005, he was denied his right to file any grievances or utilize the grievance system in any way. In the Third Circuit, inmates "do not have a constitutionally protected right to the prison grievance process."*Burnside v. Moser,* 138 Fed. App'x 414, 416 (3d Cir.2005) (not precedential) (citing *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991)). Therefore, " '[i]f the state elects to provide a grievance mechanism, violations of its procedures do not ... give rise to a § 1983 claim." ' *Hoover,* 886 F.Supp. at 418-19 (quoting *Spencer v. Moore,* 638 F.Supp. 315, 316 (E.D.Mo.1986)). Accordingly, the court will dismiss Brathwaite's claim regarding his access to the prison grievance system.

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. The moving defendants' Motion to Dismiss for Failure to State a Claim (D.I.28) is GRANTED.
*9 2. The plaintiff's claims against Carroll, Burris, Pierce, Cunningham, Godwin, Dunn, and

Overmeyer shall be dismissed with prejudice.
3. The plaintiff's retaliation, cruel and unusual punishment, and lack of an adequate grievance system claims alleged in the amended complaint (D.I.9) shall be dismissed with prejudice.
4. The plaintiff shall be permitted to amend the complaint as directed in the court's Memorandum. The amended complaint shall be filed within forty-five (45) days from the date of this Order.

D.Del.,2006.
Brathwaite v. Carroll
Not Reported in F.Supp.2d, 2006 WL 839385 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Littlejohn v. City of Philadelphia

1993 WL 79600 (E.D.Pa. 1993)

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

▷
Littlejohn v. City of Philadelphia
E.D.Pa.,1993.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Stephanie LITTLEJOHN, Administratrix of the
Estate of Arthur Littlejohn, Jr.
v.
CITY OF PHILADELPHIA, and Press Grooms,
Warden of the Philadelphia Detention Center.
**No. CIV. A. 91-4640.**

March 22, 1993.

MEMORANDUM AND ORDER
BECHTLE.
*1 Presently before the court is plaintiff's motion
for a new trial or for reconsideration of the court's
entry of a directed verdict in favor of defendant.
Upon consideration of the arguments advanced by
both parties in connection with this motion and the
record developed in the trial of this matter, the court
will deny the motion.

I. BACKGROUND

Plaintiff Stephanie Littlejohn ("plaintiff"), executrix
of the estate of Arthur Littlejohn, Jr. ("decedent"),
brought this action, pursuant to 42 U.S.C. § 1983,
against the City of Philadelphia ("City"), claiming
that the City violated decedent's constitutional rights
in failing to prevent decedent's suicide while he was
a detainee at the Philadelphia Detention Center ("
PDC").[FN1] In addition to her asserted federal
claims, plaintiff also alleged several claims arising
under state tort law, some of which are brought on
behalf of decedent and others which are brought on
behalf of plaintiff and her four young children.[FN2]

This matter was tried before a jury, and plaintiff
presented her case-in-chief over a period of three
days. At the close of plaintiff's case, the City

moved, pursuant to Fed.R.Civ.P. 50(a), for entry of
a directed verdict in its favor. For the reasons
discussed in detail below, the court granted that
motion and entered judgment in favor of defendants
and against plaintiff.

The facts of the case, as developed in the
presentation of plaintiff's case-in-chief, are
essentially as follows. On July 17, 1989, decedent
was taken into custody by the Philadelphia police
on the complaint of his wife, the plaintiff in this
action, that he had tried to shoot her and other
members of her family. Decedent was taken to
PDC and given a physical examination. The PDC
intake physician noted that decedent previously had
exhibited suicidal tendencies and directed that
decedent be placed on "close watch." Decedent
was then housed in "Q" Dorm.

At approximately 4:00 p.m. on July 17, 1989,
decedent and approximately fifty other inmates
were permitted to go to the dining hall for their
evening meal. In order to arrive at the dining hall, "
Q" Dorm inmates must descend two flights of stairs
outside of "Q" Dorm and walk through an
electronically-operated door into the dining hall.
Prison procedure provides that one guard
accompany the inmates as they travel down the
steps toward the dining hall. Once the inmates
move through the electronically-operated door, the
guard signals center control to shut the door.

The guard assigned to accompany the inmates on
July 17, 1989, was Kenneth Pickford. Plaintiff
offered testimony showing that Pickford followed
all of the "Q" Dorm inmates, including decedent,
down the two flights of steps outside of "Q" Dorm.
After the inmates went through the electronic door
into the dining hall, Pickford signaled that the door
be closed. After the door was closed, Pickford
ascended the two flights of stairs to his duty station
in and about "Q" Dorm.

*2 Shortly after Pickford returned to "Q" Dorm,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

another correctional officer noticed that decedent had hanged himself with a bed sheet from a post on one of the staircases in the stairwell that led from "Q " Dorm to the dining hall. Plaintiff offered testimony indicating that either 7 to 8 minutes or 10 to 15 minutes elapsed, depending on which witness was believed, between the time in which decedent was discovered, and the time in which he was cut down, placed on a stretcher, and taken to the hospital. Two days later, on July 19, 1989, decedent died as a result of the injuries sustained in the suicide attempt of July 17, 1989.[FN3]

## II. DISCUSSION

Plaintiff presently moves for a new trial and for reconsideration of the court's Order granting the City's motion for directed verdict at the close of plaintiff's case. Upon consideration of the evidence presented to the court, none of plaintiff's theories states a viable cause of action.

### A. *Statute of Limitations*

Prior to examining the merits of plaintiff's claims, the court must note the statute of limitations problems inherent in this case. On July 19, 1991, two years after the death and two years and two days after the suicide attempt, plaintiff filed this action, alleging an array of federal and state law claims. Although all of plaintiff's claims are governed by a two-year statute of limitations, the time for commencing the limitations period differs depending upon the capacity in which plaintiff sues.

While the complaint and the amended complaint are very vague as to the exact nature of plaintiff's claims, a generous reading of all the allegations and reasonable inferences therefrom, suggests that the plaintiff asserted her claims in two capacities. First, plaintiff makes a claim, on behalf of decedent, for damages sustained by decedent as a result of the City's alleged violation of decedent's civil rights and negligence in housing decedent at PDC. Procedurally, this claim is brought by plaintiff acting in her capacity as administratrix of decedent's estate, pursuant to the Pennsylvania Survival Act,

42 Pa.C.S.A. § 8302, and represents those claims which decedent could have asserted against the City had he survived the suicide attempt. Second, plaintiff makes claims on behalf of herself, as the surviving widow, and her children, for injuries they have allegedly sustained as a result of decedent's death under the Wrongful Death Act, 42 Pa.C.S.A. § 8301.

Regardless of the capacity in which plaintiff presents the claims, the statute of limitations period remains the same; all of the federal and state law claims must have been brought within two years of the event forming the basis of the claim. The statute of limitations for actions brought under § 1983 is the forum state's statute of limitations for personal injuries. *Wilson v. Garcia,* 471 U.S. 261 (1985). In Pennsylvania, the limitations period for personal injury actions is two years. 42 Pa.C.S.A. § 5524. Hence, plaintiff was required to bring her civil rights action and her common law action for negligence and wrongful death within two years of the incident alleged as the basis of her claims.

**\*3** As to the federal civil rights and state negligence claims brought pursuant to the operation of the Survival Act, plaintiff's theory is that the City's official policy of unconstitutional conduct or deliberate indifference created circumstances under which decedent had the opportunity to hang himself. Therefore, the event which dictates the start of the limitations period is the suicide attempt on July 17, 1989, and the claims brought pursuant to the Survival Action should have been filed on or before July 17, 1991. Plaintiff's complaint, however, was not filed until July 19, 1991, which is two years and two days after that event. Hence, all claims regarding injuries sustained as a result of the suicide attempt were filed too late and are precluded by the applicable statute of limitations.[FN4]

Regarding the claims brought pursuant to the Wrongful Death Act, the event that triggers liability is decedent's death, which occurred on July 19, 1989. Plaintiff's complaint, filed on July 19, 1991, was timely as to this aspect of plaintiff's case, and the claims regarding injuries sustained as a result of decedent's allegedly wrongful death are not barred by the statute of limitations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

B. *Federal Claims*

1. *Alleged Civil Rights Violations*

Even absent the statute of limitations difficulties plaguing plaintiff's federal claims, the evidence offered by plaintiff at trial was insufficient to meet her burden of proof to establish municipal liability under § 1983. The court properly directed a verdict in favor of the City as to plaintiff's federal claims and detects no basis upon which to grant plaintiff's motion for reconsideration.

The City was the only defendant named in the claims actually brought to trial. It is well-established that a municipality cannot be held liable under § 1983 for the actions of its employees on a theory of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658 at 694 (1978). Rather, a municipality is subject to direct liability under § 1983 only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." *Id.*[FN5]

Moreover, as recently explained by the Third Circuit in a case addressing municipal liability for jailhouse suicides, in order to hold the City liable for a municipal policy or procedure, "scienter-type evidence must have been adduced with respect to a high-level official determined by the district court, in accordance with local law, to have final policymaking authority in the areas in question." *Simmons v. Philadelphia,* 947 F.2d 1042, 1063 (3d Cir.1991), *cert. denied,*112 S.Ct. 1671 (1992). In other words, § 1983 liability is conditioned upon evidence indicating primary liability of a high level official possessing policymaking authority.[FN6] *Simmons,* 947 F.2d at 1063, n.17.

*4 In the specific context of alleged civil rights violations resulting in the suicide of prison detainees, the Third Circuit recently articulated the following elements which a plaintiff must prove in order establish municipal liability under § 1983:
... that the officials determined by the district court

to be the responsible policy makers were aware of the number of suicides in City lockups and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in a longstanding policy or custom of inaction in this regard. As a predicate to establishing her concomitant theory that the City violated [decedent's] rights by means of a deliberately indifferent policy to train, plaintiff must similarly have shown that such policy makers, likewise knowing of the numbers of suicides in City lockups, either deliberately chose not to provide officers with training and suicide prevention or acquiesced in a longstanding practice or custom providing no training in this area. Plaintiff additionally must establish, with respect to each of her theories, that the City's acquiescent election to take no measures to prevent suicides caused one or more of its police officers to neglect [decedent's] serious medical needs, thereby causing his constitutional injury.

*Simmons,* 947 F.2d at 1064-65.

Generally, the thrust of plaintiff's § 1983 claim is that the City promoted a policy of deliberate indifference toward potentially suicidal detainees, a policy which proximately caused decedent's suicide attempt and ultimate death. Plaintiff presented various theories for which she sought relief for violations of decedent's civil rights. Inasmuch as plaintiff has sued only the City, according to *Simmons,* plaintiff must demonstrate that a policymaking official, with knowledge of the number of suicides at PDC and alternatives available for preventing them, deliberately chose not to prevent such events or acquiesced in an official policy of inaction which facilitated decedent's suicide attempt.

To the extent that plaintiff's claim is based on the absence of any suicide watch policy, plaintiff's own evidence demonstrates that there was a City policy in place regarding persons with suicidal tendencies. Plaintiff's Exhibit P-1, entitled "Suicide Prevention and Intervention," is a nine-page document, intended for distribution among correctional officers. Exhibit P-1 contains information covering topics such as the characteristics typical of persons

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

who pose a suicide risk, precautionary measures to prevent suicide attempts, and action to be taken in response to a suicide attempt. Therefore, through plaintiff's own evidence, rather than show an absence of a suicide policy, plaintiff merely established that one existed.[FN7]

Insofar as plaintiff bases the civil rights claim upon the failure to provide a "suicide watch" area in which to house those inmates exhibiting suicidal behavior, there is no evidence that it was the official policy or custom to not provide such an area.[FN8] Furthermore, "Q" Dorm at PDC is an area in which suicidal inmates can be monitored under "close watch." As plaintiff's expert Dr. Robert Sadoff testified, "close watch" typically indicates that a patient should be continually observed by a health care professional or correctional guard trained in suicide prevention. (R. 8/19/92 at 18, 20, 22.) According to Dr. Sadoff, it is not necessary to isolate a person held under close watch and observe him on a on a one-on-one basis; rather, "close watch" can be properly carried out if the person suspected of being a suicide risk is placed in a housing unit with other, non-suicidal inmates, so long as a qualified person is designated to watch the inmate who may be at risk. (R. 8/19/92 at 18, 20.) Therefore, by placing decedent in "Q" Dorm under "close watch," PDC did provide a place for housing an inmate demonstrating suicidal tendencies.[FN9]

*5 To the extent that plaintiff attempted to establish that PDC inmates are inadequately supervised as they travel to the dining hall, even if plaintiff had proven that such a condition existed, it would not result in municipal liability under § 1983. It was plaintiff's theory that because only one guard accompanied the "Q" Dorm residents to the dining hall, decedent had the opportunity to separate himself from the remainder of the inmates in order to hang himself. Again, no evidence was presented to indicate that there existed any official City policy or custom resulting in deliberate understaffing of corrections officers or that there was a policy of deliberate indifference with regard to the escorting of inmates to various areas in the prison. Furthermore, plaintiff did not establish that any official policymaker knew that the level of supervision at PDC resulted in a greater frequency

of suicide attempts. At best, allowing decedent to separate from the remainder of the inmates may amount to negligence, for which the City cannot be held liable under § 1983. *Monell,* 436 U.S. at 694.

Similarly, assuming that plaintiff demonstrated that decedent was not administered cardio-pulmonary resuscitation ("CPR"), there is no evidence that it was a policy of PDC or the City not to give CPR to injured inmates or not to train corrections officers regarding when and how to administer CPR. That is, as with the alleged understaffing of inmate movement, the failure to give CPR may be the basis of a negligence claim, but the evidence produced by plaintiff falls short of that needed to establish municipal liability under § 1983.

The same can be said of plaintiff's claim that PDC personnel failed to follow the physician's orders to transfer decedent from one location to a suicide watch location. Plaintiff was unable to establish the existence of a policy or custom to that effect. Construed liberally in favor of plaintiff, the evidence presented at trial indicates, at most, negligence on the part of municipal employees, a condition for which plaintiff cannot recover against the City under § 1983.

### 2. *Eighth Amendment Claim*

The allegations regarding the adequacy of supervision for inmate movement to the dining hall also form the basis of plaintiff's claim under the Eighth Amendment, a claim whose preservation at trial is questionable. However, assuming that plaintiff properly raised the Eighth Amendment claim at trial, the facts developed by plaintiff are insufficient to sustain a claim of a violation of decedent's Eighth Amendment rights.

While plaintiff's Eighth Amendment allegations are vague, plaintiff apparently claims that the failure to provide two guards for inmate movement to the dining room demonstrated deliberate indifference to, or disregard of, the suicidal tendencies exhibited by decedent. In order to demonstrate deliberate indifference arising to the level of a constitutional violation, plaintiff must prove that defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 5

engaged in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

**\*6** Deliberateness and indifference cannot be presumed simply because an event occurs; plaintiff must demonstrate that the defendant consciously took a deliberate course of action or inaction. Plaintiff failed to present any evidence of such a conscious choice, but merely demonstrated that only one guard accompanied the "Q" Dorm residents to the dining hall on the day decedent hanged himself. Simply showing that an event has occurred does not enable the jury to conclude that the conduct was deliberately indifferent, any more than it might indicate that the events occurred due to negligence, accident, mistake, or as a result of confusion.

Moreover, even if plaintiff could show deliberate indifference on the part of any employee, she could not recover because no individual City employee was named as a defendant. The Eighth Amendment claim is brought through operation of § 1983, and, absent the establishment of an official policy or custom, the City cannot be held liable for the misdeeds of its employees under a theory of *respondeat superior. Monell,* 436 U.S. at 694, 98 S.Ct. at 2018.

### C. State Claims

Plaintiff asserted a claim of common law negligence against the City, claiming that its employees failed to use the degree of due care necessary to protect decedent, particularly in view of the fact that those employees knew, or should have known, that decedent had a past history of suicide attempts and that he exhibited suicidal tendencies at the time of his intake at PDC. None of plaintiff's negligence theories are viable because they were asserted against only the City, whose liability for personal injury is strictly limited by statute.[FN10]

Title 42 Pa.C.S.A. §§ 8541 and 8542 set forth the parameters of municipal liability for damages incurred for personal injury caused by the acts of the municipality or its employees. Section 8541 generally exempts municipalities from liability, except for events which occur as per the conditions listed in § 8542. Even if the jury would have concluded that City employees acted negligently in exercising their duty of care toward decedent, the alleged acts of negligence do not meet the requisite conditions set forth in § 8542(b) for the imposition of municipal liability. *See* 42 Pa.C.S.A. § 8542(b)(1-8).[FN11] Therefore, the court correctly refused to submit the negligence claim to the jury.

As for plaintiff's claim under the Wrongful Death Act, 42 Pa.C.S.A. § 8301, even if the City were responsible to plaintiff for her husband's death, plaintiff produced no evidence of the amount of damages to which she would be entitled. Wrongful death damages are designed to compensate the spouse, children or parents of the deceased for pecuniary loss they have sustained by denial of future contributions the deceased would have made in his lifetime, and as well as to allow recovery for certain administrative, funeral and medical expenses. *Burkett v. George,* 118 Pa. Commw. 543, 545 A.2d 985 (1988).

**\*7** Plaintiff did not offer sufficient evidence to allow a jury to render a verdict concerning lost earnings. Indeed, the only testimony offered were some vague estimates by decedent's widow that decedent had been earning $600.00 or $700.00 per month. Plaintiff offered no evidence regarding the means of calculating lost future earnings, nor did plaintiff present evidence regarding the extent to which decedent's own maintenance should be deducted from decedent's future earnings. Furthermore, plaintiff testified that one year prior to the suicide attempt, decedent had been in an automobile accident and had suffered injuries that prevented him from working. Plaintiff offered no evidence regarding decedent's skills or knowledge and did not establish decedent's employability in the market. Consequently, the paucity of evidence regarding lost future earnings prevented the court from submitting to the jury any claim for lost income.[FN12]

Furthermore, plaintiff did not present sufficient evidence to enable the court to submit to the jury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

any claim pertaining to loss of love, affection, tutelage, guidance, comfort, and society that decedent would have given to his wife and her children from the time of death to the time of trial and from the time of trial into the future. The only evidence offered as to such a claim was that plaintiff and decedent apparently had a relatively good relationship for the first two years of their marriage. At some point in 1988, the relationship became stormy, with decedent becoming increasingly violent with plaintiff, attacking her on a number of occasions. Decedent had been previously arrested by the police for attacking plaintiff, and she and the children had sought refuge in a shelter for victims of domestic violence. In fact, the reason for decedent's incarceration at PDC was that he had been arrested for threatening plaintiff and members of her family with a gun, and had had an altercation with her brother. Based on this evidence, the court would not let plaintiff's claim for loss of comfort and society go to the jury.

### D. *The Court's Evidentiary Rulings*

Plaintiff alternatively moves for a new trial, claiming that several of the court's evidentiary rulings, specifically the exclusion of several witnesses, were erroneous, and that absent those rulings, plaintiff would have been able to satisfy her burden of proof. Upon consideration of the positions advanced by both parties at trial and in the present motion and response, the court concludes that no evidentiary errors were committed which would entitle plaintiff to a new trial.

Since much of the court's basis for excluding those witnesses stems from the manner in which discovery was conducted, the court finds it necessary to outline a number of features of the administration of the case.[FN13] From the outset, the case has been burdened with differences between plaintiff's counsel and defendant's counsel over the manner in which the discovery and transmission of information between counsel was to take place. The discovery process was replete with disputes and disagreements as to the accuracy of each counsel's assertions that they telephoned the other, or they received letters or dispatched letters

to the other, or notified the other of some event that was to take place. There were one or two episodes in court where discovery squabbles were resolved or attempted to be resolved by the court and efforts were made to have counsel amicably proceed with the preparation of the case. On balance, defendant's counsel was more responsive and responsible to the court's requirements than plaintiff's counsel.

*8 The court filed its Rule 16 Scheduling Order on March 20, 1992. As per that Order, the parties were to complete discovery by May 19, 1992 and file their pretrial memoranda by May 26, 1992. As per the stipulation of counsel, the court extended those deadlines to July 6, 1992 and July 13, 1992, respectively. The Rule 16 Order also required counsel, at the time of filing the pretrial motions, to furnish to the other a *curriculum vitae* of any experts they were to call and to meet all other requirements of Federal Rule of Civil Procedure 26 concerning expert opinions.

As set forth at length in the hearing held before the court on July 21, 1992, numerous problems arose with respect to plaintiff's production of expert reports. As discussed at that hearing, it was apparent that the case had been languishing for months, and the court directed plaintiff to comply with all requirements regarding expert testimony if she chose to proceed further.

As the record reflects, by the time this case was called for trial, plaintiff's counsel had failed to furnish reports for several of her proposed experts, and those reports which were furnished were sent to defendant's counsel only hours before the commencement of trial. (*See e.g.,* R. 8/17/92 at 4-18.) Furthermore, plaintiff's counsel did not file its pretrial memorandum until the last working day before the start of trial, in direct disregard of the court's Order. Plaintiff also failed to furnish to the City a copy of her pretrial memorandum and the exhibits she expected to use at the trial.

Because of the stilted progression of discovery, during the course of the trial, the court required plaintiff to give offers of proof for several of her witnesses. Upon plaintiff's offer of proof regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 7

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

her expert witnesses, Dr. Sadoff and Dr. Nelson, it became apparent that both experts would give the exact same opinion. The court ruled that the receipt of both opinions would be cumulative, and, as per Federal Rule of Evidence 403, excluded one expert. Plaintiff now contends that the exclusion of her expert was error, entitling her to a new trial.

In ruling to exclude the testimony of one expert, the court specifically allowed plaintiff to choose which expert would testify. (R. 8/18/92 at 147.) This allowed plaintiff the opportunity to select the expert which she felt would give the strongest testimony or who would be more available to testify. Plaintiff chose to allow Dr. Sadoff to testify, and the court accordingly excluded the testimony of Dr. Nelson. Upon review of the record, the court concludes that Dr. Nelson's testimony was properly excluded and rejects plaintiff's request for a new trial insofar as it is based upon the exclusion of this testimony.

Plaintiff also requests a new trial based on the court's exclusion of the testimony of two inmates, presently housed at the penal facility at Huntingdon, Pennsylvania, who allegedly witnessed events pertaining to decedent's suicide attempt. The court excluded that evidence for several reasons.

*9 First, the inmates were deposed before trial without the presence of defendant's counsel and in violation of Fed.R.Civ.P. 30(a) and the court's Order precluding the depositions. Defendant's counsel notified plaintiff by letter that the City expected to file a motion for protective order on August 6, 1992, based on Federal Rule of Civil Procedure 30(a)'s mandate precluding the taking of prisoners' depositions without prior permission of court under conditions that are set by the court.

The court, through its emergency judge, on August 7, 1992, held a telephone conference with defendant's counsel and a colleague of plaintiff's counsel, who could not be located. During that conference, the emergency judge granted a protective order and prohibited plaintiff's counsel from deposing those prisoners until counsel could agree on a discovery plan which met with the court's approval.

Plaintiff's counsel's colleague failed to communicate to plaintiff's counsel the results of the telephone conference and, despite knowledge that the defendant was objecting to their prisoner depositions, plaintiff's counsel visited the prisoners at the Huntingdon facility with a court reporter and took their depositions out of the presence of defendant's counsel and in violation of both Rule 30(a) and the ruling of the emergency judge. Absent proper pretrial depositions, the court precluded the testimony of the two prisoners during the trial on the ground that it was patently unfair to expect the City to defend against testimony of which it had no knowledge, and in respect to which depositions had not been allowed by the court because of the failure of plaintiff's counsel to convene with defendant's counsel to develop conditions under which the court could allow prisoner depositions to be taken under Fed.R.Civ.P. 30(a).

Second, the court excluded the testimony of the inmates because it was cumulative under Fed.R.Evid. 403. Plaintiff's offer of proof regarding the inmates' testimony was that they had seen decedent hanging from the stairs and that he had been hanging there for 7 to 8 minutes before any correctional officers arrived. They were further prepared to testify that no CPR had been given in an attempt to revive decedent. This testimony had already been offered through other witnesses. In light of the cumulative nature of the evidence, coupled with the inherent unfairness of allowing the inmates to testify, the court prohibited the introduction of their testimony. Upon review of the record, the court concludes that the exclusion of the testimony of the inmates was proper.

### III. CONCLUSION

For the reasons set forth above, the court will deny plaintiff's motion for reconsideration of its entry of directed verdict in favor of the City. Moreover, the court will deny plaintiff's request for a new trial as well as her request for the imposition of sanctions.

An appropriate Order follows.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 8

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

ORDER

AND NOW, TO WIT, this day of March, 1993, upon consideration of plaintiff's motion for reconsideration or new trial and plaintiff's motion for sanctions, IT IS ORDERED that said motions are *denied.*

> FN1. The complaint also named as a defendant Press Grooms, Warden of PDC. Upon the stipulation of counsel, the court, by Order dated August 18, 1992, dismissed Grooms as a defendant.

> FN2. Apparently, two of plaintiff's children are decedent's biological children, and the other two are plaintiff's children from a previous marriage.

> FN3. As discussed below, the particular dates of these events, July 17, 1989, the day of the hanging, and July 19, 1989, the day of the death, are very important in respect to the applicable statute of limitations for the state causes of action brought pursuant to the Pennsylvania Survival Act and Wrongful Death Act.

> FN4. Hence, as a matter of law, plaintiff was barred from recovering any amount to which decedent's estate may have been entitled which would have been related to the injuries sustained due to the hanging itself, such as pain and suffering.

> FN5. A municipal policy is defined as a " statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Monell,* 436 U.S. at 690. A municipal custom lacks the formal approval of a policy and is found where " ' such practices of state officials ... [are] so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Id.* at 691 (*quoting Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970) ).

> FN6. As the *Simmons* court indicated, however, it is not necessary that the policymaker, who may enjoy some type of immunity, actually be held liable under § 1983. *Simmons,* 947 F.2d at 1063, n.16.

Prior to the commencement of trial, plaintiff filed a motion requesting that the court identify the official policy makers, which, after a hearing held on July 21, 1992, was denied by the court by Order dated July 27, 1992. Plaintiff persists in arguing that it is the court's responsibility to identify the official policymakers responsible for setting policy with regard to suicidal detainees. Plaintiff's motion did not request that the court determine whether an individual named by plaintiff was an official policymaker. Rather, plaintiff's motion was more in the form of a discovery request, whereby plaintiff demanded that the court supply her with the names of individuals in the City who could be held as official policymakers.

While it is the court's duty to determine whether the person proffered by a plaintiff to be a policymaker with respect to the events at issue is, as a matter of state law, so empowered, *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701 (1989), the court is not obligated to do discovery for a party and provide plaintiff with a list of names of the persons who hold such authority.

At trial, the only official policymaker mentioned in the record is Prison Superintendent Owens. In a discourse with counsel, the court identified Superintendent Owens as an official policymaker, and rejected plaintiff's assertion that the correctional officers were official policymakers. (R. 8/18/92 at 140.)

Therefore, the court fulfilled any obligation it has to identify the City policymakers involved in this action.

> FN7. Moreover, plaintiff did not offer evidence that any policymaking official deliberately chose or acquiesced in a longstanding policy or custom of failing to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 9

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

disseminate to correctional officers the information set forth in Exhibit P-1 or of instructing correctional officers to ignore that information.

FN8. In any event, plaintiff's argument to this effect is irrelevant because the event at issue did not occur in "Q" Dorm and is not related to his confinement in that area. Rather, decedent hanged himself in the stairwell on the way to the dining hall.

FN9. Whether decedent was properly monitored while a resident in "Q" Dorm merely raises an issue regarding negligence. In fact, it was Dr. Sadoff's opinion that the proximate cause of decedent's suicide attempt was negligence. (R. 8/19/92 at 16.)

FN10. Sufficient evidence existed to submit to the jury a negligence claim asserted against individual municipal employees based upon the failure of those employees to adequately perform their duties as reasonable correctional officers. However, the court was unable to allow the jury to consider that claim because none of those individuals were named as defendants.

FN11. Furthermore, to the extent that plaintiff asserts liability to the City for any City employee's wilful misconduct, such a claim is specifically barred by 42 Pa.C.S.A. § 8542(a)(2).

FN12. In addition, plaintiff presented no evidence pertaining to other cognizable damage claims, such as medical expenses, funeral expenses or administrative fees associated with her husband's death.

FN13. A review of the record regarding the discovery process also leads the court to conclude that plaintiff's motion for sanctions must be denied.

E.D.Pa.,1993.
Littlejohn v. City of Philadelphia

Not Reported in F.Supp., 1993 WL 79600 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# <u>Saunders v. Sullivan</u>

608 A.2d 730, 1992 WL 53423 (Del. 1992)

Westlaw.

608 A.2d 730                                                                                    Page 1

608 A.2d 730, 1992 WL 53423 (Del.Supr.)
**(Cite as: 608 A.2d 730, 608 A.2d 730 (Table))**

**H**
Saunders v. Sullivan
Del.,1992.
(The decision of the Court is referenced in a
Atlantic Reporter in a 'Table of Decisions Without
Published Opinions.')
Supreme Court of Delaware.
Robert SAUNDERS, Plaintiff Below, Appellant,
v.
John SULLIVAN, John Ellingsworth, Stan Taylor,
Ellie Shockle, Marlene Litchensladter and
Department of Corrections, Defendants Below,
Appellees.
No. 373,1991.

Submitted: Jan. 27, 1992.
Decided Feb. 26, 1992.

Court Below: Superior Court of the State of
Delaware in and for New Castle County, C.A. No.
86-C-DE-2.
Superior Court, New Castle County, 1991
WL21S915

AFFIRMED.

Before MOORE, WALSH and HOLLAND,
Justices.

WALSH, Justice.
*1 This 26th day of February, 1992, upon
consideration of the appellant's *pro se* brief and the
appellees' motion to affirm pursuant to Supreme
Court Rule 25(a), it appears to the Court that:

(1) The appellant, Robert Saunders ("Saunders")
appeals the granting of a motion for summary
judgment by the Superior Court in a negligence
action arising out of an assault on Saunders by other
inmates incarcerated at the Sussex Correctional
Institute ("SCI"). The Superior Court granted

summary judgment on the ground that Saunders'
claim was barred under the doctrine of *res judicata*.
The Superior Court also noted that even absent
such bar there was no factual basis upon which to
posit a claim of gross or wanton negligence as
required under Delaware law.

(2) Saunders initially brought his claim in federal
court. *Robert Saunders v. John L. Sullivan, et al.,*
C.A. No. 86-574-LON Magistrate's Report and
Recommendation (D.Del. February 9, 1989) (the
federal suit). The Superior Court, in deciding the
motion for summary judgment, adopted a recitation
of those facts determined in the federal suit.

On September 9, 1986 Saunders was transferred to
SCI. Prior to this transfer, Saunders wrote to
prison officials informing them that his transfer to
SCI would cause problems because "former
members of the Arran [sic] Brotherhood gang" were
housed there. Due to the presence of this group,
Saunders claimed that there were racial tensions at
SCI.

On November 17, 1986, there was an outbreak of
racial violence at SCI which resulted in an inmate
being stabbed. The next day, Saunders was
stabbed in the neck, chest, and thigh by five white
inmates who used prison fashioned knives.

(3) Saunders, in the federal suit and in this action,
claims that he should never have been sent to SCI
given the alleged presence of "white inmates who
held membership in Arran [sic] Brotherhood" and
the appellees failed to take any measures to address
the racial problems caused by the presence of that
group. Thus, Saunders contends that the appellees
failed to adequately protect him. In order for
Saunders' claim to succeed under Delaware law, he
must establish that the appellees acted with gross or
wanton negligence. *See*10 *Del.C.* § 4001.

The federal magistrate concluded that since
Saunders failed to show any facts which would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

608 A.2d 730                                                                                    Page 2

608 A.2d 730, 1992 WL 53423 (Del.Supr.)
**(Cite as: 608 A.2d 730, 608 A.2d 730 (Table))**

substantiate his claim that his safety was in danger, there was no reason to conclude that the appellees were deliberately indifferent to Saunders' safety. The Superior Court, applying the doctrine of *res judicata*, barred Saunders' State law claim and granted the appellees' motion for summary judgment.

(4) A party is precluded from raising in subsequent lawsuits a claim that was resolved in a prior action. This preclusion results when: (1) the original court had jurisdiction, (2) the parties in both suits are identical, (3) issues in the second lawsuit were decided in the first suit, (4) the disposition of the first suit was adverse to the proponent of the claim, and (5) the disposition was final. *Epstein v. Chatham Park, Inc.,* Del.Super., 153 A.2d 180 (1959). A review of the record establishes that the Superior Court was correct in applying the doctrine of *res judicata* since each prong of this test was met. The federal court certainly had jurisdiction over the parties and the subject matter. The parties are identical and the disposition of the federal suit was adverse to Saunders and is final, having been sustained on appeal. *Robert Saunders v. Sullivan, et al.,* D.C. Civil No. 86-00574, (D.Del., April 6, 1989), *aff'd,* No. 89-3263 (3rd Cir., Oct. 24, 1989).

**\*2** (5) Under federal standards, an inmate may recover from prison officials for an assault by fellow inmates if the inmate can demonstrate that the officials were deliberately indifferent to a substantial risk that the inmate would incur serious personal injury. *Wheeler v. Sullivan,* D.Del., 599 F.Supp. 630, 640-41 (1984). Applying this standard, the magistrate concluded that the appellees in this case were not deliberately indifferent to a substantial risk to Saunders' safety. For *res judicata* purposes, the Superior Court was required to determine if the magistrate's finding of " no deliberate indifference" was the equivalent of no gross or wanton negligence as required by Delaware law.

To establish gross negligence a party must demonstrate "more than ordinary inadvertence or inattention." *Jardel Co., Inc. v. Hughes,* Del.Supr., 523 A.2d 518, 530 (1987). Gross negligence is the failure to perceive a risk of such a nature and degree that the failure to perceive such risk constitutes a gross deviation from the standard of care exercised by a reasonable person. *Id.* Wanton behavior, on the other hand, is similar to recklessness; it is a conscious indifference to a substantial risk. *Id.*

The deliberate indifference standard, as applied in the federal suit, requires proof of indifference to known substantial risks. Delaware mandates this same requirement. *Jardel,* 523 A.2d at 530. The equivalency satisfies the "same issues" prong of *res judicata.* Thus, the Superior Court was correct in granting the appellee's motion for summary judgment on the basis of the doctrine of *res judicata.*

(6) Finally, the Superior Court also ruled that even absent the application of *res judicata,* there was no factual basis upon which to posit a claim of gross or wanton negligence. We find no error in this ruling.

(7) It is manifest on the face of the opening brief that the appeal is without merit because the issues on appeal are clearly controlled by settled Delaware law.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED.

Del.,1992.
Saunders v. Sullivan
608 A.2d 730, 1992 WL 53423 (Del.Supr.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et al.,                    )
                                         )
            Plaintiffs,                  )
                                         )
      v.                                 )              C. A. No. 06-104-JJF
                                         )
FIRST CORRECTIONAL MEDICAL               )
INC.; et. al.,                           )
                                         )
            Defendants.                  )

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on <u>October 15, 2007</u>, she caused the attached, *Opening Brief in Support of State Defendants' Motion for Summary Judgment*, to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire          Daniel McKenty, Esquire
Martin & Wilson, P.A.               Heckler & Frabizzio
1508 Pennsylvania Ave., Suite 1C    P.O. Box 128
Wilmington, DE 19806                Wilmington, DE 19899-0128

                                    /s/ Stephani J. Ballard
                                    Stephani J. Ballard, I.D. #3481
                                    Deputy Attorney General
                                    Carvel State Office Building
                                    820 N. French Street, 6th Floor
                                    Wilmington, DE  19801
                                    (302)577-8400
                                    Attorney for State Defendants

31