## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, individually;<br>TINA GROSSMAN as next friend of<br>BRITTANY BARKES; TINA<br>GROSSMAN as next friend of<br>ALEXANDRA BARKES; and<br>KAREN BARKES as administratrix<br>of the ESTATE OF CHRISTOPHER<br>BARKES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** | ) | C. A. No. 06-104-JJF |
| | )<br>) | |
| v. | )<br>) | |
| FIRST CORRECTIONAL MEDICAL<br>INC.; STANLEY TAYLOR;<br>RAPHAEL WILLIAMS;<br>CERTAIN UNKNOWN INDIVIDUAL<br>EMPLOYEES OF STATE OF<br>DELAWARE DEPARTMENT OF<br>CORRECTION; CERTAIN<br>UNKNOWN INDIVIDUAL<br>EMPLOYEES OF FIRST<br>CORRECTIONAL MEDICAL, INC.,<br>And STATE OF DELAWARE,<br>DEPARTMENT OF CORRECTION, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Defendants.** | )<br>) | |

## APPENDIX TO OPENING BRIEF IN SUPPORT OF
## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED: October 15, 2007        Attorney for State Defendants

## TABLE OF CONTENTS

Affidavit of Correctional Officer Brian Emig ........................................................A000001

Affidavit of Correctional Officer Brian Forte.......................................................A000003

Affidavit of Correctional Officer Kimphus Daniels ..............................................A000005

Affidavit of Correctional Officer Denisha Young ..................................................A000007

Affidavit of Correctional Officer Sandra Rayne.....................................................A000009

Deposition of Karen Barkes...................................................................................A000011

Complaint...............................................................................................................A000032

State Defendants' Answer to Complaint and Crossclaim.......................................A000042

FCM's Answer to State Defendants' Crossclaim ..................................................A000054

Rule 16 Scheduling Order......................................................................................A000059

State Defendants' Rule 26(a)(1) Initial Disclosures ..............................................A000063

Plaintiffs' Rule 26(a)(1) Initial Disclosures..........................................................A000068

Plaintiffs' Responses to State Defendants 1st Set of Interrogatories......................A000075

Plaintiffs' Responses to State Defendants 1st Set of Requests for Admission........A000090

State Defendants' Responses to Plaintiffs' 1st Set of Interrogatories ....................A000096

State Defendants' Responses to Plaintiffs' 1st Set of Requests for Production ......A000110

State Defendants' Letter Request re: Discovery Responses, 6/4/07.......................A000117

Plaintiffs' 8/6/07 Letter Response to Defendants 6/4/07 letter...............................A000120

Plaintiffs' Answers to State Defendants' 2nd Set of Interrogatories .......................A000123

State Defendants' Supplementation of Initial Disclosures .....................................A000131

State Defendants' Second Supplementation of Initial Disclosures.........................A000134

***RECORDS PRODUCED BY STATE DEFENDANTS IN DISCOVERY***

FCM Medical/Intake Screening Documents, 11/13/04 ..........................................A000145

Incident Reports, 11/14/04...............................................................................A000150

Perry Phelps Email, 11/15/04 re: Barkes' suicide ...................................................A000154

Mortality Review, page 3....................................................................................A000155

Toxicology Report ..............................................................................................A000156

Standard Operating Procedure, Policy 190.04, re: Suicide Prevention ..................A000157

DOC Suicide Prevention Training Materials..........................................................A000161

DOC Suicide Prevention Training Logs ................................................................A000194

HRYCI Shift Commander's Report/Staffing Logs, 11/13-11/14/04 .....................A000209

Warden Raphael Williams Employee Time Card, 2004.........................................A000280

Documents re: Barkes' 1997 Incarceration............................................................A000281

Documents re: Barkes' 11/13/07 VOP Arrest .......................................................A000287

FCM Contract with DOC......................................................................................A000289

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **KAREN BARKES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 06-104-JJF** |
| | ) | |
| **FIRST CORRECTIONAL MEDICAL** | ) | |
| **INC.; et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**CERTIFICATE OF MAILING AND/OR DELIVERY**</u>

The undersigned certifies that on <u>October 15, 2007</u>, she caused the attached,

*Appendix to Opening Brief in Support of State Defendants' Motion for Summary*

*Judgment,* to be electronically filed with the Clerk of Court using CM/ECF which will

send notification of such filing to the following:

Jeffrey K. Martin, Esquire        Daniel McKenty, Esquire
Martin & Wilson, P.A.             Heckler & Frabizzio
1508 Pennsylvania Ave., Suite 1C  P.O. Box 128
Wilmington, DE 19806             Wilmington, DE 19899-0128

                                  /s/ Stephani J. Ballard
                                  Stephani J. Ballard, I.D. #3481
                                  Deputy Attorney General
                                  Carvel State Office Building
                                  820 N. French Street, 6th Floor
                                  Wilmington, DE  19801
                                  (302)577-8400
                                  Attorney for State Defendants

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,         )
                                 )
                                 )
        Plaintiffs,        )
                                 )
v.                                  )
                                 )
FIRST CORRECTIONAL MEDICAL  )
INC.; STANLEY TAYLOR, et. al.    )     C. A. No. 06-104-JJF
                                 )
        Defendants.      )

**Affidavit of Correctional Officer Brian Emig**

1.     I am a Correctional Officer employed by the State of Delaware Department of

Correction. I held that position, and was working as a CO at Howard R. Young

Correctional Institution in November 2004.

2.     On Saturday, November 13, 2004, I was working 8:00 a.m. to 4:00 pm. shift in

the Booking and Receiving (B/R) area of the prison. I recall an inmate named

Christopher Barkes arriving at the facility to be held on a violation of probation that

afternoon. I recall Barkes asking me if he (Barkes) would be going downstate (to the

VOP center) and I said yes.

3.     Barkes seemed fine, and did not act differently from other inmates. I believe I

was the CO who strip searched Barkes. I would have called medical if anything had

seemed wrong with this inmate.

4.     Barkes was given an intake medical examination by a nurse. He was medically

cleared, and then I brought him back to his cell in the B/R area.

5.     I also worked the morning shift on Sunday November 14, 2004 in another area of

the prison, and I responded to B/R when the medical emergency Code was called. When

I arrived, Barkes was on the floor and medical personnel were doing CPR. I was not involved in the resuscitation efforts.

BE IT REMEMBERED that on this _15th_ day of _October_, 2007, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **BRIAN EMIG**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of his knowledge, information and belief.

BRIAN EMIG

SWORN TO AND SUBSCRIBED before me on this _15_ day of _Oct_, 2007

Notary Public

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,                    )
                                          )
                                          )
          Plaintiffs,                     )
                                          )
v.                                        )
                                          )
FIRST CORRECTIONAL MEDICAL                )
INC.; STANLEY TAYLOR, et. al.             )    C. A. No. 06-104-JJF
                                          )
          Defendants.                     )

### Affidavit of Correctional Officer Brian Forte

1.      I am a Correctional Officer employed by the State of Delaware Department of

Correction. I held that position, and was working as a CO at Howard R. Young

Correctional Institution in November 2004.

2.      On November 13, 2004, I was working 8:00 a.m. to 4:00 pm. shift in the Booking

and Receiving area of the prison. I recall an inmate named Christopher Barkes arriving at

the facility to be held on a violation of probation that afternoon.

3.      Barkes exhibited no unusual behavior during his intake. I remember Barkes as

being mild mannered, respectful, and clean cut.

4.      Barkes was seen by an FCM nurse for a medical evaluation as part of his intake.

The nurses do the medical intake just down the hall from the Booking and Receiving

area.

5.      If I had observed any unusual behavior by this inmate, I would have alerted the

medical staff.

        BE IT REMEMBERED that on this ___11th___ day of _October_, 2007,

personally appeared before me, the Subscriber, a Notary Public for the State and County

aforesaid, **BRIAN FORTE**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of his knowledge, information and belief.

_BRIAN FORTE_

SWORN TO AND SUBSCRIBED before me on this _11_ day of _Oct_, 2007.

_Notary Public_

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,                )
                                       )
                                       )
            Plaintiffs,                )
                                       )
v.                                     )
                                       )
FIRST CORRECTIONAL MEDICAL            )
INC.; STANLEY TAYLOR, et. al.          )     C. A. No. 06-104-JJF
                                       )
            Defendants.                )

**Affidavit of Correctional Officer Kimphus Daniels**

1.      I am a Correctional Officer employed by the State of Delaware Department of

Correction. I held that position, and was working as a CO at Howard R. Young

Correctional Institution in November 2004.

2.      On November 13-14, 2004, I was working on the overnight shift (midnight to

8:00 a.m.), in the Booking and Receiving area of the prison. I was the lead worker on

that shift, and was relieved by CO Sandra Rayne at 0800.

3.      An inmate named Christopher Barkes was the only inmate being housed in

Booking and Receiving at the time. Barkes was being held on a violation of probation,

and was to be transferred to another facility on Monday, November 15, 2004.

4.      During the overnight, I recall that I saw Barkes asleep. I noticed nothing at all

strange or unusual with Barkes' behavior on that overnight shift. No one else on the shift

mentioned anything unusual about him.

5.      If I had observed any erratic behavior by this inmate, I would have alerted the

medical staff.

6.      Barkes was served breakfast before 8:00 a.m.

BE IT REMEMBERED that on this ___/ /___ day of ___Oct___, 2007,

personally appeared before me, the Subscriber, a Notary Public for the State and County

aforesaid, **KIMPHUS DANIELS**, who, being by me duly sworn according to law did

depose and say that the foregoing statement is correct to the best of his knowledge,

information and belief.

KIMPHUS DANIELS

SWORN TO AND SUBSCRIBED before me on this _//_ day of _Oct_, 2007.

Notary Public

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,                )
                                      )
                                      )
            Plaintiffs,               )
                                      )
v.                                    )
                                      )
FIRST CORRECTIONAL MEDICAL            )
INC.; STANLEY TAYLOR, et. al.         )        C. A. No. 06-104-JJF
                                      )
            Defendants.               )

**Affidavit of Correctional Officer Denisha Young**

1.      I am a Correctional Officer employed by the State of Delaware Department of

Correction. I held that position, and was working as a CO at Howard R. Young

Correctional Institution in November 2004.

2.      On November 13-14, 2004, I was working on the overnight shift (midnight to

8:00 a.m.), in the Booking and Receiving (B/R) area of the prison. I recall inmate

Christopher Barkes as a VOP. He was being housed in the first cell in the B/R area.

3.      I did periodic checks on Barkes on the overnight shift and he seemed fine. I took

him breakfast at 6:30 and he ate. I saw nothing at all strange about him, and he did not

appear to me to be upset.

4.      I stayed on to work overtime on the next shift (November 14, 2004, 0800-1600),

but I was not working in B/R. I recall that the prison was locked down after the Code

was called.

        BE IT REMEMBERED that on this ___15th___ day of _Qctober_, 2007,

personally appeared before me, the Subscriber, a Notary Public for the State and County

aforesaid, **DENISHA YOUNG**, who, being by me duly sworn according to law did

depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_____
DENISHA YOUNG

SWORN TO AND SUBSCRIBED before me on this *15* day of *Oct*, 2007.

_____
Notary Public

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,                      )
                                            )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          )
                                            )
FIRST CORRECTIONAL MEDICAL                  )
INC.; STANLEY TAYLOR, et. al.               )       C. A. No. 06-104-JJF
                                            )
            Defendants.                     )

## Affidavit of Correctional Officer Sandra Rayne

1.      I am a Correctional Officer employed by the State of Delaware Department of
Correction. I held that position, and was working as a CO at Howard R. Young
Correctional Institution in November 2004.

2.      On Sunday, November 14, 2004, I was working 8:00 a.m. to 4:00 pm. shift in the
Booking and Receiving (B/R) area of the prison. At approximately 11:35 a.m. CO
Martelli yelled "Cpl. Rayne, come here!" I responded to the cell where inmate
Christopher Barkes was housed and found him hanging and CO Martelli attempting to
get him down. I ran and got the cutters and assisted CO Martelli in cutting down Barkes.
A medical emergency Code was called by CO Dorene Fields and medical personnel
arrived quickly.

3.      Earlier that morning, I had asked Barkes if he wanted to take a shower and he said
no. I asked him "are you OK?" and he said yes. In my experience, it was not unusual for
an inmate not to want to take a shower.

**A000009**

4.  Barkes was sitting or lying down in his cell when I saw him that morning. He did not appear to be depressed, and I did not notice anything about him I considered unusual. If there had been a problem evident, we would have called medical.

BE IT REMEMBERED that on this ___11___ day of __October__, 2007, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **SANDRA RAYNE**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_Sandra R Rayne_
SANDRA RAYNE

SWORN TO AND SUBSCRIBED before me on this _11_ day of _Oct_, 2007.

_[signature]_
Notary Public



**WILCOX & FETZER LTD.**

In the Matter Of:

# Barkes, et al.

## v.

# First Correctional Medical, Inc., et al.

### C.A. # 06-104 JJF

---

Transcript of:

Karen Barkes

**September 24, 2007**

---

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

A000011

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAREN BARKES,                    )
individually, et al.,            )
                                 )
    Plaintiffs,                  )
                                 )
    v.                           ) C.A. No. 06-104 JJF
                                 )
FIRST CORRECTIONAL               )
MEDICAL, INC., et al.,           )
                                 )
    Defendants.                  )

            Deposition of KAREN S. BARKES taken
pursuant to notice at the offices of the Department of
Justice, 820 North French Street, 6th Floor, Wilmington,
Delaware, beginning at 10:05 a.m., on Monday,
September 24, 2007, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street - Suite 102
          Wilmington, Delaware 19801
          for the Plaintiffs

        GERALD J. HAGER, ESQUIRE
        HECKLER & FRABIZZIO
          800 Delaware Avenue - Suite 200
          Wilmington, Delaware 19801
          for the Defendant First Correctional
          Medical, Inc.

        STEPHANI J. BALLARD, ESQUIRE
        DEPARTMENT OF JUSTICE
          820 North French Street - 6th Floor
          Wilmington, Delaware 19801
          for the State defendants
            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

Barkes, et al. v. First Correctional Medical, Inc., et al.

```
2
1              KAREN S. BARKES,
2         the witness herein, having first been
3         duly sworn on oath, was examined and
4         testified as follows:
5    BY MS. BALLARD:
6    Q.   Good morning.  Is it Barkes?
7    A.   Yes.
8    Q.   I'm sure your attorney has discussed how a
9    deposition works with you, but just to refresh your
10   memory, I'll be asking you questions.  It's an informal
11   process, but the court reporter is taking down everything
12   we say.  So it's important that only one of us speak at
13   once.  If you answer with a "yes" or "no," do that
14   verbally like "yes," "no," not "uh-huh," because that's
15   hard to understand on the record.
16           Also, if you don't understand one of my
17   questions, let me know.  Okay?
18   A.   Okay.
19   Q.   Just before we get started, I'm sure you
20   discussed this with your attorney, obviously we're going
21   to be covering some areas that are probably going to be
22   difficult with you.  Your marriage with Christopher, your
23   recovery issues, yours and his, and I know it won't be
24   easy for you to answer some of these questions, but
```

```
3
1    because you did file a lawsuit, all these things are at
2    issue, so we have to cover them.  Okay?
3    A.   Okay.
4    Q.   If you need to take a break at any time, just
5    let me know and we will do that.
6    A.   All right.
7    Q.   Other than your attorney, did you discuss the
8    fact that you were having a deposition with anybody
9    before coming here?
10   A.   Yes.  My family and friends.
11   Q.   What did you discuss with them?
12   A.   Just basically that I was coming.
13   Q.   Did you talk about areas that we might cover in
14   the deposition, about Chris or yourself?
15   A.   No, not really.
16   Q.   Did you do anything else to prepare?
17   A.   Jeff and I talked.
18   Q.   You don't have to talk about whatever you
19   talked about with Jeff.
20           Did you look at any documents at home or
21   anything like that?
22   A.   I read over the suit.
23   Q.   How old are you?
24   A.   Thirty-nine.
```

```
4
1    Q.   Where did you go to high school and college if
2    you went?
3    A.   I went to John Dickinson, and I went to an
4    adult ed in Washington, D.C.
5    Q.   Is that a GED?
6    A.   No.  I just took classes.
7    Q.   College classes?
8    A.   No.  High school classes.
9    Q.   Do you have a high school diploma?
10   A.   No.
11   Q.   Where are you living right now?
12   A.   200 Garrett Court -- no, Garrett Road.
13   Q.   How long have you been there?
14   A.   Just under a year.
15   Q.   Were you living --
16   A.   3111 Crystal Court.
17   Q.   Before that?
18   A.   Yes.
19   Q.   What do you do for a living?
20   A.   I'm a house cleaner.
21   Q.   Do you work for an agency or do you just work
22   on your own?
23   A.   On my own.
24           MS. BALLARD:  Could we go off the record?
```

```
5
1           (Discussion off the record.)
2    BY MS. BALLARD:
3    Q.   How long have you been employed as I guess I
4    would say a self-employed house cleaner?
5    A.   About 15 years.
6    Q.   Do you have any children?
7    A.   No.
8    Q.   When did you and Chris get married?
9    A.   April 5th, 2003.
10   Q.   How long did you know Chris before you got
11   married?
12   A.   Since we were 18 or 19.
13   Q.   How did you meet?
14   A.   His first wife's graduation party.
15   Q.   Did you all go to high school together?
16   A.   No.  It was a college graduation.
17   Q.   So you were at the party and he was at the
18   party?
19   A.   Uh-huh.
20   Q.   You didn't know him from going to school
21   together or anything like that?
22   A.   No.  I knew him from AA meetings, but we met at
23   the party.
24   Q.   Did you keep in touch all those years or did
```

2 (Pages 2 to 5)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

**6**

1  you meet up again later?
2  A.  On and off I'd see him.
3  Q.  Were you ever married before you were married
4  to Chris?
5  A.  No.
6  Q.  Have you been married since?
7  A.  No.
8  Q.  Have you lived with anyone since Chris's death?
9  A.  No.
10  Q.  Do you keep a diary?
11  A.  No.
12  Q.  Do you keep like a date book in which you write
13  important events or anything like that?
14  A.  No.
15  Q.  Did you in 2003 or 2004?
16  A.  No.
17  Q.  Tell me about the last time you talked to Chris
18  prior to his death.  The very last time.
19  A.  He called me on the 13th and said he was in
20  Gander Hill.  He said that he hadn't gotten high, that
21  they got him on a probation violation, that he was tired
22  of messing up and he's sorry to hurt me and he couldn't
23  hurt me anymore and to tell the girls that they loved them.
24  Q.  And the girls refer to his --

**7**

1  A.  Brittany and Allie.
2  Q.  Who are his daughters from a previous marriage?
3  A.  Yes.
4  Q.  Did they live with the two of you?
5  A.  No.
6  Q.  I guess you answered this.  Did he tell you why
7  he had been arrested?
8  A.  A probation violation.
9  Q.  Did he say what it was?
10  A.  No.  They would stay weekends with us.
11  Q.  The girls would?
12  A.  Yes.
13  Q.  This was on a weekend, correct?
14  A.  Yes.
15  Q.  Were they at your house at the time?
16  A.  No.
17  Q.  Is there anything else you remember about the
18  conversation?  How long was the conversation?
19  A.  Three minutes.
20  Q.  Anything else you remember about it?
21  A.  I was adamant that I wasn't going to say
22  anything to the girls, that he should call them himself,
23  and I told him that he could do the 60 days violation of
24  probation standing on his head and that he should -- that

**8**

1  we would figure things out when he got out.
2  Q.  Had he been picked up on a VOP -- you know that
3  that means violation of probation?
4  A.  Yes.
5  Q.  Had he been picked up on a violation of
6  probation before this?
7  A.  Yes.
8  Q.  How long before this?
9  A.  March of 2004.
10  Q.  Did he have to spend time either in prison or
11  in a level 4 facility or was he out on his own?
12  A.  No.  He was at the VOP down in Sussex.
13  Q.  Was that the 60 days you were referring to?
14  A.  Maybe it's Georgetown.  No.  I had known from
15  before that probably a violation of probation would be
16  60 days at the maximum.
17  Q.  What did you mean by telling him he could do
18  that easily?
19  A.  Because he did a year and a half -- or two and
20  a half years prior.
21  Q.  In prison?
22  A.  Yes.
23  Q.  But the VOP --
24  A.  He said that he couldn't deal with being in

**9**

1  prison again and that he couldn't deal with getting out
2  and having to rebuild his life again.
3  Q.  Did he say that during this November 13th
4  conversation or some other time?
5  A.  Yes.  No, that.  He told me he was going to
6  kill himself.
7  Q.  He told you during that conversation?
8  A.  That he wanted to.
9  Q.  What exactly did he say to you?
10  A.  He said, "I can't live this way anymore."  I
11  knew that that meant that he was -- that he wanted to
12  kill himself.
13  Q.  What did you do about that?
14  A.  I told --
15  Q.  Did that concern you?
16  A.  Yes.  I told him that he would be fine, he
17  could do up to the 60 days and then when he got out, that
18  we would work on getting things back together.
19  Q.  What did he say?
20  A.  He said he didn't think he could do it and just
21  tell the girls that they loved them and that he loved me
22  and he was sorry that he hurt me.
23  Q.  Were you concerned at that point that he
24  actually would kill himself?

3  (Pages 6 to 9)

**A000014**

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

**10**

1    A.  I thought he couldn't kill himself because he
2    was in jail.
3    Q.  Do you remember answering some written
4    questions in connection with this case maybe four or five
5    months ago --
6    A.  Yes.
7    Q.  -- your attorney sent you?
8        Do you recall being asked what about Chris
9    prior to that incarceration in November of 2004 would
10   have put someone on alert that he was a suicide risk?
11   A.  Yes.
12   Q.  Isn't it correct that you didn't mention that
13   he told you that he would kill himself in that phone
14   conversation?
15   A.  I knew that nobody would know that phone
16   conversation.
17   Q.  But isn't that something that you considered
18   certainly an alert that he was a risk to kill himself at
19   that time?
20   A.  I don't understand.
21   Q.  Well, given the fact that you were asked about
22   signs that Christopher could have been a risk to kill
23   himself, you didn't mention that he actually told you
24   that he wanted to kill himself or something you

**11**

1    interpreted that way the day he went into prison.  Is
2    there a reason you didn't mention that?
3    A.  To me the previous suicide attempts, the fact
4    that his probation officer knew that he was suicidal and
5    he went in on a probation violation, the fact that he was
6    on medication, the fact that he was a drug addict and
7    alcoholic, those were the factors that...
8    Q.  Do you have personal knowledge of exactly what
9    he told the personnel in prison when he got there that
10   day?
11   A.  No.
12   Q.  Who is his probation officer that you referred
13   to?
14   A.  He had just changed probation officers at the
15   1st of November, and I'm unaware of her name.
16   Q.  So in November 2004 he had a new probation
17   officer?
18   A.  Yes.
19   Q.  Did you after having that conversation with
20   Chris call anyone to try to take steps to help him?  Did
21   you do anything in response to what he told you?
22   A.  No.  I hung up the phone and knowing that he
23   was in prison and that they knew the information about
24   him being suicidal, I knew that they would take care of

**12**

1    him.
2    Q.  How did you presume that they knew that?
3    A.  Because of his record before, his previous
4    suicide attempt in Gander Hill and his history.
5    Q.  Prior to that conversation on November 13th,
6    what was the last prior contact you had with Chris before
7    he went into prison, either in person or by phone?
8    A.  That morning we had talked.
9    Q.  On the phone?
10   A.  Uh-huh.
11       MR. MARTIN:  Yes?
12       THE WITNESS:  Yes.
13   BY MS. BALLARD:
14   Q.  And what was the substance of that
15   conversation?
16   A.  He was supposed to come over at noon and we
17   were going to have lunch together and do some stuff
18   around the house.
19   Q.  Anything else you talked about that morning?
20   A.  Nothing remarkable.
21   Q.  What time was the last conversation when you
22   told me about before, if you remember?  What time of day?
23   A.  6 o'clock.
24   Q.  P.m.?

**13**

1    A.  Yes.
2    Q.  Were you concerned between 12:00 and 6:00 that
3    he hadn't shown up at your house?
4    A.  Yes.
5    Q.  Did you try to call anybody to find out where
6    he was?
7    A.  Yes.
8    Q.  Who did you call?
9    A.  Aunt Helen.  I tried to call his cell phone.
10   Q.  I take it you didn't reach Chris by cell?
11   A.  No.
12   Q.  Did you talk to Aunt Helen?
13   A.  Yes.  She said that he had left around 12:00
14   and that she hadn't seen him.
15   Q.  What's Helen's full name?
16   A.  Helen Young.
17   Q.  When was the last time you actually saw or
18   spent time with Chris in person before he went into
19   prison on November 13th, 2004?
20   A.  Friday evening.
21   Q.  So that would be Friday, the 12th?
22   A.  Yes.
23   Q.  Where did you see him?
24   A.  At Aunt Helen's house.

4  (Pages 10 to 13)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

14

1    Q.  Is it correct he was living with her at that
2  time?
3    A.  For a week he stayed there.
4    Q.  For a week prior to going into Gander Hill?
5    A.  Yes.
6    Q.  Why was he staying with her that week?
7    A.  They put him on house arrest and so it was
8  unclear if he could stay at our house until the probation
9  officer asked if there was somewhere else that he could
10  stay, and he was staying at Aunt Helen's until they could
11  figure that out.
12    Q.  Why wouldn't he have been staying at home?
13    A.  There was always a thing if there was a
14  no-contact order.
15    Q.  Are you saying there was a no-contact order at
16  that time?
17    A.  It was always unclear.
18    Q.  Did you think there was a no-contact order of
19  him to have no contact with you at that time?
20    A.  No.
21    Q.  Was there a no-contact for you to have no
22  contact with him?
23    A.  No, there was never a no-contact order. The
24  probation officer would say that we couldn't reside

15

1  together, but the court never said that we couldn't
2  reside together. The judge never said.
3    Q.  Were you residing together two weeks prior to
4  his suicide?
5    A.  Yes.
6    Q.  So why wasn't it a problem at that point?
7    A.  Because when he went in to get a different
8  probation officer, they were the ones who had a problem.
9    Q.  Do you know why?
10    A.  No.
11    Q.  You said he was going to come over for lunch.
12  Would that have been a violation of what the probation
13  officer had told him?
14    A.  No.
15    Q.  Why not?
16    A.  Because they said that, even though we didn't
17  have a no-contact order, we couldn't live together.
18    Q.  Your understanding is that a probation officer
19  told Chris that he couldn't live with you?
20    A.  Yes.
21    Q.  Starting in November?
22    A.  I want to say it was the Tuesday before he
23  died.
24    Q.  Had something happened between the two of you

16

1  in early November that would have caused that to be put
2  in place?
3    A.  No. It was from his prior violation. He went
4  back to court in November.
5    Q.  From the March violation?
6    A.  I'm unsure.
7    Q.  Is it your recollection he had some kind of
8  court appearance in early November 2004?
9    A.  Yes.
10    Q.  Did a judge issue an order that had to do with
11  whether he could have contact with you or live with you?
12    A.  No.
13    Q.  Did you ever see anything written that
14  addressed whether he could live with you or not?
15    A.  No.
16    Q.  Did anybody, other than Chris, tell you he
17  should not be living at the house or anything like that?
18    A.  The probation officer.
19    Q.  She told you that?
20    A.  Yes.
21    Q.  You don't recall her name?
22    A.  No.
23    Q.  How did she tell you that? Did she call you?
24    A.  No. I had went with him.

17

1    Q.  Where?
2    A.  To the Plummer Center when he went in to see
3  her for the first time.
4    Q.  Is that before or after the court appearance?
5    A.  After.
6    Q.  So you and Chris sat with the probation officer
7  at the Plummer Center?
8    A.  No.
9    Q.  I'm not following what happened in November.
10  It's kind of important. So if you can --
11    A.  He went in to sign up with this new probation
12  officer. Then he called me on my cell phone and said,
13  "They're having a problem with us living together,"
14  because it being -- the original charge being a domestic
15  dispute.
16        And I said, "Fine. I'll move out."
17        And the woman didn't believe that, so she
18  came out and talked to me at my car and said, "You're the
19  one who's the victim. You don't move out. He needs to
20  find another place to live."
21        And that's when we knew -- I called
22  Aunt Helen and asked her if he could stay there until we
23  could figure out with the judge or with the probation
24  officer if he could come and live at home.

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

A000016

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

---

**18**

1     Q.   I thought he went to the Plummer Center by
2     himself.  Did you go with him?
3          A.   He went in by himself.  I sat in the car.
4          Q.   Then this female probation officer came out and
5     spoke to you?
6          A.   Yes.  With a man.  It was a female and a man
7     came out.
8          Q.   Then did you talk to Chris about it afterwards
9     or was he not to have contact with you?
10         A.   No.  They said that he could have contact.  We
11    just couldn't reside in the same house.
12         Q.   Did that bother you?
13         A.   Yeah.  I didn't understand why.
14         Q.   So what were you going to do about that?
15         A.   Well, he had written a letter to the judge
16    asking if we could reside together and that he figured he
17    would talk to his probation officer the next week, and we
18    were working on other places that he could stay.
19         Q.   So at some point --
20         A.   Other options.
21         Q.   Is it correct at some point, maybe about a week
22    before he went into Gander Hill on November 13th, he
23    moved into Aunt Helen's house?
24         A.   Yes.

---

**19**

1     Q.   What did he take with him?
2          A.   Just his clothes.
3          Q.   Would it be during that week that you think he
4     wrote a letter to the judge?
5          A.   Oh, yes.
6          Q.   Did you see the letter?
7          A.   Yes.
8               MS. BALLARD:  Jeff, have we been given a
9     copy of that letter?  Do you know if it's in your
10    production?
11              MR. MARTIN:  Can we go off the record?
12              MS. BALLARD:  Why do we need to go off the
13    record?  It would be responsive to the discovery.
14              MR. MARTIN:  If we have it, we certainly
15    have given it to you, Stephani.  That's my response.  I
16    don't know that I have ever seen it.
17              MS. BALLARD:  I don't know that I have ever
18    seen it.  That's why I'm asking.
19    BY MS. BALLARD:
20         Q.   Do you have a copy of that letter at home?
21         A.   No.
22         Q.   Did you give it to your attorney?
23         A.   No.
24         Q.   Where is the letter?

---

**20**

1     A.   I don't have it.
2          Q.   Do you know where it is?
3          A.   No.  If I had it, I would have given it to you.
4          Q.   I'm sorry.  We kind of got off track.  You said
5     you saw Chris on Friday, the 12th?
6          A.   Yes.
7          Q.   In person?
8          A.   Yes.
9          Q.   That was because you went to Aunt Helen's
10    house?
11         A.   Yes.
12         Q.   Was that just to pay a visit to him?
13         A.   Yes.
14         Q.   What did you talk about at that time, you and
15    Chris?
16         A.   How my day at work went, how things were going
17    with him.
18         Q.   Just routine catching up?
19         A.   Uh-huh.
20              MR. MARTIN:  Yes?
21              THE WITNESS:  Yes.
22    BY MS. BALLARD:
23         Q.   What was Chris's demeanor?  Did he seem okay?
24    Did he seem like himself --

---

**21**

1     A.   Yes.
2          Q.   -- or anything unusual?
3          A.   No.
4          Q.   At that point in time, let's say before his
5     arrest, were you under the impression that he was abusing
6     alcohol or drugs?
7          A.   No.
8          Q.   How long before his death was the last time you
9     knew he was abusing alcohol or drugs?
10         A.   I'm unsure.
11         Q.   Would it be months or a year?
12         A.   His last hospitalization.  I'm unsure of when
13    that was.
14         Q.   What was that for?  What was that
15    hospitalization for, the last one?
16         A.   Well, he was in a drug treatment center, but it
17    started out in a psych unit.
18         Q.   So he had some emergency psychiatric care and
19    then he went into a drug treatment center?
20         A.   Yes.
21         Q.   Do you remember what time period he was in the
22    drug treatment center the last time?
23         A.   No.
24         Q.   I did review medical records in this case, both

---

6 (Pages 18 to 21)

**A000017**

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

**22**

1  some of yours and Chris's, and they make reference to the
2  fact that you have both been in recovery for substance
3  addiction. Would you agree with that?
4  A.  Yes.
5  Q.  How long have you been in recovery?
6  A.  Since I was 17. 1985.
7  Q.  What substances did you use at that time?
8  A.  Pot, alcohol, pills, PCP, LSD.
9  Q.  Have you had relapses since or have you been
10 completely in recovery?
11 A.  Yes.
12 Q.  You went into recovery when you were about 18?
13 A.  Seventeen.
14 Q.  You have been --
15 A.  Clean ever since.
16 Q.  Did you treat medically when you were 17 for
17 those conditions or did you go into --
18 A.  I was in a rehab.
19 Q.  Do you remember the name of that place?
20 A.  Straight, Incorporated.
21 Q.  Was that in Delaware?
22 A.  No. Springfield, Virginia.
23 Q.  Since that time when you were 17, have you been
24 in counseling for addiction issues or recovery issues?

**23**

1  A.  No.
2  Q.  But you go to AA?
3  A.  Yes.
4  Q.  In 2004 prior to Chris's death, were you being
5  treated for depression or any other mental health
6  conditions?
7  A.  I had just started going to see the
8  counselor -- one of the counselors that was in the group
9  that Chris was going to, and they started me on an
10 antidepressant, but...
11 Q.  What group was that?
12 A.  Kalkstein Associates.
13 Q.  Do you remember the name of your counselor?
14 A.  No.
15 Q.  You got an antidepressant?
16 A.  Yes.
17 Q.  Do you remember the name of that?
18 A.  Wellbutrin.
19 Q.  How long did you take that?
20 A.  I'm going to say a couple months.
21 Q.  Actually, I'm sorry, when did you start with
22 Kalkstein Associates? When did you start treating with
23 them?
24 A.  Maybe a month before his death.

**24**

1  Q.  What made you seek treatment at that time?
2  A.  They suggested it. When Chris was going to see
3  his person, they suggested that I come in for counseling.
4  Q.  Did you have couples counseling?
5  A.  No. We were going to.
6  Q.  But for that month you got separate counseling?
7  A.  Yes.
8  Q.  And he got separate counseling?
9  A.  Yes.
10 Q.  What was he treating for at that time?
11 A.  Bipolar.
12 Q.  So he was seeing a psychiatrist?
13 A.  And a psychologist.
14 Q.  Do you know what medications he was on, if any?
15 A.  Effexor, Depakote, Seroquel, and another one I
16 can't remember.
17 Q.  You named Stanley Taylor as a defendant in this
18 case. Are you aware that he's a former commissioner of
19 the Department of Corrections?
20 A.  Yes.
21 Q.  And he's now retired?
22 A.  Yes.
23 Q.  Have you ever had any personal dealings with
24 Commissioner Taylor?

**25**

1  A.  No.
2  Q.  To your knowledge, did Chris ever have any
3  personal dealings with him?
4  A.  No.
5  Q.  Are you aware that Raphael Williams was and is
6  the warden of Howard Young Correctional Institution,
7  which we're also calling Gander Hill?
8  A.  Yes.
9  Q.  Have you ever had any personal dealings with
10 Warden Williams?
11 A.  Somebody from the warden's office called me or
12 talked to me on the phone. I am unsure if it was him.
13 That's who I asked for.
14 Q.  When was this?
15 A.  After Chris died.
16 Q.  How long after? Or did they call you to notify
17 you, or are you referring to something else?
18 A.  No. About a week or two after he died I
19 called.
20 Q.  You called the warden's office?
21 A.  Yes.
22 Q.  You spoke with somebody?
23 A.  I asked for the warden and they put somebody --
24 I was unclear the person's name or his name at the time,

7 (Pages 22 to 25)

A000018

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

**26**

1  and I just asked how did they know that he was suicidal
2  and how could they say that he wasn't.
3    Q.  Is it possible you spoke to the deputy warden
4  and his name was Perry Feltz?
5    A.  I'm unsure.  They had said that they were the
6  warden.
7    Q.  So the person who spoke said, "I'm the warden"?
8    A.  Yes.
9    Q.  Raphael Williams, did he have an accent,
10  because he has a Jamaican accent?
11    A.  No.  But I had asked for the warden and
12  somebody got on the phone and said they were the warden.
13    Q.  I'm asking because we have records showing
14  Warden Williams was on vacation for a period of time and
15  there was a deputy warden whose name was Perry Feltz.
16    A.  I don't know.  He wasn't clear that he had said
17  this is the deputy warden versus the warden.
18    Q.  He probably was acting warden at that point.
19       To your knowledge, did Chris ever have
20  personal dealings with Warden Raphael Williams?
21    A.  No.
22    Q.  If I were to represent to you that
23  Raphael Williams was not working the weekend your husband
24  committed suicide, would you have any basis to dispute

**27**

1  that?
2    A.  No.
3    Q.  Why did you sue Commissioner Taylor in
4  connection with your husband's death?
5    A.  I don't know any...
6    Q.  Why did you sue Warden Williams?
7    A.  Those were the two in charge of the prison.
8    Q.  Would it be accurate to say you sued them
9  because they were in charge of the institution?
10    A.  Yes.
11    Q.  We covered some of this.  We talked about
12  November.  Let's go back to October 2004.  Was Chris
13  living with you in your house at that point?
14    A.  Yes.
15    Q.  How would you describe your relationship with
16  him in that last month you actually lived together?
17    A.  We did what we normally did.  He was working at
18  Pepsi.  We would see the girls certain days and have
19  dinner and go see their games.
20    Q.  How were you getting along?
21    A.  We got along fine.
22    Q.  Would you say you were having any marital
23  problems or disputes at that time?
24    A.  No.

**28**

1    Q.  In September or October 2004, was he abusing
2  drugs or alcohol?
3    A.  Not to my knowledge.
4    Q.  Would you agree that Chris had his own long
5  history of substance abuse?
6    A.  Yes.
7    Q.  How far back does that go?
8    A.  When he was a teenager.
9    Q.  I believe you said you met him when he was 18.
10  Were you aware at that time that he had substance abuse
11  issues?
12    A.  Yes.
13    Q.  How did you become aware of that?
14    A.  I met him in AA.
15    Q.  When you were both young?
16    A.  Yes.
17    Q.  Seventeen or eighteen?
18    A.  Yes.  Well, 18 or 19.
19    Q.  Because Chris was a year or two older than you?
20    A.  He was a year.  I lived in Washington for the
21  first year.
22    Q.  Washington, D.C.?
23    A.  Yes.
24    Q.  Did he live in Washington, D.C.?

**29**

1    A.  No.  When I moved here, I met him.
2    Q.  When he was a young man, 18, 19, what
3  substances did he have problems with at that time?
4    A.  He was sober at that time.
5    Q.  What substances had caused him to go into
6  treatment?
7    A.  Pot, alcohol, cocaine.
8    Q.  Over the years did he continue to abuse those
9  substances off and on?
10    A.  No.  He was sober for 10 years.
11    Q.  From about 18 to 28?
12    A.  Yes.
13    Q.  What happened?
14    A.  He had started abusing -- as far as my
15  knowledge, he started abusing prescription drugs.
16    Q.  Do you know what they were?
17    A.  Percocet.
18    Q.  Anything else?
19    A.  We generally don't use specific names, so no.
20    Q.  How about alcohol when he was in his 20s or
21  30s?
22    A.  Before the accident he was drinking.
23    Q.  Before the 1997 car accident?
24    A.  Yes.  But he only drank for a very short time

8 (Pages 26 to 29)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

---

**30**

1   and went into a rehab and then he got out and drank that
2   day and had the car accident.
3       Q.   Were you with him as his girlfriend or a
4   friend?
5       A.   No.
6       Q.   I want to be clear if I'm asking from your own
7   recollection or if you just got this from Chris.
8           MR. MARTIN:   Let me also suggest you pause
9   for a moment after Ms. Ballard finishes her question
10  before you answer because your responses are coming right
11  on the heels of her question and it's difficult for our
12  reporter to take all that down.  Just give her a moment
13  before you answer.  Thank you.
14  BY MS. BALLARD:
15      Q.   I don't remember what my question was.  When
16  you're talking about Chris either being in recovery or
17  using substances say when he was in his 20s or 30s and
18  before you got married, are you speaking from your
19  personal recollection or things Chris told you over the
20  years?
21      A.   Things Chris told me and certain things I
22  remember as an acquaintance/friend.
23      Q.   Did you see him in AA meetings and things like
24  that over the years since he had been 18?

**31**

1       A.   Yes.
2       Q.   Would it be correct to say you were friends for
3   a long period of time and then at some point it became
4   romantic and you got married?
5       A.   Yes.
6       Q.   Because Chris was previously married during
7   that time.
8       A.   Yes.
9       Q.   Did you have a relationship when he was
10  married?
11      A.   No.  I mean, a friendship.
12      Q.   I understand.
13          How old was Chris when he died?
14      A.   Thirty-seven.
15      Q.   Between 30 and 37 what was his status in terms
16  of being either sober or using substances?  Maybe this
17  will be easier.  After he got out of jail for the car
18  accident.
19      A.   He was sober for a while and relapsed.  I'm
20  unsure when.  And then he was sober for two years before
21  we got married.  And then he relapsed after we got
22  married.  Like it would be a four-day binge.  He didn't
23  continuously use, generally.
24      Q.   Was it alcohol?

**32**

1       A.   No.  It would be prescription pills.
2       Q.   Did you abuse alcohol while you were married?
3       A.   There would be binges.  He would go on a day
4   binge.
5       Q.   With alcohol?
6       A.   Uh-huh.
7           MR. MARTIN:   Yes?
8           THE WITNESS:   Yes.
9   BY MS. BALLARD:
10      Q.   We start talking and it's hard to remember to
11  say "yes" and "no."
12          Did you say you got married in April of
13  2003?
14      A.   Yes.
15      Q.   Let's talk about that time, April 2003 until
16  his death.  During times when he would have these binges
17  or relapses, how would he behave?
18      A.   I'm unsure what you're asking me.
19      Q.   Would he come home drunk?  Would he get angry?
20  Would he cry?  What behaviors did he exhibit that let you
21  know he started abusing something again?
22      A.   He would get very depressed and generally I
23  would get angry at him.
24      Q.   Would you always know if he had started using

**33**

1   something?
2       A.   Yes.
3       Q.   That would be because of him acting depressed?
4       A.   No.  It was almost an internal alarm that I
5   can't describe.
6       Q.   What would you do when you thought he was
7   abusing drugs or alcohol?
8       A.   Mostly within two days he was in a psych unit.
9       Q.   Would you get him admitted or would he admit
10  himself?
11      A.   Most of the time he asked me to help him get
12  in.
13      Q.   How many times during approximately the year
14  and a half of your marriage did he have one of these
15  binges where he would have to go in and get help?
16      A.   I can't even remember the times.  I couldn't
17  count without looking at the medical records.
18      Q.   Would you see a connection between when he was
19  using these substances and him getting depressed or
20  suicidal?
21      A.   Ask the question again.
22      Q.   Did you see a connection between him having
23  relapsed or used drugs or alcohol and getting depressed
24  or suicidal?

9  (Pages 30 to 33)

**A000020**

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

34

1    A.   Not all the time.
2    Q.   So he would sometimes get depressed when he was
3    not abusing substances?
4    A.   Yes.
5    Q.   Did he talk to you about his problems with
6    addiction?
7    A.   Yes.
8    Q.   What would he say? Let's say during your
9    marriage.
10   A.   I mean, it was a common topic. We went to
11   meetings together. We had AA friends together. So I --
12   Q.   I know it's a general topic, but I'm trying to
13   get a feel. Did it seem like something he was constantly
14   struggling with or something he had relatively under
15   control most of the time?
16   A.   I don't know how to describe that.
17   Q.   Did it cause friction between you and Chris?
18   A.   When he was using, yes.
19   Q.   Is it correct that you kicked him out of the
20   house a few times when he was using?
21   A.   Yes.
22   Q.   Do you remember how many times?
23   A.   I want to say twice. I didn't kick him out of
24   the house. He knew if he was using, he could not live

35

1    there.
2    Q.   Did you ask him to leave?
3    A.   Once I know I did. Once I just told him he
4    couldn't go home if he was going to choose to use.
5    Q.   The several times he was out of the house
6    because he was using, did he stay with his aunt Helen?
7    A.   No.
8    Q.   Where did he stay?
9    A.   Two different friends.
10   Q.   Do you know their names?
11   A.   No. I know their first names.
12   Q.   What were their first names?
13   A.   One was Kathy and one was -- I'm unsure of his
14   name. I can see his face, but...
15   Q.   How long was he out of the house each of those
16   two times that you remember? How long was he out of your
17   house?
18   A.   Three, four days. Before he went into the
19   hospital again.
20   Q.   You recall that Chris attempted suicide in
21   November of 2003?
22   A.   Yes.
23   Q.   How did that happen?
24   A.   Actually, in November of 2003, that's not when

36

1    he tried to kill himself. That's his -- wait.
2    November 2003 was the first hospitalization he had. That
3    wasn't for suicide.
4    Q.   What was it for?
5    A.   Depression and drug addiction. I don't think
6    it was a suicide attempt that got him there.
7    Q.   You think he just went in because he started
8    abusing drugs or alcohol?
9    A.   Yes.
10   Q.   Was he living with you at the time of that
11   hospitalization?
12   A.   Yes.
13   Q.   Did you admit him to the hospital or did he do
14   that --
15   A.   Yes. We went together.
16   Q.   What hospital, if you remember?
17   A.   Rockford.
18   Q.   How long was he in Rockford that time?
19   A.   Four or five days. I have to look at the
20   record.
21   Q.   Was there a suicide attempt in September of
22   2004?
23   A.   Yeah. Was that the one with the IV tubing?
24   Q.   I'm asking what your recollection is.

37

1    A.   I'm not good with keeping track of which one.
2    Q.   Tell me about the IV tubing incident.
3    A.   He had been using and staying with that woman
4    Kathy, and a probation officer I guess came for her
5    because she was on probation. He had a high alcohol
6    content. So they took him to Wilmington -- a
7    breathalyzer. And they took him to Wilmington Hospital,
8    and while he was in the emergency room, he tried to hang
9    himself with IV tubing and a sheet. And then he was
10   taken to Rockford.
11   Q.   Were you at the hospital when this happened?
12   A.   No.
13   Q.   When had he last been living with you prior to
14   going into the hospital?
15   A.   Two or three days.
16   Q.   He had been out of the house two or three days
17   and then this happened?
18   A.   Yes.
19   Q.   Before he left home had he been acting
20   depressed or unusual?
21   A.   Well, he was using drugs, but no. In fact, he
22   was working and going to work.
23   Q.   At that point he left home, but you didn't
24   think he was a suicide risk. Would that be accurate?

10 (Pages 34 to 37)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

---

**38**

1    A. No. I always knew Chris was a suicide risk.
2    Q. What do you mean you always knew?
3    A. I knew that Chris had mental health issues and
4   I knew that his mental health issues made him a suicide
5   risk.
6    Q. In your opinion, at any point he was a suicide
7   risk?
8    A. No. I knew if he was cared for when he was in
9   that -- in those critical moments, that he would be okay.
10  When he was in Wilmington Hospital and they told me about
11  the IV tubing, I knew he would be okay because they would
12  keep him safe, Rockford would keep him safe.
13   Q. But he hung himself or he tried to hang himself
14  in Wilmington Hospital when he was in the hospital,
15  correct?
16   A. Yes. Under the probation officer's watch.
17   Q. So you knew who was in the room at the time --
18  are you saying a probation officer was in the room at the
19  time?
20   A. No. He had left the room.
21   Q. And he was in an emergency room department?
22   A. Yes. But they were watching him and that's how
23  he didn't die.
24   Q. How do you know who was watching him at what

---

**39**

1   point?
2    A. Because the nurses walked in and found him
3   trying to hang himself.
4    Q. Obviously nobody was in the room with him when
5   he actually tried --
6    A. But they were checking him.
7    Q. Were you aware that anybody was in the room
8   with him when he tried to make the attempt?
9    A. No. They walked in when he was trying to hang
10  himself.
11   Q. Where did you get the information about who was
12  in the room when?
13   A. The nurse, Chris, the medical records, the
14  people at Rockford.
15   Q. These are things that people told you after the
16  incident?
17   A. Uh-huh.
18     MR. MARTIN: Yes?
19     THE WITNESS: Yes.
20  BY MS. BALLARD:
21   Q. I'll represent to you at least in your
22  interrogatories you said the IV tubing incident took
23  place in September 2004. At that point was Chris on or
24  supposed to be on any medications like the ones you

---

**40**

1   mentioned?
2    A. Yes.
3    Q. Do you know if he was taking them at that
4   point?
5    A. Yes.
6    Q. When Chris lived with you, did he seem to be
7   compliant with taking his medications?
8    A. Yes.
9    Q. In your written interrogatory answers, and this
10  is question 2(d), you wrote or through your attorney you
11  wrote, "Decedent," meaning Chris, "tried to overdose on
12  an illegal drug to kill himself. He made a statement to
13  Plaintiff, Karen Barkes, that two people were dead
14  because of his mistake. When he became unconscious,
15  Karen Barkes called 911. The police and ambulance
16  revived him and took him to the hospital."
17       There isn't a date provided for that one.
18  Do you recall when that was?
19   A. No.
20   Q. You have no recollection?
21   A. No.
22   Q. Do you recall the incident?
23   A. Yes.
24   Q. Can you tell me a little more about the

---

**41**

1   incident? It sounds like he was home with you at the
2   time?
3    A. Yes. He came home. And he had told me that --
4   I had known that he had been struggling with guilt and
5   trying to figure out a way to deal with that. And he had
6   told -- he was despondent and said he wanted to die, he
7   was tired of feeling guilty. And I was angry because I
8   knew that he had been using.
9    Q. At some point he became unconscious?
10   A. Yeah. It was at Christmas time, because I
11  remember there were Christmas lights out.
12   Q. Do you know what drug he was using?
13   A. They had said heroin.
14   Q. Do you recall him becoming unconscious and you
15  called 911?
16   A. Yes.
17   Q. Where did he go that time for treatment?
18   A. Wilmington Hospital.
19   Q. Did he go into a drug program after Wilmington
20  Hospital, if you recall?
21   A. Uh-uh.
22   Q. No?
23   A. No.
24   Q. Who was Chris's primary care physician when you

---

11 (Pages 38 to 41)

A000022

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

42

1 were married?
2   A.  Most of the time Dr. Bercaw?
3   Q.  Dr.?
4   A.  Bercaw.
5   Q.  Do you know how to spell that?
6   A.  Just a guess.  B-e-r-c-a-w.
7   Q.  Do you know the doctor's first name?
8   A.  No.
9   Q.  Was he with a certain practice group?
10  A.  I don't know.
11  Q.  Was he your doctor?
12  A.  No.
13  Q.  Who was your primary care physician?
14  A.  Dr. Depfer.
15  Q.  How do you spell that?
16  A.  D-e-p-h-e-r.
17  Q.  Is he still your doctor?
18  A.  D-e-p -- I'm unsure.
19  Q.  What's the first name of Dr. Depfer?
20  A.  Charles.  I have only been going to him since I
21  was 13.
22          MR. MARTIN:  Off the record.
23          (Discussion off the record.)
24

44

1   Q.  Did his problems seem to be getting worse or
2  did they just flare up occasionally?
3   A.  Flare up occasionally.
4   Q.  It wasn't like a progression of getting worse?
5   A.  No.
6   Q.  How would it affect you when he would abuse
7  alcohol or drugs?  I know you said you would get angry,
8  but how did it affect you at home?
9   A.  Psychologically I think, because of my
10  knowledge, I understood that it wasn't personal and that
11  it didn't have to do with me and that I could be
12  supportive of him when he chose to get sober again.
13  Q.  Did it make you angry that you could stay in
14  recovery and he couldn't?
15  A.  No.
16  Q.  Did Chris have a friend named Scott Herr?
17  A.  Yes.
18  Q.  Is that one of the two people that you couldn't
19  remember the name of?
20  A.  No.
21  Q.  Who is Scott Herr?
22  A.  He was somebody who had just started getting
23  sober and that Chris and him were friends and would go
24  have coffee together and go to meetings together.

43

1  BY MS. BALLARD:
2   Q.  Tell me about Aunt Helen.  Is this a family
3  member that Chris was especially close to?
4   A.  Yes.  She is his father's sister.
5   Q.  Do you know why she's the one who he chose to
6  go live with in November 2004?
7   A.  When he was a teenager and having problems in
8  California, he had come to live with Helen and Helen's
9  husband.
10  Q.  Is Helen's husband named Tom, by any chance?
11  A.  Yes.
12  Q.  There was an Uncle Tom and I didn't know who
13  that was.
14  A.  He has died.
15  Q.  He died?
16  A.  Yes.  But he was in AA and so they took Chris
17  under their wing.
18  Q.  Was Helen in AA, to your knowledge?
19  A.  No.
20  Q.  During your marriage in 2003 to 2004, would you
21  say that Chris had more problems or that the problems
22  increased with him abusing substances during your
23  marriage?
24  A.  I don't understand the question.

45

1   Q.  Do you know where he lives?
2   A.  He lives in Claymont, but he's moving next
3  week.
4   Q.  Do you still keep in touch with him?
5   A.  Yes.
6   Q.  Did he help Chris with any recovery issues?
7   A.  Yes.  Just being able to talk and have a
8  friend.
9   Q.  What's Chris's mother's name?
10  A.  Dorothy.
11  Q.  Dorothy Barkes?
12  A.  Yes.  They call her Dottie.
13  Q.  Where does she live?
14  A.  California.
15  Q.  Do you keep in touch with her?
16  A.  I tell her -- I e-mail his family with stuff
17  that's going on with the court and general information,
18  but no.
19  Q.  Was Chris close to her during your marriage?
20  A.  No.
21  Q.  How about Chris's father, what's his name?
22  A.  Raymond.
23  Q.  Does he live in California, also?
24  A.  Yes.

12 (Pages 42 to 45)

**A000023**

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

46

1  Q. Do you keep in touch with him?
2  A. Other than to e-mail.
3  Q. Same sort of things with his mother?
4  A. Yes.
5  Q. Was Chris close to him when you were married?
6  A. Not really. They would talk on the phone once
7  a month.
8  Q. As far as you can recall, can you give me
9  Chris's job history? Was he working for Pepsi at the
10  time he died?
11  A. Yes.
12  Q. How long did he work for Pepsi? You can either
13  take it forward or backward, whatever is easier.
14  A. We can go backwards. I want to say that he
15  started the beginning of summer.
16  Q. Summer of '04?
17  MR. MARTIN: Yes?
18  THE WITNESS: Yes.
19  BY MS. BALLARD:
20  Q. What other jobs did he have before that?
21  A. He worked at Big Sky Bakery as a baker. He
22  worked at Grotto's Pizza. And then he was incarcerated.
23  Q. That was approximately '97 to '99?
24  A. Yes. He worked -- he started working at

47

1  Grotto's when he was in work release.
2  Q. Was he a cook?
3  A. Yes. Pizza maker. Before that I'm unclear.
4  He worked at Leader Nursing Homes. He worked at
5  St. Francis. And I'm unsure of the -- I know we talked
6  about certain -- he worked at Sears prior to that, but I
7  can't --
8  Q. I'm not going to hold you to dates.
9  Are you aware he was licensed as a
10  registered nurse in Delaware at some point?
11  A. Yes.
12  Q. Did he lose his license at some point?
13  A. Yes.
14  Q. Did he talk about nursing or did he miss being
15  a nurse?
16  A. Oh, yes.
17  Q. What would he say?
18  A. That he missed being a nurse. At some point he
19  wanted to get his license back to be able to do nursing
20  again. He would talk to other nurses who had lost their
21  licenses and got them back. He would talk to him on how
22  they would get them back.
23  Q. Did his losing his license have to do with
24  substance abuse issues?

48

1  A. Yes.
2  Q. When you were married, did he seem
3  knowledgeable about medical issues?
4  A. Yes.
5  Q. You seem pretty emphatic about that. Would he
6  talk about medical issues a lot?
7  A. He always knew the questions on Jeopardy. If
8  somebody was sick -- he wouldn't offer advice, but he
9  would know what they were talking about. My father came
10  up with some weird kind of leukemia and he knew what
11  was...
12  MR. MARTIN: Can we take a short break?
13  MS. BALLARD: Sure.
14  (A recess was taken.)
15  BY MS. BALLARD:
16  Q. We were talking about Chris having been an RN
17  and you said he seemed knowledgeable about medical
18  issues. Did Chris seem to be insightful into his own
19  addiction issues?
20  A. Yes.
21  Q. I know it's a general question, but what sort
22  of things would he say about his own addiction issues?
23  A. I mean, he knew that, if he used, he would be
24  out of control. Not out of control -- like he would keep

49

1  using.
2  Q. Did he seem to have insight into other mental
3  health issues like depression and bipolar?
4  A. Not as much.
5  Q. Was there an incident where Chris was
6  criminally charged with offensive touching, a domestic
7  incident with you in November 2003?
8  A. Yes.
9  Q. What happened there?
10  A. The first time Chris was hospitalized in
11  November of 2003, they put him on Zoloft and he had been
12  complaining about the Zoloft making him feel manic, and
13  he was trying to be compliant, but he didn't understand
14  what was going on. I didn't even understand what was
15  going on. He was calling Rockford talking to the doctor
16  down there. He said keep taking the medication until he
17  could see the psychiatrist, which was three weeks later.
18  But he continued to feel worse. And so he started
19  drinking to try to bring himself down, if that makes
20  sense. And it wound up sending him off the deep end.
21  I called the police when I felt like -- I
22  was trying to get him to agree to go back to the hospital
23  and he had felt like the hospital didn't help and it has
24  just made his problems worse.

13  (Pages 46 to 49)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

50

1    Q.   When you say "the hospital," do you mean
2    Rockford?
3    A.   Yes.  And I was trying to get him to stay in
4    the house and he wanted to leave, and he wound up
5    slapping me, which then I opened -- I called 911 because
6    I figured the police would help me try to get him in the
7    hospital.
8    Q.   Did they take him to the hospital?
9    A.   I'm unsure what happened that time.  I don't
10   really -- I know that's when they said in order to take
11   him, they have to charge him with that.
12   Q.   Charge him with?
13   A.   Offensive touching.  I told them I didn't want
14   to press charges because I knew with his record it
15   wouldn't be -- but they said that that's the only way
16   that they could help.
17   Q.   Are you aware that he entered a guilty plea to
18   that charge at some point?
19   A.   Yeah.  I think.
20   Q.   Did you have to testify?
21   A.   No.  I want to say that he pled.  I'm unsure
22   because I'm not with the court --
23   Q.   That's all right.
24   A.   But I remember that he said, "I'll just plead

51

1    guilty and then do the six months' probation."  That's
2    what I generally remember.
3    Q.   Was there another domestic incident where he
4    threw a phone at you in January of 2004?
5    A.   Yes.  He threw the phone and it hit me.  He
6    wasn't aiming it at me.
7    Q.   How did that incident start?
8    A.   He had started using again.
9    Q.   Alcohol, do you recall?
10   A.   No.
11   Q.   You don't recall?
12   A.   No.  It's all the same to me.
13   Q.   You were arguing, I guess?
14   A.   Yes.
15   Q.   Can you tell me how it came about?
16   A.   I don't remember.  I mean, generally, the same
17   argument, "Chris, are you using again?"
18        "No, I'm not."
19        "Yes, you are."
20   Q.   Would you find that he would I don't want to
21   say lie to you, but he wouldn't admit it at first and you
22   would have to have a discussion with him and get him to
23   admit he was using?
24   A.   I'm replaying.  He would know -- when he would

52

1    get in rehab, he would say, "I know that you were right."
2        And I'd say, "You know I'd know when you
3    are using."
4        So generally it would be a moot point.  I
5    might bring it up because I was frustrated, but I
6    wouldn't beat a dead horse.  We both know he was.
7    Q.   Did you during either of these incidents hit or
8    strike Chris?
9    A.   I would try to restrain him.
10   Q.   So would that be a no, you didn't hit him?
11   A.   No.
12   Q.   Were there other occasions where you would
13   fight or argue with Chris and it became physical, other
14   than the two you described?
15   A.   No.  There were times that I was trying to
16   restrain him to keep him from leaving the house but, no.
17   Would he hit me?  No.
18   Q.   Did you consider Chris to be verbally abusive
19   towards you at any point?
20   A.   No.
21   Q.   You've described several incidents of
22   depression or a suicide attempt in 2003-2004.  When Chris
23   wasn't actively depressed, was he getting outpatient
24   counseling, mental health counseling?

53

1    A.   On and off.  He tried different places, Open
2    Door, PSI.
3    Q.   Did he find them not to be helpful?  Is there a
4    reason he didn't continually get counseling?
5    A.   Different reasons, different places.  Some not
6    helpful, some -- Chris knew -- he was knowledgeable
7    enough to know about addiction and how to -- the best way
8    to deal with his addiction.  He didn't understand the
9    mental health issues he was up against, and it seemed
10   like those places weren't very helpful at getting him to
11   understand that.
12   Q.   You mentioned some prescriptions he was taking
13   for depression like Effexor, Seroquel.  Where would he
14   get those prescriptions filled when you lived together?
15   A.   Generally our pharmacy was Target or Shop Rite.
16   When he agreed to the bipolar medications, we got them
17   through Medco.
18   Q.   Is that a mail order?
19   A.   Yes.
20   Q.   You said, "when he agreed to the bipolar."  Was
21   that a diagnosis that came somewhat later?  I'm not sure
22   what you meant by that.
23   A.   Chris knew about medical things, but it was
24   hard for him to understand the mental health problems,

14  (Pages 50 to 53)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

|  | 54 |
|---|---|
| 1 | and he wasn't sure what was wrong with him, and so when |
| 2 | the bipolar -- he knew he was depressed, but he wasn't |
| 3 | sure about the bipolar until I guess one of the |
| 4 | hospitalizations when they started him on the Effexor, |
| 5 | Depakote. |
| 6 | Q.  Do you remember when that diagnosis of bipolar |
| 7 | was made? |
| 8 | A.  No.  I guess they thought about it after he |
| 9 | went on the manic episode with the Zoloft.  A |
| 10 | psychologist had mentioned to me -- a friend of mine had |
| 11 | mentioned to me that that was a possibility. |
| 12 | Q.  When he started taking the meds for bipolar, |
| 13 | did it seem to help? |
| 14 | A.  Yes. |
| 15 | Q.  Tina Grossman, she was Chris's first wife? |
| 16 | A.  Yes. |
| 17 | Q.  What was your relationship like with Tina |
| 18 | during your marriage to Chris? |
| 19 | A.  Tina and I had been friends for a long time, |
| 20 | but we didn't see eye to eye on certain things.  It was |
| 21 | the normal ex-wife-new wife relationship. |
| 22 | Q.  Was it things that had to do with Chris and the |
| 23 | kids or other sort of things? |
| 24 | A.  No.  It was more on her opinion about my |

|  | 55 |
|---|---|
| 1 | behavior. |
| 2 | Q.  Did she disapprove in some way of your |
| 3 | behavior? |
| 4 | A.  No.  But we're different people.  Her and I are |
| 5 | different people. |
| 6 | Q.  You mentioned something about her opinion of |
| 7 | your behavior, so you must have had something in mind. |
| 8 | I'm trying to find out what that is.  I'm not saying it |
| 9 | was valid or not.  I just want to know what her opinion |
| 10 | was. |
| 11 | A.  I don't know how to describe it. |
| 12 | Q.  Sounds like there was some conflict between you |
| 13 | and Tina. |
| 14 | A.  Yes. |
| 15 | Q.  What was the conflict over? |
| 16 | A.  It seemed like anything I did.  Driving down |
| 17 | the street, not waving. |
| 18 | Q.  Did it have anything to do with Chris's |
| 19 | recovery and substance abuse issues? |
| 20 | A.  No. |
| 21 | Q.  Did Chris get along with her when he was |
| 22 | married to you? |
| 23 | A.  Chris knew how to deal with her better. |
| 24 | Q.  I think you said his children would come over |

|  | 56 |
|---|---|
| 1 | every weekend? |
| 2 | A.  Every other weekend. |
| 3 | Q.  What are his children's names? |
| 4 | A.  Brittany and Allie.  Alexandria.  They call her |
| 5 | Allie. |
| 6 | Q.  How old are they now? |
| 7 | A.  Brittany's 18.  Al would be 15. |
| 8 | MR. MARTIN:  Let's go off the record. |
| 9 | (Discussion off the record.) |
| 10 | BY MS. BALLARD: |
| 11 | Q.  So Allie's about 15? |
| 12 | A.  Yes. |
| 13 | Q.  Do you recall Chris having trouble making his |
| 14 | child support payments when he was married to you? |
| 15 | A.  No.  He was in arrears because of being in |
| 16 | jail.  She started the child support while he was in |
| 17 | jail.  So every time that he -- it was part of the thing |
| 18 | that he would pay off some of the arrears every -- he was |
| 19 | out of a job for a little while, but he didn't stop -- he |
| 20 | didn't go and ask for the child support to be stopped. |
| 21 | He knew that it would collect and he would pay. |
| 22 | Q.  How would you describe Chris's relationship |
| 23 | with his daughters when he was married to you? |
| 24 | A.  They were close.  They talked on the phone |

|  | 57 |
|---|---|
| 1 | every day. |
| 2 | Q.  Did his daughters get along with you? |
| 3 | A.  Yeah. |
| 4 | Q.  Are you familiar with a Dr. Joshi? |
| 5 | A.  Yacoub. |
| 6 | Q.  What is it? |
| 7 | A.  Yacoub? |
| 8 | Q.  I believe it's J-o-s-h-i. |
| 9 | A.  Oh, no. |
| 10 | Q.  What was the one you were going to mention or |
| 11 | trying to mention? |
| 12 | A.  There was a Yacoub.  He was the Rockford |
| 13 | doctor. |
| 14 | Q.  I think there was a Jackson at Rockford.  I |
| 15 | haven't heard of that one. |
| 16 | A.  Jacobson. |
| 17 | Q.  Was there a psychiatrist that you at some point |
| 18 | contemplated bringing a legal claim against?  Not in |
| 19 | connection with this suicide, something else. |
| 20 | A.  Me personally? |
| 21 | Q.  You and/or Chris.  Based on treatment.  Based |
| 22 | on his treatment of Chris. |
| 23 | A.  I was angry with the psychiatrist that was |
| 24 | treating Chris. |

15  (Pages 54 to 57)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

|  | 58 |
|---|---|
| 1 | Q.   Which psychiatrist is that? |
| 2 | A.   Privett. |
| 3 | Q.   Privett? |
| 4 | A.   Dr. Privett. |
| 5 | Q.   Where was he? |
| 6 | A.   She was at the Kalkstein Associates. |
| 7 | Q.   When -- I'm sorry. Go ahead. |
| 8 | A.   They wouldn't give me his records after he |
| 9 | died. |
| 10 | Q.   I was talking about something before he died. |
| 11 | I saw that in the records. So there wasn't another |
| 12 | doctor who treated Chris that you contemplated bringing a |
| 13 | claim against for his treatment of Chris prior to the |
| 14 | suicide? |
| 15 | A.   Not that I can think of. |
| 16 | Q.   You're not familiar with this Dr. Joshi? |
| 17 | A.   No. |
| 18 | Q.   Have you ever filed a lawsuit before this one? |
| 19 | A.   No. |
| 20 | Q.   Did you receive counseling at Delaware Family |
| 21 | Center in 2001 through at least 2002? |
| 22 | A.   Yes. |
| 23 | Q.   Who was your counselor there? |
| 24 | A.   Jane Anderson. |

|  | 60 |
|---|---|
| 1 | A.   No. |
| 2 |         MS. BALLARD:  I'm going to mark a document |
| 3 | Barkes 1. |
| 4 |         (Barkes Deposition Exhibit No. 1 was marked |
| 5 | for identification.) |
| 6 | BY MS. BALLARD: |
| 7 | Q.   I'll give you a couple minutes to flip through |
| 8 | that. I just have some specific questions. |
| 9 |         For the record, this is a record of |
| 10 | Catholic Charities, Inc., Counseling and Substance Abuse |
| 11 | Services, interview date for Christopher Barkes, |
| 12 | 12/18/2003. |
| 13 |         You're welcome to read the whole thing, but |
| 14 | I have some specific questions. Just let me know when |
| 15 | you're ready. |
| 16 |         Were you aware that Chris had sought |
| 17 | counseling with Catholic Charities in December 2003? |
| 18 | A.   Yes. |
| 19 | Q.   On this document on the front page after the |
| 20 | initial paragraph, is it correct that it says, |
| 21 | "Presenting Problems as Seen by Client"? |
| 22 | A.   On the first page? |
| 23 | Q.   Yes. |
| 24 | A.   Oh, I see. Yes. |

|  | 59 |
|---|---|
| 1 | Q.   Are you still seeing Jane Anderson? |
| 2 | A.   I'm in a women's group that she facilitates. |
| 3 | Q.   I have some notes here that are from '01 to |
| 4 | '02. Do you recall the last time you actually treated at |
| 5 | Delaware Family Center? |
| 6 | A.   It would have been after Chris died. |
| 7 | Q.   In 2002, this is actually 7/17/02, Dr. Anderson |
| 8 | wrote in her notes that you said, "I'm afraid I'll take |
| 9 | my issues out on him," meaning Chris. |
| 10 |         Do you recall what you meant by that? This |
| 11 | is before you were married. This is 2002. |
| 12 | A.   Not out of context, no. |
| 13 | Q.   What she wrote that time was "Karen and Chris, |
| 14 | K unused to being alone. 'I'm afraid I'll take my issues |
| 15 | out on him.'" |
| 16 |         Does that help? |
| 17 | A.   Before we got married, we had met with Jane to |
| 18 | just talk about couples issues. I had been single and |
| 19 | had lived alone and used to that. I had been on my own |
| 20 | for a long time. So I was used to that. And I was |
| 21 | afraid that I would be a bad wife, like I didn't want to |
| 22 | be a bad wife to him. |
| 23 | Q.   Did it have anything to do with recovery issues |
| 24 | or anything like that? |

|  | 61 |
|---|---|
| 1 | Q.   At the bottom of the last paragraph on that |
| 2 | page, it says, "Reason for securing services at this |
| 3 | time," and among other reasons, is it correct it says, |
| 4 | "Marital conflict"? |
| 5 | A.   Yes. |
| 6 | Q.   Do you know what Chris may have been referring |
| 7 | to as marital conflict at that point? |
| 8 | A.   At that point we were arguing because he was |
| 9 | drinking. |
| 10 | Q.   Anything else? |
| 11 | A.   No. |
| 12 | Q.   Also on that first page it says, "Drug of |
| 13 | choice is alcohol." |
| 14 | A.   Yes. |
| 15 | Q.   Under "Frequency." Would you agree with that, |
| 16 | that that was his drug of choice? |
| 17 | A.   Yes. It was hard to say because I never -- I |
| 18 | mean, I never drank with him, I never used drugs with |
| 19 | him. |
| 20 | Q.   I understand, but when he had these relapses, |
| 21 | would it typically be alcohol? Would you smell alcohol? |
| 22 | A.   Yes. But he did drugs, too. |
| 23 | Q.   Would you turn to page 5 of the document? |
| 24 | After the list of his friends and family, there's a |

16 (Pages 58 to 61)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

---

**62**

1  paragraph there and the last sentence says, "According to
2  Mr. Barkes, he has experienced serious problems in the
3  past 30 days with his: sexual partner/spouse."
4      Do you know what problems he would have
5  been referring to at that time?
6      A.  Me arguing about his drinking or using drugs.
7      Q.  No other problems?
8      A.  No.
9      Q.  A little further down that same page,
10  "Mr. Barkes reported being abused in the past 30 days:
11  emotionally by his sexual partner or spouse."
12      Do you have any idea what he's referring to
13  there?
14      A.  Me being mad about him drinking.
15      Q.  Do you know why he would have considered that
16  emotional abuse?
17      A.  No.
18      Q.  If you can turn to page 6. The first full
19  paragraph on that same page, I'll just read it into the
20  record. "Client stressed that his wife has been sober
21      for last 18 years.  As per client, despite
22      marital conflict he is satisfied with being
23      married.  However, his wife is verbally abusing
24      him by putting him down and bringing back

**63**

1      traumatic past as it relate to his vehicular
2      homicide which increased his guilt, shame and
3      depression.  Client is hoping to work things
4      through with his wife."
5      What was he referring to by telling the
6  therapist you were verbally abusing him about his past
7  and in particular the accident?
8      A.  I knew that, if Chris was to stay sober, he had
9  to deal with that accident and the guilt, and I would
10  bring it up, that he had to deal with it.
11      Q.  What kind of things would you say to him?
12      A.  That the guilt was eating him up inside and
13  that he had to find some way to deal with that.  And I
14  didn't know how.
15      Q.  Did you get the feeling when you would bring
16  that subject up with him, that he would feel depressed?
17      A.  I knew that he felt guilty.  I knew it would
18  make him -- I knew that it made him feel worse, but I
19  knew that denying it and pretending like it didn't happen
20  was making things worse.
21      Q.  One last question on this one.  On page 7
22  there's a list of mental health status exam items, and is
23  it correct that during this exam --
24      A.  Hold on one second.  I can't listen.  Go ahead.

**64**

1      Q.  The therapist indicated at this time that
2  Christopher had no suicidal intent, suicidal intent,
3  none?  It's the middle of the page.
4      A.  Yes.  Yes, I see it.  Your question about it?
5      Q.  I was asking if the document said that, but if
6  you want to elaborate on your observations of Chris at
7  that time, that's fine, too.  This is December 2003.
8      A.  Uh-huh.  And your question would be?
9      Q.  My question was just if that's what the
10  therapist indicated, that he had no suicidal intent at
11  this time.  But it seemed like you may have wanted to add
12  to the answer.
13      A.  No.  That's what the person put.
14      Q.  That's all I have with that.  Let me get this
15  one marked as Barkes 2.
16      (Barkes Deposition Exhibit No. 2 was marked
17  for identification.)
18  BY MS. BALLARD:
19      Q.  For the record, this is an assessment form from
20  Christiana Care with what appears to be an admit date of
21  11/25/03, and it's been produced by plaintiffs as P 659.
22  Let me know when you're ready.
23      In the middle of this "History of
24  Presenting Problem" paragraph, the provider wrote: "Came

**65**

1  home on Zoloft, 100," I'm not sure what the dosage is
2  there, but it says 100 something.  "Violent when mixed
3  with alcohol per wife.  She kicked him out.  He went to
4  his aunt's who is also angry."
5      Was this the incident you told me about
6  where he was taking Zoloft and then tried to take alcohol
7  to come down from that?
8      A.  Yes.
9      Q.  According to this, it appears that he went to
10  his aunt's after you kicked him out of the house?  Do you
11  agree with that?
12      A.  No.
13      Q.  Which part do you not agree with?
14      A.  That he went to his aunt's house.
15      Q.  Where did he go?
16      A.  You know, I'm unsure.
17      Q.  Would it be correct that, after this episode,
18  you did kick him out of the house?
19      A.  No.
20      Q.  Were you with him in the emergency room --
21      A.  Yes.
22      Q.  -- during this time?
23      A.  Yes.
24      Q.  Is it possible that you gave the nurse any of

17 (Pages 62 to 65)

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

| | 66 | | 68 |
|---|---|---|---|
| 1 | this information, or do you think it came from | 1 | Q. Do you have a card or something? |
| 2 | Christopher? | 2 | A. No. |
| 3 | A. It came from Chris. | 3 | MR. MARTIN: I guess the best method would |
| 4 | Q. It also says a little further down, and this is | 4 | be to check it on the Internet to see if we can track it |
| 5 | referring to you, "She's livid about his behavior, | 5 | down that way. |
| 6 | especially his lying about his use." | 6 | BY MS. BALLARD: |
| 7 | Is that accurate? | 7 | Q. Was this through Chris's work that he got the |
| 8 | A. Yes. | 8 | prescriptions through Medco? Why did he start using |
| 9 | Q. Is that something you expressed to the nurses | 9 | Medco I guess is my question? |
| 10 | there? | 10 | A. I want to say there was a thing that it was |
| 11 | A. Yes. | 11 | less money for a three months' supply versus -- I'm |
| 12 | Q. Three lines from the bottom of that big | 12 | unsure, because I never actually had to do it. But I |
| 13 | paragraph is it correct it says, "Denies suicidal on unit | 13 | think it was less expensive if you went through Medco |
| 14 | but not if he goes home"? | 14 | versus going to the... |
| 15 | A. Yes. | 15 | Q. Was the prescription coverage through his work? |
| 16 | Q. It also says after that, "As of this moment, | 16 | A. Yes. |
| 17 | wife does not want him to return"? | 17 | Q. Through Pepsi? |
| 18 | A. No. Your question is does it say that? Yes. | 18 | A. Yes. |
| 19 | Q. You do not agree with that? | 19 | Q. In October of '04 he filled another drug, |
| 20 | A. I wanted him hospitalized. I didn't want him | 20 | Albuterol, at the Shop Rite; is that right? |
| 21 | to come home. I wanted him hospitalized. | 21 | A. Yes. |
| 22 | Q. Was he hospitalized after this? | 22 | Q. Is there a reason he didn't use Medco for that |
| 23 | A. I don't remember. I'd have to look at the | 23 | one? |
| 24 | medical records. | 24 | A. Other than he only took that when he had |

| | 67 | | 69 |
|---|---|---|---|
| 1 | Q. That's all I have on that. | 1 | breathing problems and so he probably didn't use it as |
| 2 | Let's get this next one marked as the next | 2 | often, versus he knew that he was going to be on the |
| 3 | number. | 3 | Depakote, Seroquel, and Effexor for a long time. |
| 4 | (Barkes Deposition Exhibit No. 3 was marked | 4 | Q. Do you recall prescriptions of Depakote, |
| 5 | for identification.) | 5 | Effexor, and Seroquel being mailed to the house in |
| 6 | BY MS. BALLARD: | 6 | October 2004? |
| 7 | Q. This is a record we subpoenaed from the Shop | 7 | A. Yes. |
| 8 | Rite pharmacy, and it's their record of prescriptions | 8 | Q. That's all I have on that. |
| 9 | that Christopher filled there. Is it correct that in | 9 | MS. BALLARD: This is the last one. |
| 10 | September of '04 it appeared he was filling prescriptions | 10 | (Barkes Deposition Exhibit No. 4 was marked |
| 11 | for Depakote, Effexor, and Seroquel? | 11 | for identification.) |
| 12 | A. What was the date? | 12 | BY MS. BALLARD: |
| 13 | Q. September 3rd, '04, and September 9th, '04. | 13 | Q. I ask you to take a look at this one. This is |
| 14 | A. Yes. | 14 | a record from Rockford Center, admission date 9/10/04 by |
| 15 | Q. Who is Dr. Jacobson that prescribed those? | 15 | a Mujib Obeidy, M.D. Let me know when you're ready. |
| 16 | A. That was the doctor from Rockford. | 16 | For the record, this is P 196 through 198 |
| 17 | Q. According to this, it appears he did not refill | 17 | of plaintiffs' production. |
| 18 | those prescriptions after September of 2004. | 18 | Do you recall Chris being admitted to |
| 19 | A. He started getting them through Medco. | 19 | Rockford Center in September '04 after a three-day |
| 20 | Q. All three of those? | 20 | alcohol binge? |
| 21 | A. Yes. | 21 | A. Yes. |
| 22 | MS. BALLARD: Jeff, can we get an address | 22 | Q. Is it correct that this report indicates he was |
| 23 | for Medco so I can subpoena their records? | 23 | kicked out of the house by you? |
| 24 | BY MS. BALLARD: | 24 | A. Yes. |

18 (Pages 66 to 69)

**A000029**

Barkes, et al. v. First Correctional Medical, Inc., et al.
Karen S. Barkes

---

**70**

1    Q.   At the bottom of the paragraph titled "History
2  of Present Illness," is it correct the report says, "He,"
3  meaning Chris, "also states that after he was kicked out
4  of his house he has not had access to his medication"?
5    A.   Yes.
6    Q.   Do you know if he went to live with Aunt Helen
7  this particular time?
8    A.   No.
9    Q.   He did not?
10    A.   You mean after or those three days?
11    Q.   When he was kicked out of the house.
12    A.   No.
13    Q.   Who was he with?
14    A.   This is the -- when he was with that girl,
15  Kathy.
16    Q.   Right.  This is when the probation officer came
17  to her house and picked him up.
18        Under "Mental Status Examination" on page
19  2, the report indicates:  "Appears to be very concerned
20  about the problems that he is having with his wife"...
21        Do you know what he was referring to in
22  September of '04?
23    A.   Yes.  Me being angry that he was getting high
24  again or drinking again.

---

**71**

1    Q.   Any other problems you can think of that he
2  might have been referring to?
3    A.   No.
4    Q.   The last page, page 3, under "Treatment Plan,"
5  is it correct that this doctor wrote:  "I will not start
6  him on any Depakote"?  Is that what it says?
7    A.   Yes.
8    Q.   That's all I had on that.
9        Let me just go really briefly to the
10  conversation you had with Chris on November 13th, 2004,
11  when he called you from prison.
12        I believe you said he told you he hadn't
13  gotten high?
14    A.   Yes.
15    Q.   Did he sound intoxicated to you?
16    A.   No.
17    Q.   You said you sort of had a sixth sense about
18  it.  Did you get the feeling that he had gotten high?
19    A.   No.
20    Q.   You've seen the medical records and the autopsy
21  report from that incident.  If I represented that that
22  report said he was not under the influence of any
23  substances, would that be your recollection, also?
24    A.   Yes.

---

**72**

1        MS. BALLARD:  That's all I have.  Thank
2  you.
3        Do you have any?
4  BY MR. HAGER:
5    Q.   Just real briefly.  My name is Gerry Hager, and
6  I represent First Correctional in this matter.
7        Have you ever talked with anyone at First
8  Correctional Medical regarding his treatment at the
9  prison?
10    A.   Not his treatment.  I was trying to get his
11  records.
12    Q.   Who did you talk to?
13    A.   The receptionist who picked up in Arizona.
14  Nowhere -- I kind of got -- I got bounced around.  They
15  said they wouldn't give me his medical records.
16    Q.   So you made a call to Arizona?
17    A.   Yes.  And then they gave me the office here and
18  they gave me the prison.
19    Q.   During those telephone calls, did anyone ever
20  talk to you at all about his care at the prison?
21    A.   No.
22    Q.   Did you ever talk to any of the individual
23  employees at First Correctional Medical other than the
24  receptionist that you talked to?

---

**73**

1    A.   No.
2        MR. HAGER:  That's all I have.  Thank you.
3        MR. MARTIN:  I have no questions.  We will
4  read and sign.
5        (Deposition concluded at 12:05 p.m.)
6        - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

19  (Pages 70 to 73)

Barkes, et al. v. First Correctional Medical, Inc., et al.

74

```
 1          T E S T I M O N Y
 2
 3   DEPONENT: KAREN S. BARKES          PAGE
 4
 5   BY MS. BALLARD............................... 2
 6   BY MR. HAGER................................. 72
 7
 8          E X H I B I T S
 9
10   BARKES DEPOSITION EXHIBIT NO.      MARKED
11
12   1 - Record of Catholic Charities, Inc.,
     Counseling and Substance Abuse Services,
13   interview date for Christopher Barkes,
     12/18/2003..................................... 60
14
     2 - Assessment form from Christiana
15   Care........................................... 64
16   3 - Prescription record from Shop Rite
     pharmacy...................................... 67
17
     4 - Record from Rockford Center............... 69
18
19
20
21
22
23
24
```

76

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

    I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 24th day of
September, 2007, the deponent herein, KAREN S. BARKES,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.
    I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                      _Kimberly A. Hurley_

Kimberly A. Hurley
Certification No. 126-RPR
(Expires January 31, 2008)

DATED:  September 27, 2007

75

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

20 (Pages 74 to 76)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters          302-655-0477

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES individually; TINA          )
GROSSMAN as next                          )
friend of BRITTANY BARKES; TINA           )
GROSSMAN as next friend of ALEXANDRA      )
BARKES; and KAREN BARKES as administratrix )
of the ESTATE OF CHRISTOPHER BARKES,      )
                                          )
      Plaintiffs,                        )
                                          )
v.                                        )        Civil Action No.   0 6     1 0 4
                                          )
FIRST CORRECTIONAL MEDICAL,               )        JURY TRIAL DEMANDED
INC.; STANLEY TAYLOR; RAPHAEL             )
WILLIAMS; CERTAIN UNKNOWN                 )
INDIVIDUAL EMPLOYEES OF THE STATE OF      )
DELAWARE DEPARTMENT OF                     )
CORRECTION; CERTAIN UNKNOWN               )
INDIVIDUAL EMPLOYEES                       )
OF FIRST CORRECTIONAL MEDICAL,            )
INC.; and STATE OF DELAWARE               )
DEPARTMENT OF CORRECTION,                  )
                                          )
      Defendants.                        )

## COMPLAINT

### Parties

1.      Plaintiff Karen Barkes individually is, and at all times relevant hereto was, a

resident of Wilmington, Delaware, and was the wife of decedent Christopher Barkes (who is

hereinafter sometimes referred to as "Mr. Barkes") at the time of the death of Christopher

Barkes.

2.      Plaintiff Tina Grossman is the mother and next friend of Brittany A. Barkes

(hereinafter sometimes referred to as "Brittany," date of birth August 30, 1989) and Alexandra

M. Barkes (hereinafter sometimes referred to as "Alexandra," date of birth March 9, 1993), who are the children of Christopher Barkes.

3.      Plaintiff Karen Barkes as Administratrix of the Estate of Christopher Barkes has been appointed Administratrix of the Estate of Christopher Barkes by the New Castle County Register of Wills.

4.      Defendant Stanley Taylor is the Commissioner of Correction for the State of Delaware, and in that capacity is the Chief Officer of the Department of Correction (the department will hereinafter sometimes be referred to as the "DOC."

5.      Defendant Raphael Williams is and was at all times relevant hereto the Warden of the Howard R. Young Correctional Institution (which was formerly often referred to as "Gander Hill," and which will hereinafter be referred to as "HRYCI").

6.      Defendants, unknown individual employees of the DOC, were, on information and belief, involved in the care and custody of Christopher Barkes, either directly or indirectly by virtue of their obligations to properly administer such care and custody, at relevant times hereto.

7.      Defendant, State of Delaware Department of Correction, is a subdivision of the State of Delaware.

8.      Defendant, First Correctional Medical, Inc. (hereinafter sometimes referred to as "FCM"), is, on information and belief, a corporation responsible, at all times relevant hereto, for the performance of medical services within HRYCI pursuant to a contract with the State of Delaware.

9.    Defendants, unknown individual employees of FCM, were, on information and belief, involved in the care and custody of Christopher Barkes, either directly or indirectly by virtue of their obligations to properly administer such care and custody, at relevant times hereto.

### Jurisdiction

10.    The United States District Court for the District of Delaware has jurisdiction over the parties and the claims by virtue of the pendency of a federal claim under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343, and under the principles of ancillary and pendent jurisdiction as well as the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

### Facts

11.    Christopher Barkes, whose date of birth was December 12, 1966, was found to have committed suicide at age 37 on or about November 14, 2004, while incarcerated at HRYCI.

12.    Seven years prior to his suicide, in 1997, Mr. Barkes was involved in an automobile accident while under the influence of alcohol, which accident resulted in the deaths of two other involved parties.

13.    As a result of his involvement in the aforesaid motor vehicle accident, Mr. Barkes pleaded guilty to two counts of vehicular homicide and was sentenced to two years in prison to be followed by an extended period of probation.

14.    Mr. Barkes was deeply impacted by the tragic auto accident identified above; psychological reports relating to his frame of mind, generated as a result of treatment he received in the years after the vehicular homicide, indicate that he was wracked with extreme guilt over the deaths that had resulted from the accident, and he had been diagnosed as suffering from post-traumatic stress disorder resulting from that accident.

15.    As a result of the post-traumatic stress disorder and related guilt, depression, and anxiety, certain alcohol and drug problems of Mr. Barkes were exacerbated, and in November of 2003 he attempted suicide by overdosing on pills, although he survived.

16.    On information and belief, Mr. Barkes attempted suicide on at least one other occasion while incarcerated at HRYCI.

17.    In February of 2004, as part of a sentencing order related to, *inter alia*, certain violations of his probation, Mr. Barkes was ordered as follows by the Family Court of the State of Delaware: to continue certain psychiatric day treatment services he was obtaining from Psychotherapeutic Services, Inc.; to attend at least five meetings of Alcoholics Anonymous per week; to be evaluated for emotional and/or psychological problems; and to take such mental health medication as was prescribed.

18.    On September 10, 2004 while receiving care at Chrisitana Care Hospital, Mr. Barkes tried to kill himself using his IV tubing. Mr. Barkes' probation officers were notified.

19.    On November 13, 2004 Christopher Barkes was incarcerated at HRYCI for loitering, in violation of his probation.

20.    During the initial intake of Christopher Barkes, on November 13, 2004, employees of defendant FCM noted that Christopher Barkes took the following medications: Depakote XR, Seroquel and Effexor XR, whose clinical use is to treat depression and bipolar disorder.

21.    Christopher Barkes was not given any of the above-listed medications by FCM personnel on November 13, 2004 or thereafter.

22.     The intake form prepared at the time of Mr. Barkes' entry into HRYCI, which was signed by a member of the FCM intake nursing staff, was checked "yes" next to the inquiry, "Have you ever attempted suicide?"

23.     The initial period of any incarceration is often a critical time for detecting potential suicides, as noted in the Program Statement of the United States Bureau of Prisons relating to suicide prevention.

24.     Upon information and belief, instead of double-bunking Christopher Barkes (which is to say, housing him with a cellmate) or placing him in a suicide watch cell or "Ram room", Christopher Barkes was housed alone in cell F-122.

25.     With regard to incarcerated individuals who have a history of suicidal ideation and are believed to be suicidal, the National Commission on Correctional Health Care ("NCCHC") calls for double-bunking and constant supervision.

26.     Upon information and belief, Christopher Barkes was not placed under constant supervision nor was his status checked at regularly-scheduled intervals sufficient to prevent his suicide.

27.     Upon information and belief, defendants either made provision to Christopher Barkes, or authorized the provision to Christopher Barkes, or failed to prevent the provision to Christopher Barkes, of bedding (such as bed sheets and linens) and/or other items that could be used by a suicidal inmate to harm himself.

28.     Upon information and belief, at approximately 11:40 a.m. on November 14, 2004, Christopher Barkes was found unconscious in his cell by prison officials, who determined that he had hung himself with bedsheets.

29.     Prison officials and/or FCM personnel attempted to revive Christopher Barkes unsuccessfully.

30.     Christopher Barkes was thereafter transferred to Christiana Hospital.

31.     The ER referral completed by FCM and/or DOC personnel relating to the transfer of inmate Christopher Barkes to Christiana Hospital expressly noted that Mr. Barkes had a history of bipolar disorder.

32.     Christopher Barkes was pronounced dead in Christiana Hospital on November 14, 2004.


## COUNT I

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983 – Cruel and Unusual Punishment (by Karen Barkes as Administratrix against all individual defendants and FCM)

33.     Paragraphs 1 to 32 are restated as if more fully set forth herein.

34.     The vulnerability of Christopher Barkes to suicide constituted a serious medical need of which defendants knew or should have known, and the actions and/or inactions of defendants, under color of state law, in addressing or failing to address that need, constituted deliberate indifference which could be expected to lead to substantial and unnecessary suffering, injury, and/or death, and which did in fact lead to the death of Mr. Barkes.

35.     As a result of the wrongful actions of the defendants, Mr. Barkes suffered attendant physical injuries, mental anguish, pain and suffering, and death, and was deprived of his right to life and his right to be free from cruel and unusual punishment, for which plaintiff Karen Barkes as Administratrix now seeks compensation.

## COUNT II

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983 – Failure to train and/or maintenance of wrongful customs, practices and polices (by Karen Barkes as Administratrix against FCM as a person and as a state actor, and against the individual FCM defendants)

36.    Paragraphs 1-35 are restated as if more fully set forth herein.

37.    In performing its medical services for the DOC, FCM and the individual FCM defendants were state actors performing state functions under color of state law.

38.    The death of Christopher Barkes was the direct result of the customs, practices, policies and procedures of FCM and the individual FCM defendants, including but not limited to: a failure to properly train and supervise FCM personnel so as to properly recognize suicidal inmates and how to properly care for inmates identified as making previous attempts on their life, and/or a failure to institute appropriate procedures for the timely transmission of important medical information to appropriate personnel.

39.    The aforesaid actions of FCM and the individual FCM defendants amounts to deliberate indifference to the rights of inmates, including the rights of Mr. Barkes.

40.    As a result of the wrongful actions of the defendants, Mr. Barkes suffered attendant physical injuries, mental anguish, pain and suffering, and death, and was deprived of his right to life and his right to be free from cruel and unusual punishment, for which plaintiff Karen Barkes as Administratrix now seeks compensation.

## COUNT III

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983 – Failure to train and/or maintenance of wrongful customs, practices and polices (by Karen Barkes as Administratrix against the State of Delaware Department of Corrections and the individual defendant employees of the DOC)

41.     Paragraphs 1 to 40 are restated as if more fully set forth herein.

42.     The death of Christopher Barkes was the direct result of the customs, practices, policies and procedures of defendant Stanley Taylor, defendant Raphael Williams, the individual DOC defendants, and the defendant State of Delaware Department of Correction, including but not limited to: a failure to properly train and supervise DOC personnel so as to properly recognize suicidal inmates and how to properly care for inmates identified as making previous attempts on their life, and/or a failure to institute appropriate procedures for the timely transmission of important medical information to appropriate personnel.

43.     The aforesaid actions of defendants constitute deliberate indifference to the rights of inmates who come into contact with employees of the DOC and FCM, including the rights of Mr. Barkes.

44.     As a direct and proximate result of the actions of the Defendants, Christopher Barkes suffered attendant physical injuries, mental anguish, pain and suffering, and death, and was deprived of his right to life and his right to be free from cruel and unusual punishment, for which plaintiff Karen Barkes as Administratrix now seeks compensation.

## COUNT IV

### Wrongful Death under 10 Del. C. § 3724 (by Karen Barkes individually and Tina Grossman as next friend of Alexandra and Brittany Barkes, against FCM and the individual defendants)

45.     Paragraphs 1-44 are restated as if more fully set forth herein.

46. The aforesaid actions of the defendants caused the wrongful death of Christopher Barkes.

47. Plaintiffs are authorized to recover for the damages they have suffered as a result of the wrongful death of Christopher Barkes pursuant to the terms of 10 Del. C. § 3724, and they have suffered severe damages as identified thereunder, including but not limited to the loss of companionship and support of their husband and/or father, Christopher Barkes, with attendant and severe emotional anguish.

## COUNT V

### Survival action under 10 Del. C. § 3701 for medical malpractice (by Karen Barkes as Administratrix against FCM and the individual FCM defendants)

48. Paragraphs 1-44 are restated as if more fully set forth herein.

49. The aforesaid actions of the defendants constituted medical malpractice, causing great pain and suffering, physical injury, and death to Christopher Barkes.

50. Plaintiff Karen Barkes as Administratrix is authorized to recover for the damages suffered by Christopher Barkes as a result of the medical malpractice of the defendants, pursuant to 10 Del. C. § 3701.

**WHEREFORE,** plaintiffs demand that judgment be entered in their favor against defendants on the above claims, including awards of compensatory damages, punitive damages, costs of suit, interest, attorneys' fees under 42 U.S.C. § 1988 and any other appropriate or relevant statutory or common law basis, and such other and further relief as this Court may deem appropriate.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
jmartin@margolisedelstein.com
Attorneys for Plaintiff

DATE: February 16, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

KAREN BARKES, individually;           )
TINA GROSSMAN as next friend of       )
BRITTANY BARKES; TINA                 )
GROSSMAN as next friend of            )
ALEXANDRA BARKES; and                 )
KAREN BARKES as administratrix        )
of the ESTATE OF CHRISTOPHER          )
BARKES,                               )          C. A. No. 06-104-JJF
                                      )
          Plaintiffs,                 )
                                      )
v.                                    )
                                      )
FIRST CORRECTIONAL MEDICAL            )
INC.; STANLEY TAYLOR;                 )
RAPHAEL WILLIAMS;                     )
CERTAIN UNKNOWN INDIVIDUAL            )
EMPLOYEES OF STATE OF                 )
DELAWARE DEPARTMENT OF                )
CORRECTION; CERTAIN                   )
UNKNOWN INDIVIDUAL                    )
EMPLOYEES OF FIRST                    )
CORRECTIONAL MEDICAL, INC.,           )
And STATE OF DELAWARE,                )
DEPARTMENT OF CORRECTION,             )
                                      )
          Defendants.                 )

**ANSWER AND CROSSCLAIM OF STATE OF DELAWARE DEFENDANTS:**
**DEPARTMENT OF CORRECTION, STANLEY TAYLOR,**
**RAPHAEL WILLIAMS**
**AND "UNKNOWN EMPLOYEES" OF STATE OF DELAWARE**

COME NOW, State of Delaware defendants, Department of Correction, Stanley

Taylor, Raphael Williams and "unknown employees" of the State of Delaware, and

answer plaintiff's complaint as follows: Unless expressly admitted or qualified, all of the

allegations in the Complaint are generally denied.

1.      Admitted, upon information and belief.

2.     Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

3.     Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

4.     Admitted that Defendant Stanley W. Taylor, Jr. was appointed by the Governor of the State of Delaware as the Commissioner of the Delaware Department of Correction (DOC), and currently serves in that position.

5.     Admitted.

6.     Admitted that decedent, Christopher Barkes, was in the custody of DOC, at the Howard R. Young Correctional Institution (HRYCI), at or about the time of his death.  Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of the balance of this averment.

7.     Admitted that the Department of Correction is a department within the executive branch of the State of Delaware government.

8.     Admitted.  At all relevant times, First Correctional Medical, Inc. was responsible for the provision and performance of medical services to inmates at HRYCI as well as other State correctional institutions.

9.     Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

10.     Admitted, upon information and belief.  However State Defendants reserve all defenses, including jurisdictional defenses, which may be available to them.

11.     Admitted.

12.     Defendants are generally aware of this incident which resulted in a criminal conviction against Christopher Barkes.  Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of the particulars of this averment.

13.     Defendants are generally aware of this incident which resulted in a criminal conviction against Christopher Barkes.  Defendants are currently without knowledge or information sufficient to form a belief as to the truth or falsity of the particulars of this averment.

14.     Defendants are without knowledge or information sufficient to respond to this averment. Otherwise, denied.

15.     Defendants are without knowledge or information sufficient to respond to this averment.  Otherwise, denied.

16.     Upon information and belief, Denied.

17.     Defendants are without knowledge or information sufficient to respond to this averment.

18.     Defendants are without knowledge or information sufficient to respond to this averment.

19.     Admitted that on November 13, 2004, decedent, Christopher Barkes, was arrested by Wilmington Police Department, and subsequently incarcerated that same day at HRYCI.  Upon information and belief, Barkes was arrested for loitering for the purpose of purchasing drugs and driving while revoked, in violation of an existing order of probation imposed as a result of a domestic violence assault conviction.

20.    Defendants are without knowledge or information sufficient to respond to this averment.

21.    Defendants are without knowledge or information sufficient to respond to this averment.

22.    Defendants are without knowledge or information sufficient to respond to this averment.

23.    This averment calls for legal and/or medical conclusions and opinions of ultimate fact to which no response is deemed necessary.  Should an answer be deemed necessary, this averment is denied in its entirety.

24.    Admitted, upon information and belief, that during the less than 24 hours of his incarceration on November 13-14, 2004, Christopher Barkes was housed in a cell (#122) in the Booking and Receiving area of HRYCI.  Otherwise, denied.

25.    This averment calls for legal and/or medical conclusions and opinions of ultimate fact to which no response is deemed necessary.  Should an answer be deemed necessary, this averment is denied in its entirety.

26.    Denied as alleged.

27.    Denied as alleged.

28.    Admitted that Christopher Barkes was found to have committed suicide on the morning of November 14, 2005.  Defendants are without knowledge or information sufficient to respond to the particulars of this averment.

29.    Admitted.  In addition, upon information and belief, an EMT/ambulance crew was promptly called to HRYCI and attempted to resuscitate Christopher Barkes.

30.    Admitted.

31.    Defendants are without knowledge or information sufficient to respond to this averment.

32.    Upon information and belief, Admitted.

33.    Answering defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 32 above.

34.    Denied.

35.    Denied.

36.    Answering defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 35 above.

37.    This averment states and calls for legal conclusions to which no response is deemed necessary.  Should an answer be deemed necessary, this averment is denied in its entirety.

38.    This allegation is not directed to answering State defendants.  To the extent an answer is required, or to the extent Plaintiffs seek to impute FCM's liability, if any, to the State, this averment is denied.

39.    This allegation is not directed to answering State defendants.  To the extent an answer is required, or to the extent Plaintiffs seek to impute FCM's liability, if any, to the State, this averment is denied.

40.    Denied.

41.    Answering defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 40 above.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Answering defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 44 above.

46.    Denied.

47.    Denied.

48.    Answering defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 47 above.

49.    This allegation is not directed to answering State defendants.    To the extent an answer is required, or to the extent Plaintiffs seek to impute FCM's liability, if any, to the State, this averment is denied.

50.    This allegation is not directed to answering State defendants.    To the extent an answer is required, or to the extent Plaintiffs seek to impute FCM's liability, if any, to the State, this averment is denied.

### RELIEF

1.    It is specifically denied that plaintiffs are entitled to damages, including compensatory damages, punitive damages and/or attorneys' fees.

2.    It is specifically denied that plaintiffs are entitled to any relief.

3.    Plaintiffs are not entitled to punitive damages for liability, if any, under 10 Del.C. §3724.

### AFFIRMATIVE DEFENSES

1.    The State defendants are immune from liability to plaintiffs under the doctrine of sovereign immunity.

2.    The State defendants are immune from liability under the Eleventh Amendment of the United States Constitution.

3.    The State of Delaware, Department of Correction, and State defendants in their official capacities are not subject to suit or liable for alleged violations of plaintiff=s constitutional rights as they are not "persons" pursuant to 42 U.S.C.A. §1983.

4.    Officials and employees of the State of Delaware acting in good faith within the scope of their employment and without knowingly violating well established federal rights, are entitled to qualified immunity and cannot be held liable in this action.

5.    The State defendants are immune from liability to the plaintiff under the Delaware State Tort Claims Act.  10 Del.C. §4001 et. seq.

6.    Individual defendants cannot be held liable in the absence of personal involvement for alleged constitutional deprivations.

7.    To the extent the Plaintiffs seek to hold the defendants liable based on supervisory responsibilities, the Doctrine of Respondeat Superior is not a basis for liability in an action under 42 U.S.C.A. §1983.

8.    To the extent Plaintiffs' claims sound in negligence, Plaintiffs cannot state a cause of action under 42 U.S.C.A. §1983.

9.    Plaintiffs fail to state a claim against State defendants for failure to train and maintenance of wrongful customs, practices and policies.

10.    Plaintiffs fail to state a claim against State defendants for violation of the Eighth Amendment as a result of denial of medical care.

11.    Decedent's illness, if any, existed prior to the date of the alleged wrongful conduct by defendants.

12.     The extent of Decedent's illness, if any, was not known to or reasonably ascertainable by Defendants prior to his death.

13.     Decedent's injuries, and Plaintiffs' damages, if any, resulted from an intervening and superseding cause.

14.     Decedent contributed to his injuries, including, but not necessarily limited to, concealing his illness (if any) and/or the extent of his illness, proximately causing his own injuries and Plaintiffs' damages, if any, arising from the alleged incident.

15.     Plaintiffs otherwise fail to state a claim upon which relief may be granted.

## STATE DEFENDANTS' CROSSCLAIM AGAINST FIRST CORRECTIONAL MEDICAL, INC. (FCM), FOR CONTRACTUAL DEFENSE AND INDEMNIFICATION

### JURISDICTION

1.     The District Court has jurisdiction over the State Defendants' crossclaim against FCM pursuant to 28 U.S.C.A. §§ 1367, as well as Federal Rules of Civil Procedure 13(g) and 18.

### COUNT I

### CONTRACTUAL INDEMINIFICATION

2.     The State of Delaware Department of Correction and Defendant, First Correctional Medical-Delaware, L.L.C. (FCM), were parties to a contract for the provision of medical services to the Delaware Department of Correction's inmate population, applicable and effective during November, 2004, and at all relevant times to this action.

3.    The contract specifically created in co-defendant, First Correctional Medical-Delaware, L.L.C., a clear and unequivocal duty to

> hold harmless, indemnify and defend the DOC [Department of Correction], the State of Delaware and their agents, employees or officers . . . from any and all suits, actions, losses, liability, damages (including punitive damages), expenses, reasonable attorney fees (including salaries of attorneys regularly employed by the State of Delaware), judgments or settlements . . . arising out of the provision of health care services by FCM, its employees, or subcontractors under the contract, including direct or indirect negligence or intentional acts of omission or commission, and professional malpractice regardless of any intentional acts o[r] omissions or commission by employees or officials of the DOC.

(6/17/02 Contract, ¶8. Hereinafter referred to as the "hold harmless provision").

4.    All conditions precedent to recovery under the contract, if any, have been satisfied or waived.

5.    According to the contract and the language of the hold harmless provision, the State Defendants are third-party beneficiaries of the contract.

6.    State Defendants have been required to be represented by the undersigned counsel rather than an attorney provided by co-defendant First Correctional Medical.

7.    The State of Delaware Department of Correction has been required to expend public funds necessary to the litigation of this matter.

8.    Injuries, if any, to decedent and Plaintiffs were proximately caused by the actions, omissions and/or professional malpractice of defendant, First Correctional Medical.

9.    The State Defendants deny any liability arising out of any allegation by any party in this litigation. Defendant, First Correctional Medical, is liable for defense and indemnification of the State and State Defendants under the hold harmless provision

even if the State and/or any State Defendant is found to have engaged in negligent, intentional or other conduct resulting in injury and liability to decedent and/or plaintiffs.

## COUNT II

### COMMON LAW INDEMNIFICATION

10.    The State Defendants incorporate by reference paragraphs 1 – 9 of the crossclaim as if more fully set forth herein.

11.    The State Defendants deny any liability arising out of any allegation by any party in this litigation.  To the extent Plaintiffs are successful in recovering any award against any State Defendant, the State Defendants are entitled to be held harmless, defended, and indemnified pursuant to the express language of the hold harmless provision of the contract.

12.    Should the Court rule that any portion of the contract or the hold harmless provision is inapplicable or void, the State Defendants are entitled to common law indemnification in the alternative.  In the event that any State Defendant is found liable to the Plaintiffs, then the State Defendants cross-claim against co-defendant First Correctional Medical, whose negligence was the primary and proximate cause of any and all damage sustained by the Plaintiffs, and for which the State Defendants, if liable at all, are only secondarily liable.  The State Defendants are therefore entitled to common law indemnification in the event that their claim for contractual indemnification is rejected by the Court.

13.    With respect to any state law claim for negligence or any recovery thereunder, the State Defendants' cross-claim against co-defendant First Correctional

Medical, to have the relative degrees of fault apportioned pursuant to the Uniform

Contribution Among Tortfeasors Law, 10 <u>Del. C.</u> § 6301, *et seq.*


**WHEREFORE,** State Defendants demand that judgment be entered in their favor

as to all claims, and against the plaintiffs as to all claims, and that costs and attorney fees

be awarded to the State Defendants. The State Defendants further demand that judgment

be entered in their favor as to the instant cross-claim and that costs and attorney fees

incurred in relation thereto be awarded to the State Defendants.


**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**


<u>/s/ Stephani J. Ballard</u>
STEPHANI J. BALLARD (ID # 3481)
Deputy Attorney General
State of Delaware
Department of Justice
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants


DATED: April 7, 2006

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al.,                )
                                      )
                                      )
        Plaintiffs,                   )
                                      )
v.                                    )
                                      )        C. A. No. 06-104-JJF
FIRST CORRECTIONAL MEDICAL            )
INC.; et.al.,                         )
                                      )
        Defendants.                   )

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on April 7, 2006, she caused the attached, *Answer and*
*Crossclaim of State of Delaware Defendants: Department of Correction, Stanley Taylor,*
*Raphael Williams and "Unknown Employees" of State of Delaware,* to be electronically
filed with the Clerk of Court using CM/ECF which will send notification of such filing to
the following:

Jeffrey K. Martin, Esquire          Daniel L. McKenty
Margolis Edelstein                  McCullough & McKenty
1509 Gilpin Avenue                  1225 N. King Street, Suite 1100
Wilmington, DE 19806                P.O. Box 397
                                    Wilmington, DE  19899-0397

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for State Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

KAREN BARKES, et al.         )
                                 )
                                 )
            Plaintiffs        )     C.A. No. 06-104
                                 )
           v.                )
                                 )
FIRST CORRECTIONAL MEDICAL,    )     JURY OF 12 DEMANDED
INC., et al.                    )
                                 )
           Defendants.     )

**FIRST CORRECTIONAL MEDICAL'S ANSWER TO STATE DEFENDANTS' CROSS-CLAIM AGAINST FIRST CORRECTIONAL MEDICAL FOR CONTRACTUAL DEFENSE AND INDEMNIFICATION**

    1.    Admitted.

    2.    Admitted.

    3.    Denied.  By way of further answer, the contractual language speaks for itself.

    4.    Denied.

    5.    Denied.

    6.    Denied.

    7.    Denied.

    8.    Wrongful conduct by answering defendant is denied and it is hereby denied that any actions of the answering defendant caused any illnesses, injuries, or damages of any nature to the plaintiff.

    9.    Denied.

    10.    Answering defendants incorporate by reference paragraphs 1-9 of the Answer to the Cross-claim as if more fully set forth herein.

11.    Denied.

12.    Denied.

13.    Denied.  By way of further answer, co-defendant's paragraph 13 is nonsensical.

**WHEREFORE**, defendant First Correctional Medical demands that the action against it be dismissed and that it be awarded the costs of defense of this action.

## FIRST AFFIRMATIVE DEFENSE

This claim is barred by the doctrine of Accord and Satisfaction.

## SECOND AFFIRMATIVE DEFENSE

This claim is barred by State Defendants' Assumption of Risk.

## THIRD AFFIRMATIVE DEFENSE

This claim is barred by State Defendants' Comparative Negligence.

## FOURTH AFFIRMATIVE DEFENSE

This claim is barred by the doctrine of Estoppel.

## FIFTH AFFIRMATIVE DEFENSE

This claim is barred for Failure of Consideration.

## SIXTH AFFIRMATIVE DEFENSE

This claim is barred by Laches.

## SEVENTH AFFIRMATIVE DEFENSE

State Defendants failed to state a claim upon which relief may be granted.

## EIGHTH AFFIRMATIVE DEFENSE

The indemnification clause cited by State Defendants does not indemnify the State for acts of negligence committed by State Employees.

**McCULLOUGH & McKENTY, P.A.**

/s/ Dana Spring  Monzo
Daniel L. McKenty, Del. Bar No. 2689
Dana Spring Monzo, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Inc.

Dated: June 12, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

KAREN BARKES, et al.                    )
                                        )
                                        )
                    Plaintiffs          )      C.A. No. 06-104
                                        )
          v.                            )
                                        )
FIRST CORRECTIONAL MEDICAL,             )      JURY OF 12 DEMANDED
INC., et al.                            )
                                        )
                    Defendants.         )

## CERTIFICATE OF SERVICE

I, **Dana Spring Monzo,** hereby certify that on this date a copy of the attached *First Correctional Medical's Answer to State Defendants' Cross-Claim Against First Correctional Medical for Contractual Defense and Indemnification,* was efiled and served via first class mail upon the following:

Jeffrey K. Martin, Esquire
Margolis Edelstein
1509 Gilpin Ave.
Wilmington, DE 19806

Stephanie J. Ballard, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**McCULLOUGH & McKENTY, P.A.**

/s/ Dana Spring  Monzo
Daniel L. McKenty, Del. Bar No. 2689
Dana Spring Monzo, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Inc.

Dated: June 12, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et al.        )
                                    )
        Plaintiffs,        )
                                    )
        v.               )     C. A. No. 06-104-JJF
                                    )
FIRST CORRECTIONAL    )
MEDICAL, INC, et al.,       )
                                    )
        Defendants.       )

## RULE 16 SCHEDULING ORDER

The parties having satisfied their obligations under Fed. R. Civ. P. 26(f),

IT IS ORDERED that:

1. **Pre-Discovery Disclosures.** The parties will exchange the information required by Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2 <u>within 30 days after the date of entry of this Order.</u>

2. **Joinder of other Parties.** All motions to join other parties shall be filed on or before <u>January 31, 2007</u> .

3. **Settlement Conference.** Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring the possibility of a settlement.  If the parties agree that they would benefit from a settlement conference, the parties shall contact Magistrate Judge Thynge to schedule a settlement conference so as to be completed no later than the Pretrial Conference or a date ordered by the Court.

4. **Discovery.**

(a) Exchange and completion of interrogatories, identification of all fact witnesses and document production shall be commenced so as to be completed by **August 31, 2007**.

(b) Maximum of __25__ interrogatories by each party to any other party.

(c) Maximum of __50__ requests for admission by each party to any other party.

(d) Maximum of __15__ depositions by plaintiff(s) and __15__ by defendant(s).

(e) Reports from retained experts required by Fed. R. Civ. P. 26(a)(2) are due from the plaintiff(s) by **May 31, 2007** ; from the defendant(s) by **July 31, 2007** .

(f) Any party desiring to depose an expert witness shall notice and complete said deposition no later than thirty (30) days from receipt of said expert's report, unless otherwise agreed in writing by the parties.

5. **Discovery Disputes.**

(a) A party seeking discovery which the opposing party refuses to provide shall file a motion (no brief) pursuant to Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37.1. Said motion shall not exceed a total of four (4) pages. An Answer to the Rule 37 motion, not to exceed four (4) pages, shall be filed within five (5) days of service of the motion. No reply is permitted.

(b) All papers shall set forth in a plain and concise manner the issue(s) in dispute, the party's position on the issue(s), and the reasons for the party's position.

(c) Upon receipt of the Answer, the movant shall notify Chambers by e-mail at jjf_civil@ded.uscourts.gov that the parties have completed briefing.

(d) Upon receipt of the movant's e-mail, the Court will determine whether a conference is necessary and advise the parties accordingly.

(e) There is no limit on the number of Rule 37 motions a party may file, unless otherwise ordered by the Court.

6. **Amendment of the Pleadings.** All motions to amend the pleadings shall be filed on or before  **January 31, 2007** .

7. **Case Dispositive Motions**. Any case dispositive motions, pursuant to the Federal Rules of Civil Procedure, shall be served and filed with an opening brief on or before **October 15, 2007**.  Briefing shall be pursuant to D. Del. LR 7.1.2.  No case dispositive motion may be filed more than ten (10) days from the above date without leave of the Court.

8. **Applications by Motion.**

(a) Any applications to the Court shall be by written motion filed with the Clerk of the Court in compliance with the Federal Rules of Civil Procedure and the Local Rules of Civil Practice for the United States District Court for the District of Delaware (Amended Effective January 1, 1995).  Any non-dispositive motion shall contain the statement required by D. Del. LR 7.1.1.  Parties may file stipulated and unopposed Orders with the Clerk of the Court for the Court's review and signing.  The Court will not consider applications and requests submitted by letter or in a form other than a motion.

(b) No facsimile transmissions will be accepted.

(c) No telephone calls shall be made to Chambers.

(d) Any party with a true emergency matter requiring the assistance of the Court shall e-mail Chambers at: jjf_civil@ded.uscourts.gov.  The e-mail shall provide a short statement describing the emergency.

9. **Pretrial Conference and Trial.** After reviewing the parties' Proposed Scheduling Order, the Court will schedule a Pretrial Conference.

The Court will determine whether the trial date should be scheduled when the Scheduling Order is entered or at the Pretrial Conference.  If scheduling of the trial date is deferred until the Pretrial Conference, the parties and counsel shall anticipate and prepare for a trial to be held within sixty (60) to ninety (90) days of the Pretrial Conference.

_8/28/06_
DATE

UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **KAREN BARKES, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 06-104-JJF** |
| | ) | |
| **FIRST CORRECTIONAL** | ) | |
| **MEDICAL, INC.,** | ) | |
| **STANLEY TAYLOR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## STATE DEFENDANTS'
## RULE 26(a)(1) INITIAL DISCLOSURES

Defendants Department of Correction, Stanley Taylor, Raphael Williams, and "Unknown Employees" of the State of Delaware ("State Defendants") disclose the following information in compliance with Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Scheduling Order in this matter. These disclosures are based on information reasonably available to State Defendants as of this date. Continuing investigation and discovery may alter these disclosures. State Defendants reserve the right to supplement the information disclosed below if additional information becomes available.

By making these disclosures, State Defendants do not represent that they are identifying every document, tangible thing, or witness possibly relevant to this claim. Nor do State Defendants waive their rights to object to the production of any document or tangible thing disclosed on the basis of any privilege, the work-product doctrine, relevancy, undue burden or any other valid objection. State Defendants' disclosures represent a good faith effort to identify information they reasonably believe is required by

Rule 26(a) (1).

State Defendants' disclosures are made without waiver of: 1) the right to object on the grounds of competency, privilege, relevancy and materiality, hearsay or other proper ground, 2) the right to object to the use of any such information, for any purpose, in whole or in part, in any other action; and 3) the right to object on any and all proper grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

All of the disclosures set forth below are made subject to the above objections and qualifications.

**(A)    Individuals likely to have discoverable information in support of Defendants' defenses.**

1.    John Polk, Department of Correction;

2.    Dorene Fields, Department of Correction;

3.    Stephen Martelli, Department of Correction;

4.    Sandra Rayne, Department of Correction;

5.    Fred Way, Department of Correction;

6.    Perry Phelps, Department of Services for Children, Youth and Their Families, (formerly of Department of Correction);

7.    Paul Howard, Department of Correction;

8.    Nurse Colleen Bell, First Correctional Medical;

9.    Nurse Courtney Kenton, First Correctional Medical;

10.    Nurse Gabriel Termilus, First Correctional Medical;

11.    Nurse Jackie, First Correctional Medical;

12.    Unknown intake Nurse on duty 11/13/04, First Correctional Medical;

13.     Other unknown medical personnel employed by First Correctional Medical;

14.     Jennie Vershvovsky, M. D., Assistant Chief Medical Examiner

In addition, State Defendants reserve their rights, pursuant to Rule 26(e) to identify additional witnesses.  State Defendants further reserve the right to identify and call any witnesses listed by the Plaintiff or other Defendant(s).

**(B)     Documents that may be used to support State Defendants' defenses (copies [Bates # 001-00151] are being produced along with these disclosures):**

1.     Contents of Plaintiff's Institutional file, including but not limited to disciplinary, inmate grievance, classification, institutional records, criminal/sentencing information and related documentation contained therein;

2.     Any and all medical examination reports and records applicable to the Plaintiff while incarcerated within the custody of the Department of Correction.  All known records from Christopher Barkes' medical file maintained by DOC are being produced herewith;

3.     DOC Incident reports and documents pertaining to the events of November 14, 2004;

4.     State of Delaware Department of Health and Human Services Certificate of Death and Autopsy Report.

State Defendants reserve their rights, pursuant to Rule 26(e) to identify additional documents.  State Defendants further reserve the right to identify and utilize any document listed by the Plaintiff.

**(C)    Experts and their opinions: Damage Computation.**

State Defendants have not yet retained any experts, but reserve the right to do so, and will supplement this response as required by Rule 26(a).

**(D)    Insurance Agreements in force:**

None. State Defendants further disclose that no such insurance exists.

**(E)    Basis for any damages claimed:**

State Defendants have filed a counter-claim for damages. The State of Delaware Department of Correction and Defendant, First Correctional Medical-Delaware, L.L.C./FCM Inc. (FCM), were parties to a contract for the provision of medical services to the Delaware Department of Correction's inmate population, applicable and effective during November, 2004, and at all relevant times to this action. Pursuant to the terms of that contract, FCM is liable for defense and indemnification of damages assessed against the State and State Defendants (if any) under the "hold harmless" provision. In the alternative, State Defendants are entitled to common law indemnification by FCM.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400

Attorney for State Defendants

Dated: September 26, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

**KAREN BARKES, et al.**      )
                                   )

      **Plaintiffs,**      )
                                   )

      **v.**      )      **C. A. No. 06-104-JJF**
                                   )

**FIRST CORRECTIONAL**      )
**MEDICAL, INC.,**      )
**STANLEY TAYLOR, et al.,**      )
                                   )

      **Defendants.**      )

## NOTICE OF SERVICE

The undersigned certifies that on September 26, 2006, she caused the **STATE**

**DEFENDANTS' RULE 26(a) DISCLOSURES** to be delivered to the following persons

in the form and manner indicated:

### NAME AND ADDRESS OF RECIPIENT(S):

Jeffrey K. Martin, Esquire
Margolis Edelstein
1509 Gilpin Ave.
Wilmington, DE 19806

Dana Spring Monzo, Esquire
McCullough & McKenty
1225 N. King St., Ste. 1100
P.O. Box 397
Wilmington, DE 19899-0397

### MANNER OF DELIVERY:

   X   Two true copies by first class mail, postage prepaid, to each recipient

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al   :
           :
  Plaintiffs,     :  C.A. No. 06-104(JJF)
           :
v.          :
           :  JURY TRIAL DEMANDED
FIRST CORRECTIONAL MEDICAL, :
INC., STANLEY TAYLOR, et. al  :
           :
  Defendants.    :

## PLAINTIFFS' RULE 26(a)(1) INITIAL DISCLOSURES

Plaintiffs, Karen Barkes, et. al., by and through their undersigned attorney, hereby exchanges the following Pre-Discovery Disclosures, pursuant to Fed. R. Civ. P. 26(a)(1).

## RESERVATIONS

1. Plaintiff's Initial Disclosures are made without waiver of, or prejudice to, any objections Plaintiffs may have. Plaintiffs expressly reserves all objections, including, but not limited to: (a) relevance; (b) attorney-client privilege; (c) work-product protection; (d) any other applicable privilege or protection under federal or state law; (e) undue burden; (f) materiality; (g) overbreadth; (h) the admissibility in evidence of these Initial Disclosures of the subject matter thereof; and (i) producing documents containing information disclosed or transmitted to any state or federal agency, to the extent such information is confidential and not required to be disclosed under applicable law. All objections are expressly preserved, as are Plaintiffs' right to move for a protective order. Plaintiffs reserve the right to retract any inadvertent disclosures of information or documents that are protected by the attorney-client privilege, the work product doctrine or any other applicable protection.

1

A000068

2.    Plaintiffs has not completed their investigation of this case and reserve the right to clarify, amend, modify, or supplement the information contained in these Initial Disclosures if and when it obtains supplemental information, to the extent required by the Federal Rules of Civil Procedure.

3.    Plaintiffs' Initial Disclosures are made subject to and without limiting any of the foregoing.

## INITIAL DISCLOSURES

I.    The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information.

## ANSWER:

1.    Karen Barkes, 3111 Crystal Court, Wilmington, DE 19810.

2.    Tina Grossman, 21 Hilton Road, Wilmington, DE 19810.

3.    Stanley Taylor, Chief Officer of the Department of Corrections, 245 McKee Road, Dover, Delaware 19904; Commissioner of Corrections for the State of Delaware.

4.    Raphael Williams, Warden of the Howard R. Young Correctional Facility, 1301 East 12th Street Wilmington, DE 19801.

5.    John Polk, Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

2

6.    Dorene Fields, Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

7.    Stephen Martelli, Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

8.    Sandra Payne, Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

9.    Fred Way, Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

10.    Paul Howard, Bureau Chief of the Department of Corrections, 245 McKee Road, Dover, Delaware 19904.

11.    Frederick Villars, M.D., Wilmington Hospital, 501 West 14th Street, Wilmington, DE 19801.

12.    Perry Phelps; Department of Services for Children, Youth and Their Families, 1825 Faulkland Road, Wilmington, DE 19805-1195.

13.    Jennie Vershvovsky, Assistant Chief Medical Examiner, 200 South Adams Street, Wilmington, DE 19801.

14.    Mariam Mammen, M.D., Wilmington Hospital, 501 West 14th Street, Wilmington, DE 19801.

15.    Debbie L. Fitzgerald, a nurse at Christiana Care, Department of Psychiatry, 501 West 14th Street, Wilmington, DE 19801.

16.    Anita Matos, a nurse at Christiana Care, , Department of Psychiatry, 501 West 14th Street, Wilmington, DE 19801

3

17.     Gaber Yaccub, M.D., Rockford Center, 100 Rockford Drive, Newark, DE 19713.

18.     Alex Jacobsen, M.D., Rockford Center, 100 Rockford Drive, Newark, DE 19713.

19.     Tracy D. Frazier, associate with David Kalkstein, MD, Ph.D, and Associates, 3411 Silverside Road, Hagley Building, Suite 102, Wilmington, DE 19810.

20.     Erin E Chudzik-Pryor, an EMT with New Castle County, New Castle County Government Center, 87 Reads Way, New Castle, DE 19720.

21.     Aaron M. Tarpine, , an EMT with New Castle County, New Castle County Government Center, 87 Reads Way, New Castle, DE 19720.

22.     Arthur T. Pastorius, BS,CAC, Mermont Treatment Center, 100 Yearsley Mill Road, Lima, PA 19063-5593.

23.     Joseph A Mallory, CA, Mermont Treatment Center, 100 Yearsley Mill Road, Lima, PA 19063-5593.

24.     Laynette Graves, CA, Mermont Treatment Center, 100 Yearsley Mill Road, Lima, PA 19063-5593.

25.     Carolyn Wolf, CA, director of PSI Day Treatment Center, Woodmill Drive, Suite 34, Wilmington, DE 19808

II.     A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the parties that are relevant to disputed facts alleged with particularity in the pleadings.

4

**ANSWER:**

1.     Any and all medical records from First Correction Medical from November 14, 2004.

2.     Any and all medical records from Christiana Care Health Services from November 14 and on and immediately prior to November 14, 2004.

3.     Any and all medical records while under treatment of David Kalkstein, M.D., Ph.D.

4.     Any and all medical records from Mirmont Treatment Center.

5.     Any and all medical records from Christiana Care Health Services from September 10, 2004.

6.     Any and all medical records from stays at Rockford Center.

7.     Any and all medical records while under care of PSI Day Treatment Program.

8.     Any and all medical records from various visits to the Emergency Room at Christiana Care Health Services facilities.

9.     Any and all medical records from Christiana Care Health Services while under care of Frederick Villars, M.D.

III.     A computation of any category of damages claimed by the disclosing parties, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

5

**ANSWER:**

To be provided at a later date.

IV.    For inspection and copying as under Rule 34 any insurance agreement under

which any person carrying on an insurance business may be liable to satisfy part or all of

a judgment which may be entered in the action or to indemnify or reimburse for

payments made to satisfy the judgment.

**ANSWER:**

Not applicable.

**MARGOLIS EDELSTEIN**

---

Jeffrey K. Martin, Esquire (Del. Bar #2407)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
(302) 777-4682 fax
jmartin@margolisedelstein.com
Attorney for Plaintiffs

Dated: November 10, 2006

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al                    :

    Plaintiffs,                          :          C.A. No. 06-104(JJF)

                   :

v.                                      :

                   :          **JURY TRIAL DEMANDED**

FIRST CORRECTIONAL MEDICAL,             :
INC., STANLEY TAYLOR, et. al            :

                   :

    Defendants.                          :

### CERTIFICATE OF SERVICE

    I hereby certify that on November 10, 2006 I electronically filed the attached

Plaintiffs' Pre-Discovery Disclosures with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following attorneys of record below:

Stephani J. Ballard, Esquire
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, DE 19801

Dana M. Spring-Monzo, Esquire
McCullough & McKenty,PA.
1225 King Street
Suite 100
P.O. Box 397
Wilmington, DE 19899-0397

                                    MARGOLIS EDELSTEIN

                                    Jeffrey K. Martin, Esquire (Del Bar #2407)
                                    1509 Gilpin Avenue
                                    Wilmington, DE 19806
                                    (302) 777-4680
                                    (302) 777-4682 (fax)
                                    Attorney for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, individually; | ) | |
| TINA GROSSMAN as next friend of | ) | |
| BRITTANY BARKES; TINA | ) | |
| GROSSMAN as next friend of | ) | |
| ALEXANDRA BARKES; and | ) | |
| KAREN BARKES as administratrix | ) | |
| of the ESTATE OF CHRISTOPHER | ) | |
| BARKES, | ) | C. A. No. 06-104-JJF |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL | ) | |
| INC.; STANLEY TAYLOR; | ) | |
| RAPHAEL WILLIAMS; | ) | |
| CERTAIN UNKNOWN INDIVIDUAL | ) | |
| EMPLOYEES OF STATE OF | ) | |
| DELAWARE DEPARTMENT OF | ) | |
| CORRECTION; CERTAIN | ) | |
| UNKNOWN INDIVIDUAL | ) | |
| EMPLOYEES OF FIRST | ) | |
| CORRECTIONAL MEDICAL, INC., | ) | |
| And STATE OF DELAWARE, | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSES TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** To the extent you contend that a State Defendant violated the Plaintiffs' or decedent's clearly established constitutional rights, state with particularity and specificity as to each defendant the factual basis for your

contention, and identify all individuals with knowledge, documents or tangible physical evidence that support your contentions.

**RESPONSE:**

1)      **Raphael Williams was Warden of the Howard R. Young Correctional Institution when Christopher Barkes was previously incarcerated and attempted suicide. He is responsible for the welfare of all inmates during their stay at HRYCI.**

2)      **Department of Correction is responsible for all incarcerated inmates at HRYCI.   Upon information and belief, DOC failed to provide constant supervision and placed Christopher Barkes in a single cell with bedding and/or other items that could be used by a suicidal inmate to harm himself.**

3)      **Further discovery is needed to determine the extent of the violations and the identities of the violators.**

**INTERROGATORY NO. 2:** Describe   in   detail   the   circumstances, including the date, manner and location, surrounding prior alleged suicide attempts by Christopher Barkes referenced in your Complaint as follows:

(a) paragraph #15 of your Complaint, referencing a suicide attempt by Barkes in November of 2003;

(b) paragraph #16 of your Complaint, referencing an alleged additional suicide attempt by Barkes while he was incarcerated at Howard R. Young Correctional Institution (HRYCI);

(c) paragraph #18 of your Complaint, referencing an alleged additional suicide attempt by Barkes on September 10, 2004, at Christiana Hospital;

(d) As to the alleged 9/10/04 attempt referenced in paragraph #18, please also identify the names of the "probation officers" whom you allege were "notified" of this attempt, and the date(s) and manner of notification;

- 2 -

(e) please identify any other prior suicide attempts by Christopher Barkes of which you are aware.

**RESPONSE:**

(a)    In November 2003, Christopher Barkes was staying with his Aunt Helen Young at 14 Ruby Drive in Claymont, DE. Plaintiff Karen Barkes had talked to him a few times during the day. Decedent was depressed over his recent drug use and stated that he saw no end to the pain that he felt over his mistakes in his life. He took a number of prescription pills that he had and called his father, Raymond Barkes. Raymond Barkes then called the ambulance and Aunt Helen. Decedent was then taken by ambulance to Wilmington Hospital where his stomach was pumped. He was admitted for being suicidal.

(b)    Decedent was serving time at Gander Hill for the accident in 1997. He collected a number of pills until he got enough that he thought would kill him. Decedent was then taken to St. Francis Hospital where he stayed four (4) days before going back to Gander Hill.

(c)    On September 10, 2004, Decedent was found by a probation officer at a friend's house in an intoxicated condition. He was taken to Wilmington Hospital because of his breathalyzer reading. While they were waiting for treatment, Decedent tried to hang himself with a sheet and IV tubing. Decedent was admitted to the Rockford Center for being suicidal.

(d)    Decedent tried to overdose on an unknown illegal drug to kill himself. He made a statement to Plaintiff Karen Barkes about not being worthy to be alive when two (2) people were dead because of his mistake. When he became

- 3 -

unconscious, Karen Barkes called 911. The police and an ambulance revived him and took him to the hospital.

(e)    Unaware of any others except those documented above.

**INTERROGATORY NO. 3:** Describe in detail the incident(s) surrounding a domestic altercation between Christopher Barkes and his wife, Karen Barkes, on or about November 21, 2003, that led to Christopher Barkes entering a guilty plea, on or about December 17, 2003, to a charge of offensive touching.

**RESPONSE:**

After Decedent's first hospitalization at Rockford, he was prescribed Zoloft. He was complaining about feeling like "jumping out of his skin", "like [he] could climb the walls", and feeling highly manic. Decedent called the doctor who told him to keep taking the Zoloft. He had tried to drink alcohol to bring himself "down" from the Zoloft. Decedent began arguing with his wife. As Karen Barkes was trying to get him to agree to go back to the hospital, he open-hand slapped Karen Barkes across the face. Karen Barkes called the police hoping police could help her get Decedent to the hospital.

**INTERROGATORY NO. 4:** Describe in detail the incident(s) surrounding a domestic altercation between Christopher Barkes and his wife, Karen Barkes, on or about January 29, 2004, that led to Christopher Barkes entering a guilty plea, on or about February 17, 2004, to a charge of Assault Third Degree.

**RESPONSE:**

- 4 -

**A000078**

**Decedent had started drinking again and he was arguing with his wife. As Karen Barkes was walking into the dining room, Decedent threw the phone striking Karen Barkes in the arm.**

**INTERROGATORY NO. 5:** Please provide a detailed description of the activities of Christopher Barkes (including places and names of persons visited; job duties or social events attended; court or probation/parole appearances; medical appointments, if any) which took place between November 3, 2004 and November 13, 2004, inclusive. Please specifically note any contacts between Christopher Barkes and any of the plaintiffs and/or his children during that time.

**RESPONSE:**

**Decedent was very involved with both of his girls' sporting events. On November 7, 2004, he went to Alexandra's volleyball game at Immaculate Heart of Mary. Tina Grossman, Decedent's former spouse, talked by phone with Decedent on Sunday, November 10, while Decedent was living with his Aunt Helen. Decedent expressed that he wanted to take the girls to Mass and to see his mother on the 14th of November, his mother's birthday.**

**INTERROGATORY NO. 6:** Describe in detail the incident(s) that led to Barkes' arrest, and subsequent incarceration at HRYCI, on November 13, 2004.

**RESPONSE:**

On November 13, 2004, Decedent was due to arrive at Karen Barkes's home at 12 noon. Around 5 p.m., Karen Barkes got a call from Decedent stating that he was in Gander Hill.

**INTERROGATORY NO. 7:** Identify the name of provider, address, inclusive dates of treatment, and whether inpatient or outpatient, as to any hospitalizations, and/or medical, psychological, psychiatric, detoxification or counseling treatment of Christopher Barkes for issues pertaining his use or abuse of drugs and/or alcohol, at any point during his life.

**RESPONSE:**

Doctor's: Dr. Privit and Tracy Frazer from Kalkstein Associates

Rehabilitation Centers: Mirimont; 100 Yearsley Road, Media, PA 18101

Net Detox 3315 Kirkwood Highway, Wilmington, DE 19808

North East Treatment Centers

Outpatient Facilities:                    Open Door

Catholic Charities

PSI

Hospitals:                    Rockford Center, 100 Rockford Drive, Newark, DE

Meadowood, 575 South DuPont Highway, New Castle, DE 19720

Christiana Care's Wilmington Hospital

A000080

**INTERROGATORY NO. 8:** Identify the name, address, medical specialty and practice group (if any), of all physicians who were actively treating Christopher Barkes as of November 13, 2004, including, but not limited to, specific identification of those physicians who prescribed the medications you identify at paragraph #20 of your Complaint, and the conditions or diagnoses for which these medications were prescribed to Barkes. Please also identify the name and address of all pharmacies where Christopher Barkes would have filled prescriptions within 2 years prior to November 13, 2004.

**RESPONSE:**

**Pharmacies included: Target, 1050 Brandywine Blvd. Wilmington, DE 19810**

**Shoprite, 1300 Rocky Run Parkway, Wilmington, DE 19810**

**Medco Pharmacies – a mail-order pharmacy**

**INTERROGATORY NO. 9:** Describe in detail the factual bases for your allegations in paragraphs 24, 26 and 27 that, as of November 13, 2004, upon his admission to HRYCI, Christopher Barkes was manifesting any suicidal ideations or threats, or otherwise indicating that he was, *at that time*, at risk for suicide. As part of your answer, please specifically describe what behavior(s) (if any) by Christopher Barkes should have alerted State Defendants and/or defendant FCM that suicide precautions should have been taken as to Barkes upon his admission to HRYCI.

**RESPONSE:**

**The police report stated that Decedent was in the cell alone. Plaintiff will supply further responses upon receipt of discovery response from Defendants.**

- 7 -

**A000081**

**INTERROGATORY NO. 10**:  Please provide the names, last known addresses and phone numbers of any family, friends, coworkers or other acquaintances of Christopher Barkes who had witnessed any suicidal behavior, ideation or threats of suicide by Barkes, and describe in detail the circumstances and the behavior of Barkes observed by each.

**RESPONSE:**

**Helen Young (Decedent's aunt) 14 Ruby Drive, Claymont, DE 19703**

**Raymond Barkes (Decedent's father) 5952 Maury Avenue, Woodland Hills, CA 91367**

**Helen Young was with Decedent when he attempted the suicide attempt with pills. Decedent had called his father Raymond and spoke to him after taking the pills**

**INTERROGATORY NO. 11**:  Please provide the names, last known addresses and phone numbers of any family, friends, coworkers or other acquaintances of Christopher Barkes who had witnessed problematic use or abuse of alcohol and/or drugs (prescription or non-prescription) by Barkes, and describe in detail the circumstances and the behavior of Barkes observed by each.

**RESPONSE:**

**Scott Herr, South Avon Drive, Claymont, De 19703. Scott was a friend of Decedent who talked to him about Decedent's drug/alcohol problem.   They discussed Decedent's mental health issues and guilt over the accident.**

- 8 -

**INTERROGATORY NO. 12:**    Identify any and all drugs, narcotics, prescriptions, and medications (whether legal or illegal) Barkes has used in the past, or was using prior to his November 13, 2004 incarceration; please note specifically any substances as to which Barkes was diagnosed with and/or treated for addiction.

**RESPONSE:**

**Illegal: pot, cocaine, and opiates**

**Legal: Lexapro, Zoloft, Flexeril, Zyrtec, Patenol. Flonase, Effexor, Seroquil, and Depakote**

**INTERROGATORY NO. 13:**    Please describe in detail any alleged mental, emotional, psychological, behavioral and/or substance abuse problems Barkes was ever diagnosed with or treated for; identify the date on which either you or Barkes became aware of such information; identify all persons having knowledge of such information including any treating doctors, psychologist or psychiatrists; provide the nature of any diagnosis or prognosis rendered; and identify all documents referring or relating to such information.

**RESPONSE:**

**See previously provided information in interrogatory #7.**

**INTERROGATORY NO. 14:**    Please describe in detail any alleged mental, emotional, psychological, behavioral and/or substance abuse problems *any plaintiff* (including minor children) has ever been diagnosed with or treated for; identify all persons having knowledge of such information including any treating doctors,

- 9 -

psychologist or psychiatrists; provide the nature of any diagnosis or prognosis rendered; and identify all documents referring or relating to such information.

**RESPONSE:**

**Straight, Inc. in Springfield, VA (no longer exists) November 1984 to November 1986 for drug and alcohol abuse**

**Therapist: Jane Anderson for treatment for PTSD**

**INTERROGATORY NO. 15:** Identify:

a.    any and all places where Christopher Barkes actually resided from December 12, 1984 to November 13, 2004, with dates of residence as to each; and

b.    for every residence provided in subparagraph (a) provide the names and present addresses of all person(s) with whom Barkes resided;

c.    Please identify specifically where Christopher Barkes actually resided (whether or not considered a "permanent" address) as of November 12, 2004.

**RESPONSE:**

**(a)    1984-1987: 5952 Maury Avenue, Woodland Hills, California 91367 with his parents and 4-5 siblings;**

**1987-1989: 14 Ruby Court, Claymont, DE 19703, with his Uncle Tom and Aunt Helen.**

**1989-1991: 914 Governor Circle, Wilmington, DE 19809 with his wife Tina and their daughter, Brittany Barkes.**

- 10 -

**1991-1995: 118 Homewood Road, Wilmington, DE 19803 with Tina, and daughters, Brittany and Alexandra.**

**1995-1996: no place in particular.**

**1996-1999: incarcerated for 2.5 years**

**1999-2002: 14 Ruby Court, Claymont, DE 19703, with his Aunt Helen.**

**2002-2004: 3111 Crystal Court, Wilmington, DE 19810 with Karen Barkes, Brittany Barkes, and Alexandra Barkes (part time)**

    **(b)**    **included in above.**

    **(c)**    **14 Ruby Drive, Claymont, DE 19703**


**INTERROGATORY NO. 16:** Identify the dates of marriage and names of spouse(s), as to all marriages by Christopher Barkes; date(s) of divorce, or separation, if any, and the names and birth dates of all children arising out of the marriage(s). Please also identify the names, addresses, birth dates and mothers' names and addresses, of all children of Christopher Barkes in addition to those arising out of his marriage(s).


**RESPONSE:**

1)    **April 28, 1989 married Tina Marie Grossman; divorced in March 1996. Daughter Brittany Ann was born August 30, 1989 and daughter Alexandra Marie was born March 9, 1993.**

2)    **April 5, 2003 Christopher Barkes married Karen Undercuffle.**

- 11 -

**INTERROGATORY NO. 17:**    State and identify all compensatory, statutory, punitive, and future damages, including both general and special damages, that each specific Plaintiff claims as a result of the Defendants' alleged conduct and include the basis for your calculations of those amounts, if any.

**RESPONSE:**

**To be provided at a later date.**

**INTERROGATORY NO. 18:**    Identify all employment Christopher Barkes had in the fifteen (15) years prior to his death, including the name and address of each employer, name of supervisor, dates of employment, rate of pay, job title and responsibilities, and reason for termination.

**RESPONSE:**

**1989 to 1993: Sears, Market Street, Wilmington, DE; sales person.**

**September 1993 to April 1994:   St. Francis Hospital, Wilmington, DE; registered nurse**

**February 1995 to January 1996:   Microntronix, Claymont, DE; Sales Manager**

**January 1996: Leader Nursing and Rehabilitation Center, Wilmington, DE: charge nurse**

**1999 (dates unknown): Grotto's Pizza, Wilmington, DE; pizza maker**

**2000 (dates unknown): Big Sky Bakery, Marsh Road, Wilmington, DE; baker at $10.50/hr.**

2004 (dates unknown): Pepsi Cola Company; Northeast Blvd. Wilmington, DE.

**INTERROGATORY NO. 19**: Describe in detail the contributions that Christopher Barkes gave to support any plaintiff, or minor child of Barkes, prior to November 13, 2004, and identify any and all documents that evidence these contributions.

**RESPONSE:**

**Christopher Barkes paid minimum child support, but often was in arrears. The full amount was never recalled.**

**INTERROGATORY NO. 20:** Describe in detail the mental anguish that any individual plaintiff alleges to have suffered as a result of the death of Christopher Barkes, and identify any and all documents that support your allegation that the responding plaintiff(s) have suffered mental anguish.

**RESPONSE:**

**Since her husband's death, Karen Barkes has suffered emotional distress over losing her husband. Decedent had been her major support emotionally. The first year after his death, Karen Barkes was in a state of shock. Karen Barkes was unable to motivate herself to get out of bed or take care of her basic needs, such as bathing or eating. Ms. Barkes was unable to maintain focus to perform simple tasks, such as taking out the trash, cleaning the house, or paying bills. Her job suffered because she became unable to deal with the responsibility of showing up for**

A000087

work.  As Karen Barkes entered the second year after her husband's death, Karen

Barkes started coming out of the shock and the amount of stress from the emotional

toll which caused her to be hospitalized because of stress migraines.  Some days she

would be forced into a dark room because of the migraines.  Karen Barkes had

never had headaches before, let alone migraines.  Since her husband's death, Karen

Barkes still has trouble focusing.  It is still difficult to keep up with the basic needs

of running a house by herself.  Decedent's daughters have also suffered emotional

trauma from the loss of their father.


**INTERROGATORY NO. 21:**  Identify each person you have retained or

employed to provide expert testimony in this action or whom you intend to call as an

expert witness at the trial of this matter and state the subject matter on which such expert

is expected to testify, the substance of the facts and opinions to which such expert is

expected to testify and a summary of the grounds for each opinion.  Please identify any

documents prepared by the expert(s) with regard to this case to date.

**RESPONSE:**

**To be provided at a later date.**

MARGOLIS EDELSTEIN

*/s/Jeffrey K. Martin, Esquire*
Jeffrey K. Martin, Esquire
(DE Bar #2407)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
(302) 777-4682 (fax)
jmartin@margolisedelstein.com

Dated:  February 23, 2007

- 14 -

**A000088**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;          )
TINA GROSSMAN as next friend of      )
BRITTANY BARKES; TINA                )
GROSSMAN as next friend of           )
ALEXANDRA BARKES; and                )
KAREN BARKES as administratrix       )
of the ESTATE OF CHRISTOPHER         )
BARKES,                              )          C. A. No. 06-104-JJF
          Plaintiffs,                )
                                     )
v.                                   )
FIRST CORRECTIONAL MEDICAL           )
INC.; STANLEY TAYLOR;                )
RAPHAEL WILLIAMS;                    )
CERTAIN UNKNOWN INDIVIDUAL           )
EMPLOYEES OF STATE OF                )
DELAWARE DEPARTMENT OF               )
CORRECTION; CERTAIN                  )
UNKNOWN INDIVIDUAL                   )
EMPLOYEES OF FIRST                   )
CORRECTIONAL MEDICAL, INC.,          )
And STATE OF DELAWARE,               )
DEPARTMENT OF CORRECTION,            )
                                     )
          Defendants.                )

<u>CERTIFICATE OF SERVICE</u>

I, Jeffrey K. Martin, hereby certify that on Friday, February 23, 2007, a copy of

**Plaintiff's Responses to Defendant's First Set of Interrogatories** were served by hand delivery

on the following:

Stephani J. Ballard
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801

                                     MARGOLIS EDELSTEIN
                                     /s/ *Jeffrey K. Martin, Esquire*
                                     Jeffrey K. Martin, Esquire (#2407)
                                     1509 Gilpin Avenue
                                     Wilmington, DE 19806
                                     (302) 777-4680
                                     (302) 777-4682 fax
                                     jmartin@margolisedelstein.com
                                     Attorneys for Plaintiff

Dated: February 23, 2007

- 15 -

**A000089**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;            )
TINA GROSSMAN as next friend of        )
BRITTANY BARKES; TINA                  )
GROSSMAN as next friend of             )
ALEXANDRA BARKES; and                  )
KAREN BARKES as administratrix         )
of the ESTATE OF CHRISTOPHER           )
BARKES,                                )
                                       )          C. A. No. 06-104-JJF
         Plaintiffs,                   )
                                       )
                                       )
v.                                     )
                                       )
FIRST CORRECTIONAL MEDICAL             )
INC.; STANLEY TAYLOR;                  )
RAPHAEL WILLIAMS;                      )
CERTAIN UNKNOWN INDIVIDUAL             )
EMPLOYEES OF STATE OF                  )
DELAWARE DEPARTMENT OF                 )
CORRECTION; CERTAIN                    )
UNKNOWN INDIVIDUAL                     )
EMPLOYEES OF FIRST                     )
CORRECTIONAL MEDICAL, INC.,            )
And STATE OF DELAWARE,                 )
DEPARTMENT OF CORRECTION,              )
                                       )
         Defendants.                   )

**PLAINTIFFS' RESPONSES TO STATE DEFENDANTS' FIRST SET OF REQUESTS
FOR ADMISSIONS**

1.      On or about December 17, 2003, Christopher Barkes entered a guilty plea to a

charge of "Offensive Touching", resulting from a domestic altercation, on or about November

21, 2003, with his wife, plaintiff, Karen Barkes.

**DENIED; a Not Guilty plea was entered.**

2.    As part of his sentence for the 12/17/03 conviction, Christopher Barkes was placed on probation, with the condition that he have "no contact" with his wife, Karen Barkes.

**ADMITTED.**

3.    As part of his sentence for the 12/17/03 conviction, Christopher Barkes was placed on probation, with the condition of "receiving substance abuse evaluation and treatment.

**DENIED; condition of "receiving substance abuse evaluation and treatment" was never included.**

4.    As part of his sentence for the 12/17/03 conviction, Christopher Barkes was placed on probation, with the condition of "zero tolerance" for any consumption of alcohol.

**ADMITTED.**

5.    On or about January 29, 2004, Christopher Barkes committed a physical assault upon his wife, Karen Barkes.

**ADMITTED.**

6.    At the time of the January 29, 2004 assault, Christopher Barkes was tested for alcohol consumption and found to be under the influence of alcohol.

**ADMITTED.**

7.    On or about February 17, 2004, Christopher Barkes entered a guilty plea in

Family Court to a charge of Assault third degree, arising out of the January 29, 2004 assault against his wife, Karen Barkes.

**DENIED; a Not Guilty plea was entered.**

8.    On or about March 15, 2004, Christopher Barkes was found to be in violation of an order of probation imposed as a result of the conviction for the January 29, 2004 assault against his wife, Karen Barkes.

**ADMITTED.**

9.    As of November 13, 2004, Christopher Barkes and his wife, plaintiff, Karen Barkes, were separated and not residing in the same home.

**DENIED; couple was not officially separated.**

10.    As of November 13, 2004, Christopher Barkes was subject to an order of probation imposed as a result of his conviction for a domestic-related assault against his wife, Karen Barkes, and/or his March 2004 violation of probation.

**ADMITTED.**

11.    Christopher Barkes was under the influence of alcohol at the time of the March 16, 1997 motor vehicle accident, referenced at paragraphs 12-14 of the Complaint.

**ADMITTED.**

12.    Christopher Barkes had a history of drug and alcohol problems dating back to at least age 19 (12/12/84).

**ADMITTED.**

13.    At the time of his intake assessment at HRYCI on November 13, 2004, Christopher Barkes denied any suicidal thoughts or plans.

**DENIED; Decedent told intake personnel at HRYCI of his past suicide attempt and told them he was depressed.**

14.    At the time of his intake assessment at HRYCI on November 13, 2004, Christopher Barkes denied any history of drug or alcohol abuse to intake personnel.

**DENIED; Decedent told intake personnel at HYRCI of his history of drug and alcohol abuse.**

15.    At the time of his intake assessment at HRYCI on November 13, 2004, Christopher Barkes was not manifesting any violent or erratic behavior.

**DENIED; Decedent admitted suicidal thoughts to intake personnel at HRYCI on November 13, 2004.**

16.    At no time from his admission to HRYCI on November 13, 2004 until his suicide on November 14, 2004, did Christopher Barkes display any violent or erratic behavior.

**DENIED; Decedent refused to take a shower and had flat affect (a warning sign of**

**suicide) at the time he was admitted.**

17. Following Barkes' intake at HRYCI on November 13, 2004, an order was issued for a "routine" referral to Mental Health Services, due to Barkes' past psychiatric history. (See Defendants' initial disclosures, Bates page D00040).

**DENIED; a referral was written, but this referral was never acted upon.**


MARGOLIS EDELSTEIN


*/s/ Jeffrey K. Martin, Esquire*
Jeffrey K. Martin, Esquire (DE Bar #2407)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
(302) 777-4682 (fax)
jmartin@margolisedelstein.com

Dated:  February 23, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;           )
TINA GROSSMAN as next friend of       )
BRITTANY BARKES; TINA                 )
GROSSMAN as next friend of            )
ALEXANDRA BARKES; and                 )
KAREN BARKES as administratrix        )
of the ESTATE OF CHRISTOPHER          )
BARKES,                               )        C. A. No. 06-104-JJF
   Plaintiffs,          )
v.                                    )
FIRST CORRECTIONAL MEDICAL            )
INC.; STANLEY TAYLOR;                 )
RAPHAEL WILLIAMS;                     )
CERTAIN UNKNOWN INDIVIDUAL            )
EMPLOYEES OF STATE OF                 )
DELAWARE DEPARTMENT OF                )
CORRECTION; CERTAIN                   )
UNKNOWN INDIVIDUAL                    )
EMPLOYEES OF FIRST                    )
CORRECTIONAL MEDICAL, INC.,           )
And STATE OF DELAWARE,                )
DEPARTMENT OF CORRECTION,             )
                                      )
   Defendants.          )

## CERTIFICATE OF SERVICE

  I, Jeffrey K. Martin, hereby certify that on Friday, February 23, 2007, a copy of

**Plaintiff's Responses to Defendant's First Set of Admissions** were served by hand delivery on the

following:

Stephani J. Ballard
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801

           MARGOLIS EDELSTEIN
           */s/ Jeffrey K. Martin, Esquire*
           Jeffrey K. Martin, Esquire (#2407)
           1509 Gilpin Avenue
           Wilmington, DE 19806
           (302) 777-4680
           (302) 777-4682 fax
           jmartin@margolisedelstein.com
           Attorneys for Plaintiff

Dated: February 23, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES individually; TINA )
GROSSMAN as next )
friend of BRITTANY BARKES; TINA )
GROSSMAN as next friend of ALEXANDRA )
BARKES; and KAREN BARKES as administratrix )
of the ESTATE OF CHRISTOPHER BARKES, )
                                         )

        Plaintiffs, )

        v. )        C.A. No. 06-104 JJF

                                          )
FIRST CORRECTIONAL MEDICAL, )        JURY TRIAL DEMANDED
INC.; STANLEY TAYLOR; RAPHAEL )
WILLIAMS; CERTAIN UNKNOWN )
INDIVIDUALEMPLOYEES OF THE STATE OF )
DELAWARE DEPARTMENT OF )
CORRECTION; CERTAIN UNKNOWN )
INDIVIDUAL EMPLOYEES )
OF FIRST CORRECTIONAL MEDICAL, )
INC.; and STATE OF DELAWARE )
DEPARTMENT OF CORRECTION, )
                                          )

        Defendants. )

## STATE DEFENDANTS RESPONSES TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

    1.      Has the State of Delaware or any representative of the State of Delaware

indicated to You that the State of Delaware will indemnify you for any judgment entered

against You in this case? If Your answer is "yes", please describe the scope of such

indemnification, including the manner in which it is limited in any fashion (for example,

if there is a limitation with regard to punitive damages.)

1

**ANSWER:**

Objection. This question is outside the scope of permissible interrogatory under F.R.C.P. 33 as it calls for legal analysis and conclusions. The question further is not reasonably calculated to lead to the discovery of admissible evidence and calls for information which is protected by attorney-client privilege. F.R.C.P. 26(b).

2.     Identify by name and SBI number all inmates taken in on November 13, 2004 between 9:00 AM and 12:00 PM and for each inmate so identified please state:

(a)     whether such inmate remains incarcerated, and if still incarcerated provide the anticipated date of release and the institution in which the inmate is currently incarcerated;

(b)     if such inmate is no longer incarcerated, the date of release, the current address of the inmate, and the probation status of the inmate (if applicable) and;

(c)     whether such inmate was interrogated with regard to his knowledge.

**ANSWER:**

Please see inmate Admittance Report, 11/13/04-11/14/04, produced as part of Defendants' Responses to Plaintiff's Requests for Production, Bates Stamp # D00384. Barkes was not committed as an "inmate" assigned to HRYCI, at the time of his admission to the facility on Saturday, November 13, 2004 on an administrative warrant, but was being held at HRYCI on a temporary basis, pending a transfer to Sussex VOP Center, which would have occurred on Monday, November 15, 2004. Therefore, his name does not appear on the Admittance Report.

2

3.      Identify by name, rank, and job title, all employees of the DOC and any subcontractors including First Correctional Medical ("FCM") with responsibility for the "initial intake" of prisoners on November 13 and 14, 2004 at Howard R. Young Correctional Institute ("HRYCI") and for each such individual identified please state:

      (a)      whether he or she is still employed by the DOC;

      (b)      if not employed by the DOC, the person's home address;

      (c)      which employees had what responsibilities, and;

      (d)      which employees had any contact with and/or responsibility for Christopher Barkes.

**ANSWER:**

As to DOC (State of Delaware) employees, DOC staffing records show that the following officers worked in the Booking and Receiving area on the dates in question:

November 13, 2004: CO Mark Saunders; CO Valentino Thorne; Cpl. Christopher Chappel; CO Mark Bullock; CO Dorene Fields; CO Brian Emig; Cpl. Brian Forte; CO Kenneth Matthews; CO Lyle Bryant; CO Wayne Dial.

November 14, 2004: Cpl. Kimphus Daniels; Cpl. Benny Dotson; CO Mark Bullock; CO Denisha Young; CO Scott Ivy; Cpl. Sandra Rayne; CO Stephen Martelli; CO Dorene Fields; CO Wayne Dial; CO Michael Fields; CO Bernard Smith. (See staffing/shift logs, 11/13/04-11/14/04, produced as part of Defendants' Responses to Plaintiff's Requests for Production, Bates Stamp # D00385-D00455.)

All of the above officers still work for DOC except for CO Scott Ivy (now a New Castle County Police Officer) and CO Mark Saunders (now a Camden County NJ Police Officer). All others still work at HRYCI, except for CO Dorene Fields who now works at

3

Plummer Community Corrections, and Cpl. Rayne now works at Baylor Women's facility.

According to incident reports previously produced, COs Dorene Fields and Sandra Rayne had spoken to inmate Barkes shortly before his suicide. CO Martelli, making lunch rounds, found Barkes hanging in his cell, unresponsive, and attempted rescue efforts. It is not known which CO(s) took Barkes' intake information upon his admission to the facility on November 13, 2004, however his intake occurred during the 0800-1600 shift.

To the extent "initial intake" of detainees involves medical assessments, Health Care workers at DOC facilities, including HRYCI, were/are not employees or "subcontractors" of DOC, but rather were, at all relevant times, solely employed by, and responsible to, the contracted Health Care Provider, FCM. State Defendants are without knowledge as to the requested information as to employees of FCM, except to the extent noted in the State's responses to Initial Disclosures, including incident reports. Upon information and belief, the information sought by this interrogatory is in the possession of Defendant, FCM.

4.     Explain in detail, any and all procedure(s) in effect on November 13 and 14, 2004 for processing an inmate into the HRYCI.

**ANSWER:**

Please see Policy Number 60.04, SOP on "Admissions," produced as part of Defendants' Responses to Plaintiff's Requests for Production, Bates Stamp # D00457-D00460. Barkes was not committed as an "inmate" assigned to HRYCI at the time of his

4

**A000099**

admission to the facility on November 13, 2004 on an administrative warrant, but was being held at HRYCI on a temporary basis, pending a transfer to Sussex VOP Center, which would have occurred on Monday, November 15, 2004.   A full intake is not done at the "holding facility" on inmates being held on administrative warrants—for instance, they are not fingerprinted, and they are not issued prison clothing.  These procedures are done after transfer to the receiving facility.


5.       Please identify all nurses or medical personnel working at HRYCI on November 13 and 14, 2004, and for each such individual identified please state:

       (a)       whether he or she is still employed at HRYCI or FCM;

       (b)       if not employed at HRYCI or FCM, the person's home address;

       (c)       which employees had what responsibilities; and,

       (d)       whether the employee had any contact with or responsibility for Christopher Barkes.

**ANSWER:**

Health Care workers, including nurses, at DOC facilities, including HRYCI, were/are not employees or "subcontractors" of DOC, but rather were, at all relevant times, solely employed by, and responsible to, the contracted Health Care Provider, FCM.  State Defendants are without knowledge as to the requested information as to employees of FCM, except to the extent noted in the State's responses to Initial Disclosures, including incident reports.  Upon information and belief, the information sought by this interrogatory is in the possession of Defendant, FCM.

5

6.    Identify and explain the procedure in effect on November 13 and 14, 2004,

that DOC employees and/or medical personnel at HRYCI must follow when admitting to

the prison a suicidal or mentally ill inmate at "initial intake".

**ANSWER:**

Objection to the extent this question suggests or presumes that the deceased

Plaintiff/inmate, Christopher Barkes, was "suicidal" or "mentally ill" at the time of his

intake at HRYCI on November 13, 2004.  See response to Interrogatory # 4, above.  A

medical and mental health screening by the health care provider is part of the intake

process.  If the medical provider identifies any inmate as a suicide risk, that inmate is

housed in the infirmary, with precautions appropriate to that inmate's conditions and

needs. *See also* Standard Operating Procedure 190.04, regarding "Suicide Prevention,"

produced as Bates # D00461-D00464.


7.    Identify and explain the procedure for administering prescribed

medication to any inmate on November 13 and 14, 2004 once the inmate was admitted to

HRYCI.

**ANSWER:**

Policies and procedures for administration of prescribed medication to

inmates/detainees at HRYCI are determined by the contracted medical provider—in this

case, FCM.  Employees of DOC/HRYCI do not participate in the distribution of

medications to inmates; this is handled solely by medical staff.  Upon information and

belief, at the time in question, medications were distributed to inmates, as prescribed, at

least once per 8-hour shift.

6

8.      Identify by name, rank, and job title, all employees of the HRYCI or FCM

who accompanied Christopher Barkes's body to Christiana Hospital, and for each such

individual identified please state:

        (a)      whether he or she is still employed by the DOC or FCM;

        (b)      if not employed by the DOC or FCM, the person's home address;

and

        (c)      which employees had what responsibilities.

**ANSWER:**

The COs who accompanied Christopher Barkes to the hospital were Reginald

Young and Gervin Cumberbatch. Both are still employed by DOC. State Defendants are

not in possession of the requested information as to employees of FCM, but do not

believe that any FCM employees went to the hospital with Barkes.

9.      How many hours of suicide prevention training do the individuals

identified in responses to Interrogatories 3, 5, and 18 have once they are employed by

DOC or FCM?

**ANSWER:**

As to correctional officers (COs) employed by DOC, all COs receive initial

training at the Academy on suicide prevention. This initial training is taught by the

medical provider contractor; it is part of an all day training on multiple medical and

psychiatric issues related to inmates, including suicide awareness and prevention. Upon

information and belief, in 2004, this training was provided by mental health professionals

7

employed by the health care provider, FCM. The amount of time spent on this topic varies from class to class. COs also receive refresher training on suicide awareness. Refresher training is approximately 30 minutes long. Refresher training is conducted by DOC personnel but the training materials are created and/or approved by the medical contractor. Upon information and belief, as of 2004, refresher training was approximately biannual; it is now annual.

State Defendants are not in possession of responsive information as to employees of FCM. Upon information and belief, information sought by this interrogatory is in the possession of Defendant, FCM.

10.    Prior to November, 2004, how much training was given to correctional officers at HRYCI for detecting suicidal behavior?

**ANSWER:**

Please see response to Interrogatory # 9.

11.    Approximately how much time transpired between the discovery of Christopher Barkes hanging until he was "cut down" by an HRYCI officer?

**ANSWER:**

Upon information and belief, based upon times that appear in the records, at approximately 11:00 a.m. on November 14, 2004, Correctional Officer Dorene Fields saw Christopher Barkes lying awake on the bed in his cell. At approximately 11:35 a.m., Correctional Officer Stephen Martelli reported to Barkes' cell to deliver his lunch and found that Barkes had hung himself. Martelli, at 11:35 a.m., called for assistance, called

8

a "Code Red/Code 7" and immediately proceeded to release Barkes from the sheet and

lower him to the floor, with the assistance of C/O Fields and C/O Sandra Rayne. Medical

personnel from FCM reported to the cell at approximately 11:38 a.m. and began CPR.

13.    Were any DOC or FCM employees aware that Christopher Barkes refused

to take a shower prior to his death? If so, when?

**ANSWER:**

According to the incident report prepared by C/O Sandra Rayne, Rayne looked in

on Barkes at approximately 10:50 a.m. on November 14, 2004, and asked him if he

wanted to take a shower. Barkes said "no" and said that he "was OK." Rayne asked

Barkes if he was sure he did not want a shower, and he said no again. (See Defendants'

Initial Disclosures, Bates p. D04). State Defendants cannot respond to this interrogatory

as to knowledge, if any, by employees of FCM.

14.    What conditions are stated on the suicide check list at HRYCI that require

the intake employee to call FCM's corporate officers?

**ANSWER:**

Objection, this interrogatory is vague and appears to be directed to a party other

than the answering defendants. Notwithstanding said objection, as part of the initial

intake of a detainee, at the relevant time in November 2004, medical personnel from

FCM would complete an "Adult Intake Mental Health Screening Form." This form was

completed at Christopher Barkes' intake on November 13, 2004. The form contains 17

items, concerning mental health status, for which new intakes are to be screened.

9

Information is obtained from observation and questions directed to the inmate. In addition to the 17 item checklist, the form also requires the medical provider to state whether or not the inmate exhibits "Hallucinations" or "Violent Behavior or Threats." The form states that if the inmate presents with 8 or more positive mental health risk factors from the list, the Provider on call is to be notified and supervision instituted. The form speaks for itself and appears at Defendants' Initial Disclosures, Bates p. D0010. Christopher Barkes' intake form, on November 13, 2004 at 3:00 p.m., resulted in a score of only two (2) items from the list. At that time, Barkes also was given a Referral to Mental Health Services, on a "routine" urgency level, based on his past mental health history. (D0040). State Defendants are without information as to when, if ever, FCM medical providers are to call "FCM's corporate officers" in connection with a mental health screening.

15.    What is the prescribed manner to sign one's name on a form at HRYCI?

**ANSWER:**

Objection. This question is vague and overbroad. Without waiver of said objection, there is no prescribed manner for DOC employees to sign their name(s) on an institutional form. State Defendants cannot respond to this interrogatory as to policies, if any, of FCM.

16.    How many FCM or DOC personnel were involved in initial screening on incoming inmates on November 13, 2004, and for each such individual identified, please state:

10

A000105

(a)    the names and current home address of each employee;

(b)    whether he or she was employed by DOC or FCM; and

(c)    what responsibilities each individual assigned.

**ANSWER:**

Please see response to Interrogatory #3, above. While several officers may work at the intake desk at HRYCI at any given time, typically, one officer will perform the initial intake of a new inmate/detainee. It is not known at this time who did the initial intake of Christopher Barkes on November 13, 2004. Barkes was not considered an "inmate" assigned to HRYCI at the time of his admission to the facility on November 13, 2004 on an administrative warrant, but was being held at HRYCI on a temporary basis, pending a transfer to Sussex VOP Center, which would have occurred on Monday, November 15, 2004.

State Defendants are not in possession of the requested information as to employees of FCM, other than to note that at least one person from FCM's medical screening staff evaluated Christopher Barkes and completed the "Adult Intake Mental Health Screening Form." (See Defendants' Initial Disclosures, Bates p. D10; D32-33). At that time, Barkes also was given a Referral to Mental Health Services, on a "routine" urgency level, based on his past mental health history. (D0040).

17.    At the time of his admission to the HRYCI in November 2004, was anyone aware that Christopher Barkes tried to commit suicide by overdosing on medication while first incarcerated at HRYCI in 1997?

11

**ANSWER:**

Objection, this question is vague, overbroad and presumes facts not in evidence in this case. Notwithstanding said objection, the only prior suicide attempt of which medical intake personnel at HRYCI were made aware on November 13, 2004, as related by Barkes himself at intake, was an attempt by overdose in 2003. Barkes did not disclose what appear to be numerous other suicide attempts, and hospitalizations, including at least one in September 2004, that were part of his past history. Further, Barkes falsely denied a history of drug or alcohol use at intake. (D0032).

18.    What were the three medications that Christopher Barkes was taking on November 13, 2004, by whom were they prescribed, and did he continue to receive them after his admission to HRYCI on November 13, 2004?

**ANSWER:**

At intake, medical personnel noted that Barkes was on the following medications:

1. Depakote, 1500 mg.[1]

2. Effexor, 150 mg.

3. Seroquel, 25 mg.

4. Synthroid, 25 mg.

State Defendants are without knowledge of the accuracy of Barkes' self-report, or who prescribed the drug(s) to Barkes and/or whether he was actively taking them as prescribed prior to intake. On Saturday, November 13, 2004, Barkes' medical chart shows that he was prescribed, and received dosages of Effexor, Seroquel and Synthroid.

---

[1] Drugs and dosages are noted as, upon information and belief, they were self-reported by Barkes and recorded by FCM medical personnel on the "Standard Intake Screening Form." (D0032).

12

(*See* D009, 12, 41). Barkes did not receive medication on Sunday November 14, 2004, as

he committed suicide prior to the medical cart arriving to his cell area.

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Stephani J Ballard*
Stephani J. Ballard (#3481)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
stephani.ballard@state.de.us
Attorney for State Defendants

Dated: March 9, 2007

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et al.       )
                             )
      Plaintiffs,       )
                             )
      v.             )     C. A. No. 06-104-JJF
                             )
FIRST CORRECTIONAL      )
MEDICAL, INC.,            )
STANLEY TAYLOR, et al.,    )
                             )
      Defendants.     )

## NOTICE OF SERVICE

The undersigned certifies that on March 9, 2007, she caused the **STATE DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** to be delivered to the following persons in the form and manner indicated:

Jeffrey K. Martin, Esquire         Dana Spring Monzo, Esquire
Margolis Edelstein              McCullough & McKenty
1509 Gilpin Ave.                1225 N. King St., Ste. 1100
Wilmington, DE 19806        P.O. Box 397
                             Wilmington, DE 19899-0397

**MANNER OF DELIVERY:**

      Two true copies by first class mail, postage prepaid, to each recipient and
  X   via e-mail

                         STATE OF DELAWARE
                         DEPARTMENT OF JUSTICE

                         */s/ Stephani J. Ballard*
                         Stephani J. Ballard, I.D. #3481
                         Deputy Attorney General
                         Carvel State Office Building
                         820 N. French Street, 6th Floor
                         Wilmington, DE 19801
                         (302) 577-8400
                         Attorney for State Defendants

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES individually; TINA )
GROSSMAN as next )
friend of BRITTANY BARKES; TINA )
GROSSMAN as next friend of ALEXANDRA )
BARKES; and KAREN BARKES as administratrix )
of the ESTATE OF CHRISTOPHER BARKES, )
　　　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　　　　　　)
　　v. 　　　　　　　　　　　　　　　)　　　C.A. No. 06-104 JJF
　　　　　　　　　　　　　　　　　　　　　　)
FIRST CORRECTIONAL MEDICAL, )　　　JURY TRIAL DEMANDED
INC.; STANLEY TAYLOR; RAPHAEL )
WILLIAMS; CERTAIN UNKNOWN )
INDIVIDUAL EMPLOYEES OF THE STATE OF )
DELAWARE DEPARTMENT OF )
CORRECTION; CERTAIN UNKNOWN )
INDIVIDUAL EMPLOYEES )
OF FIRST CORRECTIONAL MEDICAL, )
INC.; and STATE OF DELAWARE )
DEPARTMENT OF CORRECTION, )
　　　　　　　　　　　　　　　　　　　　　　)
　　　　Defendants. )

## STATE DEFENDANTS RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

　　　　Pursuant to F.R.C.P. 34, State Defendants respond to Plaintiffs' First Request for

Production of Documents as follows. Documents with Bates numbers D00152 – D00513

are produced as part of these Responses. In addition to documents identified below, other

responsive documents have been previously produced by State Defendants (Bates

numbers D0001 – D00151) as part of their Initial Disclosures and supplements thereto.

Documents produced as part of these responses should also be considered supplemental

to State Defendants' Initial Disclosures.

1

## DOCUMENTS TO BE PRODUCED

1.      Copies of any and all photographs, videotapes, motion pictures, sketches, diagrams, plans, or other drawings taken or prepared by you or on your behalf or in your possession or available to you concerning any aspect of this litigation.

   **ANSWER:**

   A videotape was made by the Quick Response Team (QRT) at HRYCI, of response and resuscitation efforts by DOC, FCM and paramedic/EMT responders following Barkes suicide. Copies on DVD are being provided; the DVD bears Bates # D00513. A video training tape used for DOC refresher training on suicide prevention is available for review upon request.

2.      Copies of all written or recorded statements or summaries or resumes of interviews taken of any person with respect to any issue in this litigation, including, but not limited to, the decedent and/or and named Defendants in this action.

   **ANSWER:**

   Objection, this Request is overbroad and calls for the production of attorney-client privileged and work product materials. Notwithstanding said objection, see Incident Reports, previously produced.

3.      Copies of any and all report[s] of investigation, finding[s] of fact or result[s] of inspection, observation[s] of fact or circumstances, or any other matter relating to any aspect of this litigation.

   **ANSWER:**

   See response to Request # 2, above. See also Mortality Review and Autopsy Report, previously produced and produced again herein at D00363-D00383. In addition, upon information and belief, Delaware State Police conducted an investigation following

2

the suicide, which is a matter of protocol in inmate deaths. DOC is not in possession of any records from DSP's investigation.

4.     Any report[s] by any person qualifying as an expert containing opinions and/or facts upon which such opinions are based, concerning any aspect of this litigation.

**ANSWER:**

To be supplied at a later date.

5.     Copies of any and all document[s], writing[s], or other item[s] identified or referred to in your Answers to Interrogatories propounded by Plaintiffs which do not fall within the above request.

**ANSWER:**

*See* Bates # D00152 – D000513.

6.     Copies of any and all other document[s] or things in your possession or available to you in addition to those items specified in the foregoing requests which are or may be relevant to any issue in this litigation, including, but not limited to, issues of causation, liability and/or damage.

**ANSWER:**

Objection. This request is vague, overbroad and seeks production of documents which would reveal attorney mental impressions and work product. Notwithstanding said objection, all non-privileged documents known to Defendants to date, which are responsive to discovery requests and/or subject to production under Rule 26(a) have been

3

produced.    Defendants reserve their right to supplement discovery if additional responsive documents become available.


7.    Copies of any and all other document[s] or things in your possession or available to you in addition to those items specified in the foregoing requests which you intend to rely upon at trial of this matter.

**ANSWER:**

Objection.  This request is vague, overbroad and seeks production of documents which would reveal attorney mental impressions and work product.  See response to Request #6 above.  Defendants will identify exhibits to be used at trial at the appropriate time in the pre-trial submissions.


8.    Copies of forms completed by Christopher Barkes during the intake of Barkes at HRYCI in November 2004.

**ANSWER:**

All responsive documents in Defendants' possession were previously produced with Defendants' Initial Disclosures.  Barkes was not committed as an "inmate" assigned to HRYCI at the time of his admission to the facility on Saturday, November 13, 2004 on an administrative warrant, but was being held at HRYCI on a temporary basis, pending a transfer to Sussex VOP Center, which would have occurred on Monday, November 15, 2004.

4

9.    Any and all written procedures and/or protocols regarding intake of a new inmate and any and all forms to be completed by inmates during the intake process.

**ANSWER:**

See State Defendants' Response to Interrogatory Number 4. *See also* Policy Number 60.04, SOP on "Admissions," Bates Stamp # D00457-D00460.

10.    Any and all written procedures and/or protocols regarding suicide prevention.

**ANSWER:**

*See* Standard Operating Procedure 190.04, regarding "Suicide Prevention," produced as Bates # D00461-464.  See also FCM and DOC training materials for COs on suicide prevention and awareness, Bates # D00465 – 00497; D00513.

11.    A full and complete copy of the Morbidity and Mortality Report issued regarding the death of Christopher Barkes.

**ANSWER:**

This document was previously produced with Defendants' Initial Disclosures, except that the cover page was missing from the version produced.  A complete report is produced with these Responses, with Bates numbers D00363-D00383.

5

12.     A full and complete Department of Correction record of Christopher

Barkes, Inmate #361999, including his incarcerations at any DOC facilities and

probationary records.

**ANSWER:**

All institutional and medical records not previously produced, including those

pertaining to Barkes' 1997 incarceration are produced with these responses, with Bates

numbers D00152 –D00365.

<div style="margin-left: 40%;">

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


*/s/ Stephani J Ballard*
Stephani J. Ballard (#3481)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
stephani.ballard@state.de.us
Attorney for State Defendants

</div>

Dated:  March 9, 2007

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et. al                    :
                                        :
        Plaintiffs,                     :        C.A. No. 06-104 JJF
                                        :
v.                                      :
                                        :        JURY TRIAL DEMANDED
FIRST CORRECTIONAL MEDICAL,             :
INC., STANLEY TAYLOR, et. al            :
                                        :
        Defendants.                     :

## NOTICE AND CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2007, a true and correct copy of the *State*

*Defendants' Responses to Plaintiffs' First Request for Production of Documents* was

served upon the following counsel of record via first class mail, postage prepaid:

Jeffrey K. Martin, Esquire            Dana M. Spring-Monzo, Esquire
Margolis Edelstein                    McCullough & McKenty,PA.
1509 Gilpin Ave.                      1225 King Street
Wilmington, DE 19806                  Suite 100
                                      P.O. Box 397
                                      Wilmington, DE 19899-0397

                                      STATE OF DELAWARE
                                      DEPARTMENT OF JUSTICE

                                       /s/ Stephani J. Ballard
                                      Stephani J. Ballard, I.D. #3481
                                      Deputy Attorney General
                                      Carvel State Office Building
                                      820 N. French Street, 6th Floor
                                      Wilmington, DE 19801
                                      (302) 577-8400
                                      Attorney for State Defendants

Dated: March 9, 2007

7



**DEPARTMENT OF JUSTICE**
NEW CASTLE COUNTY
820 NORTH FRENCH STREET
WILMINGTON, DELAWARE 19801

CRIMINAL DIVISION (302) 577-8500
FAX (302) 577-2496
CIVIL DIVISION (302) 577-8400
FAX (302) 577-6630
TTY (302) 577-5783

**JOSEPH R. BIDEN, III**
**ATTORNEY GENERAL**

June 4, 2007

Jeffrey K. Martin, Esquire
1509 Gilpin Ave.
Wilmington, DE 19806

   *Re:* *Barkes v. FCM, et al.*
     *C.A. No. 06-104 JJF*

Dear Jeff:

   When we recently discussed the *Barkes* case, I noted that State Defendants would follow up on Plaintiff's responses to State Defendants' Interrogatories/Requests for Admission/Requests for Production, with a notification of responses which we feel are deficient or incomplete. Please consider this letter our request for additional responsive information, as detailed below, and as Defendants' attempt to informally reach agreement on a discovery dispute pursuant to Local Rule 7.1.1.

## PLAINTIFF'S RESPONSES TO INTERROGATORIES (D.I. 33)

- Interrogatory # 2(b). Please provide the date of this alleged suicide attempt at HRYCI.

- Interrogatory #6. This interrogatory requests information as to Christopher Barkes' alleged conduct which resulted in his arrest on November 13, 2004. The response simply states that Karen Barkes got a call from Christopher when he was at HRYCI, but states no facts as to how and why he got there.

- Interrogatory #7. This response does not include the requested date(s) of treatment at each facility/provider.

- Interrogatory #8. This interrogatory requests identification and information about *physicians* who were treating Barkes, including specifically physicians who prescribed certain medications to Barkes for diagnosed conditions. While pharmacies which would have filled prescriptions were listed, no information at all was provided responsive to the question about treating/prescribing physicians.

- Interrogatory #9: This interrogatory requests, *inter alia*, "the factual bases for your allegations in paragraphs 24, 26 and 27 that, as of November 13, 2004, upon his admission to HRYCI, Christopher Barkes was manifesting any suicidal ideations or threats, or otherwise indicating that he was, *at that time*, at risk for suicide."

  Plaintiff's response states that further response will be supplied upon receipt of discovery responses from Defendants. State Defendants provided responses in the form of initial disclosures and records on September 26, 2006, and responses to Plaintiff's written discovery requests on March 9, 2007. Kindly supply an answer to this interrogatory at this time.

- Interrogatory #13: This interrogatory requests description and details of various medical and other conditions suffered by Barkes, including diagnoses and treatment. The reference to Response to Interrogatory #7, which is simply a listing of providers, is not responsive.

- Interrogatory #14: This requests information about medical diagnoses/treatment of the named plaintiffs. Two providers are listed, but it is not specified which plaintiff(s) treated there. An address is need for therapist, Jane Anderson. *As a reminder, I am still awaiting an executed medical release for Karen Barkes herself.*

- Interrogatory #15: Your response states that between 1995 and 1996, Christopher Barkes resided "no place in particular." Was he homeless? Can you be more specific with this response?

### PLAINTIFF'S RESPONSES TO REQUESTS FOR ADMISSIONS (D.I. 35)

- RFA #7: Plaintiffs' response denies that Christopher Barkes pled guilty to the referenced charges. Please refer to page D0059 in which the Court documents "Defendant's Guilty Plea."

- RFA #9: Plaintiffs' response is not responsive. The question was whether Christopher and Karen Barkes were "separated and not residing in the same home" as of the date in question. As you know, there is no "official" or "legal" separation in Delaware. Does this response remain "Denied" as to the question presented?

### PLAINTIFF'S RESPONSES TO REQUESTS FOR PRODUCTION (D.I. 34)

- Request #11: This request was for documents "related to the *investigation of Christopher Barkes' death* . . . ." The documents referenced in Plaintiffs' response, P0730-0738, appear to be copies of letters Christopher Barkes wrote to Karen Barkes from prison. These are clearly not responsive to the question. If no responsive documents exist, please state that. If responsive documents do exist, kindly reference and/or produce them.

- Request #12: This request is for correspondence to/from Barkes while he was incarcerated. Your response is "documents do not exist." It would seem that the documents referenced at #11 are responsive to this request. Please advise.

- Request #13: This has not been responded to yet. Please respond or state if no documents exist.

- Request #15: This requests documents pertaining to Barkes' support of his children. Plaintiffs' response is "Items of emotional support may be viewed at the offices of Plaintiffs' attorney. Please describe what these "items" are so that I may determine how to proceed.

- Request #16: You were awaiting copies of tax returns from the IRS. I am assuming these have been received by now. If so, please produce copies.

- Requests # 17, 18 and 19: These requests have not yet been responded to. Please provide responsive documents if any exist.

- Request #20: Please describe the nature/contents of the "various tapes" (and whether audio, video, etc.) that are available to be "viewed" at your office. If copies of these tapes can be made for Defendants, with or without charge, please advise.

I am requesting that Plaintiffs provide amended responses to remedy the above deficiencies within 14 days of receipt of this letter. If you wish to discuss any of these items further, feel free to contact me by phone or email. Please provide any supplemental responsive information in writing, however, so the record is clear.

Very truly yours,

Stephani J. Ballard
Deputy Attorney General

SJB/jlom

# MARTIN & WILSON, P.A.

## *Workplace Advocates*

1508 Pennsylvania Avenue
Wilmington, DE  19806

Jeffrey K. Martin, Esquire*
Timothy J. Wilson, Esquire*

Telephone:  (302)  777-4681
Facsimile:  (302)  777-5803

---

*Licensed in DE, PA and NJ*

---

August 6, 2007

Stephani J. Ballard, Esquire
Department of Justice
New Castle County
820 North French Street
Wilmington, DE  19801

      RE:    BARKES  v.  FCM, et al.
          C.A. NO.:  06-104 JJF

Dear Stephani:

    I am responding to your letter of June 4, 2007 in the above-captioned matter.  I regret it has taken me this long to respond to your letter.  Given that your requests were in letter form, I am responding in kind.  If, however, you would like these responses in a formal pleading, kindly advise.

## **PLAINTIFF'S RESPONSES TO INTERROGATORIES (D.I. 33)**

Interrogatory # 2(b).   Please provide the date of this alleged suicide attempt at HRYCI.

    **October 31, 1997**

Interrogatory # 6.    This interrogatory requests information as to Christopher Barkes' alleged conduct which resulted in his arrest on November 13, 2004.  The response simply states that Karen Barkes got a call from Christopher when he was at HRYCI, but states no facts as to how and why he got there.

    **Administrative warrant #8787 dated November 13, 2004.  Barkes was arrested by Officer McLaughlin of the Wilmington Police Department and charged with loitering for purposes of purchasing drugs.  He was also charged with driving with a revoked license.**

Interrogatory # 7.    This response does not include the requested date(s) of treatment at each facility/provide.
    **See attached. We do not have information on some of these providers.**

Interrogatory # 8.    This interrogatory requests identification and information about *physicians* who were treating Barkes, including specifically physicians who prescribed certain medications to Barkes for diagnosed conditions. While pharmacies which would have filled prescriptions were listed, no information at all was provided responsive to the question about treating/prescribing physicians.

    **We do not have any of this information.**

Interrogatory # 9.    This interrogatory requests, *intra alia*, "factual bases for your allegation in paragraphs 24, 26, and 27 that, as of November 13, 2004, upon his admission to HRYCI, Christopher Barkes was manifesting any suicidal ideations or threats, or otherwise indicating that he was, *at that time*, at risk for suicide.

Interrogatory # 13.    This interrogatory requests description and details of various medical and other conditions suffered by Barkes, including diagnoses and treatment. The reference to Response to Interrogatory # 7, which is simply a listing of providers, is not responsive.

    **Emergency room admissions to Christiana Care on August 29, 2003, November 25, 2003, December 8, 2003, December 21, 2003, and December 25, 2003.**

Interrogatory # 14:    This requests information about medical diagnoses/treatment of the named plaintiffs. Two providers are listed, but it is not specified which plaintiff(s) treated there. An address is needed for therapist, Jane Anderson. *As a reminder, I am still awaiting an executed medical release for Karen Barkes herself.*

    3608 Lancaster Pike
    Wilmington, DE
    (302) 995-9600

Interrogatory # 15.    Your response states that between 1995 and 1996, Christopher Barkes resided "no place in particular." Was he homeless? Can you be more specific with this response?

## PLAINTIFF'S RESPONSES TO REQUESTS FOR ADMISSIONS (D.I. 35)

RFA #7.    Plaintiffs' responses denies that Christopher Barkes pled guilty to the referenced charges. Please refer to page D0059 in which the Court documents "Defendant's Guilty Plea."

RFA #9.    Plaintiffs' response is not responsive.   The question was whether Christopher and Karen Barkes were "separated and not residing in the same home" as of the date in question.   As you know, there is no "official" or "legal" separation in Delaware. Does this response remain "denied" as to the question presented?

### PLAINTIFF'S RESPONSES TO REQUESTS FOR PRODUCTION (D.I. 34)

Request # 11. This request was for documents "related to the *investigation of Christopher Barkes' death*..." The documents referenced in Plaintiffs' response, P0730-0738, appear to be copies of letters Christopher Barkes wrote to Karen Barkes from prison. These are clearly not responsive to the question. If no responsive documents exist, please state that. If responsive documents do exist, kindly reference and/or produce them.

> **Delaware State Police**
> **Troop 2**
> **Complaint # 01-04-129879**
> **Dated: Sunday, November 14, 2004 at 1150**

Request # 12. This request is for correspondence to/from Barkes while he was incarcerated. Your response is "documents do not exist." It would seem that the documents referenced at # 11 are responsive to this request. Please advise.

Request # 13: This has not been responded to yet.   Please respond or state if no documents exist.

**We have found no prior medical records or physician's names for care other than suicide attempts. No information of doctors who prescribed medicines.**

Request # 15. This requests documents pertaining to Barkes' support of his children. Plaintiffs' response to "items of emotional support" may be viewed at the offices of Plaintiffs' attorney. Please describe what these "items" are so that I may determine how to proceed.

**Numerous family videos.**

Request # 16. You were awaiting copies of tax returns from the IRS. I am assuming these have been received by now. If so, please produce copies.

Requests # 17, 18, and 19.    These requests have not yet been responded to. Please provide responsive documents if any exist.

Request # 20. Please describe the nature/contents of the "various tapes" (and whether audio, video, etc.) that are available to be "viewed" at your office. If copies of these tapes can be made for Defendants, with or without charge, please advise.

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;     :
TINA GROSSMAN as next friend of  :   C. A. No.: 06-104 JJF
BRITTANY BARKES; TINA         :
GROSSMAN as next fried of       :
ALEXANDRA BARKES; and        :
KAREN BARKES as administratrix of the  :
ESTATE OF CHRISTPHER BARKES,  :
                              :

            Plaintiffs,   :
                              :

     v.                    :
                              :

FIRST CORRECTIONAL MEDICAL   :
INC.; STANLEY TAYLOR;        :
RAPHAEL WEILLIAMS: CERTAIN   :
UNKNOWN INDIVIDUAL       :
EMPLOYEES OF STATE OF      :
DELAWARE DEPARTMENT OF    :
CORRECTIONS; CERTAIN       :
UNKNOWN INDIVIDUAL EMPLOEES :
OF FIRST CORRECTIONAL MEDICAL, :
INC., and STATE OF DELAWARE,   :
DEPARTMENT OF CORRECTION,   :
                              :

           Defendants.  :

## PLAINTIFFS' ANSWERS TO STATE DEFENDANTS' SECOND SET OF INTERROGATORIES DIRECTED TO PLAINTIFFS

**INTERROGATORY NO. 22:**    In your response to State Defendants' Request for

Admission (RFA) No. 13, you "deny" the statement: "At the time of his intake

assessment at HRYCI on November 13, 2004, Christopher Barkes denied any suicidal

thoughts or plans." Please state, with particularity and specificity, each and every factual

basis for your denial and response to RFA No. 13, and identify all individuals with

knowledge, documents or tangible physical evidence that support your contentions.

Specifically identify all information which you contend Christopher Barkes provided to HRYCI intake personnel which would have alerted them to his alleged imminent suicidal thoughts or plans.

**RESPONSE: Adult Intake Mental Health Screening form dated November 13, 2004 – Time: 1500 hours. Item 1, 6, 8 and 10. Intake Officer Anita Robinson – DOC**

**INTERROGATORY NO. 23:** In your response to State Defendants' Request for Admission (RFA) No. 14, you "deny" the statement: "At the time of his intake assessment at HRYCI on November 13, 2004, Christopher Barkes denied any history of drug or alcohol abuse to intake personnel." Please state, with particularity and specificity, each and every factual basis for your denial and response to RFA No. 14, and identify all individuals with knowledge, documents or tangible physical evidence that support your contentions. Specifically identify all information which you contend Christopher Barkes provided to HRYCI intake personnel which would have advised them of his history of drug and alcohol abuse.

**RESPONSE: Adult Intake Mental Health Screening form dated November 13, 2004 – Time: 1500. Item 16 - Officer Anita Robinson – DOC**

**INTERROGATORY NO. 24:** In your response to State Defendants' Request for Admission (RFA) No. 15, you "deny" the statement: "At the time of his intake assessment at HRYCI on November 13, 2004, Christopher Barkes was not manifesting any violent or erratic behavior": Mr. Bakes exhibited at his initial intake, and identify all individuals with knowledge, documents or tangible physical evidence that support your contentions.

**RESPONSE: Adult Intake Mental Health Screening form dated November 13, 2004**

**– Time: 1500 hours. Items 12, 13, and 15. Officer Anita Robinson –**

**DOC**

**INTERROGATORY NO. 25:** In your response to State Defendants' Request for Admission (RFA) No. 16, you "deny" the statement: "At no time from his admission to HRYCI on November 13, 2004 until his suicide on November 14, 2004, did Christopher Barkes display any violent or erratic behavior." Please describe, with particularity and specificity, what sort of "violent or erratic behavior" (in addition to what you identify as responsive conduct – "refus[ing] to take a shower" and having a "flat affect") Mr. Barkes exhibited at HRYCI following initial intake until the time of his suicide, and identify all individual with knowledge, documents or tangible physical evidence that support your contentions.

**RESPONSE: No current documents in our possession other than what is stated above. Plaintiff has an insufficient factual basis to admit or deny this statement.**

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
DE Bar I.D. No. 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4581
E-mail: jmartin@martinandwilson.com
Attorney for Plaintiffs

DATED:    August 6, 2007

# ADULT INTAKE MENTAL HEALTH SCREENING

FCM

| Name: Baker Christopher | Sex: M | DOB: 12-12-66 | Date: 11-13-04 |
| Facility: HRYCI | | | Time: 1500 |

1. Hallucinations     Yes ___   No ✓     If yes describe _____

2. Violent Behavior or Threats     ___   ✓

### Suicide Prevention Screening (check appropriate column for each question)

| | Column A YES | Column B NO | COMMENTS |
|---|---|---|---|
| 1. Arresting or transporting officer believes subject may be suicide risk. If yes, notify Provider on call. | | ✓ | |
| 2. Lacks close family/friends in community. | | ✓ | |
| 3. Experienced a significant loss within the last 6 months (loss of job, relationship, death of close family member). | | ✓ | |
| 4. Worried about major problems other than legal situation (i.e. terminal illness). | | ✓ | |
| 5. Family member or significant other has attempted or committed suicide (spouse, patient, sibling, close friend, lover). | | ✓ | |
| 6. ~~Is the subject a former patient/client of a psych/mental and drug or alcohol abuse treatment agency?~~ | | | |
| 7. Holds position of respect in community (i.e. professional, public official) and/or alleged crime is shocking in nature. Feels embarrassment/shame. If yes, notify Provider on call. | | ✓ | |
| 8. Is thinking about killing self. If yes, notify Provider on call. | | ✓ | |
| 9. If yes to #8, has a suicide plan and/or suicide instrument in possession? | | ✓ | |
| 10. ~~Have you ever attempted suicide? Check what/the sole method?~~ | | ✓ | before age 23 |
| 11. Feels there is nothing to look forward to in the future (expresses feelings of helplessness and hopelessness). If yes to #10 and #11, notify Provider on call. | | ✓ | |
| 12. Shows signs of depression (crying, emotional flatness). | | ✓ | |
| 13. Appears overly anxious, afraid, or angry. | | ✓ | |
| 14. Appears to feel unusually embarrassed or ashamed. | | ✓ | |
| 15. Is acting and/or talking in a strange manner. (Cannot focus attention, hearing, or seeing things that are not there.) | | ✓ | |
| 16. Is apparently under the influence of alcohol or drugs. | | ✓ | |
| 17. If yes to #16, is individual incoherent or showing signs of withdrawal or mental illness? If yes to both #16 and #17, notify Provider on call. | | ✓ | |

Total Column A: 2

**Actions:** If total checks in Column A are 8 or more, notify Provider on call. SIGNATURE OF SCREENING MEDICAL STAFF
On Call Provider notified: ___ Yes
Supervision instituted: ___ Constant ___ Other
Referred to: Mental Health Team
___ Yes ___ No
___ Emergency: Who _____ When _____
___ Non-emergency

SIGNATURE AND STAMP OF INTAKE MEDICAL STAFF _[signature]_

D00010

A000126

# STANDARD INTAKE SCREENING FORM

FCM

LAST NAME _Barnes_
FIRST NAME _Christopher_
Institution name: _Hrycz_
Previous incarceration at this facility? _1999_
D.O.B. _12·12·66_ NUMBER _361999_    INTAKE DATE _11/13/04_ TIME _1500_
INSURANCE INFORMATION: Medicare Y /N Medicaid Y /N Social Security Number: _553 43 7241_

**SECTION 1:**    Medical Records brought with patient?    yes ☐    no ☑
VITAL SIGNS:
BP _128/82_  P _60_  TEMP _98.0_  R _16_    WT _190 lbs_

ANY OBVIOUS SIGNS OF ILLNESS OR TRAUMA? OR DEFORMITIES? YES/NO (if yes describe)

ANY OBVIOUS SIGNS OF ALTERED MENTAL STATUS, ALTERED APPEARANCE, OR ABNORMAL CONDUCT?
YES/NO (If yes describe)

ANY SIGNS OF TREMORS OR SWEATING? YES /NO (if yes please describe)

**SECTION 2:**
1. Are you currently on any medications?    yes ☑    no ☐
If inmate on medications, call the MD to get orders to continue/change/or stop.
Medications brought with patient?    yes ☐    no ☑
MEDICATIONS & DOSES  1. _Depakote XL_  2. _Effexor xl  150 mg_
_7500 mg SA_  _Am_
3. _Seroquel  25 mg 1 pill Prozac_ _25 mg 1 day_

2.  Are you allergic to any medications?    yes ☐    no ☑
IF YES PLEASE LIST THE ALLERGIES AND REACTIONS_____

3. Has a Doctor told you to take pills for any illness?    yes ☐    no ☑

4. Have you been exposed to HIV? (blood transfusion etc)    yes ☐    no ☑

5. History of intravenous drug abuse?    yes ☐    no ☑

6. Visible poor skin conditions, rashes, or needle marks?    yes ☐    no ☑
IF YES PLEASE DESCRIBE_____

7. History of alcohol abuse?    yes ☐    no ☑
History of cocaine/amphetamine abuse?    yes ☐    no ☑
History of marijuana abuse?    yes ☐    no ☑

LAST USED_____
DESCRIBE ANY VISIBLE SIGNS OF ALCOHOL OR DRUG WITHDRAWL

8.  Have you ever attempted suicide?    yes ☑    no ☐

9.  Are you afraid you might lose your mind
or go crazy?    yes ☐    no ☑

D00032

MR-1000
Revised 2/23/04        First Correctional Medical, Inc.        Not for Redistribution

**A000127**

**STANDARD INTAKE SCREENING FORM    INMATE NAME:** _Barker,_____    **ID#** _361959_

10.  Do you have or ever had any of the following diseases?

| Sexually transmitted diseases? | yes ☐ | no ☑ |
|---|---|---|
| If yes, what _____ When _____ | | |
| Treatment _____ | | |
| Asthma? | yes ☐ | no ☑ |
| COPD? | yes ☐ | no ☑ |
| Heart disease? | yes ☐ | no ☑ |
| Hepatitis? | yes ☐ | no ☑ |
| Type _____ When _____ | | |
| Epilepsy? | yes ☐ | no ☑ |
| Date of last seizure _____ | | |
| High Blood Pressure? | yes ☐ | no ☑ |
| Diabetes? | yes ☐ | no ☑ |
| Type _____ | | |
| OTHER _____ | | |

11.  Do you have any dental problems?    YES ☐    NO ☑  (Please complete all Info)
Visual Exam  Y  N  Oral Tissues  Y  N  Infections  Y  N  Caries  Y  N
Swelling/abnormalities  Y  N    Describe abnormalities: _____

12.  Access to Health Services explained to inmate    YES ☐    NO ☑

13.  If the inmate is a female and between the ages of 10-50 years a urine pregnancy test must
be obtained. Positive ☐    Negative ☐    Para ____    Gravida ____
Abortion ____    N/A    Miscarriage ____

**SECTION 3:**
1. HAVE YOU EVER BEEN TESTED FOR TUBERCULOSIS?    YES ☐    NO ☐
IF NO THEN GIVE PPD AND DOCUMENT ON IMMUNIZATION/TB CONTROL RECORD
IF YES, CONTINUE WITH QUESTION #2

2. WAS YOUR LAST TB TEST POSITIVE OR NEGATIVE?
IF NEGATIVE WITH NO DOCUMENTATION, ADMINISTER PPD AND DOCUMENT IN CHART ON IMMUNIZATION
RECORD. IF POSITIVE, MAKE CID REFERRAL.

**COMPLETE THE CHART BELOW.**

| SYMPTOM | YES | NO | DURATION |
|---|---|---|---|
| COUGH WITH BLOOD | | ✓ | |
| COUGH W/O BLOOD | | ✓ | |
| FEVER | | ✓ | |
| NIGHT SWEATS | | ✓ | |
| LIVE W/TB CONTACT | | ✓ | |
| HX of DRUG ABUSE | | ✓ | |
| WEIGHT LOSS | | ✓ | |
| FATIGUE/MALAISE | | ✓ | |

IF INMATE HAS COUGH, FEVER, OR NIGHT SWEATS, PLACE PT IN AN N-95 MASK UNTIL PLACED IN
RESPIRATORY ISOLATION AND CALL PROVIDER IMMEDIATELY.

**PLAN OF TREATMENT**

STARTED    COMPLETION DATE

CURRENT MEDICATIONS _____    _____
TAKEN TB MEDS IN PAST _____

PATIENT COUNSELED REGARDING ACTIVE VS. LATENT TB AND IMMUNIZATION FORM COMPLETED.
SIGNATURE & STAMP OF INTAKE NURSING STAFF _____

D00033

MR-1000
First Correctional Medical

## IN THE UNITED STATED DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;                    :
TINA GROSSMAN as next friend of                :    C. A. No.:  06-104 JJF
BRITTANY BARKES; TINA                          :
GROSSMAN as next fried of                      :
ALEXANDRA BARKES; and                          :
KAREN BARKES as administratrix of the          :
ESTATE OF CHRISTPHER BARKES,                    :
                                               :
                    Plaintiffs,                :
                                               :
                                               :
          v.                                   :
                                               :
FIRST CORRECTIONAL MEDICAL                      :
INC.; STANLEY TAYLOR;                           :
RAPHAEL WEILLIAMS: CERTAIN                      :
UNKNOWN INDIVIDUAL                              :
EMPLOYEES OF STATE OF                           :
DELAWARE DEPARTMENT OF                          :
CORRECTIONS; CERTAIN                            :
UNKNOWN INDIVIDUAL EMPLOEES                     :
OF FIRST CORRECTIONAL MEDICAL,                  :
INC., and STATE OF DELAWARE,                    :
DEPARTMENT OF CORRECTION,                       :
                                               :
                    Defendants.                :

## NOTICE OF SERVICE

Please take notice that the undersigned did hereby forward copies of Plaintiffs'

Answers to State Defendants' Second Set of Interrogatories Directed to Plaintiffs via U.S.

First Class, Postage Paid Mail on this 6th day of August, 2007 to the following:

Stephani J. Ballard, Esquire
Department of Justice
New Castle County
820 North French Street
Wilmington, DE  19801

MARTIN & WILSON, P.A.


JEFFREY K. MARTIN, ESQUIRE
DE Bar I.D. No.: 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
E-mail: jmartin@martinandwilson.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-104-JJF |
| | ) | |
| FIRST CORRECTIONAL | ) | |
| MEDICAL, INC., | ) | |
| STANLEY TAYLOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**STATE DEFENDANTS' SUPPLEMENTATION**

**OF INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(e)**

Pursuant to Fed. R. Civ. P. 26(e), the Defendants Department of Correction, Stanley Taylor, Raphael Williams, and "Unknown Employees" of the State of Delaware ("State Defendants") make the following supplementary disclosures:

**(A)    Individuals likely to have discoverable information in support of Defendants' defenses.**

15.    Cpl. Brian Forte, Department of Correction;

16.    Sgt. Brian Emig, Department of Correction;

17.    Lt. Kimphus Daniels, Department of Correction;

18.    Scott Ivy, New Castle County Police Department (formerly of Department of Correction)

19.    CO Denisha Young, Department of Correction;

20.    CO Reginald Young, Department of Correction;

21.    CO Gerwin Cumberbatch, Department of Correction;

22.     Captain Carol Jefferson, Department of Correction

23.     Phillip McLaughlin, Wilmington Police Department

In addition, State Defendants reserve their rights, pursuant to Rule 26(e) to

identify additional witnesses.  State Defendants further reserve the right to identify and

call any witnesses listed by the Plaintiff or other Defendant(s).

**(B)     Documents that may be used to support State Defendants' defenses:**

To date State Defendants have produced documents Bates numbered D00001 –

D00517 as well as medical records from the following providers: Catholic Charities,

ShopRite Pharmacies and Jane Anderson, LCSW.  Also, provided were employment

records from Manor Care and records from the Delaware Board of Nursing.

<div style="margin-left:50%">

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400

Attorney for State Defendants

</div>

Dated: August 7, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **KAREN BARKES, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **C. A. No. 06-104-JJF** |
| | ) | |
| **FIRST CORRECTIONAL** | ) | |
| **MEDICAL, INC.,** | ) | |
| **STANLEY TAYLOR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF SERVICE

The undersigned certifies that on August 7, 2007, she caused the STATE DEFENDANTS' SUPPLEMENTATION OF INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(e) to be delivered to the following persons in the form and manner indicated:

NAME AND ADDRESS OF RECIPIENT(S):

Jeffrey K. Martin, Esquire          Daniel McKenty, Esquire
Martin & Wilson, P.A.               Heckler & Frabizzio
1508 Pennsylvania Avenue, Suite 1C  P.O. Box 128
Wilmington, DE 19806                Wilmington, DE 19899-0128

**MANNER OF DELIVERY:**

   X   Two true copies by first class mail, postage prepaid, to each recipient

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

 /s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-104-JJF |
| | ) | |
| FIRST CORRECTIONAL | ) | |
| MEDICAL, INC., | ) | |
| STANLEY TAYLOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**STATE DEFENDANTS' SECOND SUPPLEMENTATION**

**OF INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(e)**

Pursuant to Fed. R. Civ. P. 26(e), the Defendants Department of Correction, Stanley Taylor, Raphael Williams, and "Unknown Employees" of the State of Delaware ("State Defendants") make the following supplementary disclosures:

**(B)    Documents that may be used to support State Defendants' defenses:**

- Health Care Services Contract dated 6/17/02 and September 2003 Addendum Bates numbered D00518 – D00525 (attached)

- Health Care Services Contract Request for Proposal March 2002 (available for review at office of counsel for State Defendants)

- Proposal to Delaware Department of Correction Health Care Services Contract #2828 from First Correctional Medical and Attachments to the Proposal (available for review at office of counsel for State Defendants)

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400

Attorney for State Defendants

Dated: August 30, 2007

*Original*

RECEIVED

2002 JUN 21 PM 2 04

BUSINESS OFFICE

# HEALTH CARE SERVICES CONTRACT

This Agreement is made this 17th day of June 2002, by and between First Correctional Medical-Delaware, L.L.C. ("FCM") and the State of Delaware, Department of Correction ("DOC").

## RECITALS

WHEREAS, the DOC desires to purchase the health care services offered by FCM to serve the needs of the State of Delaware and the State's inmate population; and

WHEREAS, the State has asked prospective vendors to submit proposals for contract No. 2828; and

WHEREAS, FCM's sole member (First Correctional Medical, Inc.) submitted a proposal to provide the aforementioned health care services to the DOC and its proposal was accepted by the DOC; and

WHEREAS, on Wednesday May 29, 2002, the DOC and FCM's sole member entered into final negotiations with the express intent to execute a contract for the provision of health services to Delaware's incarcerated population; and

NOW THEREFORE, in consideration for the mutual promises contained herein, the parties enter into this Agreement and its related documents to govern their relationship and hereby revoke any previous agreement between the parties. All references in said documents to "FCM" or "First Correctional Medical, Inc." or "First Correctional Medical" shall be deemed a reference to FCM as if FCM made the proposal and agreements set forth in or under such documents and was the successful bidder. The Terms and Conditions of this Agreement are contained within this DOC/FCM health care services contract which shall include by this reference the Request for Proposal, FCM's Proposal and the FCM Question and Response Memorandum dated May 21, 2002; and

NOW THEREFORE, the DOC and FCM mutually agree as follows:

D00518

1. This agreement is contingent upon funding being appropriated by the State of Delaware for each year of this contract. Funding is appropriated for medical services through the annual State Budget Act.

2. The DOC and FCM agree on an annual base price of $17,735,904.00 for the 1st two years of the contract. FCM shall submit to DOC an invoice on or about the 15th and last day of each month during the term of this contract commencing on July 15th of each fiscal year. Each invoice shall be for one twenty-fourth of the annual base price due hereunder for each year of this contract. DOC shall pay each invoice within 5 days of receipt. The amount of said monthly payment shall change in the event of any mutually agreed to change in the annual base price for any year that this contract remains in effect or as otherwise provided under the contract documents including any schedules which are a part thereof or which are attached hereto (which shall be deemed a part hereof).
Additional modifications to the DOC Request and FCM's Proposal:

    A.   The Sex Offender Unit has been deleted.

    B.   Three Transition Units and a Structured Care Unit currently are in operation. The Transition Units are at Plummer Community Correctional Center, Multi-Purpose Criminal Justice Facility and Baylor Women's Correctional Institution. The Structured Care Unit is at Sussex Correctional Institution.

    C.   Subject to the terms hereof and the documents referred to herein, the required Vendor services include but are not limited to basic medical services, mental health services, dental services, continuous suicide watch, the transition units, structured care programs, specialized women's services, and services to DOC staff. A complete itemization of services is in the DOC's RFP, as limited by FCM's Proposal.

3. The DOC accepts the variable rate per inmate proposed per year by FCM for times when the count is over the 6700-offender base as shown on the attached schedules which are made a part hereof. After each month, FCM and DOC shall

2

agree to a reconciliation of the number of inmates for the prior month (over a base of 6700). Any additional payment (based on the attached schedule) due FCM as a result of any number of inmates over the base amount shall be paid to FCM with the next payment due hereunder.

4. Annual increases will be in accordance with the revised Cost Summary Sheet presented in FCM's proposal reflecting the new base of $17,735,904.00 and the other terms and provisions hereof.

5. FCM and the DOC agree to modify the RFP and Proposal as follows:

A.    To the extent ACA Health Care Standards and NCCHC Standards differ, FCM will adhere to the higher standard;

B.    To the extent that community standards for mental health care are unclear or not specific, FCM will be required to implement "Best Practices" from State Correctional Systems, which shall be deemed to be the average national level of such services.

C.    Clarify language in the FCM proposal to read:

a) Pg. 26, paragraph 1, last sentence. Be it known that the DOC does not authorize the transfer of inmates to a detoxification facility.

b) Pg. 60, "Response to trauma incidents", second paragraph, last sentence should read: "These reports will be provided to the warden or designee, and others as appropriate in the corrections chain of command prior to the end of shift in which the incident occurred."

D.    Contract provides for a capitated rate for health care services. Fee structure is established by the base rate (as adjusted) plus per diem rate for inmate population over 6700. Structural changes and/or additions to institutions will not result in a renegotiated rate for service.

000520

E.  The parties acknowledge that DOC shall pay for any equipment and services (including software and the charges for installation and training relating thereto) which are necessary, required or requested by FCM under the operation of this contract which individually exceeds $500.00 per individual item. All equipment, supplies and facilities currently in place at or located within the facilities at which the services shall be provided shall be made available to FCM at no cost to or credit against FCM in connection with the performance of its services hereunder. In addition, DOC shall provide at its cost and expense all maintenance services required or requested by FCM in connection with any equipment or any part of the facilities.

F.  Out of the first two payments due FCM hereunder, DOC shall retain a total sum of $500,000.00 ($250,000.00 in each of the first two payments) to insure the observance and performance of all of the covenants, terms, conditions and undertakings herein contained to be performed or observed by FCM. Said security deposit or the balance thereof shall be returned to FCM not more than thirty (30) days following the termination or expiration of this contract provided that FCM has materially performed and observed all of said covenants, terms, conditions and undertakings herein. No other bond, guaranty or other deposit, security or assurance shall be due, required or owed by FCM.

G.  Any financial reporting obligations shall be limited to FCM.

H.  In no event shall staffing levels constitute a breach or default by FCM hereunder.

I.  In the event that FCM does not receive payment on or before the 30 day following the receipt of an invoice by the DOC, the amount due on the invoice shall bear interest at an annual rate of 12.00% (or the maximum rate allowed by law, whichever is lower) until said payment is made in full.

4

U00521

6.  The DOC is purchasing Professional Health Services. Performance is the essence of this contract.  To the extent, negotiations involved a discussion of staffing patterns; those discussions were intended to ensure FCM fully understood the scope of the contract.

7.  Appropriation

Funds authorized for use under the contract are obligated within the budget period (fiscal years July 1- June 30) of which they are awarded.  Contracts and purchase orders must be issued on or before the expiration date of the budget period or the funds will no longer be available for use by the vendor. If funds are not appropriated at the amounts established by this contract each party shall have the right, to be exercised with not less than 60 days prior notice to the other, to terminate this contract and all payment and service obligations hereunder and relating hereto. However, said termination right may only be exercised with an effective date of the last day of the last month of a fiscal year of the term of this contract. At no time will the level of services go below those specified by the NCCHC Prison Standards.

8.  **DEPARTMENT INDEMNIFICATION**

The FCM will hold harmless, indemnify, and defend the DOC, the State of Delaware and their agents, employees, or officers of the State of Delaware from any and all suits, actions, losses, liability, damages (including punitive damages), expenses, reasonable attorney fees (including salaries of attorneys regularly employed by the State of Delaware), judgments, or settlements incurred by the DOC, the State of Delaware or their agents, employees, or officers arising out of the negligent provision of health care services by FCM, its employees, or subcontractors under the contract, including direct or indirect negligence or intentional acts of omission or commission, and professional malpractice regardless of any negligence or any intentional acts of omissions or commission by employees or officials of the DOC.

D00522

## 9. APPLICABLE LAW/GOVERNING LAW/ CHOICE OF LAW

The laws of the State of Delaware shall apply, except where Federal Law has precedence. FCM consents to jurisdiction and venue in the State of Delaware. The DOC shall enter a Purchase Order on or before June 30, 2002. The Purchase Order must be approved on July 8' 2002 or this contract shall be null and void and of no force or effect. FCM must possess an active Delaware Business License as issued by the Department of Finance through its Division of Revenue. FCM must remain in good financial standing with the State of Delaware.

If any provision of this contract is held by a court of competent jurisdiction to be contrary to law, the remaining provisions of this contract will remain in full force and effect.

FCM's sole member shall have no right, title, obligation or liability hereunder or under any document referred to herein unless hereafter expressly accepted and agreed to thereby.

## 10. TERMS AND RENEWAL OPTIONS

Subject to the other terms and provisions hereof, the initial term ("Initial Term") of this contract shall be for a period of 6 years commencing July 1, 2002 (" the Commencement Date") and expiring (unless renewed) on June 30, 2008. This contract is renewable by the DOC for two (2) additional periods of two (2) years each ("the Extended Term"), according to the terms of the RFP.

If DOC defaults hereunder, FCM may, at its discretion, terminate this contract upon not less than thirty days written prior notice.

## 11. CONFLICT RESOLUTION

The contract documents shall consist of this contract, the Request for Proposal, the FCM Proposal, and the FCM Question and Response Memorandum dated May 21, 2002, as well as all cost and other updates relating thereto and the schedules, grids and other attachments attached hereto which are hereby made a part hereof. In the event of any conflict between the contract documents, the contract documents

U00523

will be interpreted in the following order and the lower number below shall govern and control:

1.  This Contract and the summary sheet, pricing grid, and the other schedules, grids and attachments hereto.
2.  FCM's response to DOC written questions dated 5/21/2002 (the FCM Question and Response Memorandum dated May 21, 2002)
3.  Request for Proposals (including any amendments and updates and other questions and answers)
4.  FCM Proposal and any updates relating thereto

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

BY: _____

TITLE: Commissioner

DATE: 6/17/02

FIRST CORRECTIONAL MEDICAL-
DELAWARE, L.L.C.

BY: _____

TITLE: President

DATE: 6/17/02

D00524

## ADDENDUM TO HEALTH CARE SERVICES CONTRACT #2828

## TO ESTABLISH A PROCEDURE FOR REIMBURSEMENT OF PAYMENT TO THE DEPARTMENT OF HEALTH AND SOCIAL SERVICES (DHSS) FOR MEDICAID ELIGIBLE INCARCERATED PERSONS

**In accordance with the agreement between DHSS and FCM,** incarcerated persons under the custody of the Delaware Department of Corrections (DOC) who incur inpatient hospital stays greater than 24 hours, in an acute care hospital with a Delaware Medicaid provider agreement, shall be considered for Medicaid.

**It is agreed** that the DOC will reimburse DHSS for 100% of the Medicaid per discharge and outlier payments and ancillary payments made for incarcerated persons. FCM understands that DOC will then recover 100% of the Medicaid discharge and outlier and ancillary payments by reducing payments DOC makes to FCM. All payments will be made in accordance with the payment schedule defined in the contract agreement #2828.

State of Delaware
Department of Correction

By: _____

Title: Commissioner

Date: 9/5/03

First Correctional Medical
Delaware, L.L.C.

By: _____

Title: President

Date: 9/8/83

000525

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**KAREN BARKES, et al.**        )
                               )
     **Plaintiffs,**        )
                               )
     **v.**                 )     C. A. No. 06-104-JJF
                               )
**FIRST CORRECTIONAL**    )
**MEDICAL, INC.,**           )
**STANLEY TAYLOR, et al.,**   )
                               )
     **Defendants.**       )

## <u>NOTICE OF SERVICE</u>

The undersigned certifies that on August 30, 2007, she caused the STATE

DEFENDANTS' SECOND SUPPLEMENTATION OF INITIAL DISCLOSURES

PURSUANT TO FED. R. CIV. P. 26(e) to be delivered to the following persons in the

form and manner indicated:

     NAME AND ADDRESS OF RECIPIENT(S):

Jeffrey K. Martin, Esquire           Daniel McKenty, Esquire
Martin & Wilson, P.A.              Heckler & Frabizzio
1508 Pennsylvania Avenue, Suite 1C    P.O. Box 128
Wilmington, DE 19806              Wilmington, DE 19899-0128

        **MANNER OF DELIVERY:**

      <u> X </u>  Two true copies by first class mail, postage prepaid, to each recipient

                           STATE OF DELAWARE
                           DEPARTMENT OF JUSTICE

                         <u> /s/ Stephani J. Ballard         </u>
                         Stephani J. Ballard, I.D. #3481
                         Deputy Attorney General
                         Carvel State Office Building
                         820 N. French Street, 6th Floor
                         Wilmington, DE 19801
                         (302) 577-8400
                         Attorney for State Defendants

# STANDARD INTAKE SCREENING FORM

FCM

LAST NAME _Barkes_

FIRST NAME _Christopher_

Institution name: _Hrycz_

Previous Incarceration at this facility? _1997_

D.O.B. _12·12·66_ NUMBER _361999_    INTAKE DATE _11/3/04_ TIME _1500_

INSURANCE INFORMATION: Medicare Y Ⓝ Medicaid Y Ⓝ Social Security Number: _555 43 7341_

**SECTION 1:** Medical Records brought with patient?                yes ☐        no ☑

VITAL SIGNS:

BP _140/92_    P _60_    TEMP _98.0_    R _16_    WT _190 lbs_

ANY OBVIOUS SIGNS OF ILLNESS OR TRAUMA? OR DEFORMITIES?  YES/ⓃO (if yes describe)

_____

ANY OBVIOUS SIGNS OF ALTERED MENTAL STATUS, ALTERED APPEARANCE, OR ABNORMAL CONDUCT?
YES/ⓃO (if yes describe)

_____

ANY SIGNS OF TREMORS OR SWEATING?  YES /ⓃO (if yes please describe)

_____

**SECTION 2:**

1. Are you currently on any medications?        yes ☑        no ☐
   If inmate on medications, call the MD to get orders to continue/change/or stop.
   Medications brought with patient?        yes ☐        no ☐

MEDICATIONS & DOSES  1. _Depakote XL 500 mg_    2. _Effexor XR 150 mg AM_

3. _Seroquel 25 mg 3 day Risperdal 25 mg 0 day_

2. Are you allergic to any medications?                yes ☐        no ☑
IF YES PLEASE LIST THE ALLERGIES AND REACTIONS _____

_____

3. Has a Doctor told you to take pills for any illness?        yes ☐        no ☑

4. Have you been exposed to HIV? (blood transfusion etc)        yes ☐        no ☑

5. History of intravenous drug abuse?        yes ☐        no ☑

6. Visible poor skin conditions, rashes, or needle marks?        yes ☐        no ☑
IF YES PLEASE DESCRIBE _____

7. History of alcohol abuse?        yes ☐        no ☑
   History of cocaine/amphetamine abuse?        yes ☐        no ☑
   History of marijuana abuse?        yes ☐        no ☑

LAST USED _____
DESCRIBE ANY VISIBLE SIGNS OF ALCOHOL OR DRUG WITHDRAWL

8. Have you ever attempted suicide?        yes ☑        no ☐

9. Are you afraid you might lose your mind
   or go crazy?        yes ☐        no ☑

D00032

**STANDARD INTAKE SCREENING FORM**    INMATE NAME: _Barker,_____ ID# _361 959_

10. Do you have or ever had any of the following diseases?
Sexually transmitted diseases?
If yes, what _____ When _____    yes ☐    no ☑
Treatment _____
Asthma?
COPD?    yes ☐    no ☑
Heart disease?    yes ☐    no ☑
Hepatitis?    yes ☐    no ☑
Type _____ When _____    yes ☐    no ☑
Epilepsy?
Date of last seizure _____    yes ☐    no ☑
High Blood Pressure?
Diabetes?    yes ☐    no ☑
Type _____    yes ☐    no ☑
OTHER _____

11. Do you have any dental problems?    YES ☐    NO ☑ (Please complete all info)
Visual Exam  Y  N  Oral Tissues  Y  N  Infections  Y  N  Caries  Y  N
Swelling/abnormalities  Y  N  Describe abnormalities: _____

12. Access to Health Services explained to inmate    YES ☐    NO ☑

13. If the inmate is a female and between the ages of 10-50 years a urine pregnancy test must be obtained. Positive ☐    Negative ☐    Para _____
Gravida _____
Abortion __N/A__    Miscarriage _____

**SECTION 3:**
1. HAVE YOU EVER BEEN TESTED FOR TUBERCULOSIS?    YES ☑    NO ☐
IF NO THEN GIVE PPD AND DOCUMENT ON IMMUNIZATION/TB CONTROL RECORD
IF YES, CONTINUE WITH QUESTION #2

2. WAS YOUR LAST TB TEST POSITIVE OR NEGATIVE?
IF NEGATIVE WITH NO DOCUMENTATION, ADMINISTER PPD AND DOCUMENT IN CHART ON IMMUNIZATION RECORD. IF POSITIVE, MAKE CID REFERRAL.

COMPLETE THE CHART BELOW.

| SYMPTOM | YES | NO | DURATION |
|---|---|---|---|
| COUGH WITH BLOOD | | ✓ | |
| COUGH W/O BLOOD | | ✓ | |
| FEVER | | ✓ | |
| NIGHT SWEATS | | ✓ | |
| LIVE W/TB CONTACT | | ✓ | |
| HX of DRUG ABUSE | | ✓ | |
| WEIGHT LOSS | | ✓ | |
| FATIGUE/MALAISE | | ✓ | |

IF INMATE HAS COUGH, FEVER, OR NIGHT SWEATS, PLACE PT IN AN N-95 MASK UNTIL PLACED IN RESPIRATORY ISOLATION AND CALL PROVIDER IMMEDIATELY.

PLAN OF TREATMENT    STARTED    COMPLETION DATE

CURRENT MEDICATIONS _____    _____
TAKEN TB MEDS IN PAST _____

PATIENT COUNSELED REGARDING ACTIVE VS. LATENT TB AND IMMUNZATION FORM COMPLETED.
SIGNATURE & STAMP OF INTAKE NURSING STAFF _____

D00033

# ADULT INTAKE MENTAL HEALTH SCREENING



| Name: Baker Christina | Sex: M | DOB: 12·12·66 | Date: 11·13·04 |
| Facility: HRyC I | | | Time: 1500 |

1. Hallucinations     Yes ____    No ✓ ____    If yes describe _____

2. Violent Behavior or Threats     ____    ✓ ____

## Suicide Prevention Screening (check appropriate column for each question)

| | Column A YES | Column B NO | COMMENTS |
|---|---|---|---|
| 1. Arresting or transporting officer believes subject may be suicide risk. If yes, notify Provider on call. | | ✓ | |
| 2. Lacks close family/friends in community. | | ✓ | |
| 3. Experienced a significant loss within the last 6 months (loss of job, relationship, death of close family member). | | ✓ | |
| 4. Worried about major problems other than legal situation (i.e. terminal illness). | | ✓ | |
| 5. Family member or significant other has attempted or committed suicide (spouse, patient, sibling, close friend, lover). | | ✓ | |
| 6. Has psychiatric history (note current psychotropic medical and name of most recent treatment agency). | ✓ | | |
| 7. Holds position of respect in community (i.e. professional, public official) and/or alleged crime is shocking in nature. Feels embarrassment/shame. If yes, notify Provider on call. | | ✓ | |
| 8. Is thinking about killing self. If yes, notify Provider on call. | | ✓ | |
| 9. If yes to #8, has a suicide plan and/or suicide instrument in possession? | | ✓ | |
| 10. Has previous suicide been attempted? (Check wrists and note method). | ✓ | | OVERDOSE 2003 |
| 11. Feels there is nothing to look forward to in the future (expresses feelings of helplessness and hopelessness). If yes to #10 and #11, notify Provider on call. | | ✓ | |
| 12. Shows signs of depression (crying, emotional flatness). | | ✓ | |
| 13. Appears overly anxious, afraid, or angry. | | ✓ | |
| 14. Appears to feel unusually embarrassed or ashamed. | | ✓ | |
| 15. Is acting and/or talking in a strange manner. (Cannot focus attention, hearing, or seeing things that are not there.) | | ✓ | |
| 16. Is apparently under the influence of alcohol or drugs. | | ✓ | |
| 17. If yes to #16, is individual incoherent or showing signs of withdrawal or mental illness? If yes to both #16 and #17, notify Provider on call. | | ✓ | |
| Total Column A: | 2 | ✓ | |

Actions: If total checks in Column A are 8 or more, notify Provider on call. SIGNATURE OF SCREENING MEDICAL STAFF:

On Call Provider notified: ____ Yes

Supervision instituted: ____ Constant ____ Other

Re____ to: Mental Health Team

____ Yes ____ No

____ Emergency: Who ____ When ____

____ Non-emergency

SIGNATURE AND STAMP OF INTAKE MEDICAL STAFF _____

D00039

MR-1001
Revised 3/11/2004

First Correctional Medical, Inc.     Not for Redistribution

A000147

# REFERRAL TO MENTAL HEALTH SERVICES



| Inmate name: Barkes, Christopher | Number: 361999 | Date of Referral: 11·13·04 |
|---|---|---|
| Job: | Lock: | Unit: |

**URGENCY LEVEL:** ☒ Routine          ☐ ASAP          ☐ Urgent

Additional Comments: _Hx Bipolar, Hx attempted Suicide in 2003_

☐ **BRIDGE ORDER:** medication, dose, expiration date:_____

☐ **NO BRIDGE ORDER** but inmate CURRENTLY ON PSYCHIATRIC MEDICINE:

medication, dosage, last time medicine was taken:_____

☐ **INMATE REFUSES MEDICATION OR MEDICATION HAS EXPIRED**_____

| Referred by: | |
|---|---|
| Title: _LPN_ | Phone Ext. |

Response:_____

| Mental Health Staff Signature: | Date of Response: |
|---|---|
| Supervisor Signature: | |

Admin-2024
Revised 3/16/04

First Correctional Medical

Not for Redistribution

D00040



Facility Name

EFFEXOR XR 150 mg PO Q AM

SEROQUEL 35 mg PO QHS
+ 2 wks

Synthroid 35 mcg PO Qam

PATIENT NAME: Bailes, Christopher 7/26/1999

ALLERGY: NKA

WING: B+C

DIAGNOSIS

DOCUMENTATION CODES =
DC - Discontinued Order    R - Refused         S - Self Administered
DO - Dose Omitted          C - Court           NS - No Show
+ - Medical Hold           LD - Lock Down      O - Other

D00041

incident#
**3009890**

**HRYCI Howard R.Young Correctional Institution**
**1301 E. 12th Street**
**WILMINGTON DE, 19809**
**Phone#: 302-429-7700**

Date: _11/15/2004_

# INCIDENT REPORT

| Group#: N/A | Type: Inmate Involved | Incident Date: 11/14/2004 | Time: 11:35 | Confidential: No |
|---|---|---|---|---|

**Facility:** HRYCI Howard R.Young Correctional Institution

Followup Required :No

**Incident Location:** RECEIVING ROOM

**Location Description:** receiving room #122

**Violated Conditions:** Other

**Description of Incident:**

On the date,and time while relieving 12x8 shift I C/O Fields did a check on I/M Barkes,Christopher approximately 0740hrs by knocking on the window in room 122, and asking I/M Barkes was he okay, he responded with " yes". Approximately 1045 hrs after doing a fugitive warrant I C/O Fields went up front to hand paper work to primary, the captain quarters while walking by room 122 window I C/O Fields look inside and seen I/M Barkes laying in the bed awoke. When I returned at approximately 1100 I/M Barkes was in the same position. Approximately 1135 while OFFICER Martelli was starting to run chow, I C/O Fields was calling in the headcount for booking and receiving when OFFICER Martelli called a Code 7. I notified primary with the code 7, and secure the area and responded in the back with Officer Martelli, and Cpl.Rayne. Approximately 1138 medical Nurse Colleen Bell, Courtney Kenton, and Gabriel Termilus responded in room 122 and took over the situation by starting CPR.

| Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|
| N/A | N/A | N/A | |

**Evidence Type:** N/A

Date Collected: N/A

**Discovered By :** N/A

Secured By: N/A

**Type of Force Used:** [ ]   PHYSICAL   [ ]   CHEMICAL [ ]   STUN [ ]   OTHER   [ ]   CAPSTUN [X]   NONE

**Restraints Used**   : N/A

~~ediate Action Taken:~~

N/A

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Inmate | Christopher, Barkes | 00361999 | N/A |
| Staff | Stephen, Martelli | N/A | Booking/Receiving Room Officer |
| Staff | Dorene, Fields | N/A | Booking/Receiving Room Officer |
| Staff | Sandra, Rayne | N/A | Booking/Receiving Room Officer |

**Reporting Officer:** Fields, Dorene  (Booking/Receiving Room Officer)

**Entered By:** Fields, Dorene  (Booking/Receiving Room Officer)

| Approval Information | |
|---|---|

[ X ]   Approved   [ ] Disapproved   **Date:** 11/14/2004   **Approved by:** Polk, John W  (Staff Lt./Lt)

**Comments:** N/A

D00002

3009891

HRYCI Howard R.Young Correctional Institution
1301 E. 12th Street
WILMINGTON DE, 19809
Phone#: 302-429-7700

Date: 11/15/2004

# INCIDENT REPORT

oup#: N/A    Type: Inmate Involved    Incident Date: 11/14/2004    Time: 11:35    Confidential: No

**Facility:** HRYCI Howard R.Young Correctional Institution

Followup Required : No

**Incident Location:** RECEIVING ROOM

**Location Description:** RECEIVING ROOM ROOM 122

**Violated Conditions:** Other

**Description of Incident:**

Approx 1135 lc/o martelli wasfeeding lunch when lc/o martelli entered 122 to feed det barkes christopher 361999.Athat time IC/O MARTELLI ENTER 122 TO CHECK ON DETBARKES .AT THAT TIME DET BARKES WAS HANGING FROM THE STEEL PARKA IN ROOM 122.AT THAT TIME I C/ MARTELLI INFORMED C/O FIELDS TO CALL CODE7 . AT APPROX 1137 CODE7 WASCALLED I C/O MARTELLI UNTIED DET BARKES AND LOWERED TOFLOOR.

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| N/A | N/A | N/A |

**Evidence Type:** N/A

**Date Collected:** N/A

**Discovered By :** N/A

**Secured By:** N/A

**Type of Force Used:** [ ]  PHYSICAL  [ ]  CHEMICAL [ ]  STUN [ ]  OTHER  [ ]  CAPSTUN [X]  NONE

**Restraints Used    :** N/A

**Immediate Action Taken:**

N/A

| Individuals Involved | | | | |
|---|---|---|---|---|
| Person Code | Name | SBI# | | Title |
| Inmate | Christopher, Barkes | 00361999 | N/A | |
| Staff | Dorene, Fields | N/A | Booking/Receiving Room Officer | |
| Staff | Stephen, Martelli | N/A | Booking/Receiving Room Officer | |
| Staff | Sandra, Rayne | N/A | Booking/Receiving Room Officer | |

**Reporting Officer:** Martelli, Stephen  (Booking/Receiving Room Officer)    **Entered By:** Martelli, Stephen  (Booking/Receiving Room Officer)

| Approval Information | | |
|---|---|---|
| [X] Approved | [ ] Disapproved  Date: 11/14/2004  Approved by: Polk, John W  (Staff Lt./Lt) | |

**Comments:** N/A

D00003

incident#
3009895

**HRYCI Howard R.Young Correctional Institution**
**1301 E. 12th Street**
**WILMINGTON DE, 19809**
**Phone#: 302-429-7700**
Date: 11/15/2004

# INCIDENT REPORT

| up#: N/A | Type: Inmate-Involved | Incident Date: 11/14/2004 | Time: 11:35 | Confidential: No |
|---|---|---|---|---|

Facility: HRYCI Howard R.Young Correctional Institution

Followup Required : No

Incident Location: RECEIVING ROOM

Location Description: RECEIVING ROOM CELL#122

Violated Conditions: Other

**Description of Incident:**

ON THE ABOVE DATE AND APPROXIMATE TIME, OFFICER MARTELLI WAS FEEDING LUNCH TO THE INMATES IN BOOKING AND RECEIVING. WHEN OFFICER MARTELLI WENT INTO CELL#122 TO FEED INMATE BARKES, CHRISTOPHER , HE YELLED FOR CPL RAYNE. CPL RAYNE WAS IN ROUTE TO PRIMARY CONTROL. CPL RAYNE RAN INTO CELL#122 AND FOUND INMATE BARKES HANGING BY HIS NECK WITH A SHEET. INMATE BARKES HAD MUCUS COMING OUT OF HIS NOSE AND MOUTH. OFFICER MARTELLI YELLED FOR OFFICER FIELDS TO CALL A CODE 7. CPL RAYNE AND OFFICER MARTELLI WAS TRYING TO UNTIE THE SHEET. CPL RAYNE TOLD OFFICER MARTELLI TO GO GET THE CUTTER. OFFICER MARTELLI RAN TO THE KEY BOX WHERE THE CUTTER IS KEPT. CPL RAYNE RAN AFTER HIM BECAUSE SHE HAD THE KEY THAT OPENS THE KEY BOX ON HER PERSON. CPL RAYNE TOOK OUT THE SCISSORS AND THE CUTTER. OFFICER MARTELLI AND CPL RAYNE RAN BACK TO CELL#122, OFFICER MARTELLI WAS TRYING TO CUT INMATE BARKES DOWN WITH THE CUTTER. CPL RAYNE WAS TRYING TO HOLD INMATE BARKES BODY. CPL RAYNE BEGAN TRYING TO CUT HIM DOWN WITH THE SCISSORS. CPL RAYNE TOLD OFFICER MARTELLI TO TRY TO UNTIE THE SHEET. OFFICER MARTELLI WAS ABLE TO UNTIE THE SHEET. SGT WAY THE FIRST FLOOR LEAD WORKER ARRIVED WITH MEDICAL STAFF. CPL RAYNE GAVE SGT WAY THE CUTTERS TO CUT THE SHEET OFF OF INMATE BARKES NECK. CPL RAYNE LEFT THE CELL WHILE MEDICAL STAFF WORKED ON INMATE BARKES. BARKES,CHRISTOPHER INMATE#361999 D.O.B. 12/12/1966 WAS HOUSED IN BOOKING AND RECEVING BECAUSE HE VIOLATED HIS PROBATION. HE CAME IN ON SATURDAY AT 1445 WITH PLUMMER CENTER. INMATE BARKES WAS DUE TO BE TRANSFERRED TO THE V.O.P.BUILDING ON MONDAY MORNING. INMATE BARKES WAS PLACED IN CELL#122 [ ] CH IS LOCATED ON THE RIGHT HAND SIDE WHEN YOU ENTER BOOKING AND RECEIVING. THERE IS A BIG WINDOW IN THE CELL WHERE INMATE BARKES WAS LOCATED. CPL RAYNE LAST CHECKED ON INMATE BARKES AT APPROXIMATELY 1050. INMATE BARKES WAS ASKED BY CPL RAYNE IF HE WANTED TO TAKE A SHOWER. INMATE BARKES STATED THAT HE WAS OK AND SAID NO. CPL RAYNE ASKED HIM WAS HE SURE, INMATE BARKES SHOOK HIS HEAD  AND SAID NO AGAIN. INMATE BARKES LAID BACK ON THE BOTTOM BUNK.

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| N/A | N/A | N/A |

Evidence Type: N/A

Discovered By : N/A

Date Collected: N/A

Secured By: N/A

Type of Force Used: [] PHYSICAL   [] CHEMICAL [] STUN [] OTHER  [] CAPSTUN [X] NONE

Restraints Used    : N/A

Immediate Action Taken:
CALLED A CODE 7

| | Individuals Involved | | | |
|---|---|---|---|---|
| Person Code | Name | SBI# | Title | |
| Inmate | Christopher, Barkes | 00361999 | N/A | |
| Staff | Sandra, Rayne | N/A | Booking/Receiving Room Officer | |
| Staff | Stephen, Martelli | N/A | Booking/Receiving Room Officer | |
| Staff | Dorene, Fields | N/A | Booking/Receiving Room Officer | |
| Staff | Fred, Way III | N/A | CO Corporal/Sgt. - Large Inst. | |

R  rting Officer: Rayne, Sandra  (Booking/Receiving Room Officer)

Entered By: Rayne, Sandra  (Booking/Receiving Room Officer)

D00005

| Incident# |
|-----------|
| 3009895 |

**HRYCI Howard R.Young Correctional Institution**
**1301 E. 12th Street**
**WILMINGTON DE. 19809**
**Phone#: 302-429-7700**

Date: 11/15/2004

# INCIDENT REPORT

| Dup#: N/A | Type: Inmate Involved | Incident Date: 11/14/2004 | Time: 11:35 | Confidential: No |
|-----------|----------------------|---------------------------|-------------|------------------|

## Approval Information

☐ Approved   ☐ Disapproved   Date:          Approved by:

Comments: N/A

D00006

**Downey Ann (DOC)**

| | |
|---|---|
| **From:** | Phelps Perry (DOC) |
| **Sent:** | Monday, November 15, 2004 11:04 AM |
| **To:** | Howard Paul (DOC) |
| **Cc:** | Williams Raphael (DOC); Downey Ann (DOC); Mann Sue (DOC) |
| **Subject:** | I/M Christopher Barkes #00361999 |

Chief,
    The official time of death is 1242 hours 11/14/2004. I/M Barkes was seen upon his arrival on 11/13/04 @ 1500 hours.
    During the standard intake screening, he was asked had he ever attempted suicide and he said yes, which was the (2003) incident not (2001) which I had previously relayed to you. He also stated that he was taking several mental health medications, which an order was written and he received on Saturday night. He did not receive any on Sunday, simply because the medical cart had not arrived in his area yet.
    The issue with the intake mental health screening goes like this, there are 17 questions on the suicide prevention screening form. at the bottom of the form reads like this: Actions, if total checks in Column A are 8 or more, notify Provider on call.
    The score only totaled up to 2, the two yes answers were patient has psychiatric history and has previous suicide attempt. (overdose 2003). Therefore, the threshold of eight or more yes answers were not met. I have included a copy of the Mental Health Screening form for your review.
    Should you have any questions or comments please feel free to contact me at 429-7746.

**Mortality Review**

| Date | Time | Chronological Review of Relevant Events **** |
|------|------|----------------------------------------------|
| 11/14/04 | | Code 7 called to booking & receiving. Inmate was found by medical staff with a sheet tied around his neck, lying next to the toilet. No pulse or respirations were found. Inmate placed on back on floor and CPR was started. 911 was called. |
| | | AED paddles were applied. AED advised "no Shock advised" 4 times. |
| | | CPR continued until EMT's arrived and took over. |
| | | Inmate was tracched by the EMT's and transported via ambulance to Christiana Hospital. |

****

Relevant events include:    Nurse Sick Call    Physician Visit    Chronic Care Visit    Suicide Attempt

Emergency visit to:    Medical Unit / Hospital    Emergency Department / Surgery    Crisis Intervention Center

| INMATE LAST NAME | FIRST | MI | INMATE NUMBER | |
|------------------|-------|-----|---------------|---|
| Barkes | Christopher | | 00361999 | D00013 |



**DELAWARE HEALTH
AND SOCIAL SERVICES**

OFFICE OF CHIEF MEDICAL EXAMINER
FORENSIC SCIENCES LABORATORY

Richard T. Callery, M.D., F.C.A.P.
Chief Medical Examiner
Director, Forensic Sciences Laboratory

# Toxicology Report

Name   CHRISTOPHER BARKES

Rec'd in Lab by   Jessica Jennings

Medical Examiner   Jennie Vershvovsky, MD

Case No.  N 04-1892

Date   11/15/2004

Tox No.  04-0668

Time   12:57

## OCME Screens

| Procedure | Specimen | Compound | Result |
|---|---|---|---|
| Postmortem Drug Screen 1 By EIA | Heart Blood | | None Detected |

* Enzyme Immunoassay (EIA) provides only a preliminary analytical result that is contingent upon a confirmatory test.

## OCME Confirmations

| Procedure | Specimen | Compound | Result |
|---|---|---|---|
| Alcohol Analysis By GCFID | Heart Blood | | None Detected |

_____
Certifying Toxicologist

12/3/04
_____
Date

D00026

12/2/2004



Page 1 of 1

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 1 OF 4 |
| EFFECTIVE DATE: JANUARY 1, 2001 | OPR: HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

I.  **POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offenders who may be a suicide risk during intake processing and/or the identification and supervision of suicide-prone offenders during their incarceration. The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

II.  **SCOPE:** This procedure shall apply to all Howard R Young Correctional Institution personnel.

III.  **PROCEDURE:**

A.  Recognizing suicide potential during the admissions/classification process

1.  Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

a.  Severe alcohol/drug dependence

b.  Psychiatric potential suffering from impaired judgment or history of mental illness.

c.  Chronic physical problems

2.  Classification interview - Classification Specialists shall consider offenders a suicide risk if they possess the above risk factors and state that they:

a.  Have a history of recent or recurrent suicide attempts.

b.  Have seriously contemplated suicide in the past or present.

c.  Have extreme depression or impulsiveness, including feelings of hopelessness that appear to be chronic.

d.  Have been admitted to a mental hospital or crisis center for attempted suicide.

B.  Post admission indicators of suicide potential

1.  Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

2.  During a suicidal crisis, most persons will display either some or all of the following signs of depression:

000514

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

    a.  Sadness or crying

    b.  Withdrawal or silence

    c.  Loss or gain of appetite marked by noticeable weight gain or loss

    d.  Insomnia

    e.  Mood variation (in many cases, extreme and unexplained)

    f.  Lethargy (slowing of physical movements such as walking and talking)

    g.  Changes in behavior such as giving away personal possessions, planning a funeral, putting affairs in order, etc.

3.  Additionally, many offenders may give a housing unit officer verbal cues that indicate a suicide crisis is impending, such as:

    a.  Projecting feelings of hopelessness and helplessness

    b.  Speaking about getting out of jail unrealistically

    c.  Not effectively dealing with the present and being preoccupied with the past

    d.  Explaining intentions to commit suicide

    e.  Increasing difficulty relating to others

    f.  Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a Correctional Officer)

4.  Offenders who should be observed closely for possible suicidal tendencies are:

    a.  Older offenders

    b.  Chronically or terminally ill offenders

    c.  Offenders recuperating from major surgery

    d.  Anyone subjected to homosexual assault

    e.  Incarcerated law enforcement officers

    f.  Incarcerated professionals

000515

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

g. Persons who have committed a crime of passion

5. If a Correctional Officer has reason to believe that an offender fits any of the aforementioned profiles:

   a. Immediately implement crisis intervention techniques

   b. Notify the Shift or Housing Unit Supervisor

   c. Document all information on an incident report and forward to security and medical personnel

C. Crisis Intervention Techniques

1. When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

   a. Do not judge the offender

   b. Talk, listen, discuss, keep lines of communication open, and be supportive

   c. Ask pertinent questions; be direct

   d. Do not give personal advice or be untruthful

   e. Do not dare the offender

   f. Do not act shocked or alarmed

   g. Refer for professional help

2. The following are guidelines to assist in a suicide crisis:

   a. Recognize the clues - hopelessness, helplessness, haplessness

   b. Trust your judgment - you have observed offenders and can recognize changes in behavior

   c. Listen and be supportive

   d. Attempt to diffuse the tension and agitation: inject a feeling of hope, but do not lie to the offender

000516

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

   e.  Tell others – notify medical and supervisory staff

   f.  Document all pertinent information in an Incident Report

D.  Suicide Risk Assessment – The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

   1.  High Risk – Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

   2.  Moderate Risk – Exhibits suicidal behavior and/or will not make a "no suicide" contract.

   3.  Low Risk – May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

E.  Housing assignment for suicidal offenders

   1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation (eye contact) process. This is to be documented on the close observation form.

   2.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

   3.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.

REVISED: MAY 1, 2005

000517



# LESSON PLAN COVER SHEET

Course Title:    Correctional Officer Training

Lesson Plan:    Mental Health Overview

Instructor(s):    D. Carroll  Mental Health Clinician

Prepared by:    Dianne Candek RN FCM Nurse Educator

| | |
|---|---|
| Suggested Day:  September 18, 2002<br><br>Allowed time:  Two hours | Target Population:  Delaware CO Cadets<br><br>Number of participants: 35 |

| | |
|---|---|
| **Performance Objectives:**<br>1. CO's will understand the categories of mental illness.<br>2. CO's will have a basic understanding of signs of mental illness.<br>3. CO's will be able to recognize signs of potential suicide.<br>4. CO's will be able to appropriately notify mental health staff of potential mental health problems. | **Evaluation Procedure:**<br>1. Questions and answers.<br>2. Written Test |

**Presentation Guide:**

1. Introduction:
   a. Discussion of some of the more common mental illnesses that may occur in the inmate population.
   b. Categorizing disorders.
      - Can lead to stigma or bias
      - We should not add to the stigma of mental illness

2. Categories of mental illness
   a. Schizophrenic Disorder:
      - Is a cluster of similar illnesses
      - One of the most devastating illnesses known to man
      - Caused by problems in the chemistry of the brain
      - Characterized by two types of symptoms
         o Positive
         o Negative
      - May show a marked decrease in responsiveness to the environment
      - Difficulties in decision making, feeling or showing interest
      - Difficulty socializing

D00465

- What CO staff can do
  - Refer to Mental Health Staff for evaluation
  - Encourage medication compliance
  - Keep your frustration level low with these patients
  - Decrease stimulation in their environment

b. Major depressions:
  - Typically characterized by either depressed mood or the loss of interest or pleasure in nearly all activities for a period of at least two weeks.
  - Reduced appetite.
  - Insomnia.
  - Inability to sit still, pacing or hand-wringing.
  - Decreased energy.
  - Unrealistic feelings of worthlessness.
  - What the CO can do:
    - Refer inmate to the Mental Health staff.
    - Encourage medication compliance.
    - Assess frequently for suicide intent.

c. Bipolar Disorder
  - Also known as Manic Depressive Disorder
  - Characterized by wide mood swings from manic to depressed.
  - Elevated mood is generally euphoric.
  - Inflated self esteem
  - Decreased need for sleep
  - Increase in goal directed activity
  - Thoughts may race
  - What the CO can do:
    - Refer the inmate to the Mental Health staff.
    - Encourage medication compliance.
    - Be aware that manic cycles develop rapidly.

d. Anxiety Disorders
  - Characterized by anxiety, nervousness, worry.
  - Panic attack
    - Sudden onset of intense discomfort, apprehension, terror, often associated with a sense of impending doom. May include the following symptoms:
      - Increased heart rate
      - Sweating
      - Trembling
      - Chest pain
      - Dizziness, lightheadedness
      - Feelings of unreality
  - Generalized anxiety
    - Will feel excessive anxiety and worry for a prolonged period of time, usually greater than six months, about a number of events or activities.
    - Symptoms may include:
      - Restlessness
      - Easily fatigued
      - Difficulty concentrating
      - Sleep disturbance
  - What CO staff can do:
    - Refer inmate to Mental Health staff
    - Encourage medication compliance
    - Be aware that these people are at risk for becoming abusive of, or addicted to their medications.

2

e. Antisocial Personality Disorder
- A pattern or disregard for, and violation of, the wishes, rights and feelings of others.
- These persons fail to conform to social norms with respect to lawful behavior and frequently are deceitful and manipulative.
- These individuals tend to be irresponsible in all facets of life, such as work, finances, and family.
- They show little remorse.
- These individuals may appear to be very charming and appear verbal and bright but lack guilt, empathy or sorrow.
- What the CO can do:
  - Set very firm structure and relationships with these individuals.
  - Take extra time to investigate stories and requests.
  - Closely monitor requests for extra medications.
  - Frequently assess for the presence of substance abuse.
  - Provide structure, but do it respectfully.

f. Borderline Personality Disorder
- These individuals have extreme difficulty maintaining stability in several areas of their lives.
- They have difficulty knowing who they are, what they value, what they like and what they want to do.
- They may rapidly shift moods within a few hours.
- They may have difficulty controlling their anger.
- They may frequently threaten suicide.
- What the CO staff can do:
  - Be as consistent with these individuals as possible.
  - Remain focused with these individuals.
  - Respond to crisis as calmly as possible.

g. Mental Retardation
- Significant sub-average intelligence accompanied by limitations in adaptive functioning.
- They have difficulty in meeting their own day to day living needs.
- These individuals are diagnosed by a standardized intelligence test.
- An important point to remember is someone may not score well on a test of intelligence due to a lack of education or a different cultural background and this does not necessarily mean they are retarded.

3. Suicide Prevention
   a. Some of the important issues to become familiar with:
   - Most people who commit suicide have made either direct or indirect statements indicating their suicidal intentions.
   - Most suicidal acts represent a carefully thought out strategy.
   - Most suicidal people are not intent on dying. Part of them wants to remain alive and part of them wants not to die, but for the pain to end.
   - You can not make someone suicidal. Asking a despairing person about suicide shows them that you are interested and you care about them.
   - Statistics show that suicides in custodial settings occur several times (2x to 16x) more often than in the community. Suicide is the number one cause of death in adult detention facilities.
   b. High risk suicide periods in correctional settings:
   - The first 24 hours of confinement
   - Waiting for trial
   - Sentencing
   - Impending release
   - Holidays
   - Decreased staff supervision

3

c. Potential predisposing factors:
- o Recent excessive drinking/use of drugs
- o Recent loss of stabilizing resources
- o Severe guilt or shame over the offense
- o Same sex rape or threat of it
- o Poor health or terminal illness
- o Mental illness

d. Emotional and behavioral warning signs:
- o Depression
  - ▪ Overwhelming pain, hopelessness, helplessness, social isolation, loss of interest in activities previously enjoyed
- o Suicidal behavior
  - ▪ Verbal or written statement of suicidal intention
  - ▪ Previous suicide attempt
  - ▪ Self inflicted injuries
  - ▪ Saying good-bye or making statements such as, "You won't have to worry about me anymore" or "I want to go to sleep and never wake up".

e. What CO staff can do:
- o Listen: Give the person an opportunity to unburden their troubles and ventilate their feelings
- o Give them relief from being alone with their pain. Let them know that you are glad they turned to you
- o Avoid arguments and advice giving
- o **REFER IMMEDIATELY TO MEDICAL/MENTAL HEALTH.**
- o If the person is unable/unwilling to keep themselves safe, they will be placed on a suicide watch.

f. Suicide Watch
- • These inmates are moved to the medical unit or mental health unit.
- • They are placed usually in paper gowns, with a canvas suicide blanket and watched constantly or more often, every 15 minutes.
- • All means to help them hurt themselves are removed.
- • Only finger foods and Styrofoam containers are allowed.
- • As their condition improves, their level of suicide watch is gradually made less restrictive.

4

D00468

© FCM                              Corrections Staff Training

# OVERVIEW OF SERIOUS MENTAL ILLNESS

## INTRODUCTION

We're meeting today to talk about some of the more common major mental illnesses that you might see working with the inmate population everyday. The main tool used for identifying/classifying these disorders is the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM IV). The DSM IV loosely defines a mental disorder as "a clinically significant behavioral or psychological syndrome or pattern that occurs in a person and that is associated with distress ( a painful syndrome) or disability (impairment in one or more areas of functioning)  or with a significantly increased risk of suffering death, pain, disability or an important loss of freedom." What this means is that someone's psychiatric disorder is causing significant loss of functioning in everyday life, sometimes to the extent that it is putting someone's well-being in danger. Many of the characteristics of the disorders we will talk about today do happen to people everywhere, everyday - just not at the frequency or intensity which makes them a mental illness. We have all felt depressed, anxious, thought we heard a knock at the door, thought someone was talking about us, driven for a period of time without realizing how we got there, etc. Recognizing this can help you to be more empathic in your work - recognizing that we are more alike than we are different.

Each person we encounter brings with them a cultural background which has an effect on their life and the expression of their symptoms. Some symptoms are described or expressed differently in different cultures. Additionally, many behaviors or beliefs which may be considered abnormal by the dominant culture, are within the normal range of beliefs or behaviors of an individual's culture. Examples? It is always important to be sensitive to what a behavior or belief means to an individual in reference to their cultural background.

Categorizing disorders does not mean categorizing people. Categorizing people can lead to stigma, or bias against an individual because of characteristics attributed to them. People with mental illness are one of the most stigmatized groups in the world. The stigma affects their feelings about themselves, their hopefulness about whether or not they can recover, and their ability to form relationships with others. It is important, when working with inmates with major psychiatric disorders, to do so in such a way that we do not add to the stigmatization. Be careful of the language you use. Instead of calling them a schizophrenic, or depressive, or borderline, or worse, crazy, nuts, etc., we might better refer to them as a person - a person with a disorder or disability. Also remember that there is no assumption that all individuals described as having the same mental disorder are alike in all important ways. People are individuals. Their individual traits and histories will define their needs as much as their individual illness. Take time to get to know the

D00469

person. If you remain focused on individuality, it becomes hard to generalize or stigmatize.

## CATEGORIES OF MENTAL DISORDERS

The DSM IV divides mental disorders into several categories, which are further divided onto different axes or dimensions. On Axis I, we find the major psychiatric diagnosis. These are acute episodes of illness, which are typically treatable with medication, psychotherapy, or some combination of the two. This would include things like Schizophrenic Disorder, Depressive Disorder, Bipolar Disorder, and Anxiety Disorders. Substance abuse or dependence is also recorded on Axis I. Axis II records Personality Disorders, such as Antisocial Personality Disorder and Borderline Personality Disorder (two of the more common you might see in the inmate population). These are enduring, habitual ways of perceiving, thinking about, and relating to the world and ourselves. These conditions tend to be more difficult to manage clinically. Also included on Axis II is Mental Retardation.

### Axis I Disorders

**Schizophrenic Disorder**: Probably not a single illness, but a cluster of similar illnesses, each with its own course and prognosis. One of the most devastating illnesses known to man, because it affects so many areas of a person's life and can create tremendous disability. Also one of the illnesses least understood by the general public, causing great fear and stigma. Schizophrenic Disorder is caused by problems in the chemistry of the brain. Medications that people are on directly affect the production of these chemicals in the brain. There is evidence that there is a strong genetic component to the development of this disorder, however non-genetic factors also play a role. Schizophrenic Disorder typically first strikes an individual during the late adolescent or early adulthood years. Because this is such an important age period for our development, Schizophrenic Disorder may create disabilities in the development of many adult activities. Once thought to be part of the illness, these deficits are now understood to be the result of the illness interrupting appropriate development during this stage. Therefore, we can assist people with Schizophrenic Disorder to overcome some of the difficulties of their illness.

Schizophrenic Disorder is characterized by two types of symptoms which are called positive and negative symptoms. Positive symptoms are not "good" symptoms. They are active, present signs of disruption in the thinking and sensory processes of the brain. They represent an excess or distortion of normal functioning. Negative symptoms appear to be a lessening or loss of normal functions. It is important to realize that this is a highly individual illness, and people will have varying manifestations. Some people may have only one or two symptoms and very mild disturbances in everyday functioning, while other people may have problems in many areas. That is why it is important to consider each individual's disabilities, as well as assets, so that we might help them to build upon and maximize their intact areas of functioning.

D00470

of auditory hallucinations, you should always refer the person to a physician to rule out a medical cause.

**Affect:** A person experiencing Schizophrenic Disorder may display a flat, immobile, unresponsive facial expression, with poor eye contact, monotone speech, and reduced body language ("affective flattening"). Although a person with affective flattening may smile and warm up occasionally, their range of emotional expressiveness is clearly diminished most of the time. Other times, the person may laugh, cry, or have outbursts of anger, apparently unrelated to what is happening ("inappropriate affect").

**Movement and Activity:** With Schizophrenic Disorder may come a disturbance in a person's ability to move normally. People may show a marked decrease in responsiveness to the environment, which can reach the point of total unawareness, and may be slowed down, sometimes to the point of immobility ("catatonia"). There may be posturing, odd movements, gesturing, grimacing, or purposeless and unstimulated excessive motor activity. Important to be aware that movement problems may be related to medication side effects. Disorganized behavior may lead to problems in any type of goal directed behavior, so that people may have difficulties performing activities of daily living, such as maintaining hygiene. They may appear disheveled or unusual. They may have difficulties initiating or self-directing activity, making decisions, or feeling/showing interest. This can frequently be frustrating for staff. It is important to remember that this is a symptom of the illness, not a deliberate attempt to be frustrating. People with Schizophrenic Disorder are coping with a number of difficult things, and often have difficulty socializing. Withdrawal and detachment are common interactional styles. Conversely, they sometimes can be intrusive and fail to recognize limits of personal space.

## WHAT STAFF CAN DO:

1. If you recognize these signs of Schizophrenic Disorder, refer inmate to mental health for evaluation.
2. Encourage medication compliance.
3. Schizophrenic Disorder is expressed through difficulties processing information. Be clear and concrete in what you are saying to people. Check to insure that you that you have heard them correctly, and that you have been heard correctly.
4. Be respectful. Being simple and concrete does not mean talking to people as though they are children or are unable to understand, rather, it is giving information in a way that it is easily absorbed.
5. Keep your emotion and frustration level low. Do not respond to people with high levels of emotion. Allow yourself enough time to interact with people without rushing them.
6. Meet the person where they are. Do not insist that they adopt your version of reality.
7. Decrease stimulation in the immediate environment.
8. Schizophrenic Disorder and its symptoms can be very frightening to the person experiencing it. Provide support and security when someone is experiencing

D00471

© FCM Corrections Staff Training

Areas of functioning which may be affected by Schizophrenic disorder include:

**Thinking:** Inference of disordered thinking is usually based primarily on the individual's speech. Disorganized thinking may manifest in a variety of ways. Speech may shift from one topic to another without any apparent awareness that the ideas are unrelated ("derailment," "looseness of associations"), or disturbance might occur within a clause, so that words or phrases are joined together without logical connection ("incoherence," "word salad"). Answers to questions may be only slightly, or not at all related ("tangentiality"). People may be speaking a normal amount, but giving very little information because they are so vague ("poverty of thought"), or may be unable to communicate or find an idea at all ("thought blocking"). Additionally, people may go over and over the same information, unable to move from a subject ("perseveration"), or may use non-words to convey meaning ("neologisms").

Disturbances in thinking may also involve delusions, which are false, fixed beliefs. These are erroneous beliefs that most people in a person's culture would regard as totally implausible. The content of these delusions may include any of a variety of themes. People may believe that they are being conspired against, tormented, attacked, harassed, cheated, followed, tricked, spied on, or subject to ridicule ("persecutory," "paranoid"). Other times, people may believe that certain gestures, comments, passages from books, newspapers, song lyrics, movies, television programs, or other environmental cues are specifically directed at them ("reference"). Other common delusions seen with Schizophrenic Disorder are the belief that your body or actions are being acted on or manipulated by some outside force ("control"), that outside thoughts have been put into your mind ("thought insertion"), that your thoughts have been taken away by some outside force ("thought withdrawal"), or the belief that one's thoughts are being broadcast out loud so that they can be perceived by others ("thought broadcasting"). Less common are thoughts of inflated power, worth, knowledge, identity or special relationship to a deity or famous person ("grandiose"), or thoughts pertaining to the appearance or functioning of the body ("somatic").

**Perception:** People with Schizophrenic Disorder may have difficulty accurately perceiving reality, including experiencing various types of hallucinations - a false sensory experience. Hallucinations may occur in any sensory modality (auditory, visual, olfactory, gustatory, tactile), but auditory hallucinations are by far the most common and characteristic of Schizophrenic Disorder. Auditory hallucinations are usually experienced as voices, whether familiar or unfamiliar, which the person perceives as distinct from their own thoughts, and which the person hears as coming from outside their head. The content might be quite variable, although threatening or pejorative voices are quite common. Often these voices speak directly to the person and comment on their behavior. The voices may command the person, which may create danger for the person or for others. When hallucinations occur in other sensory modalities, especially in the absence

D00472

© FCM                Corrections Staff Training

frightening symptoms. Help someone to feel safe by using a soft voice, a non-threatening posture, and slow hand gestures. Let the person know what you are doing and why you are doing it. Reassure them. Do not use this as a time to argue with someone about what they are perceiving to be real.

9. Get to know the person behind the illness. Remember, Schizophrenic Disorder occurs in a pattern of exacerbation and remission. Hardly anyone is ill all the time. Recognize when people are doing well. Build on a person's strengths and areas of wellness.

**Major Depression**: While you might expect someone in a correctional setting to experience some depression as a normal response to their circumstance, sometimes these feelings become so intense or prolonged as to cause a major disruption in a person's day to day functioning. A Major Depressive Episode is typically characterized by either depressed mood or the loss of interest or pleasure in nearly all activities for a period of at least two weeks. These feelings occur for most of the day, nearly every day. The mood is often described as depressed, sad, hopeless, or discouraged. Some individuals emphasize somatic complaints, such as body aches or pains, while many report or exhibit increased irritability. Loss of interest or pleasure is almost always present to some degree, with the person reporting not caring anymore or not feeling any enjoyment in activities that were previously considered pleasurable. In addition, the person must experience at least four additional symptoms drawn from a list that includes:

**Appetite**: Usually reduced, with many individuals having to force themselves to eat. Others may report increased appetite, and may have specific cravings. Severe appetite changes in either direction may result in significant loss or gain in weight.

**Sleep**: Most common sleep disturbance is insomnia. Individuals typically wake too early and are unable to fall back asleep, or wake in the middle of the night, with difficulty returning to sleep. Difficulty falling asleep initially may also occur. Less frequently, individuals oversleep, with prolonged nighttime sleep or increased daytime sleep.

**Movement and Activity**: Motor changes may include the inability to sit still, pacing, or hand-wringing ("Psychomotor agitation"), or slowed body movements, speech, and thinking ("Psychomotor retardation"). Agitation or retardation must be severe enough to be observed by others, not simply subjective feelings of the individual.

**Energy**: Decreased energy, tiredness, and fatigue are common. Even the smallest tasks may require substantial effort. Individual may complain of exhaustion without physical exertion. Efficiency of task accomplishment may be reduced.

**Sense of Self**: Unrealistic feelings of inadequacy, worthlessness, self-blame, or guilt. The person may often look to cues in their environment to confirm these bad feelings about themselves. May misinterpret neutral or trivial events as evidence of personal defects, or have exaggerated sense of personal responsibility for events.

D00473

**Thinking:** Many individuals report impaired ability to think, with poor concentration and attention, and indecisiveness. They may appear easily distracted or complain of memory difficulties.

**Suicide:** May have recurrent thoughts of death, believing that life is not worth living or that others would be better off without them. This may lead to suicidal thoughts or attempts.

Additionally, with severe depression, individuals may suffer from delusions or hallucinations. These are typically Mood Congruent, and could include the believe that you are evil or responsible for world tragedies, or that your body is rotting. Hallucinations are typically voices which harass the individual with accusations of personal failings, or encouraging suicide.

WHAT STAFF CAN DO:

1. If you recognize these signs of Major Depressive Disorder, refer inmate to Mental Health for evaluation.
2. Encourage medication compliance.
3. Remember that symptoms are part of an illness over which person has little control. This is not a sign of weakness or lack of character. Patience, respect, and care go a long way toward helping someone with a Major Depression.
4. Do not argue with self-perceptions, which may be a symptom of the disorder. It is more useful to help person develop some positive coping skills.
5. Assess frequently for suicidal ideation or intent.

**Bipolar Disorder:** Also know as Manic-Depressive Disorder, as it is characterized by wide swings of mood from manic to depressed. A manic episode is characterized by a distinct period where there is an abnormally and persistently elevated, expansive mood. The elevated mood may be described as euphoric, unusually good, or high. In addition, the mood disturbance must be accompanied by at least three additional symptoms from a list that includes:

**Sense of Self:** Inflated self-esteem is typically present, ranging from uncritical self-confidence to marked grandiosity, which may reach delusional proportions. Individuals may give advice on matters about which they have no special personal knowledge, or may embark on a task for which they have no particular experience or talent. Grandiose delusions are common, such as having a special relationship with God or some important figure, or being God or some important figure.

**Sleep:** Almost invariably, there is a decreased need for sleep, with people going for up to days without sleep, and yet not feeling tired. Feel full of energy.

**Movement and Activity:** Increase in goal directed activity. Often involves excessive planning of, and participation in multiple activities. May take on multiple new ventures,

D00474

© FCM                    Corrections Staff Training

increase sociability, and imprudently become involved in pleasurable activities with no regard for possible consequences. This might include recklessness, buying sprees, sexual indiscretions, etc. Speech is pressured, loud, rapid, and difficult to interrupt. May be a nearly continuous flow of accelerated speech, with abrupt changes from one topic to another. This is because...

**Thinking:** Thoughts may race, often at a faster rate than can be articulated. There may be a reduced ability to differentiate between thoughts that are relevant to the topic from those that may not be. There is an inability to screen out external stimulation, so the individual may be distractible.

People with mania often do not recognize that they are ill, and resist efforts to intervene. They may rapidly shift to anger, irritability, or depression, especially when they are thwarted. They may make suicidal threats or gestures.

WHAT STAFF CAN DO:

1. If you recognize these signs of Bipolar Disorder, refer inmate to Mental Health for evaluation.
2. Encourage medication compliance.
3. Be aware that manic cycles usually develop rapidly. Early intervention in the cycle may prevent full blown mania.

**Anxiety Disorders:** Anxiety Disorders are characterized, not surprisingly, by anxiety, nervousness, worry. These are the symptoms most common in the general population, and for which the most psychiatric prescriptions are written each year. It is also not surprising that such symptoms would be common in a correctional setting. Like depression, this might be a normal reaction to the circumstance. However, sometimes the symptoms become so intense or prolonged as to create a serious disruption in a person's day to day functioning, and may require intervention.

A **Panic Attack** is a discrete period in which there is a sudden onset of intense discomfort, apprehension, fearfulness, or terror, often associated with a sense of impending doom. The discomfort may include symptoms, such as:

1. palpitations, pounding heart, or accelerated heart rate
2. sweating
3. trembling or shaking
4. sensations of shortness of breath or smothering
5. feelings of choking
6. chest pain or discomfort
7. nausea or abdominal distress
8. feeling dizzy, unsteady, lightheaded, or faint
9. feelings of unreality (derealization) or being detached from oneself (depersonalization)

D 0 0 4 7 5

© FCM                    Corrections Staff Training

10. fear of losing control or going crazy
11. fear of dying
12. numbness or tingling sensations (paresthesias)
13. chills or hot flushes

**Generalized Anxiety** occurs when a person feels excessive anxiety and worry, more days than not, for a prolonged period of time (greater than six months), about a number of events or activities. The person finds it difficult to control the worry and anxiety, which is associated with three or more of the following symptoms:

1. restlessness or feeling keyed up or on edge
2. being easily fatigued
3. difficulty concentrating or mind going blank
4. irritability
5. muscle tension
6. sleep disturbance (difficulty falling or staying asleep, or restless, unsatisfying sleep)

WHAT STAFF CAN DO:

1. If you recognize these signs of an Anxiety Disorder, refer inmate to Mental Health for evaluation.
2. Encourage medication compliance. Be aware, though, that people with anxiety disorders are at risk for becoming abusive of, or addicted to their medication. It is important to help them monitor medication use.
3. Help person to develop and use additional, non-medication coping strategies for their illness, such as relaxation.

## Axis II Disorders

Each of us has a personality and personality traits. Personality traits are our enduring, or habitual, ways of perceiving, thinking about, and relating to the world and oneself. We tend to be consistent in these patterns through a wide range of situations, but also have some flexibility in our approach to situations, particularly if our usual way is not working. A person is considered to have a personality disorder when their way of interpreting the world and acting in it is inflexible, not adaptive to situations, and causes them significant distress or problems in everyday life functioning. These difficulties are not brief or transitory, but are stable, enduring, and characteristic of the person's long term functioning, across a broad range of personal and social situations.

**Antisocial Personality Disorder** : A pervasive pattern of disregard for, and violation of, the wishes, rights, and feelings of others. People with Antisocial Personality Disorder fail to conform to social norms with respect to lawful behavior, and frequently are deceitful and manipulative in order to gain personal profit or pleasure. They may repeatedly lie, use an alias, con others, or malinger. Decisions may be made on the spur of the moment, with no forethought or consideration of the consequences to self or others. Tend to be

D00476

irritable and aggressive, and may repeatedly get into fights or commit acts of physical assault. These individuals display a reckless disregard for their safety or the safety of others, which may be manifested through such things as speeding, DUI's, substance use, or sexual behavior that has a high risk for harmful consequences. They tend not to have monogamous relationships, or to follow through on their responsibilities to family or children. Individuals with Antisocial Personality Disorder tend to be consistently irresponsible in all facets of life, such as work, finances, and family. They show little if any remorse for the consequences of their acts. May be indifferent to, or provide superficial rationalizations for having hurt, mistreated, or stolen from others ("life's unfair," "they had it coming," "losers deserve to lose"). They may superficially appear quite personally charming, and appear verbal and bright, but lack any empathy, guilt, or sorrow for the consequences they cause others.

## WHAT STAFF CAN DO:

1. Set very firm structure around your interactions and relationships with the person. Be as predictable and consistent as you can.
2. Take extra time to investigate stories and requests.
3. Closely monitor requests for extra medication.
4. Utilize natural consequences.
5. Frequently assess for the presence of substance abuse problems (even here).
6. Take care in placement. Don't place someone who could be victimized with an antisocial cellmate.
7. Provide some of the structure and control which the person is unable to provide for themselves, but do it respectfully, with the intention to assist rather than control.

**Borderline Personality Disorder:** A person is said to have Borderline Personality Disorder when they have pervasive and extreme difficulty maintaining stability in several areas of their lives. They have a sense of impending separation, rejection, or abandonment, or loss of structure, which they make frantic efforts to avoid, and which can lead to profound changes in self-image, mood, thought, and behavior. They have difficulty knowing who they are, what they value, what they like, what they want to do, what kind of person they want a relationship with ("unstable sense of self"). They may move from overvaluing, idealizing a person, wanting to spend a great deal of time together, very quickly to devaluing the person, feeling that the other does not care enough, is not there enough, does not give enough ("unstable sense of others"). They may rapidly shift moods, within a few hours, rarely more than a few days ("unstable sense of emotion"). People with Borderline Personality Disorder tend to impulsively act in ways that can be harmful to them, such as overspending, substance abuse, casual sex, binge eating, or recklessness. They may have great difficulty controlling their anger, which is often intense and out of proportion to the situation causing it. People with Borderline Personality Disorder may experience a sense of boredom or emptiness, and may sometimes feel as though they do not exist at all. They may frequently threaten suicide, make suicidal gestures, or engage in self-mutilation, such as cutting or burning the skin. These behaviors may be manipulative, but also may be their attempt to express anger, or

D00477

© FCM          Corrections Staff Training

to overcome the numbness and emptiness that they feel. People with Borderline Personality Disorder are often difficult and frustrating to work with.

WHAT STAFF CAN DO:

1. Remember, this is a very uncomfortable and painful way to live.
2. Be as consistent as possible. No matter how the person is feeling (likes you/hates you, happy/depressed), you should be the same person - patient, helpful, and calm.
3. Remain focused. Listen to the person's concerns, but try not to get too side-tracked. Remain consistently supportive, without taking sides.
4. Respond to crisis as calmly and predictably as possible.
5. Recognize your role in conflict, and your responses which might exacerbate a situation. People with Borderline Personality Disorder may evoke strong emotional responses from others. It is part of your professional role to engage in self-examination, and to respond professionally, not in anger, or with overstepping professional limits.

Also looked at on Axis II is **Mental Retardation**. The essential feature of Mental Retardation is significantly subaverage intelligence, as measured by a standardized intelligence test, accompanied by significant limitations in adaptive functioning. Adaptive functioning refers to how effectively individuals cope with common life demands, and how well they meet the standards of personal independence expected of someone in their particular age group, cultural background, and community setting. This would include such areas as self-care, communication, social skills, work, safety, self direction, health, etc. The important point to keep in mind here is that there are many reasons why someone may not score well on a test of intelligence, from lack of education to different cultural background. This does not make them Mentally Retarded. In order to be diagnosed, considered Mentally Retarded, you must also not be able to meet your own day to day living needs. This is an important distinction in how we think about people.

D00478

© FCM                                    Corrections Staff Training

# SUICIDE PREVENTION

Suicide may be associated with a wide variety of inmates and situations, so it is important to become familiar with the issues around suicide and suicide prevention.

**MYTH:** People who make suicidal statements/threaten suicide don't commit suicide.
**FACT:** Most people who commit suicide have made either direct or indirect statements indicating their suicidal intentions. More than 75% of all completed suicides did things in the few weeks or months prior to their deaths to indicate to others that they were in deep despair.

**MYTH:** Suicide is an impulsive act in response to an immediate situation/happens suddenly and without warning.
**FACT:** Most suicidal acts represent a carefully thought out strategy for coping with serious personal problems.

**MYTH:** People who attempt suicide have gotten it out of their system and won't attempt it again.
**FACT:** Four out of five persons who kill themselves have made at least one prior attempt.

**MYTH:** If someone is going to kill themselves, there's nothing you can do to stop them.
**FACT:** Most suicidal people are not intent on dying. They are ambivalent about living. Part of them wants to remain alive (the part that is telling you), and part of them wants not to die, but for the pain they are in to end.

**MYTH:** Talking to somebody about suicide may give them the idea/cause them to kill themselves.
**FACT:** People already have the idea. You can not make someone suicidal. Asking a despairing person about suicide shows them that you are interested and care about them, that you take them seriously, and that you are willing to let them share their pain with you.

**MYTH:** Suicide happens less frequently in the structure of a jail/prison setting.
**FACT:** Statistics show that suicides in custodial settings occur several times (2x to 16x) more often than in the community. Suicide is the number one cause of death in adult detention facilities.

D00479

© FCM                    Corrections Staff Training

## HIGH RISK SUICIDE PERIODS IN CORRECTIONAL SETTINGS

1. **The first 24 hours of confinement:** This is the most crucial period, especially the first 3 hours.
2. **Waiting for trial:** Waiting and the unknown can produce great anxiety/stress for many people.
3. **Sentencing:** The day of reckoning. Can be a breaking point for some inmates, including the repeat offender, who knows what kind of life to expect in prison, and can not bear the thought of returning.
4. **Impending release:** This can catch staff off guard, as this is usually considered something to look forward to. For some people, the adjustment back into the community may be difficult ("institutionalized"). The stigma of facing family, friends, or coworkers may feel too great. Severe guilt or shame may outweigh what we would consider the positives of release.
5. **Holidays:** Holidays often mean loved ones gathering together. This can add to the loneliness felt by inmates.
6. **Decreased staff supervision:** Many times, less staff is on duty during weekends, nights, and holidays. Suicide is a private act, and often occurs during these times. Fewer programs and activities also affect the atmosphere of the institution.

## POTENTIAL PREDISPOSING FACTORS

1. **Recent excessive drinking/use of drugs:** Depression may set in when an inmate sobers up. In other cases, some drugs and alcohol can have a depressing effect. In yet other cases, alcohol/drugs can affect judgment and impulse control. All of these cases can influence suicide.
2. **Recent loss of stabilizing resources:** Wife/husband/loved one/parent, job, home, finances, status, self-esteem.
3. **Severe guilt or shame over the offense:** While some inmates involved in serious crimes commit suicide, most who take their own lives in prison are charged with relatively minor offenses. Guilt or shame may be inversely proportionate to the seriousness of the offense. Persons of high status in the community who commit shameful crimes, such as child molestation or sexual assault may need especially close attention.
4. **Same sex rape or threat of it:** Many inmates who were prevented from committing suicide reported, on interview, that they had been raped or leaned on heavily for sexual favors.
5. **Poor health or terminal illness:** While mainly a problem of the elderly, persons of all ages can become depressed when seriously ill.
6. **Mental illness:** While many people who do not suffer from serious mental illness do commit suicide, people who are severely depressed or suffer from delusions/hallucinations, with voices telling them what to do are at high risk for suicide.

D00480

© FCM    Corrections Staff Training

## EMOTIONAL AND BEHAVIORAL WARNING SIGNS

1. **Depression**: Overwhelming pain, hopelessness, helplessness, social isolation, loss of interest in activities previously enjoyed, tearfulness, apathy, and other signs and symptoms of Major Depression. Sometimes, the early stages of recovery from depression can be a high risk period, because people may have the energy to act on their feelings. Depression that seems to quickly disappear for no apparent reason may be cause for concern, as it may suggest that the person has found relief in decision to suicide.

2. **Suicidal behavior**: Verbal or written statement of suicidal ideation or intent. Previous suicide attempts. Self-inflicted injuries, which may be an attempt to manipulate, but could actually be severe enough to cause accidental death. Saying good-bye, or making ambiguous/indirect statements, such as " You won't have to worry about me anymore," or " I'm going away," or "I want to go to sleep and never wake up". Giving away possessions. Development of a suicide plan, especially if there is access to means.

## WHAT STAFF CAN DO

1. Listen. Give the person the opportunity to unburden their troubles and ventilate their feelings. You don't need to say much, and there are no magic words. If a suicidal person turns to you, it is likely that they believe that you are caring. No matter how negative the manner and content of their talk, they are doing a positive thing by turning to you, and they have a positive view of you. If you are concerned, your voice and manner will show it. Give them relief from being alone with their pain. Let them know that you are glad that they turned to you. Patience, sympathy, and acceptance. Avoid arguments and advice giving.

2. Refer immediately to Medical/Mental Health. If the person is unwilling/unable to keep themself safe, they will be placed on a Suicide Watch.

## SUICIDE WATCH

Inmates placed on a suicide watch are moved to a safe area (Medical Isolation or Segregation), where they are placed in paper gowns, usually with a canvas suicide blanket, and watched as much as constantly, but usually every 15 minutes. All other means by which they could hurt themselves are removed, to the extent that they are given only finger foods in Styrofoam containers. As their condition improves with treatment, the level of suicide watch is gradually made less restrictive. They may be given a mattress, some clothing, and regular food trays with utensils. They are watched with less frequency, from every 15 minutes, to every 30 minutes or every hour. Eventually, as the crisis passes, their privileges are completely restored, with a return to their previous housing status.

D00481

## EMOTIONAL AND BEHAVIORAL WARNING SIGNS

1. **Depression**: Overwhelming pain, hopelessness, helplessness, social isolation, loss of interest in activities previously enjoyed, tearfulness, apathy, and other signs and symptoms of Major Depression. Sometimes, the early stages of recovery from depression can be a high risk period, because people may have the energy to act on their feelings. Depression that seems to quickly disappear for no apparent reason may be cause for concern, as it may suggest that the person has found relief in decision to suicide.

2. **Suicidal behavior**: Verbal or written statement of suicidal ideation or intent. Previous suicide attempts. Self-inflicted injuries, which may be an attempt to manipulate, but could actually be severe enough to cause accidental death. Saying good-bye, or making ambiguous/indirect statements, such as " You won't have to worry about me anymore," or " I'm going away," or "I want to go to sleep and never wake up". Giving away possessions. Development of a suicide plan, especially if there is access to means.

## WHAT STAFF CAN DO

1. Listen. Give the person the opportunity to unburden their troubles and ventilate their feelings. You don't need to say much, and there are no magic words. If a suicidal person turns to you, it is likely that they believe that you are caring. No matter how negative the manner and content of their talk, they are doing a positive thing by turning to you, and they have a positive view of you. If you are concerned, your voice and manner will show it. Give them relief from being alone with their pain. Let them know that you are glad that they turned to you. Patience, sympathy, and acceptance. Avoid arguments and advice giving.

2. Refer immediately to Medical/Mental Health. If the person is unwilling/unable to keep themself safe, they will be placed on a Suicide Watch.

## SUICIDE WATCH

Inmates placed on a suicide watch are moved to a safe area (Medical Isolation or Segregation), where they are placed in paper gowns, usually with a canvas suicide blanket, and watched as much as constantly, but usually every 15 minutes. All other means by which they could hurt themselves are removed, to the extent that they are given only finger foods in Styrofoam containers. As their condition improves with treatment, the level of suicide watch is gradually made less restrictive. They may be given a mattress, some clothing, and regular food trays with utensils. They are watched with less frequency, from every 15 minutes, to every 30 minutes or every hour. Eventually, as the crisis passes, their privileges are completely restored, with a return to their previous housing status.

D00482



## SHORTNESS OF BREATH

✓ Can be caused by multiple problems including cardiac, diabetic and pulmonary problems. Should be addressed to the medical staff IMMEDIATELY. This is a potentially life-threatening situation.

✓ If an inmate is known to have respiratory problems and has an inhaler available to him/her, he/she should have immediate access to the inhaler.

## DRUG & ALCOHOL WITHDRAWAL

✓ **Alcohol withdrawal** symptoms include:

Confusion
Nausea
Trembling
Nervousness
Hallucinations
Seizures

**Drug withdrawal** symptoms include:

Nausea and vomiting
Abdominal pain
Profuse sweating
Agitation
Tremors
Seizures

✓ Notify the medical staff IMMEDIATELY if you even suspect someone is beginning to withdraw from alcohol (potentially life threatening) or drugs.

## HANGING ATTEMPT

✓ IMMEDIATELY move the inmate to the floor.
✓ Loosen anything that is around the neck area.
✓ Call for medical assistance
✓ **Begin CPR IMMEDIATELY, if there is no pulse or breathing**



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTIONS**
**EMPLOYEE DEVELOPMENT CENTER**
**245 MCKEE ROAD**
**DOVER, DELAWARE 19904**
**Telephone: (302) 739-5601**
**Fax: (302) 739-5751**

## LESSON PLAN AUTHORIZATION

COURSE TITLE:  CEIT

LESSON PLAN TITLE:  **Hanging Situations (strangulation)**

DATE OF ORIGINAL:  **05/09/90**

PREPARED BY:  Fred Franze/Tony Figario

REVIEWED AND UPDATED BY:  Fred Franze/Tony Figario

DATE:  09/14/06

APPROVALS:

_Kathleen Mickle-Askin_    DATE: _10/2/06_
Training Academy Administrator

_Ronald D Saul_    DATE: _9/25/06_
Training Administrator II

_____  DATE: _____
Training Administrator II

D00484

**A000180**

## DELAWARE DEPARTMENT OF CORRECTION
## EMPLOYEE DEVELOPMENT CENTER
## LESSON PLAN

**COURSE TITLE: CEIT**

**LESSON TITLE: Hanging Situations (strangulation)**

**PREPARED BY: Fred Franze/Tony     DATE: 5/9/90   Revised 9/14/06
Figario**

| TIME FRAME | PARAMETERS |
|---|---|
| Hours:  30 Minutes | Audience: Security and Support personnel working inside secured areas<br><br>Number: As Required<br><br>Space: As Required |

| PERFORMANCE OBJECTIVES | EVALUATION TECHNIQUE |
|---|---|
| 1.  Be able to identify parts of a body affected by hanging.<br><br>2. Be able to do ABC assessment.<br><br>3. Be able to perform basic emergency care for a hanging victim.<br><br>4. | 1. Perform assessment and basic emergency care for a hanging victim.<br><br>2.<br><br>3.<br><br>4. |

D00485

NIC Lesson Plan                                                    Page 2

## INSTRUCTOR MATERIALS

Overheads  DVD of  CPR                 Videotapes:

Slides

Posters                                Reference Documents:

## EQUIPMENT/SUPPLIES NEEDED

Flipchart & stands                 Videotape player

Flipchart Markers
                                   Videocamera

Masking tape
                                   Televisions  X

Slide projector
    (Carousel)                     Videoshow  X

Overhead projector                 Computers  X

Projector screen   X

## STUDENT HANDOUTS

# Needed:                   Title Hanging attempt
As needed

D00486

## METHODS/TECHNIQUES

Illustrated lecture, skill demonstration, skill practice with rescue manikin.

## REFERENCES

The following books and other materials are used as a basis for this lesson plan. The instructor should be familiar with the material in these reference documents to effectively teach this module.

| Title | Author |
|---|---|
| 1. CPR/AED Instructor manual | 1. American Safety & Health Institute |
| 2. | 2. |
| 3. | 3. |

## GENERAL COMMENTS

In preparing to teach this material, the instructor should take into consideration the following comments or suggestions.

D00487

Department of Correction Employee Development Center **LESSON PLAN**

TITLE:  Hanging Situations (Strangulation)

| PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
| **I.    SET**<br><br>This training is mandatory for all security and support personnel working inside secure areas or have access to, or reason to be in secure areas where inmates are housed.<br><br>The purpose is to help prevent fatalities from hangings. If trained personnel are on hand to immediately aid the hanging victim, some if not all fatalities may be prevented.<br><br>**II. INSTRUCTIONAL INPUT**<br>A. In the prison setting is not uncommon for detainees or sentenced offenders to attempt to commit suicide.<br>B. Staff members must be alert for hanging attempts and be able to render appropriate emergency care.<br>C. Staff must be alert for anything in the offender's surroundings that could be used to facilitate a suicide: | |

**A000184**          D 0 0 4 8 8

Department of Correction Employee Development Center **LESSON PLAN**

TITLE:   Hanging Situations (Strangulation)

| PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
| 1. Exposed overhead pipes or other objects that could be used to support the weight of a human body suspended by a bed sheet or rope or other object used in a hanging attempt. | |

D. Action following discovery of an attempted hanging:

1. Support the hanging person by wrapping your arms around the body and lifting the person enough to remove the strain on the neck.

2. Call for help in a voice loud enough to be heard by other staff members in the area.

3. When help arrives, have the staff member call for medical assistance and locate and bring the special tool used to cut through the bed sheet or other material used in the hanging attempt.

4. While waiting for the arrival of the special tool, try to take the victim

Department of Correction Employee Development Center **LESSON PLAN**

| TITLE:   Hanging Situations (Strangulation) | |
|---|---|
| PRESENTATION GUIDE | TRAINER NOTES |

down by any means possible:

   a. Loosen the material from the victim's neck.

   b. Slip the victim's head out of the "noose" if possible.

   c. Remove the material from the point of suspension if possible, then loosen and remove the "noose" from the victim's neck

5. Immediately do an ABC assessment as you were taught in CPR training to determine the condition of the victim.

6. If necessary, perform CPR until medical help arrives.

7. Time is absolutely critical in these situations so action must be immediate.

8. When medical help arrives, try to give them an estimate of how long the victim had been hanging and describe what emergency care you gave.

9. In no instance should the victim be

Department of Correction Employee Development Center **LESSON PLAN**

TITLE:   Hanging Situations (Strangulation)

| PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
| left alone.<br><br>10.    Assume that a spinal injury has occurred and take appropriate precautions as you were taught in the "First Aid Course:<br><br>a. Handle the victim with extreme care being sure to manipulate the spine (particularly the cervical spine) as little as possible.<br><br>b. The victim should be lying supine (flat on his/her back so that CPR may be properly performed if necessary.<br><br>**III. GUIDED PRACTICE** If time and space permit, use the rescue dummy for a practical exercise.<br><br><br>**IV. EVALUATION/CLOSURE**<br>Remember – suicide attempts, particularly hanging attempts, are not at all uncommon. It is the responsibility of correctional staff to be | |

D00491

A000187

Department of Correction Employee Development Center **LESSON PLAN**

TITLE:   Hanging Situations (Strangulation)

| PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
| **Aware of this and know how to handle these situations.** **All security and support personnel should be properly trained in CPR/AED and Basic First Aid. All personnel must be aware of the possibility of a hanging attempt and be willing to provide emergency treatment. Yourprompt action may save a life!** | |

**A000188**

D00492

Department of Correction Employee Development Center **LESSON PLAN**

TITLE:   Hanging Situations (Strangulation)

| PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
|  |  |

D 0 0 4 9 3

**A000189**

# Handouts/Orientation Manual

D00494

# Hanging Attempt

A hanging attempt may affect any or all of the structures in the neck. These include airway, spinal cord, and the major blood vessels, which bring blood to the head. All of this must be considered when caring for the hanging victim.

Actions to Follow a Hanging Attempt

1. Extricate the victim – (Take him down) Protecting the head and neck as much as possible.
2. Have someone call an ambulance now.
3. Give basic First Aid (See Below)

## First Aid

1. Monitor and maintain open airway
   a. Look, listen; feel for breathing if subject is unconscious.
   b. Maintain an open airway; if necessary use the modified jaw thrust technique do not tilt the head back.
      i. Place your fingers behind the angles of the lower jaw.
      ii. Forcibly bring the lower jaw forward.
      iii. Use your thumbs to pull the lower lip down to allow breathing through the mouth as well as the nose.
   c. Give artificial ventilation, if necessary, while continuing maintenance of open airway using jaw lift.
2. If there is no pulse, do chest compressions.
3. Assume a spinal cord injury and handle accordingly.
   a. Place victim flat on floor with head stabilized.
   b. Do not let victim or anyone else lift or twist victim's head.
   c. Give the victim nothing by mouth.
4. Do not leave the victim alone.
5. CPR masks are provided in the first aid kits provided in each institution. Don't hesitate to use them.

**Remember**:

A suicide attempt is a serious matter, regardless of how you feel about the victim's attempt to take his own life. Do not belittle him/her or make sarcastic remarks. If you do this you might aggravate an already bad emotional situation.
A suicidal inmate needs psychological help. If possible get him/her this help right away or as soon as his/her physical condition permits.

D00495



## EMOTIONAL & BEHAVIORAL WARNING SIGNS

**Depression:** Overwhelming pain, hopelessness, helplessness, social isolation, loss of interest in activities previously enjoyed, tearfulness, apathy and other signs and symptoms of Major Depression. Sometimes, the early stages of recovery from depression can be a high risk period because people may have the energy to act on their feelings. Depression that seems to quickly disappear for no apparent reason may be cause for concern, as it may suggest that the person has found relief in the decision for suicide.

**Suicidal Behavior:** Verbal or written statement of suicidal ideation or intent. Previous suicide attempts, Self-inflicted injuries which may be an attempt to manipulate but could actually be severe enough to cause accidental death. Saying good-bye or making ambiguous/indirect statements such as "You won't have to worry about me anymore" or "I'm going away" or "I want to go to sleep and never wake up." Giving away possessions. Development of a suicide plan, especially if there is access to means.

First Correctional Medical Proprietary Information, July 2003
A000192



## JAIL & PRISON SUICIDE RESEARCH*

### Jail Suicide Statistics

- o  There are 400-600 jail suicides (excluding state/federal prisons) per year, and suicide is the leading cause of death in most jails throughout the country.
- o  During the 1980's, the suicide rate in county jails was ~ 107/100,000 inmates (9 times > community rates).
- o  During the 1990's, the suicide rate in county jails dropped dramatically and in 1999 was 54/100,000 (4.5 times > community rates) (BJS, 2001).
- o  75% of suicides are detained on non-violent charges
- o  60% of suicides are intoxicated at the time of confinement
- o  51% of suicides occur within the first 24 hours of confinement and 29% occur within the first 3 hours
- o  67% of suicides are in isolation at the time
- o  50% of suicides occur within 3 days of a court hearing (Marcus & Alcabes, 1993)
- o  94% of suicides are by hanging

### Prison Suicide Statistics

- o  There are nearly 200 prison suicides/year, and suicide is the 3rd leading cause of death in prisons, behind natural causes and AIDS.
- o  In 1999, the suicide rate in state and federal prisons was 15/100,000 inmates (slightly higher than community rates); this reflects a slight drop from 1984-1993.
- o  The majority of prison suicides are by persons with documented histories of mental illness and suicidal behavior.
- o  64% of completions had one attempt during confinement; 56% had > 3 attempts during confinement (Yan-He, 2001).
- o  Most suicides were by persons serving terms of ≥ 10 years but occurred between 6 months to 2 years of confinement.
- o  The majority of suicides occurred in "special housing units," such as disciplinary segregation or protective custody

*Adapted from Hayes, Lindsay M. (2003). "Toward a Better Understanding of Suicide Prevention in Correctional Facilities," ACA Winter Conference, Charlotte, NC.

### Important Factors

- •  High risk of suicide in chronic schizophrenia during periods of acute psychosis
- •  Suicidal impulses in borderline personalities are most common when perceived rejection from a provider leads to intense feelings of anger
- •  It is important to assess the patient's potential for suicidal completion and link the suicidal ideation with other emotional responses rather than to label the patient as "acting out" or "attention seeking" (Marcus, 1996)
- •  Take all suicidal threats seriously – even if you think they are manipulating

2

Instructor: _____    Jun—01    Ceit #128    Time: 6:45AM.

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
|  |  |  |  | Conflict Resolution Creative Conflict — 1 |
| Human Relations Sexual Harassement Cultural Diversity — 4 | Cross Gender — 5 | Report Writing Fundamentals inmate disciplinary sys. Incident / Disciplinary — 6 | Report Writing Practical exercises on filling out reports — 7 | Riot / Gas — 8 |
| Stress SCBA — 11 | Fire School — 12 | Special Meds. — 13 | Legal & Gangs — 14 | Drugs & Aids H. Downes Agent Knotts — 15 |
| DTAC — 18 | DTAC — 19 | DTAC — 20 | DTAC — 21 | QRT — 22 |
| Weapons — 25 | Range — 26 | Range — 27 | Range — 28 | Range — 29 |

D00498

| Category | Jennifer Kelleher 16 | Kenneth Matthews 17 | Michelle Morris – COOK 18 | Ervin Neal 19 | Jamie Nuding COOK 20 | Donald Ovemyer 21 | Michael Reynolds 22 | Monica Riordan COOK 23 | DeShawn Serrano 24 | Timothy Shaw 25 | Shanay Walker 26 | David Wells 27 | Walter Whaley 28 | Cecilia White – COOK 29 | Denise Wieland – COOK 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I.M. & S. | 90 | 92 | 94 | 88 | 90 | 88 | 96 | 94 | 96 | 90 | 92 | 84 | 94 | 90 | 96 |
| Report Writing I | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Report Writing II | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Legal Awareness | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Gangs | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| AIDS | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Drug Awareness | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| I.P.C. | 96 | 92 | 96 | 80 | 88 | 88 | 96 | 96 | 96 | 84 | 96 | 80 | 84 | 80 | 92 |
| Fire Extinguisher | 90 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 90 | 100 |
| S.C.B.A. | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Defensive Tactics | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Q.R.T. | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Use of Force | 100 | 92 | 100 | 92 | 100 | 100 | 100 | 100 | 100 | 96 | 100 | 100 | 100 | 100 | 100 |
| Tear Gas / Capstun | 84 | 88 | 88 | 100 | 88 | 92 | 100 | 100 | 96 | 96 | 92 | 88 | 96 | 88 | 92 |
| Weapons Test | 100 | 70 | 90 | 100 | 90 | 90 | 90 | 90 | 70 | 90 | 90 | 80 | 90 | 90 | 90 |
| Weapons Qual. | P | 70 P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| C.P.R. | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| First Aid | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Special Med. Top. | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| 10-Code | 93 | 100 | 100 | 93 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 96.5 | 93 | 100 | 100 |
| Observation Report | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Red Book | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| S.O.P. Book | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| P.T. Test | 237 | 248 | 147 | 205 | 195 | 122 | 228 | 131 | 136 | 153 | 92 | 132 | 144 | 232 | 226 |
| Overall | | | | | | | | | | | | | | | |

LEX LAPINSKY

NAME

STUDENT ATTENDANCE SHEET    CLASS: Celt #128

X: PRESENT    O: ABSENT    L: LATE    H: HOLIDAY

WEEK 1   WEEK 2   WEEK 3   WEEK 4   WEEK 5   WEEK 6   WEEK 7

Names (partial, as legible):
- Maria Lyons-PARALIG
- Kenneth Matthews
- Rachelle Morris
- Irvin Neal
- Jamie Nuding-Cook
- Ronald Overmyer
- Michael Reynolds
- Monica Riordan-COOK
- eShawn Serrano
- Timothy Shaw
- danay Walker
- David Wells
- Miller Whaley
- Priscilla White
- Louise Wieland
- Tamara Wise
- eek Wynder
- Christopher Yates

A000196

ID000500

**ANNUAL DATA SHEET**

**X: PRESENT    O: ABSENT    L: LATE    H: HOLIDAY**

CLASS: #128

| NAME | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **WEEK 8** | | | | | **WEEK** | | | | | **WEEK** | | | | | **WEEK** | | | | | **WEEK** | | | | | **WEEK** | | | | | **WEEK** | | | | |
| ...ria Lyons-PARALG | ↑ | X | H | X | | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...nneth Matthews | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...helle Morris | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...vin Neal | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ie Nuding-COOK | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ald Overmyer | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...hael Reynolds | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ica Riordan-COOK | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Shawn Serrano | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...othy Shaw | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...may Walker | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...d Wells | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ter Whaley | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...lla White | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...se Wieland | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ra Wise | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...ck Wynder | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ...stopher Yates | X | X | H | X | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |

A000197

000501

**CLASS: OS/OS**

**INSTRUCTORS:** CPL G. Elliott ... M. Brinkley & Ron Smith

**DATE:** 11/18/03

* needs CPR card

## PLEASE PRINT CLEARLY ON EACH BLOCK

## FOR INSTRUCTORS USE ONLY

| Name | | Soc. Security # | Item Race Sex | Position | CPR AED | | | | FIRST AID |
|---|---|---|---|---|---|---|---|---|---|
| Jermaine McReynolds | MtF | | c/o B M | Correctional Officer | P | P | P | P | |
| Daniel Bower | MtF | | c/o W M | Corrections Officer | P | P | P | P | |
| Contrath Victor | MtF | | c/o W M | c/o | P | P | P | P | |
| Davina Bragg | MtF | | c/o B M | Security Team | P | P | P | P | |
| Charles Burrell | MtF | | c/o B M | c/o | P | P | P | P | |
| Jordan L ... K | MtF | | c/o B M | Correctional Officer | P | P | P | P | |
| Shivelle L Griffin | | | c/o B M | corr. officer | P | P | P | P | |
| Michael J. Brand | | | c/o W M | c/o | P | P | P | P | |
| La Toya O Pelican | | | c/o B F | corr. officer | P | P | P | P | |
| Veronica Kinlett | MtF | | c/o B F | Correctional Officer | P | P | P | P | |
| Keoshia Cooper | MtF | | c/o B F | Correctional | P | P | P | P | |
| Reginald D. Young | | | % B M | c/o | P | P | P | P | |
| Darese M. Fields | | | % B F | c/o | P | P | P | P | |
| VanAmzio A Floyd Sr | | | c/o B M | Security Team | P | P | P | P | |

D000511

CLASS: OS/OS     MPCJF     8x4

FA/AED     SP MCJ CPE

INSTRUCTORS: Col. Bobo Cpl Riley

DATE: 11/20/03

* Needs Card

PLEASE PRINT CLEARLY ON EACH BLOCK

FOR INSTRUCTORS USE ONLY

| Name | | | | |
|---|---|---|---|---|
| LEWIS ETONY | HRCC | | | |
| Dushwalter | HRCC | | | |
| Shasmd Henry | HRCC | | | |
| Logan, Robert | Hercc | | | |
| Parker, Philip | Hercc | | | |
| MOY LISA | Hercc | | | |
| Alexander, Stephen | Hercc | | | |
| Robbins, Robert | HERCC | | | |
| VALLE, Hector | HRCC | | | |
| Emil, Brian | Herter | | | |
| Doug Lt Johnson | HERCC | | | |
| Patrick T Smith | Hercc | | | |
| John Amado | HRCC | | | |

Position Block = Cook Maintenance Storekeeper Corpere etc

A000199

D00510

CLASS: OS/OS

INSTRUCTORS: Cpl Williams, Cpl Kifer, Lt Fowler

MPCJF 8x4

DATE: 11-21-03

PLEASE PRINT CLEARLY ON EACH BLOCK

FOR INSTRUCTORS USE ONLY

| Name | | |
|---|---|---|
| Brian Forte | | |
| Gregory Cerisier | | |
| Alan Nasral | | |
| Angelina LaWhite | | |
| Henry Jones Jr. | | |
| Garth Willard | | |
| Rogers Thompkins | | |
| Annette Bradley | | |
| CHAP Kalopner | | |
| Michael Kadow | | |
| Scott Borton | | |
| Michael Miller | | |
| Lillian Gresmer | | |
| Ruffino Perez | | |
| Leigh McComb | | |

000509

CLASS: OS/OS   GH

INSTRUCTORS: LT Fowler  FA   LT Bradley  CPL   MC, AED, SP   Col Elliott

PLEASE PRINT CLEARLY ON EACH BLOCK

DATE: 12/1/03

FOR INSTRUCTORS USE ONLY

| Name | | | | | |
|---|---|---|---|---|---|
| John E Healy | | M W | | P P P P P | P P P P P |
| Stephen Martell | | W M | | P P P P P | P P P P P |
| Robert Ryalee | | M B 96 | | P P P P P | P P P P P |
| Chaezell Pat... | | M B 96 | | P P P P P | P P P P P |
| Joseph Bryant | | M B 96 | K-9 | P P P P P | P P P P P |
| Neal, Charles | | M B 96 | | P P P P P | P P P P P |
| Rayne Sailor | | F B 9x | | P P P P P | P P P P P |
| Kennedy, Howard | | M B SqT | | P P P P P | P P P P P |
| Parnell, Allen | | M B 96 | | P P P P P | P P P P P |

X5(4)
F1 W2
M 9 B8
H 0
A 0
I 0
D 0

Position Block = Cook, Maintenance, StoreKeeper, Complete, etc.

FAXED  12/2/03

A000201

D00508

CLASS: OS/OS   (Boney) (Elliott)

INSTRUCTORS: Cpl Elliott & Boney

DATE: 1-14-04

PLEASE PRINT CLEARLY ON EACH BLOCK

FOR INSTRUCTORS USE ONLY

Position Block = Cook Maintenance, Storekeeper, Corrections etc.

| Print Name | SSN | Rank Race Sex | | KEEP | | | | FIRE SSN |
|---|---|---|---|---|---|---|---|---|
| A. Nutt | | % Pfc W M | | P | P | P | P | 08 09 53 |
| Marcus L. Lazarus | | Pfc H M | | P | P | P | P | 05 38 04 |
| Shade Jesse | | % Bk M | | P | P | P | P | 09 31 41 |
| WHYNE DIAC | | % Bk M | | P | P | P | P | 08 71 26 |
| Greg Farrington | | % Wh M | | P | P | P | P | 09 98 99 |
| Robert L. Spasek | | % Wh M | | P | P | P | P | 09 18 90 |
| C. Thursumodic Nutton | | % Bk M | | P | P | P | P | 08 33 41 |
| Derrick Brooks | | % Bk M | | P | P | P | P | 08 36 58 |
| Richard Harrison | | % Wh M | | P | P | P | P | 13 52 17 |
| Samoor Chandler | | % Wh M | | P | P | P | P | 03 23 37 |
| Richard Cousener | | % Bk M | | P | P | P | P | 10 04 91 |
| Johnny Mitchell | | % W M | | P | P | P | P | 08 42 38 |
| Robertson Charles | | % W M | | P | P | P | P | 08 09 69 |

X5(4)
FØ W4
M14 B9
H1
4Ø
ZØ

N|D|3
10|4

D00505



CLASS: OS/OS

INSTRUCTORS: CPR, AED, MC

PLEASE PRINT CLEARLY ON EACH BLOCK

DATE: 2-4-08  NDB 10/8

FOR INSTRUCTORS USE ONLY

HEYCI - 12x8
FAJAGCAP SP SCBA
PE Elliott
Riker Booz Elliott

Position Block = Cook Maintenance, Storekeeper, Concrete etc.

| Name | | SSN |
|---|---|---|
| ROBERT C. GADDY | | 042937 |
| C. HARMON | | 055633 |
| P. SHERBER | | 013008 |
| P. Destrick | | 077121 |
| Anita Robinson | | 031026 |
| Michelle Ellis | | 042979 |
| Kevin/El Hopkins Sr | | 028675 |
| William Brown | | 041251 |
| Donald Chadwick | | 014370 |
| Clay Caldwell | | 032241 |
| Pamela R. Byles | | 053190 |
| Zachary R. Palmer | | 077152 |
| Gary L. Ferguson | | 080977 |
| Mark J. Bullock | | 011607 |
| SHARON ROBERT | | 050653 |
| SCOTT IVY | | 071253 |
| W. Gu DKomo | | 083615 |

A000203

D00503

CLASS: OS/OS

INSTRUCTORS: ___

PLEASE PRINT CLEARLY ON EACH BLOCK

DATE: 1-15-04

FOR INSTRUCTORS USE ONLY

| Name | Social Security # | Race/Sex | Position | | | | | | FIRE |
|---|---|---|---|---|---|---|---|---|---|
| LYLE BRYANT JR. | ▮ | B M | | P | P | P | P | P | 09 48 67 |
| GARY A. INCE | ▮ | B M | | P | P | P | P | P | 09 99 06 |
| Reggie T. Thomsen | ▮ | B M | | P | P | P | P | P | 10 05 11 |
| Vincent Williams | ▮ | B M | | P | P | P | P | P | 08 10 13 |
| BERNARD SMITH | ▮ | B M | | P | P | P | P | P | 05 52 70 |
| Pearsanton, Anthony | ▮ | B M | | P | P | P | P | P | 08 03 27 |
| Robinson, Brian | ▮ | B M | | P | P | P | P | P | 08 05 77 |
| Joseph, Medford | ▮ | B M | | P | P | P | P | P | 02 78 09 |
| Woodson, Campbell | ▮ | B M | | P | P | P | P | P | 07 12 41 |
| Bradford, Asa | ▮ | W M | | P | P | P | P | P | 07 87 79 |
| Schaffer, Twanika | ▮ | B F | | P | P | P | P | P | 09 34 95 |
| Senato, Kevin | ▮ | W M | | P | P | P | P | P | 04 51 30 |
| Rivera, Edward | ▮ | H M | | P | P | P | P | P | 08 98 24 |
| Tallman, Christopher | ▮ | W M | | P | P | P | P | P | 08 12 83 |
| Alers, Janet | ▮ | W F | | P | P | P | P | P | 07 87 85 |
| Freeds, Mike | ▮ | W M | | P | P | P | P | P | 02 21 52 |
| | ▮ | W M | | P | P | P | P | P | 09 60 05 |

Position Block = Cook, Maintenance, Storekeeper, Corrections, etc.

A000204

D00507

CLASS: OSIOS

INSTRUCTORS: Col Barr Boney Riker

DATE: 1-30-04

PLEASE PRINT CLEARLY ON EACH BLOCK

FOR INSTRUCTORS USE ONLY

| Name | Social Security # | Rank/Pay/Grade/Sex | Position | | | | | | PRE | SCBA | CPR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deborah A. Adams | | E6 W F | | P | P | P | P | 01 | 56 | 13 |
| Sean L. Lewis | | E6 B M | | P | P | P | P | 01 | 18 | 47 |
| John R. Hedrick | | E6 W M | | P | P | P | P | 09 | 99 | 03 |
| William Troy | | E6 B M | | P | P | P | P | 05 | 52 | 34 |
| Derrick Harrelds | | E6 B M | | P | P | P | P | 01 | 44 | 84 |
| Vance L. Johnson | | E6 B M | | P | P | P | P | 09 | 48 | 90 |
| Christopher N. Chappel | | O1 B M | | P | P | P | P | 04 | 29 | 84 |
| Matin Bush | | O1 B M | | P | P | P | P | 08 | 85 | 94 |
| Phoenic Valentini | | O1 B M | | P | P | P | P | 04 | 29 | 84 |
| Richard Puckett | | O1 B M | | P | P | P | P | 05 | 21 | 43 |
| Al Jesus Juarez | | O1 B M | | P | P | P | P | 08 | 09 | 83 |
| Saul Semon | | O1 B M | | P | P | P | P | 09 | 10 | 47 |
| Mike Jennite | | O1 B F | | P | P | P | P | 01 | 41 | 80 |
| Harold Lindsey | | O1 B M | | P | P | P | P | 08 | 71 | 51 |
| | | | | | | | | 09 | 80 | 99 |

Position Block: E = Cook  Maintenance  Storekeeper  Concrete etc.

000506

**CLASS: OSIOS**

**INSTRUCTORS:**

DATE: 2-6-04

PLEASE PRINT CLEARLY ON EACH BLOCK

FOR INSTRUCTORS USE ONLY

Position Block = Cook, Maintenance, Storekeeper, Concrete, etc.

| Name | | | | | |
|---|---|---|---|---|---|
| STOMACK, STEPHEN | clogu M | officeR 094334 | p | p | p |
| Triplett Sr. James L. | Sgt BLK M | officeR 039191 | p | p | p |
| Client, Shawn | % w m | off 080971 | p | p | p |
| HENRY, ChRIS | clo B F | 097249 | p | p | p |
| young, Darshe | % B F | officer | p | p | p |
| PoRteR, RAymond | c/o W M | 9189325 | p | p | p |

A000206

D00504

CLASS: OS/OS

INSTRUCTORS:

PLEASE PRINT CLEARLY ON EACH BLOCK

DATE: 3-1-04 / 3-2-04

FOR INSTRUCTORS USE ONLY

| Name | | | | |
|---|---|---|---|---|
| Shawn D Anthony | | | | |
| Jamoe L. Johnson | | | | |
| Asbury L. Wilkins III | | | | |
| Lakia Harris | | | | |
| Cynthia Daniels | | | | |
| Taji Jasmine Lee | | | | |

NDB

A000207

D00502



D00512

**A000208**

# HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER:  **Capt. Berggrun, Brian R**          DATE:  11/13/04

DAY:  Saturday                    TIME ASSUMED DUTY:          2320hrs

I HAVE BRIEFED MY RELIEF:  YES  XXXX          NO: _____

RELIEVED BY:  Capt. Jefferson, Carol

OFF GOING SHIFT COMMANDER:          Capt. Berggrun

ON COMING SHIFT COMMANDER:          Capt. Jefferson

### BEGINNING EQUIPTMENT COUNT

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| .38 Revolvers | 2 | Shackles | 8 | Cutter | 1 | Gas Mask | | 3 |
| Speed Loaders | 3 | Travel Chains | 9 | Capstun | 1 | S/C Keys | | 22 |
| .38 Rounds | 24 | Hacksaw | 1 | .40 S & W | 7 | Gas Cards | | 19 |
| Holsters | 6 | Crank | 1 | .40 Rounds | 196 | TBC | | 1487+1 |
| Handcuffs | 8 | Sealed Keys | 11 | .40 Magazines | 14 | K9 | Hackett | |
| Black Boxes | 5 | Locks | 5 | | | OSP | Cilento | |

| TIME | COMMENTS |
|---|---|
| 2315 | Capt. Berggrun on duty, rec'd 22 s/c keys, briefing by Capt. Bamford |
| 2338 | (4) New Commitments   TBC=1491+1 |
| 2400 | Code Red |
| 0022 | Code Green   TBC=1491+1 |
| 0036 | (20) E-Crew workers out to clean |
| 0142 | (1) New Commitment   TBC=1492+1 |
| 0155 | (1) Release  Bail Posted   TBC=1491+1 |
| 0258 | Cpl. Oliver on duty for the kitchen |
| 0312 | S/Sgt. Leonard on duty for the kitchen |
| 0340 | (1) In House transfer from 1E-15 to Inf.198 I/M Evans placed on PCO II |
| 0345 | Code Red |
| 0404 | Code Green   TBC=1491+1 |
| 0500 | (4) In House transfer from floor to beds |
| 0645 | Code Red |
| 0709 | Code Green   TBC=1491+1 |
| 0710 | Capt. Berggrun on duty, rec'd 22 s/c keys, briefing by Capt. Bamford |

Jefferson                              Berggrun

D00385

Cpl Bongean
SHIFT COMMANDER
2400-0800

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
11/08/04

DAY Saturday
DATE: 11 / 13 / 04

| # | NAME OFFICERS | DAYS OFF | STAT | A/B | C/D | E/F |
|---|---|---|---|---|---|---|
| 11 | CILENTO, STEVEN  OPS | W/ETH | X | X | OPS | |
| 12 | DAVID, JOHN | W/ETH | X | 2 | E/F | |
| 13 | DEITRICH, PHILLIP | TH/FR | X | | | |
| 14 | DIXON, YVETTE | FR/SA | / | Beam 2 | | |
| 15 | FREDERICKS, GARRY | TH/FR | X | 2 | W | |
| 16 | GAYMON, KIMBRIDGE | MO/TU | X | 2 | P/8 | |
| 17 | GRIFFIN, CHARLES | SA/SU | / | | | |
| 18 | HACKETT, RICHARD | MO/TU | X | K-9 | | |
| 19 | HAGAINS, DERRICK | SU/MO | X | 2 | K-9 | |
| 20 | HARMON, CORNELIUS | MO/TU | X | 2 | 9 | |
| 21 | HARRIS, LAKIA | TH/FR | X | Beam 1 | | |
| 22 | HENRY, LATISHA | W/ETH | X | 1 | 4/6 | |
| 23 | HOPKINS, KEVIN | SA/SU | / | | | |
| 24 | IVY, SCOTT | FR/SA | / | | | |
| 25 | JOHNSON, JAMIE | W/ETH | X | 2 | T | |
| 26 | KETLER, DESHAUN | TU/WE | X | 2 | 6/H | |
| 27 | LEGETTE, JOSEPHINE | TU/WE | X | 2 | | |
| 28 | LEVAN, SEAN | SA/SU | / | | | |
| 29 | PADDY, ROBERT | SU/MO | X | 2 | 9/H | Rover |
| 30 | PLATT, LISA | TU/WE | X | 2 | E/6 | Rover |
| 31 | POOLE, CHARZELL | FR/SA | / | | | |
| 32 | RICHBURG, STEFAN | TH/FR | X | 2 | 6/m | |
| 33 | ROACH, SHARON | SU/MO | X | 1 | E/c | |
| 34 | ROBINSON, ANITA | SU/MO | X | | | |
| 35 | RODRIGUEZ, ZACHARY | TH/FR | X | Donahue 1/2 | Rover | |
| 36 | SAUNDERS, MARK | TU/WE | X | 2 | 9/6 | Rover |
| 37 | SCHRACK, DONALD | MO/TU | | End | | |

A000210

D00386

HOWARD R.YOUNG CORRECTIONAL INSTITUTION

DUTY ROSTER

11/08/04

DAY Saturday

DATE: 11 / 13 / 04

SHIFT COMMANDER

2400-0800

Capt. Bongiorno

| NAME | DAYS OFF | STAT | | | | | | |
|------|----------|------|---|---|---|---|---|---|
| 38 SHORTER, TERRANCE | SU/MO | VAC | | | | | | |
| 39 SMITH, DAREN | SA/SU | / | | | | | | |
| 40 SOUL, JAMAR | SA/SU | / | | | | | | |
| 41 STROMACK, STEPHEN | TH/FR | X | / | V/z Revis | | | | |
| 42 THORNE, VALENTINO | TU/WE | X | B/L | | | | | |
| 43 TROY, WILLIAM | TU/WE | X | 2 -C | | | | | |
| 44 WILKINS, ASBURY | FR/SA | / | | | | | | |
| 45 WILLIAMS, JOSEPH | SU/MO | X | 2 c/b | | | | | |
| 46 WOODARD,GLEN | SA/SU | / | | | | | | |
| 47 YEAGER, KRISTINA | TU/WE | X | 3 R | | | | | |
| 48 YOUNG , DENISHA | WE/TH | X | 3 S | | | | | |
| 49 YOUNG , MINELLE | TH/FR | X | Pu | | | | | |

A000211

D00387

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
10/25/04

DAY: Saturday
DATE: 11/13/04

Cpt. Bergen
SHIFT COMMANDER 2400-0800

12X8 SHIFT VHRS 11/08/04 TO 11/21/04

| # | NAME | DAYS OFF | S A T | B | C | D | E | F | G |
|---|------|----------|-------|---|---|---|---|---|---|
| 1 | AHART, AUSTIN | m/s | X | 1st Post |  |  |  |  |  |
| 2 | WILLIAMS, TONY | s/s | / |  |  |  |  |  |  |
| 3 | HACKETT, ROBERT | F/S | / |  |  |  |  |  |  |
| 4 | HAMMOND, JAMES | w/t | X |  |  |  |  |  |  |
| 5 | LONG, KENNETH | m/s | X | 2 |  |  |  |  |  |
| 6 | GRIFFIN, SHIRELLE | — |  |  |  |  |  |  |  |  |

00388



Capt. Bougan
SHIFT COMMANDER
2400-0800

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04

DAY Saturday
DATE: 11 / 13 / 04

RESPONSE TEAMS
PRIMARY/QRF

T/L
1  Cpl Harriford
2  Ahart
3  Benn
4  Paddy
5  Stromack
6  Saunders

SECONDARY QRT
T/L
1
2
3
4
5
6

FIRE TEAM
T/L  Cpl Harriford
1  Ahart        Hose
2  Rodrigues    SBA
3  Benn         Hose
4  Paddy        SBA
5  Stromack     Hose
6  Saunders     C/C

A000213

D00389

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
OVERTIME DUTY ROSTER

DAY  Saturday
DATE: 11 / 13 / 04

OT DUTY ROSTER

| | OFFICERS LAST NAME | OFFICERS FIRST NAME | SSN # | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Clark | Veron | | 8hrs | Chris 2308 |
| 2 | Covelli | John | | 8hrs | Chris 2308 |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

SS# IS ONLY NECCESSARY IF OFFICER DOES NOT WORK AT THIS INSTITUTION

ATTACH THIS PAGE TO DUTY ROSTER.

D00390

Saturday
12X8 SHIFT

## BUREAU OF PRISONS
## OVERTIME REPORT

BUDGET UNIT# **006**    BUDGET UNIT NAME **HRYCI**

PERIOD WORKED 11/13/04    PAYCYCLE PAID 11/13/04

| REASON FOR OVERTIME | TOTALS |
|---|---|
| ADMINISTRATIVE | |
| AWOL | |
| CALL BACK | |
| CLASSIFICATION | |
| COURT | |
| COMPASSIONATE LEAVE | |
| EXTRA DUTY – INSIDE | |
| EXTRA DUTY – OUTSIDE | |
| FMLA | |
| GYM VACANCY | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | |
| INVENTORY | |
| JURY DUTY | |
| LATE RELIEF | |
| LEAVE WITHOUT PAY | |
| MAILROOM / SUPPLY | |
| MEETING / UNION BUSINESS | |
| MILITARY LEAVE | |
| OUTSIDE HOSPITAL 2 c/o's | 16 |
| REPORTS | |
| SHAKEDOWN | |
| SICK | |
| SUSPENSION | |
| TRAINING | |
| TRANSPORTATION | |
| FUNERAL RUN | |
| INMATE TRANSFER | |
| MEDICAL RUN | |
| TRAVEL TIME | |
| OTHER | |
| UNAUTHORIZED ABSENCE | |
| VACANCY | |
| VACATION | |
| WEAPONS RECLASSIFICATION | |
| WORKMAN'S COMPENSATION | |
| OTHER: FIRE EQUIPTMENT | |
| OTHER: ESCAPE DRILLS | |
| OTHER: EXECUTIONS | |
| OTHER: OUT OF STATE TRANSFERS | |
| OTHER: RECORDS | |
| OTHER: CODE | |
| OTHER: SPECIAL PROJECTS | |
| OTHER: CONSTRUCTION, VEST, GRIEVANCES | |
| OTHER: COMPUTER PROBLEMS | |
| OTHER: WATCH CMDR. | |
| OTHER: | |
| OTHER: | |
| **TOTAL HOURS REPORTED** | 16 |

**A000215**

D00391

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
SHIFT CONTINUATION ROSTER
2400-0800

SATURDAY

DATE: 11 / 13 / 04

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 1 | 1 | | | | | | | |
| STAFF LIEUTENANT | 0 | | | | | | | | |
| LIEUTENANTS | 2 | 2 | | | | | | | |
| SERGEANTS | 0 | 1 | | | | | | | |
| CORPORALS | 5 | 4 | | | | | | | |
| OFFICERS | 36 | 36+2OT | | 2 | | | | | 1 vacancy 1 vacancy |
| K-9 OFFICERS | 1 | 1 | | 1 | | | | | |
| TOTAL | 45 | 45(1) | 0 | 3 | 0 | 0 | 0 | 0 | 2 |

COMMENTS: 2 o.t.'s needed    2 outside Hospital

PREPARED BY: Capt. _____ Bergeron
SHIFT COMMANDER (TITLE AND SIGNATURE)

REVIEWED BY: _____
SECURITY SUPERINTENDENT (SIGN AND DATE)

_____ 11/15/04
DEPUTY WARDEN (SIGN AND DATE)

Page 1

A000216

D00392

# HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER:  __Capt. Carol Jefferson__          DATE:  __11/13/04__

DAY:  __Saturday__          TIME ASSUMED DUTY:  __0715 hrs.__

I HAVE BRIEFED MY RELIEF:   YES   __XXXX__          NO:  _____

RELIEVED BY:  __Capt. David Bamford__

OFF GOING SHIFT COMMANDER:  __Capt. C. Jefferson__

ON COMING SHIFT COMMANDER:  _____

### BEGINNING EQUIPTMENT COUNT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| .38 Revolvers | 2 | Shackles | 8 | Cutter | 1 | Gas Mask | 3 |
| Speed Loaders | 3 | Travel Chains | 9 | Capstun | 1 | S/C Keys | 22 |
| .38 Rounds | 24 | Hacksaw | 1 | .40 S & W | 7 | Gas Cards | 20 |
| Holsters | 6 | Crank | 1 | .40 Rounds | 196 | TBC | 1491+1=1492 |
| Handcuffs | 8 | Sealed Keys | 11 | .40 Magazines | 14 | K9 | J. Lee |
| Black Boxes | 5 | Locks | 5 | | | OSP | Terrell |

| TIME | COMMENTS |
|---|---|
| 0715 | Capt. Jefferson on duty, rec'd 22 s/c keys and briefing from Capt. |
| | Berggrun.  Lt. Queener and Lt. Farmer on duty.  TBC=1491+1osh=1492 |
| | All OSH equipment is accounted for.  No areas locked down. |
| 0716 | (1) New Commitment          TBC=1492+1osh=1493 |
| 0800 | Code Red          TBC=1492+1osh=1493 |
| 0820 | Code Green          TBC=1492+1osh=1493 |
| 0840 | (1) Release- Time served          TBC=1491+1osh=1492 |
| 0845 | Maint. Bray called in to fix S 10 door and primary control panel, |
| | To repair switch F207. |
| 0853 | C/O Rivera  training on doors. |
| 1030 | Maint. Bray  arrives to repair S 10 door and primary control panel. |
| 1135 | Code Red          TBC=1491+1osh=1492 |
| 1207 | Code Green          TBC=1491+1osh=1492 |
| 1350 | C/o McReynolds, T. called off sick for the 4x12 shift. |
| 1404 | C/o C. Lewis called off sick for the4x12 shift, has RTWF. Will return |
| | 11/14/04. |
| 1500 | Capt. Bamford on duty, rec'd 22 s/c keys and briefing from Capt. |

D00393

| TIME | COMMENTS |
|------|----------|
|      | Jefferson. |
| 1500 | Code Red        TBC=1491+1osh=1492 |
| 1506 | C/O S. Miller called off sick for the 4x12 shift. |
| 1527 | Code Green        TBC=1491+1osh=1492 |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |

D00394

MULTI-PURPOSE CRIMINAL JUSTICE FACILITY
DAILY ROSTER

DATE: 11/13/04    DAY: SATURDAY    SHIFT: 12x8

SHIFT COMMANDER: CAPT. BERGGRUN, B ✓

**UNIT 1 & 2**

SHIFT SUPERVISOR:

| | |
|---|---|
| LT: | LT. PEDRICK, A ✓ |
| PRIMARY CONTROL: | CPL. PORTER, R. ✓ |
| PRIMARY CONTROL: | C/O YOUNG, M ✓ |

| L/W: | CPL. HARRIFORD, W |
| B&R: | CPL. CHAPPEL, D ✓ |
| B&R: | C/O Sandlers, M. C/C ✓ |
| B&R: | C/O BULLOCK, M. ✓ |
| B&R: | C/O THORNE, V ✓ |

| EQUIP: | ✓ |
| OPS: | C/O CILENTO, S ✓ |
| K-9: | C/O Hackett, R ✓ |

| 1ST FLR. ROVER: C/O Hack, A HOSE | ✓ |
| 1A/B: | C/O BOSTON, T ✓ |
| 1E/F: | C/O ROACH, S ✓ |

| 1C/D: | C/O Henry, L ✓ |
| INF: | C/O Schrack, D ✓ |

SEC. CNTRL: C/O CAIN, R

| DORM 4: | C/O Hammond, J vhr ✓ |
| DORM 4: | C/O BROWN, W ✓ |

| LT: | LT. KENNEY, A ✓ |
| A/F ROVER: | C/O RODRIGUEZ, Z  SBA ✓ |
| 2 A/B: | C/O GAYMON, K ✓ |
| 2 C/D: | C/O WILLIAMS, J ✓ |
| 2 E/F: | C/O DAVID, J ✓ |

**UNIT 3 & 4**

| L/W: | CPL. DOTSON, B   WAND ✓ |
| 2 G/M ROVER: | C/O HAGAINS, D.   HOSE ✓ |
| 2 G/H: | C/O KETLER, D ✓ |
| 2 J/K: | C/O BUSH, M ✓ |
| 2 L/M: | C/O RICHBURG, S ✓ |

FITNESS CENTER:
C/O: CHRISTIAN HOSP from Virginia ✓
C/O: CHRISTIAN HOSP Rm 2308

① CLARK, VERON
② COVELL, JOHN

| 2 O/T ROVER: | C/O PADDY, R   SBA ✓ |
| 2 Q: | C/O HARMON, C ✓ |
| 2 R: | C/O YEAGER, K ✓ |
| 2 S: | C/O YOUNG, D ✓ |
| 2 T: | C/O JOHNSON, J ✓ |
| DORM 1: | C/O HARRIS, L ✓ |
| GYM: | |

| 2 V/Z ROVER: | C/O STROMACK, S  HOSE ✓ |
| 2V: | C/O Long, K   vha ✓ |
| 2W: | C/O FREDRICKS, G ✓ |
| 2Y: | C/O TROY, W ✓ |
| 2Z: | C/O LEGETTE, J ✓ |
| DORM 2: | C/O DEITRICH, P ✓ |
| GYM: | |

MISC: C/O Platt, Lisa 2E-4 Rover ✓

DORM 1 & 2 ROVER: C/O Robinson, A ✓

| PINA, J. | |
| Adams, D | VAC |

HOL, VAC, SICK, MIL, ETC.
RESIGNED

Shorter, T    VAC.
Townsen, P    VAC

HOL, VAC, SICK, MIL, ETC.

MISC. INFORMATION:
| Williams, T | Sls |
| Hackett, R | Fls |
| Hack, A | mls |
| Hammond, J | w/T   mls |
| Long, K | mls |

P. 6

A000219    D00395

**HOWARD R.YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

DAY: _Saturday_
DATE: _11 / 13 /04_

CAPT. BERGGRUN
SHIFT COMMANDER
2400-0800

| NAME | | DAYS OFF | STAT | | | | | | | | | HOURS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BERGGRUN, BRIAN CAPTAIN | SU/MO | X | | | | | | | | | | | | | | | | |
| 2 | LEE, WAYNE STAFF LT. | FR/SA | / | | | | | | | | | | | | | | | | |
| 3 | PEDRICK, ALLEN LIEUTENANT | WE/TH | X | | | | | | | | | | | | | | | | |
| 4 | CHUDZIK, DONALD LIEUTENANT | FR/SA | / | | | | | | | | | | | | | | | | |
| 5 | KENNEY, AUDREY LIEUTENANT | SU/MO | X | | | | | | | | | | | | | | | | |
| 1 | PARKER, PHILIP VAR/VAR CAPT. | VAR | / | | | | | | | | | | | | | | | | |
| 2 | PRITCHETT, MICHAEL VAR/VAR LT. | VAR | / | | | | | | | | | | | | | | | | |
| 3 | FOUNTAIN, REUBEN K-9 | TU/WE VAC | | | | | | | | | | | | | | | | | | |
| 4 | LEE, JAY K-9 | WE/TH | / | | | | | | | | | | | | | | | | |
| 5 | K-9 VAR/VAR | | | | | | | | | | | | | | | | | | | |
| | **SERGEANTS** | | | | | | | | | | | | | | | | | | |
| 1 | TRIPLETT, JAMES SERGEANT | SA/SU | / | | | | | | | | | | | | | | | | |
| | **CORPORALS** | | | | | | | | | | | | | | | | | | |
| 1 | DANIELS, KIMPHUS CPL | FR/SA | / | | | | | | | | | | | | | | | | |
| 2 | PORTER, RAYMOND CPL | SU/MO | X | pe | | | | | | | | | | | | | | | |
| 3 | CHAPPEL, CHRISTOPHER CPL | TU/WE | X | Pe. | | | | | | | | | | | | | | | |
| 4 | HARRIFORD, WILLIAM CPL | MO/TU | X | LW 1/2 | | | | | | | | | | | | | | | |
| 5 | DOTSON, BENNY CPL | TH/FR | X | LW 3/4 | | | | | | | | | | | | | | | |
| 6 | CPL | WE/TH | / | | | | | | | | | | | | | | | | |
| | **OFFICERS** | | | | | | | | | | | | | | | | | | |
| 1 | ADAMS, DEBORAH | SU/MO | VAC. | | | | | | | | | | | | | | | | |
| 2 | BADAHUR, RAMROOP | FR/SA | / | | | | | | | | | | | | | | | | |
| 3 | BATES, PAMELA | FR/SA | / | | | | | | | | | | | | | | | | |
| 4 | BENN, DONALD | SA/SU | / | | | | | | | | | | | | | | | | |
| 5 | BOSTON, TAMARA | MO/TU | X | | | | | | | | | | | | | | | | |
| 6 | BROWN, WILLIAM | SU/MO | X | Dur 4 | | | | | | | | | | | | | | | |
| 7 | BULLOCK, MARK | MO/TU | Bic. | | | | | | | | | | | | | | | | |
| 8 | BURLEY, SONYA | FR/SA | / | | | | | | | | | | | | | | | | |
| 9 | BUSH, MATIN | TU/WE | 2 | | | | | | | | | | | | | | | | |
| 10 | CAIN, REBEKAH | TU/WE | X | | | | | | | | | | | | | | | | |

TUESDAY ONLY 2300-0700

A000220

D00396

## Multi-Purpose Criminal Justice Facility
### Daily Roster: 8x4 Shift

**DATE:11-13-04**     **SATURDAY**    8

| | | | |
|---|---|---|---|
| Shift Command: CAPT.JEFF. ✓ | Security Team: C/O CERISIER ✓ | | |
| Shift Supervisor: | Security Team: C/O Taylor OT ✓ | | |
| Operations Lt: | Security Team: C/O FLOYD ✓ | | |
| | Security Team: C/O KADOW ✓ | Sickcall(am)... | |
| Unit 27: C/O TERRELL ✓ | | | |
| K-9: C/O LEE ✓ | | | |
| **Unit 1** | LW B/R: CPL FORTE ✓ | 1A/B: C/O JOHNSON, D. T ✓ | 1A/B: C/O Scott ✓ |
| LT ✓ | B/R: C/O FIELDS ✓ | 1C/D: C/O Savages OT ✓ | 1C/D: C/O Milligan T ✓ |
| LW: CPL | C/O. | 1E/F: C/O J. DAVIS ✓ | 1E/F: C/O.HARGROVE T ✓ |
| Lobby: C/O MCGEE, N. ✓ | B/R: C/O EMIG ✓ | 1E/F: C/O Hitchens OT ✓ | |
| Unit 11: C/O HASTINGS ✓ | B/R: ✓ | INF: C/O R. Beckett OT ✓ | INF: C/O NEWMAN |
| P/C BKS: CPL MCMULLIAN ✓ | | DORM 4: C/O W. ROEMER ✓ | DORM 4:C/O.C. KALONDER ✓ |
| P/C DRS: C/O.HARRISON ✓ | | UNIT 12 C/O.POWELL ✓ | VSR 1: C/O BORDLEY ✓ |
| **Unit 2** | LW B/R: C/O DIAMOND T ✓ | 2A/B:C/O Blue OT ✓ | VSR 2: C/O. FLAKES ✓ |
| LT: FARMER / RICHARDS ✓ | 2C/D: C/O HIGGINS ✓ | 2C/D: C/O Paige OT ✓ | |
| LW G-M: CPL GREENE ✓ | 2E/F: C/O AMAR OT ✓ | 2E/F: C/O K. Baker OT ✓ | |
| LW: | 2G/H: C/O COOPER cfc ✓ | 2G/H: C/O D. Powell OT ✓ | |
| Unit 13: | 2J/K: C/O BROOKS. ✓ | 2J/K: C/O Harrisford OT ✓ | |
| Unit 14: C/O NEWMAN ✓ | 2L/M: C/O CONRAD ✓ | 2L/M: C/O Cannon T OT ✓ | |
| **Unit 3** | 2Q: C/O T. BUFF. ✓ | 2V: C/O BRELAND ✓ | Dorm 1. C/o Breau ✓ |
| LT: QUEENER ✓ | 2R: C/O DANIELS, V. ✓ | 2W: C/O AUSTIN ✓ | Dorm 2: C/O Gassner ✓ |
| S/C: C/O ROY ✓ | 2S: C/O SHADE ✓ | 2Y: C/O BROWN ✓ | Dorm Rover: REDMAN ✓ |
| S/C: CPL GRESMER ✓ | 2T: C/O Z. Rodriguez ✓ | 2Z: C/O | MISC: |
| LW: SGT. KENNEDY ✓ | Unit 15: C/O Still, D. ✓ | 2Z: C/O Boyle ✓ | UNIT 16: C/O |
| LW: SGT ✓ | LW: C/O ...SON TERL | MISC: | UNIT 25 KINLOCH ✓ |
| | MISC: ✓ | MISC: C/O | MISC: C/O ✓ |

Page 1

A000221      D00397

# Multi-Purpose Criminal Justice Facility
## Daily Roster: 8x4 Shift

**DATE: 11-13-04**    **SATURDAY**

| VAC/HOL/MILITARY | | OVERTIME | VHR'S | | OUTSIDE HOSPITAL | ROOM # | OFFENDER |
|---|---|---|---|---|---|---|---|
| GOODALL | MLWOP | C/o Mark Blue | PRITCHETT | F/S | ✓ C/o Connie King ✓ | Christiana Hosp 2308 | |
| PRINCE, K. | W/C | Cpl John Harrisford | SAVAGE | M/S | ✓ C/o Marvin Prysoft ✓ | " " " | |
| WILLIAMS | VAC | C/o Zachary Radaniwast | GRIFFIN | S/S | ✓ | " " " | |
| DEPAUL, R. | MLWOP | C/o Katonna Rawley | LISKIEWICZ | F/S | ✓ | | |
| EVERETTE | HT | C/o Zachary Prige | FAGAN | S/S | ✓ | | |
| Thompkins S | | C/o Marvin Hackett | BAROW | M/S | ✓ | | |
| Griffin | SARS | Cpl Ronny Foster | BANE | W/T | ✓ | | |
| | | C/o Mark Cannon | MILLIGAN | M/T | ✓ | | |
| | | C/o Donald Powell | SCOTT | T/F | ✓ | | |

P. 2

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04
REVISED

DAY: Saturday
DATE: 11/13/04

SHIFT COMMANDER 0800-1600

| # | NAME | RANK | DAY'S OFF |
|---|------|------|-----------|
| 1 | JEFFERSON, CAROL | CAPTAIN | SU/MO |
| 2 | POLK, JOHN | STAFF LIEUT | FR/SA |
| 3 | QUEENER, WILLIAM | LIEUTENANT | SU/MO |
| 4 | FARMER, SYLVIA | LIEUTENANT | TU/WE |
| 5 | SHEETS, PATRICK | LIEUTENANT | FR/SA |
| 6 | | LIEUTENANT | WE/TH |
| 1 | PARKER, PHILIP VAR/VAR | CAPTAIN | VAR |
| 2 | EMIG, MARK | CAPTAIN | SA/SU |
| 3 | PRITCHETT, MICHAEL VAR/VAR LT. | | VAR |
| 4 | FAHEY, GERALD | STAFF LIEUT | SA/SU |
| 5 | BRYANT, JOSEPH | K-9 | FR/SA |
| 6 | LEE, JAY | K9 | WE/TH |
| 7 | ALEXANDER, SPENCER | K-9 | SA/SU |

**SERGEANT'S**

| # | NAME | RANK | DAY'S OFF |
|---|------|------|-----------|
| 1 | GRANT, JOHN | SERGEANT | SA/SU |
| 2 | GREENE, CHARLES | SERGEANT | SU/MO |
| 3 | LEWIS, MICHAEL | SERGEANT | FR/SA |
| 4 | MOODY, MARY | SERGEANT | SA/SU |
| 5 | KENNEDY, HOWARD | SERGEANT | TH/FR |
| 6 | RICHARDS, CHARLES | SERGEANT | WE/TH |
| 7 | WILSON, WAYNE | SERGEANT P/C | SA/SU |
| 8 | WAY, FRED | SERGEANT | WE/TH |
| 9 | | SERGEANT | SA/SU |

**CORPORALS**

| # | NAME | RANK | DAY'S OFF |
|---|------|------|-----------|
| 1 | GRESMER, LILLIAN | CORPORAL | SU/MO |
| 2 | GOLDSBORO, REGINALD | CORPORAL | SA/SU |
| 3 | KERNS, FRANKIE | CORPORAL | SA/SU |
| 4 | MASSEY, TERRIS | CORPORAL L/R | SA/SU |
| 5 | RAYNE, SANDRA | CORPORAL | FR/SA |
| 6 | HAMILTON, LARRY | LOADING DOCK | SA/SU |
| 7 | JACKSON, EDWARD | CORPORAL | TU/WE |
| 8 | PEREZ, RUFFINO | CORPORAL | WE/TH |
| 9 | MCMILLAN, KENNETH P/C | CORPORAL | SU/MO |

FRIDAY AND SATURDAY ONLY 0700-1500

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04
REVISED

DAY: _Saturday_
DATE: _11/13/04_

SHIFT COMMANDER 0800-1600

| # | NAME | | DAYS OFF |
|---|------|---|----------|
| | **CORPORALS** | | |
| 10 | DIAL, SEAN | CORPORAL M/R | SA/SU |
| 11 | FORTE, BRIAN | CORPORAL | TH/FR |
| 12 | TAYLOR, BARRY | CORPORAL S/T | FR/SA |
| | | CORPORAL | |
| 13 | | CORPORAL S/T | MO/TU |
| | **OFFICERS** | | |
| 1 | AMAR, MYRON | | TU/WE |
| 2 | AUSTIN, SCOTT | | SU/MO |
| 3 | BRELAND, TILLIS | | SU/MO |
| 4 | BRINKLEY/WARREN MEDICAL RUN OFFICER | | SA/SU |
| 5 | BROOKS, DERRICK | | MO/TU |
| 6 | BROWN, DANA | | MO/TU |
| 7 | BUFF, TIMOTHY | | WE/TH |
| 8 | BURNS, WILLIAM    KEY PROGRAM | | SA/SU |
| 9 | BURRELL, CHARLES | | FR/SA |
| 10 | BUTCHER, BARBARA | | FR/SA |
| 11 | BUTCHER, ROBERT    SUPPLY | | SA/SU |
| 12 | CERISIER, GIVENCHY | | TH/FR |
| 13 | CHARLES, RADCLIFFE | | FR/SA |
| 14 | CONRAD, KIMBERLY | | WE/TH |
| 15 | COOPER, LEATHIA | | TH/FR |
| 16 | CROPPER, PERVONE | | SA/SU |
| 17 | CUMBERBATCH, GERWIN | | FR/SA |
| 18 | CURRINGTON, LYNN  MAIL ROOM | | SA/SU |
| 19 | DANIELS, VINCENT | | SU/MO |
| 20 | DAVIS, JULIUS | | TH/FR |
| 21 | DEMBY, GREG | | FR/SA |
| 22 | DEPAUL, RONALD | | MO/TU |
| 23 | DIAMOND, WALLACE | | TU/WE |
| 24 | EMIG, BRIAN | | MO/TU |
| 25 | EVERETTE, GWENDOLYN | | MO/TU |
| 26 | FIELDS, DORENE | | WE/TH |
| 27 | FLAKES, LESLIE | | WE/TH |
| 28 | FLOYD, VANANZIO    S/T | | SU/MO |

A000224

D00400

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04
REVISED

DAY: _____
DATE: 11/3/04

SHIFT COMMANDER #0600-1600



| # | NAME | DAYS OFF | |
|---|------|----------|---|
| 29 | GAINES, QUINTON GROUNDS KEEPER | SA/SU | X |
| 30 | GASSNER, RICHARD | TU/WE | X |
| 31 | GOODALL, OSBORNE | TU/WE | X |
| 32 | GRIFFIN, SHIRELLE | SU/MO | S |
| 33 | HARGROVE, SHELTON | MO/TU | X |
| 34 | HARRISON, RICHARD | MO/TU | X |
| 35 | HASTINGS, KENNETH | MO/TU | X |
| 36 | HEALY, JOHN OPS | SA/SU | X |
| 37 | HENRY, STANFORD | SA/SU | X |
| 38 | HIGGINS, APRIL | MO/TU | X |
| 39 | HITCHENS, MELVIN | TU/WE | X |
| 40 | JOHNSON, DWIGHT | SU/MO | X |
| 41 | KADOW, MICHAEL  S/T | MO/TU | X |
| 42 | KOLONDER, CHAD | TH/FR | X |
| 43 | KING, CONNIE  MAIL ROOM | SA/SU | X |
| 44 | KINLOCH, VERONICA | TH/FR | X |
| 45 | LIVINGSTON, JOHN | SA/SU | |
| 46 | LOGAN, ROBERT | SA/SU | |
| 47 | MARTELLI, STEPHEN | FR/SA | |
| 48 | MCGEE, NAVINIA | SU/MO | X |
| 49 | MCREYNOLDS, JERMAINE | FR/SA | X |
| 50 | NEAL, CHARLES | SA/SU | |
| 51 | NEWMAN, ANNETTE | SU/MO | X |
| 52 | NEWMAN, BARRY | SU/MO | X |
| 53 | PALMA, RICARDO | SA/SU | |
| 54 | PELLE, PAUL | FR/SA | |
| 55 | POWELL, JIVONNE | TU/WE | X |
| 56 | PRINCE, KENYA | WE/TH | |
| 57 | RAWLEY, DONALD | FR/SA | |
| 58 | REDMAN, LATOYA | WE/TH | X |
| 59 | RIVERA, COURTNEY | TU/WE | X |
| 60 | ROEMER, WILLIAM | TH/FR | X |
| 61 | ROY, JOSETTE | TU/WE | X |
| 62 | SHADE, JESSE | MO/TU | X |

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04
REVISED

DAY: Saturday    DATE: 11/03/04

SHRIFF COMMANDER 0600-1600

| # | NAME | | DAYS OFF |
|---|------|---|---|
| 63 | SHINN, JAMES | INFO. SYST. COORD. | SA/SU |
| 64 | SMITH-BOARDLEY, NANNETTE | | WE/TH |
| 65 | STILL, DIONNE | | WE/TH |
| 66 | SUTTON, JERON | | SA/SU |
| 67 | SILVIE, ANTHONY | KEY PROGRAM | SA/SU |
| 68 | TALENTI, ANDREW | | SA/SU |
| 69 | TERRELL, CLIFFORD | S/T | TH/FR |
| 70 | THOMPKINS, ROGER | | SU/MO |
| 71 | TURNER, GORDON | | SA/SU |
| 72 | WAYMAN, GLENN | | SA/SU |
| 73 | WHITE, JACQUELINE | SICK CALL | SA/SU |
| 74 | WILLIAMS, JANELL | | WE/TH |
| 75 | WRIGHT, GEORGE | | SA/SU |
| 76 | YOUNG, REGINALD | | FR/SA |
| 77 | | | TU/WE |
| 78 | | | TU/WE |
| 79 | | | TU/WE |
| 80 | | | WE/TH |
| 81 | | | WE/TH |
| 82 | | | WE/TH |
| 83 | | | TH/FR |
| 84 | | | FR/SA |
| 85 | | | FR/SA |
| 86 | | | FR/SA |
| 87 | | | SA/SU |
| 88 | | | SU/MO |
| | FRINK, ADRIANE | ON MILITARY LEAVE W/O PAY | SA/SU |



A000226

D00402

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
11/08/04

SHIFT COMMANDER 0800-1600

DAY: Saturday
DATE: 11/23/04

| # | NAME | DAYS OFF |
|---|------|----------|
| | 8X4 VHRS 11/08/04 TO 11/21/04 | |
| 1 | CARMONA, JOSE | |
| 2 | SAVAGE, KAREN | |
| 3 | LISKIEWICZ, GREG | |
| 4 | FAGAN, MALISSA | |
| 5 | BAROW, MARK | |
| 6 | BANE, SAMUEL | |
| 7 | MILLIGAN, TYSEAN | |
| 8 | KLINE, JAMES | |
| 9 | SCOTT, JEFFERY | |

A000227

D00403

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
OVERTIME DUTY ROSTER

DAY: _Saturday_
DATE: _11/13/04_

OT DUTY ROSTER

| | OFFICERS LAST NAME | OFFICERS FIRST NAME | SSN # | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Chockett | Richard | | 8 | Infirmary |
| 2 | Hline | Mark | | 8 | 7+65 |
| 3 | Rose | Zachary | | 8 | 29 |
| 4 | Butler | Roberts | | 8 | 26L |
| 5 | Jewell | Donald | | 8 | 26L |
| 6 | Satchield | William | | 8 | 23K |
| 7 | Carruthe | Mark | | 8 | 24m |
| 8 | Rathigan | Zachary | | 8 | 27 |
| 9 | Taylor | Battle | | 8 | Em. Team |
| 10 | Kley | Cornel | | 8 | Charts/sgt 308 |
| 11 | Scott Edwards (4th & 11th) | Maurice | 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 | 8 | Charts/sgt 238 |
| 12 | | | | 8 | Check/sgt |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

ATTACH THIS PAGE TO DUTY ROSTER.
SS# IS ONLY NECCESSARY IF OFFICER DOES NOT WORK AT THIS INSTITUTION

A000228

D00404

*C'apt C. Jefferson*
*11/13/04*

| | 8X4 |
|---|---|
| | SHIFT |

# BUREAU OF PRISONS
# OVERTIME REPORT

| BUDGET UNIT# | 006 | BUDGET UNIT NAME | **HRYCI** |
|---|---|---|---|
| PERIOD WORKED | *11/13/04* | PAYCYCLE PAID | *Same* |

| REASON FOR OVERTIME | TOTALS |
|---|---|
| ADMINISTRATIVE | |
| AWOL | |
| CALL BACK | |
| CLASSIFICATION | |
| COURT | |
| COMPASSIONATE LEAVE | |
| EXTRA DUTY – INSIDE | |
| EXTRA DUTY – OUTSIDE | |
| FMLA | |
| GYM VACANCY | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | |
| INVENTORY | |
| JURY DUTY | |
| LATE RELIEF | |
| LEAVE WITHOUT PAY | |
| MAILROOM / SUPPLY | |
| MEETING / UNION BUSINESS | |
| MILITARY LEAVE | |
| OUTSIDE HOSPITAL *–2% Christ.Hosp. 2308* | *16* |
| REPORTS | |
| SHAKEDOWN | |
| SICK | |
| SUSPENSION | |
| TRAINING | |
| TRANSPORTATION: | |
| ξ   FUNERAL RUN | |
| ξ   INMATE TRANSFER | |
| ξ   MEDICAL RUN | |
| ξ   TRAVEL TIME | |
| ξ   OTHER | |
| UNAUTHORIZED ABSENCE | *64* |
| VACANCY – *8C/o* | |
| VACATION | |
| WEAPONS RECLASSIFICATION | |
| WORKMAN'S COMPENSATION *–1C/o* | *8* |
| OTHER: FIRE EQUIPTMENT | |
| OTHER: ESCAPE DRILLS | |
| OTHER: EXECUTIONS | |
| OTHER: OUT OF STATE TRANSFERS | |
| OTHER: RECORDS | |
| OTHER: CODE | |
| OTHER: SPECIAL PROJECTS | |
| OTHER: CONSTRUTION, VEST, GRIEVANCES | |
| OTHER: COMPUTER PROBLEMS | |
| OTHER: WATCH CMDR. | |
| OTHER: RESIGNATION | |
| OTHER: | |
| **TOTAL HOURS REPORTED** | *88* |

**A000229**

D00405

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
SHIFT CONTINUATION ROSTER
0800-1600

SATURDAY

DATE: 11.13.04

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 1 | 0 | | | | | | | |
| STAFF LIEUTENANT | 0 | 0 | | | | | | | |
| LIEUTENANTS | 3 | 2 | | | | | | | 1-Vacancy |
| SERGEANTS | 4 | 4 | | | | | | | |
| CORPORALS | 6 | 4 | | 1 | | | | | 1-Vacancy; 1-Dept H S/S |
| OFFICERS | 59 | 43+11=54 | 2 | 1 | 1 | | | | 8-Vacancies; 1-DAC; 2-MLCOTP |
| K-9 OFFICERS | 1 | 0(N) | | | | | | | |
| TOTAL | 74 | 66(N) | 2 | 1 | 1 | | | | 14 |

COMMENTS: 11 Overtime PRS. Noted — 2 C/O's (BPSD 2300 C/Linn, Mr. Fontbrandt); 1 K-9C/O (Robilotti), 8 C/O Vacancies (Mr. Blue, 2-Hay, K. Baylor, O. Powell, W. Fairchild, Mr. Cannon, 2-Ahdoyon (±B. Taylor)

PREPARED BY: Capt. Carl Jefferson  SHIFT COMMANDER (TITLE AND SIGNATURE)  11/13/04

REVIEWED BY: M. Drue J. Williams  11/5  SECURITY/SUPERINTENDENT (SIGN AND DATE)

DEPUTY WARDEN (SIGN AND DATE)  11/13/04

Page 1

D00406

A000230

*11/15*

# HOWARD R. YOUNG CORRECTIONAL FACILITY
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER: _____ Capt. Bamford _____ DATE: __ 11/13/04 __

DAY: _____ Saturday _____ TIME ASSUMED DUTY: _____ 1520 _____

I HAVE BRIEFED MY RELIEF:   YES: ___ XXX ___      NO: _____

RELIEVED BY: _____ Slt. Lee _____

OFF GOING SHIFT COMMANDER: _____ Capt. Bamford _____

ON COMING SHIFT COMMANDER: _____ Slt. Lee _____

## BEGINNING EQUIPMENT COUNT

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| .38 Revolvers | 0 | Shackles | 8 | Cutter | 1 | Gas Mask | | 3 |
| Speed Loaders | 1 | Travel Chains | 9 | Capstun | 1 | S/C Keys | | 22 |
| .38 Rounds | 12 | Hacksaw | 1 | .40 S & W | 6 | Gas Cards | | 19+1 |
| Holsters | 5 | Crank | 1 | .40 Rounds | 168 | TBC | 1491+1 | |
| Handcuffs | 8 | Sealed Keys | 11 | .40 Magazines | 12 | K9 | Lorah | |
| Blackboxes | 5 | Locks | 5 | | | OPS | McCreary | |

| TIME | COMMENTS |
|---|---|
| 1450 | Capt. Bamford arrives for duty. |
| 1520 | Relieve 8x4 after briefing and receipt of shift keys. |
| 1600 | Code Red. |
| 1624 | Code Green.                    TBC=1491+1 |
| 1922 | 1 (one) commitment.          TBC=1492+1 |
| 2000 | Code Red. |
| 2012 | Code Green.                    TBC=1492+1 |
| 2046 | 1 (one) commitment.          TBC=1493+1 |
| 2132 | 1 (one) commitment.          TBC=1494+1 |
| 2247 | 1 (one) commitment.          TBC=1495+1 |
| 2300 | Code Red. |
| 2309 | Code Green.                    TBC=1495+1 |
| 2310 | 4x12 relieved by 12x8 after briefing and exchange of shift keys. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**A000231**

D00407

# HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## DAILY ROSTER: 4X12 SHIFT

**DATE: 11/13/04**　　　　**DAY: SATURDAY**

| | | | |
|---|---|---|---|
| SHIFT CMDR: BAMFORD, D. ✓ | | SECURITY TEAM CPL: PRANGE, R. | MISC: |
| SHIFT SUPV: | | SECURITY TEAM: D'ANIELLO, A. ✓ | |
| OPERATIONS LT: | | SECURITY TEAM: GALLI, B. ✓ | |
| SICK CALL | | SECURITY TEAM: FARRINGTON, G. ✓ | |
| UNIT 27: MCCREARY, J. ✓ | | K-9: LORAH, P. ✓ | |

### UNIT 1

| | | | |
|---|---|---|---|
| LT: SENATO, K. ✓ | SGT B/R: MATTHEWS, K. ✓ | 1A/B: EVANS, L. ✓ | INF: BLUE, M. ✓ |
| SGT: DEFEO, G. QRT ✓ | B/R: BRYANT, L. ✓ | 1A/B: | INF: Newman, b. (OT) ✓ |
| SGT: | B/R: DIAL, W. ✓ | 1C/D: Johnson, D. (OT) ✓ | DORM 4: Baker, S. ✓ |
| LOBBY CPL: SESSOMS, S. ✓ | B/R: | 1C/D: CARMONA, J.(VHR) ✓ | DORM 4: NATHANSON, P. ✓ |
| P/C DRS: NDIAYE, L. ✓ | B/R: | 1C/D: | |
| P/C BKS: Barley, ___ ✓ | | 1E/F: | 1E/F: |
| UNIT 12: HAMBRIGHT, J. ✓ | | 1E/F: MITCHELL, J ✓ | |
| | | 1E/F: WARREN, R. ✓ | 1E/F: RIVERA, E. CIC ✓ |

### UNIT 2

| | | | |
|---|---|---|---|
| LT: RYDER, R. ✓ | 2A/B: BAYNE, M.(VHR) ✓ | 2E/F: PAIGE, Z. ✓ | 2J/K: Green, C. (OT) ✓ |
| SGT: | 2A/B: Minnith ___ ✓ | 2E/F: Shade, J. (OT) | 2J/K: WARMKESSEL, E. ✓ |
| SGT: Klker, M ✓ | 2C/D: Ernia, B. (OT) ✓ | 2G/H: HACKETT, D. ✓ | 2L/M: Clark, ___ ✓ |
| UNIT 13: DENNY, R. ✓ | 2C/D: LAMBERT, R. ✓ | 2G/H: | 2L/M: |

### UNIT 3

| | | | |
|---|---|---|---|
| LT: | 2Q: MACK, B. ✓ | 2V: COUGHLAN, S. ✓ | DORM 1: VOLOCZYN ✓ |
| S/C SGT: JOHNSON, K. ✓ | 2R: JOHNSON, P.(VHR) ✓ | 2W: CANNON, M. ✓ | DORM 2: Powell, D. ✓ |
| S/C CPL: Lawrence, P ✓ | 2S: Johnson H. ✓ | 2Y: Rogers, R. (VHR) ✓ | DM ROVER: |
| SGT: | 2T: INCE, G. ✓ | 2Z: ROBINSON, B. ✓ | GYM: |
| SGT: WALL, D. ✓ | UNIT 15: WARE, L. ✓ | UNIT 16: Williams, V. ✓ | GYM: |
| | | | GYM: |
| | | | UNIT 25: |

D00408

# HOWARD R. YOUNG CORRECTIONAL FACILITY
## DAILY ROSTER: 4X12 SHIFT

**DATE: 11/13/04**

**SATURDAY**

| VHR RELIEF | | VAC/SICK/MILITARY | | OUTSIDE HOSPITAL | ROOM # | OFFENDER |
|---|---|---|---|---|---|---|
| MINNITI, V. | M/S | CURTIS, S. | S/S MLWOP | | | |
| KLINE, J. | F/S | ROWE, J. | T/W MLWOP | | | |
| CARMONA, J. | M/T | NEAL, D. | W/T MLWOP | | | |
| SEARLES, W. | F/S | CAMPBELL, E. | S/S MLWOP | | | |
| BAYNE, E. | M/S | CUSTER, E. | M/T W/O | | | |
| JOHNSON, P. | T/F | SCHAFFER, T. | M/T W/O | | | |
| ROGERS, R. | T/W | MEDFORD, J. | F/S VAC | | | |
| | | VARGAS, R. | S/M VAC | | | |
| | | ROMANOWSKI, T. | T/F SICK | | | |
| | | WILLIAMS, G. | VAC | | | |
| | | | | Presley / R.2(Care)MEDICAL RUNS | | |
| | | | | Rodgers S.F. | | |
| | | | | Miller, S. ABS. | | |
| | | | | McReynolds ABS. | | |
| | | | | Lewis, C. ABS. | | |

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
11/08/04

SHIFT COMMANDER
1600-2400

_Capt Damford_

DAY ___  DATE ___

| | NAME | DAYS OFF | S | 1 A/B | 1 E/D | 2 A/C | 2 D/G | 2 G/K | 2 L/N | 2 N/S | 2 S/T | 2 T/W | 2 W/2 | D O R N/F | B R K/Y | FG/SC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAMFORD, DAVID  CAPTAIN | SU/MO | X | | | | | | | | | | | | |
| 2 | SABATO, JOSEPH  STAFF LT | FR/SA | | | | | | | | | | | | | |
| 3 | SENATO, KEVIN  LT. | SU/MO | X | | | | | | | | | | | | |
| 4 | DYCH, WALTER  LT. | FR/SA | | | | | | | | | | | | | |
| 5 | RYDER, ROBERT  LT. | WE/TH | X | | | | | | | | | | | | |
| 6 | LT. | TU/WE | | | | | | | | | | | | | |
| 1 | PARKER, PHILIP  VARVAR CAPT. | VAR | | | | | | | | | | | | | |
| 2 | PRITCHETT, MICHAEL VARVAR LT. | VAR | | | | | | | | | | | | | |
| 3 | LORAH, PETE  K-9 | SU/MO | | | | | | | | | | | | | |
| 4 | LEE, JAY  K-9 | WE/TH | X | | | | | | | | | | | | |
| 5 | K-9 | VHR | | | | | | | | | | | | | |
| | SERGEANT'S | | | | | | | | | | | | | | | |
| 1 | MEDFORD, JOSEPH | FR/SA | | | | | | | | | | | | | |
| 2 | FRENCH, STEPHEN | SA/SU | | | | | | | | | | | | | |
| 3 | ROWE, JOHN | TU/WE | | | | | | | | | | | | | |
| 4 | DEFEO, GREGORY | TH/FR | | | | | | | | | | | | | |
| 5 | LAWRENCE, PHILLIP | MO/TU | | | | | | | | | | | | | |
| 6 | KIKER, MARY | MO/TU | | | | | | | | | | | | | |
| 7 | | SU/MO | | | | | | | | | | | | | |
| 8 | | SU/MO | | | | | | | | | | | | | |
| 9 | | WE/TH | | | | | | | | | | | | | |
| 10 | | WE/TH | | | | | | | | | | | | | |
| | CORPORALS | | | | | | | | | | | | | | | |
| 1 | EDWARDS, JUNE | SA/SU | | | | | | | | | | | | | |
| 2 | VARGAS, RAMON | SU/MO | | | | | | | | | | | | | |
| 3 | WILLIAMS, GARLAND | WE/TH | | | | | | | | | | | | | |
| 4 | WALL, DAVID | MO/TU | | | | | | | | | | | | | |
| 5 | SESSOMS, SONIA | TH/FR | | | | | | | | | | | | | |
| 6 | STEVENS, JAMES  S/T | FR/SA | | | | | | | | | | | | | |
| 7 | | FR/SA | | | | | | | | | | | | | |

TEMPORARY ASSIGNED

SUNDAY AND MONDAY ONLY

1600-2300 HOURS

A000234

000410

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
**11/03/04**

**DAY** _3 of 4_    **DATE:** 11/13/04

**SHIFT COMMANDER**
**1600-2400**

| # | OFFICERS NAME | DAY OFF |
|---|---|---|
| 1 | APA, BRADFORD | FR/SA |
| 2 | BAKER, SIDNEY | MO/TU |
| 3 | BLUE, MARK | SU/MO |
| 4 | BRYANT, LYLE | TU/WE |
| 5 | BURLEY, KATRINA | FR/SA |
| 6 | CAMPBELL, EWONNU | SA/SU |
| 7 | CANNON, MARK | WE/TH |
| 8 | CARLOCK, DONALD | FR/SA |
| 9 | CHUKUNNEYE, NNABUGWE | SA/SU |
| 10 | CLARK, VERON | WE/TH |
| 11 | COLEMAN, ALLEN    OPS | WE/TH |
| 12 | COUGHLAN, STEPHEN | SA/SU |
| 13 | CUSTER, ELLYN | TU/WE |
| 14 | DANIELLO, ANGELO S/T | MO/TU |
| 15 | DAVIES, KERRY | WE/TH |
| 16 | DENNY, RAHIM | FR/SA |
| 17 | DIAL, WAYNE | TU/WE |
| 18 | DUGGINS, HORACE | TH/FR |
| 19 | EVANS, LARRY | FR/SA |
| 20 | FABRES, EDUARDO | MO/TU |
| 21 | FARRINGTON, GREGORY S/T | TU/WE |
| 22 | FIELDS, MICHAEL | FR/SA |
| 23 | GALLI, BRIAN | TH/FR |
| 24 | HACKETT, DWIGHT | TH/FR |
| 25 | HAMBRIGHT, JESSE | TH/FR |
| 26 | HOOKS, DESIREE | FR/SA |
| 27 | INCE, GARY | TU/WE |
| 28 | JOHNSON, COREY | SA/SU |
| 29 | JOHNSON, DAVID | FR/SA |
| 30 | JOHNSON, HARRY | TU/WE |
| 31 | JOHNSON, KELLI | WE/TH |
| 32 | JONES-NDIAYE, LOLITA | TH/FR |
| 33 | JORDAN, LEWIS | SA/SU |
| 34 | LAMBERT, ROBERT | WE/TH |

D00411

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

SHIFT COMMANDER
1600-2400

DAY: Sat.    DATE: 11/13/04

| # | NAME | DAYS OFF | SAT 1 | SUN 1 | ... |
|---|------|----------|-------|-------|-----|
| 35 | LEWIS, CARMELLA | W/TH | ABS | | |
| 36 | MATHEWS, KENNETH | MO/TU | X | RR | |
| 37 | MACK, BOBBY | MO/TU | X | RR / 212 | |
| 38 | MAYS, REGINALD | SA/SU | X | 212 | |
| 39 | MCCREARY, JASON | TH/FR | X | 2.7 | |
| 40 | MCCREARY, MEGAN | FR/SA | | | |
| 41 | MCREYNOLDS, TIMOTHY | TU/WE | ABS | | |
| 42 | MEEKS, JAMES | SA/SU | | | |
| 43 | MILLER, STACEY | MO/TU | ABS | | |
| 44 | MITCHELL, JOHNNY | SU/MO | X | IEF | |
| 45 | MOORE, JAMES | SU/MO | X | 14 | |
| 46 | NATHANSON, PHILLIP | MO/TU | X | Dec H | |
| 47 | NEAL, DOUGLAS | W/TH | ex hours | | |
| 48 | NEAL, LOUIS | SA/SU | | | |
| 49 | PAIGE, ZACHARY | SU/MO | X | 280 | |
| 50 | PLEASANTON, ANTHONY | FR/SA | | | |
| 51 | POWELL, JACKIE | SA/SU | | | |
| 52 | PRANGE, RALPH  S/T | SU/MO | X | | |
| 53 | PRESSLEY, CHARLES | W/TH | Reg | off | |
| 54 | PYLE, GEORGE | SA/SU | X | Doc | |
| 55 | RITTER, JOSEPH | SU/MO | | | |
| 56 | RIVERA, EDWARD | SU/MO | X | IEF | |
| 57 | ROBINSON, BRIAN | MO/TU | X | 2 2 | |
| 58 | ROMANOWSKI, THOMAS | MO/TU | 5 | | |
| 59 | SCHAFFER, TAMIKO | MO/TU | uc | | |
| 60 | SMITH, BERNARD | FR/SA | | | |
| 61 | SOTO, FELIPE | SA/SU | | | |
| 62 | WARE, LEA | SU/MO | X | ur | |
| 63 | WARMKESSEL, EDITH | TU/WE | X | 212 | |
| 64 | WARREN, REGGIE | TU/WE | X | IEF | |
| 65 | WILLIAMS, VINCENT | TH/FR | X | 16 | |
| 66 | WOLOSZYN, CHARLES | TU/WE | X | | |
| 67 | | W/TH | X | | |
| 68 | | MO/TU | | | |

A000236

D00412

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04

SHIFT COMMANDER
1600-2400

DAY: SAT
DATE: K / 13/04

| OFFICERS | NAME | DAY OFF |
|---|---|---|
| 69 | | WE/TH |
| 70 | | WE/TH |
| 71 | | WE/TH |
| 72 | | TH/FR |
| 73 | | SU/MO |
| | POWELL, DONALD | SA/SU |
| | CURTIS, STEPHANIE | MO/TU |

ON M.L.W.O.P.

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
10/25/04

SHIFT COMMANDER 2400-0800

DAY: _____
DATE: _____

| # | NAME | DAY'S OFF | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|------|-----------|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| | 12X8 SHIFT VHRS 11/08/04 TO 11/21/04 | S M T W T F S | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | AHART, AUSTIN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | WILLIAMS, TONY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | HACKET, ROBERT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | HAMMOND, JAMES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | LONG, KENNETH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | GRIFFIN, SHIRELLE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

A000233

000414

SHIFT: _4 x 12_    ORT ARMORY INVENTORY/ISSUE LOG    SHIFT COMMANDER: _CAPT. D. BANFORD_

| | DESCRIPTION | QUANTITY | QUANTITY ISSUED | TIME OUT | TIME IN | ISSUING OFFICER |
|---|---|---|---|---|---|---|
| 1 | Black Bags | 19 | 10 | | | Sgt. G. Deseo |
| 2 | HELMETS | 19 | 10 | | | |
| 3 | VEST | 10 | 10 | | | |
| 4 | PAD SETS | 19 | 10 | | | |
| 5 | SHIELDS | 3 | 2 | | | |
| 6 | PR-24 | 1 | ∅ | | | |
| 7 | BATONS | 15 | 8 | | | |
| 8 | GAS MASK / 1 Black Bag | 6 | 6/6 | | | |
| 9 | HAND CUFF (#B34521) | 1 | ∅ | | | |
| 10 | HANDCUFF (#681777) | 1 | ∅ | | | |
| 11 | LEG SHACKLE (#029680) | 1 | — | | | |
| 12 | LEG SHACKLE (#P19372) | 1 | 1 | | | |
| 13 | BAG OF FLEX CUFFS | 1 | — | | | |
| 14 | VENTILATION FAN | 1 | ∅ | | | |
| 15 | FIRE SUIT | 3 | ∅ | | | |

| PRIMARY ORT MEMBERS | | FIRE TEAM | |
|---|---|---|---|
| | Sgt. G. Deseo | TL. Sgt. | |
| 1 | c/o L. WARE    with 15 | AIR PACK | |
| 2 | c/o R. DOWNS    " 13 | FIRE HOSE | |
| 3 | c/o J. HAMBRICHI  " 12 | 1ST AID | |
| 4 | c/o J. MOORE    " 14 | KEYS/EV  c/o A. Daniello | |
| 5 | c/o V. WILLIAMS  " 16 | | |

| SECONDARY ORT MEMBERS | | Damage Equipment |
|---|---|---|
| 1 | c/o A. DANIELLO    " S/F | |
| 2 | c/o E. BAYNE    2A+B | |
| 3 | c/o Z. PAIGE    2E+F | |
| 4 | c/o R. LAMBORI    2C+D | |
| 5 | c/o CARNOWA    1C+D | |

| CAMCORDER / GAS MASK | |
|---|---|

D00415

A000239

H.R.Y.C.I
Q.R.T Bag Issue
Inventory

| C/O Name | Bag # | Helmet | Pads | Vest # | Comments |
|---|---|---|---|---|---|
| Winks | L-6 | 1 | 1 | 3x-3 | GOOD |
| Denney | M-6 | 1 | 1 | XL-1 | |
| Hemberger | M-1 | 1 | 1 | 2X-1 | |
| Moore | L-6 | 1 | 1 | 2X-3 | |
| Williams | L-3 | 1 | 1 | 2X-4 | BAG ALS RETURN |
| Daniello | N-5 | 1 | 1 | 2X-5 | |
| Barnic | L-2 | 1 | 1 | 2X-2 | ✓ |
| Price | M-3 | 1 | 1 | L-1 | |
| Labaori | XL-3 | 1 | 1 | 3X-2 | |
| Circnote | L-5 | 1 | 1 | 3X-1 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

For the condition of the Equipment Put G for Good, Put P for Poor and B for Bad Condition in the box.

A000240

D00416

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
OVERTIME DUTY ROSTER

DAY _____ 5+9e
DATE: 4/13/64

OT DUTY ROSTER

SS# IS ONLY NECCESSARY IF OFFICER DOES NOT WORK AT THIS INSTITUTION

ATTACH THIS PAGE TO DUTY ROSTER.

| | OFFICERS LAST NAME | OFFICERS FIRST NAME | SSN # | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Dusberry | Barry | | 8 | Inf. |
| 2 | Greene | Chris | | " | 2.9/C |
| 3 | Johnson | David | | " | 1CD |
| 4 | Shade | Jesse | | " | 2 GF |
| 5 | Erig | Brian | | " | 2 E D |
| 6 | Burley | Katheren | | " | 2/C |
| 7 | Grssney | Lillian | | ~1 | Chow Hosp. |
| 8 | McGee | Mininia | | H | " |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

D00417

A000241

**4x12 SHIFT**

## BUREAU OF PRISONS
## OVERTIME REPORT

| BUDGET UNIT# | 006 | BUDGET UNIT NAME | MPCJF |
|---|---|---|---|
| PERIOD WORKED | 11/13/04 | PAYCYCLE PAID | |

| REASON FOR OVERTIME | TOTALS |
|---|---|
| ADMINISTRATIVE | |
| AWOL | |
| CALL BACK | |
| CLASSIFICATION | |
| COURT | |
| COMPASSIONATE LEAVE | |
| EXTRA DUTY – INSIDE | |
| EXTRA DUTY – OUTSIDE | |
| FMLA | |
| GYM VACANCY | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | |
| INVENTORY | |
| JURY DUTY | |
| LATE RELIEF | |
| LEAVE WITHOUT PAY | |
| MAILROOM / SUPPLY | |
| MEETING / UNION BUSINESS | |
| MILITARY LEAVE | |
| OUTSIDE HOSPITAL | 16 |
| REPORTS | |
| SHAKEDOWN | |
| SICK | |
| SUSPENSION | |
| TRAINING | |
| TRANSPORTATION: | |
| • FUNERAL RUN | |
| • INMATE TRANSFER | |
| • MEDICAL RUN | |
| • TRAVEL TIME | |
| • OTHER | |
| UNAUTHORIZED ABSENCE | |
| VACANCY | 48 |
| VACATION | |
| WEAPONS RECERTIFICATION | |
| WORKMAN'S COMPENSATION | |
| OTHER: FIRE EQUIPMENT | |
| OTHER: ESCAPE DRILLS | |
| OTHER: EXECUTIONS | |
| OTHER: OUT OF STATE TRANSFERS | |
| OTHER: RECORDS | |
| OTHER: CODE | |
| OTHER: SPECIAL PROJECTS | |
| OTHER: COMPUTER PROBLEMS | |
| OTHER: RESIGNATION | |
| OTHER: WATCH CMDR. | |
| OTHER: | |
| OTHER: | |
| **TOTAL HOURS REPORTED** | 64 |

D00418

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
SHIFT CONTINUATION ROSTER
1600-2400

SATURDAY

DATE: 11/13/04

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 1 | 1 | | | | | | | |
| STAFF LIEUTENANT | 0 | 0 | | | | | | | |
| LIEUTENANTS | 3 | 2 | | | | | | | 1-Vacancy |
| SERGEANTS | 8 | 3 | | | | | | 1 | 4-Vacancies |
| CORPORALS | 4 | 2 | | 1 | 1 | | | | |
| OFFICERS | 51 | 40 | 5 | 1 | 1 | | | 2 | 7-Vacancies, Rule |
| K-9 OFFICERS | 1 | 1 | | | | | | 3 | 10-1 Vacancies |
| TOTAL | 68 | 49 | 5 | | | 0 | | | |

COMMENTS: 6 - Overtime positions - 6 - Vacancies
2 - Cbr. Hosp.

PREPARED BY: _____
SHIFT COMMANDER (TITLE AND SIGNATURE)

REVIEWED BY: _____
SECURITY SUPERINTENDENT (SIGN AND DATE)

_____
DEPUTY WARDEN (SIGN AND DATE)

Page 1

D00419

**A000243**

# HOWARD R.YOUNG CORRECTIONAL INSTITUTION
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER: _____ **Staff Lieutenant Lee** _____ DATE: __**11-14-04**__

DAY: __**Sunday**__ TIME ASSUMED DUTY: __**2310**__

I HAVE BRIEFED MY RELIEF:   YES   **XXX**                    NO: _____

RELIEVED BY: _____ **Staff Lieutenant Polk** _____

OFF GOING SHIFT COMMANDER: _____ **Staff Lieutenant Lee** _____

ON COMING SHIFT COMMANDER: _____ **Staff Lieutenant Polk** _____

## BEGINNING EQUIPTMENT COUNT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| .38 Revolvers | 2 | Shackles | 8 | Cutter | 1 | Gas Mask | 3 |
| Speed Loaders | 3 | Travel Chains | 9 | Capstun | 1 | S/C Keys | 22 |
| .38 Rounds | 24 | Hacksaw | 1 | .40 S & W | 7 | Gas Cards | 16 |
| Holsters | 6 | Crank | 1 | .40 Rounds | 196 | TBC | 1495+1 |
| Handcuffs | 8 | Sealed Keys | 11 | .40 Magazines | 14 | K9 | Fountain |
| Black Boxes | 5 | Locks | 5 | | | OSP | Cilento |

| TIME | COMMENTS |
|---|---|
| 2310 | S/Lt. Lee and Lts. Chudzik and Pedrick in area for duty. S/Lt. Lee |
| ////// | relieves Capt. Bamford after briefing                    TBC=1495+1 |
| 2315 | (1) New Commitment        (4X12)                    TBC=1496+1 |
| 2400 | Code Red |
| 0005 | Cpl. Covelli & C/O Hagains, D. (2308 Christiana Hosp.) |
| ////// | (1) 38 caliber, (6) rounds, (1) speed loader. |
| 0021 | Code Green                                        TBC=1496+1 |
| 0048 | (24) E-crew workers out. |
| 0125 | (1) New Commitment                              TBC=1497+1 |
| 0150 | (1) New Commitment                              TBC=1498+1 |
| 0235 | C/O Roemer, W. called out for 8X4 shift with the flu. |
| 0240 | (1) New Commitment                              TBC=1499+1 |
| 0321 | (1) In house transfer, floor to bed. |
| 0345 | Code Red |
| 0406 | Code Green                                        TBC=1499+1 |
| 0410 | FSS III Leonard & FSS I Oliver in area for duty. |
| 0514 | C/O Buff, T. called out for 8X4 shift with the flu. |

D00420

| TIME | COMMENTS |
|------|----------|
| 0645 | Code Red |
| 0705 | Code Green                                              TBC=1499+1 |
| **BRIEFING:** | 2H pod outer hallway and interview room doors not operating from the |
| ////// | panel. Maintenance unable to fix till Monday. Also advised of light out |
| ////// | outside Primary Control. Will look at on Monday. |
| 0715 | S/Lt. Lee relieved by S/Lt. Polk after briefing.        TBC=1499+1 |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |
|      |          |

D 0 0 4 2 1

MULTI-USE CRIMINAL JUSTICE FACILITY
DAILY ROSTER

DATE: 01/11/04

DAY: SUNDAY                    SHIFT: 12 X 8

SHIFT COMMANDER: S/LT. LEE, W

SHIFT SUPERVISOR:

**UNIT 1 & 2**

LT: LT. D. CHUDZIK
PRIMARY CONTROL: C/O SAUNDERS, M
PRIMARY CONTROL: CPL. DOTSON, B.

| | | OPS: C/O CILENTO, S |
| L/W: CPL CHAPPEL, D | WAND | K-9: C/O FOUNTAIN, R * |
| B&R: CPL DANIELS, K | | |
| B&R: C/O YOUNG, D | C/C | SEC. CNTRL: C/O JOHNSON, J |
| B&R: C/O IVY, S * | | |
| B&R: C/O BULLOCK, M. | | |

1ST FLR ROVER: C/O TROY, W    HOSE

| 1A/B: C/O FREDRICKS, G | 1C/D: C/O N'Dayé, Edita | D.T. | DORM 4: C/O Williams, Vincent i D.T. |
| 1E/F: C/O HARMON, C | INF: C/O SCHRACK, D | | DORM 4: C/O RICHBURG, S |

**UNIT 3 & 4**

LT: LT. PEDRICK, A

| L/W: CPL. HARRFORD, W | EQUIP. | FITNESS CENTER: |
| 2 A/F ROVER: C/O RODRIGUEZ, Z   SBA | 2 G/M ROVER: C/O BAHADUR, R HOSE • | C/O: |
| 2 A/B: C/O Clark, Leroy D.T. | 2 G/H: C/O BUSH, M | C/O: |
| 2 C/D: C/O STROMACK, S | 2 J/K: C/O WILKINS, A • | |
| 2 E/F: C/O DAVID, J | 2 L/M: C/O BOSTON, T | MISC: 2308 Christmas (ey) |

| 2 Q/T ROVER: C/O HACKETT, R   SBA • | 2 V/Z ROVER: C/O POOLE, C   HOSE• | Cavello, John |
| 2Q: C/O YEAGER, K | 2V: C/O HENRY, L • | Hasnins, Burdick |
| 2R: C/O THORNE, V | 2W: C/O LEGETTE, J | |
| 2S: C/O Hammond, J VHR• | 2Y: C/O BURLEY, S • | |
| 2T: C/O Hackett, R VHR• | 2Z: C/O YOUNG, M S/r Harris √ | |

| DORM 1: C/O HARRIS, L | DORM 2: C/O DEITRICH, P | DORM 1 & 2 ROVER: C/O KETLER, D |
| GYM: | GYM: | |

HOL, VAC, SICK, MIL, ETC.          HOL, VAC, SICK, MIL, ETC.

MISC. INFORMATION
Williams, J  s/s
Hackett, R  Pls
Aberto, A  m/s
Dixon, J  WIT
Hammond, J  m/s
Long, K

| PINA, J. | RESIGNED |
| WOGU, I. | RESIGNED |
| BATES, P | RESIGNED |
| Dixon, Y | S-ABS |
| Gaujman, K | Trans |
| Cain, R. | VAC |
| Plate, L. | Trans Bnce |
| | Resigned |

A000246

D00422

# HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## DAILY ROSTER: 4X12 SHIFT

**DATE: 11/14/04**                                                     **SUNDAY**

| VHR RELIEF | | VAC/SICK/MILITARY | | | OUTSIDE HOSPITAL | ROOM # |
|---|---|---|---|---|---|---|
| MINNITI, V. | M/S | CURTIS, S. | S/S | MLWOP | Butcher Barbara. | |
| KLINE, J. | F/S | ROWE, J. | T/W | MLWOP | McGee Marjorie | |
| CARMONA, J. | M/T | NEAL, D. | W/T | MLWOP | | |
| SEARLES, W. | F/S | CAMPBELL, E. | S/S | MLWOP | | |
| BAYNE, E. | M/S | CUSTER, E. | M/T | W/C | | |
| JOHNSON, P. | T/F | SCHAFFER, T. | M/T | W/C | | |
| ROGERS, R. | T/W | MEDFORD, J. | F/S | VAC | | |
| | | VARGAS, R. | S/M | VAC | | |
| | | PRESSLEY, C. | | VAC/ML | | |
| | | ROMANOWSKI, T. | T/F | SICK | | |
| | | | Infores SF | | MEDICAL RUNS | OFFENDER |

P __2

A000247

D00423

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

DAY: _Sunday_
DATE: _11/14/04_

SHIFT COMMANDER
2400-0800

Shift Lee

| # | NAME | | DAYS OFF |
|---|------|---|----------|
| 1 | BERGRUN, BRIAN | CAPTAIN | SUMO |
| 2 | LEE, WAYNE | STAFF LT. | FR/SA |
| 3 | PEDRICK, ALLEN | LIEUTENANT | WE/TH |
| 4 | CHUDZIK, DONALD | LIEUTENANT | FR/SA |
| 5 | KENNEY, AUDREY | LIEUTENANT | SUMO |
| 1 | PARKER, PHILIP | VARVAR CAPT. | VAR |
| 2 | PRITCHETT, MICHAEL | VARVAR LT. | VAR |
| 3 | FOUNTAIN, REUBEN | K-9 | TU/WE |
| 4 | LEE, JAY | K-9 | WE/TH |
| 5 | | K-9 VARVAR | |
| 1 | TRIPLETT, JAMES | SERGEANT | SA/SU |
| | | CORPORALS | |
| 1 | DANIELS, KIMPHUS | CPL | FR/SA |
| 2 | PORTER, RAYMOND | CPL | SUMO |
| 3 | CHAPPEL, CHRISTOPHER | CPL | TU/WE |
| 4 | HARRIFORD, WILLIAM | CPL | MO/TU |
| 5 | DOTSON, BENNY | CPL | TH/FR |
| 6 | | CPL | WE/TH |
| | | OFFICERS | |
| 1 | ADAMS, DEBORAH | | SUMO |
| 2 | BADAHUR, RAMROOP | | FR/SA |
| 3 | BATES, PAMELA | | FR/SA |
| 4 | BENN, DONALD | | SA/SU |
| 5 | BOSTON, TAMARA | | MO/TU |
| 6 | BROWN, WILLIAM | | SUMO |
| 7 | BULLOCK, MARK | | MO/TU |
| 8 | BURLEY, SONYA | | FR/SA |
| 9 | BUSH, MATIN | | TU/WE |
| 10 | CAIN, REBEKAH | | TU/WE |

TUESDAY ONLY    2300-0700

HOURS

A000248

D00424

S/Lt. Lee

SHIFT COMMANDER
2400-0800

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
11/08/04

DAY: Sunday    DATE: 11/14/04

| # | NAME OFFICERS | DAYS OFF | STAT | 1 T A O C E |
|---|---|---|---|---|
| 11 | CILENTO, STEVEN OPS | WE/TH | | OPS |
| 12 | DAVID, JOHN | WE/TH | | 2 E/F |
| 13 | DIETRICH, PHILLIP | TH/FR | Dorm II | |
| 14 | DIXON, YVETTE | FR/SA | ABS | |
| 15 | FREDERICKS, GARRY | TH/FR | 1 | Ab |
| 16 | GAYMON, KIMBRIDGE | MO/TU | VAC | |
| 17 | GRIFFIN, CHARLES | SA/SU | | |
| 18 | HACKETT, RICHARD | MO/TU | 2 | Off Rvr |
| 19 | HAGAINS, DERRICK | SU/MO | | |
| 20 | HARMON, CORNELIUS | MO/TU | 1 | E/f |
| 21 | HARRIS, LAKIA | TH/FR | Dorm I | |
| 22 | HENRY, LATISHA | WE/TH | 2 | V |
| 23 | HOPKINS, KEVIN | SA/SU | | |
| 24 | IVY, SCOTT | FR/SA | B/a | |
| 25 | JOHNSON, JAMIE | WE/TH | S/c | |
| 26 | KETLER, DESHAUN | TU/WE | Dorm Rvr | |
| 27 | LEGETTE, JOSEPHINE | TU/WE | 2 | W |
| 28 | LEVAN, SEAN | SA/SU | | |
| 29 | PADDY, ROBERT | SU/MO | | |
| 30 | PLATT, LISA | TU/WE | Restricted | |
| 31 | POOLE, CHARZELL | FR/SA | 2 | VI2 Rvr |
| 32 | RICHBURG, STEFAN | TH/FR | Dorm VI | |
| 33 | ROACH, SHARON | TH/FR | | |
| 34 | ROBINSON, ANITA | SU/MO | | |
| 35 | RODRIGUEZ, ZACHARY | TH/FR | 2 | Ar Rvr |
| 36 | SAUNDERS, MARK | TU/WE | Plc Rane | |
| 37 | SCHRACK, DONALD | MO/TU | Inf | |

**HOWARD R.YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
**11/08/04**

**DAY:** Sunday
**DATE:** 11/14/04

SHIFT COMMANDER 2400-0800
S/Lt. Lee

| # | NAME | DAYS OFF |
|---|------|----------|
| 38 | SHORTER, TERRANCE | SUMO |
| 39 | SMITH, DAREN | SA/SU |
| 40 | SOUL, JAMAR | SA/SU |
| 41 | STROMACK, STEPHEN | TH/FR |
| 42 | THORNE, VALENTINO | TU/WE |
| 43 | TROY, WILLIAM | TU/WE |
| 44 | WILKINS, ASBURY | FR/SA |
| 45 | WILLIAMS , JOSEPH | SUMO |
| 46 | WOODARD,GLEN | SA/SU |
| 47 | YEAGER , KRISTINA | TU/WE |
| 48 | YOUNG , DENISHA | WE/TH |
| 49 | YOUNG , MINELLE | TH/FR |

A000250

D00426

YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
10/25/04

SHIFT COMMANDER 2400-0800

DAY: _____
DATE: 11/29/04

| # | NAME | DAY'S OFF |
|---|------|-----------|
| 1 | AHART, AUSTIN | M-S |
| 2 | WILLIAMS, TONY | S-S |
| 3 | HACKETT, ROBERT | F-S |
| 4 | HAMMOND, JAMES | W-T |
| 5 | LONG, KENNETH | W-S |
| 6 | GRIFFIN, SHIRELLE | M-S |

12X8 SHIFT VHRS 11/08/04 TO 11/21/04

A000251

000427

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

DAY  Sunday
DATE: 11/14/04

SHIFT COMMANDER
2400-0800  S/Lt Lee

**RESPONSE TEAMS**
**PRIMARY QRT**

| | | |
|---|---|---|
| T/L | Cpl Hannigans | |
| 1 | Troy, W. | |
| 2 | Rodriguez, Z. | |
| 3 | Hackett, R. | |
| 4 | Batonza, R. | |
| 5 | Powel, C. | |
| 6 | Younce D. C/C | |

**SECONDARY QRT**

| | | |
|---|---|---|
| T/L | Same | |
| 1 | | |
| 2 | A3 | |
| 3 | | |
| 4 | | Amoss |
| 5 | | |
| 6 | | |

**FIRE TEAM**

| | | |
|---|---|---|
| T/L | Same | |
| 1 | | |
| 2 | A5 | |
| 3 | | |
| 4 | | Abler |
| 5 | | |

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
OVERTIME DUTY ROSTER

DAY: _Sunday_
DATE: _11/14/04_

OT DUTY ROSTER

| | OFFICERS LAST NAME | OFFICERS FIRST NAME | SS# | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Clark | Venus | HHYL E YsL | 8 | 2 A/3 |
| 2 | N'Diaye | Lolita | HHYL E YsL. | 8 | 1C/D |
| 3 | Williams | Vincent | HHYL E Vsl. | 8 | Door IV |
| 4 | Caudell | John | 25B | 8 | 25B Christmas Hse. |
| 5 | Haskins | Derrick | 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 HU | 8 | 1308 Christmas Hse. |
| 6 | | | HHYL E HU | 8 | 1308 Christmas Hse. |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

SS# IS ONLY NECCESSARY IF OFFICER DOES NOT WORK AT THIS INSTITUTION

ATTACH THIS PAGE TO DUTY ROSTER.

A000253

D00429

**BUREAU OF PRISONS**
**OVERTIME REPORT**

12X8 SHIFT

| BUDGET UNIT# | 006 | BUDGET UNIT NAME | **HRYCI** |
|---|---|---|---|
| PERIOD WORKED | | PAYCYCLE PAID | |

| REASON FOR OVERTIME | | TOTALS |
|---|---|---|
| ADMINISTRATIVE | | |
| AWOL | | |
| CALL BACK | | |
| CLASSIFICATION | | |
| COURT | | |
| COMPASSIONATE LEAVE | | |
| EXTRA DUTY – INSIDE | | |
| EXTRA DUTY – OUTSIDE | | |
| FMLA | | |
| GYM VACANCY | | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | | |
| INVENTORY | | |
| JURY DUTY | | |
| LATE RELIEF | | |
| LEAVE WITHOUT PAY | | |
| MAILROOM / SUPPLY | | |
| MEETING / UNION BUSINESS | | |
| MILITARY LEAVE | | |
| OUTSIDE HOSPITAL | 2 @ 8 hours | |
| REPORTS | | 16 |
| SHAKEDOWN | | |
| SICK | | |
| SUSPENSION | | |
| TRAINING | | |
| TRANSPORTATION | | |
| FUNERAL RUN | | |
| INMATE TRANSFER | | |
| MEDICAL RUN | | |
| TRAVEL TIME | | |
| OTHER | | |
| UNAUTHORIZED ABSENCE | | |
| VACANCY | 3 @ 8 hours | |
| VACATION | | 24 |
| WEAPONS RECLASSIFICATION | | |
| WORKMAN'S COMPENSATION | | |
| OTHER: FIRE EQUIPTMENT | | |
| OTHER: ESCAPE DRILLS | | |
| OTHER: EXECUTIONS | | |
| OTHER: OUT OF STATE TRANSFERS | | |
| OTHER: RECORDS | | |
| OTHER: CODE | | |
| OTHER: SPECIAL PROJECTS | | |
| OTHER: CONSTRUTION, VEST, GRIEVANCES | | |
| OTHER: COMPUTER PROBLEMS | | |
| OTHER: WATCH CMDR. | | |
| OTHER: | | |
| OTHER: | | |
| **TOTAL HOURS REPORTED** | | 40 |

**A000254**

D00430

HOWARD R. YOUNG CORRECTIONAL INSTITUION
SHIFT CONTINUATION ROSTER
2400-0800

DATE: 11 / 18 / 04        SUNDAY

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 0 | 0 | | | | | | | |
| STAFF LIEUTENANT | 1 | 1 | | | | | | | |
| LIEUTENANTS | 2 | 2 | | | | | | | |
| SERGEANTS | 0 | 0 | | | | | | | |
| CORPORALS | 5 | 4 | | | | | | | |
| OFFICERS | 34 | 30 | 1 | 1 | | | | | 3-VACANCIES |
| K-9 OFFICERS | 1 | 1 | | | | | | | 1-VACANCY |
| TOTAL | 43 | 38 (6) | 1 | 1 | | | | | 4-VACANCIES |

COMMENTS:  OVERTIME: 5 = (2) OSH, (3) VACANCIES = 5 TOTAL

PREPARED BY: _____ S/CT. WS M.L
SHIFT COMMANDER (TITLE AND SIGNATURE)

REVIEWED BY: _____ 11/15
SECURITY SUPERINTENDENT (SIGN AND DATE)

_____ 11/15/04
DEPUTY WARDEN (SIGN AND DATE)

Page 1

D00431

**A000255**

## HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER: **S/LT POLK, J.**    DATE: 11-14-04

DAY: SUNDAY    TIME ASSUMED DUTY: 0720HRS

I HAVE BRIEFED MY RELIEF: YES XX    NO:

~~RELIEVED BY:~~    S/LT SABATO

OFF GOING SHIFT COMMANDER:    S/LT POLK, J.

ON COMING SHIFT COMMANDER:

### BEGINNING EQUIPTMENT COUNT

| .38 Revolvers | 2 | Shackles | 8 | Cutter | 1 | Gas Mask | 3 |
|---|---|---|---|---|---|---|---|
| Speed Loaders | 3 | Travel Chains | 9 | Capstun | 1 | S/C Keys | 22 |
| .38 Rounds | 24 | Hacksaw | 1 | .40 S & W | 6 | Gas Cards | 19 |
| Holsters | 6 | Crank | 1 | .40 Rounds | 168 | TBC | 1499+1 |
| Handcuffs | 8 | Sealed Keys | 11 | .40 Magazines | 12 | K9 | BRYANT |
| Black Boxes | 5 | Locks | 5 | | | OSP | KADOW |

| TIME | COMMENTS |
|---|---|
| 0715 | S/LT POLK RELIEVED S/LT LEE AFTER BRIEFING. NOTIFIED OF THE ALCOVE DOOR ON 2H-POD THAT WAS BROKEN AND MAINTENANCE WAS NOTIFIED. TWO CALL OFFS WERE RECORDED, C/O ROEMER, W. & C/O BUFF, T. LT FARMER IS ON DUTY. |
| 0730 | HELD MUSTER, ALL PERSONNELL REPORTED FOR DUTY WITH EXCEPTIONS NOTED ON DUTY ROSTER. ALL AREAS ARE MANNED, WITH NO LOCKDOWNS OR CANCELLATIONS. |
| 0800 | CODE RED |
| 0816 | CODE GREEN TBC-1499+1 |
| 1117 | ONE NEW COMMITMENT TBC-1500+1 |
| 1135 | CODE RED |
| 1140 | CODE 7 B/R I/M BARKES, C. #361999 HUNG HIS SELF IN CELL #122, CPR IS ADMINISTERED BY MEDICAL, UNRESPONSIVE AT THIS TIME. |
| 1141 | DEPUTY WARDEN PHELPS IS PAGED |

D00432

**A000256**

| TIME | COMMENTS |
|------|----------|
| 1142 | DEPUTY WARDEN PHELPS RETURNS PAGE, AND IS NOTIFIED OF THE CODE 7 IN B/R, AND 911 WAS CALLED ALONG WITH WITH THE STATE POLICE. |
| 1152 | AMBULANCE AND THE FIRE DEPARTMENT ARRIVE IN THE INSTITUTION. |
| 1155 | CODE GREEN TBC-1500+1 |
|      | MAJOR WILLIAMS WAS NOTIFIED OF THE INCIDENT IN B/R. |
| 1200 | STATE POLICE ARRIVE IN THE FACILITY. |
| 1207 | CODE 7 10-1, ALL AREAS WERE LOCKED DOWN, PENDING EMERGENCY CLARIFICATION. |
| 1221 | AMBULANCE DEPARTS FACILITY, C/O CUMBERBATCH & C/O YOUNG, R. DEPART WITH THE AMBULANCE. |
| 1255 | LOCKDOWN WAS LIFTED, FACILITY IS OPERATING AT NORMAL. |
| 1300 | DEPUTY WARDEN ARRIVES IN THE FACILITY. |
| 1306 | STATE POLICE CRIME SCENE INVESTIGATION UNIT ENTERS THE FACILITY |
| 1345 | NOTIFIED BY C/O CUMBERBATCH AT CHRISTIANA THAT I/M BARKES, CHRISTOPHER #361999 HAS PASSED. |
| 1355 | CODE 8 2YPOD |
| 1359 | CODE 8 2YPOD IS 10-1, I/M DOWNS, D #452968 AND I/M HAR-GROW, R. # 440862 WERE TAKEN TO 1EPOD PENDING A DISCPLINARY HEARING. |
| 1444 | THREE NEW COMMITMENTS TBC-1503+1 |
| 1451 | ONE RELEASE (BAIL) TBC-1502+1 |
| 1500 | CODE RED |
| 1515 | CODE GREEN TBC-1502+1 |
| 1520 | S/LT SABATO RELIEVED S/LT POLK AFTER BRIEFING. |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |
|      | |

D00433

# Multi-Purpose Criminal Justice Facility
## Daily Roster; 8x4 Shift

**DATE: 11-14-04**  **SUNDAY**

| | | |
|---|---|---|
| Shift Command: S/LT Polk | Security Team: CPL B. TAYLOR | |
| Shift Supervisor: | Security Team: C/O. TERRELL | |
| Operations Lt: | Security Team: C/O | |
| | Security Team: C/O CERISIER | |
| Unit 27: C/O KADOW | | |
| K-9: C/O BRYANT | | |
| **Unit 1** | | |
| LT: ___ Forte | L/W B/R: CPL RAYNE | 1A/B: ___ RIVERA |
| | B/R: C/O | 1A/B: C/O Milligan |
| L/W: SGT. F. WAY | B/R: C/O MARTELLI | 1C/D: C/O MCREYNOLDS | 1C/D: C/O Scott |
| LOBBY: C/O DEMBY | B/R: C/O D. FIELDS | 1E/F: C/O. EMIG | 1E/F: C/O CHARLES |
| Unit 11: C/O C. BURRELL | B/R: | 1E/F: C/O J. DAVIS. | |
| P/C BKS: C/C Bailey | B/R: | INF: C/O | INF: C/O S. HARGROVE. |
| P/C DRS: C/O KINLOCH | | DORM 4: | DORM 4: C/O KALONDER. |
| **Unit 2** | | Unit 12: C/O | |
| Lt: FARMER | 2A/B: C/O | 2A/B: C/O |
| L/W A-F: | 2C/D: C/O | 2C/D: C/O |
| KENNEDY | C/O GASSNER | 2E/F: C/O | 2E/F: C/O |
| L/W: CPL | 2G/H: C/O COOPER | 2G/H: C/O | DORM 4: C/O |
| Unit 13: C/O R. YOUNG | 2J/K: C/O CONRAD | 2J/K: C/O | DORM 4: C/O |
| Unit 14: C/O EVERETTE | 2L/M: C/O EVERETTE | 2L/M: C/O | VSR 1: C/O N. BORDLEY. |
| **Unit 3** | | |
| LT: | 2Q: C/O BROOKS | 2V: C/O POWELL | Dorm 1: C/O |
| S/C: C/O ROY | 2R: C/O HIGGINS | 2W: C/O Diamond | Dorm 2: C/O HASTINGS |
| S/C: CPL JACKSON | 2S: C/O SHADE | 2Y: C/O BROWN | Dorm Rover: C/O |
| L/W: SGT | 2T: C/O HITCHENS | 2Z: C/O | MISC: |
| L/W: SGT | UNIT 15: C/O STILL | UNIT 16: | UNIT 25: C/O REDMAN |
| L/W: SGT. | MISC | MISC | MISC: C/O |

A000258

D00434

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04
REVISED

DAY: Sunday
DATE: 11-14-04

SHIFT COMMANDER 0800-1600

| # | NAME | | DAYS OFF |
|---|------|---|----------|
| 1 | JEFFERSON, CAROL | CAPTAIN | SU/MO |
| 2 | POLK, JOHN | STAFF LIEUT | FR/SA |
| 3 | QUEENER, WILLIAM | LIEUTENANT | SU/MO |
| 4 | FARMER, SYLVIA | LIEUTENANT | TU/WE |
| 5 | SHEETS, PATRICK | LIEUTENANT | FR/SA |
| 6 | | LIEUTENANT | WE/TH |
| 1 | PARKER, PHILIP VAR/VAR | CAPTAIN | VAR |
| 2 | EMIG, MARK | CAPTAIN | SA/SU |
| 3 | PRITCHETT, MICHAEL VAR/VAR LT. | | VAR |
| 4 | FAHEY, GERALD | STAFF LIEUT | SA/SU |
| 5 | BRYANT, JOSEPH | K-9 | FR/SA |
| 6 | LEE, JAY | K-9 | WE/TH |
| 7 | ALEXANDER, SPENCER | K-9 | SA/SU |
| | SERGEANTS | | |
| 1 | GRANT, JOHN | SERGEANT | SA/SU |
| 2 | GREENE, CHARLES | SERGEANT | SU/MO |
| 3 | LEWIS, MICHAEL | SERGEANT | FR/SA |
| 4 | MOODY, MARY | SERGEANT | SA/SU |
| 5 | KENNEDY, HOWARD | SERGEANT | TH/FR |
| 6 | RICHARDS, CHARLES | SERGEANT | WE/TH |
| 7 | WILSON, WAYNE | SERGEANT P/C | SA/SU |
| 8 | WAY, FRED | SERGEANT | SA/SU |
| 9 | | SERGEANT | SA/SU |
| | CORPORALS | | |
| 1 | GRESMER, LILLIAN CORPORAL | | SU/MO |
| 2 | GOLDSBORO, REGINALD CORPORAL | | SA/SU |
| 3 | KERNS, FRANKIE | CORPORAL | SA/SU |
| 4 | MASSEY, TERRIS | CORPORAL L/R | SA/SU |
| 5 | RAYNE, SANDRA | CORPORAL | FR/SA |
| 6 | HAMILTON, LARRY | LOADING DOCK | SA/SU |
| 7 | JACKSON, EDWARD | CORPORAL | TU/WE |
| 8 | PEREZ, RUFFINO | CORPORAL | WE/TH |
| 9 | MCMILLIAN, KENNETH P/C | CORPORAL | SU/MO |

FRIDAY AND SATURDAY ONLY 0700-1500

D00435

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04
REVISED

DAY: Sunday
DATE: 11-14-04

SHIFT COMMANDER 0800-1600

| # | NAME | DAYS OFF | | | | | | | | | | | | | | | | | | | |
|---|------|----------|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| | **CORPORALS OFFICERS** | | | | | | | | | | | | | | | | | | | | |
| 13 | | MOTU | | | | | | | | | | | | | | | | | | | |
| 12 | TAYLOR, BARRY  CORPORAL  S/T | FR/SA | | | | | | | | | | | | | | | | | | | |
| 11 | FORTE, BRIAN  CORPORAL | TH/FR | | | | | | | | | | | | | | | | | | | |
| 10 | DIAL, SEAN  CORPORAL  M/R | SA/SU | | | | | | | | | | | | | | | | | | | |
| | **CORPORALS** | | | | | | | | | | | | | | | | | | | | |
| 1 | AMAR, MYRON | TU/WE | | | | | | | | | | | | | | | | | | | |
| 2 | AUSTIN, SCOTT | SU/MO | | | | | | | | | | | | | | | | | | | |
| 3 | BRELAND, TILLIS | SU/MO | | | | | | | | | | | | | | | | | | | |
| 4 | BRINKLEY/WARREN MEDICAL RUN OFFICER | SA/SU | | | | | | | | | | | | | | | | | | | |
| 5 | BROOKS, DERRICK | MO/TU | | | | | | | | | | | | | | | | | | | |
| 6 | BROWN, DANA | MO/TU | | | | | | | | | | | | | | | | | | | |
| 7 | BUFF, TIMOTHY | WE/TH | | | | | | | | | | | | | | | | | | | |
| 8 | BURNS, WILLIAM  KEY PROGRAM | SA/SU | | | | | | | | | | | | | | | | | | | |
| 9 | BURRELL, CHARLES | FR/SA | | | | | | | | | | | | | | | | | | | |
| 10 | BUTCHER, BARBARA | FR/SA | | | | | | | | | | | | | | | | | | | |
| 11 | BUTCHER, ROBERT  SUPPLY | SA/SU | | | | | | | | | | | | | | | | | | | |
| 12 | CERISIER, GIVENCHY | TH/FR | | | | | | | | | | | | | | | | | | | |
| 13 | CHARLES, RADCLIFFE | FR/SA | | | | | | | | | | | | | | | | | | | |
| 14 | CONRAD, KIMBERLY | WE/TH | | | | | | | | | | | | | | | | | | | |
| 15 | COOPER, LEATHIA | TH/FR | | | | | | | | | | | | | | | | | | | |
| 16 | CROPPER, PERVONE | SA/SU | | | | | | | | | | | | | | | | | | | |
| 17 | CUMBERBATCH, GERWIN | FR/SA | | | | | | | | | | | | | | | | | | | |
| 18 | CURRINGTON, LYNN  MAIL ROOM | SA/SU | | | | | | | | | | | | | | | | | | | |
| 19 | DANIELS, VINCENT | SU/MO | | | | | | | | | | | | | | | | | | | |
| 20 | DAVIS, JULIUS | TH/FR | | | | | | | | | | | | | | | | | | | |
| 21 | DEMBY, GREG | FR/SA | | | | | | | | | | | | | | | | | | | |
| 22 | DEPAUL, RONALD | MO/TU | | | | | | | | | | | | | | | | | | | |
| 23 | DIAMOND, WALLACE | TU/WE | | | | | | | | | | | | | | | | | | | |
| 24 | EMIG, BRIAN | MO/TU | | | | | | | | | | | | | | | | | | | |
| 25 | EVERETTE, GWENDOLYN | MO/TU | | | | | | | | | | | | | | | | | | | |
| 26 | FIELDS, DORENE | WE/TH | | | | | | | | | | | | | | | | | | | |
| 27 | FLAKES, LESLIE | WE/TH | | | | | | | | | | | | | | | | | | | |
| 28 | FLOYD, VANANZIO  S/T | SU/MO | | | | | | | | | | | | | | | | | | | |

TEMPORARY ASSIGNED
TEMPORARY ASSIGNED

D00436

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**DUTY ROSTER**
**11/08/04 REVISED**

DAY: Sunday    DATE: 11-14-04

SHIFT COMMANDER 0800-1600

| # | NAME | DAYS OFF |
|---|------|----------|
| 29 | GAINES , QUINTON  GROUNDS KEEPER | SA/SU |
| 30 | GASSNER , RICHARD | TU/WE |
| 31 | GOODALL , OSBORNE | TU/WE |
| 32 | GRIFFIN , SHIRELLE | SU/MO |
| 33 | HARGROVE , SHELTON | MO/TU |
| 34 | HARRISON , RICHARD | MO/TU |
| 35 | HASTINGS , KENNETH | MO/TU |
| 36 | HEALY , JOHN  OPS | SA/SU |
| 37 | HENRY , STANFORD | SA/SU |
| 38 | HIGGINS , APRIL | MO/TU |
| 39 | HITCHENS , MELVIN | TU/WE |
| 40 | JOHNSON , DWIGHT | SU/MO |
| 41 | KADOW , MICHAEL  S/T | MO/TU |
| 42 | KOLONDER , CHAD | TH/FR |
| 43 | KING , CONNIE  MAIL ROOM | SA/SU |
| 44 | KINLOCH , VERONICA | TH/FR |
| 45 | LIVINGSTON , JOHN | SA/SU |
| 46 | LOGAN , ROBERT | SA/SU |
| 47 | MARTELL , STEPHEN | FR/SA |
| 48 | MCGEE , NAVINIA | SU/MO |
| 49 | MCREYNOLDS , JERMAINE | FR/SA |
| 50 | NEAL , CHARLES | SA/SU |
| 51 | NEWMAN , ANNETTE | SU/MO |
| 52 | NEWMAN , BARRY | SU/MO |
| 53 | PALMA , RICARDO | SA/SU |
| 54 | PELLE , PAUL | FR/SA |
| 55 | POWELL , JIVONNE | TU/WE |
| 56 | PRINCE , KENYA | WE/TH |
| 57 | RAWLEY , DONALD | FR/SA |
| 58 | REDMAN , LATOYA | WE/TH |
| 59 | RIVERA , COURTNEY | TU/WE |
| 60 | ROEMER , WILLIAM | TH/FR |
| 61 | ROY , JOSETTE | TU/WE |
| 62 | SHADE , JESSE | MO/TU |

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04
REVISED

DAY: Sunday
DATE: 11-14-04

SHIFT COMMANDER 0800-1600

| # | NAME | | DAYS OFF |
|---|------|---|----------|
| 63 | SHINN, JAMES | INFO. SYST. COORD. | SA/SU |
| 64 | SMITH-BOARDLEY, NANNETTE | | WE/TH |
| 65 | STILL, DIONNE | | WE/TH |
| 66 | SUTTON, JERON | | SA/SU |
| 67 | SUVIE, ANTHONY | KEY PROGRAM | SA/SU |
| 68 | TALENT, ANDREW | MAIL ROOM | SA/SU |
| 69 | TERRELL, CLIFFORD | S/T | TH/FR |
| 70 | THOMPKINS, ROGER | | SUMO |
| 71 | TURNER, GORDON | | SA/SU |
| 72 | WAYMAN, GLENN | | SA/SU |
| 73 | WHITE, JACQUELINE | SICK CALL | SA/SU |
| 74 | WILLIAMS, JANELL | | WE/TH |
| 75 | WRIGHT, GEORGE | | SA/SU |
| 76 | YOUNG, REGINALD | | FR/SA |
| 77 | | | TU/WE |
| 78 | | | TU/WE |
| 79 | | | TU/WE |
| 80 | | | WE/TH |
| 81 | | | WE/TH |
| 82 | | | WE/TH |
| 83 | | | TH/FR |
| 84 | | | FR/SA |
| 85 | | | FR/SA |
| 86 | | | FR/SA |
| 87 | | | SA/SU |
| 88 | | | SUMO |
| | FRINK, ADRIANE | | SA/SU |

ON MILITARY LEAVE W/O PAY

A000262

D00438

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
11/08/04

SHIFT COMMANDER 0800-1600

DAY: Tuesday
DATE: 11-14-06

| # | NAME | DAYS OFF |
|---|------|----------|
| | 8X4 VHRS 11/08/04 TO 11/21/04 | |
| 1 | CARMONA, JOSE | |
| 2 | SAVAGE, KAREN | |
| 3 | LISKIEWICZ, GREG | |
| 4 | FAGAN, MALISSA | |
| 5 | BAROW, MARK | |
| 6 | BANE, SAMUEL | |
| 7 | MILLIGAN, TYSEAN | |
| 8 | KLINE, JAMES | |
| 9 | SCOTT, JEFFERY | |

A000263

000439

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
**OVERTIME DUTY ROSTER**

DAY _Sunday_
DATE: _11/19/06_

| # | OFFICERS LAST NAME | OFFICERS FIRST NAME | SSN # | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Hammond | James (CHP) | | 8 | Dorm IV |
| 2 | Sessons | Sonia (CHP) | | 8 | 2A16 |
| 3 | Pavilou | Mark (CHP) | | 8 | 20D |
| 4 | Lackig | Denisha (CHP) | | 8 | C.E.F. |
| 5 | Stevens | James (CHP) | | 8 | 26/H |
| 6 | Searles | CMC (CHP) | | 8 | 2/H. |
| 7 | Cobalt | David (STR) | 093 - 48 - 9728 | 8 | 24/M |
| 8 | Neir | Louis (CH3) | | 8 | 22.16d |
| 9 | Johnson | David (CH2) | | 8 | 20D |
| 10 | Evans | Larry (CH2) | | 8 | Serenity |
| 11 | Hamilton | Larry (8x4) | | 8 | Chest 308 |
| 12 | Bingham | Stephen (CH2) | | 8 | " |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

OT DUTY ROSTER

SS# IS ONLY NECCESSARY IF oFFICER DOES NOT WORK AT THIS INSTITUTION

ATTACH THIS PAGE TO DUTY ROSTER.
IF OFFICER DOES NOT WORK AT THIS INSTITUTION

D00440

SHIFT

# BUREAU OF PRISONS
# OVERTIME REPORT

| BUDGET UNIT# | **006** | BUDGET UNIT NAME | **HRYCI** |
|---|---|---|---|
| PERIOD WORKED | *11-14-04* | PAYCYCLE PAID | *11-14-04* |

| REASON FOR OVERTIME | TOTALS |
|---|---|
| ADMINISTRATIVE | |
| AWOL | |
| CALL BACK | |
| CLASSIFICATION | |
| COURT | |
| COMPASSIONATE LEAVE | |
| EXTRA DUTY – INSIDE | |
| EXTRA DUTY – OUTSIDE | |
| FMLA | |
| GYM VACANCY | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | |
| INVENTORY | |
| JURY DUTY | |
| LATE RELIEF | |
| LEAVE WITHOUT PAY | |
| MAILROOM / SUPPLY | |
| MEETING / UNION BUSINESS | |
| MILITARY LEAVE | |
| OUTSIDE HOSPITAL | *16* |
| REPORTS | |
| SHAKEDOWN | |
| SICK | |
| SUSPENSION | |
| TRAINING | |
| TRANSPORTATION: | |
| ξ   FUNERAL RUN | |
| ξ   INMATE TRANSFER | |
| ξ   MEDICAL RUN | |
| ξ   TRAVEL TIME | |
| ξ   OTHER | |
| UNAUTHORIZED ABSENCE | |
| VACANCY  *Correctional Officer* | *80* |
| VACATION | |
| WEAPONS RECLASSIFICATION | |
| WORKMAN'S COMPENSATION | |
| OTHER:  FIRE EQUIPTMENT | |
| OTHER:  ESCAPE DRILLS | |
| OTHER:  EXECUTIONS | |
| OTHER:  OUT OF STATE TRANSFERS | |
| OTHER:  RECORDS | |
| OTHER:  CODE | |
| OTHER:  SPECIAL PROJECTS | |
| OTHER:  CONSTRUTION, VEST, GRIEVANCES | |
| OTHER:  COMPUTER PROBLEMS | |
| OTHER:  WATCH CMDR. | |
| OTHER:  RESIGNATION | |
| OTHER: | |
| **TOTAL HOURS REPORTED** | *96* |

D 0 0 4 4 1

**A000265**

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
SHIFT CONTINUATION ROSTER
0800-1600

DATE: 11/14/04

SUNDAY

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 0 | 0 | | | | | | | |
| STAFF LIEUTENANT | 1 | 1 | | | | | | | 1 - Transfer 1 - Vacant |
| LIEUTENANTS | 3 | 1 | 1 | 1 | 0 | 0 | 0 | | |
| SERGEANTS | 4 | 3 | | | | | | | |
| CORPORALS | 6 | 4 | | 1 | | | | | 1 - Res. Days off, 1 - Vacant |
| OFFICERS | 56 | 50 | 2 | | | | | 2 | 1 - military |
| K-9 OFFICERS | 1 | | | | | | | 2 | |
| TOTAL | 71 | 60? | 2 | 3 | 0 | 0 | 0 | 5 | (10 Vacancies) |

COMMENTS: _Twelve O.T. positions were used to fill openings. (9 - O.S.H. / 10 In-House)_

No AREAS ARE ON LOCKDOWN OR HELD. FACILITY IS AT NORMAL OPERATION.

1. Cpl. Hammond T. Rep. Sgt. Vacancy    6. Cpl. Sorrels W. Rep. Sgt. Vacancy    11. Cpl. Hamilton L. Rep. OSH Vacancy
2. Cpl. Sessions S.    "    "    7. Cpl. Catlett    "    "    "    12. Cpl. Boothe W. S    "    "
3. Cpl. Cannon A.    "    "    8. Cpl. Nale L.    "    "    "    "
4. Cpl. Cluse D.    "    "    9. Cpl. Johnson D    "    "    "    "
5. Cpl. Stephens J.    "    "    10. Cpl. Evans L.    "    "    "    "

PREPARED BY: _[signature]_ 5/11
SHIFT COMMANDER (TITLE AND SIGNATURE)

REVIEWED BY: _[signature]_ 11/15
SECURITY SUPERINTENDENT (SIGN AND DATE)

_[signature]_ 11/15/04
DEPUTY WARDEN (SIGN AND DATE)

Page 1

D00442

A000266

# HOWARD R.YOUNG CORRECTIONAL INSTITUTION
## SHIFT COMMANDER'S REPORT

SHIFT COMMANDER: _____ **S/Lt. Sabato** _____ DATE: __**11/14/04**__

DAY: _____ **Sunday** _____ TIME ASSUMED DUTY: _____ **1520**

I HAVE BRIEFED MY RELIEF:  YES ___ **X** ___    NO: _____

RELIEVED BY: _____ **S/Lt. Lee** _____

OFF GOING SHIFT COMMANDER: _____ **S/Lt. Sabato**

ON COMING SHIFT COMMANDER: _____ _S/Lt. L_

## BEGINNING EQUIPTMENT COUNT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| .38 Revolvers | 1 | Shackles | 8 | Cutter | 1 | Gas Mask | 3 |
| Speed Loaders | 2 | Travel Chains | 9 | Capstun | 1 | S/C Keys | 22 |
| .38 Rounds | 18 | Hacksaw | 1 | .40 S & W | 6 | Gas Cards | 19 |
| Holsters | 4 | Crank | 1 | .40 Rounds | 168 | TBC | 1502+1 OSH |
| Handcuffs | 7 | Sealed Keys | 11 | .40 Magazines | 12 | K9 | Lee, J. |
| Black Boxes | 4 | Locks | 4 | | | OSP | McCreary, J. |

| TIME | COMMENTS |
|---|---|
| 1520 | S/Lt. Sabato relieves S/Lt. Polk after briefing |
| 1600 | Code Red / Formal Headcount            TBC 1502+1 OSH |
| 1605 | C/O McCreary, J. OSP with 1 .38 Cal., 6 Rds.  & 1 Speed Loader |
| | C/O Sessoms Lobby with 1 .38 Cal., & 6 Rds. & 1 Speed Loader |
| | C/O Lee K-9 with 1 .40 Cal., 28 Rds. & 2 Mags. |
| 1619 | Code Green |
| 1835 | 1 RELEASED BAIL            TBC 1501+1 OSH |
| 2000 | Code Red / Mid Shift Headcount            TBC 1501+1 OSH |
| 2022 | Code Green / DACS Green |
| 2105 | Code 8 2D-Pod  I/M Wilson, Julius #365665 Transferred to 1F-9 Admin. Seg. |
| 2113 | 1 NEW COMMITMENT            TBC 1502+1 OSH |
| 2114 | CODE 8 10-1 |
| 2300 | Code Red / End of Shift Headcount            TBC 1502+1 OSH |
| 2311 | Code Green / DACS Green |
| 2315 | S/Lt. Lee relieves S/Lt. Sabato after briefing |
| | |

D00443

# HOWARD R. YOUNG CORRECTIONAL INSTITUTION
## DAILY ROSTER: 4X12 SHIFT

**DATE: 11/14/04**    **DAY: SUNDAY**

| | | | | | |
|---|---|---|---|---|---|
| SHIFT CMDER: SABATO, J. | ✓ | | | SECURITY TEAM CPL: STEVENS, J. | MISC: |
| SHIFT SUPV: | | | | SECURITY TEAM: FARRINGTON, G. | ✓ |
| OPERATIONS LT: | | | | SECURITY TEAM: D'ANIELLO, A. | ✓ |
| SICK CALL | | | | SECURITY TEAM: WARREN, R. | ✓ |
| UNIT 27: MCCREARY, J. | ✓ | | K-9: LEE, J. | ✓ |
| **UNIT 1** | | SGT B/R: DIAL, W. | ✓ | 1A/B: | INF: WOLOSZYN, G. | ✓ |
| LT: | ✓ | B/R: DAVIES, K. | ✓ | 1A/B: McIlvaine, M. | INF: | ✓ |
| SGT: DEFEO, G. | ✓ AM | B/R: MACK, B. | ✓ | 2E/F: POWELL, D. | INF: CARLOCK, D. | ✓ |
| SGT: | ✓ | B/R: FIELDS, M. | ✓ | 1C/D: | 2U/K: EVANS, L. | ✓ |
| LOBBY CPL: Sessions | ✓ | B/R: SMITH, B. | ✓ | 1C/D: Powell V Edwards | ✓ (OT) | 2U/M: Teffeau, Clifton | (OT) |
| P/C DRS: N'DIAYE, L. Treleus | ✓ | B/R: | | 1C/D: ROGERS, R. (VHR) | DORM 4: WILLIAMS, V. | ✓ |
| P/C BKS: BURLEY, K. | ✓ | B/R: | | 1C/D: DENNY, R. Owens | ✓ | DORM 4: JOHNSON, H. | ✓ |
| UNIT 12: HAMBRIGHT, J. | ✓ | | | 1E/F: BRYANT, L. | ✓ | 1E/F: MATTHEWS, K. | ✓ |
| **UNIT 2** | | | | | |
| LT: RYDER, R. | ✓ | 2A/B: DIAL, W. | ✓ | 2E/F: SEARLES, W. (VHR) | ✓ | 2U/K: KLINE, J. (VHR) | ✓ |
| SGT: WILLIAMS, G. | ✓ | 2A/B: MACK, B. | ✓ | 2E/F: POWELL, D. | ✓ | 2U/K: EVANS, L. | ✓ |
| SGT: | | 2C/D: | | 2G/H: MILLER, S. | ✓ | 2U/M: HACKETT, D. | ✓ |
| UNIT 13: JOHNSON, D. | ✓ | 2C/D: WARMKESSEL, E. | ✓ | 2G/H: JOHNSON, P. (VHR) | ✓ | 2U/M: HACKETT, D. | ✓ |
| UNIT 14: DUGGINS, H. | ✓ | | | F/C: | | F/C: | |
| **UNIT 3** | | | | | |
| LT: DYCH, W. | ✓ | 2Q: McREYNOLDS, T. | ✓ | 2V: Carmona (VHR) | ✓ | DORM 1: HOOKS, D. | ✓ |
| SGT: WALL, D. Vince Tan | ✓ | 2R: MATHIASON | ✓ | 2W: ROBINSON, B. | ✓ | DORM 2: JOHNSON, K. | ✓ |
| SIC CPL: Caldwell | ✓ | 2S: CLARK, V. | ✓ | 2Y: COUGHLAN, S. | ✓ | DM ROVER: Caldwell | ✓ |
| SGT: KIKER, M. | ✓ | 2T: BAKER, S. | ✓ | 2Z: Lambert | ✓ | GYM: | ✓ |
| SGT: | | UNIT 18: Oleaskowski | ✓ | UNIT 16: APA, B. | ✓ | GYM: | ✓ |
| | | | | | UNIT 25: | |

## Multi-Purpose Criminal Justice Facility
### Daily Roster: 8x4 Shift

**DATE:11-14-04**　　　　　　　　　　　　　　　　　　　　　　　　**SUNDAY**

| VAC/ HOL/MILITARY | OVERTIME | VHR'S | | OUTSIDE HOSPITAL | ROOM # | OFFENDER |
|---|---|---|---|---|---|---|
| GOODALL　MLWOP | | PRITCHETT | F/S | ✓ Larry Hamilton | Christ. Hosp 2308 | |
| PRINCE. K.　W/C | | SAVAGE | M/S | Stephen Coughlan | " | |
| HAMMOND　MLWOP | | GRIFFIN | S/S | ✓ | " | |
| DEPAUL, R.　MLWOP | | LISKIEWICZ | F/S | ✓ | " | |
| ROSER　RESIGNED | | FAGAN | S/S | ✓ | | |
| SHEETS　VAC | | BAROW | M/S | ✓ | | |
| WILLIAMS　VAC | | BANE | W/T | ✓ | | |
| Roemer　Has | | MILLIGAN | M/T | ✓ | | |
| Buff　Has | | SCOTT | T/F | ✓ | | |
| Richards　Vac | | | | | | |

F. 2

D 0 0 4 4 5

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

DAY
DATE: 11 / 14 / 04

SHIFT COMMANDER
1600-2400

| # | NAME | DAYS OFF | A | B | | | | | | | | | | | | | | | |
|---|------|----------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAMFORD, DAVID CAPTAIN | SU/MO | X | | | | | | | | | | | | | | | |
| 2 | SABATO, JOSEPH STAFF LT | FR/SA | X | | | | | | | | | | | | | | | |
| 3 | SENATO, KEVIN LT. | SU/MO | X | | | | | | | | | | | | | | | |
| 4 | DYCH, WALTER LT. | FR/SA | X | | | | | | | | | | | | | | | |
| 5 | RYDER, ROBERT LT. | WE/TH | X VUH RRAD LT. | | | | | | | | | | | | | | | |
| 6 | | TU/WE | TU VUH ARAD LT. TEMPORARY ASSIGNED | | | | | | | | | | | | | | | |

| 1 | PARKER, PHILIP VARVAR CAPT. | VAR | — | | | | | | | | | | | | | | | |
| 2 | PRITCHETT, MICHAEL VARVAR LT | VAR | — | — | | | | | | | | | | | | | | |
| 3 | LORAH, PETE K-9 | SU/MO | | | | | | | | | | | | | | | | |
| 4 | LEE, JAY K-9 | WE/TH | X | | | | | | | | | | | | | | | |
| 5 | K-9 | VHR | | | | | | | | | | | | | | | | |

SUNDAY AND MONDAY ONLY
1500-2300 HOURS

SERGEANT'S

| 1 | MEDFORD, JOSEPH | FR/SA | √ | | | | | | | | | | | | | | | |
| 2 | FRENCH, STEPHEN | SA/SU | √ | | | | | | | | | | | | | | | |
| 3 | ROWE, JOHN | TU/WE | Meyard | | | | | | | | | | | | | | | |
| 4 | DEFEO, GREGORY | TH/FR | X UNIT I | UNIT I 1/4 | | | | | | | | | | | | | | |
| 5 | LAWRENCE, PHILLIP | MO/TU | X Thos | UNIT 3 1/4 | | | | | | | | | | | | | | |
| 6 | KIKER, MARY | MO/TU | X | UNIT 3 1/4 | | | | | | | | | | | | | | |
| 7 | | SU/MO | | | | | | | | | | | | | | | | |
| 8 | | SU/MO | | | | | | | | | | | | | | | | |
| 9 | | WE/TH | | | | | | | | | | | | | | | | |
| 10 | | WE/TH | | | | | | | | | | | | | | | | |

CORPORALS

| 1 | EDWARDS, JUNE | SA/SU | | | | | | | | | | | | | | | | |
| 2 | VARGAS, RAMON | SU/MO | / | | | | | | | | | | | | | | | |
| 3 | WILLIAMS, GARLAND | WE/TH | X UNIT 3 1/4 | | | | | | | | | | | | | | | |
| 4 | WALL, DAVID | MO/TU | X 5 1/2 | | | | | | | | | | | | | | | |
| 5 | SESSOMS, SONIA | TH/FR | X 5 1/2 | | | | | | | | | | | | | | | |
| 6 | STEVENS, JAMES S/T | FR/SA | X 5/1 LOBBY | | | | | | | | | | | | | | | |
| 7 | | FR/SA | | | | | | | | | | | | | | | | |

A000270

D00446

**HOWARD R. YOUNG CORRECTIONAL INSTITUTION**
DUTY ROSTER
11/08/04

DAY: _____
DATE: 11/14/04

SHIFT COMMANDER
1600-2400

| # | NAME | DAY OFF | |
|---|---|---|---|
| | OFFICERS | | |
| 1 | APA, BRADFORD | FR/SA | MO/TU | X — UNIT 16 |
| 2 | BAKER, SIDNEY | MO/TU | X — a 7 |
| 3 | BLUE, MARK | SU/MO | |
| 4 | BRYANT, LYLE | TU/WE | X |
| 5 | BURLEY, KATRINA | FR/SA | X — 1 E/F |
| 6 | CAMPBELL, EWONNU | SA/SU | X — Dr. Appt |
| 7 | CANNON, MARK | WE/TH | X |
| 8 | CARLOCK, DONALD | FR/SA | X — S7c |
| 9 | CHUKUNNEYE, NNABUGWE | SA/SU | X — 16F |
| 10 | CLARK, VERON | WE/TH | X |
| 11 | COLEMAN, ALLEN  OPS | SA/SU | |
| 12 | COUGHLAN, STEPHEN | TU/WE | X — a V |
| 13 | CUSTER, ELLYN | MO/TU | w/c |
| 14 | DANIELLO, ANGELO S/T | WE/TH | |
| 15 | DAVIES, KERRY | FR/SA | X |
| 16 | DENNY, RAHIM | TU/WE | X — 1 E/F |
| 17 | DIAL, WAYNE | TH/FR | X |
| 18 | DUGGINS, HORACE | FR/SA | X |
| 19 | EVANS, LARRY | MO/TU | X |
| 20 | FABRES, EDUARDO | MO/TU | S |
| 21 | FARRINGTON, GREGORY S/T | TU/WE | X |
| 22 | FIELDS, MICHAEL | FR/SA | X |
| 23 | GALLI, BRIAN | TH/FR | X |
| 24 | HACKETT, DWIGHT | TH/FR | X |
| 25 | HAMBRIGHT, JESSE | TH/FR | X |
| 26 | HOOKS, DESIREE | FR/SA | X |
| 27 | INCE, GARY | TU/WE | X |
| 28 | JOHNSON, COREY | SA/SU | |
| 29 | JOHNSON, DAVID | FR/SA | X |
| 30 | JOHNSON, HARRY | TU/WE | X |
| 31 | JOHNSON, KELLI | WE/TH | X |
| 32 | JONES-NDIAYE, LOLITA | FR/SA | X |
| 33 | JORDAN, LEWIS | SA/SU | |
| 34 | LAMBERT, ROBERT | WE/TH | X |

D00447

SHIFT COMMANDER
1600-2400

HOWARD R. YOUNG  CORRECTIONAL INSTITUTION
DUTY ROSTER
11/08/04

DAY: _Sunday_
DATE: _11/14/04_

| # | NAME | DAYS OFF | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | LEWIS, CARMELLA | WE/TH | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 36 | MATTHEWS, KENNETH | MO/TU | X | P/c. Training | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 37 | MACK, BOBBY | MO/TU | X | 1 E/c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 38 | MAYS, REGINALD | SA/SU | X | 2 A/c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 39 | MCCREARY, JASON | TH/FR | | U.O.T. 22 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 40 | MCCREARY, MEGAN | FR/SA | X | 1 A/c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 41 | MCREYNOLDS, TIMOTHY | TU/WE | X | 2 c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 42 | MEEKS, JAMES | SA/SU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 43 | MILLER, STACEY | MO/TU | X | 2 c/c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 44 | MITCHELL, JOHNNY | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 45 | MOORE, JAMES | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 46 | NATHANSON, PHILLIP | MO/TU | X | 2 c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 47 | NEAL, DOUGLAS | WE/TH | X wop | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 48 | NEAL, LOUIS | SA/SU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 49 | PAIGE, ZACHARY | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 50 | PLEASANTON, ANTHONY | FR/SA | X | U.O.T. 2 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51 | POWELL, JACKIE | SA/SU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 52 | PRANGE, RALPH S/T | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 53 | PRESSLEY, CHARLES | WE/TH | V | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 54 | PYLE, GEORGE | SA/SU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 55 | RITTER, JOSEPH | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 56 | RIVERA, EDWARD | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 57 | ROBINSON, BRIAN | MO/TU | X | 2 W | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 58 | ROMANOWSKI, THOMAS | TH/FR | S | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 59 | SCHAFFER, TAMIKO | MO/TU | W/C | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 60 | SMITH, BERNARD | FR/SA | X | 13 W | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 61 | SOTO, FELIPE | SA/SU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 62 | WARE, LEA | SU/MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 63 | WARMKESSEL, EDITH | TU/WE | X | 2 c/o | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 64 | WARREN, REGGIE | TU/WE | X | S | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 65 | WILLIAMS, VINCENT | TH/FR | X | Open 4 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 66 | WOLOSZYN, CHARLES | WE/TH | X | 1 E/c | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 67 | | MO/TU | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 68 | | TU/WE | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

A000272

000448

HOWARD R. YOUNG  CORRECTIONAL INSTITUTION

DUTY ROSTER

11/08/04

SHIFT COMMANDER

1600-2400

DAY _____

DATE: 11 / 1 / 04

| OFFICERS | | | |
|---|---|---|---|
| **NAME** | **DAY OFF** | | |
| 69 | WE/TH | | |
| 70 | WE/TH | | |
| 71 | WE/TH | | |
| 72 | TH/FR | | |
| 73 | SU/MO | | |
| POWELL, DONALD | SA/SU | | |
| CURTIS, STEPHANIE | MO/TU | | |

ON-MI-WO/P

D00449

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
VHR DUTY ROSTER
10/25/04

SHIFT COMMANDER 2400-0800

DAY: _____
DATE: 11/14/04

| NAME | DAYS OFF |
|------|----------|
| 12X8 SHIFT VHRS 11/08/04 TO 11/21/04 | |
| 1 AHART, AUSTIN | |
| 2 WILLIAMS, TONY | |
| 3 HACKETT, ROBERT | |
| 4 HAMMOND, JAMES | |
| 5 LONG, KENNETH | |
| 6 GRIFFIN, SHIRELLE | |

A000274

100450

## RETURNED INVENTORY/ISSUE LOG

| | DESCRIPTION | QUANTITY | QUAN. RET. | TIME OUT | TIME IN | ISSUEING OFFICE |
|---|---|---|---|---|---|---|
| 1 | Black Bags | 19 | 10 | | | SGT. G. DOTCO |
| 2 | HELMETS | 19 | 10 | | | |
| 3 | VEST | 10 | 10 | | | |
| 4 | PAD SETS | 19 | 10 | | | |
| 5 | SHIELDS | 3 | 2 | | | |
| 6 | PR-24 | 1 | 1 | | | |
| 7 | BATONS | 15 | 7 | | | |
| 8 | GAS MASK / 1 Black Bag | 6 | 6/1 | | | |
| 9 | HAND CUFF (#B34521) | 1 | 1 | | | |
| 10 | HANDCUFF (#681777) | 1 | Ø | | | |
| 11 | LEG SHACKLE (#_____) | 1 | 1 | | | |
| 12 | LEG SHACKLE (#P19372) | 1 | 1 | | | |
| 13 | BAG OF FLEX CUFFS | 1 | | | | |
| 14 | VENTILATION FAN | 1 | Ø | | | |
| 15 | FIRE SUIT | 3 | Ø | | | |

### PRIMARY ORT MEMBERS

| | | |
|---|---|---|
| 1 | SGT. G. DOTCO | |
| 2 | C/O H. DUGGINS UNIT # 14 | |
| 3 | C/O D.R. JOHNSON " 13 | 521 |
| 4 | C/O J. HAMBRIGHT " 12 | |
| 5 | C/O B. APA " 16 | |
| | C/O A. PLEASANTON " 15 | |

### FIRE TEAM

| | |
|---|---|
| TL | |
| AIR PACS | |
| FIRE HOSE | |
| 1ST AID | |
| KEYS/EV | C/O |

### SECONDARY ORT MEMBERS

| | | |
|---|---|---|
| 1 | C/O B. MACK | 2 A+B |
| 2 | C/O L. EVANS | J+K |
| 3 | C/O D. POWELL | 2 E+F |
| 4 | C/O D. HACKETT | L+M |
| 5 | C/O R. RODGERS | 1 C+D |

#### Damage Equipment

### CAMCORDER / GASEMASK

D00451

A000275

# H.R.Y.C.I
## Q.R.T Bag Issue Inventory

For the Condition of the Equipment Put G for Good, Put P for Poor and B for Bad Condition in the box.

| C/O Name | Bag # | Helmet | Pads | Vest # | Comments |
|---|---|---|---|---|---|
| DEGGROS | M-4 | ✓ | ✓ | 2x-4 | GOOD |
| JOHNSON | L-2 | ✓ | ✓ | 2x-6 | |
| HARBRIGHT | XL-1 | ✓ | ✓ | 2x-1 | |
| MACE | M-5 | ✓ | ✓ | 2x-2 | |
| APA | M-2 | ✓ | ✓ | XL-1 | ✗ BAGS ALSO TORN ✗ |
| PLEASANTON | M-3 | ✓ | ✓ | L-1 | |
| EVANS | L-6 | ✓ | ✓ | 3x-3 | |
| POWELL | X6-6 | ✓ | ✓ | 3x-2 | |
| HACKETT | L-4 | ✓ | ✓ | 2x-2 | |
| RODGERS | L-3 | ✓ | ✓ | 3x-1 | ✓ |

D00452

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
OVERTIME DUTY ROSTER

DAY

DATE: 11/14/04

OT DUTY ROSTER

| | OFFICERS LAST NAME | OFFICERS FIRST NAME | SSN # | OT HOURS | POST |
|---|---|---|---|---|---|
| 1 | Powell, | Jeronne | HAYCI | 8 | 1C16 |
| 2 | Terrell | Clifford | " | 8 | 2 v/n |
| 3 | Butcher | Barbra | " | 8 | C.H. 230 |
| 4 | McGee | Darwin. | " | 8 | C.H. 230P |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

SS# IS ONLY NECCESSARY IF OFFICER DOES NOT WORK AT THIS INSTITUTION

ATTACH THIS PAGE TO DUTY ROSTER.

D00453

**4x12 SHIFT**

# BUREAU OF PRISONS
## OVERTIME REPORT

| | | | |
|---|---|---|---|
| BUDGET UNIT# | 006 | BUDGET UNIT NAME | MPCJF |
| PERIOD WORKED | 11/14/04 | PAYCYCLE PAID | |

| REASON FOR OVERTIME | | TOTALS |
|---|---|---|
| ADMINISTRATIVE | | |
| AWOL | | |
| CALL BACK | | |
| CLASSIFICATION | | |
| COURT | | |
| COMPASSIONATE LEAVE | | |
| EXTRA DUTY – INSIDE | | |
| EXTRA DUTY – OUTSIDE | | |
| FMLA | | |
| GYM VACANCY | | |
| HEARINGS / INVESTIGATIONS / DISCIPLINARY | | |
| INVENTORY | | |
| JURY DUTY | | |
| LATE RELIEF | | |
| LEAVE WITHOUT PAY | | |
| MAILROOM / SUPPLY | | |
| MEETING / UNION BUSINESS | | |
| MILITARY LEAVE | | |
| OUTSIDE HOSPITAL | 2 @ 8 | 16 |
| REPORTS | | |
| SHAKEDOWN | | |
| SICK | | |
| SUSPENSION | | |
| TRAINING | | |
| TRANSPORTATION: | | |
| • FUNERAL RUN | | |
| • INMATE TRANSFER | | |
| • MEDICAL RUN | | |
| • TRAVEL TIME | | |
| • OTHER | | |
| UNAUTHORIZED ABSENCE | | |
| VACANCY | 2 @ 8 | 16 |
| VACATION | | |
| WEAPONS RECERTIFICATION | | |
| WORKMAN'S COMPENSATION | | |
| OTHER: FIRE EQUIPMENT | | |
| OTHER: ESCAPE DRILLS | | |
| OTHER: EXECUTIONS | | |
| OTHER: OUT OF STATE TRANSFERS | | |
| OTHER: RECORDS | | |
| OTHER: CODE | | |
| OTHER: SPECIAL PROJECTS | | |
| OTHER: COMPUTER PROBLEMS | | |
| OTHER: RESIGNATION | | |
| OTHER: WATCH CMDR. | | |
| OTHER: | | |
| OTHER: | | |
| **TOTAL HOURS REPORTED** | | 32 |

D00454

A000278

HOWARD R. YOUNG CORRECTIONAL INSTITUTION
SHIFT CONTINUATION ROSTER
1600-2400

DATE: 11, 14, 04

SUNDAY

THE NUMBER OF PERSONNEL ON DUTY THIS SHIFT WAS AS FOLLOWS:

| TITLE | NUMBER SCHEDULED | NUMBER PRESENT | SICK | VAC | HOL | FMLA | SWOP LWOP | MIL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| CAPTAIN | 0 | 0 | | | | | | | |
| STAFF LIEUTENANT | 1 | 1 | | | | | | | |
| LIEUTENANTS | 3 | 2 | | | | | | | 1-VACANT |
| SERGEANTS | 7 | 2 | 1 | 1 | | | | 1 | 2-VACANT / 1 TRNG |
| CORPORALS | 5 | 4 | | | | | | 1 | 1-VACANT |
| OFFICERS | 53 | 47 | 2 | 1 | | | | 1 | 5-VACANCIES |
| K-9 OFFICERS | 1 | 1 | | | | | | | |
| TOTAL | 70 | 57 | 2 | 2 | | | | 2 | 9-VACANCIES |

COMMENTS: 4 OVERTIME — 2 VACANT + 2 O.S.H.

PREPARED BY: _Sgt. Floyd Clark_
SHIFT COMMANDER (TITLE AND SIGNATURE)

REVIEWED BY: _Steve Wesley 11/5_
SECURITY SUPERINTENDENT (SIGN AND DATE)

_[signature]_ 11/15/04
DEPUTY WARDEN (SIGN AND DATE)

Page 1

D00455

**A000279**

# DEPARTMENT OF CORRECTION    EMPLOYEE TIME CARD    Calendar Year 2004

**Employee Name:** Williams, Raphael    **SSN:** ___    **DEPTID (DDS):** 006

**Employment Date:** December 06, 1982    **Class Title:** Warden IV

**Adjusted Service Date:** Not Applicable

Sick Accrual (hrs per month) -37.5 hrs 9.5 / 40.0 hrs: 10
Vacation (hrs per month) -37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14

ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

**Accrual Rate**
Sick: 10 Hours
Vacation: 10 Hours

**Remarks:** Perfect Attendance For 2001 - Taken - ___
Perfect Attendance For 2002 - Taken - ___

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard
at the end of 2004. Forward the original to Human Resources.

NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>
Review and note accruals at top of card. Resolve discrepancies with your timekeeper.

Leave balances at end of 2004

A000280

FORM #: DC-99
DETAINER/PC LOG
REVISED 7/86

# DEPARTMENT OF CORRECTION
## DETAINER/PENDING CHARGE LOG (DC-99)

INMATE NAME: Boehler, Christopher

S.B.I. #: 00361999

| DATE REC'D | REQUESTING AUTHORITY | CHARGES | INIT'S | BAIL AMOUNT | CASE NO. | DISPOSITION & DATE | INIT' |
|---|---|---|---|---|---|---|---|
| 3/04/97 | Veh Homicide 1st | | | 10,000 | | 18 mos | |
| | Veh Homicide 1st | | | 10,000 | | | |
| | DUI | | | 2,000 | | | |
| | Driv w/susp | | | 4,000 | | N/G | |

D00075

A000281

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE
       v.
CHRISTOPHER J BARKES

DOB: 12/12/66
SBI: 00361999

CASE NO. 9703008667
CR.A. NO. IN97041239

CHARGE: VEH.HOM. 2ND

CHARGE DISP: PLED GUILTY

SENTENCE ORDER
———————————

NOW, THIS 12TH DAY OF SEPTEMBER, 1997, IT IS THE ORDER OF THE COURT THAT:

    THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE CHARGED.

    THE DEFENDANT IS TO PAY THE COST OF PROSECUTION.

    EFFECTIVE MARCH 16,1997, THE DEFENDANT IS PLACED IN THE CUSTODY OF THE DEPARTMENT OF CORRECTIONS AT SUPERVISION LEVEL 5   FOR A PERIOD OF 3 YEARS.

    AFTER SERVING 1 YEAR AT SUPERVISION LEVEL 5, THIS SENTENCE IS SUSPENDED FOR 2 YEARS AT SUPERVISION LEVEL 4 - SUBSTANCE ABUSE TREATMENT PROGRAM.   UPON SUCCESSFUL COMPLETION OF THE TREATMENT PROGRAM, THIS SENTENCE IS SUSPENDED FOR THE BALANCE AT SUPERVISION LEVEL 3.

    THE DEFENDANT IS TO BE HELD AT SUPERVISION LEVEL 5 UNTIL SPACE IS AVAILABLE AT SUPERVISION LEVEL 4.

RECEIVED
'97 OCT 28 AM 8 07
M.P.C.J.F. RECORDS

PAGE 001 OF 5

D00080

STATE OF DELAWARE ... CHRISTOPHER J BARKES
9703008667

AS TO THE CHARGE OF IN97041240, VEH.HOM. 2ND,
IT IS THE ORDER OF THE COURT THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE
CHARGED.

THE DEFENDANT IS PLACED IN THE CUSTODY OF THE DEPARTMENT OF
CORRECTION AT SUPERVISION LEVEL 5 FOR A PERIOD OF 3 YEARS.

AFTER SERVING 18 MONTHS AT SUPERVISION LEVEL 5, THIS SENTENCE
IS SUSPENDED FOR 18 MONTHS AT SUPERVISION LEVEL 2.

THIS SENTENCE SHALL BE SERVED CONSECUTIVELY TO THE SENTENCE IN
CR.A. NO. IN97-04-1239.

THE NON-INCARCERATIVE PORTION OF THIS SENTENCE SHALL BE SERVED
CONSECUTIVELY TO THE NON-INCARCERATIVE PORTION OF THE SENTENCE
IMPOSED IN CR.A. NO. IN97-04-1239.

PAGE 002 OF 5

STATE OF DELAWARE    CHRISTOPHER BARKES
9612002900

AS TO THE CHARGE OF IN97010130, POSS,USE,CONS.N,
IT IS THE ORDER OF THE COURT THAT:

THE DEFENDANT IS ADJUDGED GUILTY OF THE OFFENSE
CHARGED.

THE DEFENDANT IS PLACED IN THE CUSTODY OF THE DEPARTMENT OF
CORRECTION AT SUPERVISION LEVEL 5 FOR A PERIOD OF 1 YEAR.

THIS SENTENCE IS SUSPENDED FOR 1 YEAR AT SUPERVISION LEVEL 2.

THE NON-INCARCERATIVE PORTION OF THIS SENTENCE SHALL BE SERVED
CONSECUTIVELY TO THE NON-INCARCERATIVE PORTION OF THE SENTENCE
IMPOSED IN CR.A. NO. IN97-04-1240.

STATE OF DELAWARE v. CHRISTOPHER BARKES,
9703008667 9612002900

THE FOLLOWING CONDITIONS SHALL APPLY TO THIS SENTENCE, THE
DEFENDANT SHALL:

PAY FINANCIAL OBLIGATIONS DURING THE PROBATIONARY PERIOD.

BE EVALUATED FOR SUBSTANCE ABUSE AND FOLLOW ANY DIRECTIONS FOR
COUNSELING, TESTING, OR TREATMENT MADE BY THE PROBATION OFFICER.

BE EVALUATED FOR EMOTIONAL AND/OR PSYCHOLOGICAL PROBLEMS AND
FOLLOW ANY DIRECTIONS FOR TREATMENT OR COUNSELING MADE BY THE
PROBATION OFFICER.

HAVE NO CONTACT WITH THE VICTIMS' FAMILIES.

_____
JUDGE CARL GOLDSTEIN

STATE OF DELAWARE v. CHRISTOPHER BARKES,
9703008667 9612002900

FINANCIAL OBLIGATIONS ARE IMPOSED ON THE DEFENDANT PURSUANT TO THIS
SENTENCE AS FOLLOWS:

| | |
|---|---|
| TOTAL CDEFA-DIVERSION ORDERED | 0.00 |
| TOTAL CIVIL PENALTY ORDERED | 0.00 |
| TOTAL COSTS ORDERED | 77.80 |
| TOTAL DRUG SURCHARGE ORDERED | 0.00 |
| TOTAL FINE AMOUNT ORDERED | 0.00 |
| TOTAL FORENSIC FINE ORDERED | 0.00 |
| TOTAL SHERIFF KENT ORDERED | 0.00 |
| TOTAL SHERIFF NCC ORDERED | 0.00 |
| TOTAL PUBLIC DEF. FEE ORDERED | 50.00 |
| TOTAL RESTITUTION ORDERED | 0.00 |
| TOTAL SHERIFF SUSSEX ORDERED | 0.00 |
| TOTAL VICTIMS' COMP ORDERED | 0.00 |
| TOTAL VIDEO PHONE FEE ORDERED | 0.00 |
| TOTAL FINANCIAL ORDER | 127.80 |

PAGE 005 OF 5

D00084

A000286

PC - 11·04·026

# Offender Status Sheet

Date: 11/13/2004

SBI #: __00361999__    Name: CHRISTOPHER BARKES
ation(s): SCN    Level(s): 3,4H    Race: WHITE    DOB: 12/12/1966
AKA: CHRISTOPHER J BARKES; CHRISTOPHER V BARKES; CHRISTOPHER S BARKES
Offender Type:    Officer(s): Doherty, Robin M. (14)

Start Date: 11/01/2004    MED: 04/30/2005    STRD: 04/30/2005    ADJ: 04/30/2005    PED:    Statutory Days Earned:

| CASE/Court | CRA#/Judge | Charge Desc/Sex Type/Sentence Date | Status/Eff Date | Length Y M D | Start Dt | MED | STRD | Adj Date | CR/WK |
|---|---|---|---|---|---|---|---|---|---|
| 0401020740 U1 | 0401020740 Patricia Stewart | VIOL O/PROBATN STANDARD | Current 11/01/2004 11/01/2004 | 6 0 | 11/01/2004 | 04/30/2005 | 04/30/2005 | 04/30/2005 | |

Special Conditions:

| CRA# | Level | Code | Condition Description | Conditions Comments |
|---|---|---|---|---|
| 0401020740 | 4H | CRT1 | Other Conditions: | Sent. on 11/01/04, by Comm. Patricia Tate-Stewart/FCNC, for charge of VOP-0401020740: As of 11/01/04 - VOP - sent. dated 03/15/04 is revoked and def. is sent. as follow: Commitment at LV-5 for term of 1 yr. 30 days, of which 1 yr. 30 days is susp. for commitment at LV-4/HCP for 6 mos., followed by 6 mos. LV-3. LV-4, hold at 3. met |

D00042

**WARRANT#**
**8787**



PCCC Plummer Community Corrections Center
38 Todds Lane
WILMINGTON DE, 19802 5773
Phone No. 302-577-3039 Fax No. 302-577-2849

## ADMINISTRATIVE WARRANT - Standard

Warrant Date: <u>11/13/2004</u>

RE: <u>Barkes, Christopher</u>          SBI#: <u>00361999</u>     R/S: <u>W / M</u>     DOB: <u>12/12/1966</u>

Judge/Court : <u>The Honorable PATRICIA STEWART / New Castle County Family Court</u>

Charge(S) : 0401020740 - 0401020740 - VIOL O/PROBATN

The above named offender is under Level <u>4 HC</u> supervision by the Department of Correction and is alleged to be in violation of their conditions of supervision.

I, Doherty, Robin M                          ,a Probation/Parole Officer of the Department of Correction, do hereby deputize any

Sheriff, Constable, or Peace Officer of the State of Delaware to arrest and detain:

Barkes, Christopher                          ,persuant to 11 Del. Code, 4334(b) and/or 4352(a).

Warrant Comments: Blue Warrent          Blue Warrent          Blue Warrent     #PC-11-04-026

　　　　Mr Berks was sentenced by Commisioner P. Stewart on 11-01-04 in family court for VOP, The VOP sentence dated 03-15-04 was revolked and the defendant was ordered to serve 1 yr and 30 days at L-5 which was susp. for 6 mo at L-4 HCP, Defendant was ordered to be supervised at L-3 until space avaliale at L-4. Mr Barker reported to began his supervision on 11-03-04 and Did violate the conditions of supervision.

## IT IS ALLEGED THAT THE FOLLOWING CONDITION(S) OF SUPERVISION HAS (HAVE) BEEN VIOLATED:

Condition # : PGMV Other Program Violation

　　　　As to condition #1 You will not commit a new criminal or motor vehicle offense while under supervision. To Wit .. On 11-13-04 offender Barker was arrested by Officer Mcloughlin of WPD and charged with loitering for the purpose of purchasing drugs,He was also charged with driving while revolked.

A VOP HAS BEEN SUBMITTED REQUESTING A CAPIAS BE ISSUED . (Circle One) YES     NO

Administrative Warrant must be faxed to the sentencing judge and the Pre-Sentence office upon arrest.

SIGNED: _____                          DATE: <u>11-13-04</u>

D00045

*Original*

RECEIVED

2002 JUN 21 PM 2 04

BUSINESS OFFICE

## HEALTH CARE SERVICES CONTRACT

This Agreement is made this 17th day of June 2002, by and between First Correctional Medical-Delaware, L.L.C. ("FCM") and the State of Delaware, Department of Correction ("DOC").

## RECITALS

WHEREAS, the DOC desires to purchase the health care services offered by FCM to serve the needs of the State of Delaware and the State's inmate population; and

WHEREAS, the State has asked prospective vendors to submit proposals for contract No. 2828; and

WHEREAS, FCM's sole member (First Correctional Medical, Inc.) submitted a proposal to provide the aforementioned health care services to the DOC and its proposal was accepted by the DOC; and

WHEREAS, on Wednesday May 29, 2002, the DOC and FCM's sole member entered into final negotiations with the express intent to execute a contract for the provision of health services to Delaware's incarcerated population; and

NOW THEREFORE, in consideration for the mutual promises contained herein, the parties enter into this Agreement and its related documents to govern their relationship and hereby revoke any previous agreement between the parties. All references in said documents to "FCM" or "First Correctional Medical, Inc." or "First Correctional Medical" shall be deemed a reference to FCM as if FCM made the proposal and agreements set forth in or under such documents and was the successful bidder. The Terms and Conditions of this Agreement are contained within this DOC/FCM health care services contract which shall include by this reference the Request for Proposal, FCM's Proposal and the FCM Question and Response Memorandum dated May 21, 2002; and

NOW THEREFORE, the DOC and FCM mutually agree as follows:

D00518

1. This agreement is contingent upon funding being appropriated by the State of Delaware for each year of this contract. Funding is appropriated for medical services through the annual State Budget Act.

2. The DOC and FCM agree on an annual base price of $17,735,904.00 for the 1st two years of the contract. FCM shall submit to DOC an invoice on or about the 15th and last day of each month during the term of this contract commencing on July 15th of each fiscal year. Each invoice shall be for one twenty-fourth of the annual base price due hereunder for each year of this contract. DOC shall pay each invoice within 5 days of receipt. The amount of said monthly payment shall change in the event of any mutually agreed to change in the annual base price for any year that this contract remains in effect or as otherwise provided under the contract documents including any schedules which are a part thereof or which are attached hereto (which shall be deemed a part hereof).

   Additional modifications to the DOC Request and FCM's Proposal:

   A. The Sex Offender Unit has been deleted.
   B. Three Transition Units and a Structured Care Unit currently are in operation. The Transition Units are at Plummer Community Correctional Center, Multi-Purpose Criminal Justice Facility and Baylor Women's Correctional Institution. The Structured Care Unit is at Sussex Correctional Institution.
   C. Subject to the terms hereof and the documents referred to herein, the required Vendor services include but are not limited to basic medical services, mental health services, dental services, continuous suicide watch, the transition units, structured care programs, specialized women's services, and services to DOC staff. A complete itemization of services is in the DOC's RFP, as limited by FCM's Proposal.

3. The DOC accepts the variable rate per inmate proposed per year by FCM for times when the count is over the 6700-offender base as shown on the attached schedules which are made a part hereof. After each month, FCM and DOC shall

2

000519

agree to a reconciliation of the number of inmates for the prior month (over a base of 6700). Any additional payment (based on the attached schedule) due FCM as a result of any number of inmates over the base amount shall be paid to FCM with the next payment due hereunder.

4. Annual increases will be in accordance with the revised Cost Summary Sheet presented in FCM's proposal reflecting the new base of $17,735,904.00 and the other terms and provisions hereof.

5. FCM and the DOC agree to modify the RFP and Proposal as follows:

    A.    To the extent ACA Health Care Standards and NCCHC Standards differ, FCM will adhere to the higher standard;

    B.    To the extent that community standards for mental health care are unclear or not specific, FCM will be required to implement "Best Practices" from State Correctional Systems, which shall be deemed to be the average national level of such services.

    C.    Clarify language in the FCM proposal to read:

        a) Pg. 26, paragraph 1, last sentence. Be it known that the DOC does not authorize the transfer of inmates to a detoxification facility.

        b) Pg. 60, "Response to trauma incidents", second paragraph, last sentence should read: "These reports will be provided to the warden or designee, and others as appropriate in the corrections chain of command prior to the end of shift in which the incident occurred."

    D.    Contract provides for a capitated rate for health care services. Fee structure is established by the base rate (as adjusted) plus per diem rate for inmate population over 6700. Structural changes and/or additions to institutions will not result in a renegotiated rate for service.

000520

E.    The parties acknowledge that DOC shall pay for any equipment and services (including software and the charges for installation and training relating thereto) which are necessary, required or requested by FCM under the operation of this contract which individually exceeds $500.00 per individual item. All equipment, supplies and facilities currently in place at or located within the facilities at which the services shall be provided shall be made available to FCM at no cost to or credit against FCM in connection with the performance of its services hereunder. In addition, DOC shall provide at its cost and expense all maintenance services required or requested by FCM in connection with any equipment or any part of the facilities.

F.    Out of the first two payments due FCM hereunder, DOC shall retain a total sum of $500,000.00 ($250,000.00 in each of the first two payments) to insure the observance and performance of all of the covenants, terms, conditions and undertakings herein contained to be performed or observed by FCM. Said security deposit or the balance thereof shall be returned to FCM not more than thirty (30) days following the termination or expiration of this contract provided that FCM has materially performed and observed all of said covenants, terms, conditions and undertakings herein. No other bond, guaranty or other deposit, security or assurance shall be due, required or owed by FCM.

G.    Any financial reporting obligations shall be limited to FCM.

H.    In no event shall staffing levels constitute a breach or default by FCM hereunder.

I.    In the event that FCM does not receive payment on or before the 30 day following the receipt of an invoice by the DOC, the amount due on the invoice shall bear interest at an annual rate of 12.00% (or the maximum rate allowed by law, whichever is lower) until said payment is made in full.

U 0 0 5 2 1

6. The DOC is purchasing Professional Health Services. Performance is the essence of this contract. To the extent, negotiations involved a discussion of staffing patterns; those discussions were intended to ensure FCM fully understood the scope of the contract.

7. Appropriation

Funds authorized for use under the contract are obligated within the budget period (fiscal years July 1- June 30) of which they are awarded. Contracts and purchase orders must be issued on or before the expiration date of the budget period or the funds will no longer be available for use by the vendor. If funds are not appropriated at the amounts established by this contract each party shall have the right, to be exercised with not less than 60 days prior notice to the other, to terminate this contract and all payment and service obligations hereunder and relating hereto. However, said termination right may only be exercised with an effective date of the last day of the last month of a fiscal year of the term of this contract. At no time will the level of services go below those specified by the NCCHC Prison Standards.

8. **DEPARTMENT INDEMNIFICATION**

The FCM will hold harmless, indemnify, and defend the DOC, the State of Delaware and their agents, employees, or officers of the State of Delaware from any and all suits, actions, losses, liability, damages (including punitive damages), expenses, reasonable attorney fees (including salaries of attorneys regularly employed by the State of Delaware), judgments, or settlements incurred by the DOC, the State of Delaware or their agents, employees, or officers arising out of the negligent provision of health care services by FCM, its employees, or subcontractors under the contract, including direct or indirect negligence or intentional acts of omission or commission, and professional malpractice regardless of any negligence or any intentional acts of omissions or commission by employees or officials of the DOC.

D00522

A000293

## 9. APPLICABLE LAW/GOVERNING LAW/ CHOICE OF LAW

The laws of the State of Delaware shall apply, except where Federal Law has precedence. FCM consents to jurisdiction and venue in the State of Delaware. The DOC shall enter a Purchase Order on or before June 30, 2002. The Purchase Order must be approved on July 8, 2002 or this contract shall be null and void and of no force or effect. FCM must possess an active Delaware Business License as issued by the Department of Finance through its Division of Revenue. FCM must remain in good financial standing with the State of Delaware.

If any provision of this contract is held by a court of competent jurisdiction to be contrary to law, the remaining provisions of this contract will remain in full force and effect.

FCM's sole member shall have no right, title, obligation or liability hereunder or under any document referred to herein unless hereafter expressly accepted and agreed to thereby.

## 10. TERMS AND RENEWAL OPTIONS

Subject to the other terms and provisions hereof, the initial term ("Initial Term") of this contract shall be for a period of 6 years commencing July 1, 2002 (" the Commencement Date") and expiring (unless renewed) on June 30, 2008. This contract is renewable by the DOC for two (2) additional periods of two (2) years each ("the Extended Term"), according to the terms of the RFP.

If DOC defaults hereunder, FCM may, at its discretion, terminate this contract upon not less than thirty days written prior notice.

## 11. CONFLICT RESOLUTION

The contract documents shall consist of this contract, the Request for Proposal, the FCM Proposal, and the FCM Question and Response Memorandum dated May 21, 2002, as well as all cost and other updates relating thereto and the schedules, grids and other attachments attached hereto which are hereby made a part hereof. In the event of any conflict between the contract documents, the contract documents

6

**A000294**

000523

will be interpreted in the following order and the lower number below shall govern and control:

1. This Contract and the summary sheet, pricing grid, and the other schedules, grids and attachments hereto.
2. FCM's response to DOC written questions dated 5/21/2002 (the FCM Question and Response Memorandum dated May 21, 2002)
3. Request for Proposals (including any amendments and updates and other questions and answers)
4. FCM Proposal and any updates relating thereto

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

BY: _____

TITLE: Commissioner

DATE: 6/17/02

FIRST CORRECTIONAL MEDICAL-
DELAWARE, L.L.C.

BY: _____

TITLE: President

DATE: 6/17/02

7

## ADDENDUM TO HEALTH CARE SERVICES CONTRACT #2828

## TO ESTABLISH A PROCEDURE FOR REIMBURSEMENT OF PAYMENT TO THE DEPARTMENT OF HEALTH AND SOCIAL SERVICES (DHSS) FOR MEDICAID ELIGIBLE INCARCERATED PERSONS

In accordance with the agreement between DHSS and FCM, incarcerated persons under the custody of the Delaware Department of Corrections (DOC) who incur inpatient hospital stays greater than 24 hours, in an acute care hospital with a Delaware Medicaid provider agreement, shall be considered for Medicaid.

It is agreed that the DOC will reimburse DHSS for 100% of the Medicaid per discharge and outlier payments and ancillary payments made for incarcerated persons. FCM understands that DOC will then recover 100% of the Medicaid discharge and outlier and ancillary payments by reducing payments DOC makes to FCM. All payments will be made in accordance with the payment schedule defined in the contract agreement #2828.

State of Delaware
Department of Correction

By: _____

Title: Commissioner

Date: 9/5/03

First Correctional Medical
Delaware, L.L.C.

By: _____

Title: President

Date: 9/8/03

U00525