## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;                 )
TINA GROSSMAN as next friend of             )
BRITTANY BARKES; TINA                       )
GROSSMAN as next friend of                  )
ALEXANDRA BARKES; and                       )
KAREN BARKES as administratrix              )
of the ESTATE OF CHRISTOPHER                )
BARKES,                                     )          C. A. No. 06-104-JJF
                                            )
       Plaintiffs,                         )
                                            )
v.                                          )
                                            )
FIRST CORRECTIONAL MEDICAL                  )
INC.; STANLEY TAYLOR;                       )
RAPHAEL WILLIAMS;                           )
CERTAIN UNKNOWN INDIVIDUAL                  )
EMPLOYEES OF STATE OF                       )
DELAWARE DEPARTMENT OF                      )
CORRECTION; CERTAIN                         )
UNKNOWN INDIVIDUAL                          )
EMPLOYEES OF FIRST                          )
CORRECTIONAL MEDICAL, INC.,                 )
And STATE OF DELAWARE,                      )
DEPARTMENT OF CORRECTION,                   )
                                            )
       Defendants.                         )

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**MARTIN & WILSON, P.A.**                         **LAW OFFICES OF**
                                                 **HERBERT G. FAUERHAKE**

_[signature]_                                    _[signature]_ for

**JEFFREY K. MARTIN**, Bar I.D. 2407             **HERBERT G. FEUERHAKE**
**TIMOTHY J. WILSON**, Bar I.D. 4323             DE Bar I.D. No. 2590
1508 Pennsylvania Avenue                         521 West Street
Wilmington, DE 19806                             Wilmington, DE 19801
(302) 777-4681                                   (302) 658-6101
_Attorneys for Plaintiffs_                       _Attorney for Plaintiffs_

## TABLE OF CONTENTS

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

Statement of the Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

      I.      Christopher Barkes: Taken Down By Guilt . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

      II.     Christopher Barkes: Suicidal Ideations and Attempts . . . . . . . . . . . . . . . . . . . . . .5

      III.    Christopher Barkes: Final Detention at HRYCI . . . . . . . . . . . . . . . . . . . . . . . . . .7

      IV.   Department of Correction: Rate of Prison Suicide Twice National Average . . . . .9

      V.    U.S. Department of Justice: Deficiencies in DOC Suicide Protocols . . . . . . . . 11

      VI.   DOC Response: Reworking Failed Policies and Procedures . . . . . . . . . . . . . . .14

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.      The Mental Health and Suicide Policies and Procedures in Place at HRYCI at
       the Time of the Christopher Barkes' Suicide Were Constitutionally Defective,
       and the Maintenance of Such Policies and Procedures Including Inadequate
       Training is Attributable to the Deliberate Indifference of the State Defendants,
       and Led to the Death of Mr. Barkes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

      B.    Deliberate Indifference in the Context of Suicide . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    Deliberate Indifference of Defendants Stanley Taylor and Raphael
          Williams to the Constitutionally Defective Mental Health and Suicide
          Screening Policies and Procedures Including Inadequate Training in
          Suicide Prevention Precluding Summary Judgment . . . . . . . . . . . . . . . . . . . . . .28

II.     The Wrongful Death Claim Against Defendants Stanley Taylor and Raphael
      Williams is Justified by the Deliberate Indifference That Those Showed
      Towards Mr. Barkes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF CITATIONS

**PAGES**

Beers-Capitol v. Whetzel,
    256 F.3d 120 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26, 27

Colburn v. Upper Darby Township,
    946 F.2d 1017, 1020 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Estelle v. Gamble,
    429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 21, 22, 23, 25, 26

Farmer v. Brennan,
    511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 25, 26, 27, 28, 32, 34

Hamilton v. Leavy,
    117 F3d 742 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Helling v. McKinney,
    509 U.S. 25 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 25, 32

Rhodes v. Chapman,
    452 U.S.337 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20, 22

Sample v. Diecks,
    885 F.2d 1099 (3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Saunders v. Sullivan,
    608 A.2d 730, 1992 WL 53423 (Del. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Wilson v. Seiter,
    501 U.S. 294 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 23

Woloszyn v. County of Lawrence,
    396 F.3d 314 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27, 28

**OTHER SOURCES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

42 U.S.C. § 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

10 Del. C. § 2724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 Del. C. § 3701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 Del. C. § 3724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11 Del. C. § 6516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

11 Del. C. § 6517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

11 Del. C. § 6525 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

24 Del. C. § 1902(m)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**UNREPORTED DECISIONS**

Duerring v. Somerset County,
        2007 WL 2310865 (W.D. Pa., August 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Robinson v. Weiss,
        2001 WL 640980 (Robinson, J., Dist. of Del., May 9, 2001) . . . . . . . . . . . . . . . . . . . . . . 33

**STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

Plaintiffs, the widow and minor children of decedent, Christopher Barkes, filed the Complaint in this matter on February 16, 2006 against State of Delaware Defendants alleging violations of civil rights under 42 U.S.C. § 1983 alleging cruel and unusual punishment contrary to the Eighth Amendment and alleging failure to train and/or to maintain wrongful customs, practices and policies. Plaintiffs have filed both wrongful death actions and survival actions under Delaware statutes 10 Del. C. § 2724 and 10 Del. C. § 3701 respectively.

The State Defendants in this action include Stanley Taylor, the Commissioner of the Department of Correction ("DOC"); Raphael Williams, Warden of Howard R. Young Correctional Institution ("HRYCI"); and the State of Delaware Department of Correction. Plaintiffs have also listed "certain unknown individual employees of the State of Delaware Department of Correction". However, discovery has failed to elicit the identification of other State actors to be individually named in this litigation.

Plaintiffs also named as a defendant the healthcare provider for Department of Correction at the time of Mr. Barkes' death, First Correctional Medical, Inc. ("FCM"). FCM has failed to meaningfully participate in this litigation having only filed its Answer to the Complaint consisting of nonspecific denials and its Initial Disclosures wherein only three individuals were identified. FCM failed to update its Initial Disclosures or respond to discovery which prevented Plaintiffs from discovering the identification of other individuals who may have been named as Defendants, as well as, the nature of each identified individual's knowledge with regard to this litigation.[1]

---

[1]  See the Affidavit of Jeffrey K. Martin, Esquire wherein he sets forth the lack of participation by FCM in this litigation due to FCM's limited economic resources. (B-1 – B-4).

1

Plaintiffs and State Defendants exchanged written discovery to include Interrogatories and Requests for Production of Documents. The State Defendants provided over five hundred pages of documents to Plaintiffs and Plaintiffs provided over seven hundred pages to State Defendants.

Plaintiffs' course of discovery was unfortunately interrupted from March 2007 through the end of July 2007 for unexpected and unavoidable reasons as set forth in the Affidavit of undersigned counsel.[2] See Plaintiffs' Appendix at B-1 through B-4.

Despite the period of discovery, Plaintiff submits, as will be further set forth in the Statement of Facts, that there are still facts yet to be discovered. The identity of the intake person at HRYCI, a licensed practical nurse employed by FCM, who did the initial medical and mental health screening and assessment of Christopher Barkes on November 13, 2007, has not been identified.[3] Correspondingly, the State Defendants, despite three written requests for same, failed to produce the Department of Correction Suicide Prevention Policy and Procedures that were in effect on the date of Christopher Barkes' death, November 14, 2004 despite three specific requests for this documentation.[4]

On October 15, 2007, State Defendants filed a Motion for Summary Judgment and have filed their Opening Brief in Support thereof. This is Plaintiffs' Answering Brief in Opposition to the State Defendants' Motion for Summary Judgment.

---

[2]   Paragraph 12 of the Affidavit of Jeffrey K. Martin, Esquire sets forth the various sequence of events that caused an interruption in the discovery in this matter.

[3]   The Affidavit of Jeffrey K. Martin, Esquire demonstrates that FCM's failure to engage in discovery has resulted in this critical failure. Plaintiffs will show in the Argument that this LPN was unauthorized to perform the unassisted assessment of Christopher Barkes on November 13, 2004.

[4]   State Defendants have stated that the Suicide Prevention Policy applicable to this time period is found at A157-160. However, this is the same reference Plaintiffs' counsel was given by letter of counsel dated August 1, 2007, then referring to D00514-17 which is the same as A157-160. At the end of this policy, there is a note advising that this policy was revised in May 2005. This date may very well be significant inasmuch as while there were only six months between the date of Mr. Barkes' death and the May 2005 revision, there were two other prison suicides in the interim. Robert Porter died by hanging as HRYCI on April 13, 2005 and Jermaine Wilson hung himself at the Delaware Correctional Center on February 28, 2005. See Plaintiffs' Appendix for a listing of Delaware inmates who died in custody between 2000 and April 2005. (B-21-30).

## SUMMARY OF ARGUMENT

II.     The mental health and suicide policies and procedures in place at HRYCI at the time of the Christopher Barkes' suicide were constitutionally defective, and the maintenance of such policies and procedures including inadequate training is attributable to the deliberate indifference of the State Defendants, and led to the death of Mr. Barkes.

II.     The wrongful death claim against Defendants Stanley Taylor and Raphael Williams is justified by the deliberate indifference that those showed towards Mr. Barkes.

3

## STATEMENT OF FACTS

### I.    CHRISTOPHER BARKES: TAKEN DOWN BY GUILT

Christopher Barkes took his life four weeks before his thirty-eighth birthday. He left behind his wife, Karen, Plaintiff herein, and his two young daughters, Brittany and Alexandra, also Plaintiffs herein. Chris Barkes was a man who deeply cared for his family. He often spent weekends with his two daughters. Chris Barkes was regularly in attendance at his girls' athletic games, rarely missing a game. (A-000014).

Chris Barkes suffered a tragedy in 1997, a tragedy that he would never escape and would contribute significantly to his untimely death at the age of thirty-seven. In 1997, Chris Barkes had an automobile accident that resulted in the loss of two lives. Chris Barkes was held responsible for this accident and was incarcerated for approximately two years. He also held himself responsible admitting that two people were dead due to his mistake. (A-000022).

Prior to the 1997 accident, Chris Barkes had drug and alcohol issues. He was, however, sober for a ten-year period until the time he was twenty-eight years of age. (A-000019). He began drinking prior to the accident and this contributed to the causation of the accident. Following his incarceration, and still unable to escape his guilt over the accident, he returned to drugs and alcohol on an intermittent basis prior to his death. However, Chris Barkes was not abusing alcohol or drugs before his death in November 2004. (A-000017).

Christopher Barkes was a helper and a giver. He helped his Aunt Helen, a widow, with odd jobs around her house, including helping her to purchase automobiles and working with contractors to remodel her house. See Affidavit of Karen Barkes found in Plaintiffs' Appendix. (B-30-32). Christopher Barkes worked with Alcoholics Anonymous by orienting new members including newly released prison inmates. (Id.) As a nurse he worked with critically ill and end-

4

stage AIDS and cancer patients. (Id.) Christopher Barkes believed that if he could help a person out every day, he might be able to cope with the damage he had done with the loss of two lives in 1997.

## II. CHRISTOPHER BARKES: SUICIDAL IDEATIONS AND ATTEMPTS

Christopher Barkes attempted suicide at least four times prior to his death in November 2004, three of which occurred in the last year of his life. (A-000077-78). The first attempt occurred at HRYCI (also known as Gander Hill) while Chris Barkes was serving his sentence for the 1997 automobile accident that resulted in two deaths. At that time, he collected a number of pills over the course of several days until he had enough he believed that they would kill him. (Id.) Upon discovery of the pills, Chris Barkes was taken to St. Francis Hospital where he stayed for four days before returning to HRYCI. (Id.)

In November of 2003, Christopher Barkes was staying with his aunt in Claymont. (Id.) Karen Barkes had spoken with him a couple of times during the day and Chris acknowledged to her that he was depressed over his recent drug use and that he saw no end to the pain that he felt over his mistakes. (Id.) Thereafter, he took a number of prescription pills and then called his father, Raymond Barkes. (Id.) Raymond Barkes then called an ambulance that took Christopher Barkes to Wilmington Hospital where his stomach was pumped. (Id.) He was admitted for being suicidal.[5] (Id.)

Approximately one month later in December of 2003, Christopher Barkes attempted another overdose with an unknown illegal drug. (A-000077). He told his wife that he felt he was not worthy to be alive because two people were dead because of his mistake. Christopher

---

[5] There was some confusion in Plaintiff Karen Barkes' deposition wherein she did not recall this suicide attempt in November 2003 involving the Wilmington Hospital. (A-000021). She recalled a hospitalization at the Rockford Center during her deposition. The Rockford Center's hospitalization was different from the Wilmington Hospital hospitalization where his stomach was pumped. *Id.*

Barkes became unconscious and he was revived by police and ambulance crew and was taken to the hospital. (Id.)

Christopher Barkes was found by a probation officer to be in an intoxicated condition while he was at friend's house on September 10, 2004. (Id.) He was taken to Wilmington Hospital because of his breathalyzer reading. (Id.) While he was waiting for treatment, Christopher Barkes tried to hang himself with a bed sheet and IV tubing. (Id.) For this attempted suicide, Christopher Barkes was admitted to the Rockford Center for being suicidal. (Id.) Karen Barkes testified that the attempted suicide at the Wilmington Hospital was done "under the probation officer's watch." (A-000022). Ms. Barkes described the fact that the probation officer was at the hospital at the time that Christopher Barkes tried to hang himself. (Id.)

While in custody for the last time, Christopher Barkes called his wife during the evening hours of November 13, 2004 and advised her that "I can't live this way any more." (A-000014). Accordingly, Karen Barkes interpreted this to mean that he wanted to kill himself. (Id.) Chris Barkes told Karen that he loved her and that she should tell the girls that he loved them. (Id.) He expressed sorrow for hurting Karen. (Id.)

While Karen Barkes was upset about he husband's statements, she believed that he could not kill himself because "he was in jail." (A-000015). Karen Barkes further explained that she felt that her husband would be safe in prison because of the Department of Correction's knowledge that he was suicidal based upon his previous suicide attempts; that his probation officer knew that he was suicidal; that he went to prison on a probation violation; that he was on medication; and because he was a drug addict and alcoholic. (Id.) Karen Barkes was confident that the Department of Corrections "would take care of him." (Id.)

### III.    CHRISTOPHER BARKES:  FINAL DETENTION AT HRYCI

Christopher Barkes was admitted to the Booking and Receiving Unit of HRYCI at approximately 3:00 p.m. on Saturday, November 13, 2004 as a detainee who was expected to be transferred to the VOP Center in Sussex County on Monday, November 15, 2004.  He died less than 21 hours following his admission to HRYCI.

Upon admission into the Booking and Receiving area of HRYCI, Mr. Barkes underwent an intake medical examination by a licensed practical nurse (LPN).  (A-00001– 4).  However, due to the non-participation of FCM in this litigation, her identity, her background, and her training remain unknown.  Plaintiffs' have not been afforded the opportunity to depose this individual.

FCM, through its Initial Disclosures, identified a "Nurse Jackie" as the only nurse as to the facts of this case.  It appears that Nurse Jackie wrote a consultation request following the discovery of Christopher Barkes' body on Sunday, November 14, 2004.  The consultation request was to transfer Mr. Barkes' body by ambulance to the hospital.  See Plaintiff's Appendix at B-33.

The unidentified "intake nurse," presumably an LPN other than Nurse Jackie, and as yet still identified, filled out a form called the Adult Intake Mental Health Screening form.  (A-000147).  What we do not know is whether Christopher Barkes made any of these check marks himself or whether this form was done entirely by this "intake nurse."  Without the nurse's identification and testimony, we do not know whether Christopher Barkes relayed to her any suicide attempts other than one of the overdose suicide attempts at the end of 2003.  We do not know whether the "intake nurse" had access to any of the DOC records that would have contained Mr. Barkes' history with the Department of Correction.  Specifically, we do not know

whether this "intake nurse" was able to determine that Mr. Barkes had three suicide attempts in the last twelve months, the most recent of which occurred two months prior to Mr. Barkes' final arrival at HRYCI. Unless and until this "intake nurse" can be identified, we will not know the availability of other mental health assessors, if any, who were present at HRYCI on Saturday afternoon, November 13, 2004.

The form signed by the "intake nurse" indicates that Mr. Barkes told that nurse that he had a previous suicide attempt and he had a psychiatric history requiring psychotropic medicine. (A-000149). The State Defendants' assertion that Christopher Barkes did not relay information about his September 2004 suicide attempt is without factual basis. We do know, however, that this "intake nurse" referred Christopher Barkes to mental health services on a "routine" urgency level rather than one of the heightened alternatives of "ASAP" or "Urgent." (A-000148). There is nothing else on this form other than Mr. Barkes' name, his DOC I.D. Number, the date of November 13, 2004 and this "intake nurse's" signature followed by her title, "LPN." (Id.). It is apparent that the signatures on the referral to Mental Health form as well as the Adult Intake Mental Health Screening form are the same. (A-000147-48).

State Defendants acknowledged that only one officer does the initial intake. (A-000106). In this case, it was an LPN. The Adult Intake Mental Health Screening form has been validated by the Department of Correction as well as the need for eight checkmarks out of seventeen in order to notify the provider or the psychiatrist of a suicide potential. (A-000154). Defendant Raphael Williams was copied on the letter from Deputy Warden Perry Phelps written on November 15, 2004 in the wake of Christopher Barkes' suicide. (Id.).

The intake nurse designation as "LPN" means that she was a "Licensed Practical Nurse." The LPN title means that this is a nurse whose credentials are less than an RN, "Registered

8

Nurse." An LPN lacks the legal authority to do any "assessments without the direct supervision of an RN or a physician." 24 Del. C. § 1902(m)(2). It appears therefore that the assessment that she did on Christopher Barkes was unauthorized by virtue of her licensure under State statute.

Christopher Barkes was released to a regular cell in the Booking and Receiving area because he was deemed not to be a suicide risk. At some point that evening, Mr. Barkes was permitted to make at least one telephone call. He called his wife and advised her that he planned to kill himself. (A-000014). Christopher Barkes was the only inmate housed in the Booking and Receiving area of the prison from Saturday afternoon and until his death Sunday morning. (A-000005). Mr. Barkes was, in essence, in solitary confinement.

According to the Department of Correction correctional officers on duty that night, they did "periodic checks" on Mr. Barkes. (A-000005-10). There is no indication as to the frequencies of these checks. The correctional officers reported no "unusual behavior" by Mr. Barkes. (Id.) According to the correctional officer affidavits, no one saw Mr. Barkes between 11:00 a.m. on Sunday, November 14, 2007 and 11:35 a.m. when he was found hanging by a bed sheet that was attached to a steel partition in his prison cell. (A-000150-53).

## IV. DEPARTMENT OF CORRECTION: RATE OF PRISON SUIDICE TWICE NATIONAL AVERAGE

The State of Delaware Health and Social Services ("DHSS") issued a report in September 2005 detailing the names of Delaware inmates who died while in custody between the years 2000 and April 2005. (B-21-29). The following is a list in chronological order of the names of inmates who died in the custody of the Department of Correction during this time accompanied by the date of death, the manner of death and the institution where they died:

9

| NAME | DATE OF DEATH | MANNER OF DEATH | PRISON |
|---|---|---|---|
| Paul Whitehurst | 4-13-01 | Suicide–hanging | DCC |
| Harry Missimer | 4-24-01 | Suicide-hanging | HRYCI |
| Toribio Cejas | 8-11-01 | Suicide-hanging | DCC |
| Brent Franks | 5-22-02 | Suicide-hanging | SCI |
| David Bender | 10-31-02 | Suicide-overdose | DCC |
| Paul Gohagan | 6-23-03 | Suicide-overdose | HRYCI |
| James Hughes | 8-27-03 | Undetermined | |
| Christopher Barkes | 11-14-04 | Suicide-hanging | HRYCI |
| Jermaine Wilson | 2-18-05 | Suicide-hanging | DCC |
| Robert Porter | 4-13-05 | Suicide-hanging | HRYCI |

The United States Department of Justice ("USDOJ") issued a report through its Bureau of Justice Statistics entitled, "Suicide and Homicide in State Prisons and Local Jails" in August 2005. (B-34-45). The Bureau of Justice analyzed by state the number of prison deaths in the years 2001 and 2002. Delaware reported to the Bureau of Justice that they had four suicides during this time. Note, however, according to the list published by DHSS, there were in reality five suicides that occurred in three different institutions during this two-year interval.

The average annual mortality rate for suicides during this two-year period was calculated by each state based upon a figure of 100,000 prisoners held at mid-year. The national average suicide mortality rate for state prisons during the years in question was 14. Delaware's figures were computed to be 28, meaning that Delaware's rate of suicide in its prisons was double the national average. However, given the underreporting by Delaware for this study (there were five suicides during this interval rather than four), Delaware's suicide rate was closer to 35, meaning that it has two and a half times the national rate making it one of the highest suicide rates among all fifty states.

V.    **U.S. DEPARTMENT OF JUSTICE: DEFICIENCIES IN DOC SUICIDE PROTOCOLS**

The United States Department of Justice ("USDOJ") conducted an investigation of five Delaware prisons including HRYCI pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. The purpose of this investigation was to seek remedies for any pattern or practice of conduct that violates the constitution or federal rights of incarcerated persons. The USDOJ investigation focused on medical and mental health care issues involving the Delaware prisons. The findings letter dated December 29, 2006 from the USDOJ directed to Delaware Governor Minner is found in Plaintiffs' Appendix at B-46-69.

Upon being notified of the prospective investigation, the State of Delaware retained its own expert consultants to evaluate the medical and mental health care services at its prisons. The State's experts identified systemic deficiencies in medical and mental health care at HRYCI and three other institutions. (B-47).

The State's mental health expert found substantial deficiencies with the mental health care provided at the prisons. Among the problems identified by the State, and which are particularly pertinent to this case, were deficient procedures for handling potentially suicidal inmates. (B-55). The USDOJ investigation confirmed many of the State findings regarding the serious systemic deficiencies in psychiatric staffing, and in intake and screening of mental health issues. (Id.)

The USDOJ investigation found with regard to HRYCI that the two part-time psychiatrists who provided mental health care at HRYCI worked less than 20 hours a week combined and that there was no onsite psychiatric coverage at all for two days out of the week. (Id.). They further found that psychiatrists are routinely unavailable for treatment for team and

staff meetings and are often not involved in critical decision-making and are not adequately involved in monitoring and supervision of staff. (B-56).

The USDOJ found that the "intake and screening process with respect to the identification of serious mentally ill inmates was constitutionally inadequate." (B-59). They further found that, "the intake and screening process for medical and mental health is combined and performed by nursing staff members who do not appear to have received adequate mental health training or have the sufficient background in mental health." (Id.). As a result, these nurses are "unable to appropriately identify symptoms of mental illness." (Id.).

Specifically, as to suicide prevention practices and procedures, the USDOJ investigation "revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm." (B-60). This led to a "system in which inmates at risk for suicide are not adequately identified, housed and supervised." (Id.).

The USDOJ also determined that the "State fails to adequately assess and identify inmates at risk for suicide." (Id.). They found that the "personnel conducting the assessment lacked appropriate training and experience with issues related to mental health and suicide prevention." (Id.).

On the issue of training, the USDOJ determined that while the "State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure. Similarly, correctional staff received insufficient training in the area of suicide prevention. Training at the academy is only two or three hours, an annual refresher training methods are not adequate." (Id.). The federal

12

investigation concluded that "the intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions." (Id.).

The USDOJ investigation further found that, "the State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety. Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging." (Id.).

Finally, the USDOJ investigation revealed that, "the State fails to ensure that appropriate levels of observation are maintained. Documentation of fifteen and thirty-minute checks does not indicate that these checks are being done." (B-61). As a result of the USDOJ investigation, the USDOJ issued a number of minimum remedial measures that must be taken to avoid the constitutional infirmaries that existed at the time of their investigation. Those minimum remedial measures relating to suicide prevention are as follows:

- The State should ensure that appropriately trained staff perform mental health screening at intake. (B-62).

- The State should develop a comprehensive policy regarding suicide prevention for DOC facilities. (B-63).

- The State should ensure that all medical, mental health and correctional staff are appropriately trained regarding issues of suicide prevention, and that the content of their training is reflective of the State's suicide prevention policy. (Id.).

- The State should ensure that intake staff are sufficiently experienced and qualified to identify inmates that pose a risk of suicide. (Id.).

- The State should ensure that inmates identified at risk for suicide are housed in safe cells, free from fixtures and design features that could facilitate a suicide attempt. (Id.).

- The State should ensure that 15 and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented. (Id.).

The findings set forth by the USDOJ were revealed in the December 29, 2006 letter addressed to Governor Ruth Ann Minner. This "findings letter" is a public document and was posted on the Civil Rights Division's website. (Id.).

## VI.    DOC RESPONSE:  REWORKING FAILED POLICIES AND PROCEDURES

As a result of the joint investigation done by the State of Delaware and the United States Department of Justice that culminated in the issuing of findings that were set forth in the previous section, the Delaware Department of Correction adopted an Action Plan dated April 30, 2007 to address their deficiencies found by both the State experts as well as the USDOJ. A copy of the State of Delaware Department of Correction Action Plan dated April 30, 2007 is found in Plaintiffs' Appendix at B-66 through B-112.  References are also made to a "Memorandum of Agreement" between the United States Department of Justice and the State of Delaware regarding Dolores J. Baylor Women's Correctional Institution, the Delaware Correctional Center, the Howard R. Young Correctional Institution and the Sussex Correctional Institution which serves as a bridge between the deficiencies found and cited by letter of December 29, 2006 and the Delaware Department of Correction action plan referenced herein ("Memorandum of Agreement.")[6]  A copy of the Memorandum of Agreement dated December 29, 2006 is found in Plaintiffs' Appendix B-113 through B-136.

---

[6]   The Memorandum of Agreement is an agreement between the USDOJ and the State of Delaware through its officials.  In the introduction to the Agreement, it acknowledges that, "the State does not admit any violations of the constitutional rights of inmates confined at the Facilities nor does it admit any violation of state or federal law.  This Agreement may not be used as evidence of liability in any other legal proceeding."  This Memorandum of Agreement will not be further cited in this Brief.  However, the USDOJ's findings following the investigation of the prisons will be cited as well as the DOC's Action Plan. (B-66 through B-112).

The Department of Correction Action Plan has addressed the issues of suicide prevention that were found to be deficient by the USDOJ. The following is a list of action items regarding suicide prevention setting forth the specific goals and tasks for DOC and they are followed by a projected date for completion:

- Qualified mental health professionals will obtain Monitor approval of a curriculum for training on suicide prevention. (B-74).

  ANTICIPATED DATE OF COMPLIANCE - 01/01/08

- Documentation of attendance at suicide prevention training. (Id.).

  ANTICIPATED DATE OF COMPLIANCE - 01/01/08

- Training in the identification, referral, and supervision of inmates with serious medical and mental health needs will continue to be provided by the vendor. (Id.).

  ANTICIPATED DATE OF COMPLIANCE - 07/01/08

- Medical screening addresses the following issues: mental illness and suicide risk. This module includes a full mental health screening. Notification of a mental health provider for issues requiring immediate attention and follow-up will occur via this module system. (B-75).

  ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The policy will also address the need for specific observation of and assessment of those inmates who are identified as suicidal and those who enter DOC with a serious mental health condition or need, or who develop such a need after incarceration. (B-92).

  ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The DOC will develop or revise a suicide prevention policy to ensure training, intake screening/assessment, communication, housing, observation, intervention, and morbidity and mortality review. (B-102).

  ANTICIPATED DATE OF COMPLIANCE – 10/01/07

- The DOC will ensure that training on suicide prevention for all existing and newly hired correctional, medical and mental health staff will be provided using a monitor-approved curriculum. (B-103).

ANTICIPATED DATE OF COMPLIANCE – 01/01/08

- The DOC will develop a revised and implement policies and procedures pertaining to intake procedures in order to identify newly arrived inmates who may be at risk for suicide. (B-104).

ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The screening will include inquiry regarding past suicide ideation and/or attempts, current ideation, threat, plan, prior mental health treatment/hospitalization, recent significant loss (job, relationship, death of a family member/close friend, etc) history of suicidal behavior by a family member/close friend, suicide risk during prior confinement in a state facility and the arresting or transporting officer's belief that the inmate is currently at risk. (Id.).

ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The DOC will develop or revise and implement policies that require medical staff to place inmates identified as at risk for suicide on suicide precautions until they can be assessed by a qualified mental health professional. (B-105).

- Inmates identified as "at risk" include those who are actively suicidal (i.e. threatening or engaging in suicidal behavior) those expressing suicidal ideation, (i.e. a vague wish to die without a plan), or those with a recent history of self-harm and destructive behavior, and/or those who deny suicidal ideation and do not threaten suicide but whose behavior indicates the potential for self-injury. (Id.).

ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The DOC will develop or revise and implement policies that require a formalized risk assessment to be conducted by a qualified mental health professional within the appropriate time frame, not to exceed 24 hours from the initiation of suicide precaution. (B-106).

ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The assessment shall include, but not be limited to description of antecedent events and precipitating factors, suicidal indicators, mental status examinations, previous psychiatric and suicide risk history, level of lethality, current medication, diagnosis, and recommendation/treatment plan. (Id.).

ANTICIPATED DATE OF COMPLIANCE - 10/30/07

- The DOC will ensure that all inmates on suicide precautions are housed in suicide resistant cells (i.e. cells without protrusions that would provide easy access for hanging attempts), which provide full visibility to staff. (B-107).

ANTICIPATED DATE OF COMPLIANCE - 01/01/08

- The DOC will develop or revise and implement policies and procedures relating to the observation of inmates who are suicidal or at risk for suicide under the criteria identified. (B-108).

ANTICIPATED DATE OF COMPLIANCE -- 08/01/07

## ARGUMENT

I. **THE MENTAL HEALTH AND SUICIDE POLICIES AND PROCEDURES IN PLACE AT HRYCI AT THE TIME OF THE CHRISTOPHER BARKES' SUICIDE WERE CONSTITUTIONALLY DEFECTIVE, AND THE MAINTENANCE OF SUCH POLICIES AND PROCEDURES INCLUDING INADEQUATE TRAINING IS ATTRIBUTABLE TO THE DELIBERATE INDIFFERENCE OF THE STATE DEFENDANTS, AND LED TO THE DEATH OF MR. BARKES.**

A.    STANDARD OF REVIEW

Plaintiffs adopt the basic principles relating to summary judgment as set forth in the Standard of Review in the State Defendants' Opening Brief. With regard to the application of these principles in this case, and in other cases relating specifically to responsibility of prison officials for defective prison conditions and/or preventable prisoner suicides, see discussion in Section I-C below.

B.    DELIBERATE INDIFFERENCE IN THE CONTEXT OF SUICIDE

In evaluating the existence or non-existence of "deliberate indifference" on the part of prison officials to the Constitutional right of Christopher Barkes to be free from "cruel and unusual punishment" under the Eighth Amendment, this Court is necessarily attempting to answer a very simple question: What degree of humanity does the prison system owe to a suicidal prisoner?

Determining the manner in which recent jurisprudence has sought to answer this question begins with the opinion of the United States Supreme Court in the case of Estelle v. Gamble, 429 U.S. 97 (1976). In noting that the Eighth Amendment had originally addressed primarily "'torture[s] and other barbar[ous]' methods of punishment," 429 U.S. at 102, Justice Thurgood Marshall stated therein that the Court's subsequent opinions had proscribed more than just physically barbarous punishments, and further found that:

> The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency, . . . ,' . . . against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' . . . . or which 'involve the unnecessary and wanton infliction of pain,' . . .
>
> These elements establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' . . . the evils of most immediate concern to the drafters of the Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency . . .
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment.

429 U.S. at 102-104, citations omitted.

Thus the element of "deliberate indifference" was injected into Eighth Amendment jurisprudence. In the case of Christopher Barkes, of course, the deliberate indifference alleged has led to the most serious result, namely his death by hanging.

The opinion in Estelle v. Gamble was limited to claims made against a specific doctor with regard to the specific treatment received by an individual inmate in an isolated situation. Although there were allegations against certain senior officials in the Texas Department of Corrections, the Supreme Court remanded with regard to these other, potentially broader claims. Subsequent to Estelle v. Gamble, however, the Supreme Court began to address situations in which prison *conditions* were at issue. In Rhodes v. Chapman, 452 U.S.337 (1981), the Court first expressly found that "[c]onditions . . ., alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual . . .", 452 U.S. at 347. The concurring opinion notes the importance of judicial intervention to remedy such deprivations:

19

> Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of the prisons. . . . Prison inmates are 'voteless, politically unpopular, and socially threatening.' . . . Under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions. Insulated as they are from political pressures, and charged with the duty of enforcing the Constitution, courts are in the strongest position to insist that unconstitutional conditions be remedied, even at significant financial cost.

452 U.S. at 358-359 [citations and portions of text omitted].

As the scope of the Court's intervention in matters of prison administration expanded, the justices wrestled with the proper boundaries of that intervention. In <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991), a split developed as to the appropriate test to measure the conduct of defendants in a prison conditions case between the restrictive provisions of Justice Antonin Scalia's majority opinion and the more expansive notions of the concurring opinion by Justice White (joined by Justices Marshall, Blackmun, and Stevens). A word about this split is in order.

In <u>Wilson v. Seiter</u>, the majority opinion by Justice Scalia held that, in evaluating a prison conditions case, there is an *objective* need to demonstrate that the problem with the prison conditions at issue was sufficiently serious, and then further found that there was a *subjective* need for a culpable state of mind constituting deliberate indifference on the part of the defendant officials. It was this *subjective* need for a showing of deliberate indifference on the part of a purportedly responsible official that the concurring opinion by Justice White takes serious issue with; in particular, he notes that intent is often a difficult concept to pin down in the context of prison conditions cases, and he expressed the fear that the difficulty of proving such intent might render certain situations involving objectively inhumane prison conditions beyond the reach of proper redress in the courts. As noted above, he was joined by three other justices in this opinion.

The case of <u>Helling v. McKinney</u>, 509 U.S. 25 (1993), further clarified the manner in which a claim of cruel and unusual punishment was to be addressed, and at the same time

provided further evidence of differences on the Court with regard to the proper application of the Eighth Amendment. The respondent prisoner in Helling contended that the Nevada state prison system was causing him to be exposed involuntarily to environmental tobacco smoke ("ETS") from his cellmate's (and others') cigarette smoking. At issue was whether this exposure could lead to future health problems. In the majority opinion of Justice Byron White, the Court stated that "[w]e have great difficulty agreeing [with petitioning prison authorities] that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," 509 U.S. at 33. Justice White continues:

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety' . . . It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.' . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event.

509 U.S. at 33 [citations omitted].

Thus, the majority found that alleging a risk of future injury from unsafe conditions could state a claim for relief. Justice Clarence Thomas (joined by Justice Scalia) filed a dissent in Helling, initially expressing his underlying doubt that Estelle v. Gamble had been a proper extension of Eighth Amendment application in the first place; his alternative interpretation of the Eighth Amendment would limit its application to those punishments expressly imposed by *sentence*, as opposed to events or conditions that only arise post-sentencing and inside the prison, which such events or conditions he suggests fall outside the scope of the Eighth Amendment. Recognizing that considerations of *stare decisis* might insulate Estelle v. Gamble from any attempt to overrule its doctrine, however, he dissents on the more limited argument that applying the Eighth

Amendment even to the *risk* of future injury (as opposed to immediate and actual injury) as the Court had embraced in Helling was, in any event, an improper extension outside the reasonable scope of Estelle v. Gamble's protective shield.

At this point in its Eighth Amendment jurisprudence, then, the Supreme Court had found in Estelle v. Gamble that the Amendment extended beyond a mere examination of the sentence imposed and could reach inhumane events that occurred within the prison resulting from deliberate indifference, further found in Rhodes v. Chapman that the protection applied to prison *conditions*, further found in Wilson v. Seiter that imposing liability for inhumane events or conditions required a *subjective* showing of a culpable state of mind of deliberate indifference on the part of the defendant official, and had further found in Helling v. McKinney that inhumane conditions could be found even where such conditions only threatened a *risk* of future injury. To each of these propositions, there was an opposing view.

It is within this framework that the Supreme Court turned its attention to the dispute in Farmer v. Brennan, 511 U.S. 825 (1994). In that case, a transsexual prisoner with feminine characteristics asserted that he had been housed in facilities subjecting him to an unreasonable risk of sexual attack and violence at the hands of other inmates, as a result of the deliberate indifference of the defendant prison officials. Justice David Souter notes the objective requirement in an Eighth Amendment case, that the deprivation alleged must be sufficiently serious, 511 U.S. at 834. He then framed the specific issue facing the Court in Farmer v. Brennan: isolating a test for satisfying the *subjective* requirement (*i.e.*, the requirement established by Wilson v. Seiter) of a showing of deliberate indifference by the defendant official, see discussion at 511 U.S. 832 to 834. Simply stated, the Court was attempting to define what must be proved to establish "deliberate indifference."

22

And that, Justice Souter proceeded to do, in some detail. He first notes that "[w]hile Estelle establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," 511 U.S. at 835. He then begins to spell out the specific test the Court will apply. The State Defendants in the instant matter have set forth what might be called the tip of Souter's iceberg on this issue, in briefly quoting from his opinion:

> "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Opening Brief at page 15, quoting 511 U.S. at page 837.

This passage allows for a greater level of protection than Justice Thomas might afford should he be provided with his sought-after opportunity to abrogate Estelle v. Gamble, but it is nevertheless, on its face, a relatively strict requirement: the requirement of actual knowledge on the part of the allegedly culpable officials. It is not enough that the prison official *should* have known; he or she must have *known* of the facts inferring a substantial risk of serious harm. This is, in effect, simply a restatement of the rule derived from Wilson v. Seiter.

But although the Opening Brief stops quoting from Farmer v. Brennan at this point, Justice Souter in his opinion did not stop with this restrictive statement of the test. He goes on to clarify in some detail how a plaintiff may *prove* a claim of subjective deliberate indifference by a prison official, which is to say how such a plaintiff may *prove* actual knowledge. It is worth quoting his opinion on this point at some length, because the logic bears directly on the issues with which we are faced in the suicide of decedent Christopher Barkes herein:

Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. . . . , and **a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. . . . .** For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was '**longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known' about it,** then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk . . .

511 U.S. at 842-843 (1994) [emphasis supplied].

Thus, while subjective knowledge is required, that subjective knowledge may be *inferred* from the obviousness of the risk. As will be discussed further below, this doctrine has been given application in the Third Circuit. But before we turn to the Third Circuit cases, let us turn back to Farmer v. Brennan. Justice Souter goes on to discuss the situation where a prison official denies knowledge of the specific danger posed to a specific inmate (in the context of a prison condition allowing prisoners to attack prisoners, the issue posed therein):

Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," Helling, 509 U.S. at 35, and it does not matter whether the risk comes from a single source or multiple sources, **any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.**

511 U.S. at 843 [emphasis supplied].

The relevance of this passage to the Barkes suicide matter, and to the liability of Defendants Stanley Taylor and Raphael Williams, is readily apparent. As will be discussed further below,

24

they are responsible for a policy that created a substantial risk of serious (indeed, of *ultimate*) damage to *all* suicidal inmates and detainees, including Mr. Barkes; in Mr. Barkes' case, the risk was realized.

Moreover, Justice Souter reiterates a key holding of Helling, namely that the finding of a culpable state of mind does not require that prisoners first suffer physical injury. "Consistently with this principle, a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief.'" Helling, supra, at 33-34," 511 U.S. at 845. Thus the sad irony is that the late Christopher Barkes would have had standing to seek an injunction to protect him from the very defective policies that led directly to his death.

Justice Stevens and Justice Blackmun concurred in the result reached in Farmer v. Brennan, but indicated that they would actually go further and do away with the requirement of subjective motivation altogether. But what is perhaps the most interesting concurrence comes from Justice Thomas, who concurs in the result, which overturned a grant of summary judgment against the transsexual prisoner based upon his failure to express his safety concerns to prison officials. As noted above, Thomas has been one of the conservative voices on Eighth Amendment jurisprudence. While Thomas's concurring opinion is written in a begrudging fashion, and again posits his desire to revisit Estelle v. Gamble with the possibility of overturning the expansion of Eighth Amendment jurisprudence beyond examination of sentences, his concurrence in the result, including the remand which would be applying the new standard of proof (which he calls "a step in the right direction," 511 U.S. at 861), indicates that he now embraces this standard of proof for an Estelle v. Gamble type of "deliberate indifference" case. In other words, recognizing that "'evolving standards of decency that mark the progress of

a maturing society'" has become the touchstone (511 U.S. at 859, quoting Estelle v. Gamble), he is actually willing to apply Estelle v. Gamble, under the Court's new standard of proof, to overturn the entry of summary judgment against the prisoner.

The Third Circuit has interpreted the above-discussed Eighth Amendment jurisprudence in several leading cases applicable to the instant matter. In Hamilton v. Leavy, 117 F.3d 742 (3rd Cir. 1997), the court applied the evidentiary guidelines set forth in Farmer v. Brennan, including the drawing of inferences from circumstantial evidence to demonstrate that an official *must have known* of a specific risk (relying on the notion that the risk was "longstanding, pervasive, well-documented, or expressly noted by officials in the past," see 117 F.3d at 747-748 quoting from Farmer v. Brennan), to overturn a grant of summary judgment that had been entered in favor of prison officials. The rationale in Hamilton v. Leavy was that the relevant officials either must have known of the danger posed to an inmate who had been beaten several times in the past, or failed to take all possible actions to avoid the housing situation which led to the beating at issue in that case. In the case of Beers-Capitol v. Whetzel, 256 F.3d 120, 130-135 (3rd Cir. 2001), the Third Circuit further clarified, at some length, the Eighth Amendment deliberate indifference analysis for a prisons condition case (i.e. failure to provide medical care, or failure to screen for threats of violence, or the like) derived from Farmer v. Brennan. The Beers-Capitol opinion summarizes the deliberate indifference analysis as follows:

> From Farmer and Hamilton we extract the following precepts. To be liable on a deliberate indifference claim, a defendant prison official must both 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.' Farmer, 511 U.S. at 837, 114 S.Ct. 1970. The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. *See id.* at 837-838, 114 S.Ct. 1970. **However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the extent that the excessive risk was so obvious that the official must have known of the risk.** *See id.* at 842, 114 S.Ct. 1970.

256 F.3d at 133 (emphasis supplied).

Thus, as the Supreme Court has mandated, while "*should* have known" liability is insufficient in the Third Circuit, it is replaced by a close cousin, "so obvious that the official *must* have known." Moreover (and this is a very important point), the Beers-Capitol opinion points to two lines of "deliberate indifference" analysis (see extended discussion in Beers-Capitol, 256 F.3d at 133 to 135 with regard to the applicable tests, and at 135 to 143 with regard to specific application of the tests to various classes of defendants): first, the direct deliberate indifference of those defendants "on the scene," so to speak, versus the less direct deliberate indifference implicating *supervisors* for their deficient *policies*. The less direct claims for holding a supervisor liable for policies must meet the four-part test of Sample v. Diecks, 885 F.2d 1099, 1118 (3rd Cir., 1989). Under Sample, to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury, (2) the supervisor was aware that the unreasonable risk was created, (3) the supervisor was indifferent to that risk, and (4) the injury resulted from the policy or practice.

In Woloszyn v. County of Lawrence, 396 F.3d 314 (3rd Cir. 2005), the Third Circuit addressed the application of deliberate indifference in the context of suicide cases. Adding objective elements to the subjective analysis of Farmer v. Brennan, the court stated:

> [A] plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of the vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability.

396 F.3d at 319 [citations omitted].

With these standards in mind, we will now turn to the specific facts of this case.

C.    DELIBERATE INDIFFERENCE OF DEFENDANTS STANLEY TAYLOR
AND RAPHAEL WILLIAMS TO THE CONSTITUTIONALLY DEFECTIVE
MENTAL HEALTH AND SUICIDE SCREENING POLICIES AND
PROCEDURES INCLUDING INADEQUATE TRAINING IN SUICIDE
PREVENTION PRECLUDING SUMMARY JUDGMENT.

The standard on a motion for summary judgment in the context of a prisoner suicide case

(as with any case) is set forth in Woloszyn, supra: "In order to defeat the defendants' motion, the

plaintiff 'must introduce more than a scintilla of evidence showing that there is a genuine issue

for trial; she must introduce evidence from which a rational finder of fact could find in her

favor,'" Woloszyn, 396 F.3d at 319, quoting from Colburn v. Upper Darby Township, , 946 F.2d

1017, 1020 (3rd Cir. 1991). As will be shown, there are, at the least, genuine issues of material

fact requiring resolution at trial with regard to the liability of Defendants Stanley Taylor and

Raphael Williams.

The State's Opening Brief states, at page 17, that Defendants Taylor and Williams have

not been shown to have had any personal involvement in the suicide of Christopher Barkes. This

misplaced emphasis on the part of the State Defendants constitutes a misunderstanding of the

Plaintiffs' claims in this matter, and leads to a distortion of the analysis under the case law set

forth in the previous section. Plaintiffs in this matter are asserting claims against Stanley Taylor

and Raphael Williams in their individual capacities, for their deliberate indifference to policies

and procedures that created a substantial risk of serious injury to Christopher Barkes, and, in fact,

led directly to his death. As noted above, the proof of deliberate indifference need not be

personal to the injured inmate, but can relate to a risk faced *generally* by all prisoners. As Justice

Souter has stated in above-quoted passages in the context of dangers posed by other inmates, it

does not matter "whether a prisoner faces an excessive risk of attack for reasons personal to him

28

or because all prisoners in his situation face such a risk," 511 U.S. at 843. Indeed, as Justice

Souter points out, the standard as drawn does not even require a prisoner to allege that an injury

has resulted from the risk created by the flawed policy or procedure; in particular, he finds that

injunctive relief is available, stating that a prisoner need not await a "'tragic event . . . before

obtaining relief,'" 511 U.S. 845 [citation omitted]. Of course, in this matter, as also noted above,

the risk of tragedy was realized. And the policymakers are responsible for their flawed policies.

While not binding on this court, a recent case from the District Court for the Western

District of Pennsylvania is highly instructive on the manner in which the various rules identified

above are to be applied in the Third Circuit. In Duerring v. Somerset County, 2007 WL 2310865

(W.D. Pa., August 9, 2007), the District Court considered claims of deliberate indifference on the

part of prison personnel brought by the estate of a deceased inmate who had committed suicide;

the opinion notes the applicability of Woloszyn, supra, to the analysis. The situation facing the

district court in Duerring is remarkably similar to that facing this Court in the instant matter, as

seen in the following passage that is worth quoting at length:

> In this case, although Defendants proffer a fair amount of evidence that Mr. Duerring acted "normally" around inmates and staff on July 30, 2004, the day of his incarceration and suicide at Somerset County Jail, including his interaction with other inmates and his cell mate, plaintiff has proffered sufficient evidence to support a reasonable jury finding that he did, indeed, have a "particular vulnerability to suicide," that that the custodial officers knew or should have known of that vulnerability, and that Defendants "acted with reckless indifference" to his particular vulnerability.
>
> Unlike in Woloszyn, the summary judgment record herein shows: Mr. Duerring had previous incarcerations at the Somerset County Jail in March and May, 2004; his admissions forms from those incarcerations were on file at the Jail and indicate that he had been treated for mental illness, had attempted suicide in the past, had recently experienced a significant loss, and had no place to live; his Admission Data Form completed for his incarceration on July 30, 2004 indicated, in the "Suicide Assessment" portion of the form, that Mr. Duerring had been treated for mental illness. specifically BiPolar type 2, ADHD and anxiety, and was taking anti-psychotic and anti-anxiety drugs, and that he had attempted suicide in the past, considers suicide "all the time" because he was incarcerated,

and that he had "lost my mind"; that no one at the Jail recognized any risk factors or took any precautionary measures; and that the staff at the Jail had received little if any training in the recognition of at-risk-for-suicide detainees.

In light of that evidence, this Court cannot say that Mr. Duerring's "normal" appearance and presentation to certain inmates and staff members that night demonstrates, *as a matter of law*, that he was not particularly vulnerable to suicide, that the custodial officer or officers had no reason to know of that vulnerability, or that Defendants' failure to recognize the risk and to take any protective action was not reckless with regard to his particular vulnerability. Moreover, there is evidence from which a jury could find that Somerset County and the Warden took inadequate steps to train the corrections staff and officers at the Jail in suicide recognition and prevention until after the tragic events of July 2004, and that such lack of adequate training amounts to deliberate indifference to the constitutional rights of persons with whom the officers and employees of the Jail come in contact.

Duerring, 2007 WL 2310865 at pages *1 to *2 [emphasis in original] (case is appended hereto).

The phrase emphasized by the District Court in the above passage, "*as a matter of law*," is the

key to the analysis facing the Court herein. The task at this stage is not to *measure* the evidence,

but to determine only if there is sufficient conflicting evidence to establish a genuine issue of

material fact. And there is, indeed, substantial evidence in support of Plaintiffs' claims to

establish a genuine issue of material fact and defeat the motion for summary judgment, as set out

in detail in the Statement of Facts above. To reiterate the key facts:

- In a context in which the DOC is attempting to identify an inmate with the capacity to attempt suicide, the form associated with the mental health screening of Mr. Barkes at the time of his detention on November 13, 2004 indicates **that he had attempted suicide the previous year**, see A-000147 to A-000148;

- It was also indicated on the same mental health intake form **that he had a psychiatric history**, and was taking psychotropic medications, see A-000145 to A-000148;

- **These facts were known to DOC personnel**; in particular, the e-mail that appears at the State Defendants' appendix at A-00154 indicates an awareness of these factors;

- The same e-mail at A-00154 indicates that **the DOC was making only a mechanical review of the number of check marks on the intake form,**

stating that the "provider" would not be contacted if fewer than 8 of seventeen boxes indicated affirmative responses. The egregious nature of applying such an arbitrary numerical analysis is plainly seen by a review of the seventeen boxes found in the State Defendants' appendix at page A-000147, in that multiple boxes could be checked (as on Mr. Barkes' form) raising red flags about suicide potential without triggering the need to contact the "provider" if the total number was less than 8. Many of these boxes standing alone should trigger further inquiry, such as each of the two boxes that were checked for Mr. Barkes;

- The problem with such a high trigger for contact of the "provider" is that the individual performing the screening of Mr. Barkes **was neither a doctor nor even a registered nurse, but only an LPN,** who had no authority to perform an unsupervised assessment, see generally 24 Del. C. § 1902(m) requiring that an LPN be supervised by a registered nurse or a licensed medical professional, and compare with the more liberal authority allowed to registered nurses under 24 Del. C. § 1902(n);

- Mr. Barkes had a history of drug and alcohol problems known to the DOC, and had been incarcerated for having caused the death of two individuals in an alcohol-related automobile accident for which he felt great guilt;

- As detailed in the Statement of Facts, **Mr. Barkes had previously attempted suicide at HRYCI** (also known as Gander Hill Prison) in 1997 using pills, resulting in his 4-day hospitalization at St. Francis Hospital; had attempted suicide twice in 2003; and had in **September 2004 attempted suicide with bed sheets and IV tubing in Wilmington Hospital while under the watch of his probation officer** (having demonstrated intoxication as a result of a breathalyzer reading). Of these four attempts, **two had occurred while under the supervision of DOC personnel and the other one was disclosed on the intake form;**

- Mr. Barkes was the only inmate housed in the Booking and Receiving area during his brief 21-hour confinement on November 13-14 2004, **rendering his detention as *de facto* solitary confinement;**

- As noted in the Statement of Facts, **the State of Delaware's rate of prison suicides during the time frame relevant to the Barkes suicide was two to two and a half times** the national average;

- As detailed in the Statement of Facts, **the United States Department of Justice ("USDOJ") and the State of Delaware's own mental health expert have found that the Delaware prisons, including HRYCI, have demonstrated inadequate psychiatric coverage, including a shortage of psychiatrist time and an absence of psychiatrist involvement in**

**critical mental health decision-making** (see generally plaintiff's Appendix, B-046 to B-065 for this and other references to the USDOJ findings set forth below);

- The USDOJ report further found that the **"intake and screening process with respect to the identification of seriously mentally ill inmates [was] constitutionally inadequate"**;

- In general, the USDOJ investigation "revealed that the State's practices regarding suicide prevention **substantially depart from generally accepted professional standards and expose inmates to significant risk of harm,**" leading to "a system in which **inmates at risk for suicide are not adequately identified, housed, and supervised**";

- The USDOJ also expressly criticized the **insufficient training** of **correctional personnel** for suicide prevention and the failure of the State's medical provider to implement standard operating procedures for training;

- The USDOJ also found that the DOC's "intake process also **fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts** or ideation";

- The USDOJ also found that **"the State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety.** Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmates weight in an attempt at hanging"; and

- The USDOJ also found that **"the State fails to ensure that appropriate levels of observation are maintained."**

[Emphasis supplied]

The system in place at HRYCI during the 21-hours of Christopher Barkes incarceration was a broken system. This fact was sufficiently obvious that it is not unreasonable to infer, applying the standard of proof derived from <u>Farmer v. Brennan</u>, that Defendants Stanley Taylor and Raphael Williams had actual knowledge of the deficiencies. At this stage of the case, there is at the least a genuine issue of material fact on all relevant points sufficient to compel a denial of summary judgment. Christopher Barkes was at serious risk of harming himself, and the risk of

future harm as a result of the defective DOC policies is actionable per <u>Helling v. McKinney</u> as outlined above. The litany of recommendations made by the USDOJ with regard to suicide prevention and mental health screening, and the elaborate "Action Plan" of the DOC prepared in response thereto, each of which is detailed in the Statement of Facts, demonstrate the extent of the unconstitutional system that existed before the federal government investigated the DOC's deliberate indifference toward inmates at risk such as Christopher Barkes.

That the problems identified by the USDOJ are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" is amply demonstrated by the excessive number of suicides in Delaware prisons as well as the litigation that the Delaware prisons have engendered in recent years; see, for just one example, <u>Robinson v. Weiss</u>, 2001 WL 640980 (Robinson, J., Dist. of Del., May 9, 2001) (copy attached hereto) in which Judge Robinson found that plaintiff had alleged a valid claim for relief based upon an assertion that "the State defendants failed to ensure that proper policies and procedures were implemented to meet the serious psychiatric needs of inmates housed in Gander Hill despite their prior notice of these deficiencies," 2001 WL 640980 at page *5.

Inmates, litigants, legislators, the press, family and friends of inmates, and concerned citizens generally have been complaining about the practices and policies of the Delaware prisons for many years, attempting to get someone in the prison system to listen to them. The policy failures of Defendant Commissioner Stanley Taylor, who is charged with responsibility for inmate mental health and general well-being under 11 Del. C. §§ 6516, 6517, and 6525 (among others) constitute deliberate indifference that led to the death of Christopher Barkes, as does the failure of Defendant Warden Raphael Williams to implement the proper measures within the walls of HRYCI, wherein he was responsible.

33

Certainly within the first twenty-four hours of confinement of a detainee who has been expressly identified as having a past suicide attempt, a psychiatric history, and is being supplied with psychotropic medications by the prison, it is reasonable to expect that that prisoner will be adequately evaluated before being abandoned to his own darker inclinations. In the case of Mr. Barkes, all that needed to be done was to house him in a cell free from bedsheets or other implements of suicide (such as protrusions from which a sheet could be hung), and place him on a careful-observation schedule until such time as a qualified professional (i.e. not an unqualified and unauthorized LPN) could render an evaluation of the true suicide risk. That there was no policy in place mandating that this be done is, as Justice Thomas put it in his concurring opinion in <u>Farmer v. Brennan</u> cited above, an affront to the "evolving standards of decency that mark the progress of a maturing society."

## II.   THE WRONGFUL DEATH CLAIM AGAINST DEFENDANTS STANLEY TAYLOR AND RAPHAEL WILLIAMS IS JUSTIFIED BY THE DELIBERATE INDIFFERENCE THAT THOSE SHOWED TOWARDS MR. BARKES

For the reasons set forth in Section I, above, genuine issues of material fact exist with regard to the deliberate indifference of Defendants Stanley Taylor and Raphael Williams in their individual capacities, thereby precluding summary judgment on the wrongful death claim brought under 10 Del. C. § 3724. See, generally, <u>Saunders v. Sullivan</u>, 608 A.2d 730, 1992 WL 53423 (Del. 1992), cited in the Opening Brief of State Defendants.

## CONCLUSION

For all of the reasons set forth herein, it is respectfully submitted that the motion for summary judgment filed by the State Defendants be denied.

**MARTIN & WILSON, P.A.**

**LAW OFFICES OF**
**HERBERT G. FAUERHAKE**

JEFFREY K. MARTIN
DE Bar I.D. No. 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
*Attorneys for Plaintiffs*

HERBERT G. FAUERHAKE
DE Bar I.D. No. 2590
521 West Street
Wilmington, DE 19801
(302) 658-6101
*Attorneys for Plaintiffs*

DATED:     November 13, 2007

Westlaw.

Slip Copy

Slip Copy, 2007 WL 2310865 (W.D.Pa.)

**(Cite as: 2007 WL 2310865 (W.D.Pa.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Ronald Lee DUERRING, Sr., Executor of the
Estate of Ronald Lee Duerring, II,
Deceased, Plaintiff,
v.
SOMERSET COUNTY and Tim Mapes,
Defendants.
**No. 06cv0247.**

Aug. 9, 2007.

Richard C. Levine, Ainsman, Levine & Drexler,
Pittsburgh, PA, for Plaintiff.

Marie Milie Jones, Meyer, Darragh, Buckler,
Bebenek & Eck, Pittsburgh, PA, for Defendants.

**MEMORANDUM AND ORDER OF COURT**

ARTHUR J. SCHWAB, United States District
Judge.

*1 Before the Court is defendants Somerset County
and Warden Tim Mapes' motion for summary
judgment (doc. no. 26) in their favor on plaintiff's
complaint brought pursuant to 42 U.S.C. § 1983,
which claims that deliberate indifference on the part
of the Somerset County Jail and the Warden led to
Ronald Lee Duerring II's suicide while a detainee at
that facility, and violated his Eighth and Fourteenth
Amendment rights. After careful consideration of
the motion, response, briefs in support and in
opposition to summary judgment, and the
supporting materials submitted by the parties, the
Court finds there are genuine issues of material fact
that must be submitted to the jury.

This Court set out the standards for evaluating a
section 1983 claim by the estate of a detainee who
committed suicide in the context of a summary

judgment motion in *Woloszyn v. County of
Lawrence,* Civil Action No. 01-1361 (W.D.Pa.),
and granted summary judgment in favor of the
County of Lawrence, its Warden, and two
Corrections Officers of the Lawrence County
Correctional Facility, on the grounds that "Plaintiff
has failed to present evidence sufficient to
withstand summary judgment as to identifying
specific training measures that could reasonably
have been expected to identify Woloszyn as
particularly vulnerable to suicide, and has failed to
meet her burden of showing deliberate indifference
on the part of Lawrence County." Woloszyn
Memorandum Opinion.(doc. no. 37 at Civil Action
No. 01-1031), at 11. The United States Court of
Appeals for the Third Circuit affirmed the grant of
summary judgment for Defendants. *Woloszyn v.
County of Lawrence,* **396 F.3d 314 (3d Cir.2005).**

The standard for liability on a claim of deliberate
indifference in this setting, as enunciated by the
United States Court of Appeals for the Third Circuit
in *Woloszyn,* is as follows:

A. General Legal Principles.

Woloszyn was a pre-trial detainee when he
committed suicide. We first examined liability
under § 1983 for such suicides in *Colburn v.
Upper Darby Township,* 838 F.2d 663 (3d
Cir.1988) ("*Colburn I*"). There, we held that "if
[custodial] officials know or should know of the
particular vulnerability to suicide of an inmate,
then the Fourteenth Amendment imposes on them
an obligation not to act with reckless indifference
to that vulnerability." *Id.* at 669. We later
elaborated upon that standard in *Colburn v.
Upper Darby Township,* 946 F.2d 1017 (3d
Cir.1991) ("*Colburn II*"), where we wrote that
a plaintiff in a prison suicide case has the burden
of establishing three elements: (1) the detainee
had a "particular vulnerability to suicide," (2) the
custodial officer or officers knew or should have
known of that vulnerability, and (3) those officers

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy

Page 2

Slip Copy, 2007 WL 2310865 (W.D.Pa.)

**(Cite as: 2007 WL 2310865 (W.D.Pa.))**

"acted with reckless indifference" to the detainee's particular vulnerability.
*Colburn II,* 946 F.2d at 1023.
***Woloszyn* 396 F.3d at 319.**

In this case, although Defendants proffer a fair amount of evidence that Mr. Duerring acted "normally" around inmates and staff on July 30, 2004, the day of his incarceration and suicide at Somerset County Jail, including his interaction with other inmates and his cell mate, plaintiff has proffered sufficient evidence to support a reasonable jury finding that he did, indeed, have a "particular vulnerability to suicide," that the custodial officer or officers knew or should have known of that vulnerability, and that Defendants "acted with reckless indifference" to his particular vulnerability.

*2 Unlike in ***Woloszyn,*** the summary judgment record herein shows: Mr. Duerring had previous incarcerations at the Somerset County Jail in March and May, 2004; his admissions forms from those incarcerations were on file at the Jail and indicate that he had been treated for mental illness, had attempted suicide in the past, had recently experienced a significant loss, and had no place to live; his Admission Data Form completed for his incarceration on July 30, 2004 indicated, in the "Suicide Assessment" portion of the form, that Mr. Duerring had been treated for mental illness, specifically BiPolar type 2, ADHD and anxiety, and was taking anti-psychotic and anti-anxiety drugs, and that he had attempted suicide in the past, considers suicide "all the time" because he was incarcerated, and that he had "lost my mind"; that noone at the Jail recognized any risk factors or took any precautionary measures; and that the staff at the Jail had received little if any training in the recognition of at-risk-for-suicide detainees.

In light of that evidence, this Court cannot say that Mr. Duerring's "normal" appearance and presentation to certain inmates and staff members that night demonstrates, *as a matter of law,* that he was not particularly vulnerable to suicide, that the custodial officer or officers had no reason to know of that vulnerability, or that Defendants' failure to

recognize the risk and to take any protective action was not reckless with regard to his particular vulnerability. Moreover, there is evidence from which a jury could find that Somerset County and the Warden took inadequate steps to train the corrections staff and officers at the Jail in suicide recognition and prevention until after the tragic events of July 2004, and that such lack of adequate training amounts to deliberate indifference to the constitutional rights of persons with whom the officers and employees of the Jail come in contact. *Colburn II,* citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Although Defendants have presented a great deal of evidence to support their defense, so does plaintiff, and there remain genuine issues of material fact for the jury to resolve.

Accordingly,

**AND NOW,** this 9th day of August, 2007, for the reasons set forth above, defendants' motion for summary judgment (doc. no. 26) is **DENIED.**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Robinson v. Weiss
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Charles M. **ROBINSON**, Plaintiff,
v.
Allen C. WEISS, M.D.; Gordon **Ostrum**, Sr., M.D.,
Medical Director, Gander Hill Prison; John/Jane
Doe, Director of Psychiatric Services, State of
Delaware Correctional System; John/Jane Doe,
M.D., Medical Director, State of Delaware
Correctional System; Prison Health Services, Inc.;
Sherese Brewington-Carr, Warden, Gander Hill
Prison; Stanley Taylor, Commissioner, Department
of Correction, State of Delaware; Brian Flick,
United States Deputy Marshal; Steven Conboy,
Deputy Supervisor United States Marshal; and
John/Jane Does, Supervisors, United States Marshal
Service, District of Delaware, Defendants.
**No. Civ.A. 00-345-SLR.**

May 9, 2001.

William L. Doerler, of Trzuskowski, Kipp, Kelleher
& Pearce, Wilmington, Delaware, for plaintiff.
Lek Domni, Philadelphia, Pennsylvania, for
plaintiff, of counsel.
Gilbert F. Shelsby, Jr., and Carrie I. Dayton, of
Margan Shelsby & Leoni, Newark, Delaware, for
Allen C. Weiss and Gordon Ostrum, Sr.
Alan S. Gold, of Monaghan & Gold, P.C., Elkins
Park, Pennsylvania, for Allen C. Weiss and Gordon
Ostrum, Sr., of counsel.
John D. Balaguer, and Marc. S. Casarino,
Wilmington, Delaware, for Prison Health Services,
Inc.
Stuart B. Drowos, Deputy Attorney General, State
of Delaware, Wilmington, Delaware, for Stanley
Taylor and Sherese Brewington-Carr.
Richard Andrews, Acting United States Attorney
and Judith M. Kinney, Assistant United States
Attorney, United States Attorney's Office,

Wilmington, Delaware, for Brian Flick and Steven
Conboy.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Charles M. Robinson, a former pretrial
detainee housed in the Multi Purpose Criminal
Justice Facility in Wilmington, Delaware ("Gander
Hill"), brought this civil rights action against
several defendants associated with Prison Health
Services, Inc. ("PHS") and the United States
Marshal Service. The named defendants include
Allen C. Weiss, M.D. ("Weiss"); Gordon Ostrum,
Sr., M.D. ("Ostrum"); PHS; Gander Hill Warden
Sherese Brewington-Carr ("Brewington-Carr");
Department of Correction Commissioner Stanley
Taylor ("Taylor"); [FN1] United States Deputy
Marshal Brian Flick ("Flick"); and Deputy
Supervisor United States Marshal Steven Conboy ("
Conboy").[FN2] Unnamed defendants include the
Director of Psychiatric Services for the State of
Delaware Correctional System ("Psychiatric
Director"), the Medical Director for the State of
Delaware Correctional System ("Medical Director"
), and supervisors of the United States Marshal
Service for the District of Delaware ("Marshal
Supervisors").

> FN1. Defendants Brewington-Carr and
> Taylor are hereinafter referred to as "the
> State defendants."

> FN2. Defendants Flick and Conboy are
> hereinafter referred to collectively as "the
> federal defendants."

Plaintiff's causes of action include (1) a § 1983 [FN3]
action against defendants Weiss, Ostrum, Medical
Director, Psychiatric Director, Brewington-Carr,
and Taylor; (2) a *Bivens*[FN4] action against Flick,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2

Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Conboy, and Marshal Supervisors; (3) malpractice claims against Weiss and PHS; (4) a negligent infliction of emotional distress claim against Weiss and PHS; and (5) an intentional infliction of emotional distress claim against Weiss and PHS.

> FN3. Section 1983 of the Civil Right Act, 42 U.S.C. § 1983 (1994).

> FN4.*Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971). Plaintiff alleges violations of his Fifth and Eighth Amendment rights.

The court previously denied motions to dismiss filed by defendants PHS, Weiss and Ostrum, and the federal defendants. (D.I.66-68) The court also denied the federal defendants' motion for summary judgment. (*Id.*) Currently before the court is the State defendants' motion for summary judgment.

## II. BACKGROUND

Plaintiff's complaint [FN5] alleges that while a pretrial detainee housed in Gander Hill on federal criminal charges, he was involuntarily administered an anti-psychotic drug, Prolixin Deconoate ("Prolixin"), pursuant to the orders of Weiss on August 6, 1997. (D.I.22, ¶ 15-16, 20, 27) The next day, detention and preliminary hearings were scheduled in the United States District Court for the District of Delaware before the Honorable Mary Pat Thynge.[FN6] Plaintiff, while under the custody of defendant United States Deputy Marshal Flick, appeared before Magistrate Judge Thynge at which time plaintiff's criminal attorney, Assistant Federal Public Defender Christopher Koyste, informed the court that plaintiff was barely able to communicate with him, was drooling out of his mouth, and appeared to be in a catatonic state.(*Id.,* ¶ 31) Because of her concern for plaintiff's health, Magistrate Judge Thynge ordered defendant Flick to take plaintiff to St. Francis Hospital instead of Gander Hill. (*Id.,* ¶ 32) Defendant Flick, with the knowledge and approval of defendant Deputy Supervisor Conboy and other Marshal Supervisors, returned the plaintiff to Gander Hill instead of St.

Francis Hospital. (*Id.,* ¶ 33) On August 11, 1997, plaintiff was transferred from Gander Hill and admitted to St. Francis Hospital's intensive care unit after an emergency room evaluation. At the time of his admission, plaintiff was unresponsive and dehydrated. He had high blood pressure, a rapid heart rate, a fever of 105 degrees Fahrenheit, and a low level of oxygen in his blood. Plaintiff had pneumonia and was diagnosed with Neuroleptic Malignant Syndrome. (*Id.,* ¶ 34) Plaintiff remained at St. Francis Hospital until his return to Gander Hill on August 27, 1997. (*Id.,* ¶ 37)

> FN5. All references to the "complaint" refer to plaintiff's third amended complaint. (D.I.22)

> FN6. At the time the complaint was filed, United States Magistrate Judge Mary Pat Thynge's sir name was Trostle.

**\*2** Plaintiff alleges that because of the defendants' actions, he suffered various injuries and conditions including permanent brain damage and severe emotional stress. (*Id.,* ¶ 36) As to the specific defendants, plaintiff generally alleges that Ostrum, the Medical Director, and the Psychiatric Director failed to ensure that proper policies and procedures were implemented at Gander Hill to meet the psychiatric needs of inmates despite prior knowledge of deficiencies. Their failure to implement such policies and procedures, plaintiff alleges, constituted a deliberate indifference to plaintiff's serious medical and psychiatric needs and violated his constitutional rights. (*Id.,* ¶ 38) Plaintiff alleges that the State defendants knew of deficiencies in the care given to inmates with psychiatric needs and failed to ensure that proper policies and procedures were implemented to meet those needs. (*Id.,* ¶ 39)

Plaintiff's specific allegations against the State defendants are set forth in the complaint as follows:
10. Defendant Sherese Brewington-Carr, is an adult individual, resident of the State of Delaware who at all relevant times hereto was employed by the State of Delaware as the Warden of Gander Hill Prison, Wilmington, Delaware. She is sued in her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

individual capacity. At all times herein, defendant acted in the course and scope of her employment with the State of Delaware. At all times herein, defendant acted in the course and scope of her employment with PHS under color of state law.

11. Defendant Stanley Taylor, is an adult individual, who is a resident of the State of Delaware, who at all relevant times hereto was employed by the State of Delaware as the Commissioner for the Department of Correction[ ]. He is sued in his individual capacity. At all times herein, defendant acted in the course and scope of his employment with the State of Delaware. At all times herein, defendant acted in the course and scope of his employment with PHS under color of state law.

21. At the time that Dr. Weiss ordered the injection of Prolixin Deconoate, there were-or should have been-other anti-psychotic medications available at the prison infirmary, or at local neighboring hospitals and/or pharmacies in Wilmington, which were not in long-lasting form.

39. As of August 6, 1997 and prior thereto, [the State defendants] failed to ensure that proper policies and procedures were implemented to meet the serious psychiatric needs of inmates housed in Gander Hill Prison despite their prior notice of these deficiencies. Defendants' failure to implement such policies and procedures constituted deliberate indifference to plaintiff's serious medical/psychiatric needs and violated his constitutional rights.

40. Despite notice of the foregoing failures, deficiencies and inadequacies of psychiatric care at Gander Hill Prison, [the State defendants] failed to:

a. allocate funds to improve psychiatric care and address the failures, deficiencies and inadequacies of which it was on notice, including those aforementioned herein;

*3 b. establish an effective emergency capability with appropriate trained staff and appropriate stocked pharmaceutical[s] and medications;

c. develop clinical protocols and policies for management of psychiatric emergencies;

d. maintain twenty-four (24) hour psychiatric coverage at Gander Hill sufficient to accommodate its prison population;

e. establish professional and competent pharmacy services; and

f. include psychiatric reviews as part of the utility assurance process.

(*Id.,* ¶¶ 10-11, 12, 39-40)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *SeeAnderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *SeeCelotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

The State defendants seek summary judgment pursuant to the doctrine of qualified immunity.[FN7] In *Rouse v. Plantier,* 182 F .3d 192 (3d Cir.1999), the Third Circuit has addressed this issue in the context of inmates suing corrections officials for a deliberate indifference to the inmates' medical needs. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)."The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."*Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *see also Acierno v. Cloutier,* 40 F.3d 597, 616 (3d Cir.1994) (*enbanc* ). In determining whether defendants are entitled to claim qualified immunity, the court engages in a three-part inquiry: (1) whether the plaintiff alleged a violation of his constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official knew or should have known that the alleged action violated the plaintiff's rights.

> FN7. The State defendants also argue that (1) plaintiff cannot maintain a suit against the State defendants in their official capacities; (2) the State defendants cannot be held liable based upon respondeat superior; and (3) negligence is not a cognizable cause of action under § 1983. Since plaintiff agrees with each of these propositions, the court will not discuss them.

**\*4** The Eighth Amendment prohibits the imposition of "unnecessary and wanton infliction of pain contrary to contemporary standards of decency."*See Helling v. McKinney,* 509 U.S. 25, 32 (1993). In *Estelle v. Gamble,* 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide basic medical treatment to those whom it has incarcerated. The Court

articulated the standard to be used:
In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend " evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 106.Therefore, to succeed under these principles, plaintiff must demonstrate (1) that the State defendants were deliberately indifferent to his medical needs and (2) that those needs were serious. *Id.* The State defendants focus only on the issue of whether they were deliberately indifferent to plaintiff's medical needs. Thus, the court will assume for purposes of this motion that plaintiff's medical needs were serious.

It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference." As the *Estelle* Court noted: "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute ' an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' ' *Id.* at 105;*see also Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993) ("The law is clear that simple medical malpractice is insufficient to present a constitutional violation."); *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (emphasis omitted) (" Certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."). "Deliberate indifference," therefore, requires "obduracy and wantonness," *Whitley v. Albers,* 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.

The Third Circuit has found "deliberate indifference " in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. *See Durmer,* 991 F.2d at 68

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(citing *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346-47 (3d Cir.1987)). It also has found "deliberate indifference" to exist where the prison official persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury."*Napoleon,* 897 F.2d at 109-11 (holding that allegations of several instances of flawed medical treatment state a claim under Eighth Amendment).

*5 Here, plaintiff has alleged that the State defendants failed to ensure that proper policies and procedures were implemented to meet the serious psychiatric needs of inmates housed in Gander Hill despite their prior notice of these deficiencies. Plaintiff has stated a claim upon which relief can be granted. *SeeFarmer v. Brennan,* 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

The State defendants contracted with PHS to care for the health and medical needs of the inmate population. The State defendants admit that once an inmate is taken to the medical department in the DOC facilities, there is little to no involvement by the facilities' non-medical personnel in the care of inmates. The State defendants argue that once they turned plaintiff over to PHS for medical care, they cannot be said to have been deliberately indifferent to plaintiff's medical needs.

The court holds that the State defendants cannot shun their responsibility to provide medical care for inmates by simply contracting with a third party and then looking the other way. If, in fact, the State defendants knew of deficiencies in the policies and procedures designed to meet the medical needs of inmates at Gander Hill and failed to act upon these deficiencies, then plaintiff will be entitled to relief. [FN8]Plaintiff shall be entitled to discovery on this issue.

> FN8. In their reply brief, the State defendants attach an affidavit of the DOC's contract monitor for healthcare and substance abuse services showing that the DOC procedures were in compliance with

all applicable National Commission on Correctional Health Care Standards. Furthermore, the DOC has a Medical Review Committee which meets monthly and reviews current policies and procedures, ongoing health care problems, and contract compliance. Because this evidence was not provided in the State defendants' opening brief and because there has been no discovery thus far, the court will not consider that evidence in making its decision.

V. CONCLUSION

The State defendants' motion for summary judgment is denied. The plaintiff shall be entitled to discovery. An appropriate order shall issue.

D.Del.,2001.
Robinson v. Weiss
Not Reported in F.Supp.2d, 2001 WL 640980 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on November 13 2007, I electronically filed the attached Plaintiffs' Answering Brief in Opposition to State Defendants' Motion for Summary Judgment with the Clerk of the Court using CM/ECF which will send notification of such filing to the following attorneys of record below:

Stephani J. Ballard, Esquire
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, DE 19801

Daniel L. McKenty, Esquire
Heckler & Frabizzio, P.A.
800 Delaware Avenue
Suite 200
P.O. Box 128
Wilmington, DE 19899


**MARTIN & WILSON, P.A.**

**JEFFREY K. MARTIN,** Bar I.D. No.: 2407
**TIMOTHY J. WILSON,** Bar I.D. No. 4323
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
*Attorneys for Plaintiffs*

**LAW OFFICES OF
HERBERT G. FAUERHAKE**

**HERBERT G. FAUERHAKE**
DE Bar I.D. No. 2590
521 West Street
Wilmington, DE 19801
(302) 658-6101
*Attorneys for Plaintiffs*

36