## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES individually; TINA
GROSSMAN as next
friend of BRITTANY BARKES; TINA
GROSSMAN as next friend of ALEXANDRA
BARKES; and KAREN BARKES as administratrix
of the ESTATE OF CHRISTOPHER BARKES,

          Plaintiffs,

v.

FIRST CORRECTIONAL MEDICAL,
INC.; STANLEY TAYLOR; RAPHAEL
WILLIAMS; CERTAIN UNKNOWN
INDIVIDUAL EMPLOYEES OF THE STATE OF
DELAWARE DEPARTMENT OF
CORRECTION; CERTAIN UNKNOWN
INDIVIDUAL EMPLOYEES
OF FIRST CORRECTIONAL MEDICAL,
INC.; and STATE OF DELAWARE
DEPARTMENT OF CORRECTION,

          Defendants.

)))))))))))))))))))))))))))

C.A. No. 06-104(JJF)

JURY TRIAL DEMANDED

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN RESPONSE TO
## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR
## SUMMARY JUDGMENT

MARTIN & WILSON, P.A.

**JEFFREY K. MARTIN, ESQ. (#2407)**
**TIMOTHY J. WILSON, ESQ. (#4323)**
1508 Pennsylvania Avenue
Wilmington, DE 19806
jmartin@martinandwilson.com
twilson@martinandwilson.com
(302) 777-4681
*Attorneys for Plaintiffs*


DATED:     November 13, 2007

LAW OFFICES OF
HERBERT G. FEUERHAKE

**HERBERT G. FEUERHAKE, ESQ. (#2590)**
521 West St
Wilmington, DE 19801
herblaw@verizonmail.com
(302) 658-6101
*Attorney for Plaintiff*

## **TABLE OF CONTENTS**

Affidavit of Jeffrey K. Martin, Esquire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

First Correctional Medical's Answer to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

First Correctional Medical's Initial Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

August 1, 2007 letter from Stephani J. Ballard to Jeffrey K. Martin re: Suicide
    Policy and Procedure and its enclosures Bates # D00514-517 . . . . . . . . . . . . . . .15

October 12, 2007 letter from Jeffrey K. Martin to Stephani J. Ballard
    re: Suicide Policy and Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

"Delaware Inmates Who Died in Custody between 2000 and April 2005."
    source: Delaware Health and Social Services . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

Affidavit of Karen Barkes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Consultation Request, November 14, 2004 transferring decedent's body
    to hospital signed by "Nurse Jackie" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

"Suicide and Homicide in State Prisons and Local Jails" dated August 2005
    by the U.S. Department of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Findings letter dated December 29, 2006. from the U.S. Department of Justice
    directed to Delaware Governor Minner
    re: Investigation at Delaware Prisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

The State of Delaware Department of Correction Action Plan
    dated April 30, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66

Memorandum of Agreement between the U.S. Department of Justice
    and the State of Delaware Regarding [selected Delaware Prisons]
    dated December 29, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .113

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KAREN BARKES individually; TINA GROSSMAN as next friend of BRITTANY BARKES; TINA GROSSMAN as next friend of ALEXANDRA BARKES; and KAREN BARKES as administratrix of the ESTATE OF CHRISTOPHER BARKES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 06-cv-00104(JJF) |
| FIRST CORRECTIONAL MEDICAL, INC.; STANLEY TAYLOR; RAPHAEL WILLIAMS; CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES OF THE STATE OF DELAWARE DEPARTMENT OF CORRECTION; CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES OF FIRST CORRECTIONAL MEDICAL, INC.; and STATE OF DELAWARE DEPARTMENT OF CORRECTION, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**AFFIDAVIT OF JEFFREY K. MARTIN, ESQUIRE**

| | | |
|---|---|---|
| STATE OF DELAWARE | : | |
| | : | SS. |
| NEW CASTLE COUNTY | : | |

I, JEFFREY K. MARTIN, being duly sworn according to law, depose and state that the information contained herein is based on my own personal knowledge and is true and correct:

1.    I am co-counsel for the Plaintiffs in this matter.

B - 1

## FIRST CORRECTIONAL MEDICAL, INC.'S FAILURE TO PARTICIPATE IN THIS LITIGATION

2.      In addition to the State Defendants, Plaintiffs filed the Complaint against First Correctional Medical, Inc ("FCM"). FCM was the health care provider contracted by the Department of Correction at all times relevant to the Complaint.

3.      FCM filed an Answer to the Complaint essentially denying, without explanation, all allegations directed toward FCM and denying the allegations against the State Defendants based upon lack of knowledge. A copy of FCM's Answer to Complaint is found in Plaintiffs' Appendix at B - 6 .

4.      The only other pleading issued by FCM was the Initial Disclosures pursuant to Federal Rule Civil Procedure 26(a). A copy of FCM's Initial Disclosures is found in Plaintiffs' Appendix at B – 13. FCM's Initial Disclosures disclosed the names of three individuals with knowledge, two physicians, and "Nurse Jackie." FCM has failed to participate in the litigation process beyond filing the two pleadings set forth supra and an appearance at Plaintiff's deposition wherein counsel for FCM asked Plaintiff Karen Barkes five questions all relating to Ms. Barkes' contact with FCM. (A000030).

5.      Throughout the course of this litigation, I have spoken with the attorneys who have represented FCM in this litigation: Daniel L. McKenty, Dana Spring Monzo and Gerald J. Hager. The attorneys have relayed to me that they were unable to participate in this matter beyond what has been set forth supra because of severe financial limitations of FCM and the resulting direction from their client to not participate any further in this litigation.

B - 2

6.    Most recently, I have spoken with FCM lead attorney Daniel L. McKenty who has advised that his firm is in the process of withdrawing their representation of FCM due to the financial limitations imposed by FCM.

7.    As a result of FCM's failure to participate in this litigation, at this juncture, responding to the State Defendants' dispositive motion following the close of discovery, we still do not have the name or any other identifying information for the nurse who did the medical and mental intake screening and assessment of decedent Christopher Barkes on November 13, 2004.

8.    The reference to Nurse Jackie set forth in Initial Disclosures appears to refer to a nurse, presumably on behalf of FCM, who referred Christopher Barkes to a hospital on November 14, 2004 following his suicide. A copy of this Consultation Request is found in Plaintiff's Appendix at B (previously marked as Defendants' Bates number D00036).

### STATE DEFENDANTS' FAILURE TO PRODUCE DEPARTMENT OF CORRECTION'S SUICIDE POLICY AND PROCEDURES IN EFFECT ON 11/13/2004

9.    Plaintiffs propounded an Interrogatory to State Defendants' requesting the identification and the production of the Department of Correction (DOC) suicide prevention policies and procedures in effect at the time of Christopher Barkes' death. (A000101).

10.    State Defendants responded to Interrogatory number 6 by referencing Standard Operations Procedure 190.04 produced as Bates # D00461-464. (A000101).

11.    There was an unfortunately long and unexpected hiatus between the time of the receipt of State Defendants' Responses to Interrogatories in early March 2007 and

B - 3

the time when Plaintiff's counsel responded to and questioned Defendants' Response to Interrogatory number 6 at the end of July 2007.

  12. Shortly after the receipt of this Interrogatory Response, undersigned counsel resigned from the law firm of Margolis Edelstein on March 31, 2007 and began the new law firm of Martin & Wilson, which began on April 1, 2007. For months following the departure from Margolis Edelstein, undersigned counsel did not get mail or telephone messages from Margolis Edelstein that were directed to undersigned counsel. Undersigned counsel lost to Margolis Edelstein his telephone numbers that he had had for many years and became a defendant in two litigation actions in Philadelphia County directed against the undersigned by Margolis Edelstein. During this interval, undersigned counsel also moved from his former office building and purchased and built out a new office. Also, during this interval, undersigned counsel had conversations with the Commissioner of the Department of Corrections, Carl Danberg, wherein we discussed the resumption of the mediation that was originally scheduled for April 2007 before and cancelled by Judge Mary Pat Thynge in the wake of her increased responsibilities following the elevation of Judge Kent Jordon. At the end of this interval and indeed through at least August 20, 2007, undersigned counsel believed that this matter would be mediated. Consideration was given to the identity of an appropriate mediator for this matter. The prospect of mediation ended sometime in the very end of August when counsel for State Defendants advised undersigned counsel that mediation would not go forward.

B - 4

13. On July 24, 2007, undersigned counsel contacted counsel for State Defendants seeking the DOC policies and procedures manual regarding suicide prevention that was in effect at the time of Christopher Barkes' death.

14. On August 2, 2007, Plaintiff's counsel received a letter dated August 1, 2007 from Stephani J. Ballard, attorney for State Defendants, wherein she identified the suicide prevention policy as Bates # D00514-517. A copy of Ms. Ballard's letter of August 1 and enclosures is found in Plaintiff's Appendix.

15. Noting that the last page of the suicide prevention policy forwarded to undersigned counsel on August 1 stated "REVISED: May 1, 2005," undersigned counsel sent a follow-up letter to Ms. Ballard dated October 12, 2007 seeking the suicide procedures/protocols that were in effect on November 14, 2004. A copy of undersigned counsel's letter of October 12, 2007 is found in Plaintiff's Appendix. In response thereto, there ensued a conversation between the legal assistants for both attorneys wherein undersigned counsel's assistant was advised that there may have been some minor changes by way of the May 2005 revisions but that no further information was available.

JEFFREY K. MARTIN

SWORN AND SUBSCRIBED before me this 13TH day of November, 2007.

NOTARY PUBLIC

TIMOTHY J. WILSON, ESQ.
NOTARY PUBLIC
DELAWARE ATTORNEY
ID # 4323
DELAWARE ATTORNEY AT LAW

B - 5

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 06-104 |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL, | ) | JURY OF 12 DEMANDED |
| INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER TO COMPLAINT OF DEFENDANTS FIRST CORRECTIONAL MEDICAL, INC., AND CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES OF FIRST CORRECTIONAL MEDICAL, INC.

1.    Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

2.    Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

3.    Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

4.    Answering defendants are without sufficient information to admit or deny the allegations in this paragraph as they are directed to another defendant.

5.    Answering defendants are without sufficient information to admit or deny the allegations as they are directed to another defendant.

6.    Answering defendants are without sufficient information to admit or deny the allegations as they are directed to another defendant.

7.    Answering defendants are without sufficient information to admit or deny the

allegations as they are directed to another defendant.

      8.     Denied.

      9.     Denied that unknown individuals of FCM, Inc., were involved in the care and custody of Christopher Barkes.

      10.     Admitted upon information and belief.

      11.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      12.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      13.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      14.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      15.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      16.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      17.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      18.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

      19.     Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

20. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

21. Answering defendants are without sufficient information to admit or deny the allegations in this paragraph.

22. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

23. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

24. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

25. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

26. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

27. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

28. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

29. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

30. Admitted upon information and belief.

31. Admitted that a document in Mr. Barkes' medical chart regarding the transfer to Christiana noted that he had a history of bipolar disorder.

32.    Admitted upon information and belief.

33.    Answers to paragraphs 1-32 are restated as if more fully set forth herein.

34.    Denied.

35.    Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

36.    Answers to paragraphs 1-35 are restated as if more fully set forth herein.

37.    Objection. This paragraph states a legal conclusion to which no response is required.

38.    Denied.

39.    Denied.

40.    Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

41.    Answers to paragraphs 1-40 are restated as if more fully set forth herein.

42.    Defendants are without sufficient information to admit or deny as this paragraph is directed to other defendants.

43.    Denied.

44.    Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

45.    Answers to paragraphs 1-44 are restated as if more fully set forth herein.

46.    Denied.

47.    Answering defendants are without sufficient information to admit or deny whether plaintiffs were authorized to recover for the damages of the decedent Christopher Barkes. Wrongful conduct by answering defendants is denied and it is denied that any conduct by answering defendants caused any illnesses, injuries, or any damages of any nature to the decedent.

B - 9

48.     Answers to paragraphs 1-44 are restated as if more fully set forth herein.

49.     Denied.

50.     Answering defendants are without sufficient information to admit or deny whether Karen Barkes is authorized to recover for alleged damages suffered by the decedent.

## FIRST AFFIRMATIVE DEFENSE

51.     The Complaint fails to state a claim against defendants upon which plaintiff may recover.

## SECOND AFFIRMATIVE DEFENSE

52.     The Complaint fails to state a claim against defendant FCM upon which plaintiff may recover with respect to all claims for civil rights violations, including all claims under 42 U.S.C. § 1983 and the 8th Amendment of the Constitution of the United States, as there is no vicarious liability for civil rights claims.

## THIRD AFFIRMATIVE DEFENSE

53.     The Complaint fails to state a claim against answering defendants upon which plaintiff may recover with respect to all civil rights claims as defendants were not deliberately indifferent to a serious medical condition.

## FOURTH AFFIRMATIVE DEFENSE

54.     Plaintiffs' claims are barred under 18 Del. C. § 6853(a)(1) as plaintiffs failed to file an affidavit of merit which is a statutory requirement for a healthcare negligence action.

## FIFTH AFFIRMATIVE DEFENSE

55.     Defendants provided plaintiff's decedent medical care that was appropriate for his conditions and which met the applicable standard for care.

B - 10

### SIXTH AFFIRMATIVE DEFENSE

56.    Plaintiffs lack standing to bring this action.

### SEVENTH AFFIRMATIVE DEFENSE

57.    The plaintiff has failed to establish a parental relationship of decedent to Britney Barkes and Alexander Barkes and, accordingly, the Complaint fails to state causes of action on their behalf.

### EIGHTH AFFIRMATIVE DEFENSE

58.    Plaintiff has failed to proffer any medical expert testimony or support for their claims of medical negligence.

### NINTH AFFIRMATIVE DEFENSE

59.    The Complaint fails to state a claim for punitive damages upon which plaintiffs may recover.

**THEREFORE**, defendants FCM and certain unknown individual employees of First Correctional Medical, Inc., demand the judgment be entered in their favor with costs to be assessed against the other parties.

**McCULLOUGH & McKENTY, P.A.**

/s/ Dana M. Spring
Daniel L. McKenty, Del. Bar No. 2689
Dana M. Spring, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Inc., and certain unknown individual employees of First Correctional Medical, Inc.

March 22, 2006

B - 11

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, et al. | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 06-104 |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL, INC., et al. | ) | JURY OF 12 DEMANDED |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, **Dana M. Spring,** hereby certify that on this date a copy of the attached *Answer to Complaint of Defendants First Correctional Medical, Inc., and Certain Unknown Individual Employees of First Correctional Medical, Inc.,* was served via first class mail upon the following:

Jeffrey K. Martin, Esquire
Margolis Edelstein
1509 Gilpin Ave.
Wilmington, DE 19806

**McCULLOUGH & McKENTY, P.A.**

/s/ Dana M. Spring
Daniel L. McKenty, Del. Bar No. 2689
Dana M. Spring, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Inc., and certain unknown individual employees of First Correctional Medical, Inc.

March 22, 2006

B - 12

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

KAREN BARKES, et al.                    )
                                        )
                                        )
              Plaintiffs                )        C.A. No. 06-104
                                        )
      v.                                )
                                        )
FIRST CORRECTIONAL MEDICAL,             )        JURY OF 12 DEMANDED
INC., et al.                            )
                                        )
              Defendants.               )

## FIRST CORRECTIONAL MEDICAL INC., AND UNKNOWN EMPLOYEES OF FIRST CORRECTIONAL MEDICAL, INC.'S, ANSWERS TO RULE 26(a)(1) DISCLOSURES

26(a)(1)(a).    Sitta Gombeh-Alie, M.D.; Jose Aramburo, M.D.; Nurse Jackie, last name unknown; various other currently unidentifiable First Correctional Medical Delaware, LLC, employees.

26(a)(1)(b).    See produced medical records.

26(a)(1)(c).    N/A.

26(a)(1)(d).    There is no insurance agreement. First Correctional Medical Delaware, LLC, was self-insured.  First Correctional Medical, Inc., did not provide healthcare in the State of Delaware.

McCULLOUGH & McKENTY, P.A.


/s/ Dana Spring Monzo
Daniel L. McKenty, Del. Bar No. 2689
Dana Spring Monzo, Del. Bar No. 4605
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397
(302) 655-6749
Attorneys for First Correctional Medical, Inc.


Dated: February 26, 2007

**RECEIVED**

AUG 0 2 2007

**DEPARTMENT OF JUSTICE**
NEW CASTLE COUNTY
820 NORTH FRENCH STREET
WILMINGTON, DELAWARE 19801

CRIMINAL DIVISION (302) 577-8500
FAX (302) 577-2496
CIVIL DIVISION (302) 577-8400
FAX (302) 577-6630
TTY (302) 577-5783

JOSEPH R. BIDEN, III
ATTORNEY GENERAL

August 1, 2007

Jeffrey K. Martin, Esquire
1508 Pennsylvania Avenue, Suite 1C
Wilmington, DE 19806

    *Re:*    *Barkes v. FCM, et al.*
           *C.A. No. 06-104 JJF*

Dear Mr. Martin:

In response to your letter received last week in which you made an informal request for the Department of Correction's Policy and Procedure Manual with regard to suicide policy and procedure, please find Standard Operating Procedure policy number 190.04 (Bates Numbered #D00514 – D00517). This is the suicide prevention policy that was in place at Howard R. Young Correctional Institution at the time of Christopher Barkes' death.

Very truly yours,

Stephani J. Ballard by JHM

Stephani J. Ballard
Deputy Attorney General

SJB/jom

Enclosure

B - 15

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 1 OF 4 |
| EFFECTIVE DATE: JANUARY 1, 2001 | OPR:  HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

I. **POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offenders who may be a suicide risk during intake processing and/or the identification and supervision of suicide-prone offenders during their incarceration.  The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

II. **SCOPE:** This procedure shall apply to all Howard R Young Correctional Institution personnel.

III. **PROCEDURE:**

   A. Recognizing suicide potential during the admissions/classification process

      1. Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

         a. Severe alcohol/drug dependence

         b. Psychiatric potential suffering from impaired judgment or history of mental illness.

         c. Chronic physical problems

      2. Classification interview - Classification Specialists shall consider offenders a suicide risk if they possess the above risk factors and state that they:

         a. Have a history of recent or recurrent suicide attempts.

         b. Have seriously contemplated suicide in the past or present.

         c. Have extreme depression or impulsiveness, including feelings of hopelessness that appear to be chronic.

         d. Have been admitted to a mental hospital or crisis center for attempted suicide.

   B. Post admission indicators of suicide potential

      1. Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

      2. During a suicidal crisis, most persons will display either some or all of the following signs of depression:

000514

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

a. Sadness or crying

b. Withdrawal or silence

c. Loss or gain of appetite marked by noticeable weight gain or loss

d. Insomnia

e. Mood variation (in many cases, extreme and unexplained)

f. Lethargy (slowing of physical movements such as walking and talking)

g. Changes in behavior such as giving away personal possessions, planning a funeral, putting affairs in order, etc.

3. Additionally, many offenders may give a housing unit officer verbal cues that indicate a suicide crisis is impending, such as:

a. Projecting feelings of hopelessness and helplessness

b. Speaking about getting out of jail unrealistically

c. Not effectively dealing with the present and being preoccupied with the past

d. Explaining intentions to commit suicide

e. Increasing difficulty relating to others

f. Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a Correctional Officer)

4. Offenders who should be observed closely for possible suicidal tendencies are:

a. Older offenders

b. Chronically or terminally ill offenders

c. Offenders recuperating from major surgery

d. Anyone subjected to homosexual assault

e. Incarcerated law enforcement officers

f. Incarcerated professionals

000515

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 4 |
| SUBJECT:        OFFENDER MOVEMENT | | |

    g.  Persons who have committed a crime of passion

  5.  If a Correctional Officer has reason to believe that an offender fits any of the aforementioned profiles:

    a.  Immediately implement crisis intervention techniques

    b.  Notify the Shift or Housing Unit Supervisor

    c.  Document all information on an incident report and forward to security and medical personnel

C.  Crisis Intervention Techniques

  1.  When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

    a.  Do not judge the offender

    b.  Talk, listen, discuss, keep lines of communication open, and be supportive

    c.  Ask pertinent questions; be direct

    d.  Do not give personal advice or be untruthful

    e.  Do not dare the offender

    f.  Do not act shocked or alarmed

    g.  Refer for professional help

  2.  The following are guidelines to assist in a suicide crisis:

    a.  Recognize the clues - hopelessness, helplessness, haplessness

    b.  Trust your judgment - you have observed offenders and can recognize changes in behavior

    c.  Listen and be supportive

    d.  Attempt to diffuse the tension and agitation: inject a feeling of hope, but do not lie to the offender

000516

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 4 |
| SUBJECT:        OFFENDER MOVEMENT | | |

    e.  Tell others - notify medical and supervisory staff

    f.  Document all pertinent information in an Incident Report

D.  Suicide Risk Assessment - The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

    1.  High Risk - Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

    2.  Moderate Risk - Exhibits suicidal behavior and/or will not make a "no suicide" contract.

    3.  Low Risk - May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

E.  Housing assignment for suicidal offenders

    1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation (eye contact) process. This is to be documented on the close observation form.

    2.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

    3.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.

REVISED: MAY 1, 2005

000517



Jeffrey K. Martin, Esquire*

Timothy J. Wilson, Esquire*

*Licensed in DE, PA and NJ

1508 Pennsylvania Avenue
Wilmington, DE 19806
Telephone: (302) 777-4681
Facsimile: (302) 777-5803
www.martinandwilson.com

**VIA FACSIMILE ONLY**

October 12, 2007

Stephani J. Ballard, Esquire
Department of Justice
Carvel State Office Building
820 N French St
Wilmington, DE 19801

RE:    **CHRISTOPHER BARKES (DECEASED) v. DEPARTMENT OF CORRECTIONS**
        **C.A. No. 06-CV-00104 (JJF)**

Dear Stephani,

Have reviewed your discovery responses in this matter, I found that in response to production request number 10, you forwarded the suicide procedure/protocols dated May 2005. Kindly forward a copy of the suicide procedures/protocols that were in effect at the time of Christopher Barkes' death. In addition, our review of the records did not reveal the medical intake form that accompanied Christopher Barkes' March 2004 incarceration.

I would appreciate your attention to these matter so that we can complete our discovery record. Thank you.

Very truly yours,

Jeffrey K. Martin, Esquire



Welcome to The News Journal, Wilmington, Del.                    Customer Service | Subscri



**DELAWAREONLINE | WEATHER | ENTERTAINMENT | JOBS | CARS | HOMES | APARTMENTS | CLASS**




Try our new search!    Search Delaware  [All ▼]  [_____]  [Go]     


e|Harmony    more marriages

**TOOLBAR ON/OFF**

Advertiseme



BACHE
Bachelo
Bachelo
Bachelo
Bachelo
RN to B

MASTE
Master
Master
Master

**SPECIAL REPORT**

Subscribe

Email Story

Print Story

Discuss Story

**In Depth**

- Delaware's Deadly Prisons

**Online Extras**

- Groups want lawmakers to monitor prisons
- Danberg gets nod to be next prison chief
- Timeline of prison troubles
- Danberg named to head state prisons
- Groundbreaking changes due at prisons
- Prisoners' rights advocate urges Del. to comply with federal settlement
- Justice Department reaches settlement with Delaware over prison health care
- Taylor to retire as Del. corrections chief, leaving cloud

HOME > LOCAL
Delaware's deadly prisons

# Del. inmates who died in custody between 2000 and April 2005

**Source: Delaware Heath and Human Services**

Updated Sunday, September 25, 2005

**Name:** "Porter, Robert"
**Race:** white
**Date of birth:** 7/17/1964
**Date of death:** 4/13/2005
**Cause of death:** ANOXIC BRAIN INJURY DUE TO HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** GANDER HILL

**Name:** "Johnson, Jackie"
**Race:** black
**Date of birth:** 12/16/1952
**Date of death:** 4/7/2005
**Cause of death:** SEIZURE DISORDER
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Snow, Frederick"
**Race:** white
**Date of birth:** 11/16/1954
**Date of death:** 4/7/2005
**Cause of death:** METASTATIC NON-SMALL CELL CARCINOMA OF LUNG
**Manner of death:** NATURAL



Will h
this w

B - 21

of controversy

Top Story Chat

- Sussex crash kills teen, dog - 74 Comments
- Saddam Hussein executed - 76 Comments

Related Topics

- Pop/Rock
- Medicine
- Insulin (generic), Humulin, Novolin
- George Michael
- Medication
- Cell

Powered by Topix.net

News Choices

 Get Published

 Webcasts

Wireless

Text Alerts

E-Newsletter

RSS Feeds

News Archive

**Prison:** GANDER HILL

**Name:** "Trotman, Ronald W."
**Race:** black
**Date of birth:** 9/9/1967
**Date of death:** 3/4/2005
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Wilson, Jermaine"
**Race:** black
**Date of birth:** 1/15/1985
**Date of death:** 2/18/2005
**Cause of death:** ASPHYXIA DUE TO HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** DCC

**Name:** "Bolden, Deserae"
**Race:** black
**Date of birth:** 7/15/1961
**Date of death:** 2/17/2005
**Cause of death:** DILATED CARDIOMYOPATHY; OTHER SIGNIF: CHRONIC RENAL FAILURE
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Hamilton, Earl F."
**Race:** white
**Date of birth:** 4/30/1933
**Date of death:** 2/8/2005
**Cause of death:** "MULTIORGAN FAILURE WITH RENAL, PULMONARY & CARDIAC FAILURE DUE TO SEPSIS, ARTERIOSCLEROTIC CORONARY ARTERY DISEASE WITH HISTORY OF MYOCARIDAL INFARCTION, CONGESTIVE HEART FAILURE & ATRIAL FIBRILLATION, DIABETES MELLITUS, INSULIN DEPENDENT, UNCONTROLLED, &"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Morales, Luis N."
**Race:** white
**Date of birth:** 9/14/1950
**Date of death:** 2/7/2005
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Anderson, Darnell"



America's high-defin lineup

Packages s
**$29**
(*after mail-in


Get Dish

d
N E T W
Better TV

B - 22

**Race:** black
**Date of birth:** 1/1/1970
**Date of death:** 1/20/2005
**Cause of death:** PNEUMOCYSTIS CARINII PNEUMONIA
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Bosman, Walter C."
**Race:** white
**Date of birth:** 9/12/1963
**Date of death:** 12/28/2004
**Cause of death:** "LIVER FAILURE DUE TO HEPATITUS C; OTHER SIGNIF:
ENCEPHALOPATHY, DIABETES"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Kovatto, Rocco"
**Race:** white
**Date of birth:** 1/14/1947
**Date of death:** 11/29/2004
**Cause of death:** "MULTISYSTEM ORGAN FAILURE DUE TO SEVERE CELLULITIS OF LEFT
LEG; OTHER SIGNIF: CIRRHOSIS OF LIVER, CORONARY ARTERY DISEASE"
**Manner of death:** NATURAL
**Prison:** SCI

**Name:** "Barkes, Christopher"
**Race:** white
**Date of birth:** 12/12/1966
**Date of death:** 11/14/2004
**Cause of death:** ASPHYXIA DUE TO HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** GANDER HILL

**Name:** "Edwards, Tony"
**Race:** black
**Date of birth:** 7/25/1952
**Date of death:** 9/24/2004
**Cause of death:** "END STAGE LIVER DISEASE DUE TO CIRRHOSIS OF LIVER WITH
ASCITES, JAUNDICE & CONGESTIVE HEART FAILURE DUE TO HEPATITIS C; OTHER SIGNIF:
DIABETES MELLITUS, INSULIN DEPENDENT"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Saunders, Robert"
**Race:** black
**Date of birth:** 10/24/1960
**Date of death:** 9/4/2004
**Cause of death:**
**Manner of death:** NATURAL

B - 23

**Name:** "Anderson, James V."
**Race:** white
**Date of birth:** 2/25/1959
**Date of death:** 9/23/2003
**Cause of death:** COMPLICATIONS OF LIVER BIOPSY; OTHER SIGNIF: CIRRHOSIS OF LIFE
DUE TO HEPATITIS C
**Manner of death:** ACCIDENT
**Prison:** SCI

**Name:** "Blake, Charles"
**Race:** white
**Date of birth:** 8/4/1967
**Date of death:** 9/7/2003
**Cause of death:** CANCER OF COLON DUE TO RENAL FAILURE DUE TO
CARDIORESPIRATORY FAILURE DUE TO SEPSIS
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Dillon, Mark"
**Race:** white
**Date of birth:** 1/21/1956
**Date of death:** 9/2/2003
**Cause of death:** ASPIRATION PNUMONIA AND INANITION; OTHER SIGNIF: HISTORY OF
RENAL CARCINOMA
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Coston, Bernard"
**Race:** black
**Date of birth:** 3/4/1950
**Date of death:** 9/2/2003
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** Bloomfield
**Race:** black
**Date of birth:** 9/17/1965
**Date of death:** 8/30/2003
**Cause of death:** COMPLICATIONS OF PROMYELOCYTIC LEUKEMIA
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Hodges, James"
**Race:** white
**Date of birth:** 6/17/1973
**Date of death:** 8/27/2003
**Cause of death:** UNDETERMINED

B - 24

**Manner of death:** UNDETERMINED
**Prison:** DCC

**Name:** "Riley, Eugene"
**Race:** black
**Date of birth:** 10/21/1961
**Date of death:** 8/20/2003
**Cause of death:** CARDIAC ARRHYTHMIA DUE TO INTERSTITIAL FIBROSIS OF UNKNOWN
ETIOLOGY
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Wooten, William A."
**Race:** white
**Date of birth:** 2/10/1962
**Date of death:** 8/11/2003
**Cause of death:** "SEIZURE DISORDER, HYPERTENSIVE HEART DISEASE"
**Manner of death:** NATURAL
**Prison:**

**Name:** "Davis, Larry R."
**Race:** black
**Date of birth:** 1/23/1978
**Date of death:** 7/31/2003
**Cause of death:** DIED AT MARYLAND SHOCK TRAUMA (MARYLAND ME)
**Manner of death:** NATURAL
**Prison:**

**Name:** "Gohagan, Paul K."
**Race:** white
**Date of birth:** 6/23/1963
**Date of death:** 6/23/2003
**Cause of death:** ACUTE DRUG INTOXICATION
**Manner of death:** SUICIDE-DRUG INTOXICATION
**Prison:** GANDER HILL

**Name:** "Savoy, John"
**Race:** black
**Date of birth:** 1/6/1963
**Date of death:** 6/12/2003
**Cause of death:** INTRACEREBRAL HEMORRHAGE DUE TO HYPERTENSIVE HEART DISEASE
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Hampton, Arthur"
**Race:** black
**Date of birth:** 5/6/1930
**Date of death:** 6/11/2003
**Cause of death:** METASTATIC PROSTATE CARCINOMA

B - 25

**Prison:** DCC

**Name:** "Patterson, Robert"
**Race:** black
**Date of birth:** 8/7/1950
**Date of death:** 11/30/2002
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Nasir, Sakee A."
**Race:** black
**Date of birth:** 8/20/1946
**Date of death:** 11/28/2002
**Cause of death:** HEPATIC FAILURE DUE TO HEPATITIS C VIRAL INFECTION; OTHER
SIGNIF: HYPERTENSIVE CARDIOVASCULAR DISEASE
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Bender, David B."
**Race:** white
**Date of birth:** 5/20/1954
**Date of death:** 10/31/2002
**Cause of death:** MULTIPLE CEREBRAL INFARCTS COMPLICATING OVERDOSE OF MULTIPLE
PRESCRIBED MEDICATIONS
**Manner of death:** SUICIDE-OVERDOSE
**Prison:** DCC

**Name:** "Mckinney, James"
**Race:** white
**Date of birth:** 6/20/1955
**Date of death:** 10/23/2002
**Cause of death:** "HEPATORENAL SYNDROME DUE TO END STAGE LIVER DISEASE WITH
JAUNDICE, CONGESTIVE HEART FAILURE & PORTAL HYPERTENSION DUE TO CIRRHOSIS
OF THE LIVER DUE TO HISTORY OF HEPATITIS C"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Winston, Moe"
**Race:** black
**Date of birth:** 10/17/1954
**Date of death:** 10/21/2002
**Cause of death:** "HYPERTENSIVE HEART DISEASE, INSULIN DEPENDENT DIABETES
MELLITUS AND CIRRHOSIS"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Hald, Mark"
**Race:** white

B - 26

**Date of birth:** 2/18/1963
**Date of death:** 7/20/2002
**Cause of death:** ATHEROSCLEROTIC HEART DISEASE
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Miller, William E."
**Race:** black
**Date of birth:** 8/28/1960
**Date of death:** 7/19/2002
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Franks, Brett M."
**Race:** black
**Date of birth:** 12/7/1983
**Date of death:** 5/22/2002
**Cause of death:** ASPHYXIA DUE TO HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** SCI

**Name:** "Shantz, Ira"
**Race:** white
**Date of birth:** 6/12/1939
**Date of death:** 3/31/2002
**Cause of death:** "CARDIAC DYSRHYTHMIA DUE TO ARTERIOSCLEROTIC CORONARY
ARTERY DISEASE; OTHER SIGNIF: CHRONIC OBSTRUCTIVE PULMONARY DISEASE,
OBESITY, AND DIABETES MELLITUS"
**Manner of death:** NATURAL
**Prison:** SCI

**Name:** "Blackson, Christopher O."
**Race:** black
**Date of birth:** 6/9/1962
**Date of death:** 3/27/2002
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Daniels, Michael"
**Race:** white
**Date of birth:** 3/7/1948
**Date of death:** 2/26/2002
**Cause of death:** "ACUTE MYOCARDIAL INFARCTION DUE TO ARTERIOSCLEROTIC
CORONARY ARTERY DISEASE; OTHER SIGNIF: DIABETES MELLITUS, OBESITY"
**Manner of death:** NATURAL
**Prison:** SCI

B - 27

DIABETES MELLITUS"
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Cejas, Toribio"
**Race:** white
**Date of birth:** 4/16/1966
**Date of death:** 8/11/2001
**Cause of death:** "HANGING-EXTERNAL COMPRESSION OF NECK BY HANGING.
GENERALIZED VISCERAL CONGESTION. ATHEROSCLEROSIS OF LEFT MAIN ARTERY WITH
STENOSIS, SLIGHT."
**Manner of death:** SUICIDE-HANGING
**Prison:** DCC

**Name:** "Womer Jr., Russel H."
**Race:** white
**Date of birth:** 7/20/1949
**Date of death:** 8/9/2001
**Cause of death:** "COMPLICATIONS OF ADENOCARCINOMA OF LEFT LUNG, INCLUDING
DYSPHAGIA, INANITION, AND CACHEXIA"
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Fotakos, Gerigios L."
**Race:** white
**Date of birth:** 8/26/1933
**Date of death:** 6/7/2001
**Cause of death:** RESPIRATORY FAILURE DUE TO OBSTRUCTIVE PNEUMONIA DUE TO
CANCER OF THE LEFT LUNG WITH METASTASIS TO THE BRAIN
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Hameen, Abdullah T."
**Race:** black
**Date of birth:** 9/7/1963
**Date of death:** 5/25/2001
**Cause of death:** EXECUTION
**Manner of death:** HOMOCIDE-EXECUTION
**Prison:**

**Name:** "Crumpler, James"
**Race:** black
**Date of birth:** 6/6/1955
**Date of death:** 5/19/2001
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Brezial, James"

B - 28

**Race:** black
**Date of birth:** 1/6/1962
**Date of death:** 5/15/2001
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Brown, Karl"
**Race:** black
**Date of birth:** 10/12/1966
**Date of death:** 5/12/2001
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** GANDER HILL

**Name:** "Bervine, James E."
**Race:** black
**Date of birth:** 4/22/1969
**Date of death:** 5/7/2001
**Cause of death:**
**Manner of death:** NATURAL
**Prison:** DCC

**Name:** "Dawson, David F."
**Race:** white
**Date of birth:** 4/1/1955
**Date of death:** 4/26/2001
**Cause of death:** "INTRAVENOUS INJECTION OF SODIUM PENTOTHAL, PANCURONIUM BROMIDE, AND POTASSIUM CHLORIDE"
**Manner of death:** HOMOCIDE-EXECUTION
**Prison:** DCC

**Name:** "Missimer, Harry E."
**Race:** white
**Date of birth:** 12/4/1973
**Date of death:** 4/24/2001
**Cause of death:** HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** GANDER HILL

**Name:** "Whitehurst, Paul"
**Race:** black
**Date of birth:** 6/29/1966
**Date of death:** 4/13/2001
**Cause of death:** ANOXIC ENCEPHALOPATHY DUE TO HANGING
**Manner of death:** SUICIDE-HANGING
**Prison:** DCC

**Name:** "Mcdonald, Robert L."

B - 29

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| KAREN BARKES individually; TINA GROSSMAN as next friend of BRITTANY BARKES; TINA GROSSMAN as next friend of ALEXANDRA BARKES; and KAREN BARKES as administratrix of the ESTATE OF CHRISTOPHER BARKES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 06-cv-00104(JJF) |
| FIRST CORRECTIONAL MEDICAL, INC.; STANLEY TAYLOR; RAPHAEL WILLIAMS; CERTAIN UNKNOWN INDIVIDUALEMPLOYEES OF THE STATE OF DELAWARE DEPARTMENT OF CORRECTION; CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES OF FIRST CORRECTIONAL MEDICAL, INC.; and STATE OF DELAWARE DEPARTMENT OF CORRECTION, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

### AFFIDAVIT OF KAREN BARKES

STATE OF DELAWARE    :

                        :      SS.

NEW CASTLE COUNTY    :

       I, KAREN BARKES, being duly sworn according to law, depose and state that the information contained herein is based on my own personal knowledge and is true and correct:

       1.    I am a Plaintiff in the above-captioned action.

       2.    I first met Chris Barkes when we were eighteen or nineteen years of age and in substance abuse recovery.

3.    I married Chris Barkes on April 5, 2003 and we were married at the time of Chris' death on November 14, 2004.

4.    Chris had joint custody with his former wife of their two daughters Brittany and Alexandra ("Allie"). Brittany was 15 years old at the time of her father's death and Allie was 11 years old.

5.    We often had the girls stay at our home during the weekend. In addition, we had a family dinner on Wednesday nights where Chris would pick up the girls and cook dinner for us.

6.    Chris was very involved attending the girls' sporting events, church and school activities. He often served as a line judge and helped the coaches or the scorekeeper for the girls' teams. Chris also assisted coaching Allie in girls' basketball.

7.    Chris was also very helpful to his aunt, Helen Young, who had lost her husband. Chris did many of the jobs around her home. Chris also helped Aunt Helen to purchase automobiles and set up work with contractors who renovated her home.

8.    Chris was very active in Alcoholics Anonymous ("AA"). He helped out at the AA office and assisted new members by orienting them to AA. In addition, Chris worked with inmates who had been recently released from prison to introduce them to AA and the meetings.

9.    Chris believed that if he helped a person out every day, he might be able to cope with the damage that he had done from his 1997 car accident.

10.    When Chris worked as a nurse, he enjoyed working with patients who were very ill. He often worked in critical care and matters involving infectious disease. He enjoyed working with end-stage AIDS and cancer patients.

11.    During his final year of life, Chris spent much time talking with doctors and reading books about post-traumatic stress disorder, bipolar disorder, depression, and dual diagnosis.  He attempted to find medications that would help him.  He was trying to find a therapist who could help him deal with his issues of grief and guilt as a result of the car accident.

KAREN BARKES

SWORN AND SUBSCRIBED before me this __12__ day of November, 2007.

NOTARY PUBLIC

JEFFREY K. MARTIN, ESQ.
NOTARY PUBLIC
DELAWARE ATTORNEY
ID #2407
DELAWARE ATTORNEY AT LAW

B - 32



Attach a copy to bill and mail to:
**First Correctional Medical**
**Attn. Claims Department**
**6861 N. Oracle Road**
**Tucson, AZ 85704**

# CONSULTATION REQUEST

Facility: *HUUCI*

Name of Inmate   (Last, First): *Barkes Christopher*

Inmate ID #: *361999*

Date of Birth: *12·12·66*

Date of Request: *11/14/04*

Provider's Name (Please Print): *Nurse Jackie*

## REASON FOR REFERRAL

Social Security Number: *533·43·7341*

Pertinent history & physical finding(s) (please Print)
*Ø Pulse, Ø Resp*

Diagnosis: _____

Urgency of consult (please circle one)   **(emergency (now))**   asap (1-6 days)   urgent (1-2wks)   routine (3-12wks)   standard (13wk-6months)

Consult or test(s) requested: *Hospital*

Estimated cost of consult/test(s): _____

FCM Approved: _____ (SIGNATURE)          Date: _____

FCM Denied: _____ (SIGNATURE)          Date: _____

Contract Approved: _____ (SIGNATURE)          Date: _____

Contract Denied: _____ (SIGNATURE)          Date: _____

Consult Provider Name and Address: _____

Scheduled date/time of appt: _____

Consult #: _____

B - 33

MR-1016                    Revised 12/28/2003

D00036

U.S. Department of Justice
Office of Justice Programs

## Bureau of Justice Statistics
# Special Report

August 2005, NCJ 210036

# Suicide and Homicide in State Prisons and Local Jails

By Christopher J. Mumola
BJS Policy Analyst

Data from new Bureau of Justice Statistics (BJS) data collections offer the first opportunity to analyze the personal characteristics, current offenses, and environmental factors surrounding inmate deaths in local jails and State prisons nationwide.

To implement the Death in Custody Reporting Act of 2000 (PL 106-297), BJS began collecting inmate death records from all local jails in 2000 and expanded reporting to include State prisons in 2001. In this first report from the Deaths in Custody Reporting Program, data from 2000 to 2002 highlight inmate and facility characteristics related to high risks of suicide and homicide.

Jail suicide rates declined steadily from 129 per 100,000 inmates in 1983 to 47 per 100,000 in 2002. In 1983 suicide accounted for the majority of jail deaths (56%), but by 2002, the most common cause of jail deaths was natural causes (including AIDS) (52%), well ahead of suicides (32%). Suicide rates in State prison fell from 34 per 100,000 in 1980 to 16 per 100,000 in 1990, and have since stabilized.

State prison homicide rates dipped sharply from 1980 (54 per 100,000) to 1990 (8 per 100,000). By 2002 prison homicide rates had declined further, down to 4 per 100,000. Homicide rates in local jails were more stable, declining slightly from 5 per 100,000 in 1983 to 3 per 100,000 in 2002.

## Highlights

| | Local jail inmate deaths | | | State prison inmate deaths | | |
|---|---|---|---|---|---|---|
| Cause | 2000 | 2001 | 2002 | 2000-02 percent | 2001 | 2002 | 2001-02 percent |
| All causes | 912 | 953 | 978 | 100% | 2,878 | 2,946 | 100% |
| Illness | 462 | 432 | 459 | 47.6% | 2,304 | 2,379 | 80.4% |
| AIDS | 60 | 59 | 50 | 5.9 | 270 | 245 | 8.8 |
| Suicide | 289 | 315 | 314 | 32.3 | 169 | 168 | 5.8 |
| Homicide | 17 | 22 | 20 | 2.1 | 39 | 48 | 1.5 |
| Accident | 25 | 35 | 35 | 3.3 | 23 | 31 | 0.9 |
| Intoxication | 37 | 58 | 54 | 5.2 | 35 | 37 | 1.2 |
| Other/unknown | 22 | 32 | 46 | 3.6 | 38 | 38 | 1.3 |

**State prison, local jail suicide rates have fallen sharply since the 1980's**



Suicides per 100,000 inmates

• In 2002 the suicide rate in local jails (47 per 100,000 inmates) was over 3 times the rate in State prisons (14 per 100,000 inmates).

• The suicide rate in the Nation's 50 largest jail systems (29 per 100,000 inmates) was half that of other jails (57 per 100,000).

• Violent offenders in both local jails (92 per 100,000) and State prisons (19 per 100,000) had suicide rates over twice as high as those of nonviolent offenders (31 and 9 per 100,000 respectively).

**Homicide rates in State prisons dropped 93% from 1980 to 2002**



Homicides per 100,000 inmates

• Homicide rates were similar in local jails (3 per 100,000) and State prisons (4 per 100,000).

• 67% of homicide victims in State prisons had served at least 2 years; 37% had served 5 years.

• Violent offenders were the victims of most State prison homicides (61%), and their jail homicide rate (5 per 100,000) was over twice that of nonviolent offenders (2 per 100,000).

## The Death in Custody Reporting Act of 2000

The passage of the Death in Custody Reporting Act of 2000 (DICRA, PL 106-297) dramatically altered programs collecting data on inmate deaths. Prior to the act, BJS conducted annual counts of State prisoner deaths. Counts of jail inmate deaths were collected in the Census of Jails, which is conducted every 5 or 6 years. For both populations, death counts were obtained by gender and by general cause categories, such as illness/natural causes, AIDS, suicide, and homicide. These aggregate counts of deaths did not allow for analysis of individual death cases.

DICRA was attached as a grant requirement of the Violent Offender Incarceration and Truth-in-Sentencing (VOI/TIS) incentive grant program. Beginning in 1996, these grants provided over $2.5 billion to all 50 States and U.S. Territories for expanding prison capacity to house violent offenders for longer periods.  Each State receiving VOI/TIS funds was required under DICRA to report:

> "on a quarterly basis, information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility (including any juvenile facility) that, at a minimum, includes —

(A) the name, gender, race, ethnicity, and age of the deceased;
(B) the date, time, and location of death; and
(C) a brief description of the circumstances surrounding the death."

BJS developed a new series of collections to meet the mandates of the act. Aggregate counts of deaths were replaced by detailed, individual inmate death records, collected every 3 months from over 3,000 jail jurisdictions, 50 State prison systems, juvenile correctional authorities in all 50 States, and roughly 18,000 State and local law enforcement agencies nationwide. These new data collections were phased in over 4 years, with local jails reporting in 2000, followed by State prisons in 2001 and State juvenile authorities in 2002. A network of statewide law enforcement reporters began submitting arrest-related death records to BJS in 2003.

With these new collections, BJS has enhanced both the frequency and scope of its data on inmate mortality. Among other improvements, BJS now collects information on specific medical causes of death, as determined by a coroner or medical examiner. BJS replaced a general category of "illness/natural causes," with specific categories of medical conditions related to mortality, such as cancer, heart disease, and hepatitis C. A detailed analysis of these fatal medical conditions will be the focus of the next report from this data collection series.

---

## Long term trends show steep declines in rates of State prisoner homicide and local jail inmate suicide

Over the past two decades, State prison and local jail inmate mortality rates have displayed some dynamic changes. Suicide was the leading cause of death among jail inmates in 1983 (129 per 100,000 inmates); by 1993 that rate had been cut by more than half (54 per 100,000 inmates), and illness/natural cause (67 per 100,000) had become the most common cause of jail deaths. By 2002 the jail suicide rate (47 per 100,000) had fallen to nearly a third of the 1983 rate. Rates of death from AIDS-related causes in jails also declined; the 2002 rate (8 per 100,000) was less than half of the 1988 rate (20 per 100,000). As a result of these reductions, the overall mortality rate in local jails dropped 37% between 1983 and 2002.

State prison suicide rates have historically been much lower than those of jails, but these also dropped sharply from 34 per 100,000 in 1980 to 14 per 100,000 inmates in 2002. Even more dramatic was the decline in homicide deaths, from 54 per 100,000 inmates in 1980 to 8 per 100,000 inmates in 1990, and to 4 per 100,000 inmates in 2002. With the introduction of new therapies during the 1990's, AIDS-related mortality rates in State prison fell rapidly from 100 per 100,000 inmates in 1995 to 15 per 100,000 inmates 5 years later. Overall State prisoner mortality rates have grown slightly (6%) since 1980, mostly due to illness/natural causes (up 40% since 1980).

Local jail inmate mortality rate, per 100,000 inmates

| Year | All causes | Illness/ natural cause | AIDS | Suicide | Homicide |
|------|-----------|------------------------|------|---------|----------|
| 2002 | 147 | 69 | 8 | 47 | 3 |
| 2001 | 151 | 68 | 9 | 50 | 3 |
| 2000 | 147 | 74 | 10 | 47 | 3 |
| 1999 | 154 | 64 | 13 | 54 | 5 |
| 1993 | 149 | 67 | 15 | 54 | 4 |
| 1988 | 199 | 82 | 20 | 85 | 3 |
| 1983 | 232 | 88 | -- | 129 | 5 |

Note: Mortality rates are based on average daily population for each year.  Data on deaths for 1983-99 are from the Census of Jails; data from 2000-02 are from the Deaths in Custody data series.
-- Not available.

State prison inmate mortality rate, per 100,000 inmates

| Year | All causes* | Illness/ natural cause | AIDS | Suicide | Homicide |
|------|-------------|------------------------|------|---------|----------|
| 2002 | 246 | 198 | 20 | 14 | 4 |
| 2001 | 242 | 194 | 23 | 14 | 3 |
| 2000 | 238 | 190 | 15 | 16 | 5 |
| 1995 | 308 | 165 | 100 | 16 | 9 |
| 1990 | 228 | 187 | -- | 16 | 8 |
| 1985 | 239 | 163 | -- | 26 | 24 |
| 1980 | 233 | 141 | -- | 34 | 54 |

Note: Mortality rates for 1980-2000 are based on death counts of sentenced prisoners and the December 31 jurisdiction population as collected in the National Prisoner Statistics (NPS) program. Rates for 2001-02 are based on counts from the Deaths in Custody Reporting Program and the NPS June 30 custody population count.
*Excludes executions.          -- Not available.

B - 35

| Region and jurisdiction | Number of prisoner deaths, 2001-02 | | | Average annual mortality rate (2001-02) per 100,000 prisoners held at midyear | | |
|---|---|---|---|---|---|---|
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **U.S. total\*** | 5,815 | 337 | 87 | 244 | 14 | 4 |
| **Northeast** | 887 | 46 | 5 | 257 | 13 | 1 |
| Connecticut | 60 | 9 | 0 | 162 | 24 | 0 |
| Maine | 13 | 1 | 0 | 370 | 28 | 0 |
| Massachusetts | 49 | 3 | 0 | 239 | 15 | 0 |
| New Hampshire | 11 | 0 | 0 | 224 | 0 | 0 |
| New Jersey | 129 | 3 | 0 | 225 | 5 | 0 |
| New York | 360 | 21 | 3 | 264 | 15 | 2 |
| Pennsylvania | 248 | 6 | 2 | 327 | 8 | 3 |
| Rhode Island | 11 | 2 | 0 | 155 | 28 | 0 |
| Vermont | 6 | 1 | 0 | 217 | 36 | 0 |
| **Midwest** | 1,057 | 77 | 11 | 221 | 16 | 2 |
| Illinois | 158 | 20 | 2 | 178 | 22 | 2 |
| Indiana | 97 | 6 | 3 | 246 | 15 | 8 |
| Iowa | 20 | 3 | 0 | 123 | 18 | 0 |
| Kansas | 43 | 4 | 0 | 248 | 23 | 0 |
| Michigan | 227 | 11 | 1 | 231 | 11 | 1 |
| Minnesota | 28 | 2 | 0 | 215 | 15 | 0 |
| Missouri | 122 | 6 | 1 | 210 | 11 | 2 |
| Nebraska | 15 | 0 | 0 | 190 | 0 | 0 |
| North Dakota | 4 | 0 | 0 | 192 | 0 | 0 |
| Ohio | 229 | 8 | 2 | 254 | 9 | 2 |
| South Dakota | 15 | 4 | 2 | 262 | 71 | 34 |
| Wisconsin | 99 | 13 | 0 | 245 | 32 | 0 |
| **South** | 2,717 | 121 | 40 | 267 | 12 | 4 |
| Alabama | 172 | 2 | 1 | 342 | 4 | 2 |
| Arkansas | 73 | 8 | 2 | 322 | 36 | 9 |
| Delaware | 31 | 4 | 0 | 222 | 28 | 0 |
| Florida | 365 | 11 | 3 | 251 | 8 | 2 |
| Georgia | 199 | 10 | 4 | 217 | 11 | 4 |
| Kentucky | 77 | 1 | 1 | 325 | 4 | 4 |
| Louisiana | 150 | 2 | 0 | 381 | 5 | 0 |
| Maryland | 141 | 13 | 6 | 293 | 27 | 12 |
| Mississippi | 69 | 2 | 0 | 228 | 7 | 0 |
| North Carolina | 128 | 8 | 2 | 197 | 12 | 3 |
| Oklahoma | 115 | 2 | 4 | 260 | 5 | 9 |
| South Carolina | 116 | 2 | 3 | 267 | 5 | 7 |
| Tennessee | 112 | 2 | 3 | 317 | 6 | 8 |
| Texas | 804 | 49 | 10 | 273 | 17 | 3 |
| Virginia | 140 | 4 | 1 | 227 | 6 | 2 |
| West Virginia | 25 | 1 | 0 | 357 | 14 | 0 |
| **West** | 1,154 | 93 | 31 | 213 | 17 | 6 |
| Alaska | 22 | 3 | 0 | 263 | 36 | 0 |
| Arizona | 139 | 6 | 1 | 247 | 11 | 2 |
| California | 625 | 52 | 21 | 196 | 16 | 7 |
| Colorado | 94 | 5 | 2 | 268 | 14 | 6 |
| Hawaii | 20 | 2 | 0 | 195 | 19 | 0 |
| Idaho | 26 | 3 | 0 | 243 | 28 | 0 |
| Montana | 11 | 1 | 0 | 199 | 19 | 0 |
| Nevada | 52 | 3 | 2 | 260 | 15 | 10 |
| New Mexico | 26 | 4 | 2 | 221 | 34 | 17 |
| Oregon | 57 | 5 | 0 | 259 | 23 | 0 |
| Utah | 14 | 4 | 1 | 170 | 49 | 12 |
| Washington | 60 | 4 | 2 | 192 | 13 | 6 |
| Wyoming | 8 | 1 | 0 | 260 | 33 | 0 |

Table 1. State prison jurisdictions: Number of prisoner deaths, suicides, and homicides, and mortality rates, per 100,000 prisoners in custody, 2001-02

Note: All mortality rates are calculated based on custody populations for June 30.
\*Excludes 9 total prisoner deaths reported by the District of Columbia in 2001. None of the 9 deaths was a suicide or homicide. The District of Columbia transferred all prisoner custody operations to the Federal Bureau of Prisons during 2001.

**Nationwide, 337 State prisoners committed suicide during 2001-02**

Suicide and homicide accounted for a combined 7% of all State prisoner deaths during 2001-02 (table 1). The average annual suicide rate of State prisoners (14 suicides per 100,000 prisoners) was a third of that of local jail inmates during 2000-02 (48).

Prison suicide rates showed wide variation at the State level. New Hampshire, Nebraska, and North Dakota all reported no suicide deaths during the 2-year period. Another six States had suicide rates of 5 per 100,000 prisoners or lower. Thirteen States had suicide rates of at least 25 per 100,000 prisoners, led by South Dakota (71), Utah (49), Vermont, Alaska, and Arkansas (each with 36).

In most State prison systems, suicides were rare events. Only 9 States reported as many as 10 prisoner suicides during this period, with 42% of all suicides taking place in four States. California (52), Texas (49), New York (21), and Illinois (20) reported 142 of the Nation's 337 State prisoner suicides. About half of all States (24) recorded 3 or fewer suicides.

**87 State prisoners became victims of homicide over 2 years**

Most States did not have any prisoner homicides in the course of a year. During 2001, 31 States reported no prison homicides; 29 States did not report a homicide during 2002. Three States reported 43% of all homicides — California (21), Texas (10), and Maryland (6). No other State reported more than 5 homicides during 2001-02.

Homicide rates were low in most States, and 5 had a rate of at least 10 homicides per 100,000 prisoners, led by South Dakota (34) and New Mexico (17). However, even in these 5 States, a combined total of 13 homicides were reported over 2 years.

**Table 2. The 50 largest jail jurisdictions: Number of inmate deaths and suicides, and mortality rates per 100,000 inmates, 2000-02**

| Jurisdiction | Number of inmate deaths, 2000-02 | | Average annual mortality rate, 2000-02 | | | |
|---|---|---|---|---|---|---|
| | | | Per 100,000 inmates — average daily population | | Per 100,000 inmates — at risk[a] | |
| | All causes | Suicide | All causes | Suicide | All causes | Suicide |
| Total | 1,037 | 180 | 167 | 29 | 11 | 2 |
| Los Angeles, CA | 105 | 12 | 180 | 21 | 19 | 2 |
| New York City, NY | 99 | 9 | 224 | 20 | 27 | 3 |
| Cook County, IL | 48 | 3 | 157 | 10 | 15 | 1 |
| Maricopa County, AZ | 31 | 10 | 141 | 45 | 8 | 3 |
| Philadelphia City, PA | 41 | 6 | 198 | 29 | 33 | 5 |
| Dade County, FL | 46 | 3 | 231 | 16 | 14 | 1 |
| Harris County, TX | 52 | 7 | 243 | 32 | 15 | 2 |
| Dallas County, TX | 29 | 7 | 145 | 34 | 9 | 2 |
| Orleans Parish, LA | 14 | 2 | 77 | 10 | 6 | 1 |
| Broward County, FL | 29 | 3 | 200 | 21 | 13 | 1 |
| San Bernardino County, CA | 14 | 5 | 92 | 33 | 5 | 2 |
| San Diego County, CA | 23 | 6 | 153 | 39 | 8 | 2 |
| Shelby County, TN | 22 | 0 | 140 | 0 | 11 | 0 |
| Orange County, CA | 6 | 1 | 42 | 7 | 3 | 1 |
| Santa Clara County, CA | 14 | 5 | 115 | 40 | 8 | 3 |
| Alameda County, CA | 29 | 4 | 242 | 34 | 17 | 2 |
| Orange County, FL | 15 | 1 | 124 | 8 | 8 | 1 |
| Bexar County, TX | 26 | 2 | 245 | 20 | 12 | 1 |
| Baltimore City, MD | 39 | 9 | 381 | 88 | 27 | 6 |
| Hillsborough County, FL | 16 | 4 | 156 | 39 | 8 | 2 |
| Sacramento County, CA | 20 | 8 | 206 | 81 | 11 | 4 |
| Riverside County, CA | 8 | 4 | 92 | 46 | 5 | 3 |
| Tarrant County, TX | 10 | 2 | 92 | 18 | 6 | 1 |
| Milwaukee County, WI | 7 | 0 | 70 | 0 | 3 | 0 |
| Jacksonville City, FL | 30 | 3 | 341 | 35 | 20 | 2 |
| Pinellas County, FL | 14 | 2 | 174 | 26 | 10 | 1 |
| Davidson County, TN | 24 | 2 | 291 | 25 | 21 | 2 |
| Clark County, NV | 21 | 8 | 279 | 107 | 8 | 3 |
| Fulton County, GA | 9 | 3 | 105 | 35 | 9 | 3 |
| King County, WA[b] | 3 | 0 | 55 | 0 | 3 | 0 |
| Wayne County, MI | 17 | 8 | 208 | 97 | 13 | 6 |
| DeKalb County, GA | 7 | 0 | 78 | 0 | 6 | 0 |
| Palm Beach County, FL | 13 | 0 | 176 | 0 | 7 | 0 |
| Kern County, CA | 8 | 4 | 103 | 51 | 7 | 3 |
| Travis County, TX[c] | 11 | 2 | 141 | 26 | 7 | 1 |
| Franklin County, OH | 10 | 4 | 142 | 55 | 7 | 3 |
| Allegheny County, PA | 16 | 6 | 208 | 80 | 17 | 6 |
| Marion County, IN | 16 | 2 | 218 | 27 | 14 | 2 |
| Essex County, NJ | 12 | 1 | 180 | 14 | 16 | 1 |
| Suffolk County, MA[d] | 2 | 0 | 29 | 0 | 4 | 0 |
| El Paso County, TX | 10 | 2 | 154 | 33 | 9 | 2 |
| Fresno County, CA | 14 | 3 | 205 | 44 | 11 | 2 |
| Oklahoma County, OK | 7 | 3 | 119 | 51 | 5 | 2 |
| Cobb County, GA | 5 | 3 | 77 | 47 | 4 | 3 |
| Cuyahoga County, OH | 7 | 1 | 116 | 17 | 7 | 1 |
| Hamilton County, OH | 11 | 5 | 182 | 83 | 8 | 4 |
| Hudson County, NJ | 11 | 1 | 200 | 17 | 23 | 2 |
| San Francisco City/Co., CA | 9 | 4 | 154 | 73 | 6 | 3 |
| York County, PA | 4 | 0 | 73 | 0 | 10 | 0 |
| Mecklenburg County, NC | 3 | 0 | 52 | 0 | 2 | 0 |

Note: A specified cause of death was not provided for 6 deaths reported in 2000 (5 from New York City and 1 from Marion County), 11 deaths in 2001 (2 each from Bexar County and Jacksonville City, 1 each from Orleans Parish, Broward, San Diego, Hillsborough, Tarrant, Clark, and Suffolk counties), and 10 deaths in 2002 (2 from Alameda County, and 1 each from Dade, Broward, Bexar, Hillsborough, Milwaukee, King, Franklin, and Hamilton counties).
[a]The at-risk jail population combines the January 1 count with the number of annual admissions.
[b]King County data include only the years 2001-02.
[c]Travis County data for 2002 exclude the Travis County Substance Abuse Treatment Facility.
[d]Suffolk County data for 2000 exclude the Suffolk County House of Corrections.

**Suicide rate in the Nation's 50 largest jail jurisdictions half that of all other jails**

There are over 3,300 local jails operated by county and municipal jurisdictions nationwide. Jails typically hold unsentenced offenders, those sentenced to less than a year, and offenders sentenced to longer terms who are awaiting transfer to State prison. As a result, almost every State prisoner has been through a period of jail confinement.

Over a 3-year period (2000-02), the Nation's 50 largest jail jurisdictions reported a total of 1,037 deaths from all causes (table 2). This death count represented a higher overall mortality rate (167 per 100,000 inmates in the average daily population) than other jails (140 per 100,000).

Mortality rates varied widely among the top 50 jurisdictions. Twelve of these 50 jurisdictions had overall mortality rates of fewer than 100 deaths per 100,000 inmates, led by Suffolk County, Massachusetts (29), Orange County, California (42), and Mecklenburg County, North Carolina (52). Another 16 of the top 50 jurisdictions had rates of 200 or more deaths per 100,000 inmates, led by Baltimore City, Maryland (381), Jacksonville City, Florida (341), and Davidson County, Tennessee (291).

The 50 largest jail jurisdictions collectively had a comparatively low prevalence of suicide. Inmate suicides accounted for 17% of all deaths in these 50 largest jurisdictions but were the cause of 41% of the deaths in all other jails. The suicide rate of the 50 largest jail jurisdictions (29 per 100,000) was half that of all other jails (57).

Eight of the top 50 jurisdictions reported no suicides during 2000-02, and another 4 jurisdictions had a suicide rate of 10 per 100,000 or less. Ten of these jurisdictions also had suicide rates of at least 50 per 100,000 inmates, led by Clark County, Nevada (107), Wayne County, Michigan (97), and Baltimore City, Maryland (88).

**During 2002 the Nation's smallest jails had a suicide rate 5 times that of the largest jails**

On an average day in 2002, over 40% of the nation's jails housed fewer than 50 inmates, while 2% of all jails held at least 1,500 inmates. Rates of inmate suicide were closely related to jail size, with the smallest facilities recording the highest suicide rates.

| Number of inmates in jail | Local jail mortality rate, per 100,000 inmates, 2002 All causes | Suicide |
|---|---|---|
| Total | 147 | 47 |
| Fewer than 50 | 313 | 177 |
| 50-99 | 159 | 77 |
| 100-149 | 120 | 50 |
| 150-249 | 107 | 48 |
| 250-499 | 124 | 53 |
| 500-999 | 102 | 33 |
| 1,000-1,499 | 133 | 43 |
| 1,500-1,999 | 150 | 32 |
| 2,000 or more | 173 | 32 |

Note: Mortality rates are based on average daily population (ADP) during the calendar year; table excludes 47 jail facilities, which did not report valid ADP data.

The Nation's largest jail facilities recorded the lowest suicide rates (32 per 100,000 inmates). The suicide rate rose steadily as jail size decreased and was over 5 times higher (177 per 100,000) in jails holding fewer than 50 inmates. However, given their small populations, these jails accounted for 14% of all jail suicides.

**Jail suicide rates drop by over 90% when based on "at-risk" population**

BJS has usually based jail mortality rates on the average daily population of inmates (an ADP of under 700,000). A more sensitive measure of jail mortality would reflect the far larger number of admissions into these facilities over the entire year (nearly 13 million). All of these persons admitted are at risk of dying while held in jail.

Past attempts to collect admission data for a whole year were unsuccessful, because many jail information systems do not keep cumulative counts of admissions. As part of the new Deaths in Custody records, BJS collected annual admission data, which can be used to calculate an at-risk measure of mortality for the Nation's largest jails.

While the 50 jurisdictions had an average daily population of 207,471 over the 3-year period, these same jails had an average of 2,827,133 admissions each year. As a result, the at-risk mortality rates of these jurisdictions are far lower. The ADP rate of overall mortality in the top 50 jurisdictions (167 per 100,000) was 15 times the at-risk rate (11). The ADP-based suicide rate for these 50 jurisdictions (29 per 100,000) was 14 times the at-risk suicide rate for these facilities (2 per 100,000).

**Males and white inmates had the highest rates of suicide in jails**

Among local jail inmates, mortality rates varied across demographic subgroups (table 3). In terms of deaths from all causes, male inmates had a higher death rate (150 per 100,000 inmates) than females (130). Gender was a stronger factor in suicide rates: males (50 per 100,000) were 56% more likely to commit suicide than female jail inmates (32). The homicide rate of male inmates was low (3 per 100,000) and female inmates did not experience a single homicide during 2000-02.

The most common cause of death among jail inmates was illness (48% of all jail deaths during 2000-02). As a result, the overall mortality rates of jail inmates steadily rose with age. Among jail inmates age 18-24, the mortality rate was 60 per 100,000; this rate was 3 times higher for inmates age 35-44 (179), and over 11 times higher for inmates age 55 or older (694). The only exception to this pattern was the death rate of jail inmates under age 18 (138 per 100,000), who made up less than 2% of all jail deaths.

Jail suicide rates also increased with inmate age. Inmates age 18-24 were the least likely to commit suicide (38 suicides per 100,000 inmates); this rate increased 24% for inmates age 25-34 (47), and 39% for inmates age 35-44 (53). The oldest inmates, age 55 or older, had the highest rate of suicide (58 per 100,000) among adult inmates.

The youngest jail inmates were the exception to this pattern; jail inmates under 18 had the highest suicide rate in local jails (101 per 100,000). Given their relatively small numbers, inmates under the age of 18 committed 35 of the 918 jail suicides recorded nationwide over 3 years.

**Table 3. Local jail and State prison inmate mortality rates, per 100,000 inmates, by selected characteristics**

| | Average annual mortality rate, per 100,000 inmates | | | | | |
| | Local jail inmates, 2000-02 | | | State prison inmates, 2001-02 | | |
| Characteristic | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
|---|---|---|---|---|---|---|
| **All inmates** | 148 | 48 | 3 | 244 | 14 | 4 |
| **Gender** | | | | | | |
| Male | 150 | 50 | 3 | 251 | 14 | 4 |
| Female | 130 | 32 | 0 | 140 | 10 | 0 |
| **Age** | | | | | | |
| Under 18 | 138 | 101 | 0 | 52 | 52 | 0 |
| 18-24 | 60 | 38 | 3 | 34 | 14 | 3 |
| 25-34 | 99 | 47 | 2 | 63 | 14 | 3 |
| 35-44 | 179 | 53 | 4 | 182 | 14 | 4 |
| 45-54 | 349 | 52 | 7 | 571 | 13 | 3 |
| 55 or older | 694 | 58 | 0 | 2,019 | 13 | 4 |
| **Race/Hispanic origin** | | | | | | |
| White, non-Hispanic | 219 | 96 | 3 | 327 | 22 | 5 |
| Black, non-Hispanic | 118 | 16 | 3 | 207 | 8 | 2 |
| Hispanic | 98 | 30 | 3 | 243 | 18 | 7 |

Note: Jail inmate mortality rates are per 100,000 inmates held, based on average daily population (ADP). Inmate populations of various demographic subgroups are estimates based on the Annual Survey of Jails and the 2002 Survey of Inmates in Local Jails. State prison rates are per 100,000 inmates held in custody on June 30. Prisoner demographic subgroups are estimates based on the June 30 National Prisoner Statistics custody counts and demographic data from the National Corrections Reporting Program.

*Suicide and Homicide in State Prisons and Local Jails*   5

Inmate age did not have any clear relationship to jail homicide rates, which were no higher than 7 per 100,000 inmates for all age groups. Both the youngest (under 18) and oldest (55 or older) inmates had no homicide deaths during 2000-02.

**White jail inmates 6 times more likely to commit suicide than black inmates and 3 times more likely than Hispanic inmates**

Mortality rates displayed substantial differences by race and ethnicity. Death rates from all causes for both black (118 per 100,000 inmates) and Hispanic (98) jail inmates were at least 20% below the overall jail inmate mortality rate (148). But the death rate of white jail inmates (219 per 100,000) was 86% higher than that of black inmates and over twice as high as the rate for Hispanic inmates.

Differences across racial/ethnic categories were more pronounced in jail inmate suicide rates. The suicide rate of white jail inmates (96 per 100,000 inmates) was more than triple that of Hispanic inmates (30) and was 6 times the suicide rate for black inmates (16). White inmates accounted for nearly three-quarters of all jail inmate suicides during 2000-02.

Unlike the overall mortality and suicide rates, homicide rates were not related to race/ethnicity. White, black and Hispanic jail inmates were all equally likely to be victims of a homicide (3 deaths per 100,000 inmates).

**State prisoners age 45 or older made up 17% of inmates but 66% of deaths**

Just as in local jails, male State prisoners had higher overall mortality rates than female prisoners. While this difference was modest in local jails (the male death rate was 15% higher), males (251 deaths per 100,000 prisoners) were 79% more likely than females (140) to die in State prison during 2001-02.

In contrast, male and female suicide rates in State prisons were similar (14 suicides per 100,000 males, compared to 10 per 100,000 females). In local jails men were over 50% more likely than women to commit suicide.

The increase in mortality rates seen in older jail inmates was also evident among older State prisoners. The overall death rate was lowest for State prisoners age 18-24 (34 per 100,000). The death rate was over 5 times higher for State prisoners age 35-44 (182) and nearly 17 times higher for prisoners age 45-54 (571). The mortality rate of the oldest prisoners, age 55 or older, was highest (2,019 – or 59 times higher than the rate for prisoners age 18-24).

Deaths attributed to "illness/natural cause" made up 80% of all State prison deaths reported during 2001-02. Two-thirds of all State prison deaths involved inmates age 45 or older, though such inmates represented 17% of all State prisoners held during 2001-02.

| Inmate age | Number of inmate deaths | |
|---|---|---|
| | Local jails, 2000-02 | State prisons, 2001-02 |
| All inmates* | 2,834 | 5,818 |
| Under 18 | 48 | 3 |
| 18-24 | 323 | 149 |
| 25-34 | 609 | 507 |
| 35-44 | 896 | 1,323 |
| 45-54 | 667 | 1,809 |
| 55 or older | 291 | 2,027 |

*Excludes 9 jail inmates and 6 State prisoners whose ages were not reported.

Despite the close relationship between age and the overall mortality rates in State prison, inmate age was not related to suicide rates. State prisoner suicide rates ranged from 13 to 14 suicides per 100,000 prisoners for every age group over 18. The suicide rate of State prisoners under 18 was 4 times higher (52 per 100,000), but this age group accounted for less than 0.3% of State prisoners and had 3 suicides nationwide over 2 years. By comparison, 116 prisoners age 25-34 committed suicide during 2001-02.

Age also showed no relationship to State prison homicide rates, with all age groups over age 18 recording a homicide rate of either 3 or 4 per 100,000 inmates. No reported homicides involved State prisoners under age 18 during 2001-02.

**Black inmates had the lowest suicide and homicide rates in State prisons**

As in local jails, white inmates had the highest overall mortality rate (327 deaths per 100,000 prisoners). While the mortality rate of white jail inmates was 86% higher than that of blacks and 123% higher than that of Hispanics, the differences in State prison were smaller. White State prisoners were 35% more likely than Hispanic inmates (243 per 100,000) and 58% more likely than black prisoners (207) to die during 2001-02.

White inmates had the highest suicide rate of all State prisoners (22 suicides per 100,000 inmates). This rate was 22% higher than the Hispanic suicide rate (18 per 100,000). By comparison, white inmates in local jails were 3 times more likely than Hispanics to commit suicide. Black inmates had the lowest suicide rate of all State prisoners (8 per 100,000). Blacks were about a third as likely as whites to commit suicide in State prison and less than half as likely as Hispanics.

Homicide rates were less than 10 per 100,000 State prisoners for all racial/ethnic groups during 2001-02. Hispanic inmates were the most likely to be killed in State prisons (7 homicides per 100,000 inmates), which was over 3 times the homicide rate of black inmates (2 per 100,000). The homicide rate for white inmates (5) almost matched the rate for all State prisoners (4).

**Violent offenders committed suicide at nearly triple the rate of nonviolent offenders in jails**

The death rate of violent offenders in local jails (212 per 100,000) was 75% higher than that of nonviolent offenders (121), but this difference was larger in cases of suicide (table 4).

The suicide rate of violent jail inmates (92 per 100,000) was nearly triple that of nonviolent offenders (31). Kidnaping offenders had the highest suicide rate (275), followed by those inmates held for rape (252) or homicide (182).

|  | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
| Current offense | All causes | Suicide | Homicide |
|---|---|---|---|
| Violent | 212 | 92 | 5 |
| Nonviolent* | 121 | 31 | 2 |

*Excludes offenders with "other/unspecified" current offenses.

Among all nonviolent offenders, only probation/parole violators had a suicide rate of at least 100 per 100,000 (118). Drug offenders were found to have the lowest rates of mortality, particularly suicide. Drug offenders were the only group that had fewer

from all causes per 100,000 jail inmates (92). The suicide rate of drug offenders (18 per 100,000) was the lowest among offender groups. Violent offenders (92) were 5 times more likely to commit suicide than drug offenders, and public-order offenders were more than twice as likely to commit suicide (42).

**Local jails had an average of fewer than 20 inmate homicides each year**

Over 3 years (2000-02), there were 59 jail inmate homicides reported nationwide, resulting in a rate of 3 jail inmate homicide deaths per 100,000 inmates. Violent offenders were the most likely to be killed in local jail (5 homicides per 100,000 inmates), followed by property and public-order offenders (3 for both). Drug offenders (1 per 100,000) had the lowest homicide victimization rate of all offenders.

Kidnaping offenders had the highest rate of jail inmate homicide (15 per 100,000 inmates — 5 times the rate for all inmates), followed by inmates held for rape (9) and violation of parole/probation (7). But even among these offenders with the highest homicide rates, a combined total of eight homicides took place nationwide over this 3-year period.

**Table 4. Average annual jail inmate mortality rates, by most serious current offense, 2000-02**

|  | Number of local jail inmate deaths, 2000-02 | | | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
| Current offense | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
|---|---|---|---|---|---|---|
| **All offenses** | 2,843 | 918 | 59 | 148 | 48 | 3 |
| **Violent offenses** | 1,026 | 447 | 24 | 212 | 92 | 5 |
| Homicide[a] | 162 | 87 | 3 | 338 | 182 | 6 |
| Kidnaping | 54 | 37 | 2 | 401 | 275 | 15 |
| Rape | 56 | 29 | 1 | 489 | 252 | 9 |
| Other sexual assault | 122 | 51 | 0 | 227 | 95 | 0 |
| Robbery | 130 | 48 | 3 | 121 | 44 | 3 |
| Assault | 377 | 144 | 14 | 168 | 64 | 6 |
| **Property offenses** | 530 | 164 | 16 | 113 | 35 | 3 |
| Burglary | 139 | 58 | 4 | 108 | 45 | 3 |
| Larceny/theft | 148 | 36 | 4 | 110 | 27 | 3 |
| Arson | 12 | 4 | 0 | 208 | 70 | 0 |
| Fraud | 91 | 28 | 3 | 97 | 30 | 3 |
| **Drug offenses** | 434 | 85 | 7 | 92 | 18 | 1 |
| Possession | 197 | 43 | 3 | 95 | 21 | 1 |
| Trafficking | 184 | 34 | 4 | 79 | 15 | 2 |
| **Public-order offenses** | 765 | 200 | 12 | 160 | 42 | 3 |
| Weapons | 35 | 13 | 1 | 91 | 34 | 3 |
| Obstruction of justice | 144 | 40 | 4 | 192 | 54 | 5 |
| Traffic | 86 | 23 | 1 | 121 | 32 | 1 |
| Driving while intoxicated[b] | 113 | 22 | 1 | 92 | 18 | 1 |
| Drunkenness/morals[c] | 92 | 23 | 1 | 282 | 71 | 3 |
| Violation of parole/probation[d] | 249 | 66 | 4 | 448 | 118 | 7 |

Note: All mortality rates were calculated using average daily population counts from the Annual Survey of Jails and offense distribution estimates from the Survey of Inmates in Local Jails, 2002.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes drunkenness, vagrancy, disorderly conduct, unlawful assembly, morals, and commercialized vice.
[d]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

than 100 deaths

B - 40    *Suicide and Homicide in State Prisons and Local Jails*  7

**Drug offenders had the lowest suicide and homicide rates of all State prisoners**

State prison mortality rates showed similar patterns by offense type (table 5). Violent offenders not only had the highest overall mortality rate (312 deaths per 100,000 prisoners), they were the only State prisoners with a death rate of at least 200 per 100,000 prisoners held. Property and public-order offenders each had a rate of 184 deaths per 100,000, followed by drug offenders (166).

Compared to violent offenders in local jails (92 suicides per 100,000 inmates), the suicide rate of violent offenders in State prison (19 per 100,000) was much lower. But among State prisoners, violent offenders were more than twice as likely to commit suicide as nonviolent offenders (9 per 100,000).

Kidnapers had the highest suicide rate (36 per 100,000 prisoners), followed by offenders held for homicide (29), sexual assault (23), and assault (20). Among nonviolent offenders, probation/parole violators had the highest suicide rates (18 per 100,000), followed by offenders held for arson (16), burglary (14), and obstruction of justice (14). Drug offenders recorded the lowest suicide rates of all State prisoners (6 per 100,000 inmates).

The rate of homicide in State prison was 4 per 100,000 prisoners, and varied little across offense types. Three types of offenders had as many as 10 homicides per 100,000 prisoners — arsonists (16), kidnapers (15), and probation/parole violators (12). Among these three categories with the highest homicide rates, the number of homicides was small, with a total of nine prisoners killed over 2 years.

State prisoners convicted of fraud and driving while intoxicated had the lowest rate of homicide, with zero homicides reported for 2001-02.

**Nearly half of jail suicides occurred in the first week of custody**

Jail inmate suicides were heavily concentrated in the first week spent in custody. Forty-eight percent of all jail suicides during 2000-02 took place during the inmate's first week following admission. In particular, almost a quarter of all jail suicides took place either on the date of admission to jail (14%) or the following day (9%).

| Time served after admission | Percent of jail inmate suicides, 2000-02 |
|---|---|
| Same day | 13.7% |
| Next day | 9.0 |
| 2-7 days | 24.9 |
| 8-14 days | 9.6 |
| 15-30 days | 7.7 |
| 31-60 days | 10.6 |
| 61-180 days | 14.0 |
| 181 days or more | 10.4 |

The frequency of jail suicides slowed after the initial week, with the second week of custody accounting for 10% of jail suicides. The next 2 weeks in custody (days 15 to 30) accounted for even fewer suicides (8%). Despite this early concentration of suicides, more suicides took place after the 60th day in jail (24%) than during the first 2 days (23%).

The median time served in jail prior to committing suicide was just over 1 week (9 days), but this period of time varied across demographic and criminal offense categories (table 6). Females spent less than half as much time as males in jail prior to committing suicide (median time served: 4 days for females and 10 days for males). The median length of time served by Hispanic inmates prior to suicide (23 days) was over twice as long as the time for white inmates (9 days) and nearly 4 times longer than that for black inmates (6 days).

**Table 5. Average annual State prison inmate mortality rates, by most serious current offense, 2001-02**

| Current offense | Number of State prison inmate deaths, 2001-02 | | | Average annual mortality rate, per 100,000 State prison inmates, 2001-02 | | |
|---|---|---|---|---|---|---|
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All offenses** | 5,824 | 337 | 87 | 244 | 14 | 4 |
| **Violent offenses** | 3,691 | 229 | 53 | 312 | 19 | 4 |
| Homicide[a] | 1,295 | 89 | 16 | 417 | 29 | 5 |
| Kidnaping | 151 | 5 | 5 | 454 | 36 | 15 |
| Rape | 344 | 14 | 1 | 299 | 12 | 1 |
| Other sexual assault | 803 | 36 | 8 | 523 | 23 | 5 |
| Robbery | 552 | 28 | 11 | 171 | 9 | 3 |
| Assault | 485 | 44 | 11 | 217 | 20 | 5 |
| **Property offenses** | 904 | 58 | 18 | 184 | 12 | 4 |
| Burglary | 447 | 36 | 9 | 177 | 14 | 4 |
| Larceny/theft | 199 | 10 | 4 | 209 | 10 | 4 |
| Arson | 35 | 2 | 2 | 277 | 16 | 16 |
| Fraud | 128 | 6 | 0 | 209 | 10 | 0 |
| **Drug offenses** | 853 | 33 | 11 | 166 | 6 | 2 |
| Possession | 278 | 10 | 5 | 224 | 8 | 4 |
| Trafficking | 485 | 21 | 6 | 188 | 8 | 2 |
| **Public-order offenses** | 319 | 13 | 4 | 184 | 7 | 2 |
| Weapons | 36 | 2 | 1 | 67 | 4 | 2 |
| Obstruction of justice | 53 | 2 | 1 | 381 | 14 | 7 |
| Driving while intoxicated[b] | 123 | 2 | 0 | 263 | 4 | 0 |
| Violation of parole/ probation[c] | 32 | 3 | 2 | 194 | 18 | 12 |

Note: All mortality rates were calculated using June 30 custody prisoner counts from the National Prisoner Statistics program and 2002 offense distribution estimates from the National Corrections Reporting Program.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

Of all offender groups, public-order offenders spent the shortest time in custody prior to committing suicide; half of their suicides took place in the first 3 days of custody. Property and drug offenders each had a median time served of about a week (7 and 8 days, respectively) prior to suicide. Violent offenders spent the longest time in custody prior to suicide; half of their suicides took place after spending 3 weeks in jail (20 days).

### 7% of State prison suicides took place during the first month

In State prison, suicides were less concentrated around admission. Sixty-five percent of jail suicides occurred in the first 30 days, but 7% of prison suicides took place during the first month. Most State prison suicides (65%) took place after the inmate's first year of confinement, and 33% took place after the inmate had served at least 5 years in prison.

| Time served since admission | Percent of State prisoner suicides, 2001-02 |
|---|---|
| Less than 1 month | 7.4% |
| 1-5 months | 14.9 |
| 6-11 months | 12.5 |
| 12-23 months | 11.0 |
| 24-59 months | 21.4 |
| 60-119 months | 18.5 |
| 120 months or more | 14.3 |

The median time served in State prison prior to a suicide (30 months) was over 100 times longer than in local jails (9 days). Male (30 months) and female (29 months) State prisoners spent almost identical amounts of time in prison before committing suicide. However, race was related to the length of time served prior to suicide. Half of all suicides by white inmates occurred in the first 21 months of custody, while the corresponding figures for black (40 months) and Hispanic inmates (49 months) were twice as long.

Violent State prisoners spent more time in custody (median time served of 45 months) prior to suicide than other offenders. Drug offenders were the only other offender group who served a median of at least a year in State prison prior to their suicides (18 months), followed by property (10 months) and public-order offenders (9 months).

### At least 80% of suicides in prison and jail occurred in the inmate's cell; time of day not a factor

The vast majority of both local jail (80%) and State prison (87%) inmate suicides took place within the inmate's cell or room (table 7). Temporary

holding areas (lockups) were the next most common location of suicide events (10% in jails, 4% in prisons). Common areas such as cafeterias, libraries, and recreational areas were the scene of very few suicides (6% in jails, 3% in State prisons), as were areas outside of the correctional facility (2% of jail suicides, 3% percent of prison suicides).

Suicide events in both local jails and State prisons showed little relationship to the time of day. Aside from morning hours (20% of jail suicides), the frequency of suicides in other parts of the day varied from 24% (during after-noon hours) to 28% (evening and overnight hours). Similar data were reported for suicides in State prisons. Twenty percent of State prisoner suicides took place in the morning, with all other times of day varying from 25% (evening and overnight hours) to 30% (afternoon hours).

In both local jails (94%) and State prisons (89%), the majority of suicide events were followed up by the performance of an autopsy or post-mortem examination by a medical examiner or county coroner.

---

**Table 6. Time served since admission by jail inmates and State prisoners committing suicide, by selected characteristics**

| Characteristic | Median time served since admission* | |
|---|---|---|
| | Local jail inmate suicides, 2000-02 | State prisoner suicides, 2001-02 |
| All inmates | 9 days | 30 months |
| **Gender** | | |
| Male | 10 days | 30 months |
| Female | 4 | 29 |
| **Race/Hispanic origin** | | |
| White, non-Hispanic | 9 days | 21 months |
| Black, non-Hispanic | 6 | 40 |
| Hispanic | 23 | 49 |
| **Current offense** | | |
| Violent | 20 days | 45 months |
| Property | 7 | 10 |
| Drug | 8 | 18 |
| Public-order | 3 | 9 |

*The median time served is that length of time at which half of the inmates spent less time in custody, and the other half spent more.

---

**Table 7. Time of day and location of suicide events in local jails and State prisons**

| | Percent of inmate suicides | |
|---|---|---|
| | Local jail inmates, 2000-02 | State prisoners, 2001-02 |
| **Time of day** | | |
| Overnight (midnight-6 a.m.) | 28.0% | 24.7% |
| Morning (6 a.m.-noon) | 19.5 | 19.9 |
| Afternoon (noon-6 p.m.) | 24.1 | 30.4 |
| Evening (6 p.m.-midnight) | 28.4 | 25.0 |
| **Location of suicide event** | | |
| Inmate's cell/room | 80.8% | 86.6% |
| Temporary holding area | 9.6 | 4.0 |
| Common area[a] | 6.1 | 3.0 |
| Outside of the facility[b] | 2.3 | 3.0 |
| Elsewhere | 1.1 | 3.4 |
| Number of suicides[c] | 918 | 337 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or work release, under community supervision by the jail/prison, or in transit to/from the facility.
[c]Time of day was not reported for 12 jail and 41 prison suicides; location was not reported for 6 jail and 39 prison suicides.

---

B - 42

## Most jail homicides occurred at least 2 weeks after admission

During 2000-02 an annual average of fewer than 20 homicides took place in the more than 3,000 jail jurisdictions nationwide. In State prisons, which held nearly 1.2 million inmates nationwide, there were fewer than 50 homicides each year during 2001-02.

These homicide counts resulted in a rate of less than 5 homicides per 100,000 inmates in both State prison (4 per 100,000) and local jail (3 per 100,000 inmates, based on ADP). In the 50 largest jails nationwide, the at-risk rate of homicide averaged 0.4 per 100,000 inmates held during the year.

| Time served after admission | Percent of jail inmate homicides, 2000-02 |
|---|---|
| Same day | 5.3% |
| Next day | 7.0 |
| 2-7 days | 17.5 |
| 8-14 days | 15.8 |
| 15-30 days | 10.5 |
| 31-60 days | 14.0 |
| 61-180 days | 14.0 |
| 181 days or more | 15.8 |

Unlike suicides, homicides in local jails were not concentrated in the first few days following admission. Twelve percent occurred in the first 2 days in custody, but 54% took place after the inmate had served at least 2 weeks in jail. The median length of time served prior to a homicide death (29 days) was triple that of suicide deaths in local jails (9 days).

## Two-thirds of homicide victims in State prison had served at least 2 years in prison; nearly 40% had served 5 years or more

The initial months following admission to prison accounted for a small percentage of State prisoner homicides (table 8). One percent of prison homicides took place during the victim's first month in prison, and less than a tenth of homicide victims had served fewer than 6 months (8%). A fifth of homicides involved State prisoners who had served less than a year.

Among the 5,824 total prisoner deaths reported nationwide during 2001-02, fewer than 20 were homicides of a first-year inmate. Sixty-seven percent of State prison homicide victims had spent at least 2 years in prison, while 37% had served at least 5 years.

The median time served in State prison by homicide victims was 44 months. Hispanic homicide victims (with a median time served of 22 months) were killed after serving less than half

### Table 8. Time served, time of day, and location of homicide events in State prisons, 2001-02

| | Percent of State prison homicides, 2001-02 |
|---|---|
| **Time served after admission** | |
| Less than 1 month | 1.1% |
| 1-5 months | 6.9 |
| 6-11 months | 11.5 |
| 12-23 months | 13.8 |
| 24-59 months | 29.9 |
| 60-119 months | 24.1 |
| 120 months or more | 12.6 |
| **Time of day** | |
| Overnight (midnight-6 a.m.) | 11.4% |
| Morning (6 a.m.-noon) | 38.6 |
| Afternoon (noon-6 p.m.) | 28.6 |
| Evening (6 p.m.-midnight) | 21.4 |
| **Location of homicide event** | |
| Inmate's cell/room | 60.5% |
| Temporary holding area | 2.6 |
| Common area[a] | 28.9 |
| Outside of the facility[b] | 2.6 |
| Elsewhere | 5.3 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or at work release sites, under community supervision by the prison, or in transit.

as much time as white (46 months) or black (55 months) prisoners.

Public-order offenders were the most likely to be killed early in their prison terms, with a median time served of just under 2 years (23 months). The median term served by both drug (40 months) and property (45 months) offenders was about twice as high. Violent offenders had the longest amount of time served in prison prior to being killed, with a median term of almost 5 years (55 months).

| Characteristic | Median time served after admission: State prisoner homicides, 2001-02 |
|---|---|
| All inmates | 44 months |
| **Race/Hispanic origin** | |
| White, non-Hispanic | 46 months |
| Black, non-Hispanic | 55 |
| Hispanic | 22 |
| **Current offense** | |
| Violent | 55 months |
| Property | 45 |
| Drug | 40 |
| Public-order | 23 |

Prison suicides took place almost exclusively inside the deceased's cell or room (87%); no other location accounted for even 5% of suicide events. However, over a quarter of all prison homicides (29%) took place in common areas within prisons, such as cafeterias, libraries, workshops, and recreational yards. A small percentage of homicide events took place in either a temporary holding area or a location outside of the prison facility (3% for each). Prisoners' cells or rooms (61%) were the most likely scene of a homicide in State prison.

State prison homicides were over 3 times more likely to occur during the morning (39% of homicides) than between midnight and 6 a.m. (11%).

Nearly all State prison homicides (92%) resulted in an autopsy or post-mortem exam of the deceased. All but 8 of 87 prisoner homicides during the 2-year period were committed by other inmates (91%). Of those "other homicide" events, most involved escape attempts or cases in which assailant identity was not established.

## Homicide rate of U.S. residents, when standardized, 10 times the rate of jail inmates in 2002

According to rates compiled by the Centers for Disease Control and Prevention (CDC), the U.S. resident population experienced 6 homicides and 11 suicides per 100,000 residents (table 9). The homicide rate for both State prisoners (4) and jail inmates (3) were lower than that for the U.S. population. Suicide rates for both State prisoners (14) and jail inmates (47) were higher than the rate for the resident population. However, reliable comparisons of such rates require closer analysis.

The demographic compositions of inmate populations do not reflect those of the U.S. resident population. In 2002 the U.S. population was 51% female, 81% white, and 22% age 55 or older; by comparison, the State prison population was 6% female, 50% white, and 4% age 55 or older.

The suicide and homicide rates of these demographic subgroups vary substantially. For example, the homicide rate of black males age 18-24 in the resident population (108 per 100,000) was over 8 times that for white males of the same age (13). As a result, the differing rates of death seen in the general population and correctional facilities reflect differences in demographic makeup as much as differences in the relative safety of these environments.

To improve the comparison of mortality risks, the resident population rates can be standardized by age, race, and gender to match the proportions seen in prisons and jails. The resulting rates estimate what the resident population mortality rates would be if the U.S. resident population had the same demographic composition as prisons and jails.

Standardized to match the State prison population, the resident population had a homicide rate (35 per 100,000) nearly 9 times the rate of homicide in

Table 9. Mortality rates of U.S. resident population and State prison and local jail inmate populations, per 100,000 residents, 2002

| Cause of death | U.S. resident population rate | State prisons | | Local jails | |
|---|---|---|---|---|---|
| | | Standardized U.S. resident rate | State prisoner rate[a] | Standardized U.S. resident rate | Local jail inmate rate[b] |
| Suicide | 11 | 18 | 14 | 17 | 47 |
| Homicide | 6 | 35 | 4 | 32 | 3 |

Note: U.S. resident population mortality rates are taken from the Centers for Disease Control and Prevention's injury reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>. BJS standardized those rates by age, race, and gender to match the characteristics of the State prison and local jail inmate populations.
[a]State prisoner rates of suicide and homicide are based on June 30 custody population.
[b]Local jail inmate rates of suicide and homicide are based on average daily population (ADP).

State prisons (4). Standardizing to match local jail demographics yields a greater difference, the resident rate (32 per 100,000) being nearly 11 times higher than the rate in jails (3).

State prisoners had a higher rate of suicide (14 per 100,000) than the overall resident population (11). Once standardized to match the State prisoner population, the U.S. resident rate of suicide (18) exceeded that of State prisoners in 2002.

The standardized resident suicide rate (17 per 100,000) was less than half of the jail suicide rate based on ADP (47). However, an at-risk measure of jail suicide would be a more appropriate comparison, but not all jails reported the needed admission data. Based on the at-risk measure of suicide for the top 50 jail jurisdictions, an at-risk jail suicide rate for all jails would likely be less than a tenth of the ADP measure. (See page 5.)

### Methodology

BJS phased in data collection activity under the Death in Custody Reporting Act of 2000 (PL 106-297), with the first collection of death records covering only local jail facilities. The 2000 jail collection covered the entire calendar year (the act became law in October of 2000), while subsequent collections were done on the quarterly basis required by the act.

BJS requires a quarterly report from all jails which had an inmate death during the period. All jails were instructed to

complete an annual summary of death reports and population counts (to allow for calculation of death rates).

Jail response rates for all 3 years were over 99%. In 2000, 3,063 jurisdictions responded, and 9 refused, for a response rate of 99.7%. Data for 2001 was submitted by 3,049 jurisdictions, with 2 refusals, for a response rate of 99.9%. In 2002, data were submitted by 3,030 jurisdictions and refused by 6, for a response rate of 99.8%.

Quarterly collection of State prison inmate death records began in 2001. These records were collected from State departments of corrections, rather than from each prison facility. For all years, BJS has had 100% participation from all 50 State prison systems. Data were also collected from the District of Columbia for 2001 in which it still operated a prison system, prior to transferring sentenced felons to the custody of the Federal Bureau of Prisons.

Copies of all questionnaires collected under the Deaths in Custody series can be found on the BJS website at <http://www.ojp.usdoj.gov/bjs/quest.htm>.

*Standardized U.S. resident death rates*

Homicide and suicide rates for specific age, race, and gender groups within the U.S. population can be queried from the Centers for Disease Control and Prevention's online injury mortality reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>.

For example, the 2002 suicide rate for white females, age 35-44, was 7.8 per 100,000. These rates were then standardized to match the character-istics of State prison and local jail populations by weighting the rates by the proportion of all inmates repre-sented by that subgroup. The sum of all of the weighted subgroup rates provides the standardized rate for the resident population.

Population proportions for these gender, race and age subgroups of inmates were derived from the National Corrections Reporting Program (for State prisoners) and the 2002 Survey of Inmates in Local Jails (for jail inmates).

*Population bases for mortality rates*

Annual mortality rates were based on different population counts:

1. For prisons the custody population on June 30 of each year.

2. For local jails the average daily population in each calendar year.

Estimates of the population at risk for the largest jail jurisdictions combined the population on January 1 and admissions during the year.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Lawrence A. Greenfeld is director.

Christopher J. Mumola wrote this report, under the supervision of Allen J. Beck. Doris J. James, Lauren E. Glaze, and Rebecca L. Medway verified the report, and Tom Hester edited it.

Christopher J. Mumola, under the supervision of Allen J. Beck, designed the survey, developed the questionnaires, and monitored data collection and data processing.

Data collection and processing of State prison death records were carried out by Lara Reynolds. Data collection and processing of local jail death records were carried out by Pamela Butler, Margaret Ferguson, Patricia Torreyson, and Pearl Chase, under the supervision of Charlene Sebold, Governments Division, Census Bureau, U.S. Department of Commerce.

August 2005   NCJ 210036

**Office of Justice Programs**
Partnerships for Safer Communities

http://www.ojp.usdoj.gov

---

**Obtain the most recent data on inmate deaths from *Key Facts at a Glance* on the BJS Internet site:**

http://www.ojp.usdoj.gov/bjs/glance/shipj.htm

---

December 29, 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE  19901

    RE:   Investigation of Delaware Correctional Center, Symrna,
           Delaware; Howard R. Young Correctional Institution,
           Wilmington, Delaware; Sussex Correctional Institution,
           Georgetown, Delaware; John L. Webb Correctional
           Facility, Wilmington, Delaware; and Delores J. Baylor
           Women's Correctional Institution, New Castle, Delaware

Dear Governor Minner:

I am writing to report the findings of the Civil Rights Division's investigation of conditions and practices at the following five Delaware Department of Correction ("DOC") facilities:  the Delaware Correctional Center ("DCC"), the Howard R. Young Correctional Institution ("HRYCI"), the Sussex Correctional Institution ("SCI"), the John L. Webb Correctional Facility ("Webb"), and the Delores J. Baylor Women's Correctional Institution ("BWCI").

On March 7, 2006, we notified you of our intent to conduct an investigation of these facilities pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, which gives the Department of Justice authority to seek remedies for any pattern and practice of conduct that violates the constitutional or federal rights of incarcerated persons.  We informed you that our investigation would focus on medical and mental health care.

We note that the State has cooperated thoroughly with our investigation and, under the leadership of DOC Commissioner Stanley W. Taylor, Jr., has unequivocally indicated its clear desire to improve medical and mental health care services at the facilities.  From the outset of our investigation, the State has been proactive in evaluating the conditions at the facilities.

- 2 -

Indeed, the State retained its own expert consultants, Dr. Ronald Shansky and Dr. Roberta Stellman, to evaluate medical and mental health care services, respectively, at DCC, HRYCI, SCI, Webb, and BWCI in July and September 2006. Following these evaluations, the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in medical and mental health care at four of the five facilities: DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities"). These findings were presented to the Department of Justice in oral and written presentations by Fried, Frank, Harris, Shriver & Jacobson, outside counsel for the State. To facilitate our investigation, the State agreed to stipulate to the accuracy of these factual findings. Given the State's complete cooperation with our investigation, the unsolicited disclosure of its comprehensive internal audit of medical and mental health care services, and the State's stipulation, we elected to limit our expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006. We conducted additional tours of HRYCI, Webb and BWCI, accompanied by expert consultants in the fields of medicine, mental health care, and suicide prevention on October 4-6, 2006, October 23-25, 2006, and November 15-17, 2006. During these tours, we reviewed a wide variety of State and facility documents, including policies, procedures, and medical and mental health records relating to the care and treatment of inmates. We interviewed prison administrators, professionals, staff and inmates at each facility. In keeping with our pledge of transparency and to provide technical assistance where appropriate regarding our investigatory findings, we conveyed our preliminary findings to certain State and facility administrators and staff during verbal exit presentations at the close of each of our on-site visits. As detailed below, our investigative findings mirrored those of the State's experts.

We commend the administrators and staff of the five facilities we toured for their helpful and professional conduct throughout the course of the investigation. In particular, facility personnel cooperated fully and expeditiously with our document requests.

We are confident that our work with the State will continue in the same cooperative manner we have enjoyed throughout our investigation. However, consistent with our statutory obligation under CRIPA, we set forth below the findings of our investigation, the facts supporting them, including those facts

B - 47

- 3 -

stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.  As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.  BACKGROUND

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.  DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.  DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.  DCC also contains the
State's death row.  HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.  SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.  BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.  Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.  FINDINGS

### A.  MEDICAL CARE

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.  The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.  Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.  Farmer v.
Brennan, 511 U.S. 825, 832 (1994).  Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.
Estelle v. Gamble, 429 U.S. 27 (1976).  The responsibility to
provide adequate medical care includes mental health care.

B - 48

- 4 -

Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990). Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation. Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988). The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm. Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

     With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security. Bell v. Wolfish, 441 U.S. 420
(1979). The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners. Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

     Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient:  intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

     **1.  Sick Call**

     The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked. Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs. Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows. For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen. In addition, we found that inmates who
missed sick call were not tracked and, as a consequence, often
not rescheduled. The sick call process for inmates' requiring

B - 49

- 5 -

mental health care suffers from similar inadequacies in
scheduling and follow-up. During our tours of BWCI and HRYCI, we
found that the sick call process is not functioning properly and
that there were significant delays for inmates who had requested
to see the psychiatrist. Overall, these conditions place inmates
at serious risk of harm.

### 2. Acute Care

Our investigation revealed that patients with life-
threatening conditions are not receiving timely care. We
reviewed the records of ten patients sent to the local emergency
room; six of these patients were admitted. One patient, known to
be infected with HIV, was admitted from HRYCI with pneumocystis
carinii pneumonia ("PCP"), a potentially fatal infection in
people with AIDS. We determined that this inmate's care had been
mismanaged at HRYCI for one month before the inmate was finally
sent to the hospital. In addition, this inmate was never tested
for active tuberculosis, a likely diagnosis for patients with HIV
and pneumonia. The failure to properly diagnose and treat this
inmate could have put other inmates and staff at risk of
contracting tuberculosis.

### 3. Chronic Care

The State's expert found that there are consistent backlogs
with respect to the treatment of chronic care inmates as
evidenced by infrequent scheduled appointments. When
appointments are scheduled, they are subject to cancellation
without explanation or follow-up. The State's expert also found
that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning
chronic disease registry at HRYCI. The absence of a chronic
disease registry means that patients with chronic diseases, such
as diabetes, hypertension, asthma, HIV, and Hepatitis C are not
being followed and treated according to generally accepted
medical standards for chronic care. As a result, inmates with
chronic disease are at risk for deterioration in function,
including blindness, kidney disease, heart disease, liver
failure, and death.

We found that care was especially poor for inmates with
diabetes, asthma, and HIV. Of nine inmates with diabetes whose
charts we reviewed, only four had received tests deemed necessary
pursuant to generally accepted professional standards for care of
persons with these serious, chronic diseases. In addition, only
two inmates had been immunized against pneumococcus, a bacterium

B - 50

- 6 -

that is the leading cause of bacterial pneumonia.  The failure to
immunize chronically ill inmates against pneumococcus places them
at serious risk of harm, including death from pneumococcal
pneumonia, and constitutes a substantial departure from generally
accepted standards of care.  Another diabetic inmate whose chart
we reviewed went without insulin for three days, despite severely
elevated blood sugar levels that were known to staff, placing him
at risk of death.

    Similarly, for inmates with asthma, the chronic care
practices also fall below a minimally acceptable standard of
care.  For example, of nine asthmatic inmates who should have
been seen in the chronic care clinic over a three month period,
only three were seen.  Only two had documented measurement of
peak expiratory flow, which is a departure from the generally
accepted standard of care for asthmatic patients.

    Finally, with respect to HIV-infected inmates, we found that
chronic care practices also fall below a minimally acceptable
standard of care.  Only two of five patients whose records our
medical consultant reviewed had documented laboratory
measurements of their CD4 cells[1] and their viral load, both of
which are necessary to gauge response to medication.

**4.  Specialty Care**

    The State's expert found that outside consultations are
delayed by days or even weeks in non-emergency situations because
of bureaucratic obstacles within the private vendor's system for
obtaining authorization.  The State's expert also found that
shortages of security staff available to transport inmates to
outside medical appointments contributes to the inadequacy of
care.  In addition, the State's expert determined that, even when
outside consults are scheduled, post-consult follow-up does not
consistently occur.

    Similarly, our investigation found that access to specialty
care is untimely, and that tracking of outside care is deficient,
creating an unacceptable barrier to adequate medical care ordered
by physicians.  For example, of 10 patients who were referred by
facility doctors for outside care, three received no care at all.
All three patients had serious medical issues:  two had upper
gastrointestinal symptoms, including one patient who had

--------

[1]    CD4 cells are white blood cells that identify, attack
and destroy infections.  A normal CD4 cell count measures the
strength of a person's immune system.

B - 51

- 7 -

documented possibly cancerous polyps with a biopsy ordered and performed, but no results in his file.  A third patient had no documented follow-up with an orthopedist following serious trauma to his finger.

And, in the most extreme example, specialty care may have been denied altogether:  in March, 2002, an SCI inmate died from a malignant brain tumor that had grown so large that it distorted his facial features, and was so noticeable that other inmates referred to him as "the brother with two heads." Fourteen months before he died, SCI medical staff allegedly misdiagnosed the cancerous growth as a cyst or an ingrown hair, and allegedly made no specialty care referral nor provided any specialty care to the inmate before he died.

### 5.  Skin Infections

It is well-documented that, across the country, the incidence of skin infections among inmates is rising.  These skin infections can include methicillin-resistant staphylococcus aureus ("MRSA"), a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death.  MRSA transmission can be prevented by environmental controls, scrupulous laundry practices, early identification, effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical staff were generally unfamiliar with the diagnosis and treatment of MRSA, and that the medical staff did not culture potential MRSA infections or educate inmates on proper precautions against the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care for skin infections falls below the minimally acceptable level of care.  We also found that medical staff routinely failed to culture skin infections; in addition, we found that wound care and follow-up were inadequate.  For example, we reviewed the charts of eight inmates with skin infections at HRYCI; only two of these inmates received adequate care.  One had a deep skin infection of the neck, but had no follow-up to see if his infection was spreading.  Another inmate had inappropriate treatment for an infection that was accompanied by fever and chills, indicative of a systemic infection that could have led to pneumonia, brain infection, and death.  Both of these patients were treated with the antibiotics that are ineffective in treating MRSA.  With respect to wound care, we found another inmate at BWCI who was inappropriately treated with a topical cream for an infection on her face, but who did not see the

B - 52

- 8 -

doctor for six days, by which time she had developed cellulitis,
a deep skin infection that ultimately required hospitalization.
Our investigative findings and the State's stipulation are also
consistent with reports that DCC staff failed to properly
diagnose and treat an MRSA infection in an inmate for four months
in 2005.  This failure to recognize and treat MRSA allegedly
caused the inmate to be hospitalized for five weeks, lose the
skin on his scrotum, and undergo painful skin grafts, resulting
in permanent deformity.

Our investigation confirmed that the existence of the above
inadequacies place inmates and staff at risk of acquiring the
infection and passing it to others in the community beyond the
prison walls.  We also found that identification and treatment of
skin infections at the facilities is inadequate, including
failure to culture and treat wounds.  We found that facility
staff does not keep adequate logs of skin infections, which
prevents staff from being able to analyze data and identify
potential sources of transmission.  Notably, in many cases
physicians were prescribing the antibiotic Keflex, which not only
is rarely effective for skin infections, including MRSA, but
actually leads to prolonged infection and increased opportunities
for the infection to spread.  Finally, we found that laundry
practices at the Facilities are inadequate to prevent the spread
of skin infections, including MRSA.

## 6.  Medication Administration and Management

The State's expert found that prescribed medications are
routinely discontinued or delayed and that the current vendor has
no systems in place for ensuring that medications do not run out,
for notifying inmates when their medications have arrived, or for
verifying that the vendor is providing inmates with the correct
medications.

Our investigation confirmed these deficiencies which put
inmates at risk of harm, particularly those with chronic
conditions such as HIV.  We observed significant lapses in
medication, due either to lack of availability of medications or
the failure to administer medications consistently.  For example,
one inmate had missed 20 consecutive days of his anti-viral
medication used to treat the HIV, a potentially life-threatening
situation; another inmate with HIV had a one month lag in
receiving his HIV medications.

We also found that serial refusals to take medications were
not monitored.  Numerous inmates missed three or more doses of
medications on three consecutive days, without any evidence of

B - 53

- 9 -

follow-up by the prescribing practitioner, or evidence that the inmate was sought out or counseled.

The State's expert found that numerous systemic problems with medication administration and management exist at the facilities, including:  failure to distribute medications at the proper time intervals, leading to over- or under-prescribing medications; failure to provide necessary food at night to diabetic inmates; failure to properly monitor whether inmates are actually swallowing their medications; and pre-pouring medications.

Our investigation found similar deficiencies.  Our review of medication administration records at HRYCI revealed that approximately ten percent of the entries were left blank, indicating that inmates had not received their medication, or that the medication administration was undocumented.  We also found that the State routinely prescribes Keflex, an antibiotic, for skin infections, despite the fact that Keflex is rarely effective when used to treat skin infections.  We also learned that the State plans to administer each dose of medication from stock bottles, instead of filling prescriptions for each patient, a practice which we believe will lead to poor inventory control, diversion, error, and lack of accountability.

## B.  MENTAL HEALTH CARE

The responsibility to provide adequate medical care includes mental health care.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979); Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990).  The State is constitutionally required to provide adequate mental health care to inmates with serious mental or emotional disturbances.  The failure to provide necessary psychological or psychiatric treatment to such individuals will result in the "infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments."  Inmates of Allegheny County Jail, 612 F.2d at 763.  The key to determining whether the State has provided constitutionally adequate mental health care depends on whether inmates have reasonable access to "medical personnel qualified to diagnose and treat such illnesses or disturbances."  Id.

The State's mental health expert found substantial deficiencies with the mental health care provided at the facilities.  The State's expert conducted a number of on-site visits and determined that there is a "continuing need for substantial remedial efforts, training and auditing of mental health services provided by [the State's medical care provider]."

- 10 -

The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

### 1.  Psychiatric Staffing Deficiencies

     The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

     Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

     As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are
providing care that they are not licensed to provide (e.g.,
diagnosis of mental health disorders, treatment development
without proper psychiatric consultation, decisions regarding

B - 55

- 11 -

suicide watch step-downs, etc.). We found that psychiatrists are routinely unavailable for treatment team and staff meetings, and often are not involved in crucial decision-making, and are not adequately involved in monitoring and supervision of staff. In addition, we found that the psychiatrist who provides most of the care at HRYCI was not familiar with the procedures utilized for making decisions about which medications to prescribe for patients with psychotic disorders. Generally accepted standards of care dictate that a psychiatrist be responsible for providing mental health treatment to seriously mentally ill patients should lead treatment teams, direct medication procedures, and be meaningfully involved in treatment decisions.

### 2. Treatment Planning and Counseling Deficiencies

The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnoses and so that patients are put on the appropriate problem list. Treatment plan development is an integral part of mental health care. One aspect of treatment planning consists of psychiatric and clinical staff providing consistent notations in medical records to ensure that important information regarding an inmate's care is documented. The State's expert, Dr. Stellman, concluded that there is a continued need for remedial efforts and training in the area of medical records documentation at DOC facilities. Dr. Stellman also found that many medical records do not contain consent forms, and contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts treatment because it is virtually impossible for a qualified mental health professional to review patient medical records and determine how basic clinical decisions are being made (e.g., why an inmate was admitted to the infirmary; why medications are prescribed; why and how psychiatric close observation levels are changed; what are the bases for diagnostic conclusions). During our tour of BWCI, we reviewed the medical record of an inmate who had recently attempted suicide and found the psychiatric notes were deficient and difficult to interpret. Both the on-site and "on-call" psychiatrists made adjustments to this inmate's medication without any explanation. Also, despite the fact that this inmate had been on suicide watch on three occasions within a four-month period and was obviously in distress, there were sparse psychiatric notes in her file.

Generally accepted standards of care dictate that discharge treatment planning be provided for inmates who have serious mental illness to ensure continuity of care. The State's expert

B - 56

- 12 -

found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities.  There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy.  The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential.  This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care.  See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well.  The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate.  Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings.  For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist.  Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions.  However, clinicians are making important treatment decisions that should be left to the professional judgment of a psychiatrist, or at least made with the consultation of a psychiatrist.  Our review of the medical records at BWCI and HRYCI revealed that clinicians are recording

_____

[2]     NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers).  Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

B - 57

- 13 -

psychiatric diagnoses and making observation status decisions about patients in the infirmary, including which inmates should be removed from suicide watch, and at what pace. Psychiatrists should be performing these tasks because psychiatric diagnoses drive treatment decisions.

The State's practice of allowing clinicians to make important decisions regarding the care and treatment of inmates with serious mental illness puts patients at risk. There were three suicides at HRYCI in 2006. A clinician's decision, in May 2006, to downgrade an inmate's observation status may have aided the inmate's ability to commit suicide a few days after he entered the facility. The State took custody of this inmate after his release from a local hospital for treatment related to a suicide attempt. Apparently he was initially placed on one-to-one observation status, but he was later downgraded to a less-restrictive suicide watch despite warnings from a mental health advocate about his vulnerable mental state and need for a mental health evaluation.

### 3.  Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for substantial remedial efforts, training, and auditing with respect to the management of psychotropic medications.

Our investigation revealed that the medication administration and management of psychotropics at DOC facilities is constitutionally inadequate. We observed during our tours at BWCI and HRYCI that there are systemic problems with initiating drug therapy for newly admitted inmates. It appears that this problem may be partially the result of a deficient intake and screening process. Because the intake process is deficient there is rarely an attempt to obtain psychiatric records from community providers which would identify any psychotropic medications that were previously prescribed. If outside records were routinely obtained the delay that we observed with regard to initiating drug therapy for newly admitted inmates might be eradicated or at least greatly diminished.

We also found that the psychotropic medications that newly admitted inmates are often prescribed by community providers were substituted with other medications which may not be as therapeutically effective. We encountered inmates at HRYCI who appeared to have diminished symptom control and decreased functional ability as a result of the substitution of psychotropic medications. Another deficiency that we found with psychotropic medication administration is a lack of consistent

- 14 -

and timely distribution of medications.  Because the medication inventory does not appear to be properly controlled, medication shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient at the facilities.  The use of certain psychotropic medications may cause metabolic effects, such as weight gain, hyperlipidemia, and type II diabetes mellitus.  As such, generally accepted standards of care require prescribing physicians to monitor weight, body mass index, and abdominal girth on a regular basis.  Our review of medical records at BWCI and HRYCI indicate that the State is not following this practice.  Another side effect of certain psychotropic drugs is tardive dyskinesia (involuntary movement disorder).  Psychiatrists generally monitor this side effect by performing the Abnormal Involuntary Movement Scale ("AIMS") on a regular bases.  The State's expert found that AIMS tests are not being done once every six months as required.

**4.  Intake and Screening**

We found the intake and screening process with respect to the identification of seriously mentally ill inmates to be constitutionally inadequate.  The intake and screening process for medical and mental health is combined and performed by nursing staff members who do not appear to have received adequate mental health training or have a sufficient background in mental health.  Accordingly, they are unable to appropriately identify symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of experience with mental health issues is exacerbated by the high volume of newly admitted inmates that are processed per shift.  These deficiencies have resulted in the failure to identify inmates with serious mental illness which causes delays in treatment.  Another impact of failing to identify inmates with mental illness is that disciplinary sanctions may be inappropriately imposed on mentally ill inmates, because of behavior that could be more appropriately addressed by mental health care and treatment instead of discipline.  For example, during our tour of BWCI, we observed inmates in isolation who had not been properly identified has having mental illness, or who had not received adequate treatment for their diagnosed mental illness.  For such inmates, care should be taken to ensure that they are not unfairly disciplined for "acting out" when mental health intervention is a more appropriate response.

We also found that intake and screening for juveniles was constitutionally inadequate at HRYCI.  During our tour, we

- 15 -

reviewed a number of juvenile medical records to determine whether this special needs population was receiving comprehensive mental health evaluations subsequent to their initial intake survey. However, it appeared that such evaluations were not being routinely performed.

### C. Suicide Prevention

Our investigation revealed that the State's practices regarding suicide prevention substantially depart from generally accepted professional standards and expose inmates to significant risk of harm. Our investigation uncovered a system in which inmates at risk for suicide are not adequately identified, housed and supervised.

The State fails to adequately assess and identify inmates at risk for suicide. While the form used to conduct intake assessments is good, the personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention. Assessments are often performed by contract or agency LPN's who have not been trained adequately in suicide prevention techniques. Additionally, while the State's medical provider conducts training of its employees on suicide prevention, it has not implemented its training curricula as policy or standard operating procedure. Similarly, correctional staff receive insufficient training in the area of suicide prevention. Training at the academy is only two or three hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions. In these instances, the inmate signs a release, but outside confirmations of their medical and mental health records/histories are not consistently obtained and verified. Furthermore, post-intake follow-up of new inmates, which should be conducted within 14 days, is not done. Instead, follow-up is rolled into the initial intake process, increasing the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety. Protrusions from walls and ceilings, window frames and grates, and even the design of bunk beds in some cells provide potential anchors strong enough to support an inmate's weight in an attempt at hanging. For example, in August 2006, an HRYCI inmate who hanged himself at HRYCI was housed in an infirmary cell following his admission because he was recovering from a gunshot wound sustained during his arrest. It is not

- 16 -

clear what fixture the inmate used to hang himself, but it is apparent that the cells in the infirmary, like those in the other areas of the facility, are not sufficient to ensure the safety of inmates with suicidal ideations. Hanging was the means used in the May 2006 and February 2005 suicides at HRYCI. Additionally, unsafe light fixtures in some cells, if broken, provide a potential source of sharp-edged pieces of plastic or glass that could be used for self-harm.

The State fails to ensure that appropriate levels of observation are maintained. Documentation of 15- and 30-minute checks does not indicate that these checks are being done. Staff at one facility reported conflicting requirements for checks at lesser levels of observation, highlighting confusion about which interval was the actual policy. Rounds by mental health staff for inmates in isolation and on special units are not regularly done. Additionally, staff at some facilities incorrectly suggested that the various undocumented incidental contacts with at-risk inmates throughout the day, such as dispensing medication or picking up sick call slips, sufficed as a periodic check for inmates' safety.

### III.   **MINIMUM REMEDIAL MEASURES**

In order to address the constitutional deficiencies identified above and to protect the constitutional rights of inmates, we recommend the following measures:

1.   The State should ensure that appropriate access to medical care, including development and implementation of a functional sick call system that appropriately schedules medical appointments, and properly tracks and reschedules "no shows."

2.   The State should ensure that chronic disease registries are implemented and maintained at DOC facilities.

3.   The State should provide appropriate continuing care for patients with chronic diseases and ensure that backlogs are eliminated and do not redevelop.

4.   The State should ensure that outside consultations are not unnecessarily delayed and that appropriate post-consult follow-up care is provided. The State should ensure that security staffing levels do not negatively impact the provision of outside consultations.

B - 61

- 17 -

5.   The State should implement appropriate measures to identify, track, and treat skin infections, including culturing and treating wounds and prescribing effective antibiotics.

6.   The State should ensure the distribution of medication to patients at proper time intervals.  The State should implement a system to ensure that proper medications are being received and that sufficient stocks of medications are maintained to avoid interruptions or delays in their delivery.

7.   The State should track serial refusals of medication by patients and ensure that prescribing physicians are notified of such occurrences and that appropriate follow-up with patients takes place.

8.   The State should ensure that there is adequate psychiatric coverage provided at DOC facilities.

9.   The State should ensure that psychiatrists are actively involved in inmate care, including:  functioning as the treatment team leader; making psychiatric diagnoses; providing necessary monitoring and supervision of staff; and promoting quality mental health care.

10.  The State should provide appropriate medication distribution and management systems to ensure that psychotropic medications are available, distributed in a timely manner, and adequately monitored.

11.  The State should ensure that psychiatrists prescribe therapeutically effective medications.  If a decision is made to adjust or substitute the medications that an inmate was on prior to their detention or incarceration at a DOC facility, the psychiatrist should provide a clear justification for making the adjustment or substitution in the inmate's medical record.

12.  The State should ensure that appropriately trained staff perform a mental health screening at intake.

13.  The State should provide appropriate counseling space for qualified mental health professionals to provide mental health treatment to inmates with serious mental illness.

14.  The State should ensure that the mental health staff is appropriately documenting the care provided to inmates with serious mental illness.

- 18 -

15.  The State should provide appropriate treatment plans for
     inmates with serious mental illness.  The treatment plans
     will be reviewed on a routine bases to ensure quality of
     care.

16.  The State should develop site specific mental health
     policies for HRYCI and DCC.

17.  The State should develop a comprehensive policy regarding
     suicide prevention for DOC facilities.

18.  The State should ensure that all medical, mental health and
     correctional staff are appropriately trained regarding
     issues of suicide prevention, and that the content of their
     training is reflective of that State's suicide prevention
     policy.

19.  The State should ensure that intake staff are sufficiently
     experienced and qualified to identify inmates that pose a
     risk for suicide, and that follow mental health staff
     conduct appropriate follow-up evaluations of new inmates
     within 14 days of intake.

20.  The State should ensure that inmates identified as at risk
     for suicide are housed in safe cells, free from fixtures and
     design features that could facilitate a suicide attempt.

21.  The State should ensure that 15- and 30-minute checks of
     inmates under observation for risk of suicide are timely
     performed and appropriately documented.


                              *  *  *


     Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website and we
will provide a copy of this letter to any individual or entity
upon request.


                            B - 63

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

/s/ Wan J. Kim
Wan J. Kim
Assistant Attorney General

cc: Carl C. Danberg
Attorney General

Stanley W. Taylor, Jr.
Department of Correction Commissioner

Thomas L. Carroll, Warden
Delaware Correctional Center

B - 64

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

# The State of Delaware

# Department of Correction

# Action Plan

**April 30, 2007**

# Delaware Department of Correction
# Action Plan

## I.    Introduction

This Action Plan has been developed in accordance with the December 29, 2006 Memorandum of Agreement Between the State of Delaware and the United States Department of Justice (the MOA). In particular, paragraph 65 of the MOA requires the State to submit a "comprehensive action plan" to the United States identifying the specific measures the State intends to take in order to bring four Department of Correction facilities[1] into compliance with each paragraph of the MOA containing substantive requirements relating to three general areas: Medical and Mental Health Care, Suicide Prevention, and Quality Assurance. As is required by paragraph 65, each item addressed in the Action Plan contains a timeline for completion.

The measures described in this Action Plan are intended to provide the United States Department of Justice (the DOJ) with a roadmap of specific remedial steps to be taken by the Delaware Department of Correction (the DOC). The Action Plan has been developed with an emphasis on achievable, realistic, and, in most cases, incremental steps towards full compliance. All measures described here have been developed with the expectation that the DOC will ultimately meet or exceed requirements of the MOA and generally accepted professional standards, such as those published by the National Commission on Correctional Health Care (NCCHC).

The Action Plan is organized so that paragraph numbers refer to corresponding paragraphs in Sections III through V of the MOA. "Timeline for Completion" references in each section indicate the date by which the DOC expects to have fully implemented the proposed actions. Target deadlines for achieving incremental steps towards full compliance are also noted where appropriate. Most of the efforts described in this Action Plan will require continuing attention. To the extent that an effort does not have any defined endpoint or deadline for completion, it is noted to be "continuing."

As will be described more fully in the DOC's first Compliance Report, substantial work has already begun on many of the MOA requirements, and many improvements in the quality of inmate care are already apparent. However, most of the substantive MOA provisions discussed here involve the development or revision of policies and procedures. The corresponding sections of this Action Plan necessarily reflect a certain level of generality, because those policies and procedures are not yet complete. In those cases, the Action Plan:

---

[1] The Delaware DOC facilities covered by the MOA are the Delores J. Baylor Women's Correctional Institution (Baylor); the Delaware Correctional Center (DCC); the Howard R. Young Correctional Institution (HRYCI); and the Sussex Correctional Institution (SCI) (collectively, the "Facilities").

2

- addresses each substantive requirement;
- affirms the DOC's commitment to completing the work necessary to establish appropriate policies and procedures;
- identifies the entities or individuals responsible for achieving compliance with the underlying substantive issues;
- identifies those areas in which auditing and quality improvement efforts will be concentrated in order to assure that new policies and procedures are achieving the desired result; and
- establishes timelines for training staff on new policies and procedures, performing quality assurance, and achieving full compliance.

The MOA compliance officer will have global responsibility for assuring compliance with the MOA.

3

## II.     Medical and Mental Health Care

### 1.     Standard

All of the steps described in the pages that follow are designed to satisfy the ultimate, most fundamental requirement of the MOA: ensuring that services provided by the State address the serious medical and mental health needs of inmates in a manner that satisfies generally accepted professional standards. To accomplish this, the DOC plans to:

- diligently pursue compliance with each substantive provision of the MOA;
- rely on a multi-disciplinary, problem-solving approach to identify and overcome obstacles to improvement;
- solicit the advice of experts and consultants, where appropriate; and
- refer to NCCHC or other appropriate correctional health care standards when evaluating the services provided to inmates.

Timeline for Completion: Continuing

### 2.     Policies and Procedures

The DOC is currently drafting and revising DOC policies and procedures that will eventually replace those currently provided by the medical vendor. In the event of vendor turnover or a transition to self-operation of DOC health care services, stand-alone DOC policies will provide continuity in both the standards of care and the performance expected of staff.

- Some of the most critical policies are identified in the MOA, and relate to intake, communicable disease screening, sick call, chronic disease management, medication delivery, laboratory testing, acute care, infection control, infirmary care, and dental care. The DOC will focus its initial efforts on these most essential policies.

- The DOC will continue seeking policies and procedures from correctional facilities in other jurisdictions in an attempt to identify good models for its own manuals.

- Individuals with appropriate experience in mental health, quality assurance, medical, and nursing protocols are being assigned responsibility for drafting DOC policies and procedures, including the Director of Health Services, Mental Health Treatment Program Administrator, and the Quality Improvement Administrator

- Policies and procedures will also be subject to review and comment by the Deputy Attorney General and DOC Bureau of Prisons Chief.

4

- The DOC will continually review and update policies and procedures as needed. At a minimum, a yearly review will be conducted by the Office of Health Services.

<u>Timeline for Completion</u>:

The critical policies and procedures identified above will be drafted and available for DOJ review by 07/01/07.

Additional policies and procedures will be promulgated as needed throughout the term of the MOA, and on a continuing basis thereafter.

As noted above, policies will be continually updated as needed. A yearly review will take place, with the first yearly review to be completed by 07/01/08.

3.    **Record keeping**

   3a.    **Develop and Implement Unitary Record Keeping System**

   The DOC currently has a unitary system that includes both medical and mental health records. This paper medical record will be available to practitioners who need access to the record for treatment, quality assurance, and auditing purposes. The DOC also plans to issue a Request For Proposals during the next fiscal year to evaluate the feasibility, costs, and benefits of an electronic medical record ("EMR").

   Additionally, the DOC plans substantial improvements in the integration of medical and mental health information contained in the Delaware Automated Correction System (DACS) records. These efforts began in April 2006, and are continuing. Jim Welch, Joyce Talley, the Mental Health Treatment Program Administrator, the medical vendor, and individuals from the Delaware Management Information Systems department will continue working on enhancements to the Health and Medical Modules of DACS.

   The DACS software vendor has been provided with a list of 178 requirements for improvements to the following 12 system functions in the Health and Medical Modules:

- Intake Screening
- Scheduling
- Medical Transfers
- Chronic Care
- Sick Call
- Outside Consults
- Pregnancy
- Mental Health
- Administrative Segregation
- Infirmary Care

5

- Dental
- General/Reports

<u>Timeline for Completion:</u>

Software development:  approximately 6/18/07
System testing:  6/07 - 7/07
Revisions:  8/07
Training vendor and DOC staff:  8/07 - 9/07
Full implementation:  10/30/07
Issuance of RFP for an EMR:  7/01/08

### 3b.    Medical Records Staffing

The DOC will facilitate the provision of additional medical records staffing to reduce the potential for significant lags in filing records in the patient's medical record.

<u>Timeline for Completion:</u>

DOC will evaluate current medical records staffing and the need for additional staff by 4/1/07 (completed).

DOC negotiated an amendment to its agreement with the current medical vendor to provide for additional medical records staff, and staff are expected to be hired by no later than 10/30/07.

### 4.    Medication and Laboratory Orders

### 4a.    Policies, Procedures, and Practices for Medication and Laboratory Orders

Policies and procedures relating to medication and laboratory orders will be included in review and drafting process described in ¶ 2, above.

<u>Timeline for Completion:</u>

Policies:  07/01/07

### 4b.    Periodic Evaluation

The DOC has begun and is continuing to develop an auditing system to assure that medications are ordered and delivered in a timely manner. The auditing system will also assure that laboratory orders are taken off the chart, and tests ordered are completed and results reported to the ordering practitioner in a timely manner. This process will include continued monitoring under the DOC's audit system.

6

Timeline for Completion:

Full development of medication audit system: 10/30/07
Auditing: Continuing

### *Staffing and Training*

**5.    Job Descriptions and Licensure**

    **5a.    Appropriate Licensing/Certification of Medical and Mental Health Staff**

    The DOC will ensure that any person requiring a license or certification to practice under State law has the necessary credentials prior to employment.

- The vendor will be required to submit documentation regarding a prospective employee's licensure or certification to the DOC before the individual begins working at the Facilities.
- The licensure and certification list will be updated monthly by the medical vendor and submitted to the senior fiscal officer for the DOC, who will be responsible for reviewing the list and responding to any deficiencies.

Timeline for Completion:

Policies: 07/01/07

    **5b.    Establish Credentialing Program**

    The DOC will establish a credentialing program to ensure that all licensed and certified staff have satisfied initial education requirements, as well as any continuing education standards set by the relevant licensing and credentialing bodies.

Timeline for Completion:  01/01/08

**6.    Staffing**

The DOC plans to continue assessing staffing levels and to enter into negotiations when necessary for additional clinical and non-clinical positions. The Director of Health Services and the medical vendor share responsibility for compliance with this provision.

- An additional 14.33 FTE mental health staff and 24.82 FTE medical staff are scheduled to be hired because of staffing increases negotiated in April 2007 with the current medical vendor.

7

- The DOC will continue evaluating staffing alternatives and options for contending with a serious local and national shortage of qualified nurses.
- DOC will continue efforts to identify and hire qualified individuals to fill the following new positions established in the Office of Health Services:
  - MOA Compliance Officer;
  - Quality Improvement Administrator
  - Administrative Specialist
  - Nurse Practitioner; and
  - Physician

Timeline for Completion:  Continuing

### 7.    Medical and Mental Health Staff Management

The medical vendor has been delegated responsibility for assuring compliance with this provision.

#### 7a.    Full-Time Medical Director

A full time Medical Director is in place, provided by the contracted medical vendor.

Timeline for Completion:  Completed

#### 7b.    Director of Nursing

A full time Director of Nursing is in place, provided by the contracted medical vendor.

Timeline for Completion:  Completed

#### 7c.    Administrative Medical and Mental Health Management

A full time Mental Health Director is in place, provided by the contracted medical vendor. The DOC will facilitate the hiring of additional administrative management staff. This will occur through increased staffing levels negotiated in April 2007 with the current vendor.

Timeline for Completion:

Hiring additional administrative staff:  10/30/07

#### 7d.    Facility Clinical Director of Mental Health

8

On site clinical mental health director positions are currently established and staffed at each of the facilities.

Timeline for Completion:  Completed

## 8.    Medical and Mental Health Staff Training

The Mental Health Treatment Services Administrator, Director of Health Services, the medical vendor, and the Educational Development Center ("EDC") will share responsibility for compliance with requirements in this provision.

### 8a.    Training to Meet Serious Medical and Mental Health Needs

- Initial and in-service training activities will continue to be scheduled by the vendor to provide mental health and special needs medical and mental health populations training.
- Documentation of training and copies of training materials will be available for examination.

Timeline for Completion:  01/01/08

### 8b.    Suicide Prevention

- Qualified mental health professionals will obtain Monitor approval of a curriculum for training on suicide prevention, as described in ¶ 42 below.
- Documentation of attendance at suicide prevention training, as described in ¶ 43 below, will be available for examination.

Timeline for Completion:  01/01/08

### 8c.    Identification and Care of Inmates With Mental Disorders

- Training for medical and mental health staff on the identification and care of inmates with mental health disorders will continue to be provided by the vendor.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services and the EDC will work together to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion:  01/01/08

## 9.    Security Staff Training

9

The Director of Health Services, Mental Health Treatment Program Administrator, the medical vendor, and the EDC will share responsibility for compliance with requirements in this provision.

### 9a.    Identification, Referral, and Supervision of Inmates with Serious Medical and Mental Health Needs

- Training in the identification, referral, and supervision of inmates with serious medical and mental health needs will continue to be provided by the vendor.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services and the EDC will work together to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion:  07/01/08

### 9b.    Additional Mental Health Training for Staff Assigned to Mental Health Units

- The medical vendor will continue to provide training to staff assigned to work in mental health units.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services will work with the EDC to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion:  07/01/08

### *Screening and Treatment*

### 10.    Medical Screening

The DOC will use the updated DACS intake module for the medical and mental health screening as required under this provision.  A printed copy of the medical/mental health screening will be placed in the permanent medical chart.

The medical screening addresses the following issues:
- identification of individuals with serious medical and mental health issues;
- identification of acute medical needs;
- infectious diseases;
- chronic conditions;
- physical disabilities;

10

B - 75

- mental illness;
- suicide risk; and
- identification of potential for drug and alcohol withdrawal.

This module includes a full mental health screening. Notification of a mental health provider for issues requiring immediate attention and follow-up will occur via this module system. The DOC is currently using a version of this system that is, as noted above, scheduled for full implementation by 10/30/07. Emergent referrals are currently made via telephone.

The Director of Health Services, the medical vendor, and the Quality Improvement Administrator share responsibility for compliance with this provision.

Timeline for Completion: 10/30/07

## 11.    Privacy

The Commissioner of Correction is leading the effort to achieve full compliance with this provision.

- The DOC is reviewing long-term expansion plans at the Facilities in an effort to assure that privacy is accommodated in all areas where a medical or mental health service will be provided.
- The DOC will study the feasibility of consolidating a range of medical and mental health services into a centralized facility.
- A capital improvements plan is being prepared for presentation to the legislature.
- Because capital improvements require long range planning and substantial funding, staff are evaluating all of the Facilities to identify strategies for:
  - o making the best possible use of existing space and;
  - o addressing privacy issues.
- Examples of improvements already made include:
  - o At HRYCI, an additional patient examination room has been created from space previously used to store records.
  - o At BWCI, two offices outside the medical area, previously used for other purposes, have been provided for mental health services, freeing up an additional office in the medical area for an exam room.
  - o At SCI, a large storage closet outside the medical area was appropriately modified and converted into an interview room for the psychiatrist.
- Site Wardens and the Director of Health Services are jointly responsible for the Facility evaluations.

Timeline for Completion:

Facility evaluations: 07/01/07
Implementation of short-term changes to available space: 12/30/07

11

B - 76

Capital improvements plan to be presented to the bond bill committee in June 2007.
Full compliance: Continuing

## 12.    Health Assessments

The Director of Health Services, the medical vendor, and the Quality Improvement
Administrator will be responsible for facilitating compliance with the requirements of
this provision.

### 12a.    Timely Medical and Mental health Assessments

- The DOC will use the updated DACS module to track intakes and referrals to
  chronic care and mental health.
- As noted above, the DOC is currently using a telephone system for emergent
  referrals to mental health. This system will be used until full implementation
  of the updated DACS module.
- Referrals will be made directly from the intake system to either the sick call
  scheduling process, or to the mental health supervisor on call.
- This system allows for quick turnaround of any chronic disease or mental
  health issue identified during the intake process.
- The referral will be made within 24 hours, and appointments with providers
  will be scheduled within the time frame prescribed in the MOA.
- All inmates will receive a full health assessment, regardless of identified
  illness, within 14 days, while inmates identified at intake with a chronic
  illness will receive a full health assessment within 7 days.
- In accordance with NCCHC standards, any inmate who was previously
  incarcerated and received an intake physical exam within the previous 12
  months will receive an intake screening and chart review. If that screening
  and chart review indicate no change in health status from the previous intake,
  a new full physical exam will not be required.
- The Office of Health Services will audit intake procedures quarterly to
  monitor compliance with these standards.

Timeline for Completion:

Final roll out of updated DACS module: 10/30/07
Quarterly auditing: Continuing

### 12b.    Tracking of Inmates with Chronic Illness

- DOC will use the DACS system and manual lists to track those inmates who
  are identified (at intake or subsequently) as having a chronic condition.
- Procedures for running chronic care clinics are being amended so that
  scheduling decisions will be based on the degree of control of the illness.
  - Inmates whose illnesses are under poor control will have more
    frequent visits to the provider for appropriate evaluation and treatment.

12

       o  At a minimum, the DOC plans to assure that all chronic care patients are evaluated by a provider at least once per quarter.
- Quality improvement evaluations will be conducted by the Office of Health Services, using a DOC audit tool, every two months for the first two quarters after full implementation occurs, and every three months for the following quarters.

Timeline for Completion:

Full implementation of new chronic care scheduling procedures: 10/30/07
A paper tracking and scheduling system currently exists.
Quality improvement and audit evaluations have already begun. Auditing of the new system is expected to begin by 12/30/07.

### 13.    Referrals for Specialty Care

The medical vendor and the Quality Improvement Administrator will share responsibility for assuring compliance with this provision.

#### 13a.    Referral of Inmates Whose Needs Exceed Facility Capabilities

- The DOC has established a consult tracking system.
- The efficacy of the tracking system will be audited on a quarterly basis to evaluate whether:
    - inmates are referred in a timely manner;
    - consultants' recommendations are reviewed by appropriate referring staff; and
    - clinician responses to consultants' recommendations are documented.

Timeline for Completion:
Consult tracking system identification: Completed
Initial quality improvement audits: 10/30/07

#### 13b.    Tracking and Documenting Specialist Findings and Recommendations

After each consultant visit, immediately on return to the institution, a nurse will:
- review the documentation provided by the consultant;
- schedule a follow-up appointment with the referring (DOC vendor) provider to review the consultant's findings and see the patient.

The follow up visit with the provider is to occur no later than 7 days after the consultant appointment.

Recommendations made by the specialist and discussion with the patient will be noted in the progress notes of the patient chart.

13

The DOC audit tool is used on a quarterly basis to assure that appropriate follow up occurs and is properly documented.

Timeline for Completion:

The DOC's goal is to achieve full compliance with this provision by 10/30/07. Auditing has already begun, and is conducted every two months for the first two audits and quarterly thereafter. Review of the audit results is immediate, and corrective action is taken with the medical vendor to reinforce DOC policy.

**14.    Treatment or Accommodation Plans**

The Facility wardens and the medical vendor will share responsibility for assuring compliance with this provision.

**14a.    Special Needs Plans**

Special needs treatment plans will be developed by the medical and/or mental health providers for all special needs inmates, as defined in NCCHC standards. These plans will include, at a minimum, frequency of follow-up, the type and frequency of diagnostic testing and therapeutic regimens, and when appropriate instructions about diet, exercise, adaptation to the correctional environment, and medication.

Timeline for Completion:  10/30/07

**14b.    Discharge Planning**

For inmates with special needs, who have been in our facilities longer than 30 days, appropriate discharge planning will be included in the treatment plan. Such discharge planning shall be made in relation to the anticipated date of release.

Timeline for Completion:  10/30/07

**15.    Drug and Alcohol Withdrawal**

The Substance Abuse Treatment Program Administrator, Director of Health Services and medical vendor will share responsibility for assuring compliance with this provision.

**15a.    Policies, Protocols, and Practices to Identify, Monitor, and Treat Withdrawal**

The DOC will develop or revise appropriate policies, protocols, and practices for the identification, monitoring and treatment of inmates at risk for, or who are experiencing,

drug or alcohol withdrawal. The intake screening process will be the first line of defense for identifying at-risk individuals and implementing these policies and procedures. The DOC plans to work with the medical vendor and security staff to assure that appropriate personnel are trained on any new policies.

Timeline for Completion:

Drafting and revision of policies: 07/01/07
Staff training: 12/30/07

### 15b.    Withdrawal and Detoxification Programs

The DOC will follow the policies developed for appropriate withdrawal and detoxification of inmates who are at risk of or who have symptoms of drug or alcohol withdrawal.

Timeline for Completion:

Policies: 07/01/07

### 15c.    Methadone Maintenance for Pregnant Inmates

The DOC will work with a community provider to establish an appropriate methadone maintenance program for those inmates who are identified as pregnant at intake and are in a community methadone maintenance program or addicted to opiates.

The DOC will evaluate local and national standards for women who are pregnant and on a methadone maintenance program to assure that the DOC program meets generally accepted professional standards.

Timeline for Completion:

Development of policies: 07/01/07
Full implementation: 12/30/07

### 16.    Pregnant Inmates

The medical vendor, Quality Improvement Administrator, and the Director of Health Services will work together to achieve compliance with this provision.

* The DOC will develop or revise and implement policies and procedures consistent with the appropriate screening, treatment and follow-up of pregnant inmates.

15

B - 80

- Policies will be developed to specifically address those patients identified as "high risk" pregnancies.

- All women are currently screened for pregnancy at intake, and the DOC plans to continue this practice.

- The Director of Health Services and the medical vendor are jointly responsible for auditing and assuring compliance with this item.

Timeline for Completion:

Development of policies:  07/01/07
Training on policies: 10/30/07
Full implementation:  12/30/07

## 17.    Communicable and Infectious Disease Management

The DOC Quality Improvement Administrator, Director of Health Services, and the medical vendor will share responsibility for assuring compliance with this provision.

- Polices will be developed and/or revised relating to the identification of individuals in DOC custody with communicable diseases.
- Appropriate screening and treatment for inmates with communicable diseases will be instituted.
- Communicable and infectious disease statistics will be collected, analyzed, and available for review by the Monitor.
- Monthly reports will be instituted to assist with consistency of treatment and control of identified diseases.

Timeline for Completion:

Policy development:  07/01/07
Full implementation:  10/30/07

## 18.    Clinic Space and Equipment

The Commissioner of Correction, bureau chiefs, and wardens will work with appropriate State authorities to achieve compliance with this provision.

- The DOC is reviewing expansion plans at the Facilities to assure that in all areas where a medical or mental health service is provided that adequate space for private, face-to-face nursing and physical examinations is available.
- The DOC will study the feasibility of consolidating a range of medical and mental health services into a centralized facility.

16

B - 81

- Because capital improvements are long term solutions, sites are reviewing initial strategies for addressing space and privacy needs.
- Examples of improvements already made include:
  - At HRYCI, an additional patient examination room has been created from space previously used to store records.
  - At BWCI, two offices outside the medical area, previously used for other purposes, have been provided for mental health services, freeing up an additional office in the medical area for an exam room.
  - At SCI, a large storage closet outside the medical area was appropriately modified and converted into an interview room for the psychiatrist.

Timeline for Completion:

Site evaluations: 07/01/07
Initial solutions to be implemented: 12/30/07
Capital improvements plan to be presented to the bond bill committee: 06/07

### 18a.    Privacy for Clinical Exams

Evaluations of each site are taking place to make any initial modifications to the layout of each clinic area. Each site will conduct an audit to identify the specific areas where such changes are possible.

Timeline for Completion:

Evaluations: 07/01/07
Initial modifications/changes: 12/30/07

### 18b.    Adequately Sized and Equipped Exam Rooms

Evaluations of each site are taking place to make any initial changes to the layout of each clinic area. Each site will conduct an audit to identify the specific areas where such changes are possible.

Timeline for Completion:

Evaluations due 07/01/07
Minor modifications/changes due 12/30/07

### 18c.    Action Plan (Paragraph 65) Regarding Bringing Facilities Into Compliance

The DOC expects to present a capital improvements plan to the bond bill committee in June 2007.

17

*Access to Care*

## 19.    Access to Medical and Mental Health Services

The Commissioner of Correction, Facility wardens, medical vendor, and Director of
Health Services share responsibility for assuring compliance with these provisions.

### 19a.    Opportunity to Request and Receive Medical and Mental Health Care

The DOC will develop or revise and implement policies assuring that inmates have both
the opportunity to request and receive medical and mental health care.

Timeline for Completion:

Policies: 07/01/07
Implementation: 10/30/07

### 19b.    Medical Response to Requests

- Currently, and according to the policy in development, all written requests for
  medical/mental health care will be screened within 24 hours.
- If a clinical symptom is reported, a face-to-face encounter will occur within 72
  hours from the time of request, at the latest; or earlier if the screening process
  identifies that the patient needs to be seen more promptly.

Timeline for Completion:

Policies: 07/01/07
Implementation: 10/30/07

### 19c.    Adequate Security Staffing to Ensure Timely Escort

- The DOC will ensure that adequate security staff are available and accessible to
  inmates who need to be escorted to the medical/mental health appointment as
  necessary.
- Facility Wardens and local medical vendor staff will be responsible for assuring
  compliance with this requirement. Scheduling delays, canceled sick call visits,
  and/or missed appointments will be evaluated through the DOC audit mechanism
  to identify the root cause of the delay in providing services. Security-related
  reasons for the delay will be noted, and evaluated for appropriate corrective
  action.

Timeline for Completion:

Policies: 07/01/07

18

Implementation: 10/30/07

### 19d.    Develop and Implement Sick Call Policy

The DOC will develop or revise and implement a sick call policy that will address the following areas:
- an explanation of the order in which patients are scheduled;
- a specific procedure for scheduling patients;
- locations for treatment;
- requirements for clinical evaluations; and
- the maintenance of a sick call log.

Timeline for Completion:

Policies:  07/01/07
Implementation:  10/30/07

### 19e.    Treatment in Response to Sick Call Request in a Clinical Setting

- A policy will be developed and/or revised providing that all sick call visits will take place in an appropriate, private setting conducive to the activity.
- In some areas this will be difficult without the physical plant changes noted in ¶¶ 11 and 18.
- The DOC will work to assure that, in the meantime and to the extent possible, the clinical setting is appropriate for the service to be provided.

Timeline for Completion:

Policies:  07/01/07

### 20.    Isolation Rounds

The DOC will be responsible for drafting appropriate policies, and the medical vendor is responsible for actually performing in compliance with this provision.

- The DOC will develop or revise and implement a policy to assure that medical staff make daily sick call rounds in isolation areas and nursing staff make rounds at least three times a week.
- The policy will indicate that the intent is to provide an opportunity for inmates in isolation adequate opportunity to contact and discuss health/mental health concerns with appropriate medical/mental health staff in a setting that affords as much privacy as the security concerns allow.

Timeline for Completion:

Policies:  07/01/07

Implementation date: 10/30/07

### 21.    Grievances

The Office of Health Services, Quality Improvement Administrator, and medical vendor will share responsibility for assuring compliance with this provision.

#### 21a.    Develop and Implement Medical Grievance System

- The DOC will develop or revise and implement an improved grievance system.
- That system will ensure that medical grievances are processed and addressed in a timely manner. The Office of Health Services, along with the Bureau of Prisons, is the responsible party for assuring that grievances are handled in an efficient and effective fashion. The contract audit nurses are part of the team that will work to evaluate the effectiveness of the system, and make suggestions for improvement.

Timeline for Completion:  12/30/07

#### 21b.    Medical Grievances and Responses Placed in Inmate Files

- Medical issues raised by the grievance process will be addressed and actions taken will be noted in the progress notes of the inmates' medical record.
- The actual grievance is maintained electronically, under each inmate's name, in DACS as described in ¶ 21c below.

Timeline for Completion:  12/30/07

#### 21c.    Log, Review, and Analyze Grievance Outcomes

- Grievances, along with all updates, appeals, responses, and outcomes are, and will continue to be, logged in the DACS system, which can be reviewed by all parties.
- The Office of Health Services will review and analyze the grievances on a monthly basis to identify and note any systemic issues raised by the grievances.

Timeline for Completion:  12/30/07

#### 21d.    Develop and Implement Procedure for Addressing Systemic Problems

- The DOC will develop and implement a comprehensive system for understanding and addressing all systemic problems discovered through the analysis conducted in ¶ 21c, above.
- On a monthly basis, the Office of Health Services will be responsible for reviewing systemic problems and making recommendations for systemic responses.

20

Timeline for Completion:  12/30/07

## *Chronic Disease Care*

**22.    Chronic Disease Management Program**

The Health Services Director, the Quality Improvement Administrator, the audit nurses, and the medical vendor staff will share responsibility for assuring compliance with this provision.

### 22a.    Develop and Implement Chronic Care Disease Management Program

- The DOC will develop or revise and implement a Chronic Care Disease Management Program to identify and track inmates with chronic conditions.
- The DOC plans to implement a Chronic Care Disease Management Program that is driven by the level of control achieved for any given chronic condition.
  - For example, the frequency of chronic care appointments will be based on degree of control of the illness.
  - Each chronic care patient will be seen at least quarterly.
  - Those under poor control will have more frequent visits to the provider for appropriate evaluation and treatment.
- Appropriate diagnosis, treatment, monitoring and continuity of care are important components of the Chronic Care Disease Management Program and will be tracked accordingly.
- Quality improvement audits will be conducted using the DOC audit tool every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion: 12/30/07

### 22b.    Maintain Registry of Inmates with Chronic Disease

- DOC will use the DACS system and a manual registry to track those inmates who at intake, or on subsequent occasions, are identified as having a chronic condition.
- Compliance with this requirement will be audited every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion: 12/30/07

**23.    Immunizations**

21

The DOC Office of Health Services, and the medical vendor will share responsibility for assuring compliance with this provision.

### 23a.    Obtain Immunization Records for Juveniles

- The DOC plans to work with the Division of Public Health Immunization program to obtain records, if available, of those juveniles who are in the custody of the DOC.
- Records obtained will become a part of the unified patient chart.

Timeline for Completion:

Policies: 07/01/07

### 23b.    Update Juvenile Immunizations

- The DOC plans to develop or revise immunization policy consistent with current immunization standards.
- The DOC plans to implement standards that are consistent with current nationally recognized guidelines, adolescent immunization standards, and Delaware School Admission requirements.

Timeline for Completion:  10/30/07

### 23c.    Develop Policies and Procedures for Influenza, Pneumonia, and Hepatitis A and B Vaccines

- The DOC plans to develop or revise and implement immunization policies, which will include policies for identifying inmates who require immunizations.
- DOC policies will address immunizations that may be indicated in connection with certain chronic diseases or other conditions, as well as immunization schedules that are appropriate for certain categories of inmates.
- Patients will be evaluated for the following immunizations:  pneumonia, influenza, Hepatitis A and B.
- Inmates will be offered immunization based on the criteria established by the policy.
- Medical staff and physician extenders will be trained on immunization protocols
- The medical vendor's Quality Assurance/Control of Infectious Disease ("QA/CID") nurse will be required to monitor compliance with these policies

Timeline for Completion:

Policies: 07/01/07
Implementation start date for immunizations:  10/01/07

22

*Medication*

**24.    Medication Administration**

The medical vendor, DOC security staff, and Quality Improvement Administrator will share responsibility for assuring compliance with this requirement.

> **24a.    Appropriately Prescribe and Administer Medications in Timely Manner**

- The DOC plans to develop or revise and implement policies that are consistent with NCCHC standards for the prescription and delivery of appropriate medications, based on an assessment and clinically indicated by symptomotology.
- The current formulary will be assessed for appropriateness.
- The DOC intends to draft policies that will require prescribing practitioners to note in the medical record if an alternative medication is indicated and the reason for prescribing the alternative medication.  The alternative medication will be made available within 72 hours.

Timeline for Completion:

Policies:  07/01/07
Training:  08/01/07
Implementation date:  10/30/07

> **24b.    Appropriate Access to Medications**

- The DOC will develop or revise and implement policies to assure that inmates who are prescribed medications receive those medications on a schedule consistent with clinical practice guidelines and the instructions of the prescribing practitioner.
- A formulary committee was established in February 2007, and is scheduled to meet on at least a quarterly basis.
- The formulary committee will include the Medical Director, Director of Nursing, Director of Psychiatry, one staff clinician, one advanced practice nurse, the DOC Director of Health Services, the DOC Mental Health Treatment Services Administrator and one other DOC professional employee.
- Minutes of the formulary committee meetings will be available for review and examination.

Timeline for Completion:

Policies:  07/01/07
Implementation date:  08/01/07

23

**24c.    Policies and Procedures Regarding Missed Doses**

- DOC will develop or revise and implement policies to ensure that the prescribing practitioner is notified if a patient misses doses of a particular medication on three consecutive days.
- Notice to the provider shall be documented, according to policy, in the medical chart.
- Compliance with this requirement will be audited every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion:

Policy development: 07/01/07
Implementation date: 08/01/07

**24d.    Formulary Shall Not Unduly Restrict Medications**

- The DOC will develop or revise formulary policies which reflect the understanding that the formulary developed will not unduly restrict medications.
- Additions and deletions from the formulary will be made by vote of the committee and reasons for the addition or deletion of any particular medication will be noted in the minutes of the committee.
- Non-formulary requests must be submitted to the vendor's medical director for approval.
- Reasons for denial must be documented and alternatives noted on request forms.

Timeline for Completion:

Policies: 07/01/07
Training: 08/01/07
Implementation date: 10/30/07

**24e.    MARs Appropriately Completed and Maintained**

- The DOC is currently using a MAR in the unified chart.
- The DOC will develop or revise policies to require that medications prescribed are noted in a MAR, which will be a part of each inmate's medical file.
- DOC policies will require documentation in the MAR that is consistent with standard practices.
- Compliance with DOC policy will be audited every two months for the first two quarters beginning July 2007 and every three subsequently.

Timeline for Completion:

24

Finalization of policy: 07/01/07
Total implementation and completion of first Quality Improvement Audit: 10/30/07

### 25.    Continuity of Medication

- The DOC will develop or revise policy to assure that on intake each entering inmate is screened for medications currently prescribed and those medications are noted on the intake form.
- That list will be forwarded to the prescribing practitioner, who will determine the medical appropriateness of any medications and note any changes to the medication regimen in the progress notes.
- A face-to-face encounter will be conducted when the medical condition so dictates.
- The medication prescribed will be ordered and administered consistent with the medication policy noted above.
- The DOC will implement changes to the DACS medical module to streamline this process.

Timeline for Completion

Policy: 07/01/07
Intake changes to the DACS system: 10/30/07

### 26.    Medication Management

- The DOC will develop or revise policies and procedures consistent with standard practice for the access to, storage of, and safe and proper disposal of medications and medical waste.
- The medical vendor and the Substance Abuse Treatment Services Administrator will be the responsible parties for compliance with this item.

Timeline for Completion:

Policy: 07/01/07
Training: 08/01/07
Implementation: 09/01/07

### *Emergency Care*

### 27.    Access to Emergency Care

25

The Director of Health Services, Mental Health Treatment Program Administrator, EDC and the medical vendor will share responsibility for assuring compliance with this provision.

### 27a.    Train to Recognize and Respond to Medical and Mental Health Emergencies

- As noted in ¶¶ 8 and 9 of this document, the DOC will assure appropriate training of staff who may respond to emergency situations.

Timeline for Completion: 01/01/08

### 27b.    Timely and Appropriate Care of Medical and Mental Health Emergencies

- The DOC will develop or revise policies requiring medical personnel to use appropriate clinical judgment to determine whether the inmate must be transported to an outside facility for emergency treatment.
- If medical staff are not available, the policy will require transportation of the patient to an appropriate facility for evaluation.

Timeline for Completion:

Policy: 07/01/07
Implementation: 01/01/08

### 28.    First Responder Assistance

### 28a.    First Responder Training

As noted in ¶¶ 8 and 9 of this Action Plan, the DOC will continue to conduct training sessions for all employees. Training materials and schedules will be available to the monitor for inspection.

Timeline for Completion: 01/01/08

### 28b.    Emergency Response Protective Gear

Consistent with the training noted above, protective gear will continue to be made available. Protective gear includes items such as masks, gloves, etc.

Timeline for Completion:

Training: 10/30/07

Full implementation: 01/01/08

## *Mental Health Care*

### 29.     Treatment

Mental Health Treatment Program Administrator, the Clinical Director of Mental Health, and the medical vendor will share responsibility for assuring compliance with this provision.

- The DOC will develop policies to address the provision of mental health services by qualified mental health professionals.
- The policy will address timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities for inmates who are diagnosed with a mental health illness.
- The policy will also address the need for specific observation of and assessment of those inmates who are identified as suicidal, and those who enter DOC with a serious mental health condition or need, or who develop such a need after incarceration.

Timeline for Completion:

Policy: 07/01/07
Full implementation: 10/30/07

### 30.     Psychiatrist Staffing

The Office of Health Services will work with the medical vendor to identify qualified psychiatrists to meet the psychiatrist staffing needs in the DOC system.

#### 30a.     Psychiatrist Staffing

- Additional psychiatric staff are scheduled to be hired because of staffing increases negotiated in April 2007 with the current medical vendor.
- The DOC will assist the medical vendor in recruiting and retaining qualified psychiatrists to meet the mental health needs of inmates housed in the Facilities.
  - o The DOC plans to work with the Medical Society of Delaware to identify qualified candidates.
  - o The DOC also plans to contact regional medical schools to identify recruiting opportunities.
- The DOC will work with the Clinical Director of Mental Health and the medical vendor to identify the appropriate number of psychiatrist hours required to participate in individualized treatment plans, prescribe and adequately monitor

27

psychotropic medications, review charts, and respond to diagnostic and laboratory tests.

- As noted in ¶ 5, the DOC will ensure that psychiatrists hired by the medical vendor have appropriate licenses and certifications.
- The DOC will maintain a roster of all professionals providing this service, including the sites they are assigned to and the number of hours provided.

Timeline for Completion:  Continuing

### 30b.  Psychiatrist Duties and Responsibilities

- The DOC will work with the Clinical Director of Mental Health to assure that all psychiatric staff:
  - o collaborate with mental health staff to identify the resources needed to care for those with serious mental health illness; and
  - o communicate those needs to the warden of the particular Facility, while maintaining autonomy regarding clinical decisions.
- Psychiatrists assigned to a Facility will oversee the Facility's mental health treatment team.

Timeline for Completion:  10/30/07

### 31.    Administration of Mental Health Medications

Responsibility for compliance with this provision will be shared by the medical vendor, Mental Health Treatment Program Administrator, nursing supervisors, and the Quality Improvement Administrator.

### 31a.    Policies, Procedures, and Practices Regarding Prescribing, Distributing, and Monitoring Psychotropic Medications

- As noted in ¶ 24 of this Action Plan, the DOC will develop or revise and implement medication prescribing, ordering, distribution and reordering policies consistent with professional standards.
- This procedure will apply to all medications, including those prescribed for psychiatric conditions.

Timeline for Completion:

Policy: 07/01/07
Implementation:  10/30/07

### 31b.    MAR Documentation

- As noted in ¶24 of this Action Plan, the MAR will be used to document the time and amount of medication given and any refusal by the inmate.

28

- Only registered and licensed practical nurses will be allowed to administer medications to inmates in the Facilities, in accordance with Delaware law.
- Compliance with existing policies requiring nurses to perform mouth checks will be monitored.
- Compliance with policies requiring nurses to note any adverse effects of medications in the patient record will be audited at each Facility with the DOC audit tool every two months for the first two quarters beginning 10/30/07, and every three months for the following quarters.

Timeline for Completion:

Policies: 07/01/07
Total implementation and completion of first Quality Improvement audit: 10/30/07

### 31c.    MAR Review

- MARs will be reviewed on a regular basis by the nursing supervisor assigned to the particular clinical area.
- This review will be to assure that policies and procedures are being followed consistently and thoroughly.
- Notations in the progress notes of the medical chart will also be reviewed for appropriate documentation.

Timeline for Completion:

Policy: 07/01/07
Training: 08/01/07
Total implementation and completion of first review by nurse supervisor: 10/30/07

### 32.    Mental Illness Training

As noted in ¶¶ 8 and 9 of this Action Plan, mental illness training will be conducted consistent with this portion of the MOA.

- Security personnel who are assigned to the special needs units will have training designed for their job locations.
- Qualified mental health professionals will provide training through on-site or via interactive Internet.

Timeline for Completion:  01/01/08

### 33.    Mental Health Screening

### 33a.    Screening within 24 Hours

29

- As noted in ¶¶ 10 and 12 of this Action Plan, the DOC plans to use the updated DACS module for the initial intake process.
- This intake system is designed to be consistent with generally accepted mental health screens conducted according to NCCHC standards.
- The DOC expects that mental health screening performed with this tool will identify any history of mental illness, current psychiatric medications, potential for suicide ideation, past suicide attempts, or suicidal tendencies.

Timeline for Completion:

Policy development: 07/01/07
Screening tool on line: 10/30/07

### 33b.    Psychiatric Assessment

- The DOC will develop or revise policies to require a face-to-face encounter with a psychiatrist before any changes are made to psychotropic medications.
- The DOC expects that this assessment will take place no later than 10 days after the intake is completed.
- Inmates who require resumption of psychotropic medications are expected to be seen as soon as clinically appropriate, but no later than 10 days after intake.

Timeline for Completion:
Policy development: 07/01/07
Full implementation of policy due to lag time in hiring psychiatrists: 01/01/08

### 33c.    Medication Continuation

- The DOC will develop or revise policies intended to assure that generally accepted professional standards are met in identifying whether an inmate was prescribed psychotropic medications at the time of intake and that orders for the continuation of psychotropic medications are written in accordance with the provisions of the MOA.

Timeline for Completion:

Policy development: 07/01/07
Full implementation of policy: 10/30/07

### 33d.    Emergency Mental Health Referral

- The DOC will develop or revise its policies to require direct communication, either in-person or via telephone, with a qualified mental health professional when an immediate referral to a qualified mental health professional is clinically indicated, based on the inmate's responses to the intake screening.

30

- Quality Improvement systems developed for mental health referrals will be used to assure adherence to this policy.

Timeline for Completion:

Policy development: 07/01/07
Implementation of updated DACS module and Quality Improvement activities: 10/30/07

## 34.    Mental Health Assessment and Referral

The Clinical Director of Mental Health, the medical vendor, and DOC mental health personnel share responsibility for assuring compliance with this provision. DOC personnel will also assist with updates to the DACS mental health modules.

### 34a.    Mental Health Assessment

- When the updated DACS module is completed, it will automatically refer any inmate identified during the intake process as requiring an assessment by a qualified mental health professional.
- Inmates referred for routine mental health referrals are to be seen by a mental health professional within 72 hours.
- The vendor has been instructed that it must make direct contact with a qualified mental health professional when an urgent referral is needed for an urgent problem.

Timeline for Completion:

Policy development: 07/01/07
Full implementation: 10/30/07

### 34b.    Confidential Self-Referral

- The DOC will develop or revise policies to assure that each inmate will have access, regardless of institutional setting, to a confidential self-referral system without the need to reveal the substance of the request to security staff.
- The DOC will work to assure that written requests will be evaluated daily and triaged by qualified mental health professionals for immediate and routine evaluation.
- DOC policies will require the medical vendor to arrange for a face-to-face encounter with a qualified mental health professional within 72 hours of the request.

Timeline for Completion:

31

B - 96

Policy development: 07/01/07
Implementation: 10/30/07

### 34c.    Referral for Specialty Care

- The DOC will develop or revise policies regarding referrals to specialty psychiatric care, if such a need is identified based on the face-to-face clinical evaluation of a psychiatrist.
- All patients identified with a serious mental health condition will have routine mental health visits scheduled.
- The referral process will be monitored via regular compliance audits.

Timeline for Completion:

Policy development: 07/01/07
Full implementation of policy due to unavoidable lag time in hiring psychiatrists: 01/01/08

### 35.    Mental Health Treatment Plans

- The DOC will develop or revise policies to assure that patients requiring ongoing mental health services have a treatment plan based on diagnosis and individual clinical needs.
- DOC policies will require treatment plans to be prepared at the time of the initial assessment and updated at a minimum of quarterly.
- DOC policies will also require that changes to a treatment plan be documented in the unified medical record.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 10/30/07

### 36.    Crisis Services

Responsibility for assuring compliance with this requirement will be shared by the Commissioner of Correction, Deputy Attorney General assigned to the DOC, Mental Health Treatment Program Administrator, and the medical vendor.

### 36a.    Adequate Array of Crisis Services

- The DOC will develop or revise policies assuring that appropriate services are available in the event of a psychiatric crisis.

- Transfer to the Delaware Psychiatric Center ("DPC") will be used when it is determined that in-patient psychiatric care is necessary to stabilize the patient.
- It is currently, and will continue to be, the policy of the DOC that administrative/disciplinary isolation or observation status is not a substitute for in-patient psychiatric care.

Timeline for Completion:

Policy development: 07/01/07

Full implementation of referral to DPC: 01/01/08. (Additional time is required for full implementation of referral policies because Department of Health and Social Services policies regarding the availability of beds may also have to be revised.)

### 36b.    In-Patient Psychiatric Care

- The Delaware Psychiatric Center will be used for in-patient psychiatric services.
- The DOC, Deputy Attorney General, and medical vendor will work together to assure that transfers to DPC occur as expeditiously as possible.
- The DOC also plans to develop strategies for assuring that adequate space is available for psychiatric care at each Facility.

Timeline for Completion:

Full implementation of referral to DPC: 01/01/08. (Additional time is required for full implementation of referral policies because Department of Health and Social Services policies regarding the availability of beds may also have to be revised.)

### 37.    Treatment for Seriously Mentally Ill Inmates

### 37a.    Space for Treatment

- The DOC will continue working to assure that space is available for the treatment of inmates with a mental health diagnosis.
- The DOC is currently reviewing potential expansion options at the Facilities.
- Because capital improvements are long range solutions to space issues, the Facilities will continue reviewing opportunities for short-term modifications to existing resources in an effort to improve space available for mental health treatment.

Timeline for Completion:

Site evaluations: 07/01/07

Minor changes: 12/30/07

Capital improvements plan to be presented to the bond bill committee in June 2007.

33

### 37b.    Staffing

Recruitment of qualified mental health professional staff has been initiated, and will continue on an as-needed basis

Timeline for Completion:

Continuing

### 37c.    Adequate Array of Therapeutic Programming

- Because the availability of therapeutic programming depends significantly on the mental health staffing levels, the DOC and medical vendor plan to continue recruiting efforts.
- The DOC will develop or revise policies on the appropriate use of therapeutic programming for those inmates identified as seriously mentally ill.

Timeline for Completion:

Policy development:  07/01/07
Implementation based on hiring appropriate qualified mental health professionals:
10/30/07

### 37d.    Regular Physician Visits for Inmates on Psychotropic Medications

- The DOC will develop or revise and implement policies to assure that patients who are being treated with psychotropic medications are seen routinely by a physician to monitor responses and potential reactions to the medications.
- The DOC will conduct audits to ensure compliance.
- The DOC will work with the medical vendor to ensure the relevant health care staff receive training on new policies.

Timeline for Completion:

Policy development:  07/01/07
Implementation of regular visits by physicians:  01/01/2008

## 38.    Review of Disciplinary Charges for Mental Illness Symptoms

Responsibility for compliance with this provision will be shared by Facility wardens, the Mental Health Treatment Program Administrator, Clinical Director of Mental Health, and medical vendor.

- The DOC will develop or revise and implement policies to assure that when any inmate identified as seriously mentally ill has a disciplinary charge resulting in

34

B - 99

transfer to isolated status, the charge will be reviewed by a qualified mental health professional, who will evaluate the inmate, on the time schedule outlined in ¶ 39b below, to determine if there are mitigating factors related to the serious mental illness of the inmate.

- If the qualified mental health professional determines that such mitigating factors exist, this will be considered when punishment is imposed on that particular inmate with a serious mental illness.
- When serious security concerns exist that contraindicate the recommend remedy made by the mental health staff, a multidisciplinary case conference, including at a minimum security and mental health staff, will be held and an appropriate alternative will be identified.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of qualified mental health professional staff:
10/30/07.

## 39.  Procedures for Mentally Ill Inmates in Isolation or Observation Status

The Commissioner of Correction, Mental Health Treatment Program Administrator, and medical vendor will share responsibility for assuring compliance with this provision.

### 39a.  Policies, Procedures, and Practices Regarding Treatment of Inmates Housed in Isolation

- The DOC will develop or revise and implement policies, procedures, and practices to ensure appropriate treatment of inmates housed in isolation, including isolation rounds one time per week by qualified mental health professionals.
- The DOC will conduct audits to ensure compliance.

Timeline for Completion:

Policy development: 07/01/07
Full implementation (depending on ability to hire qualified mental health professional staff): 10/30/07.

### 39b.  Evaluation of Mentally Ill Inmates Placed in Isolation

- The DOC will develop or revise and implement policies to ensure initial evaluation by a qualified mental health professional within 24 hours for inmates with serious mental illness who are placed in isolation.
- After the initial evaluation, these inmates will be reevaluated for any psychological decompensation by a qualified mental health professional a minimum of three times per week.

35

B - 100

- The DOC will evaluate whether continued isolation is appropriate, based upon the evaluation of a qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of a sufficient number of qualified mental health professional staff: 10/30/07

### 39c.    Documentation and Treatment Review by Psychiatrist

- The DOC will develop or revise and implement its policies, procedures, and practices to ensure adequate documentation by medical/mental health staff for all admissions to and discharges from isolation.
- Such documentation shall include a review of treatment by a psychiatrist.
- The DOC will work with the medical vendor to ensure the relevant health care staff receive training on new policies.
- The DOC will conduct audits to ensure compliance.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of qualified mental health professional and psychiatric staff: 10/30/07

### 39d.    Adequate Observation Facilities

- The DOC will provide adequate facilities for observation, with no more than two inmates per room.
- Evaluations of each site are taking place to identify potential options for complying with this requirement utilizing existing resources.
- Full compliance with this requirement will be accomplished as outlined in ¶ 18 above.

Timeline for Completion:

Evaluations: 07/01/07
Initial modifications/changes due: 12/30/07
Capitol improvements as outlined in ¶ 18 above

### 40.    Mental Health Services Logs and Documentation

Responsibility for assuring continuing compliance with this provision will be shared by the DOC Quality Improvement Administrator and the medical vendor.

36

B - 101

### 40a.    Mental Health Log

- The DOC will continue maintaining a log of inmates receiving mental health services, listing all inmates receiving mental health treatment regardless of medication status.
- The log will continue to include the following information:
    o name;
    o diagnosis or complaint;
    o next scheduled appointment;
    o and medications and dosages.
- The log will continue to be maintained and made available to each clinician.

Timeline for Completion:

Log is currently available and will be maintained on a continuing basis.  Log is available on request for inspection.

### 40b.    Updated and Accurate Medical Records

- Inmate medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.
- The DOC will continue to conduct quality assurance reviews of medical records to identify deficiencies and training needs.

Timeline for Completion:

Medical records are currently available; quality assurance monitoring will be continuing.

## IV.    **Suicide Prevention**

## 41.    **Suicide Prevention Policy**

The Mental Health Treatment Program Administrator and the Quality Improvement Administrator will be responsible for assuring compliance with this provision.

- The DOC will develop or revise a suicide prevention policy to ensure training, intake screening/assessment, communication, housing, observation, intervention, and morbidity and mortality review.

Timeline for Completion:

Policy development:  07/01/07

## 42.    **Suicide Prevention Training Curriculum**

37

The Mental Health Treatment Program Administrator and EDC share responsibility for developing the suicide prevention training curriculum.

- The DOC will develop or revise a suicide prevention training curriculum, which will include the following information:
    o the DOC suicide prevention policy;
    o the ways in which facility environments contribute to suicidal behavior;
    o potential predisposing factors to suicide;
    o high risk suicide periods;
    o warning signs and symptoms;
    o case studies of recent suicides and serious suicide attempts;
    o mock demonstrations regarding the proper response to a suicide attempt;
    o and the proper use of emergency equipment.

Timeline for Completion:

Training curriculum development:  06/15/07

### 43.    Staff Training

Mental Health Treatment Program Administrator, the Director of Health Services, the medical vendor, and EDC will share responsibility for compliance with requirements in this provision.

#### 43a.    Initial Training

- Consistent with ¶ 8b above, the DOC will ensure that training on suicide prevention for all existing and newly hired correctional, medical, and mental health staff will be provided using a monitor-approved curriculum as described in ¶ 42.

Timeline for Completion:

Curriculum available for DOJ review by 06/15/07
Training will commence upon DOJ approval of the curriculum, and is expected to be completed by 01/01/08.

#### 43b.    Refresher Training

- After initial training is completed, the DOC will ensure that all correctional, medical, and mental health staff receive an annual two-hour refresher training on the suicide prevention curriculum, described in ¶ 42 above, each year.

Timeline for Completion:

Policy development by 07/01/07

38

Refresher training is scheduled to begin one year after initial training is completed (this date will be driven by the date on which DOC receives approval of the curriculum from DOJ and begins the initial training).

**44.    Intake Screening/Assessment**

Responsibility for assuring compliance with this section is being shared by Mental Health Treatment Program Administrator, the DOC Quality Improvement Administrator, DOC Management Information Systems, and CMS

- The DOC will develop or revise and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide.
- The screening will include inquiry regarding past suicide ideation and/or attempts, current ideation, threat, plan, prior mental health treatment/hospitalization, recent significant loss (job, relationship, death of a family member/close friend, etc.), history of suicidal behavior by a family member/close friend, suicide risk during prior confinement in a state facility, and the arresting or transporting officer(s) belief that the inmate is currently at risk.
- The updated DACS system will be used to track and identify if the inmate has any of the above factors noted on intake.
- Under the current intake system, these factors are noted and referrals are made via telephone to the qualified mental health professional.

Timeline for Completion:

Policy development: 07/01/07
DACS changes: 10/30/07

**45.    Mental Health Records**

Health Services Director and the medical vendor are responsible for assuring compliance with this provision.

- The DOC will develop or revise and implement policies that require medical staff to immediately request all pertinent mental health records, regarding an inmate's prior hospitalization, court-ordered evaluations, medication and other treatment, upon admission.
- The DOC Office of Health Services will work with local providers to facilitate compliance.

Timeline for Completion:

Policy development: 07/01/07
Coordination with external agencies and education of intake medical staff: 10/30/07

39

**46.    Identification of Inmates at Risk of Suicide**

Policy development will be the responsibility of the DOC; the medical vendor will be responsible for implementing the policies as written.

- The DOC will develop or revise and implement policies that require medical staff place inmates identified as at risk for suicide on suicide precautions until they can be assessed by a qualified mental health professional.
  - Inmates identified as "at risk" include those who actively suicidal (i.e. threatening or engaging in suicidal behavior), those expressing suicidal ideation, (i.e. a vague wish to die without a plan), or those with a recent history of self-destructive behavior, and/or those who deny suicidal ideation and do not threaten suicide, but whose behavior indicates the potential for self-injury.
- The assessment is to occur according to the time limit stated below in ¶ 47.

Timeline for Completion:

Policy development : 07/01/07
Implementation based on the hiring of a sufficient number of qualified mental health professional staff:  10/30/07

**47.    Suicide Risk Assessment**

The Mental Health Treatment Program Administrator,  DOC Quality Improvement Administrator, and the medical vendor will share responsibility for compliance with this provision.

- The DOC will develop or revise and implement policies that require a formalized risk assessment to be conducted by a qualified mental health professional within the appropriate time frame, not to exceed 24 hours from the initiation of suicide precautions.
- The assessment shall include, but not be limited to, description of antecedent events and precipitating factors, suicidal indicators, mental status examination, previous psychiatric and suicide risk history, level of lethality, current medication, diagnosis, and recommendations/treatment plan.
- The assessment will be documented in the treatment record.

Timeline for Completion:

Policy development:  07/01/07
Training of existing staff by 08/01/07
Timing of full implementation will be governed partly by the medical vendor's ability to hire a sufficient number of qualified mental health professional staff, but the DOC's goal is to have this task accomplished by 10/30/07.

40

**48.    Communication**

The Mental Health Treatment Program Administrator and medical vendor share responsibility for this provision.

### 48a.    Documentation for Inmates on Suicide Precautions

- The DOC will develop or revise and implement policies that require mental health or medical staff placing an inmate on suicide precautions to document the initiation of the precautions, level of observation, housing location, and conditions of the precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48b.    Notification of Mental Health Staff

- The DOC will develop or revise and implement policies requiring mental health staff to be provided with all of the documentation described in ¶ 48a (above).
- These policies will also require that in-person contact be made with mental health staff to alert them of placement of an inmate on suicide precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48c.    Medical Record Review

- The DOC will develop or revise and implement policies that require that mental health staff thoroughly review the health care record for documentation of any prior suicidal behavior.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48d.    Medical Record Documentation

- The DOC will develop or revise and implement policies requiring that mental health staff document each interaction with and/or assessment of a suicidal inmate in the health care record, including full justification of any decision to upgrade, downgrade, discharge, or maintain an inmate on suicide precautions.

41

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48e.    Downgrade / Discharge Suicide Precautions

- The DOC will develop or revise and implement policies stating that no inmate is downgraded or discharged from suicide precautions until the responsible mental and health care staff has thoroughly reviewed the inmate's health care record and conferred with correctional personnel regarding the inmate's stability.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48f.    Multidisciplinary Case Management

- The DOC will develop or revise and implement policies requiring multidisciplinary case management team meetings (to include correctional, medical, and mental health staff) to occur on a weekly basis in order to discuss the status of inmates on suicide precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 49.    Housing

The Mental Health Treatment Program Administrator, DOC Maintenance Department, DOC Wardens, and medical vendor will all share responsibility for assuring compliance with this provision.

### 49a.    Suicide Resistant Cells

The DOC will ensure that all inmates on suicide precautions are housed in suicide resistant cells (i.e. cells without protrusions that would provide easy access for hanging attempts), which provide full visibility to staff.

Cells used for suicide precautions are being or have been evaluated for suicide resistance at each of the facilities. At HRYCI, identified cells have been retrofitted with breakaway sprinkler heads. Suicide resistant air vents have been installed, and openings in window frames, which could have been used for hanging, have been sealed.

42

<u>Timeline for Completion</u>:

Facility improvements are either under way or being evaluated
Full compliance is expected to occur by 01/01/08

### 49b.    Mental Health Staff to Stipulate Conditions

- The DOC will develop or revise and implement policies requiring that the appropriate medical or mental health staff write orders in the health care record setting forth the conditions for the observation.
- Such orders will take into consideration all relevant security concerns.
- The Warden and or his or her designee will work with the mental health provider to resolve any dispute between custody and mental health/medical staff over which privileges are appropriate in a particular instance.

<u>Timeline for Completion</u>:

Policy development:  07/01/07
Implementation:  08/01/07

### 50.    Observation

The Mental Health Treatment Program Administrator is responsible for drafting the policies required under this section, and, along with the medical vendor, will oversee training on the policies. The medical vendor and DOC security staff will share responsibility for implementing the policies.

### 50a.    Policies and Procedures Pertaining to Suicidal Inmates

- The DOC will develop or revise and implement policies and procedures relating to the observation of inmates who are suicidal or at risk for suicide under the criteria identified in ¶ 50 of the MOA.
- These policies will provide that such inmates are to be placed on close observation status and observed by staff at staggered intervals, not to exceed every 15 minutes.
- The DOC policy will provide that any inmate who is actively suicidal, i.e. threatening or engaging in suicidal behavior, will be placed on constant observation and observed by staff on a continuous, uninterrupted basis.

<u>Timeline for Completion</u>:

Policy development:  07/01/07
Implementation:  08/01/07

**50b.    Daily Mental Health Assessment of Suicidal Inmates**

- The DOC will develop or revise and implement policies and procedures requiring that mental health staff interact with inmates on suicide precautions on a daily basis, rather than just observing the inmates.

Timeline for Completion:

Policy development:  07/01/07
Full implementation depends on the vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is to accomplish full implementation by 10/30/07

**51.    Step-Down Observation**

The Mental Health Treatment Program Administrator is responsible for drafting the policies required under this section, and, along with the medical vendor, will oversee training on the policies. The medical vendor and DOC security staff will share responsibility for implementing the policies.

**51a.    Step-Down Level of Observation**

- The DOC will develop or revise and implement policies and procedures requiring that inmates released from suicide precautions are gradually released via a "step-down," from a more restrictive level of observation to less restrictive levels, for an appropriate period of time prior to their discharge from suicide precautions.

Timeline for Completion:

Develop policy by 07/01/07
Train existing staff by 10/30/07
Full implementation will be contingent on the medical vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is for this to be accomplished by 01/01/08.

**51b.    Follow-Up Assessment**

- The DOC will develop or revise and implement policies and procedures requiring that inmates discharged from suicide precautions receive follow up assessment in accordance with a treatment plan developed by a qualified mental health professional.

Timeline for Completion:

Develop policy by 07/01/07
Train existing staff by 10/30/07

44

B - 109

Full implementation will be contingent on the medical vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is for this to be accomplished by 10/30/07.

## 52.    Intervention

The Mental Health Treatment Program Administrator, Director of Health Services, medical vendor, and EDC will share responsibility for compliance with requirements in this provision.

### 52a.    First Aid and CPR Training

- The DOC will develop or revise and implement policies and procedures ensuring that all staff who come into contact with inmates receive training in CPR and First Aid on a biennial basis.

Timeline for Completion:

Currently up to date; training will be continuing.

### 52b.    Annual Mock Drill

Mock drill/demonstration will be a part of the initial and annual suicide trainings as outlined in ¶¶ 42 and 43 above.

Timeline for Completion:  01/01/08

### 52c.    Response Equipment

The DOC will ensure that emergency response equipment is available within close proximity to each housing unit, including a first aid kit and an emergency rescue (cut down knife) tool, and that all staff who come into contact with inmates know the location and proper use of the equipment.

Timeline for Completion:

Completed; compliance will be continuing.

## 53.    Mortality and Morbidity Review

The DOC Quality Improvement Administrator, Mental Health Treatment Program Administrator, and medical vendor share responsibility for assuring compliance with this provision.

- The DOC will develop or revise and implement policies and procedures ensuring that a multidisciplinary review is conducted to review all suicides and serious suicide attempts (e.g., those requiring hospitalization for medical treatment).
- The review will include an inquiry of:
    o the circumstances surrounding the incident;
    o facility procedures relevant to the incident;
    o relevant training received by staff involved;
    o pertinent medical and mental health reports involving the victim;
    o possible precipitating factors; and
    o recommendations, if any, that are made.
- A written plan will be developed to address any identified areas requiring corrective action.

Timeline for Completion:

Policy development:  07/01/07
Implementation:  08/01/07

## V. Quality Assurance

### 54.    Policies and Procedures

The DOC Quality Improvement Administrator, Director of Health Services, Mental Health Treatment Program Administrator, BOP Chief Richard Kearney, and the Deputy Attorney General assigned to the DOC share responsibility for assuring compliance with this provision.

- The DOC will develop or revise quality assurance polices and procedures that address each of the substantive provisions noted above.
- The DOC Quality Assurance Program will involve:
    o the creation of a multidisciplinary team;
    o morbidity and mortality reviews with root cause analysis;
    o periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.
- The DOC Quality Assurance program will be designed to assure that the DOC is able to regularly assess and address identified deficiencies.
- An assessment tool is currently being used for DOC Quality Improvement audits.
- This assessment tool permits data tracking and analysis of trends, and can be easily modified to address new issues.

Timeline for Completion:

Polices and procedure:  07/01/07
First Quality Assurance report:  10/30/07

55.    Corrective Action Plans

55a.    Policies and Procedures to Address Identified Problems

- The DOC will develop or revise policies and procedures as needed to address issues that arise during the Quality Assurance activities described in this Action Plan.

Timeline for Completion:  10/30/07 and continuing as needed

55b.    Corrective Action Plan

- When indicated by the results of a quality assurance review, the DOC will develop corrective action plans to address identified issues.
- The purpose of the corrective action plan will be to prevent future occurrences of identified issues.

Timeline for Completion:

As needed

47

**MEMORANDUM OF AGREEMENT BETWEEN THE UNITED STATES DEPARTMENT OF JUSTICE AND THE STATE OF DELAWARE REGARDING THE DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION, THE DELAWARE CORRECTIONAL CENTER, THE HOWARD R. YOUNG CORRECTIONAL INSTITUTION, AND THE SUSSEX CORRECTIONAL INSTITUTION**

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

II.     DEFINITIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .    4

III.    MEDICAL AND MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . . .    6

IV.     SUICIDE PREVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

V.      QUALITY ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

VI.     IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

VII.    MONITORING, ENFORCEMENT, AND TERMINATION . . . . . . . . .    18

## I.    INTRODUCTION

A.    On March 7, 2006, the United States Department of Justice ("DOJ"), notified the State of Delaware ("the State") of DOJ's intent to investigate the adequacy of medical and mental health care services in five facilities operated by the State's Department of Correction pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 to determine whether those services violated inmates' constitutional rights.  The facilities investigated were:

1.    Delores J. Baylor Women's Correctional Institution ("Baylor");

2.    Howard R. Young Correctional Institution, ("Howard Young");

3.    John L. Webb Correctional Facility ("Webb");

4.    Delaware Correctional Center ("DCC"); and

5.    Sussex Correctional Institution ("Sussex").

B.    DOJ staff toured the five facilities on June 22, 2006,  July 17-19, 2006 and August 14-16, 2006.  In addition, DOJ staff, accompanied by consultants in medical care, mental health care and suicide prevention, toured Howard Young on October 4-6, 2006, Baylor and Webb on October 23-25, 2006 and Baylor again on November 15-17, 2006.

C.    On December 29, 2006, the DOJ issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1) which alleged that certain conditions at Baylor, DCC, Howard Young, and Sussex violated the constitutional rights of Delaware inmates.  It is the position of the DOJ that deficiencies in medical care, mental health care and suicide prevention at these four facilities [collectively referred to herein as "the Facilities"; see Definitions, paragraph A] were inconsistent with constitutional standards of care.  The DOJ made no findings with respect to Webb.

D.    Before the investigation began, the State had initiated its own efforts to improve conditions at the Facilities.  During the investigation, the State also commissioned an extensive internal review of the Facilities with the assistance of medical, mental health, and legal consultants, the detailed results of which they subsequently shared with DOJ and DOJ's consultants.  Throughout the course of the investigation, the State of Delaware and the staff at each Facility cooperated thoroughly and indicated a willingness to proactively and voluntarily undertake measures to improve conditions throughout the system.  Consequently, the Parties enter into this Memorandum of Agreement  ("Agreement") for the purpose of utilizing their resources in support of improving medical and mental health care at the Facilities, rather than allocating such resources to the risks and burdens of litigation.

E.    The Parties to this Agreement do not intend to create in any non-party the status
      of third party beneficiary. This Agreement shall not be construed so as to create a
      private right of action to any non-party against the State or the United States. The
      rights, duties and obligations contained in this Agreement shall bind only the
      Parties to this Agreement.

F.    In entering into this Agreement, the State does not admit any violations of the
      constitutional rights of inmates confined at the Facilities nor does it admit any
      violation of state or federal law. This Agreement may not be used as evidence of
      liability in any other legal proceeding. However, the State remains firmly
      committed to improving medical and mental health care at the Facilities.

G.    The Parties acknowledge that Correctional Medical Services ("CMS") currently
      provides medical and mental health care to inmates at the Facilities and that such
      care is provided pursuant to a contract with CMS that sets forth the terms and
      conditions of the relationship between the State and CMS. The State shall be
      responsible for ensuring that CMS (or any successor contractor) complies with
      the terms of this Agreement. Nothing in this paragraph shall abrogate the State's
      responsibility to comply fully with the terms of this Agreement.

H.    It is expressly understood and acknowledged that, while this Agreement makes no
      distinctions between those issues concerning inmate medical and mental health
      care that were previously modified and improved prior to the issuance of the
      findings letter and those that shall be modified and/or improved by virtue of the
      terms of this Agreement, the Parties acknowledge that a number of the policies
      and/or procedures which this Agreement addresses were implemented or in the
      process of being implemented prior to the issuance of the findings letter.

## II. DEFINITIONS

In this Agreement, the following definitions apply:

A.    "The Facilities" means Baylor, DCC, Howard Young, and Sussex, collectively, as
      well as any facility that is built to replace or supplement any one of them.

B.    "Effective date" means the date the Agreement is executed by the Parties.

C.    "Generally accepted professional standards" means those industry standards
      accepted by a significant majority of professionals in the relevant field, and
      reflected in the standards of care such as those published by the National
      Commission on Correctional Health Care (NCCHC). DOJ acknowledges that
      NCCHC has established different standards for jail and prison populations, and
      that the relevant standard that applies under this Agreement may differ for pre-
      trial and sentenced inmates. As used in this Agreement, the terms "adequate,"
      "appropriate," and "sufficient" refer to standards established by clinical

4

guidelines in the relevant field. The Parties shall consider clinical guidelines promulgated by professional organizations in assessing whether generally accepted professional standards have been met.

D.    "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

E.    "Inmates" means individuals sentenced to, incarcerated in, detained at, or otherwise confined at any of the Facilities.

F.    "Inmates with special needs" means inmates who are identified as suicidal, mentally ill, developmentally disabled, seriously or chronically ill, who are physically disabled, who have trouble performing activities of daily living, or who are a danger to themselves.

G.    "Isolation" means the placement of an inmate alone in a locked room or cell, except that it does not refer to adults single celled in general population.

H.    "Juveniles" means individuals detained at a facility who are under the age of eighteen (18).

I.    "Medical staff" means medical professionals, nursing staff, and certified medical assistants.

J.    "Medical professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services he or she has undertaken to provide.

K.    "Mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, psychiatric social work, activity therapy, recreational therapy or psychiatric nursing, currently licensed to the extent required by the State of Delaware to deliver those mental health services he or she has undertaken to provide.

L.    "Monitor" as used in this Agreement means the Monitor established by Section VII of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

M.    "Nursing staff" means registered nurses, licensed practical nurses, and licensed vocational nurses providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services they have undertaken to provide.

5

N.      "The Parties" means the State and the DOJ.

O.      "Security staff" means all employees, irrespective of job title, whose regular
        duties include the supervision of inmates at the Facilities.

P.      "The State" means officials of the State of Delaware, including officials of the
        Department of Correction and its Bureau of Prisons, and their successors,
        contractors and agents.

Q.      "Train," when the term is used in remedial provisions of this Agreement, means
        to adequately instruct in the skills addressed, including assessment of mastery of
        instructional material.

## III.    MEDICAL AND MENTAL HEALTH CARE

### GENERAL PROVISIONS

(1)     Standard  The State shall ensure that services to address the serious medical and mental
        health needs of all inmates meet generally accepted professional standards.

(2)     Policies and Procedures  The State shall develop and revise its policies and procedures
        including those involving intake, communicable disease screening, sick call, chronic
        disease management, acute care, infection control, infirmary care, and dental care to
        ensure that staff provide adequate ongoing care to inmates determined to need such care.
        Medical and mental health policies and procedures shall be readily available to relevant
        staff.

(3)     Record keeping  The State shall develop and implement a unitary record-keeping
        system to ensure adequate and timely documentation of assessments and treatment and
        adequate and timely access by medical and mental health care staff to documents that are
        relevant to the care and treatment of inmates. A unitary-record-keeping system consists
        of a system in which all clinically appropriate documents for the inmate's treatment are
        readily available to each clinician. The State shall maintain a unified medical and mental
        health file for each inmate and all medical records, including laboratory reports, shall be
        timely filed in the medical file. The medical records unit shall be adequately staffed to
        prevent significant lags in filing records in an inmate's medical record. The State shall
        maintain the medical records such that persons providing medical or mental health
        treatment may gain access to the record as needed. The medical record should be
        complete, and should include information from prior incarcerations. The State shall
        implement an adequate system for medical records management.

(4)     Medication and Laboratory Orders  The State shall develop and implement policies,
        procedures, and practices consistent with generally accepted professional standards to
        ensure timely responses to orders for medications and laboratory tests. Such policies,

6

procedures, and practices shall be periodically evaluated to ensure that delays in inmates' timely receipt of medications and laboratory tests are prevented.

### Staffing and Training

(5)  Job Descriptions and Licensure  The State shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. The State shall establish a credentialing program that meets generally accepted professional standards, such as those required for accreditation by the National Committee for Quality Assurance.

(6)  Staffing  The State shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide care for inmates' serious medical and mental health needs that meets generally accepted professional standards.

(7)  Medical and Mental Health Staff Management  The State shall ensure that a full-time medical director is responsible for the management of the medical program. The State shall also provide a director of nursing and adequate administrative medical and mental health management. In addition, the State shall ensure that a designated clinical director shall supervise inmates' mental health treatment at the Facilities.  These positions may be filled either by State employees, by independent contractors retained by the State, or pursuant to the State's contract with a correctional health care vendor.

(8)  Medical and Mental Health Staff Training  The State shall continue to ensure that all medical staff and mental health professionals are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of inmates with mental disorders.

(9)  Security Staff Training  The State shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of inmates with serious medical or mental health needs.  The State shall ensure that security staff assigned to mental health units receive additional training related to the proper supervision of inmates suffering from mental illness.

### Screening and Treatment

(10)  Medical Screening  The State shall ensure that all inmates receive an appropriate and timely medical screening by a medical staff member upon arrival at a facility. The State shall ensure that such screening enables staff to identify individuals with serious medical or mental health conditions, including acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol

7

withdrawal. Separate mental health screening shall be provided as described in Paragraph 34.

(11)  <u>Privacy</u>  The State shall make reasonable efforts to ensure inmate privacy when conducting medical and mental health screening, assessments, and treatment. However, maintaining inmate privacy shall be subject to legitimate security concerns and emergency situations.

(12)  <u>Health Assessments</u>  The State shall ensure that all inmates receive timely medical and mental health assessments. Upon intake, the State shall ensure that a medical professional identifies those persons who have chronic illness. Those persons with chronic illness shall receive a full health assessment between one (1) and seven (7) days of intake, depending on their physical condition. Persons without chronic illness should receive full health assessment within fourteen (14) days of intake. The State will ensure that inmates with chronic illnesses will be tracked in a standardized fashion. A re-admitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous twelve (12) months, and whose receiving screening shows no change in health status, need not receive a new full medical and mental health assessment. For such inmates, medical staff and mental health professionals shall review prior records and update tests and examinations as needed.

(13)  <u>Referrals for Specialty Care</u>  The State shall ensure that: a) inmates whose serious medical or mental health needs exceed the services available at their facility shall be referred in a timely manner to appropriate medical or mental health care professionals; b) the findings and recommendations of such professionals are tracked and documented in inmates' medical files; and c) treatment recommendations are followed as clinically indicated.

(14)  <u>Treatment or Accommodation Plans</u>  Inmates with special needs shall have special needs plans. For inmates with special needs who have been at the facility for thirty (30) days, this shall include appropriate discharge planning. The DOJ acknowledges that for sentenced inmates with special needs, such discharge planning shall be developed in relation to the anticipated date of release.

(15)  <u>Drug and Alcohol Withdrawal</u>  The State shall develop and implement appropriate written policies, protocols, and practices, consistent with standards of appropriate medical care, to identify, monitor, and treat inmates at risk for, or who are experiencing, drug or alcohol withdrawal. The State shall implement appropriate withdrawal and detoxification programs. Methadone maintenance programs shall be offered for pregnant inmates who were addicted to opiates and/or participating in a legitimate methadone maintenance program when they entered the Facilities.

8

(26)   <u>Medication Management</u>  The State shall develop and implement guidelines and controls regarding the access to, and storage of, medication as well as the safe and appropriate disposal of medication and medical waste.

## Emergency Care

(27)   <u>Access to Emergency Care</u>  The State shall train medical, mental health and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the State shall ensure that inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.

(28)   <u>First Responder Assistance</u>  The State shall train all security staff to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in an emergency situation.  The State shall provide all security staff with the necessary protective gear, including masks and gloves, to provide first line emergency response.

## Mental Health Care

(29)   <u>Treatment</u>  The State shall ensure that qualified mental health professionals provide timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to inmates requesting mental health services, inmates who become suicidal, and inmates who enter with serious mental health needs or develop serious mental health needs while incarcerated.

(30)   <u>Psychiatrist Staffing</u>  The State shall retain sufficient psychiatrists to enable the Facilities to address the serious mental health needs of all inmates with timely and appropriate mental health care consistent with generally accepted professional standards.  This shall include retaining appropriately licensed and qualified psychiatrists for a sufficient number of hours per week to see patients, prescribe and adequately monitor psychotropic medications, participate in the development of individualized treatment plans for inmates with serious mental health needs, review charts in the context of rendering appropriate mental health care, review and respond to the results of diagnostic and laboratory tests, and be familiar with and follow policies, procedures, and protocols.  The psychiatrist shall collaborate with the chief psychologist in mental health services management as well as clinical treatment, shall communicate problems and resource needs to the Warden and chief psychologist, and shall have medically appropriate autonomy for clinical decisions at the facility.  The psychiatrist shall supervise and oversee the treatment team.

(31)   <u>Administration of Mental Health Medications</u>  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that psychotropic medications are prescribed, distributed, and

11

monitored properly and safely and consistent with generally accepted professional standards. The State shall ensure that all psychotropic medications are administered by qualified medical professionals or other health care personnel qualified under Delaware state law to administer medications, who consistently implement adequate policies and procedures to monitor for adverse reactions and potential side effects and to adequately document the administration of such medications in the MARs. Documentation in the MARs shall include a clear and consistent indication of whether the inmate refused or otherwise missed any doses of medication, as well as doses consumed. As part of the quality assurance program set forth in Section V of this Agreement, a qualified medical professional or registered nurse supervisor shall review MARs on a regular and periodic basis to determine whether policies and procedures are being followed.

(32)    Mental Illness Training  The State shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a qualified mental health professional, registered psychiatric nurse, or other appropriately trained and qualified individual, and shall include instruction on how to recognize and respond to mental health emergencies.

(33)    Mental Health Screening  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional mental health care standards to ensure that all inmates receive an adequate initial mental health screening by appropriately trained staff within twenty-four (24) hours after intake. Such screening shall include an individual private (consistent with security limitations) interview of each incoming inmate, including whether the inmate has a history of mental illness, is currently receiving or has received psychotropic medications, has attempted suicide, or has suicidal propensities. Documentation of the screening shall be maintained in the appropriate medical record. Inmates who have been on psychotropic medications prior to intake will be assessed by a psychiatrist as to the need to continue those medications, in a timely manner, no later than 7-10 days after intake or sooner if clinically appropriate. These inmates shall remain on previously prescribed psychotropic medications pending psychiatrist assessment. Incoming inmates who are in need of emergency mental health services shall receive such care immediately after intake. Incoming inmates who require resumption of psychotropic medications shall be seen by a psychiatrist as soon as clinically appropriate.

(34)    Mental Health Assessment and Referral  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted professional standards to ensure timely and appropriate mental health assessments by qualified mental health professionals for those inmates whose mental health histories, or whose responses to initial screening questions, indicate a need for such an assessment. Such assessments shall occur within seventy-two (72) hours of the inmate's mental health screening or the identification of the need for such assessment, whichever is later. The State shall also ensure that inmates have access to a confidential self-referral system by which they may request mental health care without revealing the substance of their request to security

staff. Written requests for mental health services shall be forwarded to a qualified mental health professional and timely evaluated by him or her. The State shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with qualified mental health professionals.

(35) <u>Mental Health Treatment Plans</u> The State shall ensure that a qualified mental health professional prepares in a timely manner and regularly updates an individual mental health treatment plan for each inmate who requires mental health services. The State shall also ensure that the plan is timely and consistently implemented. Implementation of and any changes to the plan shall be documented in the inmate's medical/mental health record.

(36) <u>Crisis Services</u> The State shall ensure an adequate array of crisis services to appropriately manage psychiatric emergencies. Crisis services shall not be limited to administrative/disciplinary isolation or observation status. Inmates shall have access to appropriate in-patient psychiatric care when clinically appropriate.

(37) <u>Treatment for Seriously Mentally Ill Inmates</u> The State shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate space for treatment, adequate staff to provide treatment, and an adequate array of therapeutic programming. The State shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, in accordance with generally accepted correctional mental health care standards.

(38) <u>Review of Disciplinary Charges for Mental Illness Symptoms</u> The State shall ensure that disciplinary charges against inmates with serious mental illness who are placed in Isolation are reviewed by a qualified mental health professional to determine the extent to which the charge may have been related to serious mental illness, and to determine whether an inmate's serious mental illness should be considered by the State as a mitigating factor when punishment is imposed on inmates with a serious mental illness.

(39) <u>Procedures for Mentally Ill Inmates in Isolation or Observation Status</u> The State shall implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that all mentally ill inmates on the facility's mental health caseload and who are housed in Isolation receive timely and appropriate treatment, including completion and documentation of regular rounds in the Isolation units at least once per week by qualified mental health professionals in order to assess the serious mental health needs of those inmates. Inmates with serious mental illness who are placed in Isolation shall be evaluated by a qualified mental health professional within twenty-four hours and regularly thereafter to determine the inmate's mental health status, which shall include an assessment of the potential effect of the Isolation on the inmate's mental

13

B - 125

health. During these regular evaluations, the State shall evaluate whether continued Isolation is appropriate for that inmate, considering the assessment of the qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives. The State shall adequately document all admissions to, and discharges from, Isolation, including a review of treatment by a psychiatrist. The State shall provide adequate facilities for observation, with no more than two inmates per room.

(40)  Mental Health Services Logs and Documentation  The State shall ensure that the State maintains an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication(s) and dosages for inmates on psychotropic medications. In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.

## IV.  SUICIDE PREVENTION

(41)  Suicide Prevention Policy  The State shall review and, to the extent necessary, revise its suicide prevention policy to ensure that it includes the following provisions: 1) training; 2) intake screening/assessment; 3) communication; 4) housing; 5) observation; 6) intervention; and 7) mortality and morbidity review.

(42)  Suicide Prevention Training Curriculum  The State shall review and, to the extent necessary, revise its suicide prevention training curriculum, which shall include the following topics: 1) the suicide prevention policy as revised consistent with this Agreement; 2) why facility environments may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide attempts; 7) mock demonstrations regarding the proper response to a suicide attempt; and 8) the proper use of emergency equipment.

(43)  Staff Training  Within twelve months of the effective date of this Agreement, the State shall ensure that all existing and newly hired correctional, medical, and mental health staff receive an initial eight-hour training on suicide prevention curriculum described above. Following completion of the initial training, the State shall ensure that a minimum of two hours of refresher training on the curriculum are completed by all correctional care, medical, and mental health staff each year.

(44)  Intake Screening/Assessment  The State shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide. The screening process shall include inquiry regarding: 1) past suicidal ideation and/or attempts; 2) current ideation, threat, plan; 3) prior mental health treatment/hospitalization; 4) recent significant loss (job, relationship, death of family

14

member/close friend, etc.); 5) history of suicidal behavior by family member/close friend; 6) suicide risk during prior confinement in a state facility; and 7) arresting/transporting officer(s) belief that the inmate is currently at risk.

(45)  Mental Health Records  Upon admission, the State shall immediately request all pertinent mental health records regarding the inmate's prior hospitalization, court-ordered evaluations, medication, and other treatment.  DOJ acknowledges that the State's ability to obtain such records depends on the inmate's consent to the release of such records.

(46)  Identification of Inmates at Risk of Suicide  Inmates at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health personnel. Inmates at risk of suicide include those who are actively suicidal, either threatening or engaging in self-injurious behavior; inmates who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior; and inmates who deny suicidal ideation or do not threaten suicide, but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury.

(47)  Suicide Risk Assessment  The State shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 24 hours of the initiation of suicide precautions. The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history, level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record.

(48)  Communication  The State shall ensure that any staff member who places an inmate on suicide precautions shall document the initiation of the precautions, level of observation, housing location, and conditions of the precautions. The State shall develop and implement policies and procedures to ensure that the documentation described above is provided to mental health staff and that in-person contact is made with mental health staff to alert them of the placement of an inmate on suicide precautions. The State shall ensure that mental health staff thoroughly review an inmate's health care record for documentation of any prior suicidal behavior. The State shall promulgate a policy requiring mental health to utilize progress notes to document each interaction and/or assessment of a suicidal inmate. The decision to upgrade, downgrade, discharge, or maintain an inmate on suicide precautions shall be fully justified in each progress note. An inmate shall not be downgraded or discharged from suicide precautions until the responsible mental health staff has thoroughly reviewed the inmate's health care record, as well as conferred with correctional personnel regarding the inmate's stability. Multidisciplinary case management team meetings (to include facility officials and

15

available medical and mental health personnel) shall occur on a weekly basis to discuss the status of inmates on suicide precautions.

(49)    Housing  The State shall ensure that all inmates placed on suicide precautions are housed in suicide-resistant cells (i.e., cells without protrusions that would enable inmates to hang themselves). The location of the cells shall provide full visibility to staff. At the time of placement on suicide precautions, medical or mental health staff shall write orders setting forth the conditions of the observation, including but not limited to allowable clothing, property, and utensils, and orders addressing continuation of privileges, such as showers, telephone, visiting, recreation, etc., commensurate with the inmate's security level. Removal of an inmate's prison jumpsuit (excluding belts and shoelaces) and the use of any restraints shall be avoided whenever possible, and used only as a last resort when the inmate is engaging in self-destructive behavior. The Parties recognize that security and mental health staff are working towards the common goal of protecting inmates from self-injury and from harm inflicted by other inmates. Such orders must therefore take into account all relevant security concerns, which can include issues relating to the commingling of certain prison populations and the smuggling of contraband. Mental health staff shall give due consideration to such factors when setting forth the conditions of the observation, and any disputes over the privileges that are appropriate shall be resolved by the Warden or his or her designee. Scheduled court hearings shall not be cancelled because an inmate is on suicide precautions.

(50)    Observation  The State shall develop and implement policies and procedures pertaining to observation of suicidal inmates, whereby an inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior, or an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, shall be placed under close observation status and observed by staff at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). An inmate who is actively suicidal, either threatening or engaging in self-injurious behavior, shall be placed on constant observation status and observed by staff on a continuous, uninterrupted basis. Mental health staff shall assess and interact with (not just observe) inmates on suicide precautions on a daily basis.

(51)    "Step-Down Observation"  The State shall develop and implement a "step-down" level of observation whereby inmates on suicide precaution are released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions. The State shall ensure that all inmates discharged from suicide precautions continue to receive follow-up assessment in accordance with a treatment plan developed by a qualified mental health professional.

(52)    Intervention  The State shall develop and implement an intervention policy to ensure that all staff who come into contact with inmates are trained in standard first aid and

16

cardiopulmonary resuscitation; all staff who come into contact with inmates participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts; and shall ensure that an emergency response bag that includes appropriate equipment, including a first aid kit and emergency rescue tool, shall be in close proximity to all housing units. All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.

(53)    Mortality and Morbidity Review  The State shall develop and implement policies, procedures, and practices to ensure that a multidisciplinary review is established to review all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment). At a minimum, the review shall comprise an inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

## V.    QUALITY ASSURANCE

(54)    Policies and Procedures  The State shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this Agreement. These policies and procedures should include, at a minimum:  provisions requiring an annual quality management plan and annual evaluation; quantitative performance measurement with tools to be approved in advance by DOJ; tracking and trending of data; creation of a multidisciplinary team; morbidity and mortality reviews with self-critical analysis, and periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.

(55)    Corrective Action Plans  The State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

## VI.    IMPLEMENTATION

(56)    Revision of Activities and Documents  The State shall revise and/or develop as necessary its current policies, procedures, protocols, training, staffing and practices to ensure that they are consistent with, incorporate, address and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

17

(57)    <u>Dissemination of Agreement</u>  Within thirty (30) days of the effective date of this
        Agreement, the State shall distribute copies of the Agreement to all relevant staff,
        including all medical, mental health and security staff at the Facilities and explain it as
        appropriate.

(58)    <u>In Service Training</u>  Training academy staff shall develop, on an on-going basis, scripts
        for in service training directed at issues related to effective implementation of the
        Agreement.  In service training shall be provided regularly and shall be documented.  In
        service training scripts shall be provided to DOJ for its review in accordance with the
        time frames for compliance set forth below.

## VII.    MONITORING, ENFORCEMENT AND TERMINATION

(59)    <u>Termination</u>  This Agreement shall terminate three (3) years after its effective date.

(60)    <u>Satisfaction of the Agreement and Early Termination</u>  This Agreement may be
        terminated prior to the conclusion of the three (3) year period described in Paragraph 59
        if the State reaches substantial compliance with all provisions of this Agreement and
        sustains it for one (1) year. "Substantial Compliance" with each and every term of this
        Agreement for a period of one (1) year shall fully satisfy the Agreement.  Noncompliance
        with mere technicalities, or temporary failure to comply during a period of otherwise
        sustained compliance, shall not constitute failure to maintain substantial compliance.  At
        the same time, temporary compliance during a period of otherwise sustained
        noncompliance shall not constitute substantial compliance.  The State may submit a
        written request for early termination of the Agreement based upon an assertion of one (1)
        year of substantial compliance with all substantive paragraphs set forth in Sections III
        through VIII of this Agreement.  The DOJ, in its good faith discretion, will determine
        whether the State has maintained substantial compliance for the one (1) year period.

(61)    <u>Review and Approval</u>  All policies, procedures, plans and protocols required by, or
        referenced in, this Agreement shall be consistent with the substantive terms of this
        Agreement.  All policies, procedures, plans and protocols required by, or referenced in,
        this Agreement shall be submitted to the DOJ for its review and approval within sixty
        (60) calendar days after approval of the Action Plan described in Paragraph 65 of this
        Agreement.  Any such plans, policies, procedures and protocols for which this
        Agreement requires review and approval by DOJ shall be expeditiously reviewed by the
        DOJ.  The DOJ shall not unreasonably withhold any such approval.  Absent unforeseen
        circumstances beyond the Parties' control, if DOJ does not provide a written objection to
        said materials within sixty (60) days of receipt of same, the materials will be deemed
        approved by DOJ.

(62)    <u>State Response to DOJ Questions</u>  Within thirty (30) days of receipt of written questions
        from the DOJ concerning the State's compliance with this Agreement, the State shall

18

B - 130

provide the DOJ with written answers and any requested documents regarding the State's compliance with the requirements of this Agreement.

(63)    State Documentation of Compliance  The State shall maintain sufficient records to document its compliance with all of the requirements of this Agreement.  The State shall also maintain (so long as this Agreement remains in effect) any and all records required by or developed under this Agreement.

(64)    Implementation  The State shall implement policies, procedures, plans, and protocols consistent with the Action Plan referred to in Paragraph 65 of this Agreement.

(65)    Action Plan  Within one hundred and twenty (120) days after the effective date of this Agreement, the State shall prepare and submit to the DOJ a comprehensive action plan ("Action Plan") identifying the specific measures the State intends to take in order to bring the Facilities into compliance with each paragraph containing substantive requirements in Sections III through V of this Agreement ("Substantive Provisions"), including a timeline for completion of each of the measures.

(66)    Compliance Reporting  The State shall prepare and submit reports regarding compliance ("Compliance Reports") with each of the Substantive Provisions of this Agreement.  The State shall submit its first Compliance Report within ninety (90) days after submitting the Action Plan described in Paragraph 65 of this Agreement, and then every six (6) months. The Compliance Reports shall identify the State's progress in implementing the Action Plan, any revisions to the Action Plan, and shall include a summary of steps taken to implement this Agreement, along with supporting documentation and certifications. Upon achieving substantial compliance as determined by DOJ with any substantive paragraph(s) of this Agreement for one (1) year, no further reporting shall be required on that paragraph.

(67)    Selection of Monitor  Within ninety (90) days after entry of this Agreement, the State and DOJ shall together select a Monitor.  If the Parties are unable to agree on a Monitor, each Party shall submit two names of persons who have experience in corrections and who may have served as a correctional practices expert or monitor, or as a Federal, state, or county prosecutor or judge along with resumes or curricula vitae and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor from among the names of qualified persons submitted.  The selection of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement, and will not be governed by any formal or legal procurement requirements.

(68)    Limitations on Public Disclosures by Monitor  The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the State, its agents or employees.  The Monitor shall not issue statements or make findings with regard to any act or omission of the State, or their agents or representatives, except as required by the

19

B - 131

terms of this Agreement. The Monitor may testify in any case brought by any Party to this Agreement regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement.

(69)   Monitoring Resources  The Monitor, at any time, may associate such additional persons or entities as are reasonably necessary to perform the monitoring tasks specified by this Agreement. The Monitor shall notify in writing DOJ and the State if and when such additional persons or entities are selected for association by the Monitor. The notice shall identify and describe the qualifications of the person or entity to be associated and the monitoring task to be performed.

(70)   Monitor's Fees  The State shall bear all reasonable fees and costs of the Monitor. In selecting the Monitor, DOJ and the State recognize the importance of ensuring that the fees and costs borne by the State are reasonable, and accordingly fees and costs shall be one factor considered in selecting the Monitor. In the event that any dispute arises regarding the payment of the Monitor's fees and costs, the State, DOJ, and the Monitor shall attempt to resolve such dispute cooperatively.

(71)   Monitor's Duties and Responsibilities  The Monitor shall review and report on the State's implementation of, and assist with the State's compliance with, this Agreement. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or take over the role and duties of the State or the Commissioner of the Delaware Department of Corrections. The Monitor may testify in any action brought to enforce this Agreement regarding any matter relating to the implementation or enforcement of the Agreement. The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of the State, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

(72)   Technical Assistance by the Monitor  The Monitor shall offer the State technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

20

B - 132

(73)    Monitor's Access  The State shall provide the Monitor with full and unrestricted access to all of the Facilities, relevant State and facility staff and employees, and any documents (including databases) necessary to carry out the duties assigned to the State by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the State and either written consent by the State or a court order authorizing disclosure.

(74)    Monitor's Communication with the Parties  In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the State and DOJ. The Monitor shall be permitted to initiate and receive ex parte communications with the Parties and the Parties' consultants.

(75)    Compliance Monitoring  In order to monitor and report on the State's implementation of each substantive provision of this Agreement, the Monitor shall conduct periodic reviews as the Monitor deems appropriate, but no less than quarterly at each of the Facilities. The Monitor may make recommendations to the Parties regarding measures necessary to ensure full and timely implementation of this Agreement.

(76)    Compliance Coordinator  The Parties agree that the State shall hire and retain, or reassign a current State employee, for the duration of this Agreement, a Compliance Coordinator. The Compliance Coordinator shall serve as a liaison between the State, the Monitor and DOJ, and shall assist with the State's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate the State's compliance and implementation of activities required by this Agreement; (b) facilitate the provision of data, documents and other access to State employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; (d) assist in assigning compliance tasks to State personnel, as directed by the Commissioner of the Delaware Department of Corrections or his designee; take primary responsibility for collecting information to provide the State's status reports specified in paragraph 61.

(77)    DOJ Access  DOJ shall continue to have full and unrestricted access to all documents (including databases), staff, inmates and the Facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege or applicable self-evaluative privileges (e.g., 24 Del. C § 1768). Should the State decline to provide DOJ with access to a document based on attorney-client privilege, the State shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention and any protocols or analyses involving those subject areas. This Agreement does not authorize, nor shall it be construed to authorize, access to any State documents, except as expressly provided by

21

this Agreement, by persons or entities other than DOJ, the State, and the Monitor.    DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or the Monitor, absent written notice to the State and either written consent by the State or a court order authorizing disclosure. Throughout the duration of this Settlement Agreement, letters between counsel for the DOJ and counsel for the State shall be confidential and subject to the Confidentiality Agreement between the DOJ and the State entered into on May 3, 2006 and supplemented by the Non-Waiver Agreement dated September 28, 2006.

(78)    Timeliness of DOJ Review of Documents and Information    DOJ shall review documents and information provided by the State and the Monitor and shall provide its analysis and comments to the State and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

(79)    Monitor Reports    The Monitor shall issue semi-annual public reports detailing the State's compliance with and implementation of this Agreement. The first report shall issue six months from the effective date of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so.    At least ten business days prior to issuing a report, the Monitor shall provide a draft to the Parties for review and comment to determine if any factual errors have been made. The Monitor shall consider the Parties' responses and then promptly issue the report.

(80)    Noncompliance    If DOJ believes that the State has failed to substantially comply with any obligation under this Agreement, DOJ will,  prior to seeking judicial action to enforce the terms of this Agreement, give written notice of the failure to the State. The Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement within 15 days of the DOJ's written notice, the Parties shall submit the dispute to mediation. Michael Bromwich, Esq., shall serve as the mediator unless the Parties expressly agree to an alternative selection. The Parties shall split the cost of the mediator. The Parties shall attempt in good faith to mediate the dispute for a minimum of 30 days prior to initiating any court action.  DOJ commits to work in good faith with the State to avoid enforcement actions.  However, in case of an emergency posing an immediate threat to the health or safety of inmates, the DOJ may omit the notice and cure requirements herein (including the provision regarding mediation), before seeing judicial action. Non-action by the DOJ shall not constitute a waiver of the right to seek judicial action.

(81)    Successors    This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the State.

(82)    Defense of Agreement    The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the Parties shall seek to remove the matter to a federal court.

22

B - 134

(83)   <u>Enforcement</u>  Failure by either Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

(84)   <u>Non-Retaliation</u>  The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

(85)   <u>Severability</u>  In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

(86)   <u>Notice</u>  "Notice" under this Agreement shall be provided via overnight delivery and shall be provided to the Governor of the State of Delaware and to the Attorney General of the State of Delaware.

(87)   <u>Subheadings</u>  All subheadings in this Agreement are written for convenience of locating individual provisions.  If questions arise as to the meanings of individual provisions, the Parties shall follow the text of each provision.


For the DOJ:


/s/ Wan J. Kim
WAN J. KIM
Assistant Attorney General
Civil Rights Division


/s/ Shanetta Y. Cutlar
SHANETTA Y. CUTLAR
Chief
Special Litigation Section


/s/ Daniel H. Weiss
DANIEL H. WEISS
Deputy Chief


23


B - 135

/s/ Cathleen S. Trainor
CATHLEEN S. TRAINOR
LASHANDA BRANCH CHIRUNGA
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, D.C. 20530
(202) 514-6255

For the State of Delaware:


/s/ Carl C. Danberg                    /s/ Stanley W. Taylor, Jr.
CARL C. DANBERG                        STANLEY W. TAYLOR, Jr.
Attorney General of Delaware           Commissioner
                                       Delaware Department of Correction
                                       245 McKee Road
                                       Dover, DE  19904

                                       /s/ Michael R. Bromwich
                                       MICHAEL R. BROMWICH
                                       Fried, Frank, Harris, Shriver & Jacobson LLP
                                       1001 Pennsylvania Avenue, NW
                                       Washington, DC  20004


Dated:   December 29, 2006

24

B - 136

## CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, the undersigned counsel for Plaintiff in the above-captioned

case, hereby certify that the foregoing *Appendix to Plaintiff's Response to Defendant's*

*Opening Brief in Support of It's Motion for Summary Judgment* was filed via

CM/EMF on November 13, 2007 to the following:


Stephani J. Ballard
Department of Justice
Carvel State Office Building
820 N French St
Wilmington, DE 19801

Daniel L. McKenty
Heckler & Frabizzio, P.A.
800 Delaware Ave, Suite 200
P.O. Box 128
Wilmington, DE 19899


**MARTIN & WILSON, P.A.**                    **LAW OFFICES OF**
                                              **HERBERT G. FEUERHAKE**


**JEFFREY K. MARTIN, ESQ. (#2407)**    **HERBERT G. FEUERHAKE, ESQ. (#2590)**
**TIMOTHY J. WILSON, ESQ. (#4323)**    521 West St
1508 Pennsylvania Avenue               Wilmington, DE 19801
Wilmington, DE 19806                   herblaw@verizonmail.com
(302) 777-4681                         (302) 658-6101
jmartin@martinandwilson.com            *Attorney for Plaintiffs*
twilson@martinandwilson.com
*Attorneys for Plaintiffs*


DATED:        November 13, 2007

(16)    Pregnant Inmates  The State shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

(17)    Communicable and Infectious Disease Management  The State shall adequately maintain statistical information regarding contagious disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

(18)    Clinic Space and Equipment  The State shall ensure that all face-to-face nursing and physician examinations occur in settings that provide appropriate privacy and permit a proper clinical evaluation including an adequately-sized examination room that contains an examination table, an operable sink for hand-washing, adequate lighting, and adequate equipment, including an adequate microscope for diagnostic evaluations.  The State shall submit a comprehensive action plan as described in Paragraph 65 of this Agreement identifying the specific measures the State intends to take in order to bring the Facilities into compliance with this paragraph.

### Access to Care

(19)    Access to Medical and Mental Health Services  The State shall ensure that all inmates have adequate opportunity to request and receive medical and mental health care. Appropriate medical staff shall screen all written requests for medical and/or mental health care within twenty-four (24) hours of submission, and see patients within the next 72 hours, or sooner if medically appropriate.  The State shall maintain sufficient security staff to ensure that inmates requiring treatment are escorted in a timely manner to treatment areas.  The State shall develop and implement a sick call policy and procedure which includes an explanation of the order in which to schedule patients, a procedure for scheduling patients, where patients should be treated, the requirements for clinical evaluations, and the maintenance of a sick call log.  Treatment of inmates in response to a sick call slip should occur in a clinical setting.

(20)    Isolation Rounds  The State shall ensure that medical staff make daily sick call rounds in the isolation areas, and that nursing staff make rounds at least three times a week, to give inmates in isolation adequate opportunities to contact and discuss health and mental health concerns with medical staff and mental health professionals in a setting that affords as much privacy as security will allow.

(21)    Grievances  The State shall develop and implement a system to ensure that medical grievances are processed and addressed in a timely manner.  The State shall ensure that medical grievances and written responses thereto are included in inmates' files, and that grievances and their outcomes are logged, reviewed , and analyzed on a regular basis to identify systemic issues in need of redress.  The State shall develop and implement a

B - 121

procedure for discovering and addressing all systemic problems raised through the grievance system.

## Chronic Disease Care

(22)  Chronic Disease Management Program  The State shall develop and implement a written chronic care disease management program, consistent with generally accepted professional standards, which provides inmates suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care.  As part of this program, the State shall maintain a registry of inmates with chronic diseases.

(23)  Immunizations  The State shall make reasonable efforts to obtain immunization records for all juveniles who are detained at the Facilities for more than one (1) month.  The State shall ensure that medical staff update immunizations for such juveniles in accordance with nationally recognized guidelines and state school admission requirements.  The physicians who determine that the vaccination of a juvenile or adult inmate is medically inappropriate shall properly record such determination in the inmate's medical record.  The State shall develop policies and procedures to ensure that inmates for whom influenza, pneumonia and Hepatitis A and B vaccines are medically indicated are offered these vaccines.

## Medication

(24)  Medication Administration  The State shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of inmates.  The State shall ensure that inmates who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate.  The State shall develop and implement adequate policies and procedures for medication administration and adherence.  The State shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice.  The State's formulary shall not unduly restrict medications.  The State shall review its medication administration policies and procedures and make any appropriate revisions.  The State shall ensure that medication administration records ("MARs") are appropriately completed and maintained in each inmate's medical record.

(25)  Continuity of Medication  The State shall ensure that arriving inmates who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible, unless a medical professional determines such medication is inconsistent with generally accepted professional standards.  If the inmate's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct a face-to-face evaluation of the inmate as medically appropriate.

10

B - 122