# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;                )
TINA GROSSMAN as next friend of            )
BRITTANY BARKES; TINA                       )
GROSSMAN as next friend of                 )
ALEXANDRA BARKES; and                       )
KAREN BARKES as administratrix             )
of the ESTATE OF CHRISTOPHER               )
BARKES,                                     )          C. A. No. 06-104-JJF
                                            )
    Plaintiffs,                          )
                                            )
v.                                          )
                                            )
FIRST CORRECTIONAL MEDICAL                  )
INC.; STANLEY TAYLOR;                       )
RAPHAEL WILLIAMS;                           )
CERTAIN UNKNOWN INDIVIDUAL                   )
EMPLOYEES OF STATE OF                        )
DELAWARE DEPARTMENT OF                       )
CORRECTION; CERTAIN                         )
UNKNOWN INDIVIDUAL                          )
EMPLOYEES OF FIRST                          )
CORRECTIONAL MEDICAL, INC.,                 )
and STATE OF DELAWARE,                       )
DEPARTMENT OF CORRECTION,                    )
                                            )
    Defendants.                          )


## REPLY BRIEF IN SUPPORT OF
## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


DEPARTMENT OF JUSTICE
STATE OF DELAWARE


STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED: November 27, 2007    Attorney for State Defendants

# **TABLE OF CONTENTS**

Page

TABLE OF CITATIONS ................................................................................................ iii

ARGUMENT ................................................................................................................... 1

I.   SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE
DEFENDANTS AS TO COUNTS I, III, AND IV, AS PLAINTIFFS HAVE
ADDUCED NO EVIDENCE OF RECORD IN THIS CASE WHICH WOULD
CREATE A GENUINE ISSUE OF MATERIAL FACT AS TO PLAINTIFFS'
ALLEGATIONS OF EIGHTH AMENDMENT OR STATE LAW
VIOLATIONS IN CONNECTION WITH THE 2004 SUICIDE OF
CHRISTOPHER BARKES ............................................................................ 1

A.   Plaintiffs' attempts to rely on documents outside of the Rule 56 record in this
case is improper, and does not avoid summary judgment ................................ 1

1.   The "Affidavit" by Plaintiffs' own attorney, counsel of record in this case,
is not evidence, and counsel's complaints about the medical defendant's
conduct in this litigation are of no consequence to the moving State
Defendants' case for summary judgment .......................................................... 3

2.   A News Journal Article and USDOJ documents pertaining to a 2006
investigation of the State of Delaware's entire prison health system are not
part of the record in this case, were never produced in discovery, and are of no
consequence to this §1983 case based upon a 2004 suicide, or to the issues
before this Court on State Defendants' motion for summary judgment ........... 6

B.   Plaintiffs appear to have abandoned the claims in Count I of the Complaint that
State Defendants, Stanley Taylor and Raphael Williams, personally exhibited
deliberate indifference to a serious medical need of Christopher Barkes during his
brief incarceration at HRYCI.  Such a "direct liability" claim is based on the
named defendant being in custodial control of the inmate, and the Commissioner
and Warden clearly were not .......................................................................... 11

1.   Plaintiffs misrepresent the facts surrounding Barkes' November 13-14,
2004 intake and incarceration ................................................................... 12

C.   Plaintiffs fail to cite *any* evidence suggesting a genuine issue of fact as to the
claims in Count III that State Defendants, Stanley Taylor and Raphael Williams
are subject to liability on a "failure to train" or "maintenance of wrongful
practices and policies" theory in connection with the incarceration of Christopher
Barkes at HRYCI ........................................................................................... 13

i

1.  Plaintiffs have set forth no evidence in the record whatsoever which would create a genuine issue by which a jury could find any liability on State Defendants for wrongful training, practice or policy under the legal standard ...............................................................................................16

2.  Plaintiffs fail to address Defendants' argument that the "failure to train" and "wrongful practices and policies" claims are barred because these theories of municipal liability cannot be maintained against State officials, as a matter of law, by virtue of the Eleventh Amendment....18

D.  There is no legal basis or evidence of record to support Plaintiffs' state law claim in Count IV for "wrongful death" under 10 <u>Del.C.</u> §3724...............................19

II.   SUMMARY JUDGMENT MUST BE GRANTED AS TO THE STATE OF DELAWARE AND DEFENDANTS TAYLOR AND WILLIAMS IN THEIR OFFICIAL CAPACITIES, AS THEY ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT...............................................................19

CONCLUSION ...............................................................................................20

## TABLE OF CITATIONS

**Case Name**                                                                                           **Page**

Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409 (M.D. Pa. 1995) .2, 3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...................................................................1

Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988) .............................................................2, 3

City of Canton v. Harris, 489 U.S. 378 (1989) ...........................................................15, 16

Estelle v. Gamble, 429 U.S. 97 (1976) ......................................................................10, 14

Farmer v. Brennan, 511 U.S. 825 (1994)..........................................................................15

Hudson v. McMillian, 503 U.S. 1 (1992) .........................................................................14

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) ......................................................16

Littlejohn v. City of Philadelphia, 1993 WL 79600 (E.D.Pa. 1993)..................................17

Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................20

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978) .....18

Polk County v. Dodson, 454 U.S. 312 (1981) ...................................................................12

Rhodes v. Chapman, 452 U.S. 337 (1981) ........................................................................14

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) .................................................11, 12

Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989) ............................................................15

Schoch v. First Fidelity Bancorp., 912 F.2d 654 (3d Cir. 1990)..............................2, 7, 11

Trans Sport Inc. v. Starter Sportswear, Inc., 964 F.2d 186 (2d Cir. 1992) .......................18

Wilson v. Seiter, 501 U.S. 294 (1991)..............................................................................14

Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005)....................11, 15, 16, 17

**Statutes, Rules and Other Authorities**

United States Constitution, Eighth Amendment ............................................................ *passim*

United States Constitution, Eleventh Amendment ...................................................18, 19

28 U.S.C. §1367(c)(3)...................................................................................19

42 U.S.C. §1983.......................................................................................... *passim*

10 Del. C. §3724 .........................................................................................19

10 Del.C. §4001 ..........................................................................................19

Federal Rule of Civil Procedure 26(a)(2) ........................................................11

Federal Rule of Civil Procedure 26(b)(4) ........................................................11

Federal Rule of Civil Procedure 56...................................................1, 2, 4, 6

Federal Rule of Civil Procedure 56(c) ......................................................1, 20

Federal Rule of Civil Procedure 56(e) .....................................................1, 4, 7

Federal Rule of Evidence 407 ...........................................................................9

Federal Rule of Evidence 702 .........................................................................16

Delaware Lawyers' Rule of Professional Conduct 3.7 .....................................4

<u>**ARGUMENT**</u>

**I. <u>SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE DEFENDANTS AS TO COUNTS I, III, AND IV, AS PLAINTIFFS HAVE ADDUCED NO EVIDENCE OF RECORD IN THIS CASE WHICH WOULD CREATE A GENUINE ISSUE OF MATERIAL FACT AS TO PLAINTIFFS' ALLEGATIONS OF EIGHTH AMENDMENT OR STATE LAW VIOLATIONS IN CONNECTION WITH THE 2004 SUICIDE OF CHRISTOPHER BARKES.</u>**

As discussed at length in the opening brief, State Defendants' Motion for Summary Judgment is governed by Federal Rule of Civil Procedure 56(c), which provides that the moving party is entitled to summary judgment and judgment shall be entered forthwith, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (moving party's burden met by showing absence of evidence necessary to support Plaintiffs' case). State Defendants made this showing in their Opening Brief in this matter. In response to a motion for summary judgment, the burden shifts to the non-moving party (Plaintiffs here), who "*must set forth specific fact*s [from the record as defined in Rule 56(c)] that indicate [there is] a genuine material issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). Plaintiffs' have failed to adduce any actual evidence in this case which would support their allegations.

### A. Plaintiffs' attempts to rely on documents outside of the Rule 56 record in this case is improper, and does not avoid summary judgment.

Just as the moving party on a motion for summary judgment must demonstrate from the record that there is no genuine issue of material fact, the non-moving party, in response to a motion for summary judgment, must, pursuant to Rule 56(e), point to specific facts *in the record* of the case, to demonstrate that summary judgment is not appropriate. Rule 56 itself

defines the record for purposes of summary judgment as "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." It is Plaintiffs' burden in this case to point the Court to specific parts *of the record* which support their case. It is not sufficient for Plaintiffs, as they do here, to refer to documents which do not fall within the parameters of the Rule 56 record; which have never been produced in discovery; which were created after the events in question by non-parties for unrelated purposes, and which have not been relied upon or opined upon by any witness to the case. "Allowing the non-moving party to rely on . . . unidentified evidence provides an unworkable and illogical approach contravening the directive of Rule 56. . . ." Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409, 412 (M.D. Pa. 1995)(citing Childers v. Joseph, 842 F.2d 689 (3d Cir.1988). Nor is this Court required to sift through the actual record for evidence which might support the Plaintiffs' case. Id. In Childers, the Third Circuit explained that if the non-moving party bears the ultimate burden of proof on the underlying allegations (Eighth Amendment claims here), it "must *by affidavits or by the depositions and admissions on file* make a showing sufficient to establish the existence of [every] element essential to that party's case." 842 F.2d at 694 (emphasis added). Similarly, in Schoch v. First Fidelity Bancorp., 912 F.2d 654, 657 (3d Cir. 1990), the Third Circuit held that the moving party in a summary judgment proceeding is entitled "to demand at least one sworn averment of [each essential] fact before the lengthy process of litigation continues."

Plaintiffs' Answering Brief is replete with references to non-record documents, counsel's opinions, and mere hypotheses—none of which constitute proper rebuttal evidence under Rule 56—and is entirely void of reference to any affidavits of fact witnesses, sworn averments, or actual facts of record which could create a genuine issue of material fact for a

2

jury.  Notably, the Court in <u>Boykin</u> (relying on the Third Circuit in <u>Childers</u>) held that the

failure to produce competent record evidence in rebuttal of summary judgment actually

resulted in the non-moving party's adoption of the facts as set forth by the moving party.  The

parallels between the Boykin summary judgment response and the response in the instant

case are striking:

> the Boykins' statement of material facts is largely unresponsive to [the moving party's] statement, provides additional irrelevant information, and routinely fails to provide any citation to the record for any of the facts they do allege. Moreover, the Boykins do not provide affirmative evidence to support their contentions. The Boykins' response is filled with unsupported speculation and hearsay. As a result, the Boykins should be deemed to have admitted all of [the moving party's] material facts. To adopt any other approach places an undue burden on the Court and defense counsel to examine each page of the Boykins' documentation in order to determine whether the Boykins have created any dispute as to any material facts. This function and duty is one which the Boykins' counsel is obligated to fulfill.

893 F.Supp. at 412; see also <u>Childers</u>, 842 F.2d at 694-95.

> **1. The "Affidavit" by Plaintiffs' own attorney, counsel of record in this case, is not evidence, and counsel's complaints about the medical defendant's conduct in this litigation are of no consequence to the moving State Defendants' case for summary judgment.**

Perhaps the most unusual aspect of Plaintiffs' Answering Brief and Appendix is their

attempted reliance on an "affidavit" created by Plaintiffs' own attorney[1] in this case.  (B-1-5).

Attorney Martin's affidavit focuses primarily on two issues—the failure of the defendant

medical provider, FCM, to meaningfully participate in the litigation, and an alleged question

over which slightly modified version of the DOC's suicide prevention policy was in effect in

---

[1]  While the "Affidavit" of Jeffrey K. Martin, Esquire states that he is "co-counsel" for the Plaintiffs in this case (B-1), the Court's docket and prior filings in this case show that Mr. Martin has been the *only* counsel of record since the inception of the case.  His inclusion of another attorney, Herbert G. Feuerhake, Esq., on the signature pages of the response to summary judgment, does not confer counsel of record status on that attorney.

November 2004--neither of which bear upon the Rule 56 issues before this Court, or constitute competent rebuttal evidence to State Defendants' motion for summary judgment.

As a preliminary matter, an "affidavit" from counsel of record in a case is not an affidavit which is properly considered under FRCP 56(e). That Rule requires that affidavits submitted by parties in summary judgment proceedings must be based upon "personal knowledge" and "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e). Ultimately, the affidavits must set forth "specific facts showing that there is a genuine issue for trial." The affidavit of Plaintiffs' counsel, Mr. Martin, fails on all of these essential levels. Obviously Mr. Martin's complaints about the conduct of litigation by a non-moving co-defendant, and his argument over the production of various documents in discovery, are not facts which would be "admissible in evidence" to a jury. They are actually not "facts" at all—simply legal argument. Moreover, and more importantly, Mr. Martin, as counsel of record is clearly not permitted to testify as a fact witness in the same case in which he represents a party. Delaware Lawyer's Rule of Professional Conduct, 3.7. Finally, none of the "facts" averred in counsel's affidavit advance the issue of whether there is a genuine issue of material fact as to the liability, if any, of Commissioner Taylor and Warden Williams, on Plaintiffs' §1983 Eighth Amendment claims.

Despite the plain inadmissibility of the affidavit, it will be briefly addressed herein. First, Plaintiffs' counsel's complaints about the (lack of) participation by co-defendant FCM in this litigation is of no consequence whatsoever to the State Defendants' motion for summary judgment. FCM is an independent defendant. Its actions or inactions are not binding on or attributable to the moving State Defendants (who diligently litigated this case

throughout discovery).  Further, FCM is not moving for summary judgment.  Plaintiffs retain

whatever rights they have to prosecute the case against FCM, independent of the viability of

their claims against the State Defendants.  It should also be noted that, while Plaintiffs'

counsel now claims prejudice due to FCM's conduct, this issue was never brought to the

Court's attention for relief at any time in the 1 year and 9 months since the inception of this

litigation.  Only now, on the eve of summary judgment, do Plaintiffs claim that this is a

material issue.

Nor does the second issue raised in Plaintiffs' attorney's affidavit affect the outcome

of this summary judgment proceeding.  Plaintiffs, in the brief, misleadingly suggest that State

Defendants' did not produce the applicable DOC Suicide Prevention Policy to Plaintiffs

"despite three specific requests [unidentified] for this documentation."  (Ans. Brf. at 2).  This

allegation in the brief is contradicted by counsel's own affidavit, which notes that State

Defendants produced SOP 190.04 as Bates numbered documents D00461-464 (pages

attached as Exhibit A hereto).  A review of State Defendants Appendix, which does contain

material from the record, shows that State Defendants produced SOP 190.04 as early as

March 9, 2007, in response to Plaintiffs initial discovery requests.  (A000101).  Plaintiffs'

counsel, in the "affidavit," admits that he never contacted State Defendants about this

document for almost 5 months[2], at which time another copy was requested, even though the

document had already been produced in March.  While it is correct that there are two slightly

---

[2]  Plaintiffs' counsel sets forth a litany of personal problems which occurred during the transfer of his law
practice from one firm to another (B-4), none of which are State Defendants' concern or within State
Defendants' control.  Plaintiff also complains than his *ex parte* conversation with the Commissioner of
Department of Correction (a represented party) about the case did not produce the results he had hoped for in
terms of attempting settlement.  (B-4).

different versions of SOP 190.04 in the discovery production[3], this is of no consequence to whether summary judgment should be granted in this case.  This is because, as discussed further herein, and at length in the opening brief, Plaintiffs' have not adduced a scintilla of evidence supporting their claims that State Defendants exhibited deliberate indifference to (or that DOC had) a deficient suicide prevention policy causally resulting in Barkes' death. Plaintiffs never identified any expert witnesses (or, indeed, any witnesses at all) to opine on DOC's policies.  Thus, no matter which version of the policy was in effect in November 2004, there is no evidence whatsoever in the record that any version of SOP 190.04 was deficient in any way or that an alternative policy or practice would have averted the suicide in this case.

> **2.  A News Journal Article and USDOJ documents pertaining to a 2006 investigation of the State of Delaware's entire prison health system are not part of the record in this case, were never produced in discovery, and are of no consequence to this §1983 case based upon a 2004 suicide, or to the issues before this Court on State Defendants' motion for summary judgment.**

Plaintiffs' counsel includes in the Appendix, and argues at length in the Answering Brief about, a series of documents which are not part of the record in this case, and have had no role in this case as it proceeded through discovery.  These non-record documents, in fact, comprise more than 80% of the pages of Plaintiffs' Appendix.  (B 21- 29; 34-136).  Needless to say, Plaintiffs' cannot rely on such non-record, non-evidentiary documents in an attempt to create issues of fact in response to State Defendants' Rule 56 motion.  A brief discussion about these documents is in order here.

---

3  A review of the version produced at D00461-464 (Exhibit A) and the version produced at D00514-517 (A000157- 16), show only the following variations:  the second version removed item "III, A. Training", and contains the notation "Revised : May 1, 2005" at the end of the document.  Thus, it appears the version which contained the "Training" section (D00461-464) was the pre-revised version, in effect at the time of Barkes death, as it does not contain the 2005 "revised" notation.

First, Plaintiffs present a News Journal article (actually an internet printout of what appears to be the article), which purports to be a list of Delaware inmates who died in [DOC] custody—from all causes—between 2000 and April 2005.[4]  Inadmissibility aside, the only possible relevance of this newspaper article is that it lists Christopher Barkes as an inmate whose manner of death was "suicide—hanging," a completely undisputed fact in this case. (B-23).  While Plaintiffs counsel attempts, through argument alone, to extrapolate some significance from the deaths of other inmates over this 5 year period, these arguments amount to nothing more than speculation and surmise, which are meaningless without an expert opinion to interpret and opine upon these statistics.[5]  "It is clear enough that unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." Schoch, *supra*, 912 F.2d at 657.

The remainder of the voluminous non-record documents with which Plaintiffs attempt to save their case suffer from an even greater lack of relevance and materiality than does the newspaper article described above.  Plaintiffs include the following documents--*none of which are in evidence in this case*--in their Appendix:

- August 2005 "Special Report" from Federal Bureau of Justice re: statistics on suicide and homicide deaths in prisons nationwide.  (B-34-45)

- December 29, 2006 "Findings Letter" from USDOJ pertaining to a 2006 investigation of healthcare conditions in general at five DOC facilities, including HRYCI.  (B-46-65)

- December 19, 2006, "Memorandum of Agreement" (MOA) between State of

---

4  In their Statement of Facts, Plaintiffs represent that pages B-21-29 (the newspaper article) is a DHSS report, while the article clearly states that its "source" is DHSS.

5  Notably, Plaintiffs' counsel's own "list" of prior suicides shows that Barkes was the first suicide by hanging at HRYCI in more than 3 ½ years—hardly evidencing an epidemic of "deliberate indifference" as Plaintiffs argue.  (Ans. Brf. at 10).

Delaware and USDOJ re: investigation and USDOJ Findings Letter.  (B-113-136).

- April 30, 2007 DOC "Action Plan" report, in response to USDOJ findings. (B-66-112).

Although the Court need not, and should not, review these non-record documents, counsel for State Defendants can represent that none of the listed documents contain any reference to Christopher Barkes individually.

As stated above, these documents were never produced, or utilized in any way, during discovery.  Early in discovery, Plaintiffs produced more than 800 pages of documents in response to requests for production (P001-839).  These documents (almost all of which were medical records) did not contain *any* of the USDOJ materials noted above (not that this would guarantee their admissibility in any event).  Further, Plaintiffs never indicated that they intended to rely on USDOJ material to support their case (again, putting aside whether they could properly do so).  In Plaintiffs' Responses to State Defendants Interrogatories, Plaintiffs were asked to identify, *inter alia*, all documents in support of their contentions of violations of Barkes' clearly established constitutional rights.  (A00076).  Plaintiffs did not identify, or refer in any way to, the USDOJ documents or issues addressed therein.  Id. While Plaintiffs did say that "further discovery [was] needed," the remainder of the discovery period elapsed with no reference to the USDOJ documents.

In addition to the improper attempt to insert extraneous documents into the record, the USDOJ documents would be inadmissible at trial, and are of no relevance to the factual and legal issues presented in Plaintiff's complaint.  The State made no admissions of liability in connection with the 2006-2007 USDOJ proceedings, and the USDOJ documents themselves provide that they are inadmissible in litigation.  The "Memorandum of

Agreement," executed simultaneously with the "Findings Letter," provides that it "shall not be construed so as to create a private right of action to any non-party against the State . . . .In entering into this Agreement, *the State does not admit any violations of the constitutional rights of inmates* confined at the Facilities nor does it admit any violation of state or federal law. *This Agreement may not be used as evidence of liability in any other legal proceeding*." (B-116, emphasis added)[6].

The USDOJ documents are also clearly inadmissible due to the fact that they were created in 2006 and 2007, and thus post-date the 2004 suicide in this case by several years. Plaintiffs Answering Brief elides over this critical fact by not mentioning the time frame of the USDOJ investigation in the Statement of Facts. (Ans. Brf. at 11). The first page of the "findings letter" clearly states that DOC was first placed on notice of the federal investigation in March 2006. (B-46). Given the timing of the investigation, the USDOJ documents clearly could not be used as evidence to show knowledge on the part of the State Defendants as to alleged problems (if any) with suicide prevention protocols at HRYCI in November 2004. Obviously Commissioner Taylor and Warden Williams could not have been aware of the 2006 USDOJ findings in 2004. Also, any changes to DOC's suicide prevention protocols noted in the 2007 "Action Plan" would be inadmissible as evidence of liability in any event, as they would constitute a subsequent remedial measure. F.R.E. 407.

The USDOJ documents also would be inadmissible due to the fact that they do not advance the particular facts or issues of the instant case in any way. Even if one were to accept Plaintiffs' counsel's arguments about alleged deficiencies in HRYCI's suicide prevention protocols (and putting aside the issue of FCM's screening responsibilities), the

---

6  The 2007 "Action Plan" was created in accordance with and with reference to the MOA. (B-67).

mere fact that generalized findings were made pertaining to DOC practices does not equate to a finding that, *in this case*, the decedent's constitutional rights were violated. In other words, even if there was evidence in this case of systemic problems at DOC (of which there is none in the record), that is not the same as evidence—essential to Plaintiffs' burden of proof—that constitutional violations—deliberate indifference to Mr. Barkes obvious medical needs— occurred here. To hold otherwise would be to impose a strict liability standard which is antithetical to the fact-specific, defendant-specific, inquiry necessary to consideration of §1983 liability for a public official. *See* Estelle v. Gamble, 429 U.S. 97, 104 (1976).

Finally, as a matter of law, Plaintiffs' case fails because of the utter lack of any expert evidence as to decedent's medical condition at the time he was incarcerated (forseeability of the risk) and as to the adequacy of the suicide prevention policies and procedures in place at the time of the suicide. Even if the USDOJ documents were properly in the case, there is nothing in discovery applying or interpreting them with reference to this case. There is no evidence that even if any of the USDOJ recommended changes had been made in 2004 that *this suicide* would have been prevented. This is particularly true in light of the undisputed affidavits of five correctional officers who observed Barkes throughout his less than 24-hour incarceration that at no time did he display any unusual behavior or warning signs. (A0001- 00010). Plaintiffs' counsel—apparently purporting to serve as his own expert witness-- makes the bare assertion, based upon the non-evidentiary 2006 USDOJ documents, that "[t]he system in place at HRYCI during . . . Christopher Barkes' [2004] incarceration was a broken system." (Ans. Brf. at 32). Simply put, Plaintiffs cannot maintain this case, or demonstrate a genuine issue of material fact as to any of their Eighth Amendment claims without competent expert opinion(s), identified in discovery in compliance with Rule

26(a)(2).  *See* <u>Schoch</u>, *supra*.  Plaintiffs also cannot, as it appears is their intent, rely upon the non-record, non-case specific, ex-post facto findings of the USDOJ in lieu of competent expert testimony[7], in an effort to avoid summary judgment.

     **B.**    **Plaintiffs appear to have abandoned the claims in Count I of the Complaint that State Defendants, Stanley Taylor and Raphael Williams, personally exhibited deliberate indifference to a serious medical need of Christopher Barkes during his brief incarceration at HRYCI. Such a "direct liability" claim is based on the named defendant being in custodial control of the inmate, and the Commissioner and Warden clearly were not.**

As discussed in the Opening Brief, Count I of the Plaintiffs' Complaint is an allegation that the State Defendants—Commissioner Taylor and Warden Williams--violated Christopher Barkes' Eighth Amendment rights by exhibiting "deliberate indifference" to his alleged serious medical needs.  It is well-settled that liability under §1983 requires *personal involvement* on the part of the individual defendant in the alleged constitutional tort for the claim to even proceed.  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).  Thus, for Taylor or Williams to be liable under Count I, there would have to be evidence that *they personally* knew of and disregarded Mr. Barkes serious medical needs on November 13-14, 2004.  Third Circuit notes, *inter alia,* that *the custodial officers* must have or should have known of the inmate's particular vulnerability to suicide, and acted with reckless indifference to the known risk.  <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 319 (2005).

In the Opening Brief, State Defendants demonstrated that there was no evidence whatsoever that Defendants Stan Taylor, the Commissioner of DOC and Raphael Williams, the Warden of the entire HRYCI institution, had any personal involvement in the events

---

7  Expert testimony must be presented through a qualified witness, with particularized disclosures required to be provided to the opposing party during discovery, pursuant to FRCP 26(a)(2), (b)(4).  Of course, this did not occur in the instant case, as Plaintiffs never identified any experts.

surrounding Barkes' incarceration or suicide on November 14, 2004.  In short, they were not, in any sense of the word, "custodial officers."  In their Answering Brief, Plaintiffs appear to concede this factor, and abandon their "direct liability" claims against Taylor and Williams under Count I, as the "argument" portion of the brief addresses only the "policies and procedures" (Count III) and the State law wrongful death (Count IV) claims.  (Ans. Brf. at 18-34).  Plaintiffs point to nothing in the record which would suggest any facts supporting direct or "custodial" liability on the part of Taylor and Williams.[8]  Finally, of course, §1983 liability cannot be predicated on a theory of *respondeat superior*. Rode, 845 F.2d at 1207; Polk County v. Dodson, 454 U.S. 312, 325 (1981).

While Plaintiffs did not name any custodial officers as defendants in this case, State Defendants nonetheless demonstrated, in the Opening Brief, that there was no evidence in the record which should have led any DOC employee to suspect that Barkes was a suicide risk on November 13-14, 2004.  (See Op. Brf. at 19-21; A-001-0010).  State Defendants are entitled to summary judgment as to Count I.

### 1. Plaintiffs misrepresent the facts surrounding Barkes' November 13-14, 2004 intake and incarceration.

It should be noted that Plaintiffs' Answering Brief  is replete with misrepresentations of facts concerning Barkes intake and incarceration.  Plaintiffs state that "DOC" reviewed the "Mental Health Screening" form, when the document (an FCM form) was clearly completed by "Medical Staff."  (Ans. Brf. at 30; A000147).  They state that "DOC personnel" knew of Barkes' prior suicide and mental health history by citing an email that was created *after* the suicide, which simply summarized the FCM intake documents.  (Ans. Brf. at 30; A000154).

---

8  *See* Ans. Brf. at 27, noting distinction between "on the scene" liability and "policy" liability.  However,

With no factual basis, Plaintiffs argue that the FCM nurse was not properly supervised in violation of a Delaware licensing law that is of no relevance to this case. (Ans. Brf. at 31). Plaintiffs claim that Barkes' history of drug and alcohol problems was "known to the DOC" due to his 1997 prior incarceration, when there is no evidence that this was known to any correctional officer when Barkes reported as a (domestic) VOP on November 13, 2004 and when, in fact, it appears that Barkes denied having a history of drug or alcohol abuse on the "Standard Intake Screening Form." (Ans. Brf. at 31; A000145). Plaintiffs falsely claim that a September 2004 suicide attempt at Wilmington Hospital took place "under the supervision" of "his" DOC probation officer. (Ans. Brf. at 31). The only evidence in the record on this issue came from Karen Barkes, who testified that Barkes was taken to the Hospital in September 2004 by *someone else's* probation officer due to high alcohol content. (A00021). Mrs. Barkes admitted she had no personal knowledge of who, if anyone, was in the hospital room with Barkes when he attempted suicide. (A00022). She also testified that Barkes had just been assigned a brand new probation officer in November 2004. (A000016). There is no evidence that either probation officer was at HRYCI on November 13-14, 2004, such that they could have conveyed whatever information they knew. In short, the "probation officer" issue is a red herring. The factual record, as discussed in the Opening Brief, contains no evidence that any DOC employee could have foreseen this suicide.

C.    **Plaintiffs fail to cite *any* evidence demonstrating a genuine issue of fact as to the claims in Count III that State Defendants, Stanley Taylor and Raphael Williams are subject to liability on a "failure to train" or "maintenance of wrongful practices and policies" theory in connection with the incarceration of Christopher Barkes at HRYCI.**

Plaintiffs' legal argument on the Count III "policies and practices" claim is somewhat

---

Plaintiffs do erroneously conflate the legal standards for these two types of claims, as discussed further below.

confusing. Plaintiffs first discuss the leading case on the "direct liability" type of claim, alleging deliberate indifference to medical needs, <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). (Ans. Brf. at 18-19). <u>Estelle</u>'s standards do not govern "policy and practice" claims, however. Plaintiffs next discuss inapposite "conditions of confinement" cases, such as <u>Rhodes v. Chapman</u>, 452 U.S. 337 (1981)(considering a challenge to "double celling" prison conditions) and <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991)(challenging various conditions such as overcrowding, noise and sanitation). Plaintiffs' reliance on these cases (and concurrences and dissents therein) is puzzling, as there is no dispute that "medical care" Eighth Amendment claims are squarely governed by <u>Estelle</u>, and the prison conditions cases did no more than extend the same standards of liability (deliberate indifference) to Eighth Amendment claims concerning other prison conditions. The Supreme Court in <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992) explained that "[w]ith respect to the objective component of an Eighth Amendment violation, <u>Wilson</u> announced no new rule. Instead that decision suggested a relationship between the requirements applicable to different types of Eighth Amendment claims." However, Plaintiffs again overlook the key point that "policy and practice" claims are governed by a different set of legal standards than either direct medical care or "conditions of confinement" cases.

It appears that Plaintiffs are attempting to conflate the legal standards for direct liability/ "custodial" deliberate indifference with the entirely different standards governing "policy and practice" claims. *See* Ans. Brf. at 24-25 (arguing that Defendants Taylor and Williams "are responsible for a *policy that created a substantial risk of serious [harm]* to all

suicidal inmates[9] . . . ").  What plaintiffs term the "substantial risk" test (actually "excessive risk") is the standard for custodial liability set forth in Farmer v. Brennan, 511 U.S. 825, 837-38 (1994), wherein the Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement *unless the official[subjectively] knows of and disregards an excessive risk to inmate health or safety. . . ."  *See* Opening Brief at pp.14-15.

By contrast, claims based upon allegedly deficient policies and practices and/or "failure to train" are an entirely different genre of claims that may be brought against policymaking officials in accordance with the Woloszyn test established by the Third Circuit (based upon the U.S. Supreme Court's holding in City of Canton v. Harris, 489 U.S. 378 (1989)), and discussed in detail in State Defendants' opening brief.  Plaintiffs cite the Third Circuit "policy/practice" test for liability in Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989), which also arose from City of Canton, and is essentially the same test set forth in Woloszyn.[10]  Woloszyn is directly on point with the instant case, as it specifically applied the test to a claim of liability for failure to adequately train correctional officers in suicide prevention—the same claim made by Plaintiffs here in Count III.  The Woloszyn test bears repeating: in a §1983 prison suicide case alleging deliberate implementation of

---

9  Plaintiffs' argument also presupposes that Christopher Barkes should have been obviously identified as "suicidal"—of which there is no evidence in the record (*see* Defs. Appx. A-001-0010).  Plaintiffs do not identify any record or expert evidence which would create a genuine issue of material fact as to this question.  Plaintiffs' argument amounts to no more than a *res ipsa* type of claim that there must have been deliberate indifference simply because Barkes was able to successfully take his life in prison.  The regrettable fact that a suicide took place is not sufficient to create a genuine issue of fact under 42 U.S.C.A. §1983.

10  Sample found that for judgment to attach to a government policymaker, the plaintiff must show:
  1) The existing custom and practice without the (plaintiff-identified) specific alternative or additional practice created an unreasonable risk of harm;
  2) the policymaker was aware of the unreasonable risk;
  3) the policymaker was indifferent to the unreasonable risk, and
  4) constitutionally significant harm resulted from the deficient policy or practice.

unconstitutional policies or failure to train, the plaintiff's burden is to:

> (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred and,
> (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide [the specific training established in (1)] can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

396 F.3d at Id at 325 (*citing* City of Canton v. Harris, 489 U.S. 378, 389-90 (1989)).

### 1. Plaintiffs have set forth no evidence in the record whatsoever which would create a genuine issue by which a jury could find any liability on State Defendants for wrongful training, practice or policy under the legal standard.

State Defendants moved for summary judgment on the Count III claims, noting that Plaintiffs had adduced no evidence whatsoever during discovery which would support a claim that DOC's suicide prevention training and policies were constitutionally deficient in any way. In their Answering Brief, Plaintiffs have not responded with any evidence of record (only unsupported arguments of counsel based on the non-evidentiary USDOJ documents) which would create a genuine issue of fact on this claim, and thereby avoid summary judgment. Plaintiffs fail to meet their burden of proof on every aspect of the Woloszyn test.

First and foremost, Plaintiffs did not "identify [other] specific training not provided that could reasonably be expected to prevent the suicide that occurred." Woloszyn, *supra* at 325. As discussed in the opening brief, the questions surrounding the adequacy of a suicide prevention policy or training in the prison environment are not issues within the purview of the untrained layman. They are questions which can only be answered with the assistance of testimony from a witness with experience and expertise in these specialized psychiatric and penalogical areas. *See* Federal Rule of Evidence 702; Kumho Tire Co. v. Carmichael, 526

16

U.S. 137, 148-49 (1999). Indeed, in the <u>Woloszyn</u> case itself, the plaintiffs proffered opinions as to the adequacy of the county's training practices from a professor of criminology, although this did not save their claims from summary judgment based upon the facts of the case. 396 F.2d at 325-26.

Further, and importantly, Plaintiffs in the instant case never even established an evidentiary link between the named State Defendants, Taylor and Williams, and the DOC training and policies that were in effect at the time of Barkes' suicide. Plaintiffs did not depose the named Defendants in discovery. There is nothing in the record showing that Taylor and Williams were the policymakers; that they were on notice of other training which would have avoided the suicide in question, nor any evidence remotely suggesting that the named Defendants exhibited a "deliberate indifference to whether [] detainees succeed[ed] in taking their lives." <u>Woloszyn</u>, *supra*. For liability to attach, a plaintiff must demonstrate that the policymaker was actually aware of alternatives which would result in suicide prevention and "deliberately chose not to prevent such attempts or acquiesced in an official policy of inaction which facilitate decedent's suicide attempt." <u>Littlejohn v. City of Philadelphia,</u> 1993 WL 79600 (E.D.Pa. 1993). Of course, there is no evidence in the record which would support such claims against Defendants Taylor and Williams.

In this case, because Plaintiffs never identified any expert witnesses, they could not possibly meet their burden of proving deliberate indifference to a constitutionally deficient prison suicide prevention policy or training, on the part of Defendants. In the Answering Brief, plaintiffs make bare assertions that the Commissioner and Warden should have know Barkes was "at serious risk of harming himself" and that the DOC policies were "defective." Ans. Brf. at 32-33. There are no citations to the record. Plaintiffs' counsel substitutes his

17

own argument for expert opinion by stating, again without reference, "all that needed to be done was to house [Barkes] in a cell free from bedsheets . . . and place him on a careful-observation schedule . . . ." (Ans. Brf. at 34). These statements are nothing more than the "conjecture and surmise" of counsel which is not sufficient to defeat a motion for summary judgment. *See* Trans Sport Inc. v. Starter Sportswear Inc., 964 F.2d 186, 188 (2d Cir. 1992). State Defendants are entitled to summary judgment as to the Count III claims.

> **2. Plaintiffs fail to address Defendants' argument that the "failure to train" and "wrongful practices and policies" claims are barred because these theories of municipal liability cannot be maintained against State officials, as a matter of law, by virtue of the Eleventh Amendment.**

Plaintiffs' Answering Brief entirely fails to address a key legal argument raised by State Defendants in the Opening Brief, as to the "policy/failure to train" claim in Count III. This argument, which will not be reiterated in detail here, is that such claims are theories of municipal liability only, and would be legally barred against Defendants Taylor and Williams, by virtue of these *State* Defendants' Eleventh Amendment immunity. This principle is clear based upon the language used by the United States Supreme Court in Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978). In that case, the Court held that "Congress did intend *municipalities and other local government units* to be included among those persons to whom §1983 applies." 436 U.S. at 689 (emphasis added). The Court further noted that "there [is no] basis for concluding that the Eleventh Amendment is a bar to municipal liability. . . . Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes." Id. To counsel's knowledge, the United States Supreme Court has never considered a policy/practice/training §1983 claim that involved a State defendant. *See*

Op. Brf. at pp. 24-26 for further discussion of this issue.

### D.   There is no legal basis or evidence of record to support Plaintiffs' state law claim in Count IV for "wrongful death" under 10 <u>Del.C.</u> §3724.

Plaintiffs devote only one sentence of the Answering Brief to their State law wrongful death claim, set forth in Count IV of the Complaint.  Plaintiffs simply assert that because there are allegedly "genuine issues of material fact" as to the §1983 claims, this precludes summary judgment on the wrongful death claim.  Obviously, State Defendants disagree that there are "genuine issues of material fact" on the constitutional claims, and maintain that summary judgment as to those claims must be granted.  Plaintiffs do not dispute Defendants position that if the Court finds that no federal constitutional claim is stated against the moving State Defendants, the Court should decline to exercise supplemental jurisdiction over the pendent state law claims against those defendants.  28 U.S.C. §1367(c)(3).  The Court may also enter summary judgment in State Defendants' favor on the state law wrongful death claim as, if the Court concludes that the record as to the federal claims contains no evidence of deliberate indifference.  Plaintiffs also have not set forth facts which would circumvent the State Defendants' tort claim immunity under Delaware State law.  10 <u>Del.C.</u> §4001.

## II.   <u>SUMMARY JUDGMENT MUST BE GRANTED AS TO THE STATE OF DELAWARE AND DEFENDANTS TAYLOR AND WILLIAMS IN THEIR OFFICIAL CAPACITIES, AS THEY ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT.</u>

Plaintiffs do not address, and presumably do not dispute, the black letter law that the agency defendant "Department of Correction" is immune from suit under §1983, pursuant to the Eleventh Amendment, as are State Defendants Taylor and Williams in their official capacities.  Accordingly, these Defendants are entitled to judgment as a matter of law.

19

## **CONCLUSION**

To defeat a motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Similarly, Plaintiffs may not avoid summary judgment by simply restating the bare claims of the Complaint or relying on unsupported statements and arguments of counsel, or on documents that were not produced in discovery and are not part of the record of the case. For the foregoing reasons and the reasons articulated in the Opening Brief, there are no genuine issues of material fact and no bases upon which a reasonable fact-finder could find in Plaintiffs' favor on their Eighth Amendment claims for deliberate indifference to serious medical needs and "failure to train/wrongful policies and practices," nor upon the state law wrongful death claim. State Defendants are therefore entitled to judgment as a matter of law.

State Defendants respectfully request this Honorable Court grant Summary Judgment in its favor as to all Counts against them, pursuant to Rule 56(c).

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


By:___/s/ Stephani J. Ballard_____
STEPHANI J. BALLARD (I.D. No. 3481)
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
DATED:  November 27, 2007         Attorney for State Defendants

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **KAREN BARKES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **C. A. No. 06-104-JJF** |
| | ) | |
| **FIRST CORRECTIONAL MEDICAL** | ) | |
| **INC.; et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>CERTIFICATE OF MAILING AND/OR DELIVERY</u>

The undersigned certifies that on <u>November 27, 2007</u>, she caused the attached, *Reply Brief in Support of State Defendants' Motion for Summary Judgment*, to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire        Daniel McKenty, Esquire
Martin & Wilson, P.A.             Heckler & Frabizzio
1508 Pennsylvania Ave., Suite 1C   P.O. Box 128
Wilmington, DE 19806             Wilmington, DE 19899-0128

<u>/s/ Stephani J. Ballard</u>
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8400
Attorney for State Defendants

# EXHIBIT A

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 1 OF 5 |
| EFFECTIVE DATE:    JANUARY 1, 2001 | OPR:  HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

**I.  POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offender who maybe suicide potential during intake processing and or the identification and supervision of suicide-prone offenders during their incarceration.  The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

**II.  SCOPE:**  This procedure shall apply to all Howard R Young Correctional Institution personnel.

**III. PROCEDURE:**

    A.  Training - All facility correctional officers will receive special training in suicide prevention provided by the Facility Training Coordinator during in-service training.  The program is coordinated with, reviewed by, and approved by the Medical Section.

    B.  Recognizing Suicide Potential During the Admissions/Classification Process

        1.  Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

            a.  Severe alcohol/drug dependence

            b.  Psychiatric potential suffering from impaired judgment or history of mental illness.

            c.  Chronic physical problems

        2.  Classification Interview - Classification Specialist shall consider offenders a suicide risk if they possess the above risk factors and state that they:

            a.  Have a history of recent or recurrent suicide attempts.

            b.  Have seriously contemplated suicide in the past or present.

            c.  Have extreme depression or impulsiveness, including feelings of hopelessness which appear to be chronic.

            d.  Have been admitted to a mental hospital or crisis center for attempted suicide.

    C.  Post Admission Indicators of Suicide Potential

D00461

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 5 |
| SUBJECT:        OFFENDER MOVEMENT | | |

1. Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

2. During a suicidal crisis, most persons will display either some or all of the following signs of depression:

   a. Sadness or crying

   b. Withdrawal or silence

   c. Loss or gain of appetite marked by noticeable weight gain or loss

   d. Insomnia

   e. Mood variation (in many cases, extreme and unexplained)

   f. Lethargy (slowing of physical movements such as walking and talking)

   g. Changes in behavior such as giving a away personal possessions, planning a funeral, putting affairs in order, etc.

3. Additionally, many offenders may give a housing unit correctional officer verbal cues that indicate a suicide crisis is impending, such as:

   a. Projecting feelings of hopelessness and helplessness

   b. Speaking about getting out of jail unrealistically

   c. Not effectively dealing with the present and being preoccupied with the past

   d. Explaining intentions to commit suicide

   e. Increasing difficulty relating to others

   f. Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a correctional officer)

4. Offenders who should be observed closely for possible suicidal tendencies are:

   a. Older offenders
   b. Chronically or terminally ill offenders

   c. Offenders recuperating from major surgery

D00462

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 5 |
| SUBJECT:            OFFENDER MOVEMENT | | |

    d.  Anyone subjected to homosexual assault

    e.  Incarcerated law  enforcement officers

    f.  Incarcerated professionals

    g.  Persons who have committed a crime of passion

5.  If a correctional officer has reason to believe that an offender fits any of the aforementioned profiles:

    a.  Immediately implement crisis intervention techniques

    b.  Notify the Shift or Housing Unit Supervisor

    c.  Document all information on an incident report and forward to security and medical personnel

D.  Crisis Intervention Techniques

1.  When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

    a.  Do not judge the offender

    b.  Talk, listen, discuss, keep lines of communication open, and be supportive

    c.  Ask pertinent questions; be direct

    d.  Do not give personal advice or be untruthful

    e.  Do not dare the offender

    f.  Do not act shocked or alarmed

    g.  Refer for professional help

2.  The following are guidelines to assist in a suicide crisis:

    a.  Recognized the clues - hopelessness, helplessness, haplessness

    b.  Trust your judgment - you have observed offenders and can recognize changes in behavior

D 0 0 4 6 3

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 5 |
| SUBJECT:          OFFENDER MOVEMENT | | |

     c.  Listen and be supportive

     d.  Attempt to diffuse the tension and agitation: inject a feeling of hope, but do not lie to the offender

     e.  Tell others - notify medical and supervisory staff

     f.  Document all pertinent information in an Incident Report

E.  Suicide Risk Assessment - The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

    1.  High Risk - Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

    2.  Moderate Risk - Exhibits suicidal behavior and/or will not make a "no suicide" contact.

    3.  Low Risk - May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

F.  Housing Assignment for Suicidal Offenders

    1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation(eye contact) process. This is to be documented on the close observation form.

    2.  Suicidal offenders are to be placed in a close observation cell. They must be supervised under visible observation by security 24 hours a day.

    3.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

    4.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.