IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, individually;                    :
TINA GROSSMAN as next friend of                :
BRITTANY BARKES; TINA GROSSMAN                 :
as next friend of ALEXANDRA BARKES;:
and KAREN BARKES as administratrix :
of the ESTATE OF CHRISTOPHER                   :
BARKES,                                        :
                                               : Civil Action No. 06-104-JJF
          Plaintiffs,                          :
                                               :
     v.                                        :
                                               :
FIRST CORRECTIONAL MEDICAL, INC;               :
STANLEY TAYLOR; RAPHAEL WILLIAMS;              :
CERTAIN UNKNOWN INDIVIDUAL                      :
EMPLOYEES OF STATE OF DELAWARE                  :
DEPARTMENT OF CORRECTION; CERTAIN               :
UNKNOWN INDIVIDUAL EMPLOYEES OF                 :
FIRST CORRECTIONAL MEDICAL, INC.,              :
and STATE OF DELAWARE, DEPARTMENT               :
OF CORRECTION,                                 :
                                               :
          Defendants.                          :

---

Jeffrey K. Martin, Esquire, of MARTIN & WILSON, P.A., Wilmington,
Delaware.
Herbert G. Feuerhake, Esquire, of LAW OFFICES OF HERBERT G.
FEUERHAKE, Wilmington, Delaware.

Attorneys for Plaintiff.

Stephani J. Ballard, Esquire, Deputy Attorney General,
Wilmington, Delaware.

Attorney for Defendants.

---

**MEMORANDUM OPINION**

February 27, 2008
Wilmington, Delaware

Joseph J. Farnan Jr.
Farnan, District Judge.

Pending before the Court is State Defendants' Motion for Summary Judgment (D.I. 49). For the reasons discussed below, the Court will grant State Defendants' Motion.

**BACKGROUND**

*A.    Procedural Background*

Plaintiffs, Karen Barkes, individually and as adminstratrix of the Estate of Christopher Barkes, Tina Grossman, as next friend of Brittany Barkes, and Tina Grossman, as next friend of Alexandra Barkes, the widow and minor children of decedent Christopher Barkes, brought this lawsuit against First Correctional Medical, Inc. ("FCM"), Stanley Taylor, the Commissioner of the Delaware Department of Corrections ("DOC")(now retired)("Commissioner Taylor"), Raphael Williams, Warden of the Howard R. Young Correctional Institution ("Warden Williams"), Certain Unknown Individual Employees of State of Delaware Department of Correction, Certain Unknown Individual Employees of First Correctional Medical, Inc., and the State of Delaware Department of Corrections. Plaintiffs brought this action under 42 U.S.C. § 1983, alleging that Defendants had violated the Eight Amendment through their deliberate indifference to Christopher Barkes' serious medical needs, and by failing to train and/or maintaining wrongful customs, practices and polices. Plaintiffs also asserted wrongful death actions and

2

survival actions under Delaware statutes 10 <u>Del. C</u>. §§ 2724 and 3701.   The DOC, Commissioner Taylor, and Warden Williams ("the State Defendants") filed a cross-claim against FCM based on a contractual indemnification provision. Plaintiffs have not identified or served the "Unknown Individual Employees" of the DOC or FCM, and the last day to amend pleadings was January 31, 2007.[1]  (D.I. 17.)

State Defendants filed this Motion for Summary Judgment (D.I. 49) on October 15, 2007.

*B.  Factual Background*

1.   <u>Christopher Barkes</u>

Decedent, Christopher Barkes ("Mr. Barkes"), committed suicide in his cell at Howard R. Young Correctional Institution ("HRYCI") on Sunday, November 14, 2004. He was arrested by Wilmington Police on Saturday, November 13, 2004 for violating his probation, and admitted to the Booking and Receiving Unit at

---

[1]Plaintiffs' discovery in this case was interrupted for four months by "unexpected and unavoidable reasons" which are set forth in an affidavit by Plaintiffs' counsel, Jeffrey Martin, Esquire.  Despite the fact that discovery in this case ended on August 31, 2007, Plaintiffs contend that there are still facts to be discovered, including the identity of the intake person at Howard R. Young Correctional Institution: the nurse employed by FCM who did the initial medical and mental health screening of Christopher Barkes.  Plaintiffs also contend that the State Defendants have not yet produced the DOC Suicide Prevention Policy and Procedures (SOP 190.04) in effect on the date of Christopher Barkes' death. In response, State Defendants contend that the relevant version of SOP 190.04 was produced to Plaintiffs by March 9, 2007, and depict the pertinent Bates range. (D.I. 54 at 5.)

approximately 2:45 p.m., pending transportation to the VOP Center
in Sussex County on Monday, November 15, 2004.

Mr. Barkes had a history of drug and alcohol abuse. (D.I. 50
at 6; D.I. 546 at 4.)  After a ten-year period of sobriety in his
twenties, he began abusing prescription drugs and alcohol at the
age of 28. (Id.) In 1997, Mr. Barkes was the driver in an
automobile accident that resulted in the death of two people.
(Id.)  He pled guilty to two counts of vehicular homicide, and
was sentenced to two years in prison. (Id.) Following his release
from prison in 1999, Mr. Barkes continued to suffer intermittent
relapses into substance abuse, but he was sober for approximately
two years before he married Karen Barkes ("Mrs. Barkes") in April
2003.[2]  (D.I. 50 at 6.)

Mr. Barkes first attempted suicide during his first
incarceration at HRYCI following the 1997 automobile accident.
(D.I. 54 at 5.) He collected several pills over the course of
several days to gather enough to kill himself. (Id.) When the
pills were discovered, Mr. Barkes was taken to St. Francis
Hospital for four days before returning to HRYCI. (Id.) In
November 2003, Mr. Barkes was hospitalized for depression and
drug addiction.  (D.I. 50 at 6.)  The record is unclear as to
whether this hospitalization was in connection with a suicide

---

[2]Mr. Barkes had been married previously, and had two
children, Plaintiffs Alexandra and Brittany Barkes, from that
marriage. (D.I. 50 at n.3.)

4

attempt.[3]  In December 2003, Mr. Barkes attempted suicide by
overdosing on heroin, and was hospitalized. (D.I. 50 at 6-7; D.I.
54 at 5-6.)  On September 10, 2004, a DOC probation officer took
Mr. Barkes to Wilmington Hospital for excessive alcohol
consumption.[4]  (D.I. 54 at 6.) During this hospitalization, Mr.
Barkes tried to hang himself with a bed sheet and IV tubing, but
his attempt was thwarted. (D.I. 54 at 6; D.I. 50 at 7.)

After being booked on November 13, 2004, Mr. Barkes received
a medical evaluation conducted by FCM medical staff.[5] (D.I. 50 at
7.)  FCM contracted with the DOC to provide all medical services
to inmates. (Id.) As part of the medical evaluation, FCM staff
completed a Mental Health/Suicide Prevention Screening Form,
created by FCM.  (Id.)  The form lists 17 suicide risk factors
for which each inmate is screened. (D.I. 50 at 7.)  If eight or
more factors are checked "yes," or if certain serious risk
factors are present (for example, the arresting officer believes

_____

[3]Mrs. Barkes testified in deposition that Mr. Barkes's
November 2003 hospitalization was not in connection with a
suicide attempt. However, in their brief, Plaintiffs contend:
"There was some confusion" in Mrs. Barkes's deposition, and she
did not recall that Mr. Barkes, who had been living with his
aunt, took a number of prescription pills, and was admitted to
Wilmington Hospital as "suicidal." (D.I. 50 at 6; D.I. 54 at
n.5.)

[4]Mrs. Barkes testified that the DOC probation officer that
found Mr. Barkes at his friend's house was not Mr. Barkes'
probation officer. (D.I. 51 at A21.)

[5]The intake nurse was an LPN, or "Licensed Practical Nurse."

5

the inmate is a suicide risk), the physician on call is notified and suicide precautions are initiated. (Id.) Mr. Barkes answered "yes" to two of the 17 screening questions: (1) that he had a psychiatric history; and (2) that he had previously attempted suicide by overdose in 2003. (D.I. 50 at 8.) Mr. Barkes' suicide attempt at HYRCI during his first incarceration and his suicide attempt in September 2004 are not listed on the form. (Id.)

In addition to the Mental Health/Suicide Prevention Screening Form, the FCM intake nurse completed FCM's standard medical intake form, which asks whether the inmate shows any obvious signs of "altered mental status...or abnormal conduct." (Id.) According to the form, Mr. Barkes did not. (Id.) The standard medical intake form also contains a series of questions regarding the inmate's health history. Mr. Barkes answered "no" to the question of whether he had a "history of drug abuse." (Id.) The FCM intake nurse completed a referral to mental health services on a "routine" urgency level based on Mr. Barkes psychiatric history, and the reported 2003 suicide attempt. (D.I. 54 at 8.) Mr. Barkes medical file also contains a prescription chart, which depicts the prescriptions Mr. Barkes received at HRYCI, the dosages and the frequency. He received dosages of Effexor and Serquel the evening of November 13, 2004, but did not receive his medication on November 14, 2004 because the medical cart had not yet arrived before he committed suicide.

6

(D.I. 50 at 9.)

Mr. Barkes was housed in a cell in the Booking and Receiving area of HRYCI. (D.I. 50 at 8.)  Sometime during the evening of November 13, 2004, Mr. Barkes telephoned Mrs. Barkes. Mrs. Barkes stated that Mr. Barkes told her "I can't live this way anymore." (D.I. 54 at 6.)  Mr. Barkes ate breakfast in his cell on November 14, 2004 at 8 a.m., and correctional officers checked on Barkes periodically throughout the morning.   None of the correctional officers who worked in Booking and Receiving during Mr. Barkes incarceration remembered anything unusual about him, or that alerted them that he was having a suicidal crisis. (D.I. 50 at 9-10.)  At 10:45 a.m., 10:50 a.m., and 11:00 a.m, correctional officers observed Mr. Barkes lying awake on his bed.  At 11:35 a.m., a correctional officer arrived at Mr. Barkes' cell to deliver his lunch, and found him hanging by a sheet from a steel partition in the room. (D.I. 50 at 10.)  Medical staff responded to the correctional officer's Medical Emergency alert and began CPR.  Paramedics and EMTs arrived and transported Mr. Barkes to Christiana Hospital, but Mr. Barkes did not regain consciousness. (D.I. 50 at 11.)

2.   DOC's Suicide Prevention Policy

In addition to the FCM's health and mental health screening practices, the DOC, and HRYCI, have, and had, in place a Suicide Prevention Policy, SOP 190.04, which applies to all personnel,

7

and is reviewed and approved by a medical/mental health
professional. (D.I. 50 at 9.)  Under the policy, training is
provided to institutional personnel on identification of inmates
at risk for suicide.  The policy outlines potential indicators of
suicidal crisis, and requires that personnel refer inmates deemed
to be at risk for suicide to medical personnel.

As evidence that the DOC's mental health and suicide
policies and procedures in place at HRYCI at the time of Mr.
Barkes's suicide were constitutionally defective, Plaintiffs cite
to a *News Journal* article that lists Delaware inmates who died in
DOC custody between 2000 and April 2005, and an August 2005
"Special Report" from the United States Department of Justice
Bureau of Justice Statistics regarding statistics on suicide and
homicide deaths in prisons nationwide for the proposition that
Delaware's suicide mortality rate in its state prisons was double
the national average in 2000-2001.  (D.I. 54 at 10.)

Plaintiffs also point to a December 29, 2006 "Findings
Letter" from the United States Department of Justice ("USDOJ")
regarding a 2006 investigation into healthcare conditions in five
Delaware prisons, including HRYCI; a December 19, 2006
"Memorandum of Agreement" between the State of Delaware and the
USDOJ regarding the 2006 investigation; and an April 30, 2007 DOC
"Action Plan" report in response to the USDOJ's Findings Letter.
The USDOJ investigation found substantial deficiencies with the

mental health care provided at the prisons, and specifically found that practices regarding suicide prevention "substantially depart[ed] from generally accepted professional standards and expose inmates to significant risk of harm," leading to a "system in which inmates at risk for suicide are not adequately identified." (D.I. 54 at 11-12.)[6]

The documents cited by Plaintiffs were not produced to Defendants during discovery, and Plaintiffs did not indicate in their responses to interrogatories that they intended to rely on these documents in support of their contentions. (D.I. 56 at 8.) The State made no admissions of liability in connection with the 2006 USDOJ investigations, and the Memorandum of Agreement states that it is inadmissible in litigation. (D.I. 56 at 8.)

## LEGAL STANDARD

In pertinent part, Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to

---

[6] The USDOJ Findings Letter also states that the State of Delaware's correctional staff "received insufficient training in the area of suicide prevention," that "the intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions," that "the State fails to ensure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety," and that "the State fails to ensure that appropriate levels of observation are maintained." (Id. at 12-13.)

judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 200 (3d Cir. 1995).

However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal citations omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)(internal citations omitted). However, the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson v.

10

Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, if the
evidence is "merely colorable, or is not significantly
probative," summary judgment may be granted. Id.

## ANALYSIS

In their motion for summary judgment, the State Defendants
contend: (1) Plaintiffs have adduced no evidence suggesting that
Commissioner Taylor or Warden Williams exhibited "deliberate
indifference" to Mr. Barkes' serious medical needs, since neither
had any personal involvement with Mr. Barkes' incarceration or
suicide; (2) Plaintiffs' Eighth Amendment claim against State
Defendants based upon "failure to train" or the maintenance of
wrongful practices and policies, resulting in Mr. Barkes' suicide
is unsupported by the evidence, and is barred as a matter of law;
(3) the Court should grant summary judgment on Plaintiffs'
"wrongful death" claim against State Defendants because the
record contains no evidence upon which a reasonable fact finder
could find liability.

A.   Eleventh Amendment and Sovereign Immunity

First, the Court will dismiss Plaintiffs' claims against the
DOC. State Defendants correctly argue that the doctrine of
sovereign immunity bars suits for monetary damages against the
state, absent waiver or Congressional override. Kentucky v.
Graham, 473 U.S. 159, 169 (1985). The Supreme Court has held
that neither a State nor its officials acting in their official

11

capacities are "persons" within the meaning of Section 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Further, a state agency or other entity may be considered an "alter ego" or "arm of the state" such that it is entitled to immunity under the Eleventh Amendment. Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir.1995). Numerous cases in this district have recognized that the DOC is an arm of the State of Delaware and not a "person" subject to liability under Section 1983. See Arnold v. Minner, No. 04-1346, 2005 WL 1501514, at *4 (D.Del. June 24, 2005) (citations omitted). Because the DOC is entitled to immunity pursuant to the Eleventh Amendment, the Court will grant State Defendants' motion for summary judgment on Plaintiffs' § 1983 claims against the DOC.

The Court will also grant summary judgment in favor of Defendant on Plaintiffs' § 1983 claims against Commissioner Taylor and Warden Williams in their official capacities. Claims made against state officials in their official capacities are treated as claims made against the state itself. Will v. Michigan Dep't of State Police, 491 U.S. at 71.

B.   *Plaintiffs' Section 1983 Claims Against Taylor and Williams in their Personal Capacities*

In their Complaint, Plaintiffs allege that State Defendants violated Barkes' Eighth Amendment right to be free of cruel and unusual punishment by their alleged "deliberate indifference" to

12

Barkes' serious medical needs. Plaintiffs also allege that State Defendants failure to properly train and supervise its personnel and/or failure to institute appropriate polices regarding suicide prevention constituted deliberate indifference to Mr. Barkes' rights.

State Defendants contend that there is no evidence in the record that the individual State Defendants, Commissioner Taylor and Warden Williams, had any interaction with Mr. Barkes, nor any knowledge of his condition which could meet the legal standard for §1983 liability on an Eighth Amendment claim. State Defendants further contend that liability asserted against the Commissioner Taylor and Warden Williams is premised on an impermissible vicarious liability theory since Plaintiffs cannot identify any acts or omissions personally undertaken by Commissioner Taylor or Warden Williams against Mr. Barkes. State Defendants contend that there is no evidence that any State employee at HRYCI was deliberately indifferent to Mr. Barkes' medical needs, since no DOC personnel could have possibly foreseen, anticipated or prevented Mr. Barkes' suicide. State Defendants further contend that there is no evidence that Commissioner Taylor or Warden Williams were deliberately indifferent in providing DOC training or policies/practices, resulting in Mr. Barkes' suicide.

In their response to State Defendants' motion, Plaintiffs

provide a lengthy summary of Eighth Amendment jurisprudence, and contend that Commissioner Taylor and Warden Williams are liable based on their responsibility for a "policy that created a substantial risk of serious (indeed, of *ultimate*) damages to *all* suicidal inmates and detainees, including Mr. Barkes." (D.I. 54 at 25.) Plaintiffs contend that proof of deliberate indifference need not be personal to the injured inmate, but can relate to a risk faced generally by all prisoners. Plaintiffs further contend that there exists sufficient evidence to establish a material issue of fact including: (1) the mental health screening form which indicates that Mr. Barkes had attempted suicide the previous year, and had a psychiatric history; (2) the DOC applied an arbitrary numerical analysis based on the mental health screening form when determining suicide potential; (3) the intake nurse was not a registered nurse, but only an LPN; (4) the DOC knew of Mr. Barkes' history of drug and alcohol problems; (5) Mr. Barkes had previously attempted suicide at HRYCI, and, in September 2004, had attempted suicide in Wilmington Hospital, after being brought to the hospital by a probation officer; (6) Mr. Barkes was the only inmate in the Booking and Receiving area, so he was effectively in solitary confinement; (7) Delaware's rate of prison suicides during this time period was more than twice the national average; (8) in 2006, the USDOJ found that Delaware prisons demonstrated inadequate psychiatric coverage and

14

training with respect to suicide prevention. (D.I. 54 at 30-32.)
Based on this evidence, Plaintiffs contend that a reasonable jury
could infer that Commissioner Taylor and Warden Williams had
actual knowledge of the unreasonable risk created by their
deficient policies.

In response, State Defendants contend that Plaintiffs
impermissibly rely on documents that were never produced in
discovery, and have not been referenced, relied upon or opined
upon by any witness in this cases.  Defendants further contend
that Plaintiffs have failed to reference affidavits of fact
witnesses, sworn averments, or actual facts of record that would
create a genuine issue of material fact.  Defendants point out
that the USDOJ documents were created in 2006, and cannot be used
to show knowledge on the part of State Defendants of alleged
problems with suicide prevention protocols at HRYCI in November
2004.  Further, the USDOJ documents are generalized findings, and
do not equate to a finding that Mr. Barkes' constitutional rights
were violated, or that Commissioner Taylor and Commissioner
Williams were deliberately indifferent to Mr. Barkes' obvious
medical needs.

As is well established, supervisory liability cannot be
imposed under § 1983 on a respondeat superior theory. See Monell
v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v.
Goode, 423 U.S. 362 (1976). " 'A[n individual government]

15

defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.' " Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. Id.; see Monell v. Department of Social Services, 436 U.S. 658, 694-95 (1978). Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk, or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir.1989); see also City of Canton v. Harris, 489 U.S. 378 (1989); Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed. Appx. 240 (3d Cir.2005).

It is undisputed by Plaintiffs that Defendants Taylor and Williams had no personal involvement in the events surrounding Mr. Barkes's suicide, and there is no evidence in the record to suggest that the DOC Commissioner or the HRYCI Warden had any interaction with Barkes, or knowledge of his condition. Plaintiffs attempt to hold Commisioner Taylor and Williams liable "in their individual capacities for their deliberate indifference to policies and procedures that created a substantial risk of

16

serious injury" to Mr. Barkes. (D.I. 54 at 28.) Supervisory liability presents the question of whether Defendants were responsible for--"whether [they were] the moving force behind"-- the alleged constitutional tort. <u>Sample</u>, 885 F.2d at 1116-1117. To succeed on a claim against supervisors based on prison policy or practices, Plaintiffs must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice.[7] <u>Id</u>. at 1118.

First, Plaintiffs have not set forth evidence sufficient to establish that at the time of Mr. Barkes' suicide, Warden Williams and Commissioner Taylor knew that the DOC's suicide prevention policy created a substantial risk that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." <u>Framer v. Brennan</u>, 511 U.S. 825,

---

[7] More specifically, in the context of prison suicides, the Court has held that a plaintiff must "(1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives. " <u>Colburn v. Upper Darby Tp.</u>,946 F.2d 1017, 1030 (3d. Cir. 1991).

842 (1994). The events surrounding Mr. Barkes' suicide cannot be evidence of Warden Williams' or Commissioner Taylor's knowledge that the DOC's existing suicide prevention policy created an unreasonable risk of Mr. Barkes' suicide. That Delaware's rate of prison suicides in 2001-2002 was double the national average is information that might have alerted Warden Williams or Commissioner Taylor that suicide protocols were insufficient, but Plaintiffs have not presented any evidence that either Defendant had knowledge of this fact in 2004. The USDOJ 2006 Findings Report, from which Plaintiffs quote extensively, cannot be probative of Commissioner Taylor's or Warden William's awareness *in 2004* of a substantial risk posed by the DOC's suicide prevention protocols. Since Plaintiffs have not presented any evidence that information regarding the effectiveness of the DOC's suicide prevention protocols and training was available and accessible to Commissioner Taylor or Warden Williams in 2004, the Court is unable to find that the risk of Eighth Amendment injury arising from the DOC's suicide prevention protocols was so obvious that these officials must have known. Beers-Capital v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)("subjective knowledge on the part of the official can be proved by circumstantial evidence to the extent that the excessive risk was so obvious, the official must have known of the risk").

Second, Plaintiffs have not identified specific training and

18

protocols that could have prevented Mr. Barkes' suicide.
Plaintiffs criticize the DOC's "mechanical" intake screening and
form,[8] and the fact that an LPN, not a RN or a doctor, performed
Mr. Barkes' intake. (D.I. 54 at 30-31.) They contend that Mr.
Barkes was not adequately supervised, and should have been housed
in a cell "free from bed sheets or other implements of suicide."
(Id. at 34.) However, Plaintiffs do not discuss how different
intake screening or different medical personnel would have
resulted in Mr. Barkes' identification as suicidal, and prevented
his suicide. Plaintiffs also do not identify any training that
should have been provided by the State of Delaware for its
correctional officers but was not, nor do Plaintiffs depict how
additional or different training would have alerted the DOC
correctional officers on duty that Mr. Barkes required closer
supervision and/or a different cell.

Accordingly, the State Defendants' motion for summary
judgment on Plaintiffs' § 1983 claims will be granted.

C. *Plaintiffs' State Law Claims*

Plaintiffs' complaint also seeks recovery against State
Defendants based on Mr. Barkes' wrongful death, under 10 Del. C.
§ 3724, which states "an action may be maintained against a
person whose wrongful act causes the death of another." However,

___

[8]Plaintiffs rely heavily on the USDOJ's 2006 Report, but the
Report states that the "the form used to conduct intake
assessments is good." (D.I. 55 at B60.)

19

the Delaware State Tort Claims Act "shields a defendant from
personal liability for acts done in good faith, without gross or
wanton negligence, and arising out of and in connection with the
performance of official discretionary duties. See 10 Del. C. §
4001(3)." Woulard v. Food Service, 294 F.Supp.2d 596, *604 -605
(D.Del. 2003). In Saunders v. Sullivan, No. 373,1991, 1992 WL
53423, at *2 (Del. Feb. 26, 2002) the Delaware Supreme Court
held:

> To establish gross negligence a party must
> demonstrate "more than ordinary inadvertence or
> inattention." Jardel Co., Inc. v. Hughes, Del.Supr.,
> 523 A.2d 518, 530 (1987). Gross negligence is the
> failure to perceive a risk of such a nature and
> degree that the failure to perceive such risk
> constitutes a gross deviation from the standard of
> care exercised by a reasonable person. Id. Wanton
> behavior, on the other hand, is similar to
> recklessness; it is a conscious indifference to a
> substantial risk. Id.
>
> The deliberate indifference standard, as applied in
> the federal suit, requires proof of indifference to
> known substantial risks. Delaware mandates this same
> requirement. Jardel, 523 A.2d at 530.

Plaintiffs have not presented any evidence that might allow a
trier of fact to infer bad faith on the part of Commissioner
Taylor or Warden Williams. Also, because the Court has concluded
that Plaintiffs cannot establish deliberate indifference by
Commissioner Taylor or Warden Williams, the Court concludes that
Plaintiffs cannot establish their "gross or wanton negligence."
Accordingly, the Court will grant State Defendants' motion for

20

summary judgment on Plaintiffs' wrongful death claim.

## CONCLUSION

For the reasons discussed, State Defendants' Motion For Summary Judgment (D.I. 49) will be granted.

An appropriate Order will be entered.