## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES individually; TINA GROSSMAN as next friend of BRITTANY BARKES; TINA GROSSMAN as next friend of ALEXANDER BARKES; and KAREN BARKES as administratrix of the ESTATE OF CHRISTOPHER BARKES, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST CORRECTIONAL MEDICAL CENTER; STANLEY TAYLOR; RAPHAEL WILLIAMS; CERTAIN UNKNOWN INDIVIDUALEMPLOYEES OF THE STATE OF DELAWARE DEPARTMENT OF CORRECTION; CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES OF FIRST CORRECTIONAL MEDICAL CENTER; and STATE OF DELAWARE DEPARTMENT OF CORRECTION, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 06-104 JJF <br><br> JURY TRIAL DEMANDED |

## MOTION FOR REARGUMENT

Plaintiffs, pursuant to Local Rules of Civil Procedure 7.1.5, file this motion seeking reargument of the Court's decision granting summary judgment in favor of State Defendants. Plaintiffs respectfully submit that the state of the record is such as to create genuine issues of material fact requiring resolution at trial.

Insofar as the specific facts of this matter have been set forth extensively in the competing briefs filed on the summary judgment issue, they will not be repeated. Briefly stated, decedent Christopher Barkes, an individual incarcerated at the Howard R. Young Correctional Institute ("HRYCI"), committed suicide in his cell on or about November 14, 2004. The nature

of Plaintiffs' claim, stripped down to its essentials, is that Mr. Barkes provided sufficient

indications at the commencement of his incarceration (the day before his death) to place

Department of Correction ("DOC") personnel on notice that he was a risk for suicide and

required special treatment. Insofar as there was no qualified medical evaluator present of

HRYCI on November 13, 2004, the failure of the DOC to have a policy in place by which

corrections officers err on the side of caution until a proper mental health evaluation could be

performed led to a deprivation of Mr. Barkes' constitutional rights.

Several specific points justify this Motion for Reargument. We will consider each in

turn.

## I.      Confusion regarding discovery responses on suicide protocols in place at time of death

Plaintiffs have been confronted with confusing and internally inconsistent documents

purporting to represent the DOC's Suicide Prevention Policy, S.O.P. 190.04. In response to our

original request for production seeking the relevant suicide prevention policy that was applicable

on the date of Mr. Barkes' suicide, we were provided, on March 9, 2007, with documents Bates-

numbered D00461 to D00464 (see Exhibit A hereto).

In a letter dated August 1, 2007, counsel for State Defendants identified the relevant

suicide prevention policy as Bates-numbered D00514 to D00517 (see Exhibit B hereto), with no

explanation for the switch from the earlier-identified Bates pages. There are several significant

differences between the two versions. The 514-517 version actually indicates that it was revised

on "May 1, 2005," which would indicate that it could *not* have been the policy in place on the

date of Mr. Barkes' suicide in November 2004. But more importantly, the 514-517 version *omits*

language that directs the DOC personnel to place "[s]uicidal offenders" in a "close observation

cell" that must be supervised "under visible observation by security 24 hours a day," and further

2

*omits* language regarding training correctional officers about suicide prevention. Thus, there are substantial and very relevant differences between the two versions. Simply stated, if the D00461-464 policy was in effect, the record establishes that the policy was violated by Defendants.

Undersigned counsel repeatedly attempted to obtain clarification of this discrepancy from Defendants. On October 12, 2007, Mr. Martin sent a letter (found at D.I. #55 at page B-20) to counsel Stephani Ballard, Esq., again seeking the suicide procedures and protocols that were in effect at HRYCI on the date of Mr. Barkes' suicide.[1] Subsequent to this letter discussions occurred between the legal assistants for Ms. Ballard and Mr. Martin, in which Mr. Martin's assistant advised that there may have been some minor changes by way of the May 2005 revisions but that no further information was available (see reference in Mr. Martin's affidavit found at D.I. #55, page B-5).

State Defendants filed their Opening Brief in support of their Motion for Summary Judgment on October 15, 2007 (D.I. #50). At page 9 of their Brief, they reference the suicide prevention policy "in place at the time" as appearing at pages A-157 to A-160 of their Appendix; these Appendix pages (see D.I. #51-3) relate to the Bates-numbered pages D00514 to D00517, which as noted above, related to a policy not in place at the time of the November 14, 2004 suicide of Mr. Barkes, but rather to a policy that had been revised on "May 1, 2005" (see reference on page A000160, Bates-numbered D00517, found in D.I. # 51-3). This level of confusion in the record was exactly what Plaintiffs attempted to eliminate through their targeted discovery requests and Mr. Martin's letter of October 12, 2007. And, just as Plaintiffs had

---

[1] In this same letter, Mr. Martin requested the Medical Intake Form that accompanied Mr. Barkes' March 2004 incarceration; this document has, in fact, never been provided to Plaintiffs by State Defendants, another example of the failure of State Defendants to fully respond to discovery requests.

feared, the revised policy omitting the language pointing to the 24 hour suicide watch and the training of CO's about suicide prevention was cited by State Defendants in their Opening Brief.

This discrepancy was raised again in Plaintiffs' Answering Brief filed on or about November 13, 2007 (D.I. #54, at page 2 footnote 4, and in the accompanying Affidavit of counsel Jeffrey K. Martin (D.I. #55 at pages B-3 to B-5). In response to this, State Defendants addressed the issue yet again in their Reply Brief (D.I. #56).

At this point the level of confusion increased significantly. At footnote 3, on page 6 of the Reply Brief (D.I. #56), State Defendants state as follows:

> A review of the version produced at D00461 -464 (Exhibit A) and the version produced at D00514-517 (A000157-16 [sic]), show only the following variations: the second version removed item III. A. Training", and contains the notation "Revised: May 1, 2005" at the end of the document. Thus, *it appears* the version which contained the "Training" section (D00461-464) was the pre-revised version, in effect at the time of Barkes death, as it does not contain the 2005 "revised" notation. [Emphasis supplied].

This passage is troubling for several reasons. First, it is inaccurate to say that the cited variations are the "only" variations; in fact, the policy found at D00461-464 also contained the following language in Section F on page D00464 (language that could not be more relevant to the instant matter, and which we quoted in part above): "Suicidal offenders are to be placed in a close observation cell. They must be supervised under visible observation by security 24 hours a day." To misstate and then minimize the significance of the differences between the version at D00461-464 and the version at D00514-517 was extremely misleading to the Court. The omitted language is critically important: it is just this sort of "close observation" that might have saved Mr. Barkes' life, had the DOC personnel understood that he was a potentially suicidal inmate who had not yet been seen by a qualified medical evaluator.

Second, the footnote is troubling based upon its usage of the phrase "it appears," insofar as the usage of such a phrase indicates that State Defendants cannot even cite to their own policy

in place on November 14, 2004 with any certainty, but rather must make a deductive analysis based upon the content of apparently conflicting documents.

The third reason this passage is troubling is perhaps the most egregious of all. In the passage, State Defendants cite to "Exhibit A" of their Reply Brief wherein they asserted that D00461-D00464 had been "produced" through discovery. This "Exhibit A" to the Reply Brief is found in D.I. #56-1 (Exhibit C). What is remarkable about these pages D00461 to D00464 accompanying the Reply Brief is that they are *different from* pages D00461 to D00464 in the original March 9, 2007 production response, yet bear the same Bates numbers (compare Exhibits A and C attached hereto). For one thing, the Bates numbers themselves are in different positions. In addition, in the page number boxes at the top of each page, "Exhibit A" to the Reply Brief references "1 of *5*," "2 of *5*," etc., while the original production response referenced "1 of *4*," "2of *4*", etc. While not a substantive alteration, it is troubling for two reasons: first, why are there multiple *different* versions of a document that was supposed to be Bates-numbered for purposes of *eliminating* such confusion; second, what missing content appeared on the missing page "5 of 5" in "Exhibit A" that we have never seen? This inconsistency raises questions of fact with regard to the policy that was in place at the time of Mr. Barkes' suicide.

As noted at the outset of this Motion for Reargument, it is our contention that State Defendants violated Mr. Barkes' Eighth Amendment rights by virtue of their failure to have a policy in place such that a recently-incarcerated inmate such as Mr. Barkes, who had indicated on an intake form that he had a previous and relatively recent suicide attempt and who had *not been seen* by a qualified medical evaluator, would be treated *as if* he were a serious suicide risk until such time as a qualified medical evaluator eliminated that possibility. The first step in making this argument is, obviously, to review an accurate copy of the policy in place at the

relevant time. Yet, as we have seen, State Defendants have produced policies at least four times, summarized as follows:

| | |
|---|---|
| 3/9/07  Production response | D00461-464 (containing language not found in 514-517) |
| 8/1/07  Production response | D00514-517   (actually the revised policy) |
| 10/15/07 Opening Brief | D00514-517 (actually the revised policy) |
| 11/29/07 Reply Brief | D00461-464  (altered version despite same Bates numbers as 3/9/2007 production) |

This confusion over the relevant policy is heightened when one takes into account the responses of State Defendants to interrogatory requests.  For example, in response to Interrogatory #6, answered on March 9, 2007 at D.I. #51 at 101, State Defendants identified D00461-464 as the suicide policy, but also included in their answer the following passage: "If the medical provider identifies any inmate as a suicide risk, that inmate is housed in the infirmary with precautions appropriate to that inmate's conditions and needs." (Exhibit D).  This seems to be in direct conflict with the language from D00464 quoted above: "Suicidal offenders are to be placed in a close observation cell.  They must be supervised under visible observation by security 24 hours a day."  In other words, is the policy to confine the suicidal inmate to a close observation cell, or to the infirmary?  There is no citation for the additional language cited above by the State Defendants in their Interrogatory response.  Was this language contained in the second version of D00461-464 that contained five pages rather than the policy originally produced and Bates stamped that had four pages?  This language, or the withdrawal of this language, may have had a significant impact on the decision to have Christopher Barkes in the Booking and Receiving area of the prison where there was no constant supervision by correctional officers.

## II.    **USDOJ documents**

Discovery in this matter was ongoing, even during the briefing of the motion for

summary judgment. Plaintiffs filed supplemental discovery responses on November 30, 2007 by

incorporating all documents produced by Plaintiffs in their Appendix to the Answering Brief.

(Exhibit E). These documents included the documents produced by the USDOJ in December

2006. The Court had no way of knowing that Plaintiffs' production of the USDOJ report had

been made at the time of the summary judgment decision, in that the only document filed with

the Court was a *notice* of service, without the actual documents produced (as per the rule on

production). Previously, on February 20, 2007, Plaintiffs responded to a discovery request

seeking materials to be introduced into evidence at trial with the response "to be produced at a

later date"; counsel for Defendants never requested an update. In any event, the USDOJ report

was in the possession of the DOC; indeed, it had been prepared *for* the DOC specifically, and

had been provided to the DOC upon issuance. Thus, there is no prejudice to the DOC in having

to respond to these documents on summary judgment.

## III.    **Weakness of the DOC's suicide prevention policies and knowledge of such weaknesses by Defendants Taylor and Williams**

The State retained an expert consultant, Dr. Roberta Stellman, mental healthcare expert,

to review the prisons (D.I. #55 at 47). Dr. Stellman's own report identified many areas of

concern pertaining mental health care of inmates. Discussion in the USDOJ report of Dr.

Stellman's analysis and criticisms begin at page 9 of the USDOJ report on D.I. #55 at page 54, as

follows:

> · "The State's mental health expert found substantial deficiencies with the mental healthcare provided at the facilities" (D.I. #55 at 54).
>
> · "No onsite psychiatric coverage during the weekends (two days out of the week)" (D.I. #55 at 54).

7

· "The State's expert found that treatment plans for inmates need to be developed more regularly so that psychologists do not unnecessarily change diagnosis and so that patients are put on the appropriate problem list" (D.I. #55 at 56).

· "The USDOJ found that inmates at risk for suicide are not adequately identified, housed, and supervised" (D.I. #55 at 60).

· "The State fails to adequately assess and identify inmates at risk for suicide...personnel conducting the assessment lack appropriate training and experience with issues related to mental health and suicide prevention" (D.I. # 55 at 60).

· "Correctional staff receive insufficient training in the area of suicide prevention – training at the Academy is only two or three hours" (D.I. #55 at 60).

· "The Intake process also fails to ensure that appropriate action is taken when an inmate reports a history of suicidal thoughts or actions" (D.I. #55 at 60).

· "State fails to insure that inmates identified as being at risk for suicide are housed in cells which are sufficient to ensure their safety. Protrusions from walls and ceilings, window frames and grates...provide potential anchors strong enough to support an inmate's weight" (D.I. #55 at 60).

· "Hanging was the means used in the May 2006 and February 2005 suicides at HRYCI" (D.I. #55 at 61).

· "The State fails to ensure appropriate levels of observation are maintained." (D.I. #55 at 61).

The problems in mental health screening were longstanding at HRYCI, see for example

our citation, in Plaintiffs' Answering Brief to the Summary Judgment Motion, to the case of

Robinson v. Weiss, 2001 WL 640980 (D. Del. 2001) (a copy of this case is attached to our

Answering Brief (D.I. #54)), in which Judge Robinson found that plaintiff had alleged a valid

claim for relief based upon an assertion that "the State defendants failed to ensure that proper

policies and procedures were implemented to meet the serious psychiatric needs of inmates

housed in Gander Hill despite their prior notice of these deficiencies," 2001 WL 640980 at page

*5. Plaintiffs submit that the critical deficiencies in suicide prevention found in 2006 coupled

with the evidence shown by Plaintiffs about problems with prison suicide that preceded 2004, create a genuine issue of material fact for consideration by a jury.

The Court stated: "However, plaintiffs do not discuss how different intake screening or different medical personnel would have resulted in Mr. Barkes' identification as suicidal, and prevented his suicide." The problem in this case, and to some extent the crux of Plaintiffs' argument, is not that Plaintiffs cannot answer this question, but rather that *no one* can answer, because Mr. Barkes committed suicide less than twenty-four hours after his intake, and before he was ever evaluated by a qualified medical professional.

Plaintiffs submit that a layman (and a juror) could recognize the following on the state of facts in this matter: the intake process at HRYCI was, among other things, intended to identify potentially suicidal inmates; by virtue of his admission, on his intake form, that he had within the last year attempted suicide, Mr. Barkes was *by definition* someone who was potentially suicidal; and, insofar as there was no qualified medical provider on site to evaluate him on November 13 or 14, 2004, there should have been a policy in place requiring that he be placed on suicide watch until such time as a qualified evaluator cleared him for admission into the general population. *This* is the policy that Plaintiffs assert was missing: a policy to err on the side of caution under the circumstances of this case. For Mr. Barkes, the failure of the DOC to err on the side of caution was a proximate cause of his death.

Moreover, the Court's statement, in footnote 8 at page 19 of the Memorandum Opinion, to the effect that "Plaintiffs rely heavily on the USDOJ's 2006 Report, but the Report states that the "form used to conduct intake assessments is good," is accurate as far as it goes, but may not be the end of the analysis. We agree that the form served its purpose; in fact, Mr. Barkes identified himself as having once attempted suicide (although the DOC's record reflected other

suicide attempts as recent as two months before his death). The problem is not with the form; the problem is that, in the absence of a qualified medical evaluator, the State failed to act appropriately on the crucial information that had been provided on the form; stated differently, the State failed to err on the side of caution for this suicidal inmate because there was no policy in place directing them to do so.

The Court also questioned the state of the record on the *knowledge* of Defendants Williams and Taylor as to the inadequacy of the DOC's existing suicide policy, D.I. 60 at page 18:

> That Delaware's rate of prison suicides in 2001-2002 was double the national average is information that might have alerted Warden Williams or Commissioner Taylor that suicide protocols were insufficient, but Plaintiffs have not presented any evidence that either Defendant had knowledge of this fact in 2004. The USDOJ 2006 Findings Report, from which Plaintiffs quote extensively, cannot be probative of Commissioner Taylor's or Warden William's awareness in 2004 of a substantial risk posed by the DOC's suicide prevention protocols. Since Plaintiffs have not presented any evidence that information regarding the effectiveness of the DOC's suicide prevention protocols and training was available and accessible to Commissioner Taylor or Warden Williams in 2004, the Court is unable to find that the risk of Eighth Amendment injury arising from the DOC's suicide prevention protocols was so obvious that these officials must have known.

We respectfully ask this Court to review this analysis. As noted above, the DOC, under the leadership of Commissioner Taylor, had been litigating allegations of purported shortcomings in the mental health policies at HRYCI, under the leadership and supervision of Warden Williams, as early as 2001. The cavalier attitude exhibited towards an inmate such as Mr. Barkes, who despite having identified a recent suicide attempt on an intake form was neither properly evaluated nor closely observed and whether Williams and Taylor knew or should have known of insufficient suicide protocols, is precisely the kind of factual scenario best measured by a jury. The State's own expert found great shortcomings in the mental health screening process in 2006, as did the USDOJ, and it is not unreasonable to assume that these conditions

existed in 2004. Had Stanley Taylor and Raphael Wilson been deposed, they would almost certainly have denied knowledge of a problem with the DOC suicide prevention policy. However, it is the province of a jury to evaluate such testimony, and the jurors could find, under the relevant Supreme Court precedent discussed at length in Plaintiffs' Answering Brief, that under the circumstances Defendants Taylor and Williams *must have known* of the existence of a problem.

## IV.    Conclusion

For all of the reasons hereinabove stated, it is respectfully requested that the decision granting summary judgment in favor of the State Defendants be set aside and the matter allowed to proceed to trial.

DATE:

By:
Jeffrey K. Martin, Esq. (#2407)
Martin & Wilson, P.A.
1508 Pennsylvania Ave.
Wilmington, Delaware 19806
(302) 777-4681
jmartin@martinandwilson.com

and
By:
Herbert G. Feuerhake, Esq. (#2590)    for
521 West Street
Wilmington, Delaware 19801
(302) 658-6101
herblaw@verizonmail.com

Attorneys for the Plaintiffs

11

# EXHIBIT A

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 1 OF 4 |
| EFFECTIVE DATE:   JANUARY 1, 2001 | OPR:  HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

**I.  POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offender who maybe suicide potential during intake processing and or the identification and supervision of suicide-prone offenders during their incarceration.  The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

**II. SCOPE:** This procedure shall apply to all Howard R Young Correctional Institution personnel.

**III. PROCEDURE:**

A. Training - All facility correctional officers will receive special training in suicide prevention provided by the Facility Training Coordinator during in-service training.  The program is coordinated with, reviewed by, and approved by the Medical Section.

B. Recognizing Suicide Potential During the Admissions/Classification Process

1. Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

   a. Severe alcohol/drug dependence

   b. Psychiatric potential suffering from impaired judgment or history of mental illness.

   c. Chronic physical problems

2. Classification Interview - Classification Specialist shall consider offenders a suicide risk if they possess the above risk factors and state that they:

   a. Have a history of recent or recurrent suicide attempts.

   b. Have seriously contemplated suicide in the past or present.

   c. Have extreme depression or impulsiveness, including feelings of hopelessness which appear to be chronic.

   d. Have been admitted to a mental hospital or crisis center for attempted suicide.

C. Post Admission Indicators of Suicide Potential

D00461

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

1. Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

2. During a suicidal crisis, most persons will display either some or all of the following signs of depression:

   a. Sadness or crying

   b. Withdrawal or silence

   c. Loss or gain of appetite marked by noticeable weight gain or loss

   d. Insomnia

   e. Mood variation (in many cases, extreme and unexplained)

   f. Lethargy (slowing of physical movements such as walking and talking)

   g. Changes in behavior such as giving a away personal possessions, planning a funeral, putting affairs in order, etc.

3. Additionally, many offenders may give a housing unit correctional officer verbal cues that indicate a suicide crisis is impending, such as:

   a. Projecting feelings of hopelessness and helplessness

   b. Speaking about getting out of jail unrealistically

   c. Not effectively dealing with the present and being preoccupied with the past

   d. Explaining intentions to commit suicide

   e. Increasing difficulty relating to others

   f. Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a correctional officer)

4. Offenders who should be observed closely for possible suicidal tendencies are:

   a. Older offenders

   b. Chronically or terminally ill offenders

   c. Offenders recuperating from major surgery

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

    d.  Anyone subjected to homosexual assault

    e.  Incarcerated law enforcement officers

    f.  Incarcerated professionals

    g.  Persons who have committed a crime of passion

5.  If a correctional officer has reason to believe that an offender fits any of the aforementioned profiles:

    a.  Immediately implement crisis intervention techniques

    b.  Notify the Shift or Housing Unit Supervisor

    c.  Document all information on an incident report and forward to security and medical personnel

D.  Crisis Intervention Techniques

1.  When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

    a.  Do not judge the offender

    b.  Talk, listen, discuss, keep lines of communication open, and be supportive

    c.  Ask pertinent questions; be direct

    d.  Do not give personal advice or be untruthful

    e.  Do not dare the offender

    f.  Do not act shocked or alarmed

    g.  Refer for professional help

2.  The following are guidelines to assist in a suicide crisis:

    a.  Recognized the clues - hopelessness, helplessness, haplessness

    b.  Trust your judgment - you have observed offenders and can recognize changes in behavior

D00463

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 4 |
| SUBJECT:      OFFENDER MOVEMENT | | |

c.  Listen and be supportive

d.  Attempt to diffuse the tension and agitation: inject a feeling of hope, but do not lie to the offender

e.  Tell others - notify medical and supervisory staff

f.  Document all pertinent information in an Incident Report

E.  Suicide Risk Assessment - The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

1.  High Risk - Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

2.  Moderate Risk - Exhibits suicidal behavior and/or will not make a "no suicide" contact.

3.  Low Risk - May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

F.  Housing Assignment for Suicidal Offenders

1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation(eye contact) process. This is to be documented on the close observation form.

2.  Suicidal offenders are to be placed in a close observation cell. They must be supervised under visible observation by security 24 hours a day.

3.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

4.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.

# EXHIBIT B



RECEIVED

AUG 0 2 2007

**DEPARTMENT OF JUSTICE**
NEW CASTLE COUNTY
820 NORTH FRENCH STREET
WILMINGTON, DELAWARE 19801

CRIMINAL DIVISION (302) 577-8500
FAX (302) 577-2496
CIVIL DIVISION (302) 577-8400
FAX (302) 577-6630
TTY (302) 577-5783

JOSEPH R. BIDEN, III
ATTORNEY GENERAL

August 1, 2007

Jeffrey K. Martin, Esquire
1508 Pennsylvania Avenue, Suite 1C
Wilmington, DE 19806

> **Re:    *Barkes v. FCM, et al.*
> ***C.A. No. 06-104 JJF***

Dear Mr. Martin:

    In response to your letter received last week in which you made an informal request for the Department of Correction's Policy and Procedure Manual with regard to suicide policy and procedure, please find Standard Operating Procedure policy number 190.04 (Bates Numbered #D00514 – D00517). This is the suicide prevention policy that was in place at Howard R. Young Correctional Institution at the time of Christopher Barkes' death.

    Very truly yours,

Stephani J. Ballard by *JOM*
Stephani J. Ballard
Deputy Attorney General

SJB/jom

Enclosure

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 1 OF 4 |
| EFFECTIVE DATE: JANUARY 1, 2001 | OPR: HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

**I.  POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offenders who may be a suicide risk during intake processing and/or the identification and supervision of suicide-prone offenders during their incarceration. The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

**II. SCOPE:** This procedure shall apply to all Howard R Young Correctional Institution personnel.

**III. PROCEDURE:**

  A.  Recognizing suicide potential during the admissions/classification process

    1.  Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

      a.  Severe alcohol/drug dependence

      b.  Psychiatric potential suffering from impaired judgment or history of mental illness.

      c.  Chronic physical problems

    2.  Classification interview - Classification Specialists shall consider offenders a suicide risk if they possess the above risk factors and state that they:

      a.  Have a history of recent or recurrent suicide attempts.

      b.  Have seriously contemplated suicide in the past or present.

      c.  Have extreme depression or impulsiveness, including feelings of hopelessness that appear to be chronic.

      d.  Have been admitted to a mental hospital or crisis center for attempted suicide.

  B.  Post admission indicators of suicide potential

    1.  Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

    2.  During a suicidal crisis, most persons will display either some or all of the following signs of depression:

Ü00514

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

    a. Sadness or crying

    b. Withdrawal or silence

    c. Loss or gain of appetite marked by noticeable weight gain or loss

    d. Insomnia

    e. Mood variation (in many cases, extreme and unexplained)

    f. Lethargy (slowing of physical movements such as walking and talking)

    g. Changes in behavior such as giving away personal possessions, planning a funeral, putting affairs in order, etc.

3. Additionally, many offenders may give a housing unit officer verbal cues that indicate a suicide crisis is impending, such as:

    a. Projecting feelings of hopelessness and helplessness

    b. Speaking about getting out of jail unrealistically

    c. Not effectively dealing with the present and being preoccupied with the past

    d. Explaining intentions to commit suicide

    e. Increasing difficulty relating to others

    f. Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a Correctional Officer)

4. Offenders who should be observed closely for possible suicidal tendencies are:

    a. Older offenders

    b. Chronically or terminally ill offenders

    c. Offenders recuperating from major surgery

    d. Anyone subjected to homosexual assault

    e. Incarcerated law enforcement officers

    f. Incarcerated professionals

000515

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

g.  Persons who have committed a crime of passion

5.  If a Correctional Officer has reason to believe that an offender fits any of the aforementioned profiles:

   a.  Immediately implement crisis intervention techniques

   b.  Notify the Shift or Housing Unit Supervisor

   c.  Document all information on an incident report and forward to security and medical personnel

C.  Crisis Intervention Techniques

   1.  When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

      a.  Do not judge the offender

      b.  Talk, listen, discuss, keep lines of communication open, and be supportive

      c.  Ask pertinent questions; be direct

      d.  Do not give personal advice or be untruthful

      e.  Do not dare the offender

      f.  Do not act shocked or alarmed

      g.  Refer for professional help

   2.  The following are guidelines to assist in a suicide crisis:

      a.  Recognize the clues - hopelessness, helplessness, haplessness

      b.  Trust your judgment - you have observed offenders and can recognize changes in behavior

      c.  Listen and be supportive

      d.  Attempt to diffuse the tension and agitation; inject a feeling of hope, but do not lie to the offender

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 4 |
| SUBJECT:          OFFENDER MOVEMENT | | |

     e.  Tell others - notify medical and supervisory staff

     f.  Document all pertinent information in an Incident Report

D.  Suicide Risk Assessment - The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

    1.  High Risk - Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

    2.  Moderate Risk - Exhibits suicidal behavior and/or will not make a "no suicide" contract.

    3.  Low Risk - May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

E.  Housing assignment for suicidal offenders

    1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation (eye contact) process. This is to be documented on the close observation form.

    2.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

    3.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.

REVISED: MAY 1, 2005

# EXHIBIT C

Case 1:06-cv-00104-JJF    Document 56-2    Filed 11/27/2007    Page 2 of 5

| STANDARD OPERATING PROCEDURE | | |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | POLICY NUMBER 190.04 | PAGE NUMBER 1 OF 5 |
| EFFECTIVE DATE:   JANUARY 1, 2001 | OPR:  HEALTH CARE | |
| APPROVED BY WARDEN: | SUBJECT: SUICIDE PREVENTION | |
| REFERENCES: | | |

**I.  POLICY:** It is the policy of HRYCI personnel to provide special training by qualified instructors in order to identify and monitor those offender who maybe suicide potential during intake processing and or the identification and supervision of suicide-prone offenders during their incarceration. The suicide prevention and intervention program shall be reviewed and approved by a qualified medical or mental health professional.

**II. SCOPE:** This procedure shall apply to all Howard R Young Correctional Institution personnel.

**III. PROCEDURE:**

A.  Training - All facility correctional officers will receive special training in suicide prevention provided by the Facility Training Coordinator during in-service training.  The program is coordinated with, reviewed by, and approved by the Medical Section.

B.  Recognizing Suicide Potential During the Admissions/Classification Process

   1.  Medical screening is conducted by a member of the medical staff who will consider the suicide potential of an offender in regard to the following factors:

      a.  Severe alcohol/drug dependence

      b.  Psychiatric potential suffering from impaired judgment or history of mental illness.

      c.  Chronic physical problems

   2.  Classification Interview - Classification Specialist shall consider offenders a suicide risk if they possess the above risk factors and state that they:

      a.  Have a history of recent or recurrent suicide attempts.

      b.  Have seriously contemplated suicide in the past or present.

      c.  Have extreme depression or impulsiveness, including feelings of hopelessness which appear to be chronic.

      d.  Have been admitted to a mental hospital or crisis center for attempted suicide.

C.  Post Admission Indicators of Suicide Potential

D00461

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 2 OF 5 |
| SUBJECT:        OFFENDER MOVEMENT | | |

1. Some offenders, during their incarceration, may begin to experience suicidal thoughts or conversations, and those who are contemplating suicide, will display signs of depression.

2. During a suicidal crisis, most persons will display either some or all of the following signs of depression:

   a. Sadness or crying

   b. Withdrawal or silence

   c. Loss or gain of appetite marked by noticeable weight gain or loss

   d. Insomnia

   e. Mood variation (in many cases, extreme and unexplained)

   f. Lethargy (slowing of physical movements such as walking and talking)

   g. Changes in behavior such as giving a away personal possessions, planning a funeral, putting affairs in order, etc.

3. Additionally, many offenders may give a housing unit correctional officer verbal cues that indicate a suicide crisis is impending, such as:

   a. Projecting feelings of hopelessness and helplessness

   b. Speaking about getting out of jail unrealistically

   c. Not effectively dealing with the present and being preoccupied with the past

   d. Explaining intentions to commit suicide

   e. Increasing difficulty relating to others

   f. Exhibiting sudden changes in behavior (i.e., makes an unprovoked attack on a correctional officer)

4. Offenders who should be observed closely for possible suicidal tendencies are:

   a. Older offenders
   b. Chronically or terminally ill offenders

   c. Offenders recuperating from major surgery

D00462

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF PRISONS HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 3 OF 5 |
| SUBJECT:          OFFENDER MOVEMENT | | |

    d.   Anyone subjected to homosexual assault

    e.   Incarcerated law enforcement officers

    f.   Incarcerated professionals

    g.   Persons who have committed a crime of passion

5.  If a correctional officer has reason to believe that an offender fits any of the aforementioned profiles:

    a.   Immediately implement crisis intervention techniques

    b.   Notify the Shift or Housing Unit Supervisor

    c.   Document all information on an incident report and forward to security and medical personnel

D.  Crisis Intervention Techniques

1.  When there is reason to believe that an offender fits a suicide potential profile, put crisis intervention techniques into effect.

    a.   Do not judge the offender

    b.   Talk, listen, discuss, keep lines of communication open, and be supportive

    c.   Ask pertinent questions; be direct

    d.   Do not give personal advice or be untruthful

    e.   Do not dare the offender

    f.   Do not act shocked or alarmed

    g.   Refer for professional help

2.  The following are guidelines to assist in a suicide crisis:

    a.   Recognized the clues - hopelessness, helplessness, haplessness

    b.   Trust your judgment - you have observed offenders and can recognize changes in behavior

D00463

| STANDARD OPERATING PROCEDURE | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS<br>HOWARD R YOUNG CORRECTIONAL INSTITUTION | 190.04 | 4 OF 5 |
| SUBJECT:          OFFENDER MOVEMENT | | |

    c.  Listen and be supportive

    d.  Attempt to diffuse the tension and agitation: inject a feeling of hope, but do not lie to the offender

    e.  Tell others - notify medical and supervisory staff

    f.  Document all pertinent information in an Incident Report

E.  Suicide Risk Assessment - The medical staff will assess an offender's potential for suicide using the following three (3) risk categories:

    1.  High Risk - Engages in self-mutilation which cannot be stopped by removing contraband and/or other material, i.e., banging head on floor or wall, biting or scratching self, attempts to remove body parts.

    2.  Moderate Risk - Exhibits suicidal behavior and/or will not make a "no suicide" contact.

    3.  Low Risk - May have been actively suicidal, i.e., thoughts, plans, movement toward implementing plans, but verbalizes feeling a significant decrease in stress and/or makes a "no suicide" contract.

F.  Housing Assignment for Suicidal Offenders

    1.  Offenders identified by the medical staff as suicide risks will be assigned to cells designated in the infirmary for suicide observation. Security will maintain a fifteen-minute close observation(eye contact) process. This is to be documented on the close observation form.

    2.  Suicidal offenders are to be placed in a close observation cell. They must be supervised under visible observation by security 24 hours a day.

    3.  Suicidal offenders with other medical problems shall be assigned to a cell in the infirmary.

    4.  Offenders who display suicidal tendencies will be evaluated by the medical health staff for housing assignment.

B 0 0 4 6 4

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES individually; TINA            )
GROSSMAN as next                           )
friend of BRITTANY BARKES; TINA            )
GROSSMAN as next friend of ALEXANDRA       )
BARKES; and KAREN BARKES as administratrix )
of the ESTATE OF CHRISTOPHER BARKES,       )
                                           )
            Plaintiffs,                     )
                                           )
      v.                                   )        C.A. No. 06-104 JJF
                                           )
                                           )
FIRST CORRECTIONAL MEDICAL,                )        JURY TRIAL DEMANDED
INC.; STANLEY TAYLOR; RAPHAEL              )
WILLIAMS; CERTAIN UNKNOWN                  )
INDIVIDUALEMPLOYEES OF THE STATE OF        )
DELAWARE DEPARTMENT OF                     )
CORRECTION; CERTAIN UNKNOWN                )
INDIVIDUAL EMPLOYEES                       )
OF FIRST CORRECTIONAL MEDICAL,             )
INC.; and STATE OF DELAWARE                )
DEPARTMENT OF CORRECTION,                  )
                                           )
            Defendants.                     )

## STATE DEFENDANTS RESPONSES TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

1.     Has the State of Delaware or any representative of the State of Delaware

indicated to You that the State of Delaware will indemnify you for any judgment entered

against You in this case? If Your answer is "yes", please describe the scope of such

indemnification, including the manner in which it is limited in any fashion (for example,

if there is a limitation with regard to punitive damages.)

1

**A000096**

6.    Identify and explain the procedure in effect on November 13 and 14, 2004, that DOC employees and/or medical personnel at HRYCI must follow when admitting to the prison a suicidal or mentally ill inmate at "initial intake".

**ANSWER:**

Objection to the extent this question suggests or presumes that the deceased Plaintiff/inmate, Christopher Barkes, was "suicidal" or "mentally ill" at the time of his intake at HRYCI on November 13, 2004.   See response to Interrogatory # 4, above.   A medical and mental health screening by the health care provider is part of the intake process.   If the medical provider identifies any inmate as a suicide risk, that inmate is housed in the infirmary, with precautions appropriate to that inmate's conditions and needs.   *See also* Standard Operating Procedure 190.04, regarding "Suicide Prevention," produced as Bates # D00461-D00464.


7.    Identify and explain the procedure for administering prescribed medication to any inmate on November 13 and 14, 2004 once the inmate was admitted to HRYCI.

**ANSWER:**

Policies and procedures for administration of prescribed medication to inmates/detainees at HRYCI are determined by the contracted medical provider—in this case, FCM.   Employees of DOC/HRYCI do not participate in the distribution of medications to inmates; this is handled solely by medical staff.   Upon information and belief, at the time in question, medications were distributed to inmates, as prescribed, at least once per 8-hour shift.

6

# EXHIBIT E

IN THE UNITED STATES DISTRICT COUR/T

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAREN BARKES, individually;<br>TINA GROSSMAN as next friend of<br>BRITTANY BARKES; TINA<br>GROSSMAN as next friend of<br>ALEXANDRA BARKES; and<br>KAREN BARKES as administratrix<br>of the ESTATE OF CHRISTOPHER<br>BARKES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 06-104-JJF |
| | )<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| FIRST CORRECTIONAL MEDICAL<br>INC.; STANLEY TAYLOR;<br>RAPHAEL WILLIAMS;<br>CERTAIN UNKNOWN INDIVIDUAL<br>EMPLOYEES OF STATE OF<br>DELAWARE DEPARTMENT OF<br>CORRECTION; CERTAIN<br>UNKNOWN INDIVIDUAL<br>EMPLOYEES OF FIRST<br>CORRECTIONAL MEDICAL, INC.,<br>And STATE OF DELAWARE,<br>DEPARTMENT OF CORRECTION, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL RESPONSE TO STATE DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

<u>**REQUEST NO. 22:**</u>  Any and all documents that you intend to introduce into evidence at the trial of this action, to the extent not previously produced.

<u>**RESPONSE:**</u>  Plaintiff's supplement their and to this response by stating see Pages B-1 through B-136 as previously produce in Appendix to Plaintiff's Answering Brief in Response to State Defendants'

Opening Brief in Support of its Motion for Summary Judgment previous produced.

MARTIN & WILSON, P.A.

*/s/ Jeffrey K. Martin, Esquire*

**JEFFREY K. MARTIN, ESQUIRE**
Delaware State Bar No. 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
Attorneys for Plaintiffs

Dated: November 30, 2007

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **KAREN BARKES, et. al** | : | |
| | : | |
| **Plaintiffs,** | : | **C.A. No. 06-104(JJF)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **FIRST CORRECTIONAL MEDICAL,** | : | |
| **INC., STANLEY TAYLOR, et. al** | : | |
| | : | |
| **Defendants.** | : | |

### CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2008 I electronically filed *Plaintiffs' Motion for*

*Reargument* with the Clerk of the Court using CM/ECF which will send notification of

such filing to the following attorneys of record below:

Stephani J. Ballard, Esquire
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, DE 19801

Dana M. Spring-Monzo, Esquire
McCullough & McKenty,PA.
1225 King Street
Suite 100
P.O. Box 397
Wilmington, DE 19899-0397

By:  Jeffrey K. Martin, Esq. (#2407)
Martin & Wilson, P.A.
1508 Pennsylvania Ave.
Wilmington, Delaware 19806
(302) 777-4681
jmartin@martinandwilson.com
Attorney for Plaintiffs