IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et al.,

Plaintiffs,

v.

FIRST CORRECTIONAL MEDICAL, et al.,

Defendants.

Civil Action No. 06-104-JJF

---

Jeffrey K. Martin, Esquire, of MARTIN & ASSOCIATES, P.A., Wilmington, Delaware.
Herbert G. Feuerhake, Esquire, of LAW OFFICES OF HERBERT G. FEUERHAKE, Wilmington, Delaware.

Attorneys for Plaintiffs.

Defendant First Correctional Medical, Inc. Not Represented By Counsel.

---

**MEMORANDUM OPINION**

March 9, 2010
Wilmington, Delaware

**Farnan, District Judge.**

On October 9, 2009, in response to Plaintiffs' Motion For Setting An Inquisition Hearing (D.I. 90), the Court conducted an Inquisition Hearing on damages for the default judgment entered against Defendant First Correctional Medical, Inc. in the above-captioned action. Although this matter is not concluded as it relates to other Defendants, this Memorandum Opinion provides the Court's determination of damages regarding defaulted Defendant First Correctional Medical, Inc.

**I. Background**

On February 16, 2006, Plaintiffs Karen Barkes, individually and as Administratrix of the Estate of Christopher Barkes, Tina Grossman, as next friend of Alexandra Barkes, and Tina Grossman, as next friend of Brittany Barkes (collectively, "Plaintiffs") filed this action against numerous defendants, including First Correctional Medical, Inc. ("First Correctional Medical"). (D.I. 1.) The action stems from the suicide of Mr. Christopher Barkes ("Mr. Barkes), who was taken into the custody of the Delaware Department of Corrections on November 13, 2004, and committed suicide the next day. (Id. ¶¶ 17, 26.) On February 8, 2008, counsel for First Correctional Medical filed a Motion To Withdraw, citing First Correctional Medical's continued failure to meet its financial obligations to counsel. (D.I. 59 ¶¶ 10-12.) The Court granted the Motion To Withdraw on February 28, 2008, and ordered First Correctional Medical to obtain new

counsel within sixty days. (D.I. 63). Upon First Correctional Medical's failure to obtain new counsel, a Show Cause Hearing was held on May 21, 2008. First Correctional Medical did not appear at the hearing, and Plaintiffs moved for an entry of default, which the Court granted. (D.I. 73, Tr. at 2:6 -3:1.) Default judgment against First Correctional Medical was entered on June 6, 2008. (D.I. 74.)

**II. Parties' Contentions**

As a result of the default judgment entered against First Correctional Medical, Plaintiffs now seek damages with regard to the following: 1) Karen Barkes, in her role as Administratrix of the estate of Mr. Barkes, seeks damages for the conscious pain and suffering of Mr. Barkes caused by the medical malpractice of First Correctional Medical pursuant to 10 Del. C. § 3701; 2) Karen Barkes, in her individual role, seeks damages for mental anguish and the loss of the benefits of her marital relationship, suffered as a result of the wrongful death of Mr. Barkes, pursuant to 10 Del. C. § 3724; 3) Tina Grossman, as next friend of Alexandra Barkes, seeks damages for mental anguish and the loss of the benefits of the parental relationship suffered by Alexandra Barkes as a result of the wrongful death of Mr. Barkes, pursuant to 10 Del. C. § 3724; and 4) Tina Grossman, as next

friend of Brittany Barkes,[1] seeks damages for mental anguish and the loss of the benefits of the parental relationship suffered by Brittany Barkes as a result of the wrongful death of Mr. Barkes, pursuant to 10 Del. C. § 3724. (D.I. 1; D.I. 95.)[2]

**III. Discussion**

**A. Survival Action Under 10 Del. C. § 3701**

Delaware's survival statute permits a decedent's estate to prosecute claims against a defendant on behalf of the decedent. Parlin v. Dyncorp Int'l, Inc., C.A. No. 08c-01-136-FSS, 2009 WL 3636756, at *4 (Del. Super. Ct. Sept. 30, 2009). The estate can recover "any damage sustained by the decedent between the injury

---

[1] Brittany Barkes was a minor when the present action was instituted, but is currently twenty years of age. (D.I. 94, Tr. at 16:20-23.)

[2] Although not explicitly stated, upon hearing the testimony offered at the Inquisition Hearing, and reading Plaintiffs' October 19, 2009 letter (D.I. 95), the Court concludes that Plaintiffs' only theory of recovery under 10 Del. C. § 3724 is based on mental anguish. Plaintiffs did submit an earnings statement reflecting Mr. Barkes' gross pay for approximately five months prior to his suicide. (Hr'g Ex. 1.) However, Plaintiffs only mention pecuniary damages in passing in one sentence of their letter about damages theories. (See D.I. 95 ("In terms of pecuniary damages, for example, we offered evidence of Mr. Barkes' earnings during a period of approximately five months before his death, but in the end, it is the inexpressable *human* toll that is the most real damage suffered by the survivors.").) To the extent this represents an effort to recover deprivation of the expectation of pecuniary benefits pursuant to 10 Del. C. § 3724(d)(1), the Court finds there is an insufficient basis for recovery. Plaintiffs have not provided any evidence of Mr. Barkes' life expectancy or his income potential, and therefore, the Court is unable to accurately determine the expectation of pecuniary benefits which would have resulted from Mr. Barkes' continued life.

and his/her death, for which the decedent could have recovered had he/she lived." Frantz v. U.S., 791 F. Supp. 445, 448 (D. Del. 1992)(citing Magee v. Rose, 405 A.2d 143, 147 (Del. Super. Ct. 1979)). The survival statute provides, in pertinent part:

> All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. Accordingly, all actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

10 Del. C. § 3701. Damages for the conscious pain and suffering of the decedent are recoverable "provided that the plaintiff proves by a preponderance of the evidence that the decedent did not die instantaneously upon [injury] and that there was some appreciable interval of conscious pain and suffering after the injury." Magee, 405 A.2d at 146.

The Court concludes that Karen Barkes ("Mrs. Barkes"), as Administratrix of the estate of Mr. Barkes, is not entitled to recovery of damages for the conscious pain and suffering of Mr. Barkes because Plaintiffs have failed to prove, by a preponderance of the evidence, that Mr. Barkes experienced an appreciable interval of conscious pain and suffering after his self-inflicted injury, but before his death. At the Inquisition Hearing, Plaintiffs' counsel provided a brief history of Mr. Barkes' previous suicide attempts, and stated that "within 24 hours of his admission [to the Howard R. Young Correctional

Institution] he was [] found dead in his cell." (D.I. 94, Tr. at 6:8-9.) Mrs. Barkes recounted that a correctional officer telephoned to inform her that her husband had hung himself. (Tr. at 11:25-12:8.) She testified that doctors told her that they had tried unsuccessfully to resuscitate Mr. Barkes, and that she viewed a video of the resuscitation attempts, but that "[h]e was obviously dead." (Tr. at 12:13-25.) Nothing in the record proves one way or the other whether Mr. Barkes immediately passed away, or whether he experienced a period of conscious suffering and pain before death. Therefore, the Court is unable to award damages to Mrs. Barkes pursuant to § 3701.

**B. Wrongful Death Actions Under 10 Del. C. § 3724**

In contrast to the survival statute, Delaware's wrongful death statute compensates a decedent's loved ones rather than the estate. Frantz, 791 F. Supp. at 448. "It is a derivative claim and, if the action is permitted, each statutory beneficiary is entitled to separate damages upon proof of his/her loss." Id. The wrongful death statute provides, in pertinent part:

> (a) An action under this subchapter shall be for the benefit of the spouse, parent, child and siblings of the deceased person.
>
> * * *
>
> (d) In fixing the amount of damages to be awarded under this subchapter, the court or jury shall consider all the facts and circumstances and from them fix the award at such sums as will fairly compensate for the injury resulting from death. In determining the amount of the award the court or jury may consider the following: (5) Mental anguish resulting from such death to the surviving spouse and next of-kin of such deceased

> person. However, when mental anguish is claims as a measure of damages under this subchapter, such claim for mental anguish will be applicable only to the surviving spouse, children and person to whom the deceased stood in loco parentis at the time of the injury which caused the death deceased . . .

10 Del. C. § 3724. Recovery for mental anguish, even absent a showing of physical injury arising from such anguish, is permitted. Spencer v. Goodill, C.A. No. 08C-06-183-RRC, 2009 WL 3823217, at *3 (Del. Super. Ct. Nov. 13, 2009). Thus, in recovering damages for mental anguish, plaintiffs are "compensate[d for] the 'real injury caused by the death of a loved one: the emotional pain of the loss.'" Id. (citing John E. Babiarz, Jr., A New Wrongful Death Act For Delaware, Del. Law., Fall 1982, at 20)(internal alterations omitted).

Plaintiffs generally request that the Court "do justice to [Mr. Barkes'] memory, and the unfortunate circumstances of his death, in compensating his survivors for their loss." (D.I. 95.) Accordingly, in the Court's view, a brief survey of Delaware law concerning damages awards for mental anguish under § 3724 is a necessary starting point. In Bailey v. Beebe Med. Ctr., Inc., C.A. No. 03C-04-013, 2005 WL 2155704 (Del. Super. Ct. Aug. 31, 2005), aff'd, 913 A.2d 543 (Del. 2006), cited by Plaintiffs, the jury returned a verdict awarding a decedent's husband $3,000,000 and her children $2,000,000 each on their wrongful death claims. Id. at *1. Beebe Medical Center ("Beebe"), the defendant, challenged the verdicts as shocking. Id. at *2. First, Beebe

argued that the verdicts were out of proportion to the injury suffered by the decedent, Julie Bailey. Id. at *3. The Superior Court rejected this argument, finding that the verdicts were unremarkable given the nature of the decedent's injuries, and were overwhelmingly supported by the evidence presented at trial. Id. The decedent, an Alzheimer's patient, was "locked in a freezer for four hours, [] frozen to the floor in her own urine, [] nearly frozen to death, [and] pried off the floor by three people." Id. She received treatment for her frostbite without pain medication, died by suffocation, and after her death, was dropped on the floor by Beebe staff. Id. In the Court's view, the testimony of the decedent's husband and children was "powerful and moving," and "their lives will forever be adversely affected by these events." Id. at *2.

Second, Beebe argued that the verdicts were shocking because they were out of proportion to the verdicts in other large personal injury cases. Id. at *4. The Court looked at the selection of personal injury cases cited by Beebe, and found that the damages awarded to the spouses and/or parents in these cases ranged from $325,000 to $5,950,000, with an average award of $1,935,000. Id. While the verdicts were within the "ballpark" of the cases cited by Beebe, the Court cautioned that it was "not appropriate to put too much weight on this type of [comparison] analysis" because it is hard to find cases factually similar

enough to make such a comparison meaningful, and because a particular injury cannot simply be equated with a certain dollar amount of damages. Id.

In Daniels v. Daniels, C.A. No. 83C-FE-110, 1990 WL 74338 (Del Super. Ct. June 5, 1990), the Superior Court determined an amount of damages to be awarded for mental anguish under § 3724 after conducting an inquisition hearing. Plaintiffs were the wife and daughter of decedent Frank Daniels, who passed away after being shot and struck in the head with a blunt instrument. Id. at *1, 4. The decedent's wife, Gloria Daniels ("Mrs. Daniels"), was awarded $145,000 in damages for mental anguish. Id. at *3. In reaching its decision, the Court noted that Mr. and Mrs. Daniels had been married for approximately 18 years, they had one child together, and that they were involved in a family farming enterprise. Id. She testified that she cried everyday for a month, experienced difficulty in raising her daughter, and lived with a fear of being attacked. Id. The Court also found that, although she still continued to grieve, Mrs. Daniels continued to work, began another romantic relationship, and was essentially able to lead a normal life. Id. The decedent's daughter, Josephine Daniels-Wilson ("Ms. Wilson"), was awarded $130,000 in damages for mental anguish. Id. The Court discussed Ms. Wilson's testimony, in which she described the type of relationship she had with her father, and

the effect of her father's death on the relationship with her mother. Id. Ms. Wilson further testified she had not sought professional help in coping with her father's death, and that she basically led a normal life with her own husband and child. Id.

In Okie v. Owens, 1985 WL 189292 (Del. Super. Ct. Oct. 16, 1985), defendants conceded liability for wrongful death, and the only issue presented to the jury was the amount of money damages the parents of the decedent, Marion Okie, were entitled to for the mental anguish suffered as a result of their daughter's death. Id. at *1. The jury awarded $5,000 to each parent, but the Superior Court reversed and ordered a new trial on damages, finding that $5,000 was so low as to be shocking to a sense of justice and fairness. Id. at *5. In arriving at its decision, the Court considered numerous uncontroverted facts in the record, including that: the decedent was the only child of the plaintiffs; the decedent maintained a "remarkably . . . close relationship to both parents"; the decedent's death occurred on Christmas, which would make the holiday season difficult for the plaintiffs; the decedent's death was unexpected, and the plaintiffs did not have the opportunity to prepare themselves for her loss; and both plaintiffs visit the gravesite often, and they curtailed their social contacts as a result of the decedent's death. Id. The Court found that an award of $5,000 for mental anguish "hardly suggests but minimal compensation for the daily

feelings of sadness associated with the loss of their only daughter's life, and all that her life meant to them, namely her love and companionship and their future expectation of same." Id.

The Court also finds the Pattern Jury Instructions for Civil Practice in the Superior Court of the State of Delaware to be instructive on determinations of mental anguish damages. Pattern Civil Jury Instruction §22.8 ("Measure of Damages- Wrongful Death") provides as follows:

> The term "mental anguish" encompasses the grieving process associated with the loss of a loved one. You may consider that the grieving process, accompanied by its physical and emotional upheaval, will be experienced differently by different people, both in its intensity and in its duration. The ability to cope with the loss may be different for each person.
>
> There is no fixed standard or measurement. You must determine a fair and adequate award through the exercise of your judgment and experience after considering all the facts and circumstances presented to you during the trial...

Del. Super. P.J.I. Civ. §22.8 (2000).

Next, the Court turns to the evidence of record in the present action. "A consequence of the entry of a default judgment is that 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990)(citing 10 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, §2688 at 444 (2d ed. 1983)). Thus, the Court accepts as true the following factual allegations: Mr.

Barkes had attempted suicide on at least one occasion during a prior incarceration at the Howard R. Young Correctional Institution; when he was incarcerated on November 13, 2004 for a probation violation, the intake form noted that Mr. Barkes took prescription medication to treat depression and bipolar disorder; the intake form, signed by a First Correctional Medical intake nurse, stated that Mr. Barkes had previously attempted suicide; Mr. Barkes was not placed under constant supervision or checked at regular intervals; First Correctional Medical provided Mr. Barkes with the bedding which he used to hang himself; and Mr. Barkes was discovered in his cell by prison officials at approximately 11:40 a.m. on November 14, 2004 and was determined to have hung himself. (D.I. 1 ¶¶ 16, 20, 22, 26, 27, 28.)

At the Inquisition Hearing, Mrs. Barkes testified that she had been married to Mr. Barkes for almost two years at the time of his death, and that she had waited until later in life to be married. (Tr. at 6:18-20; 7:7.) She testified about the nature of their relationship, characterizing Mr. Barkes as her greatest source of emotional support. (Tr. at 7:8-10.) She further stated that she and Mr. Barkes were planning a family together, and that he and his two daughters from a previous marriage "became my whole life." (Tr. at 7:10-12.) In regard to the effect that Mr. Barkes' death had on her daily life, Mrs. Barkes testified that she was able to keep working for approximately six

months, but that she "just broke" upon receiving prison documents which stated that Mr. Barkes had identified himself as suicidal on the intake form. (Tr. at 13:6-14.) For about a year after this point, Mrs. Barkes was unable to work full-time, and subsequently could not afford to keep the house in which she resided with Mr. Barkes. (Tr. at 16-19.) She also testified that she was unable to "keep up with daily things like taking a shower, matching my clothes, being able to keep up the house." (Tr. at 7:21-23.)

Alexandra Barkes, Mr. Barkes' younger daughter, testified that she was twelve years old at the time of his passing. (Tr. at 8:18-19.) She testified that she attended the viewing, but stayed out because she did not want to see anything. (Tr. at 9:22-23.) From her testimony, it appears that Alexandra did not miss much school, and that her friends and classmates were supportive. (Tr. at 10:8-13; 11:3-13.) Further, Alexandra described her relationship with her father as being very close, and stated that he "was always there," and was extremely supportive, especially in her extracurricular activities. (Tr. at 8:20-9:3.)

Brittany Barkes, Mr. Barkes' older daughter, testified that she and her sister learned of Mr. Barkes' death from their mother, who had received a telephone call from Mrs. Barkes. (Tr. at 18:5-10.) Like her sister, Brittany characterized Mr. Barkes

as very supportive and encouraging. (Tr. at 17:10-19.) She further elaborated that Mr. Barkes was enthusiastic about Christmas, and that the holiday season was a special time with her father. (Tr. at 17:20-24.) After Mr. Barkes' death, Brittany took several days off from school, and occasionally missed school days throughout that year. (Tr. at 18:13-16.) She testified that she and her sister participated in a support program with other children their ages who had lost a parent. (Tr. at 18:21-23.) In terms of the continuing impact of Mr. Barkes' death, Brittany stated, "I feel like I'm never going to fully recover from it. It's hard when your friends are talking about - my dad, father, daughter dances. It's hard to think about that." (Tr. at 18:24-19:1.)

Upon review of the foregoing evidence, and in the exercise of its discretion, the Court concludes that Mrs. Barkes is entitled to $150,000 in damages, and Alexandra Barkes and Brittany Barkes are each entitled to $350,000 in damages for mental anguish suffered as a result of the wrongful death of Mr. Barkes. In arriving at this determination, the Court is cognizant that no monetary amount will ever truly compensate Plaintiffs for the loss of their husband and father. Although Mr. and Mrs. Barkes were married for a relatively short time, Mrs. Barkes has been deprived of realizing most of the plans they had made for a life together. Especially noteworthy is the fact

that Mrs. Barkes' difficulty in keeping up with the daily functions of life- such as taking a shower and going to work- appears to have been largely triggered by the knowledge that Mr. Barkes informed prison officials that he was suicidal. While neither Alexandra nor Brittany Barkes appear to have had major disruptions to their education as a result of their father's death, both participated in grief counseling to deal with their loss. Alexandra and Brittany will never have the opportunity to celebrate another holiday with Mr. Barkes, and they will be forever deprived of the supportive relationship they previously shared with him. Accordingly, in the Court's view, an award of $150,000 to Mrs. Barkes and $350,000 to both Alexandra and Brittany Barkes is fair compensation for the mental anguish they have suffered as a result of Mr. Barkes' death.

**IV. Conclusion**

For the reasons discussed, Karen Barkes is entitled to a damages award of $150,000. Alexandra and Brittany Barkes are each entitled to damages awards of $350,000.

An appropriate Order will be entered.