## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN BARKES, et al.,                   :
                                        :
               Plaintiffs,       :
                                        :
              v.                :      C.A. No. 06-104-LPS
                                        :
FIRST CORRECTIONAL MEDICAL,             :
INC., et al.,                           :
               Defendants.       :

---

Jeffery K. Martin, Esquire, MARTIN & ASSOCIATES, P.A., Wilmington, DE.

      Attorney for Plaintiffs.


Catherine Damavandi, Esquire, Delaware Department of Justice, Wilmington, DE.

      Attorney for Defendants.


## **MEMORANDUM OPINION**


July 17, 2012
Wilmington, Delaware

STARK, U.S. District Judge:

Pending before the Court are: (1) a Second Motion for Reargument, filed by Plaintiffs Karen Barkes, Alexandra Barkes, and Brittany Barkes ("Plaintiffs") (D.I. 199); (2) a Motion for Summary Judgment filed by Defendants Stanley Taylor and Raphael Williams ("Defendants") (D.I.226); (3) a Motion for Summary Judgment filed by Plaintiffs (D.I. 230); (4) Plaintiffs' Motion for Extension of Time to Designate an Expert (D.I. 262); and (5) Plaintiffs' Motion for Permission to Supplement Plaintiffs' Second Motion for Reargument (D.I. 263). For the reasons discussed below, the Court will deny all of the motions except for Plaintiffs' request to supplement their motion for reargument.

## BACKGROUND[1]

Plaintiffs, the surviving family members of decedent Christopher Barkes ("Barkes"), filed this action pursuant to 42 U.S.C. § 1983, stemming from Barkes' suicide at the Howard R. Young Correctional Institute ("HRYCI").[2] Barkes committed suicide in his cell on November 14, 2004 while awaiting transport to the Violation of Probation ("VOP") Center in Sussex County the following day. (D.I. 51 at A152-53, A113) Barkes had been arrested on an administrative warrant on the previous day, arising from his having loitered in an attempt to purchase drugs, thus violating his probation. (Id. at A288) Barkes was on probation for a domestic abuse conviction in March 2004. (D.I. 246 at AA105)

---

[1]More extensive background information can be found in prior opinions written by now-retired District Judge Joseph J. Farnan, Jr. (D.I. 60), Magistrate Judge Mary Pat Thynge (D.I. 165), and the undersigned judge (D.I. 185).

[2]Specifically, Plaintiffs are Karen Barkes, individually and as administratrix of the Estate of Christopher Barkes, Alexandra Barkes, and Brittany Barkes, the widow and children of decedent Christopher Barkes. (D.I. 60 at 2; D.I. 259 at 1; D.I. 260 at 1)

1

Barkes was arrested on the afternoon of November 13, 2004. (D.I. 51 at A14, A288)

That same day, at approximately 3 p.m, Barkes underwent a medical screening/intake procedure,

conducted by a Licensed Practical Nurse ("LPN") employed by First Correctional Medical, Inc.

("FCM"). (*Id.* at A1-A4, A154) Included in this procedure was an intake form which contained

questions about his mental health and suicidal desires. (*Id.* at A145-47) Barkes indicated on the

form that he had previously attempted suicide in 2003. (*Id.* at A148) Barkes did not, however,

indicate on the form that he had additionally attempted suicide on three other occasions: in 1997,

while incarcerated at the HRYCI (*id.* at A77); and twice on the same day in September 2004 (*id.*

at A78) – just 65 days prior to his eventual suicide – all of which was known to the State

probation office (*id.* at A22). Barkes also indicated on the form he had no current suicidal

ideation. (*Id.* at A147)

Additionally, as this Court has previously explained:

> The form lists 17 suicide risk factors for which each inmate is
> screened. If eight or more factors are checked, "yes," or if certain
> serious risk factors are present . . . the physician on call is notified
> and suicide precautions are initiated . . . [I]n addition to the Mental
> Health/Suicide Prevention Screening Form, the FCM intake nurse
> completed FCM's standard medical intake form, which asks
> whether the inmate shows any obvious signs of "altered  mental
> status . . . or abnormal conduct." . . . [T]he standard medical
> intake form also contains a series of questions regarding the
> inmate's health history.

(D.I. 60 at 5-6) (internal citations omitted)

At approximately 6 p.m. on November 14, Barkes called his wife, Karen Barkes, from the

HRYCI. (D.I. 246 at AA226) According to Ms. Barkes, Barkes told her that he was going to kill

himself and asked that she tell his daughters that he loved them. (*Id.* at AA225) It is undisputed

2

that Ms. Barkes did not contact anyone at the Delaware Department of Correction ("DOC") to advise them of the call she received from Barkes. (*Id.* at AA226)

Although there is no record evidence as to whether Defendants or DOC knew it on November 14, in the two months between Barkes' unsuccessful suicide attempts and his eventual suicide he had been under the care of two mental health professionals. (D.I. 246 at AA11-32, AA33-35) Nothing in the record indicates that either of these professionals regarded Barkes as suicidal as of mid-November 2004. Among other things, he had been released from Mirmont Treatment Center in Media, Pennsylvania by Dr. Richard Silver on October 15, 2004. (D.I. 246 at AA33-34)

FCM was the contract medical provider at HRYCI at the time of Barkes' incarceration. In this capacity, FCM was responsible for inmate intake and medical screening. (D.I. 233 at PA118) The provision of medical care to patients was periodically reviewed by the DOC in monthly Medical Committee Review meetings. (D.I. 246 at AA247) DOC Bureau Chief Joyce Talley oversaw and represented the DOC at these meetings. (*Id.*)

According to internal documents as well as the deposition testimony of former DOC Commissioner Stanley Taylor, the HRYCI suicide prevention procedures were modeled on the standards promulgated by the National Commission on Correctional Health Care ("NCCHC"). (D.I. 269 at Ex. C; D.I. 200 at RA58, RA66-67) The NCCHC had issued model intake forms in 1997. (D.I. 233 at PA56, PA60-62) The forms used with Barkes were, in substance, the same as the 1997 NCCHC forms. (D.I. 200 at RA58-59) In 2003, the NCCHC revised its standards, including by eliminating the 1997 forms. (D.I. 269 at Ex. B) The same year, the NCCHC completed a periodic audit of HRYCI and accredited HRYCI. (*Id.* at Ex. A)

3

In 2005, DOC terminated its contract with FCM.  (D.I. 258 at PA132-133)

Plaintiffs filed their original Complaint (D.I. 1) on February 16, 2006.  In that original

Complaint, Plaintiffs alleged Eighth Amendment violations against DOC; Commissioner Taylor;

Raphael Williams, Warden of the HRYCI; and FCM.  Thereafter, on June 6, 2008, the Court

entered a default judgment against FCM.  (D.I. 74)

On February 27, 2008, the Court granted summary judgment to Defendants Taylor and

Williams on the original Complaint's Counts I, III, and IV.  (D.I. 60)  On April 18, 2008, the

Court denied Plaintiffs' motion for reconsideration of this ruling.  (D.I. 70)  Following the

Court's grant of leave to amend the pleadings (D.I. 73 at 3-4), Plaintiffs filed their Amended

Complaint on June 13, 2008 (D.I. 75).  On March 30, 2009, the Court granted Defendants'

motion to strike the amended complaint, but permitted Plaintiffs to further amend their pleadings.

(D.I. 81)  On April 9, 2009, Plaintiffs filed their Second Amended Complaint.  (D.I. 82)

Plaintiffs were then permitted to file a Third Amended Complaint limited to a claim of failure to

supervise.  (D.I. 150 at 14-15; D.I. 158)

On April 22, 2010, Plaintiffs filed their Third Amended Complaint, solely seeking relief

as to Count V, which alleges that Defendants violated Barkes' civil rights by failing to

adequately supervise the medical treatment provided at HRYCI by FCM.  (D.I. 152)  Defendants'

moved to dismiss the Third Amended Complaint.  (D.I. 153)  Magistrate Judge Thynge's

recommendation that Defendants' motion be denied (D.I. 165) was adopted by the Court on

February 28, 2011 (D.I. 185).

On May 12, 2011, in conjunction with denying Plaintiffs' Motion for Sanctions relating

to the purported late production by Defendants of Barkes' probation records, the Court

4

authorized Plaintiffs to file a second motion for reargument relating to the Court's grant of

summary judgment to Defendants on Count I, III, and IV. (D.I. 198) Plaintiffs filed their second

motion for reargument shortly thereafter, on May 27, 2011. (D.I. 199)

Subsequently, in February 2012, Defendants and then Plaintiffs filed motions for

summary judgment on Count V. (D.I. 226; D.I. 230) On May 11, 2012, Plaintiffs filed their

motion to extend the time to designate an expert and, on May 14, they filed their motion to

supplement their motion for reargument. (D.I. 262; D.I. 263)

The Court heard oral argument on all pending motions on July 10, 2012. *See* Hr'g Tr.

July 10, 2012 (D.I. 274) (hereinafter "Tr.").

## LEGAL STANDARDS

**I.**    **Motion for Reargument**

Pursuant to Local Rule 7.1.5, a motion for reconsideration should be granted only

"sparingly." The decision to grant such a motion lies squarely within the discretion of the district

court. *See Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 419 (D. Del. 1999);

*Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990). These types of motions

are granted only if the court has patently misunderstood a party, made a decision outside the

adversarial issues presented by the parties, or made an error not of reasoning but of apprehension.

*See Shering Corp. v. Amgen, Inc.*, 25 F. Supp. 2d 293, 295 (D. Del. 1998); *Brambles*, 735 F.

Supp. at 1241. "A motion for reconsideration is not properly grounded on a request that a court

rethink a decision already made." *Smith v. Meyers*, 2009 WL 51195928, at *1 (D. Del. Dec.30,

2009); *see also Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa.

1993). It is not an opportunity to "accomplish repetition of arguments that were or should have

been presented to the court previously." *Karr v. Castle*, 768 F. Supp. 1087, 1093 (D. Del. 1991).

A motion for reconsideration may be granted only if the movant can show at least one of the following: (i) there has been an intervening change in controlling law; (ii) the availability of new evidence not available when the court made its decision; or (iii) there is a need to correct a clear error of law or fact to prevent manifest injustice. *See Max's Seafood Café by LouAnn, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). However, in no instance should reconsideration be granted if it would not result in amendment of an order. *See Schering Corp.*, 25 F. Supp. 2d at 295.

## II.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted) (emphasis in original).

6

The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

7

## DISCUSSION

### I.    Plaintiffs' Motion for Reargument

Plaintiffs filed their second motion for reargument pursuant to this Court's Memorandum

Order (D.I. 198) granting permission to file such a motion due to the then newly-available

probation records of Mr. Barkes.  By their motion, Plaintiffs seek to reinstate Counts I, III, and

IV of their original Complaint, on which the Court previously granted summary judgment to

Defendants. (D.I. 60)  Count I asserted Defendants violated Barkes' Eighth Amendment right to

be free from cruel and unusual punishment in that they were deliberately indifferent to his

medical needs, all in violation of 42 U.S.C. § 1983.  Count III asserted, again pursuant to Section

1983, that Defendants failed to train and/or maintained wrongful customs, practices, and policies,

by presiding over a prison intake system that did not take into account the DOC probation

records of admitted inmates.  These policies are said to have both created the risk of an Eight

Amendment violation and to have led to an actual violation of Barkes' Eighth Amendment

protections.  Count IV asserted a wrongful death action under 10 Del. C. § 3724.

Plaintiffs argue that had the record contained Barkes' probation records, the Court would

have denied the summary judgment motion.  Defendants produced Barkes' probation records on

September 28, 2010.  (D.I. 198 at 2)  Among other things, the probation records show that

Barkes had attempted suicide twice in one day in September 2004 (D.I. 200 at RA10), had an

ongoing problems with substance abuse, and that his probation officer noted Barkes' mental

health troubles and proclivity to injure himself (*id.* at RA44-45).

In the Court's view, the probation records are new evidence that was not available to

Plaintiffs at the time the Court decided Defendants' earlier summary judgment motion.

However, the Court will deny Plaintiffs' motion for reargument because even the addition to the

record of the probation records does not warrant altering the decision to grant judgment to

Defendants on Counts I, III, and IV. Moreover, reargument is not necessary to prevent a manifest

injustice.

### A.    Count I

Plaintiffs allege that State Defendants Commissioner Taylor and Warden Williams

violated Barkes' Eighth Amendment right to be free from cruel and unusual punishment by their

deliberate indifference to his need for medical care while he was incarcerated at HRYCI. The

Court previously granted Defendants' motion for summary judgment on Count I. (D.I. 60)

Plaintiffs' request for reconsideration rests upon Barkes' probation records, which contain

information relating to his proclivity for attempting suicide, including attempts while under the

care of the DOC and/or probation officers.

Plaintiffs' burden is to demonstrate that Defendants "failed to act despite [their]

knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 518 U.S. 825, 842 (1994).

A "fact finder may conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious." *Id.* Obviousness of risk is determined by whether the risk is

"longstanding, pervasive, well-documented, or expressly noted by prison officials." *Id.* The

circumstances must point to Defendants having "been exposed to information concerning the risk

and thus must have known about it." *Id.*

Plaintiffs essentially argue that Defendants had knowledge of both the existence of

probation records and the fact that such probation records were not made available to DOC

personnel during the time Barkes was in custody in November 2004. These two points, they

contend, demonstrate Defendants' deliberate indifference to the danger posed to Barkes and others similarly situated to him. Assuming, as Plaintiffs appear to argue, that deliberate indifference in the context of Count I can be shown by Defendants' deliberate indifference to the medical needs of prisoners such as Barkes himself – and is not limited to evidence of deliberate indifference to Barkes personally – the Court nonetheless concludes that nothing in the probation records alters the prior conclusion: a reasonable factfinder could not determine that Defendants were deliberately indifferent to the risk of suicide.

The probation records make Barkes' suicide risk more pronounced, as they detail two suicide attempts while in custody and/or under supervision, as well as commentary from DOC personnel noting Barkes' mental instability. (D.I. 200 at RA10, RA44-45) However, based on the intake form Barkes completed, DOC personnel already knew that Barkes had attempted suicide in 2003 and had a history of mental health treatment. (D.I. 51 at A147-148) Based on their own contemporaneous observation of Barkes while he was in custody on November 13 and 14, DOC personnel saw nothing to alert them that he was suicidal at that precise time. (*Id.* at A1-10). The additional information provided by the probation records would not have materially altered this mix of information – and, more importantly, its absence does not demonstrate deliberate indifference by Defendants Taylor and Williams.

Accordingly, the Court denies Plaintiffs' motion for reargument with respect to Count I.

### B.   Count III

Plaintiffs allege that Defendants violated Mr. Barkes' Eighth Amendment rights by demonstrating deliberate indifference in failing to properly train and supervise DOC personnel and failing to institute appropriate policies regarding suicide prevention. Plaintiffs contend by

10

their motion for reargument that Barkes' probation records should have been made available to DOC personnel at the time he was in custody in November 2004. In Plaintiffs' view, that his probation records were unavailable constitutes an intake policy, implemented and supervised by Defendants, that created such a risk of suicide as to constitute deliberate indifference.

To succeed on a claim against supervisors based on prison policy or practices, Plaintiffs must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. (D.I. 60 at 17) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)

Plaintiffs identify three policy alternatives that the DOC failed to implement: (1) requiring a file to be made listing DOC inmates who had attempted to commit suicide while in custody; (2) requiring a newly-admitted prisoner's DOC file be reviewed upon the prisoner's intake; and (3) requiring a probation violator's DOC file to be reviewed upon the violator's incarceration. (D.I. 199 at 16). However, even assuming that the existing policy created an unreasonable risk of Eighth Amendment injury, there is still not sufficient evidence in the record from which a reasonable factfinder could conclude that Defendants were aware such an unreasonable risk was created and were indifferent to that risk. Moreover, given the mix of information about Barkes' suicide attempt and mental health history that was available to DOC personnel, combined with their direct observation of him, there is no basis to conclude that the additional information contained in Barkes' probation records would have led to the prevention of his suicide. Thus, Plaintiffs have failed to demonstrate that the injury resulted from DOC

11

policies.

Accordingly, Plaintiffs' motion for reargument with respect to Count III will be denied.

**C.     Count IV**

Plaintiffs assert a wrongful death claim against Taylor and Williams pursuant to 10 Del. C. § 3724. In order to prevail on such a claim, Plaintiffs must demonstrate Defendants engaged in "gross or wonton negligence." 10 Del. C. § 4001. "Gross or wonton negligence" may be shown by "deliberate indifference." *Saunders v. Sullivan*, 608 A.2d 730 (Del. 1992). Plaintiffs contend that the deliberate indifference demonstrated with respect to Counts I and III also constitutes the necessary showing on Count IV. (D.I. 199 at 17). However, the Court has found Plaintiffs' showing to be inadequate with respect to Counts I and III; it follows that their showing with respect to Count IV is inadequate as well. Thus, the Court will deny Plaintiffs' motion for reargument as to Count IV.

**D.     Additional Evidence**

In support of their motion for reargument, Plaintiffs present evidence in addition to Mr. Barkes' probation records. This evidence consists of deposition testimony of Commissioner Taylor, excerpts from NCCHC written materials detailing intake standards for suicidal prisoners, and several of Defendants' interrogatory responses.

As Plaintiffs acknowledge, the Court, in permitting them to file a motion for reargument, expressly limited the scope of such a motion to addressing the impact that the recently-produced probation records had on the Court's prior ruling on summary judgment. (D.I. 198 at 8) (granting leave to seek reargument "solely to the extent [Plaintiffs] wish to argue that the addition to the record of the Barkes probation records . . . should alter the Court's ruling") Plaintiffs' request

12

that the Court consider "additional evidence" is inconsistent with the Court's order. Nonetheless, the Court has considered all of the "additional evidence" submitted in connection with the motion for reargument. The Court concludes that none of this evidence, either by itself or in conjunction with the probation records, alters the conclusions reached above. Accordingly, again, the motion for reargument will be denied.

## II.    Motion to Supplement Motion for Reargument

Plaintiffs filed their motion for reargument on May 27, 2011. (D.I. 199) Subsequently, they obtained additional discovery, including the 1997 NCCHC policies and forms as well deposition testimony from DOC probation officer Robin Moyer, DOC Bureau Chief Joyce Talley, and Defendants Taylor and Williams. (D.I. 233 at PA56-79, PA109-120, PA53-55; D.I. 200 at RA58-90 )[3] On May 14, 2012, Plaintiffs filed a motion requesting leave to supplement their motion for reargument to account for this additional evidence. (D.I. 263)

As already explained in connection with the discussion of Plaintiffs' motion for reargument, although the Court permitted Plaintiffs to file a motion for reargument based only on the probation records, the Court has considered not just the probation records but all of the other evidence Plaintiffs have asked the Court to consider. Given that the record contains all of the evidence Plaintiffs wish for the Court to consider, and that the Court has considered all of this evidence in connection with evaluating the motion for reconsideration, essentially all that is left of Plaintiffs' motion to supplement is a request to submit additional briefing relating to the

---

[3]The Court has been unable to find the Robin Moyer deposition testimony in the record.

motion for reargument.[4] In light of the extensive briefing already provided, including briefing on

the cross-motions for summary judgment on Count V (which explicitly consider the new

discovery), and the oral argument on all pending motions, the Court concludes that further

briefing on the motion for reargument would be unhelpful and unnecessary.

Accordingly, the Court will grant the motion to supplement to the extent it seeks to

expand the record on the motion for reargument and deny it in all other respects.

## III.   Cross Motions for Summary Judgment on Count V

Plaintiffs and Defendants have filed cross-motions for summary judgment with respect to

Count V of Plaintiffs' Third Amended Complaint. Count V, brought pursuant to 42 U.S.C.

§ 1983, alleges that Defendants violated Barkes' constitutional rights to be free from cruel and

unusual punishment by failing to supervise and monitor First Correctional Medical ("FCM"), the

third-party medical provider at HRYCI at the time of Barkes' detention and suicide.[5] The Court

will deny both motions for summary judgment.

### A.    Sovereign Immunity and Qualified Immunity

Defendants contend that the Eleventh Amendment bars Plaintiffs' claim, as Defendants

cannot be sued in their official capacities. The Eleventh Amendment forbids suits in federal

---

[4]Both parties agreed with this assessment during the hearing. *See* Tr. at 27:13-25, 55:10-14.

[5]In *Woloszyn v. County of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005), the Third Circuit observed that a detainee's "vulnerability to suicide represents a serious medical need," so failure by a prison official to attend to such needs when she "knew or should have known" of their existence constitutes a violation of the detainee's civil rights. *See also Colburn v. Upper Darby Township*, 838 F.2d 663, 669 (3d Cir. 1988) ("A serious medical need may exist for psychological or psychiatric treatment. . . [F]ailure to take any steps to save a suicidal inmate from injuring himself may also constitute a due process violation.").

courts against a state absent "unequivocal indication that the State intends to consent to federal jurisdiction." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985). Consistent with the Eleventh Amendment, the doctrine of sovereign immunity protects state officials from liability if the suit is such that "the state is the real, substantial party in interest." *Pennhurst State School & Hosp. v. Halder*, 465 U.S. 89, 101 (1984); *see also Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) ("[R]elief sought nominally against an [official] is in fact against the sovereign if the decree would operate against the latter."). Plaintiffs respond that they are not suing Defendants in their official capacities but are, instead, suing Defendants only in their individual capacities. (*See, e.g.*, Tr. at 25-26)

As the Court previously held with respect to the same dispute in connection with Counts I, III, and IV, Plaintiffs' claims against Defendants must be dismissed to the extent such claims are brought against Defendants in their official capacities. (D.I. 60 at 11) However, to the extent Plaintiffs are proceeding against Defendants in their individual capacities, such claims are not barred by the Eleventh Amendment or sovereign immunity. (*Id.* at 12-13) Hence, Plaintiffs may proceed with Count V against Defendants in their individual capacities.

Defendants further argue that they are protected from liability under the doctrine of qualified immunity. Government officials performing discretionary functions are not liable for damages as long as they do not violate "clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating the applicability of qualified immunity, the Court must determine "whether a constitutional right would have been violated on the facts alleged" and, if so, whether the "right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Here, Defendants contend that Plaintiffs have failed to identify what

15

constitutional right was violated and add that "receiving an intake screening which Plaintiffs

believe to be inadequate" is not a "violation of a clearly established right." (D.I. 252 at 18)

Plaintiffs respond that Barkes' had a clearly established constitutional right to receive adequate

medical care and that they have demonstrated all of the elements necessary to show supervisory

liability pursuant to *Sample*, 885 F.2d at 1099.

The Court concludes that Count V is not barred by qualified immunity. Barkes had a

clearly established constitutional right to adequate medical care.[6] If Plaintiffs can demonstrate

that Defendants failed to supervise and/or monitor FCM in such a manner as to subsequently give

rise to Barkes' suicide, they may be able to impose liability on Defendants. *See generally*

*Sample*, 885 F.2d at 1099.

**B.      Failure to Supervise FCM**

Plaintiffs contend that in failing to supervise/monitor FCM to ensure proper prisoner

intake procedures were in place, Defendants Taylor and Williams acted with "reckless or

deliberate indifference" toward Barkes' need for medical care, thus violating his Eighth and

Fourteenth Amendment guarantees of protection from cruel and unusual punishment and due

process of law, respectively.[7] To the extent Barkes is viewed as a pretrial detainee, Plaintiffs

---

[6]*See Brown v. Plata*, 131 S.Ct. 1910, 1928 (2011) ("The basic concept underlying the Eight Amendment is nothing less than the dignity of man. . . . A prison that deprives prisoners of . . . adequate medical care . . . is incompatible with the concept of human dignity . . . .") (internal quotation marks omitted).

[7]The parties devote a significant amount of briefing to the issue of whether Barkes should be viewed as a pretrial detainee or, instead, a sentenced inmate. (*See, e.g.,* D.I. 232 at 18 n.3 ("In so far as Mr. Barkes was detained for a violation of parole, he had the status of a detainee and Fourteenth Amendment protections apply."); D.I. 252 at 3 ("State Defendants disagree with Plaintiffs [sic] claim that Decedent was taken to HRYCI as a pretrial detainee, and therefore 14th Amendment jurisprudence applies. . . . Decedent was brought to the HRYCI on an

must establish three elements: (1) that Barkes had a particular vulnerability to suicide; (2) that the

custodial officer or officers knew or should have known of that vulnerability; and (3) that those

officers acted with reckless indifference to the detainee's particular vulnerability. *See Woloszyn,*

396 F.3d at 320. With respect to the second prong, "[t]he strong likelihood of suicide must be

so obvious that a lay person would easily recognize the necessity for preventive action." *Id.* To

the extent Barkes is viewed as a sentenced prisoner (in custody on a violation of probation),

Plaintiffs must establish that Defendants exhibited "deliberate indifference" to "a substantial risk

of serious harm." *Farmer,* 511 U.S. at 828. Deliberate indifference is established by proof that

Defendants knew of the serious risk to Barkes' welfare and failed to act. Such knowledge of the

risk need not be actual and may be discerned from the fact that it was obvious, that is

"longstanding, pervasive, well-documented or expressly noted by prison officials." *Id.* at 842.

Plaintiffs argue, based on what they deem to be extensive documentation in Barkes' DOC

probation records of his mental health history, substance abuse, and prior suicide attempts, that

Barkes' vulnerability to suicide was "crystal clear and indisputable" and "should have been

known to Mr. Taylor and Mr. Williams and their charges." (D.I. 232 at 18) Citing *Sample,* 885

F.2d at 1099, Plaintiffs assert that Defendants presided over a prisoner medical screening process

– carried out by FCM – which Defendants knew was deficient, yet they failed to act to prevent

the risk of prisoner suicide that materialized and led to Barkes' death.

Plaintiffs identify numerous purported deficiencies that Defendants neglected to remedy:

FCM's failure to follow properly the NCCHC intake procedures, specifically in regard to the use

---

administrative warrant . . . as a sentenced offender.")) During oral argument, however, both
parties agreed that the Court need not determine Barkes' status, nor whether his rights were
governed by the Eighth and/or Fourteenth Amendments. (Tr. at 24-25, 53-54)

of an improper 1997 form; FCM's continued reliance on the 1997 intake forms even after those

forms had been eliminated from the 2003 NCCHC standards; FCM's failure to ensure Barkes'

intake screening was conducted by a qualified health professional – as defined by the 2003

NCCHC standards – rather than a Licensed Practical Nurse ("LPN"); and FCM's lack of access

to and failure to review DOC records of incoming inmates.

Plaintiffs assert that Taylor and Williams' knowledge of the deficient intake/medical

screening system can be inferred from their deposition testimony. For instance, Plaintiffs stress

Taylor's statement that he sought to abide by NCCHC protocols and both his and Williams'

admissions that each was aware of and concerned by FCM's deteriorating provision of medical

services. (D.I. 200 at RA58, RA66-67; D.I. 258 at PA135, PA136-37, PA144-45) Both

Defendants also testified to suspecting FCM of understaffing, so as to lower cuts and increase

revenue. (D.I. 258 at PA135, PA136-37) Eventually, in 2005, DOC terminated its contract with

FCM. (*Id.* at PA132-33) Defendants were also aware of problems with DOC's document

management computer system. (*Id.* at PA151, PA152-55)

Having reviewed the record and the briefing, and listened to the arguments of counsel at

the recent hearing, the Court concludes that there are numerous genuine disputes of material fact

that preclude a grant of summary judgment to either side on Count V. Among the disputed facts,

on which a reasonable factfinder could find for either side, are: (1) whether Barkes was

vulnerable to suicide on November 13 and 14, 2004, given that he had previously attempted

suicide four times (including three times while in custody and including twice within the past 65

days) but also given that he demonstrated no signs of vulnerability that were detected by DOC

officials and he had recently been under the treatment of two mental health professionals, neither

of whom – it appears – viewed Barkes as having a particular vulnerability to attempting suicide, and further given that Barkes received from DOC several prescription medications for mental health conditions but the record does not reveal what DOC learned about Barkes' then-present treatment in order to satisfy themselves it was appropriate to dispense such medications to him; (2) whether Defendants knew or should have known of Barkes' vulnerability to suicide, given his past record of suicide attempts but also given that FCM was implementing procedures that had been approved (to some degree) by NCCHC just the prior year; (3) whether any failure by DOC officials to know of Barkes' vulnerability to suicide was due to the suicide prevention policies implemented by FCM, given that the probation records (detailing Barkes' suicide attempts and other aspects of his mental health history) were not made available to DOC officials but also given that FCM was implementing procedures that had been approved (to some degree) by the NCCHC just the prior year and DOC was monitoring FCM's activities at least through monthly Medical Review Committee (MRC) meetings; and (4) whether Defendants were deliberately indifferent to a serious or obvious risk of harm, given that Barkes was not placed on even the lowest level of suicide watch but also given that FCM had screening mechanisms in place, Barkes did not demonstrate a present suicidal ideation, and another individual at HRYCI at the very same time was taken to the HRYCI infirmary due to concerns about vulnerability to suicide (arguably evidencing the diligence of FCM and DOC officials with regard to suicide prevention).

Genuine disputes of material fact are also present with respect to the elements Plaintiffs must demonstrate to establish supervisory liability on the part of Defendants Taylor and Williams. Pursuant to *Sample*, 885 F.2d at 1118, Plaintiffs must show: (1) the existing policy created an unreasonable risk of constitutional violation; (2) Defendants were aware that the

unreasonable risk was created; (3) Defendants were indifferent to that risk; and (4) the injury to

Barkes resulted from the policy. The disputed facts, on which a reasonable factfinder could find

for either side, include: (1) whether DOC's manner of supervising FCM's suicide prevention

policy created an unreasonable risk that someone in Barkes' position would commit suicide,

given the delegation of responsibility to an already-busy Bureau Chief Joyce Talley and Talley's

lack of a "key manager," but also given that FCM officials reported to Talley's deputy, Talley

herself participated in monthly Medical Review Committee meetings, and Talley's testimony to

the effect that it was not her duty to ensure FCM compliance with NCCHC standards;[8]

(2) whether Taylor and Williams were aware an unreasonable risk was created, given the number

of suicides that occurred in DOC facilities and their knowledge of "short staffing" but also given

that Defendants did not directly interact with FCM; (3) whether Defendants were indifferent to

the risk, given that DOC did not require FCM to change its policies (even after NCCHC altered

its standards) but also given that NCCHC performed an audit of HRYCI in 2003 and found it to

be in compliance; and (4) whether Barkes' suicide resulted from Defendants' failure to supervise

FCM, given that Barkes was not placed on even the lowest level of suicide watch but also given

that he was actually observed with frequency on the morning of November 14, 2004 and did not

appear to exhibit any suicidal intentions.

In seeking summary judgment for themselves, Defendants contend that Plaintiffs' claim

of failure to supervise/monitor a medical provider is not cognizable claim under § 1983.

Defendants rely on *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004), to argue that non-medical

---

[8]The Court has considered the parties' arguments and the deposition excerpts submitted
by letter following the oral argument. (D.I. 272; D.I. 273)

prison officials are justified in "believing that the prisoner is in capable hands" if he/she is under

the care of "medical experts." Only if such an official has reason to believe or actual knowledge

that the "prison doctors or their assistants are mistreating a prisoner" may such officials be found

liable. *Id.* Defendants assert that Taylor and Williams had no actual knowledge or reason to

believe that prisoners were being mistreated by FCM personnel, particularly as the DOC official

with direct supervisory responsibility over FCM was DOC Bureau Chief Joyce Talley, not either

of the Defendants.

Defendants' arguments do not justify granting their motion for summary judgment. The

viability of Plaintiffs' theory that Defendants may be liable for failure to supervise FCM was

largely decided when the Court denied Defendants' motion to dismiss. (D.I. 185; *see also*

*Jackson v. Taylor*, 2006 WL 2347429, at \*2 (D. Del. May 12, 2006) ("While vicarious liability is

not available, supervisory liability may attach if the supervisor implemented deficient policies

and was deliberately indifferent to the resulting risk or if the supervisor's actions and inactions

were 'the moving force' behind the harm suffered by the plaintiff.")). Additionally, Defendants

have cited no case holding that a failure to supervise claim cannot be made out in the context of a

failure to supervise a third-party provider of medical care in a prison facility.[9] Defendants'

---

[9]*Spruill*, 372 F.3d at 236, holds that non-medical prison officials are not *vicariously* liable
for injuries to inmates resulting from the provision of medical care by trained physicians. Here,
however, Plaintiffs do not seek to impose vicarious liability on Defendants for the misdeeds of
FCM personnel but, rather, contend that Taylor and Williams themselves are responsible for
Barkes' harm by having failed to ensure that a proper system of medical intake procedures was in
place and implemented at the HRYCI. Moreover, *Spruill* contemplates that liability may be
imposed on an official who has "reason to believe (or actual knowledge) that prison doctors or
their assistants are mistreating (or not treating) a prisoner." *Id.* at 236. Plaintiffs' failure to
supervise claim alleges that Taylor and Williams were aware of the deficiencies to the prisoner
medical intake procedures facilitated by FCM, and there is evidence from which a reasonable
factfinder could so find.

contentions regarding the role of Ms. Talley do not warrant granting summary judgment but, instead, are part of the mix of genuine disputes of material fact, as explained above.

Defendants additionally argue that supervisory liability cannot be established under § 1983 because such suits cannot be based upon theories of *respondeat superior*. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). As the Court has previously stated, it is undisputed that neither Taylor nor Williams had any personal involvement with Barkes' suicide. (D.I. 60 at 16) However, Plaintiffs seek to hold Defendants Taylor and Williams liable for their *individual* actions (in failing to supervise) rather than for the actions of their subordinates.

In sum, the record is such that a reasonable factfinder could find that Plaintiffs have proven all of the elements of their claim, so summary judgment for Defendants is not warranted. However, the record is also such that a reasonable factfinder could alternatively find that Plaintiffs have failed to prove all of the elements of their claim, rendering summary judgment for Plaintiffs improper. Accordingly, the Court will deny both cross-motions for summary judgment and set the case for trial on Count V.

## IV.     Motion for Extension of Time to Designate an Expert

Plaintiffs seek to extend the time for designation of an expert. Under the governing scheduling order, the time for designating an expert on an issue for which a party bears the burden of proof was October 11, 2011. (D.I. 197) Under previous scheduling orders in this case, the deadline for designating an expert was May 31, 2007 and November 15, 2010. (D.I. 17; D.I. 164) At no time has Plaintiff designated an expert.

Plaintiffs now wish to provide expert testimony regarding the 1997 NCCHC standards, in particular with regard to prisoner intake procedures and intake forms. Plaintiffs argue that the untimeliness of their request results from the delayed production of the 1997 NCCHC standards by Defendants. Plaintiffs also point to the deposition testimony of several DOC employees, including Defendants Taylor and Williams, which speak to the importance of the 1997 NCCHC standard. These depositions were only recently conducted.

Defendants oppose Plaintiffs' request. They argue that Plaintiffs are at fault for failing to meet the deadline and granting the requested extension would prejudice Defendants. Defendants further contend that the 1997 NCCHC standards are irrelevant and that any expert who would testify on the points on which Plaintiffs wish to present an expert would fail to meet the requirements of Federal Rules of Evidence 402 and 703.

Federal Rule of Civil Procedure 16(b)(4) provides "a schedule may be modified for good cause and with the judge's consent." The "good cause standard under Rule 16(b) hinges on the diligence of the movant, and not on prejudice to the non-moving party." *Roquette Freres v. SPI Pharma, Inc. CA*, 2009 WL 1444835, at *4 (D. Del. May 21, 2009). Here, Plaintiffs have failed to demonstrate good cause for their repeated failure to meet the deadlines for designating an expert. Thus, Plaintiffs' motion will be denied.

The Court is unpersuaded by Plaintiffs' contention that Defendants are at fault for the belated production of the 1997 standards. The NCCHC is an independent body and the Court discerns no reason from the record that would have prevented Plaintiffs from obtaining the 1997 standards and intake forms at an earlier point in this litigation. Additionally, Plaintiffs' contention that they needed to complete certain depositions before they could recognize that they

needed an expert is unavailing.  If Plaintiffs felt that Defendants were being too slow in making

their witnesses available, Plaintiffs could have sought relief from the Court pursuant to its

Discovery Matters procedures.  (*See* D.I.197 at 3, para. 1(e))  More fundamentally, Plaintiffs

could have asked for an extension prior to the expiration of the deadline for designating an

expert.  Finally, in considering whether the Court should exercise its discretion to assist Plaintiffs

under these circumstances, the Court observes that, by moving for summary judgment on the

only remaining count (Count V), Plaintiffs represent that they are of the view that the record

already contains adequate evidence from which a reasonable factfinder must find for Plaintiffs,

even absent any expert testimony.

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion to supplement its motion for

reargument is granted to the extent it seeks to expand the record on the motion for reargument

and denied in all other respects.  All of the other pending motions – Plaintiffs' motion for

reargument, Plaintiffs' motion for leave to designate an expert, and both sides' cross-motions for

summary judgment on Count V – are denied.  An appropriate Order will be entered.